**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **United States of America,** | ) | **CASE NO. 1:16 CR 224** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| Vs. | ) | |
| | ) | |
| **Bogdan Nicolescu,** *et al.***,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendants.** | ) | |

This matter is before the Court upon the United States of America's Motion in Limine Regarding Authentication (Doc. 108). For the reasons that follow, the motion is GRANTED in PART and DENIED in PART.

The government seeks a pre-trial determination that certain exhibits it intends to introduce are authentic. Specifically, the government identifies digital devices seized by the Romanian government in connection with this investigation. According to the government, the devices belong to Nicolescu, Miclaus, or Danet. Danet is expected to testify with regard to the devices the government claims are his, and Miclaus filed no objection with respect to his devices. Accordingly, because Danet and Miclaus do not object to the authenticity of these

devices, the Court finds that the government satisfies its burden on this issue as to these defendants.

The government identifies three electronic devices associated with Nicolescu. Two are cellular telephones and one is a hard drive. Nicolescu does not object to the authenticity of the cellular telephones. With regard to the hard drive, Nicolescu argues that there is a break in the chain of custody and a lack of "distinctive" characteristics tying the hard drive to him. Upon review, the Court finds that the government has established a *prima facie* case for authentication. The government indicates that two FBI agents were present during the search in Romania and are expected to testify that the hard drive was discovered in Nicolescu's residence at the time of his arrest and placed in wax-sealed bags. Romanian law enforcement seized the evidence and, two days later, provided it to the FBI. Although there is a "break" in the chain of custody in that the government does not appear to have a witness to testify as to the location of the hard drive during the two days it was in the possession of Romanian law enforcement, the government does have a forensic examiner who will testify that no activity occurred on the device as of the date it was seized. In addition, the FBI will testify that a comparison of the inventory sheet occurred and the evidence was still in wax-sealed bags when the FBI received it from Romanian officials. And, defendant points to no evidence or suggestion that the hard drive was in fact altered. Because the government demonstrates that there is "no reasonable probability" that the hard drive removed from Nicolescu's residence was altered, the Court finds that the government satisfies its *prima facie* burden to show authenticity. *United States v. Allen,* 106 F.3d 695, 700 (6th Cir. 1997). The jury is free to weigh the break in the chain of custody in evaluating this evidence.

Defendant Nicolescu next objects to the authenticity of documents obtained from the Romanian authorities, who conducted real-time internet monitoring of Nicolescu's home internet. According to the government, the United States requested that Romanian officials conduct such monitoring and provide the results to United States officials. The FBI received the results of the monitoring and reviewed the surveillance records. The United States expects to call a witness to testify to the foregoing. In addition, the United States indicates that it will call a former Romanian officer who will testify as to the general process by which Romanian authorities conduct this type of internet surveillance, although it does not appear that he was involved in the surveillance at issue. The United States further states that it will call cooperating defendant Danet, who will testify that the surveillance obtained from his residential internet service appears to be accurate. With regard to Nicolescu, *i.e.*, the only objecting defendant, the government points out that the 23 documents at issue contain identifying markers of Nicolescu, including the use of various monikers associated with him. Upon review, the Court declines to make an authenticity determination at this point. The government admittedly does not have a witness who was involved in the surveillance. As such, the Court prefers to hear the live testimony of the FBI witnesses, former Romanian authorities, Danet, and further to hear the testimony that associates the monikers with Nicolescu before making an authenticity determination.

The government next asks that the Court determine the authenticity of three screenshots it obtained from conducting Google searches. According to the government, certain monikers and other identifying markers tie the documents to defendant Miclaus. Although Miclaus lodged no objection with respect to authenticity, Nicolescu objects to the manner in which the evidence

3

was obtained. According to Nicolescu, current events reveal the impropriety of authenticating exhibits through the open source internet. In reply, the government indicates that it seeks to authenticate these exhibits through the "distinctive characteristics" of the posts themselves. In addition, the government intends to introduce the witnesses that took the screenshots. The government further notes that it will rely on these exhibits in order to show how the government identified the Bayrob group.

Upon review, the Court finds that the government meets its *prima facie* burden for authentication with respect to these three screenshots. The government intends to introduce the individuals that conducted the internet research. And, according to the government these witnesses used the results of the research they conducted to identify the members of the Bayrob group. In this context, the Court finds that the government satisfies its *prima facie* burden.

For the foregoing reasons, the government's motion is GRANTED in PART and DENIED in PART. The Court GRANTS the government's motion with respect to all documents contained therein with the exception of the documents obtained from the Romanian authorities' real-time internet monitoring of Nicolescu's residential internet. The Court notes that for documents it did not authenticate at this time, defendant must object at trial in order to preserve his objection. The Court will not *sua sponte* revisit these issues.

IT IS SO ORDERED.

      /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge
Chief Judge

Dated: 3/1/19