## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:16-CR-00224 |
| | ) | |
| Plaintiff, | ) | JUDGE GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | **DEFENDANT RADU MICLAUS'** |
| | ) | **PRELIMINARY SENTENCING** |
| RADU MICLAUS, et al. | ) | **MEMORANDUM** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

Now comes Defendant Radu Miclaus (the "Defendant"), by and through counsel, and hereby submits the Defendant's "preliminary" sentencing memorandum. The Defendant would like to reserve the Defendant's right to rebut the evidence adduced/admitted at the December 5, 2019 sentencing in this matter to the extent that the Government produces previously undisclosed evidence of sentencing factors and loss.

## I. <u>Introduction</u>.

There are some rather unique aspects to this case, including but not limited to the large volume complicated nature of the evidence, the fact that my client went to trial after having very successfully proffered to the Government, the "grouping" provisions

of the Guidelines and the inequitable stacking set forth in the PSI.  Further, there are also a strong amount of information that requires that the trial court depart from a strict and severe application of the Guidelines as demanded by the Government. Further still, even if the Guidelines as written conceivably prevent the application of any departures, the factors in 18 USC 3553(a) warrant a departure or variance.  In the end, the Court's sentence is within the Court's discretion and must, in the end, be primarily based on the core factors set forth in 18 USC 3553(a).

Further, for purposes of the Defendant's individual sentencing issues, the Defendant incorporates by reference the Sentencing Memorandum filed by defendant Bogdan Nicolescu on November 22, 2019 (the "Nicolescu Memorandum").

## II.  **This Court has the discretion to not follow the Guideline calculation in the PSI**.

As stated above, this Court's sentence is within the discretion of this Court and must, in the end, be primarily based on the core factors set forth in 18 USC 3553(a).  As this Court knows, 18 USC 3553(a) provides:

> **(a) Factors To Be Considered in Imposing a Sentence.**
> The court shall impose a sentence sufficient, ***but not greater than necessary***, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
>
> > (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> >
> > (2) the need for the sentence imposed—
> > > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for—
    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
        (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
        (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

**** 

(5) any pertinent policy statement—
    (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
    (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Further, 18 USC 3553(b) allows this Court to vary or depart from the suggested Guideline range of this Court "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." Further, as discussed in Chapter 1, Part A of the Guidelines Manual:

The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies

but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

### III. **The *Booker* and *Kimbrough* cases allows this Court to depart or vary if the strict adherence to the Guidelines is grossly unfair.**

In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme Court of the United States made the then-mandatory Guidelines "effectively advisory." Thereafter, district courts were free to impose sentences that took into account the "history and characteristics of the defendant," the "nature and circumstances of the offense," disparities in sentences that might be "unwarranted," and other factors to fashion a sentence that is "sufficient but not greater than necessary" to achieve the overall goals of sentencing. Then in <u>Kimbrough v. United States</u>, 552 U.S. 85 (2007), the United States Supreme Court went even further in allowing district courts to disregard Guideline advisory sentences altogether if the advisory sentence is grossly inequitable.

It is anticipated that the United States will advance an argument that the Defendant should receive a sentence of 6,180 months to life - as set forth in the PSI report (USSG §5G1.2(b)). Here is why that sentence is grossly inequitable.

The Government was initially wiling to let the Defendant get (with 5K assistance) to a sentence of 94-111 months. At that time, the Government had all of the same facts and evidence that the Government presented at trial. At that time, the Government

believed in good faith that a sentence of 94-111 months fit the principles of 18 USC 3553.

The only thing that changed the Government's position was the Defendant's election to proceed with trial.   Nothing more. Nothing.

Accordingly, it stretches logic and equity for the Government to now take the position that the principles of 18 USC 3553 warrant a sentence that is essentially *sixty-five (65) times* longer than the pre-trial position.   Nothing has changed but the Defendant's exercise of his Constitutional right to a trial.   Nothing.

By the way, according to the United States Sentencing Commission "Quick Facts" Memorandum on Theft, Property Destruction and Fraud[1] determined:

A.   The average sentence length for theft, property destruction, and fraud offenders was 24 months; and

B.   23.9% received a substantial assistance departure and their average sentence reduction was 61.3%; and

C.   6.3% received some other downward departure and their average sentence reduction was 55.7%; and

D.   37.6% received a variance, and of those offenders 95.0% received a downward variance and their average sentence reduction was 53.0%;

E.   The average guideline minimum and average sentence imposed has remained relatively steady over the past five

---

[1]   A copy of the "Quick Facts" memorandum is attached hereto and made a part hereof as Exhibit A.

years; and

1.   The average guideline minimum decreased from 33 months in fiscal year 2014 to 32 months in fiscal year 2018; and

2.   The average sentence imposed was 24 months in both fiscal year 2014 and fiscal year 2018.

There are similar significant factors concerning convictions and sentences for Money Laundering.[2]   According to the United States Sentencing Commission "Quick Facts" Memorandum for Money Laundering:

A.   The average sentence for money laundering offenders was 65 months; and

B.   Only 37.7% were sentenced within the guideline range; and

C.   53.0% received a substantial assistance departure, and their average sentence reduction was 58.9%; and

D.   8.9% received some other downward departure and their average sentence reduction was 62.6%; and

E.   39.7% received a variance and of those offenders: 98.0% received a downward variance and their average sentence reduction was 48.3%; and

F.   The average sentence imposed decreased from 67 months in fiscal year 2014 to 65 months in fiscal year 2018.

Further still, there are similar significant factors concerning convictions and sentences for Copyright and Trademark

_____

[2]   A copy of the "Quick Facts" memorandum is attached hereto and made a part hereof as Exhibit B.

Page 6 of  27

Offenses.[3]   According to the United States Sentencing Commission "Quick Facts" Memorandum for Copyright and Trademark Offenses:

A.   The average sentence for copyright and trademark offenders was 11 months; and

B.   Only 32.0% were sentenced within the guideline range; and

C.   48.0% received a substantial assistance departure and their average sentence reduction was 69.8%; and

D.   20.0% received some other downward departure, and their average sentence reduction was 76.9%; and

E.   62.1% received a variance, and of those offenders 100.0% received a downward variance and their average sentence reduction was 77.2% and

F.   The average sentence imposed decreased from 13 months in fiscal year 2014 to 11 months in fiscal year 2018.

## IV.  Specific Objections to the PSI requests for Departures and requests for Variances.

The Defendant sets forth his objections to the PSI in the following fashion and procedure.  First, the Defendant will indicate (by reference to the paragraphs in the PSI) where the Defendant objects, and what the Defendant believes are the proper findings and calculations.  Second, the Defendant will discuss the application of what the Defendant believes are appropriate "departures" from any absolute, strict and inequitable application

_____

[3]   A copy of the "Quick Facts" memorandum is attached hereto and made a part hereof as Exhibit C.

of the Guidelines.  Third, the Defendant will discuss the unique aspects of this rare case that unconditionally invite a large variance from whatever the final discretionary sentence suggested by the Guidelines.

    A.    **The PSI Guideline Objections.**

        1.    ¶4 - There was no evidence that the Defendant was involved with any theft of any crypto-currencies.  There was evidence that the so-called Botnet" was used for what is called "cryptomining, which involved just using a number of people's home computers in order to boost the computer power of the defendants so that there was a greater ability to engage in normally legal conduct; to wit: generating cryptocurrency by solving complicated computer calculations.  A cryptocurrency miner has to crack a code, and is then rewarded by being able to authorize the transaction, and in return for the service provided, cryptominers earn small amounts of cryptocurrency of their own. In order to be competitive with other cryptominers, though, a cryptocurrency miner needs a computer with specialized hardware. Instead of the so-called specialize computer hardware, the defendants allegedly partially used a small portion of a large number of home

computers in order to have this specialize computer hardware. The process did allegedly slightly (and unnoticeably) slow down yet-to-be specifically identified individual computers, but no individual witnesses testified that they saw their computers slow down due to any of this cryptomining (or lost any data or money). Accordingly, the reality is that was no identifiable loss to any person/victim at all when it came to this activity.

2. ¶8 The 18 USC 3559(g) Domain Name Enhancement. The defendants were acquitted of this enhancement. ¶8 fails to point this out sufficiently (but does so in ¶13). Further, in the event that the Government attempts to imply that the Court can depart upward despite this acquittal, it has to be pointed out that not a single witness or exhibit which indicated that the Defendant had any direct or indirect involvement in any registration activity at all.

3. ¶15 Although the Defendant opted to go to trial and not testify at trial, the fact that the PSI appears to rely almost exclusively on numbers and theories of loss provided by the

Government is concerning. Further, there appears nothing in the PSI that provides any independent accounting or calculations of the loss advanced by the Government.

4.    ¶16  There was not any testimony at trial that showed how the Defendant was specifically involved with 60,000 computers.

5.    ¶17  There was not any testimony at trial that showed how the Defendant was specifically involved with 500 victims.

6.    ¶s 18, 19, 20, and 21

This alleged involved sophisticated computer programing techniques. Although there was ample evidence presented at trial about the advanced computer skills possessed by Bogdan Nicolescu ("Nicolescu") and others, no person or any exhibit identified the Defendant as having any such skills or utilizing such skills in this case.

7.    ¶25-42

The "four scheme" structure set forth in the indictment, and the duplicative stacking of multiple counts in the indictment, were designed solely by the Government to achieve a potential maximum sentencing effect.

8.    ¶43  The Defendants were acquitted of the False

Domain Registration enhancement.

9.   ¶44  As of the date of the PSI, the Government has yet to provide the Probation Officer with "restitution amounts."   Accordingly, the Defendant objects to any such restitution amounts being presented at sentencing.

10.  ¶46  Although the Defendant did in fact go to trial, he long ago engaged in a long and meaningful and very fruitful proffer with the Government (hereinafter, the "Proffer Factor").   The Proffer Factor will be addressed in the Departure and Variance discussions.

11.  ¶47 and ¶49.

It *now* appears that the Government has taken the position in the PSI that the loss here is $9.5 million to $25 million.  This alleged loss has gone up from $3.5 million to $4.5 million in the initial PSI.  In that regard, regardless of what position the Government now takes after the issue date of the PSI, the Government should be functionally forever locked itself into this loss amount for purposes of USSG §2B1.1(b)(1)(J).

Further, as it relates to the "sophisticated means" 2 level increase as set forth in ¶49

(which relies on USSG §2B1.1(b)(10)(B) and (C)), although there was a testimony and evidence at trial that there were semi-sophisticated methods used by well-trained members of the so-called "Bayrob Group" to engage in the computer activities at issue here, there was a glaring absence of any evidence that the Defendant himself was involved with any direct participation of any development or maintenance of any such sophisticated system. At best, the Defendant was nothing more than an unsophisticated mule or mope in the activities of Mr. Nicolescu and others (hereinafter generically referred to as the "Mope Factor").[4]

Further, although the 2018 Guidelines were used in determining the PSI, it may indeed be unconstitutional for the PSI or the Government to assert that the 4 level increase for a 18 USC 1030 to apply here. As it applied to the ex post-facto arguments, the Defendant incorporates the same objections set forth in

---

[4]   In the event the Government attempts to argue that the Defendant educational/vocational background in engineering should be utilized by this Court as a foundation for a "sophisticated means" increase, such an argument is technically prohibited.  See *§5H1.2. Education and Vocational Skills* which seeming bars either the Government or a defendant from asserting educational or vocational skills as a basis for any departure.

Nicolescu's Memorandum as to ¶49.

12. ¶50 Same objection as in Nicolescu's Memorandum.

13. ¶51 Same Mope Factor here. Further, to the extent not otherwise already made clear, the application of USSG §2S1.1(b)(3) in ¶51 is just really nothing more than a duplication of the data and theory set forth in ¶49 as to "sophisticated means," and in that regard is just an attempt to "stack" USSG §2S1.1(b)(3) onto USSG §2B1.1(b)(10)(B) and (C) referred to and relied upon in ¶49.

14. ¶53 There was no "public or private trust" evidence presented at trial. So this theory cannot apply here. Further (from a "special skill" standpoint), as indicated earlier, the Mope Factor applies here. Further still, the application of USSG §3B1.1(b) is just really nothing more than a duplication of the data and theory set forth in ¶49 as to "sophisticated means," and in that regard is just an attempt to "stack" USSG §3B1.1(b) onto (A) USSG §2B1.1(b)(10)(B) and (C) referred to and relied upon in ¶49 and (B) USSG §2S1.1(b)(3) referred to and relied upon in ¶51.

15. ¶ 54. Although no submitted as a per se obection to

the PSI, the PSI obviously concludes that there is absolutely no proof offered at trial that the Defendant was in any way a manager or supervisor in the alleged Bayrob conspiracy. None.  The evidence is that he was employed literally full time in other professions and jobs (including but not limited to a professional sky diving job).  In fact, when it comes to the Departures applicable to this case, there is little question that the evidence adduced at trial shows that the Defendant had (when compared to others in the case - charged and uncharged) a "minor" role in the Bayrob Group and should in fact get a 2-level reduction here.

16   ¶59   Accordingly, the Defendant should in fact have an adjusted base level/total offence level of 29.

17. ¶57   Although the Defendant put the Government to the task of trial, the Proffer Factor applies here.

18. ¶84.   The Defendant should not be sentenced to 6,180 month s(i.e. 515 years).  Further, although the 2-year sentence for Counts 16 through 20 (Identity Theft) must be run consecutive to the sentence for the other counts in this case, the

sentences for Counts 16 through 20 may be run concurrent with each other.

19.   ¶113 There are departures that apply to the Defendant.   They will be discussed below.

20.   ¶115   There are possible grounds for a variance that apply to the Defendant, and the PSI seems to indicate that this Court should consider them. They will be discussed below.


**B.**   <u>**Applicable Departures.**</u>

**1.**   **Minor Role.**   **USSG §3B1.2**

As stated on page 19 of the USSC 2019 Aggravating and Mitigating Role Adjustments Primer (the "Role Primer Memo")[5]:

In 2015, the Commission amended the Commentary to §3B1.2 to address this circuit conflict and generally adopted the approach of the Seventh and Ninth circuits. Application Note 3(A) now specifies that, when determining mitigating role, the defendant is to be compared with the other participants "***in the criminal activity***." Thus, the relative culpability of the "average participant" is measured only in comparison to those persons who actually participated in the criminal activity, rather than against "typical" offenders who commit similar crimes.

Further, as set forth on page 3 of the Role Primer Memo, even an uncharged informant may be considered a "participant" for purposes of a role adjustment.

---

[5]   A copy of the 28-page January 2019 "Primer" on ***AGGRAVATING AND MITIGATING ROLE ADJUSTMENTS: §3B1.1 & §3B1.2*** is not attached to this Sentencing Memorandum but can be circulated to this Court and the Government if need be. It is available on the United States Sentencing Commission website at https://www.ussc.gov/guidelines/primers/aggravating-and-mitigating-role-adjustments.

See <u>United States v. Dyer</u>, 910 F.2d 530, 533 (8th Cir. 1990). See also <u>United States v. House</u>, 872 F.3d 748, 752 (6th Cir.), *cert. denied*, 138 S. Ct. 367, 199 L. Ed. 2d 270 (2017).  Further still, on page 4 of the Role Primer Memo, it reads:

Courts "uniformly count as participants" those "who were (i) aware of the criminal objective, and (ii) knowingly offered their assistance." Consistent with this principle, persons who are not co-conspirators can be "participants" if they aid the defendant with knowledge of the criminal activity. Accordingly, the definition of a "participant" is broader than the scope of conspiratorial liability. For example, in *United States v. Aptt*, the court held that the defendant's high-level employee, who continued to solicit investments despite knowing that the company was operating a Ponzi scheme and made knowingly false representations to potential investors, was a "participant" in the criminal activity. Similarly, in *United States v. Alfonzo-Reyes* the court held that the defendant's wife was a "participant" in his fraud scheme where she knowingly falsified government loan applications at her husband's direction. Courts also count as a "participant" a person that is deceased at the time of the defendant's sentencing, if that person participated in the criminal activity. Additionally, some courts have concluded that a person who has received a grant of immunity is still properly counted as a "participant."

Further still, Application Note 5 to USSG §3B1.2(b) provides a "2-level reduction for *minor participants* applies to defendants who are 'less culpable than most other participants in the criminal activity, but whose role could not be described as minimal.'" See page 21 of the Role Primer Memo.

Further still, page 23 of the Role Primer Memo goes on to state that " ...in order to determine whether to apply §3B1.2, the courts should look at the defendant's role 'in the conspiracy as a whole,

including the length of his involvement in it, his relationship with the other participants, his potential financial gain, and his knowledge of the conspiracy.'"

Further still, as pointed out on pages 24 through 26 of the Role Primer Memo, drug couriers or mules (in the context of a drug conspiracy) can often be given a significant role reduction/departure based upon the fact specific involvement they had, and the that it is very permissible for a Court to examine how "critical" the mule was to the organization as a whole.  In fact, as footnote 109 of the Role Primer Memo states, §3B1.2 has clarified that there is to be no implied discouragement for a Court to apply a role reduction/adjustment for mules when the fact and equitable circumstances indicate one should apply. Given the evidence adduced at trial (as voluminous as it was), it is relatively clear that (as stated above relative to the Mope Factor) the Defendant was not in any real identifiable way anything other than a part-time/passive participant in a criminal enterprise designed and managed and operated by Nicolescu.   It is clear from the evidence at trial that even co-defendant Danet had much more "code" writing involvement and managerial

involvement in the criminal enterprise than did the Defendant.  Perhaps more disturbing, it is also further clear from the evidence at trial that a number of other Romanian witnesses (uncharged in the United States as part of their deal for their testimony) had much more "code" writing involvement and managerial involvement in the criminal enterprise than did the Defendant.

2.  **Substantial Assistance.**  **USSG §5K1.1**

The Government and the Court are well aware that the Defendant proffered early in this case - and proffered quite well.  The proffer offered to the Government without question provided the Government with "substantial assistance" into the criminal enterprise created and managed by Nicolescu and others.  There is simply no debate about this.[6] None.  For purposes of these objections to the PSI and for all sentencing purposes, the Defendant (as previously set forth above) refers to this unconditional truth as the "The Proffer Factor." What is unique about this particular case is that the Defendant decided not to take the plea offer

_____

[6]  As the Court may recall, because of this proffer the Government filed a pretrial motion in limine barring The Defendant from arguing various trial issues because of the expansiveness of the proffer delivered by The Defendant.

demanded by the Government - primarily because of how harsh he believed that plea offer to be (i.e. in light of the Proffer Factor and the Mope Factor). Instead, the Defendant sat at his trial table, behind Nicolescu, and watched the trial with the undersigned counsel, in what can only be described as a polite protest to the plea offer demanded by the Government. So, of course, the Government has no intention of making any 5K motion for substantial assistance, something they would have clearly done had the Defendant taken the plea offer. This is the only technical barrier to this Court applying a level reduction for this undisputed substantial assistance.

As stated on page 12 of the 2019 Departures and Variances Primer (the "Departures/Variances Primer Memo"):

"Although the district court's authority to grant a departure for substantial assistance is conditioned on the government's motion, a district court may review the government's refusal to make a substantial assistance motion, if such refusal was (1) prompted by an unconstitutional motive, such as the defendant's race or religion; or (2) not rationally related to a legitimate government interest."

Further, as pointed out on page 13 of the Departures/Variances Primer Memo, "Some circuits have held that it is unconstitutional for the government to withhold a substantial assistance motion to penalize a cooperating defendant for

taking his own case to trial," citing United States v. Murphy, 591 F. App'x 377, 387 (6th Cir. 2014) (noting that "prosecutors should exercise caution in declining to file substantial-assistance motions in connection with a defendant's decision to go to trial").

Further still, as will be discussed below with respect to a variance, a district court also may, even absent a government motion for a substantial assistance reduction, consider a defendant's cooperation as a possible basis for a variance under § 3553(a)(1). See United States v. Robinson, 741 F.3d 588, 599-601 (5th Cir. 2014).

3. **Departures in general - Departures not Specifically enumerated in the Guidelines.**

As stated on page 14 of the Departures/Variances Memo:

A court may depart from the applicable guideline range if it finds an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that . . . should result in a sentence different from that described." As discussed in Chapter 1, Part A of the *Guidelines Manual*:

The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

Here are some of the unique circumstances of this

case, taken together as a whole,[7] as they relate to the Defendant that take this case (and the accompanying sentence) outside of the proverbial heartland of cases like this.

1. **The Proffer Factor.**  In the event the Defendant took his plea offer, he would have had a plea agreement that requested that this Court sentence him to 94-111 months.  The only thing that changed was his election to go to trial.  Nothing more.

2. **The Mope Factor.**  Already discussed above.

3. **Absence of any Obstruction of Justice.** ¶45 and ¶54 make it unconditionally clear that the Defendant did not directly or indirectly obstruct any aspect of the 10-year complicated investigation.  Compare this to the active and verbally insulting efforts Nicolescu engaged in while he knew the authorities were

---

[7]  As set forth in the Departures/Variance Primer Memo (page 43):

> A court may depart from the applicable guideline range based on a combination of two or more offender characteristics or other circumstances, none of which otherwise independently suffice to provide a basis for departure, only if:
> (1) such offender characteristics or other circumstances, taken together, make the case *exceptional*; and
> (2) each such offender characteristic or other circumstance is–
>    (A) present to a *substantial degree;* and
>    (B) *identified in the guidelines as a permissible ground for departure*, even if such offender characteristic or other circumstance is not ordinarily relevant to a determination of whether a departure is warranted.

investigating the Bayrob Group.

4. ***USSG §5H1.9 - Dependence upon Criminal Activity for a Livelihood.*** Romania and the lack of economic opportunity. Although certainly not an excuse for any proven conduct of the Defendant in this case, it is clear from the background set forth in the PSI (¶s 68 to 80) that Romania as a country simply does not present anywhere near the same return for hard work and commitment as does the United States. In fact, one of the witnesses called by the Government to testify at trial made it clear that almost all of the kids in high school computer class were learning how to engage in computer fraud (as if it a national sport like baseball). In general, the Guidelines cannot have taken this Romania factor into consideration when they were drafted or amended.

C. <u>**Variances**</u>.

As set forth on page 44 of the Departures/Variance Primer Memo (emphasis supplied):

A "variance" outside the guideline range provided for in the *Guidelines Manual* should occur ***after*** consideration of all relevant departure provisions. Courts have held that variances ***are not subject to the guideline analysis for departures***. In some situations, a ***prohibited ground for departure may be a valid basis for a variance***. Variances are not subject to notice requirements applicable to departures (see

Page 22 of  27

discussion above). ***A court may grant a departure and a variance in the same sentence*** (*e.g*., a departure for substantial assistance and a variance for the defendant's history and characteristics). In sum, the ability to vary preserves district courts' ultimate ability to impose, ***regardless*** of what the guideline range is found to be, a sentence that it views is "sufficient, but not greater than necessary" to serve the goals of sentencing.

In connection with the Defendant's pursuit of an equitable variance, the Defendant incorporates by reference all of the contents of his objections here, including the issues presented in the Departures section above. As to the Proffer issue, case law permits a variance even if the Government does not make a 5K motion. See United States v. Massey, 663 F.3d 852 (6th Cir. 2011); United States v. Leiskunas, 656 F.3d 732 (7th Cir. 2011); United States v. Landrón-Class, 696 F.3d 62 (1st Cir. 2012); United States v. Doe, 398 F.3d 1254 (10th Cir. 2005); and United States v. Robinson, 741 F.3d 588 (5th Cir. 2014).

In addition, for variance consideration purposes, the Defendant points out other facts and issues relevant to a variance:

1. Zero criminal history points; and

2. Zero chance of the Defendant re-offending (see 18 USC 3553(a)(2) - protecting the public form future criminal activity of a defendant); and

3. The Defendant will be deported back to Romania after his sentence. See page 46 of the Departures/Variances Primer Memo wherein the USSC

states:

> See, *e.g.*, *United States v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014) (holding that "a district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family"); *United States v. Flores-Olague*, 717 F.3d 526 (7th Cir. 2013) (stating a "sentencing court is well within its prerogatives and responsibilities in discussing a defendant's status as a deportable alien"); *United States v. Morales-Uribe*, 470 F.3d 1282 (8th Cir. 2006) (observing that "the need to protect the public from a defendant may be reduced in a case where, upon immediate release from incarceration, the Government will deport the defendant").

4.  The fact that the Defendant was apprehended in his home country and was extradited to the United States - severing any personal contact with his family or friends in Romania, and including the deep depression associated with not being with his mother (with whom he had a very close relationship) at the time of her death from cancer. See e.g. United States v. Anderson, 533 F.3d 623 (8th Cir. 2008) (affirming a downward variance based on "other ways in which the defendant had suffered atypical punishment such as the loss of his reputation and his company, the ongoing case against him from the Securities and Exchange Commission and the harm visited upon him as a result of the fact that his actions brought his wife and friend into the criminal justice system").

5.  Comparison to the co-defendants' sentences. Although it is not yet known what the sentences will be for Danet and Nicolescu, there has to be some comparison to those sentences when considering

an overall sentence for the Defendant.  There is no question that Danet had more involvement with the Bayrob Group than the Defendant.  There is no question that Nicolescu was the absolute mastermind and kingpin of the Bayrob Group operations.[8]  Even the other non-charged Romanian actors who testified at trial had more activity.  In that regard, it is only fair to compare the conduct of these other people, and the type of (or lack of any) sentence they receive in determining what is a proper overall §3553 sentence.  See <u>United States v. Phinazee</u>, 515 F.3d 511 (6th Cir. 2008); <u>United States v. Statham</u>, 581 F.3d 548, 556 (7th Cir. 2009); <u>United States v. Martin</u>, 520 F.3d 87 (1st Cir. 2008); <u>United States v. Smart</u>, 518 F.3d 800 (10th Cir. 2008); <u>United States v. Zapata</u>, 546 F.3d 1179 (10th Cir. 2008); <u>United States v. Bras</u>, 483 F.3d 103 (D.C. Cir. 2007); and <u>United States v. Parker</u>, 462 F.3d 273 (3d Cir. 2006).

6.  The Mandatory Consecutive Sentence for Identity Theft.  The Defendant was found guilty of Counts 16 to 20 (Aggravated Identity Theft - 18 USC 1028).  The statute requires that the mandatory 2-year

---

[8]  This Court may recall that Nicolescu engaged in prohibited computer behavior even after arriving in the United States and while being incarcerated here in Ohio.  The Defendant did not.

sentence for those counts (which can be served concurrently per USSG §2B1.6) be served consecutively to any other sentence. This Court has the discretion in the context of an appropriate overall §3553 sentence to consider the mandatory minimum consecutive sentence when sentencing a defendant. See <u>Dean v. United States</u>, 137 S. Ct. 1170 (2017).

## V.   The Sentence.

Given all of the foregoing, it is grossly inequitable for the Government to argue for any sentence other than the original offer of 94-11 months.  Further, the Defendant submits that he be permitted leave to evaluate the victim restitution statements to see if any additional Guideline, Departure or Variance information might be contained therein.  Further still, the Defendant respectfully requests that this Court apply the departures and variances set forth above.  Lastly, the Defendant respectfully requests that his sentence be imposed only after the sentences imposed on Danet and Nicolescu so that the Defendant can address the procedures, characteristics and issues identified by the Court in imposing those sentences.

Respectfully submitted;

LIPSON O'SHEA LEGAL GROUP

*/Michael J. O'Shea*
Michael  J. O'Shea, Esq. (0039330)
michael@lipsonoshea.com
Hoyt Block Building - Suite 110
700 West St. Clair Avenue
Cleveland, Ohio 44113
(216) 241-0011 - Cleveland office
(440) 356-2700 - Rocky River office
(440-331-5401 - fax
**Attorney for the Defendant**

## PROOF OF SERVICE

I hereby certify that a true copy of the foregoing has been filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic record.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's electronic system.

S/Michael J. O'Shea
Michael J. O'Shea