```
 1                IN THE DISTRICT COURT OF THE UNITED STATES
                     FOR THE NORTHERN DISTRICT OF OHIO
 2                            EASTERN DIVISION

 3
       UNITED STATES OF AMERICA,      )
 4                                    )
                      Plaintiff,      )     Judge Gaughan
 5                                    )     Cleveland, Ohio
                 vs.                  )
 6                                    )     Number 1:16CR224
       BOGDAN NICOLESCU,              )
 7     RADU MICLAUS                   )
                                      )
 8                    Defendants.

 9
                              - - - - -
10             TRANSCRIPT OF PROCEEDINGS HAD BEFORE

11             THE HONORABLE PATRICIA ANNE GAUGHAN

12                    JUDGE OF SAID COURT,

13               ON MONDAY, MARCH 25, 2019

14                         Volume 1
                          - - - - -
15

16

17
       Official Court Reporter:      Shirle M. Perkins, RDR, CRR
18                                   U.S. District Court
                                     801 West Superior, #7-189
19                                   Cleveland, OH 44113-1829
                                     (216) 357-7106
20

21

22

23

24     Proceedings recorded by mechanical stenography; transcript
       produced by computer-aided transcription.
25
```

```
 1   APPEARANCES:

 2   For the Government:          DUNCAN T. BROWN,
                                  BRIAN MCDONOUGH,
 3                                Assistant U.S. Attorneys
                                  801 West Superior Avenue
 4                                Cleveland, OH 44113
                                  (216) 622-3600
 5
                                  BRIAN LEVINE,
 6                                U.S. Department of Justice -
                                  Criminal Division
 7                                Ste. 600
                                  1301 New York Avenue
 8                                Washington, DC 20530
                                  (202) 616-5227
 9
     For Bogdan Nicolescu:        MICHAEL GOLDBERG, ESQ.,
10                                Goldberg & O'Shea
                                  Suite 450
11                                323 Lake Place
                                  Cleveland, OH 44113
12                                (216) 696-4514

13   For Radu Miclaus:           MICHAEL J.  O'SHEA, ESQ.,
                                  Lipson O'Shea
14                                110 Hoyt Block Bldg.
                                  700 West St. Clair Avenue
15                                Cleveland, OH 44113
                                  (216) 241-0011
16

17

18

19

20

21

22

23

24

25
```

1             MONDAY SESSION, MARCH 25, 2019, AT 9:19 A.M.

2      * * * * *

3                    (Jury impaneled and sworn.)

4                    (The following proceedings were held at side

15:03:21  5      bar:)

6                         THE COURT:  Alternate Number 1 is now close to

7      tears because she can't be here.

8                         MR. BROWN:  I saw her when she was screaming

9      out in the hallway, Judge.

15:03:34 10                         THE COURT:  So you witnessed it?

11                         MR. O'SHEA:  It's Goldberg's fault.  He should

12      have asked her.

13                         THE COURT:  Honest, I'm a little frustrated

14      right now, but she claims that she cannot be present.  Mary,

15:03:50 15      you want to, for the record, fill in the blank.

16                         DEPUTY CLERK:  She said two weeks would be a

17      burden to her.  Her kids are on spring break this week and

18      she works third shift.  And I said why didn't you bring this

19      up in court.  She said I was waiting for someone to ask

15:04:02 20      about the problem being the length of time.  I said the

21      Judge said was there anything else.

22                         THE COURT:  So on behalf of the Government,

23      any problem with excusing her for cause?

24                         MR. McDONOUGH:  No, your Honor.

15:04:16 25                         THE COURT:  On behalf of Defendant Nicolescu?

1          MR. GOLDBERG:  No, your Honor.

2          THE COURT:  Defendant Miclaus?

3          MR. O'SHEA:  No, your Honor.

4          THE COURT:  Off the record.

15:05:13 5     (Proceedings resumed in the presence of the jury:)

6          THE COURT:  Ms. Miller, you are now Alternate

7     Number 1.

8          ALTERNATE JUROR:  Okay.

9          THE COURT:  Ms. Higley, you are Number 2;

15:08:25 10   Mr. English, Number 3.

11        Ladies and gentlemen, we will go into opening

12   statements, but before we do so, I would like to explain

13   some of the rules that we will be following, and I hope my

14   Courtroom Deputy or judicial assistant can hear me.  You

15:08:44 15   need notebooks.

16        Folks, give me have just one -- Mary, notebooks.  All

17   right.

18        As she passes them out, I want to tell you some of the

19   rules we're going to be following during the course of this

15:09:19 20   trial.

21        I am going to permit you to take notes, but please let

22   me give you this instruction.  Many courts do not permit

23   note taking by jurors.  And a word of caution is in order.

24   There's always a tendency to attach undue importance to

15:09:37 25   matters which one is written down.

1        Some testimony which is considered unimportant at the

2   time presented and thus not written down takes on greater

3   importance later on in the trial in light of all of the

4   evidence presented.

5        Therefore, you are instructed that your notes are only

6   a tool to aid your own individual memory and should not --

7   and you should not compare your notes with other jurors'

8   notes in determining the content of any testimony or in

9   evaluating the importance of any evidence.

10       Your notes are not evidence and are by no means a

11   complete outline of the proceedings or a list of the

12   highlights of the trial.

13       Above all, your memory should be your greatest asset

14   when it comes time to deliberate and render a decision in

15   this case.

16       And, folks, please disregard when you see me take

17   notes.  I take notes for an entirely different purpose from

18   the purpose you take notes.  We have separate functions.

19       In addition, ladies and gentlemen, you may not conduct

20   any investigation on your own.  That means you cannot go

21   online, use the computer, use any other means of

22   communication to find out any details of this case.  You are

23   confined to the facts and evidence you hear in this

24   courtroom.  No investigation on your own is permitted.

25       We've concluded the voir dire process.  Next, we will

1    hear opening statements of counsel.  And in the opening

2    statements, the attorneys seek to outline and describe for

3    you the evidence they expect will be adduced from the

4    witness stand.

15:11:39  5    Now opening statements are permitted because

6    oftentimes witnesses do not appear in what we would consider

7    to be proper chronological order.  So an opening statement

8    really is an aid.  It's a tool.  You can hear the testimony

9    of a witness and relate it to the total picture that you

15:11:58 10   receive during the opening statement.  But please keep in

11   mind opening statements are not evidence.  They are merely

12   designed to assist you.

13   Following the opening statements of all three counsel,

14   the attorneys for the Government will then present their

15:12:18 15   evidence.  Following that, the attorneys for the Defendants

16   may or may not present evidence.  Following all of the

17   evidence, the attorneys will then give what we call closing

18   arguments, and much like opening statements, closing

19   arguments are not evidence.  They are merely designed to

15:12:43 20   assist you.

21   So the Government will give their closing,

22   Mr. Goldberg, his, Mr. O'Shea's his, and then the law allows

23   the Government an opportunity to give what we call a

24   rebuttal argument.  The reason is the Government has the

15:13:00 25   burden of proof.  So the law allows the Government two

1    opportunities to address you.

2         Following all of the arguments, I will then give you

3    all of the jury instructions.  Following the jury

4    instructions, the 12 jurors will then deliberate and arrive

15:13:20 5    at a verdict.

6         Now, folks, there are times during every trial where a

7    lawyer may object to a question being asked or object to an

8    exhibit his or her opponent is trying to get admitted into

9    evidence.  These objections raise legal questions, and it's

15:13:36 10   my duty to rule on them.  If I find under the law that the

11   objection is well taken, I will sustain the objection and

12   not permit the question to be answered.  On the other hand,

13   if I find that the objection is not well taken, I will

14   overrule the objection and permit the question to be

15:14:00 15   answered.

16         Please keep in mind you must decide this case only on

17   answers that are permitted to be given under oath.  You are

18   not permitted to infer anything merely because a question

19   was asked, and I did not allow it to be answered.

15:14:15 20        In addition, folks, I will either ask counsel to

21   approach side bar or they will ask permission to approach

22   side bar.  Now what we do over here is one of two things.

23   We're either discussing a matter of law, or we're discussing

24   a matter of procedure:  "Is the next witness available?

15:14:36 25   Judge, what time are we breaking," et cetera.  In either

1    event, we're going to do it outside of your hearing.

2         Following that side bar, I will do one of two things:

3    I will either inform you of what just took place over there,

4    or more likely, I will merely put my decision into effect

15:14:55  5    without telling you any of the details.

6         Please remember, a trial is not a contest of skill,

7    learning, or tact between lawyers.  It's a proceeding to

8    determine the truth, as well as the truth can be determined,

9    for the evidence and law you hear in this courtroom.

15:15:12 10        We will now hear opening statements, and one more

11   time, I am going to remind you.  Opening statements are not

12   evidence.  They are merely designed to assist you.

13        On behalf of the Government, I now call on Mr. Brian

14   Levine.  Mr. Levine.

15:15:34 15             MR. LEVINE:  Thank you very much, your Honor.

16        OPENING STATEMENTS ON BEHALF OF THE GOVERNMENT

17             MR. LEVINE:  $400,000, 9 and 2.  This case is

18   about three numbers.  400,000, 9, and 2.

19        400,000, that's the number of computers in Ohio, in

15:16:09 20   the United States, and in the world, the Defendants, Bogdan

21   Nicolescu and Radu Miclaus, infected with a virus that they

22   created.  And as a result, a lot of innocent people lost a

23   lot of money.

24        This virus allowed the Defendants to completely

15:16:31 25   control these computers.  And by controlling these

1    computers, the Defendants stole user names and passwords,

2    they stole credit cards, and they stole millions of dollars.

3    400,000 infected computers.

4         9.  Nine is the number of years it took the FBI and

15:16:59  5    others to identify the Defendants and their group.  And

6    during the trial, we might refer to them as the Bayrob

7    Group, the Bayrob Group.

8         You'll learn they took nine years to identify

9    Defendants because they took tremendous effort to hide their

15:17:19 10    identity.  They used every technological trick out there.

11    They even invented new technology to hide themselves on the

12    Internet.  Nine years.

13         And 2.  The last number is 2.  And that's the number

14    of mistakes the Defendants made over the course of those

15:17:45 15    nine years that led the FBI and others to identify them.

16    Two mistakes.

17         My name is Brian Levine, a senior counsel with

18    Computer Crime and Intellectual Property Section of the

19    United States Department of Justice.  I work out of

15:18:07 20    Washington, D.C.  And Judge Gaughan already introduced the

21    rest of the prosecution team.  So let's turn now to the

22    individuals who stole millions of dollars from innocent

23    people.

24         Bogdan Nicolescu.  The evidence will show that he went

15:18:26 25    by the nickname MasterFraud.  That's the name he picked for

1    himself.  MasterFraud, and you will see sometimes

2    abbreviated it as lower case "mf."  He also went by the

3    nickname Obie.

4        And also sitting with Bogdan Nicolescu is his

15:18:49  5    codefendant, Radu Bogdan Miclaus.  The evidence will show

6    that he went by the nickname Minolta9797, sometimes

7    abbreviated as lower case m-i-n.  Minolta9797.  He also went

8    by the nickname, Ferdy, F-E-R-D-Y.

9        Before the Defendants had 400,000 victims, they had

15:19:25 10    one.  And you will hear from the first victim to report this

11    crime to the FBI, Yvonne Liddy.  Yvonne Liddy contacted the

12    FBI in 2007, 12 years ago.

13        Yvonne is from Perry, Ohio, and in 2007, she was still

14    in school and she was a stay-at-home mother.  In 2007,

15:19:49 15    Yvonne and her husband went on eBay.  Many of you are

16    familiar with eBay.  It's a website where sellers post

17    pictures of the items they want to sell and buyers can buy

18    those items, either from an auction format or sometimes

19    buying directly.

15:20:03 20        So Yvonne and her husband went on eBay and bought a

21    used Jeep Liberty for just shy of $10,000, which was a lot

22    of their savings at the time.  So they purchased the jeep,

23    they transferred the $10,000 from Yvonne's bank account but

24    they never got the jeep.  So you'll learn that Yvonne went

15:20:27 25    to the police.  She went to the local police and the police

1    had her come in and they had her log on, on the police

2    computer, log on to her eBay account and show them the

3    transaction.

4         So she logs on, but she can't pull up the transaction.

15:20:41  5    It's not there in her account.  She's confused.  So Yvonne

6    goes home.  You'll learn she logs on to eBay from her own

7    computer at home, and there it is.  There's the transaction.

8    So she calls eBay.  EBay has no record of the transaction at

9    all.

15:21:02  10         So what happened?  Yvonne was the victim of fraud.

11    She was the victim of a sophisticated eBay fraud scheme

12    designed by the Defendants and others in their group, and

13    here's how it worked.

14         The Defendants placed over a thousand fake

15:21:24  15    advertisements to sell cars on eBay.  Now the Defendants,

16    they never had these cars.  All they had were pictures of

17    cars.  And the prices were good.  They were a good deal.

18    They weren't crazy loans.  They were reasonable.  Now before

19    buying something expensive like a car online, buyers would

15:21:45  20    invariably e-mail questions to the seller.  Right?

21    Questions about the car.  What's the mileage, how's the

22    transmission, has it been in any major accidents?

23         And when Defendants responded to these e-mails, they

24    answered the question, but they'd also send the buyer a

15:22:04  25    picture viewer and the picture viewer was an attachment to

the e-mail attached to the e-mail, and when a buyer clicked

on the picture viewer, they would see pictures of cars, and

it could click through the pictures of cars, but that's not

all that was going on because in the background, they were

getting infected with a virus.  And once the buyer had the

virus, the Defendants had complete control of the buyer's

computer.

Now, when the buyer went back to the eBay website,

they were not actually viewing eBay.  Instead, the

Defendants were controlling exactly what the victim would

see.  And on the fake eBay website, eBay offered something

special; something called eBay Agent Protection.  And now,

the idea was that eBay said buyers could protect themselves

by wiring money not to the seller of the car but to an eBay

escrow agent, who would hold the money, would hold the money

to protect the money until the buyer was satisfied, the

buyer receives the car, fully satisfied with the car they

received, and only then would the seller get it.

In fact, the real eBay had no eBay escrow agent

program.  It was something the Defendants made up out of

thin air.  So where did the buyer's money go to?  It went to

more unsuspecting victims called Money Mules.

Now Money Mules is a person that receives money into

their bank account and then withdraws it and sends the money

to others, often via Western Union.  So Defendants created

1   fake advertisements, job advertisements for wire transfer

2   agents, which they circulated on Internet websites, and on

3   Job Corps.  This is one that they circulated on Facebook.

4   Make $7500 a month working from home.  Who wouldn't want to

15:24:33  5   do that?  Who wouldn't want to do that?

6       So people in Ohio and elsewhere in the United States

7   would sign up with the Defendants' fake wire transfer

8   companies, and they would send their personal bank account

9   information to Defendants.  And you'll hear from some of

15:24:53  10   these people.  For example, you'll hear from Donna Wolfe

11   about how she was tricked into being a wire transfer agent

12   and how Defendants manipulated her.

13       So Donna Wolfe and the other money mules would receive

14   wire transfers from eBay victims like Yvonne Liddy and

15:25:14  15   follow the Defendants' instructions to withdraw the money

16   immediately and wire the money via Western Union to

17   somewhere in Europe.  And in Europe, another money mule

18   would pick up the money at the Western Union there, using a

19   fake ID.  And eventually, the money was delivered to the

15:25:37  20   Defendants.

21       Yvonne Liddy and hundreds of other victims never got a

22   car, and they never got their money back, not from the bank,

23   not from Defendants, not at all.  All they got was infected

24   with a virus.

15:25:56  25       Now, Defendants didn't just use the virus to trick

1    people on eBay.  You'll learn that they also used their

2    virus to copy the victims' e-mail contact list, all their

3    e-mails, whether in the Microsoft Outlook or their Gmail, or

4    their Yahoo mail, what every they used, they copied every

5    single e-mail address, and this allowed the Defendants to

6    send spam, spam e-mails to hundreds of thousands or millions

7    of additional e-mail addresses in order to spread their

8    virus and infect more people.

9        Here's why the spam e-mails the Defendants sent --

10   they sent a lot of different ones but this is one.  "Western

11   Union.  You've received money.  To receive your money, print

12   the attached document and take it to Western Union."  There

13   was a document attached to the e-mail.  Well, if you

14   click -- you click on that attachment, you would get the

15   virus.

16       Now, Defendants also used the virus to steal user

17   names and passwords.  So if one was infected with the virus,

18   and they went to Gmail or Yahoo mail or a whole bunch of

19   other sites, you think you are on Google or Yahoo's website,

20   but you're actually on the Defendants' website.  So when you

21   entered your user name and password, Defendants have it.

22       Now, Defendants would then log you on to Gmail or

23   Yahoo so you'd never know the difference.  And they did this

24   with many websites.  Defendants would steal all these user

25   names and passwords so that they could control these

1   accounts or they could sell them to others.

2       Defendants also used their virus as a trick to trick

3   people into giving them their credit card numbers.  And

4   here's how they did that.  Where a victim went to websites

15:27:56 5   like Facebook, like eBay, like Wal-Mart, and they were

6   infected with the virus, Defendants used their virus to

7   redirect the victims to a fake website that looked just like

8   Facebook or eBay or Wal-Mart, and victims were now required

9   to enter into their -- enter in their credit card number to

15:28:19 10   verify the account.  We just want to make sure that this is

11   really your account.  So yes, user name and password but

12   this time, we want to also really make sure it's you.  So

13   put in your credit card information as well.  And once the

14   victims entered their credit card numbers, Defendants would

15:28:37 15   log them into their accounts.  So the victims never knew the

16   difference.

17       Now, Defendants would use these stolen credit cards

18   and actual people's identities to fund their criminal

19   activities.

15:28:51 20       Now, Defendants used their computers and their virus

21   to control thousands of computers in the United States.  And

22   eventually, the group was able to create what's called a

23   botnet.  A botnet is an army of infected computers.  They're

24   centrally controlled by the criminal.  In this case, they

15:29:17 25   were centrally controlled by Defendants.

1    Now Defendants were able to avoid law enforcement by

2    hiding their path to the Internet.  They hid their path to

3    the Internet.  You know how they got on the Internet?  They

4    started with this.  This was actually seized from the

15:29:39 5    Defendant Miclaus' apartment.  They had this in all the

6    apartments.

7    Now what this is, is a directional antenna, a

8    directional antenna.  And they would use this to hack on to

9    someone else's home Wi-Fi, somewhere in Bucharest or Brasov,

15:29:58 10   Romania.  It has a very -- you'll learn this is a very long

11   range.  So they could hack into 1,000 or millions of

12   people's Internet, their home Wi-Fi.  So when they were

13   committing the crimes, they never appeared to be coming from

14   their own Internet.  Making it extraordinarily hard to

15:30:18 15   identify them.

16   Now they also used a service called America Online or

17   AOL sometimes referred to.  America Online or AOL, and they

18   used it to access the Internet.  Now AOL was able to

19   identify the e-mail addresses that these two Defendants used

15:30:38 20   to communicate with each other.  Not with victims, but with

21   each other, how they would talk to each other.

22   Nicolescu, he used the nickname MasterFraud.  He used

23   that e-mail account.  And Miclaus, he used the account

24   Minolta9797.  So the FBI executed search warrants on these

15:31:04 25   accounts and other accounts.  And it led to hundreds or

1    thousands of e-mails between MasterFraud and Minolta and the

2    other members of their group, but the FBI still didn't know

3    who they were.  They just knew they were MasterFraud and

4    Minolta.  And that's when two mistakes come into play.

15:31:36 5    Mistake Number 1, this happened on May 13, 2013, May

6    13, 2013, and it took 90 seconds.  Minolta9797 accidentally

7    entered the user name to his personal e-mail account into

8    AOL.  RaduSPR, RaduSPR.  He accidentally entered that user

9    name while on AOL.  Now he quickly realized his mistake and

15:32:14 10    he entered his criminal user name, Minolta9797, but AOL had

11    captured, America Online had captured RaduSPR and RaduSPR

12    was easily connected to Radu Bogdan Miclaus.

13    This was his Twitter page.  This was information from

14    a subpoena that the FBI sent to Yahoo, and it showed an

15:32:48 15    address for Radu Miclaus in Bucharest, Romania.  So RaduSPR

16    was Radu Bogdan Miclaus.

17    The FBI asked Romanian National Police, which we

18    sometimes refer to as the RNP, the Romanian National Police,

19    the RNP.  They asked the Romanian National Police to

15:33:14 20    investigate Miclaus, and RNP identified regular Internet

21    communications between Miclaus and two other people.  One of

22    those people was Bogdan Nicolescu, who we know is

23    MasterFraud, and there was also communication with someone

24    we haven't talked about yet, a person by the name of Tiberiu

15:33:42 25    Danet.  And Tiberiu Danet went by the nicknames AmightySA

1    and Romeo, but all these communication between these three

2    were encrypted or locked.  It wasn't viewable, not to the

3    FBI, not to the RNP.  Nobody could break the lock, the

4    encryption lock.  So the FBI couldn't determine what they

15:34:05  5    were talking about; just that they were talking constantly

6    to each other.

7         And that's when Mistake 2 came into play.  And this

8    one took place two years later on May 14th, 2015.  And on

9    that day, Tiberiu Danet traveled to Miami, Florida, to visit

15:34:30 10   friends.

11        Now, while he was going through US Customs, the FBI

12   was able to execute a search warrant and secretly review his

13   cellphone.  And for the first time on the cellphone, the FBI

14   found unencrypted, or readable communications, between these

15:34:54 15   three individuals.  And the FBI saw chats in which these men

16   were discussing specific and unique computer files that they

17   had created in order to commit these crimes.

18        And you'll see these communications, and you'll learn

19   about what they mean, and how they established this crime.

15:35:17 20   So the FBI knew they had their men at this point.

21        You'll learn that on September 28, 2016, Special

22   Agents Diaz and MacFarlane and a number of other FBI agents

23   went to Romania and worked with the Romanian National Police

24   to arrest these three men.  And you'll learn that while the

15:35:43 25   FBI was arresting these three, they were watching their

1    criminal e-mail accounts, and the FBI saw that they were

2    still sending encrypted e-mails to each other many times a

3    day.  Constantly.  But, the moment they were arrested, they

4    stopped sending or receiving e-mails.  When Nicolescu was

15:36:04  5    arrested, MasterFraud stopped sending e-mails.  When Miclaus

6    was arrested, his account stopped sending e-mails.  And

7    after these three were arrested, their botnet stopped.  The

8    infected computers stopped receiving any commands.

9    Now in Romania, the Romanian National Police was able

15:36:31  10   to seize the Defendants' cellphones and you'll see them.

11   These are two of them right here.  This one is Nicolescu's

12   phone, and this one is Miclaus' phone.  And the FBI found

13   significant evidence on these phones.  For example, you'll

14   learn the FBI found a chat on Miclaus' phone between him and

15:37:01  15   Nicolescu, between these two, in which they actually

16   referred to each other as MasterFraud and Minolta.  The

17   Romanian National Police were also able to seize the

18   Defendants' computers, and you'll see these computers as

19   well.  These are just some of them.

15:37:18  20   These two here, these are Miclaus' computers.  These

21   are laptops.  This is one of them.  This is another.  And to

22   my right over there is a series of computers that were

23   seized from Bogdan Nicolescu's residence, MasterFraud.  And

24   I'm not going to try to lift these up.  But, these are just

15:37:55  25   some of the computers and digital devices found in Bogdan

1    Nicolescu's residence.  And you'll learn that the FBI found

2    a lot of significant evidence on these computers as well.

3         Among other things, the FBI found sophisticated

4    programs that Defendants would use in order to communicate

15:38:17 5    through the infected computers.

6         Now, in order to give you a complete picture of what's

7    going on in this case, we'll be presenting you with two

8    views of the conspiracy.  The first view is from the outside

9    looking in.  So you're going to hear from law enforcement.

15:38:39 10   You're going to hear from many different members of US law

11   enforcement and at least one member of Romanian law

12   enforcement, who's going to fly over from Romania, and

13   you're going to hear from them as well.

14        You're going to hear from private sector

15:38:52 15   investigators, from a variety of different companies who did

16   just an incredible job researching and investigating these

17   Defendants.  And you're going to hear from victims.  You're

18   not going to hear from all thousand or thousands of victims.

19   But, you're going to hear from some individual victims and

15:39:10 20   you're going to hear from some corporate victims as well.

21   So you'll have the view from the outside looking in.  But,

22   you're also going to get the view from the inside looking

23   out.

24        So you're going to hear from several actual members of

15:39:30 25   Defendants' criminal group.  And they're going to testify in

1    great detail as to how they got involved, how the crimes

2    were, what everyone's role was, what everyone's moniker was,

3    how much money did they make, all the details.

4        And you're also going to get the inside view from the

15:39:52 5    physical evidence because you are going to see the evidence

6    taken directly from Defendants' personal phones and from

7    their personal computers.

8        Now, the indictment is 21 counts.  It is a lengthy

9    indictment because these gentlemen committed crimes for nine

15:40:10 10    years, for more than nine years.  It's a lengthy indictment

11    but the indictment is easily summarized.

12        The indictment alleges the conspiracy.  And what a

13    conspiracy is, is just a couple of people, more than one

14    person working together as a group to commit a criminal

15:40:31 15    objective, just cooperating to commit crimes.  That's all

16    that it is.

17        And the indictment alleges a conspiracy to commit five

18    basic crimes.  The first one is wire fraud.  What is wire

19    fraud?  Basically tricking people online, tricking them to

15:40:48 20    click on an attachment, getting a virus, tricking them into

21    giving their credit card number, tricking them into giving

22    their user name and password, tricking them.  Wire fraud.

23        The second count, second series of crimes they're

24    charged with is computer fraud and abuse act.  What's that?

15:41:04 25    That is just infecting people with their virus, infecting

1    people with their virus and making their computers do work

2    for them.  That's a computer fraud and abuse act.

3         And we have aggravated identity theft, and that's --

4    that's just taking people's credit card information and

15:41:22  5    their account information, taking their identity by taking

6    their computer, their credit card account information.

7         And we have trademark offenses because as you've seen,

8    and as you will see, the Defendants used the logos of lots

9    of companies that we all trust in order to trick people,

15:41:42 10    companies like Western Union, Google, Yahoo, Facebook, eBay.

11    The list goes on and on.  So that's where the trademark

12    offenses come in.

13         And finally, money laundering.  Hiding millions of

14    dollars stolen from innocent victims.

15:42:01 15         The trial is going to be like a puzzle, a puzzle with

16    many pieces, and each witness is going to provide a couple

17    little pieces of the puzzle, a couple little pieces from

18    each witness.

19         Now some of those pieces might be technical, some of

15:42:19 20    them might be a little complex but that's okay.  That's

21    okay.  We'll work through that together.  Don't worry about

22    it.

23         And the other -- the other way is like a puzzle, in

24    that no one piece tells the whole story.  No one witness, no

15:42:35 25    one part of the testimony is going to tell the whole story.

1    For example, the victims, the victims don't know who

2    victimized them.  They only know they were victimized.  But

3    by the end, you will see the entire puzzle and it will be

4    crystal clear.

15:42:52  5        400,000 infected computers causing innocent people to

6    lose millions of dollars.  Nine years of investigations.

7    And two mistakes.  And you will find that Defendants are

8    guilty as charged.

9        Thank you very much.

15:43:23 10        THE COURT:  On behalf of Defendant Bogdan

11   Nicolescu, Mr. Michael Goldberg.

12        MR. GOLDBERG:  Thank you, your Honor.

13        OPENING STATEMENTS ON BEHALF OF THE BOGDAN NICOLESCU

14        MR. GOLDBERG:  Ladies and gentlemen, in some

15:43:32 15   of those puzzle pieces will be straight out lies from people

16   that are being flown in from Romania, from people that are

17   -- at least one person who was charged in this case, who is

18   going to make a great deal to point the finger at my client

19   and say he's guilty, he's MasterFraud.  And you're going to

15:43:51 20   hear the details of that deal, and you're going to see that

21   that puzzle piece isn't going to fit.

22        Now, I agree this case is about three numbers.  The

23   first number is practical infinity because that's the amount

24   of data that the FBI and the Romanian National Police were

15:44:12 25   able to gather in this investigation over nine years.  If

1    they printed it all out, it would fill probably this entire

2    building, maybe this whole block.  So practical infinity is

3    Number 1.

4        Number 2 is zero.  That's the physical link between

5    that data and the name MasterFraud and my client; the data

6    link or the physical link between the evidence they have,

7    the practical infinity, and my client as MasterFraud.

8    There's not one file in any computer that was seized from my

9    client that links to the name MasterFraud.

10        And the last number is "1" because all the

11   Government's eggs are in that basket proving that

12   Mr. Nicolescu is MasterFraud.

13        Yes, they're going to have some circumstantial proof

14   or circumstantial evidence.  Well, MasterFraud stopped

15   sending e-mails when Mr. Nicolescu was arrested.  Well,

16   there were lots of other people arrested, too, and other

17   people who weren't arrested who knew that those guys were

18   arrested.  So that proves nothing.  That's how the

19   Government's whole case is going to be.  They're going to

20   take an ocean of data and make you look at it through a pin

21   hole.  That's what that is.

22        Here's what we don't contest.  There was a botnet that

23   was created that was put on the Internet.  People were hurt

24   by it, and computers were infected.  Trademarks were used

25   illegally.  What we do contest is my client's involvement.

1    He knew some of these Defendants, but he wasn't MasterFraud

2    and he's not MasterFraud.  He's not guilty because all of

3    their eggs are in that basket.

4         The evidence is going to show that everything

5    Mr. Danet says was paid for by the Government and their

6    currency, which is time.  How much time is he going to do in

7    prison?  How much time is he not going to have to do in

8    prison if he comes in here and says what the Government

9    wants him to say?  That's Number 1.

10        The evidence will show that there is no forensic

11   footprint for any particular person doing any action on the

12   spot.  In other words, this botnet could be accessed from

13   numerous, we call them vectors, but from numerous machines.

14   Anybody on this jury, if they knew the log in and the screen

15   name ID, could log in and pick any action they wanted on one

16   of these servers or even the e-mail accounts.

17        For instance, MasterFraud.  If somebody else knew the

18   name MasterFraud and the log in ID, they could log in as

19   MasterFraud and send e-mails.  It proves nothing.  It proves

20   nothing.

21        The Government is going to bring in a parade of data,

22   people, experts, and computers, and definitely be able to

23   show there was this thing that was going on, this criminal

24   enterprise.  But, that's not the case against my client,

25   Mr. Nicolescu.  The case against my client, Mr. Nicolescu,

1    has to prove beyond a reasonable doubt that he's

2    MasterFraud.  And they -- they can't do that.  They can't

3    show from these computers.  They can't show from any digital

4    pathway or fingerprint or anything physical.  The only thing

15:48:20  5    they're going to show you are questionable screenshots of

6    text messages that could have come from anywhere.  And when

7    we drill down and we talk about where the text messages came

8    from, who had accesses to the text messaging accounts,

9    you're going to see that the Government's case is looking

15:48:42 10    through a pin hole.

11         Another thing they're not going to show you is

12    anything that Mr. Nicolescu acquired or money that he may

13    have had as a result of any of this.  They can't link him to

14    any of the money.  Nothing.  They search his house, they

15:48:58 15    found yeah, a thousand dollars or something, a couple

16    thousand dollars.  Nothing.

17         So after nine years, ten years, with the cooperation

18    of the Romanian National Police -- who, by the way, couldn't

19    tell because the two Defendants in this case, they share an

15:49:19 20    apartment.  They're definitely linked.  They went to school

21    together, but they couldn't tell who was on the Internet

22    when.  How do you build a case like that?  How do you come

23    into federal court and say convict this guy?  You don't even

24    know who's on the Internet?  They're going to try to

15:49:34 25    convince you that all of this information and all this data

1    points only to Nicolescu as MasterFraud and it's not true.

2        You'll hear the evidence.  Judge for yourself.  You'll

3    hear what the Romanian members of this conspiracy have to

4    say, and you'll decide whether you can believe beyond a

15:49:56 5    reasonable doubt.

6        I believe after you've heard everything, you'll see

7    that this case is not the case that's presented by the

8    Government, and it's questionable from all sides.

9        Thank you.

15:50:07 10        THE COURT:  On behalf of Defendant, Radu

11    Miclaus, Mr. Michael O'Shea.

12        MR. O'SHEA:  Thank you, your Honor.

13        OPENING STATEMENTS ON BEHALF OF RADU MICLAUS

14        MR. O'SHEA:  I made a big deal about it

15:50:18 15    already, I'll make a big deal about it in my opening

16    statement, and I'll make a big deal about it in my closing

17    statement.

18        What am I going to make a big deal about?  This thing

19    I talked about a lot during jury selection called the oath.

15:50:31 20        You will take an oath, or you've taken an oath, quite

21    frankly, to apply the law as the Judge gives it.  No matter

22    what your personal feelings are, what your personal

23    experiences have been, what your personal feelings might be

24    towards eastern European people, Romanians, Internet

15:50:54 25    fraudsters, ID theft, thieves, money laundering or anything

1    else, and your oath is to follow the facts that are

2    presented in this courtroom and apply the law that the Judge

3    gives you.

4        That's it. And I'm going to hold you as American

15:51:11  5    citizens to your oath. If you want to show Romania

6    anything, you'll show that our office means something, no

7    matter what the facts are, how egregious we might feel about

8    certain things, that our oath matters. This case is going

9    to be a lot more, I mean a lot more about quantity rather

15:51:36 10    than quality. I think Mr. Goldberg touched on that a little

11    bit already.

12        I think that at the end of the day, you may be

13    presented with as many a 1000, 2000 pieces of evidence or

14    exhibits. Not just these bad boys here, but lots of

15:51:53 15    evidence. It's like lots of grains of sand, folks, that

16    don't weigh very much.

17        So when you hear the evidence in this case, I want you

18    to constantly think of quantity versus quality because they

19    are not the same. Sometimes you're going to have a

16:03:13 20    Government standing right out there that says, "There's the

21    guy that robbed the bank sitting there. I saw him. I grew

22    up with him." You're not going to have anything like that.

23        So I'm just going to ask you to consider the oath, the

24    quantity and quality.

15:52:24 25        Now, on that same note, you're going to hear evidence

1    that these two gentlemen and their group back in Romania,

2    they know each other, that they have associated with one

3    another.  But, there's going to be a lot of insinuation that

4    just because someone associates with, or is a friend with,

15:52:56  5    somebody or a group that might have been involved with some

6    type of activity, that that's a, quote, conspiracy.  That

7    they're involved with this, that the friend group is no

8    longer a friend group, that the associate group is no longer

9    an associate group.  It's now a conspiracy.

15:53:11 10         You're going to get a definition during the jury

11    instruction phase of this case about what constitutes

12    conspiracy and the definition of them.  And I submit to you

13    that just because someone's a part of a group of people that

14    socialize like the show friends, they all kind of live in

15:53:26 15    the same apartment or apartments across the hall, Joey did

16    something wrong, then they're all guilty, that's going to be

17    the Government's theory in this case.  How could they not

18    know?  That will be it.

19         As I think the Prosecution has already indicated,

15:53:46 20    there's 21 counts in this case.  Count 1 is this wire fraud

21    conspiracy but Count 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and

22    13 all involve, as I understand it so far, each one is

23    representing a separate eBay alleged fraud or wire fraud.

24    You have to find -- you don't have to find people guilty or

15:54:19 25    not guilty of any or all of them.  It's not all a group, but

1    you have to separately analyze each of those 13 counts and

2    hold the Government to its burden of proving all the

3    elements in each of those counts.

4         For instance, you can't say well I got a -- there's

15:54:40 5    this one thing that I feel good about.  The other I don't.

6    But, you know, if he's -- they've proven Count 3, they've --

7    you know, we're going to give them the mulligan on Count 6

8    and 7.  You can't do it.  Each count must be separately

9    assessed and analyzed from the evidence that comes in this

15:54:58 10   room.  Stuff here, witnesses that testify here, not the gut,

11   not insinuations.

12        Now there's also the separate count, Count 14,

13   computer fraud; again, conspiracy, allegation that somebody

14   accessed or damaged computers of people.  I think they're

15:55:20 15   going to talk approximately about, you know, a number of

16   people who claim their computers were infected.  You've got

17   this Count 15 on the -- which involves trademarks, and you

18   got Count 16, 17, 18, 19, and 20; again, identity thefts.

19   Again, using the same analysis that I just talked about

15:55:41 20   before, you have to identify each count, hold the Government

21   to its burden of proof as to each of those counts, all the

22   elements in those counts and those elements will be given to

23   you by the Judge during the jury instructions phase.

24        There's also this count involving money laundering.

15:55:59 25   That's Count 21, ladies and gentlemen.  And again, that

1    count kind of is like a lone wolf.  Doesn't have any

2    duplicity in it with other counts.  Again, you'll have to

3    assess that count and all the elements in each element of

4    that count.  You've got to find guilt beyond a reasonable

5    doubt.  Each of them.

6         Now let's talk about reasonable doubt very quickly,

7    folks.  And then I'm pretty close to being done.

8         I went over to some degree during jury selection this

9    doctrine of the jury instructions and what reasonable doubt

10   is.  Now part of the definition that you will hear says that

11   reasonable doubt involves assessing this case in this

12   courtroom with this evidence, as you would the most

13   important decisions in your own lives.

14        And you think about that.  And as you're hearing the

15   evidence of this case, the lens, the optics that I ask you

16   based upon those jury instructions is to look at them from a

17   burden of proof standpoint and say what are the most

18   important decisions in your own lives.  What you had for

19   breakfast?  Nope.  Maybe what car you bought?  I don't think

20   so.  How about who you marry?  Where you put your retirement

21   funds?  Who's going to be the medical entity or person that

22   does that very serious life-saving surgery on yourself or

23   some of your loved ones?

24        Those are the most important decisions in your life,

25   and the Government will ask you to find these gentlemen,

1    including my client, guilty based upon that optic.  Think

2    about that.  Put on those glasses, most important of your

3    own affairs, own decisions in your life, and analyze that

4    case, this case using those opportunities, not because I'm

15:58:06  5    telling you to because you took that oath to follow those

6    instructions to do so.

7         At the end of the day, folks, this case is a lot like,

8    you know -- it's like a fingerprint case.  They're going to

9    claim by analogy that these and the thousands of documents

15:58:30 10    that we'll see are like the ridges in a fingerprint.  And

11    they're going to say that there's enough points of

12    comparison out there to prove this identification because

13    you'll see that there's no comparison here.  That these

14    pieces of evidence, these thousands of pieces of grains of

15:58:54 15    sand documents, they do not make up a good fingerprint.

16    They just don't.

17         So all I'm going to ask you to do is think of your

18    oath.  I'm asking you to think of the definition of

19    reasonable doubt, and I'm going to ask you to think of

15:59:11 20    fingerprints.

21         And last, as I think we pointed out already during

22    jury selection, there are two Defendants here.  Each has

23    their own lawyer.  Mr. Nicolescu has a very fine lawyer,

24    Mr. Goldberg.  I'm going to help out Mr. Miclaus.  Each of

15:59:29 25    these guys is on trial here.  Even though they're sitting

1    next to one another, folks, you must analyze the evidence as

2    it applies to each count, to each guy separately,

3    individually.  That's quantitatively not going to be any

4    task.  But, it's part of your oath.  You took the oath to do

5    it.  So I'm going to hold you to your oath.  When you raised

6    your hand and said, "I'll do it," I'm going to hold you to

7    it.  Not because it's my personal opinion, but because it's

8    the law.  And that's what this courtroom is all about.

9        Thank you.

10           THE COURT:  Side bar, counsel, please.

11        (Discussion at side bar off the record.)

12           THE COURT:  Ladies and gentlemen it's about

13    4:00.  We're going to go for just one more hour or so and

14    start some testimony.  Please call your first witness.

15           MR. LEVINE:  The Government calls Special

16    Agent Stacy Diaz.

17           THE COURT:  And, ma'am, if you would please

18    step up to the podium.  And if you would please raise your

19    right hand.

20

21

22

23

24

25

1              STACY DIAZ,

2       of lawful age, a witness called by the GOVERNMENT,

3             being first duly sworn, was examined

4                and testified as follows:

5            DIRECT EXAMINATION OF STACY DIAZ

6    BY MR. LEVINE:

7    **Q.**    Good afternoon.

8    **A.**    Good afternoon.

9    **Q.**    Would you please state and spell your last name for

10   the record.

11   **A.**    Stacy Diaz, S-T-A-C-Y, D-I-A-Z.

12   **Q.**    And, Special Agent Diaz, what do you do?

13   **A.**    I'm a Special Agent with the FBI.

14   **Q.**    And Special Agent Diaz, have you served as one of the

15   primary FBI case agents investigating Nicolescu and Miclaus

16   and their criminal group?

17   **A.**    Yes, I have.

18   **Q.**    All right.

19          I want to go through your background briefly but

20   first, did you change your name during the course of this

21   case?

22   **A.**    Yes, I did.

23   **Q.**    And what was your name during the investigation of the

24   Miclaus and Nicolescu Group?

25   **A.**    It was Stacy Lough, L-O-U-G-H.

Diaz - Direct/Levine

1   **Q.**   And what caused you to change your name?

2   **A.**   I was recently married.

3   **Q.**   All right.  Congratulations.

4   **A.**   Thank you.

16:04:23  5   **Q.**   Did you happen to marry someone who was also involved

6   in this case?

7   **A.**   Yes, I did.

8   **Q.**   All right.  Who did you marry?

9   **A.**   He is a computer forensics examiner with the FBI.  His

16:04:35 10   name is Yohel Diaz.

11   **Q.**   Okay.

12         And at a general level, what was Yohel Diaz's role in

13   this case?

14   **A.**   He helped to examine and view forensics examination of

16:04:48 15   some of the phones and computers involved in this

16   investigation.

17   **Q.**   All right.

18         And did your relationship with Computer Examiner Diaz

19   develop in part as a result of this case?

16:04:58 20   **A.**   Yes, it did.

21   **Q.**   Congratulations.

22   **A.**   Thank you.

23   **Q.**   Would your relationship with Computer Examiner Diaz

24   impact your testimony here today?

16:05:09 25   **A.**   No, of course not.

1    **Q.**    All right.  So I want to go through your background

2    briefly.

3           What is your educational background?

4    **A.**    I have a bachelor's degree in computer and information

16:05:21 5    science from the University of Maryland.

6    **Q.**    And were you employed while you were in college?

7    **A.**    Yes, I was.

8    **Q.**    How so?

9    **A.**    I was in the United States Air Force for four years.

16:05:33 10    **Q.**    Active duty?

11    **A.**    Yes.

12    **Q.**    And what did you do at the Air Force?

13    **A.**    I was a computer programmer.  I was stationed at the

14    Pentagon.

16:05:41 15    **Q.**    How long -- did you say you were with the Air Force

16    for four years?

17    **A.**    Yes.

18    **Q.**    Thank you for your service.

19    **A.**    Thank you.

16:05:46 20    **Q.**    What did you do after your service with the Air Force?

21    **A.**    I worked as a Government contractor in the D.C. area

22    for approximately five years before joining the FBI.

23    **Q.**    Where were you working as a Government contractor?

24    **A.**    Fort Meade, Maryland.

16:06:01 25    **Q.**    And what did you do as a general contractor?

1    **A.**    I helped to manage a team that was responsible for

2    developing online content for an army school, so I developed

3    web pages as well as directed the rest of the team.

4    **Q.**    How long were you at Fort Meade?

16:06:20 5    **A.**    Approximately five years.

6    **Q.**    And when did you join the FBI?

7    **A.**    In 2006.

8    **Q.**    And so have you been with the FBI for 13 years now?

9    **A.**    Yes.

16:06:28 10    **Q.**    And during that entire time, have you always been a

11    Special Agent?

12    **A.**    Yes, I have.

13    **Q.**    What does it mean to be a Special Agent with the FBI?

14    **A.**    A Special Agent is basically the investigators that

16:06:42 15    work for the FBI.  The FBI has many different positions.

16    The Special Agent is the overall investigator of a case.

17    **Q.**    All right.

18          And what happens if you find evidence that a

19    particular person committed a crime?  What happens then?

16:07:01 20    **A.**    Then we would open an investigation and begin

21    investigating that crime.

22    **Q.**    Do you decide whether a particular person gets

23    prosecuted or not?

24    **A.**    No, I do not.

16:07:11 25    **Q.**    Okay.  Who makes that decision?

Diaz - Direct/Levine

1    **A.**    The Assistant Prosecutors that would then prosecute

2    the case.

3    **Q.**    So the United States Attorney's Office?

4    **A.**    Yes.

16:07:20    5    **Q.**    Which field office of the FBI do you work from?

6    **A.**    The Cleveland office.

7    **Q.**    And have you worked with the Cleveland office during

8    your entire 13 years with the FBI?

9    **A.**    Yes, I have.

16:07:30    10    **Q.**    Within Cleveland FBI, what different squads have you

11    worked on?

12    **A.**    I was on two different squads.  The first six years

13    that I was in Cleveland, I was assigned to the Cyber Squad,

14    and then I was transferred to the Organized Crime Squad for

16:07:47    15    the last seven years.  But, I was working cyber organized

16    crime.

17    **Q.**    Okay.  So that actually gets to my next question.

18          You spent a significant amount of time investigating

19    both cyber crime and organized crime.  Do you find there's

16:08:01    20    an overlap between those two areas?

21    **A.**    Yes, definitely.

22    **Q.**    How so?

23    **A.**    In today's day and age with many crimes being

24    committed over computers and over the Internet, many cyber

16:08:13    25    criminals now work in groups.  And so organized crime is

1    simply investigating a group of people working together.  So

2    if there's a group of people working to commit cyber crimes

3    on computers or on the Internet, then that would be cyber

4    organized crime.

16:08:28  5    **Q.**    In addition to working on the Cyber Squad and the

6    organized crime squad, are you also a member of Cleveland

7    FBI's Emergency Response Team?

8    **A.**    Yes, I am.

9    **Q.**    And what do you do as a member of the FBI Response

16:08:42 10    Team?

11    **A.**    The Emergency Response Team is a -- a voluntary extra

12    duty that we perform for the FBI, and we're a team.  Each

13    division has their own team.  So I'm on the Cleveland ERT

14    team.  And we are called out to help assist processing crime

16:09:01 15    scenes.  So it could be a simple crime scene involving

16    collecting documents or it could be a very complex crime

17    seen that could be a physical traumatic crime, such as a

18    murder where we're collecting different types of evidence.

19         An example of one crime scene that I responded to on

16:09:23 20    the Cleveland Air T team some of you may be familiar with is

21    the Ariel Castro house where the three girls were found and

22    recovered from; Amanda Berry, Gina DeJesus, and Michelle

23    Knight.

24    **Q.**    Thank you for working on that.

16:09:39 25         In your capacity as FBI Special Agent, what types of

1    cyber-related cases have you investigated?

2    **A.**    I have worked a variety of cyber cases, including

3    computer intrusions into bank accounts, online fraud cases,

4    and child pornography cases, and specifically, online option

16:10:03  5    fraud cases.

6    **Q.**    Okay.

7         Have you also dealt with cyber terrorism online?

8    **A.**    Yes, I have.

9    **Q.**    And in your capacity on the Cyber Squad, have you

16:10:12  10    dealt with Romanian organized cyber crime?

11    **A.**    Yes, I have.

12    **Q.**    Approximately what percentage of your time over the

13    last 13 years would you say have you spent investigating

14    Romanian cyber crime?

16:10:24  15    **A.**    I would say approximately 75 to 80 percent of my time

16    has been on Romanian cyber organized crime.

17    **Q.**    Okay.  And does that include other investigations

18    besides the Bayrob Group?

19    **A.**    Yes, it does.

16:10:37  20    **Q.**    As part of your work with Romanian cyber crime, have

21    you ever spent an extended period of time in Romania?

22    **A.**    Yes, I have.

23    **Q.**    How long did you spend in Romania?

24    **A.**    I've been to Romania on many smaller trips for one

16:10:53  25    week or two weeks at a time, and then one time, I spent a

1    period of two months staying in Romania in 2009.

2    **Q.**   What were you doing during those two months?

3    **A.**   I was working at the US Embassy as well as working

4    everyday with the Romanian National Police, the RNP.  I

16:11:11 5    would work at their headquarters building in Bucharest.

6    **Q.**   And the RNP is what again?

7    **A.**   The Romanian National Police.

8    **Q.**   And during those two months, did you work closely with

9    the Romanian National Police or were you off doing separate

16:11:24 10    things?

11    **A.**   I worked with them everyday.

12    **Q.**   And when you were working with the Romanian National

13    Police, were you frequently working with them in RNP

14    offices?

16:11:32 15    **A.**   Yes, I was.

16    **Q.**   Now besides those two months, how many other times

17    would you estimate you visited Romania as part of your work

18    with the FBI?

19    **A.**   I think total, including those two months, I have been

16:11:43 20    there approximately 15 times.

21    **Q.**   Okay.

22    And during all of these visits, were you meeting with

23    and working with the Romanian National Police and with

24    Romania Prosecutors?

16:11:55 25    **A.**   Yes.

Diaz - Direct/Levine

1  **Q.**     So having worked closely with the Romanian National

2  Police and Romania Prosecutors, how would you say those

3  organizations compare with the FBI?

4              MR. GOLDBERG:  Objection.

16:12:04  5              MR. O'SHEA:  Objection.

6              THE COURT:  Sustained.

7  **Q.**     Okay.

8              What has your experience been working with the

9  Romanian National Police?

16:12:11 10  **A.**     It has been very positive.  We work very closely

11  together and work very well.  I believe that they are

12  comparable to the FBI.

13  **Q.**     Have you testified in state or federal court before?

14  **A.**     Yes, I have.

16:12:26 15  **Q.**     How many times have you testified in state or federal

16  court?

17  **A.**     Approximately ten to 12 times.

18  **Q.**     And are you certified to teach any law enforcement

19  courses?

16:12:39 20  **A.**     Yes, I am.

21  **Q.**     What courses?

22  **A.**     I am certified to teach courses related to evidence

23  response, related to the evidence response team, and I am

24  also certified to teach organized crime cases -- classes;

16:12:55 25  specifically, cyber organize crime classes.

1    **Q.**    And have you conducted trainings in both of those

2    areas?

3    **A.**    Yes, I have.

4    **Q.**    Have you conducted any trainings for international law

5    enforcement?

6    **A.**    Yes, I have.

7    **Q.**    What trainings have you conducted for international

8    law enforcement?

9    **A.**    I have taught at the International Law Enforcement

10   Academy, otherwise known as ILEA in Budapest, Hungary.  I

11   taught cyber organized crime class for a week there.  I've

12   also taught at the Latin American Law Enforcement Academy,

13   also referred to as LA-LEADS, in which I also again taught

14   cyber organized crime.

15   **Q.**    And were any Romania Government officials present for

16   either training?

17   **A.**    Yes, there were.

18   **Q.**    Can you elaborate?

19   **A.**    Yes.

20        At the ILEA course in Budapest, Hungary, there were

21   approximately 30 Romanian National Police officers there.

22   **Q.**    Okay.

23        As part of your job, do you also regularly attend

24   trainings related to investigating cyber crime?

25   **A.**    Yes, I do.

1    **Q.**   All right.

2         So now I want to move from your background and turn to

3    this actual investigation.  So Special Agent Diaz, when did

4    you begin personally investigating Nicolescu's and Miclaus'

16:14:11 5   group?

6    **A.**   In October 2007.

7    **Q.**   And just before we get any further, is there a name

8    that the FBI uses to refer to Nicolescu and Miclaus'

9    criminal group?

16:14:22 10  **A.**   Yes.

11   **Q.**   Where does that name come from?  First of all, what is

12   that name?

13   **A.**   We usually refer to them as the Bayrob Group.

14   **Q.**   Okay.  And now, let me ask, where does the Bayrob

16:14:32 15  Group, where does that name come from?

16   **A.**   The virus that they wrote and used was named by

17   industry investigators, and it was named as the Bayrob

18   Trojan; therefore, we named the group the Bayrob Group off

19   of the name of the virus that they used.

16:14:49 20  **Q.**   Okay.  You used the word Trojan.  What is a Trojan?

21   **A.**   A Trojan is a type of virus that can infect a

22   computer.

23   **Q.**   Okay.  What -- what makes it different than any other

24   virus?

16:15:01 25  **A.**   It's generally a virus that is installed without your

1    knowledge.  You think that you are installing something

2    simple.  Maybe you decide to install a game on your computer

3    that you can play, and without your knowledge, it's actually

4    installing a separate software package, which is the virus.

16:15:24  5    So it installs the game and then secretly installs something

6    else, which is the Trojan.

7    **Q.**    So in that example, the game is sort of like a Trojan

8    horse?

9    **A.**    Yes, it is.

16:15:34 10   **Q.**    And is that -- is that where the term Trojan comes

11   from?

12   **A.**    Yes.

13   **Q.**    Okay.  All right.

14          So what caused you to begin investigating Bayrob Group

16:15:45 15   in 2007?

16   **A.**    At the FBI, we have complaint duty that all agents

17   have to fulfill at least one day throughout the year.

18          And on complaint duty, we have to answer phone calls

19   and talk to people that call in with a complaint or we have

16:16:03 20   to interview people that walk into the office to give us a

21   complaint.  And in 2007, I happen to be on complaint duty

22   one day in October.

23   **Q.**    Okay.  And what happened on that day?

24   **A.**    The first victim the FBI is aware of, Yvonne Liddy,

16:16:20 25   called me at the FBI office that day.

1    **Q.**    Okay.

2         And Ms. Liddy will be testifying later, but at a

3    general level, what was the nature of Ms. Liddy's initial

4    complaint?

16:16:31 5              MR. O'SHEA:  Objection.

6              THE COURT:  Overruled.  You may tell us the

7    nature.

8              THE WITNESS:  When she first called the FBI

9    office in October of 2007, she was complaining about the

16:16:42 10   fact that she had bid on a computer -- sorry, on a car on

11   eBay, attempting to purchase this vehicle.  She had bid on

12   the car and had won the auction, and then she had sent the

13   money.

14             MR. O'SHEA:  Objection.

16:16:57 15            THE COURT:  Okay.  It's sustained.

16   BY MR. LEVINE:

17   **Q.**    Okay.

18        So at a more general level, can you just sort of tell

19   us what the overall nature is without going through every

16:17:08 20   step of it?

21   **A.**    Yes, she had been a victim of online auction fraud on

22   eBay.

23   **Q.**    Okay.  What does online auction fraud mean to you?

24   **A.**    Online auction fraud is generally when an individual

16:17:22 25   will post an auction on eBay or another online auction site,

1  hoping to sell an item that either doesn't exist at all or

2  they don't have themselves, and they will post this auction

3  and someone will win the auction and send them the money.

4  They get the money but they never actually provide the

16:17:41  5  product that they were supposed to be selling.

6  **Q.**    Okay.

7        And that is commonly referred to as auto auction fraud

8  or online auction fraud?

9  **A.**    Yes.

16:17:52  10  **Q.**    Okay.

11        And is that criminal scheme you just described, eBay

12  auction fraud, or auto auction fraud, online auction fraud,

13  is that a criminal scheme that's unique to the Bayrob Group

14  or is it a scheme that other criminals engaged in?

16:18:09  15  **A.**    No, it's not unique to the Bayrob Group.  It's

16  definitely a scream that other criminals engage in as well.

17  **Q.**    Now did Yvonne Liddy's initial complaint cause you to

18  open up an investigation?

19  **A.**    No, it do not.

16:18:22  20  **Q.**    Did you have a second conversation with Ms. Liddy?

21  **A.**    Yes, I did.

22  **Q.**    And at a general level, what was that conversation

23  about?

24  **A.**    Ms. Liddy called back to tell me that she had --

16:18:34  25              MR. GOLDBERG:  Objection.

1          THE COURT:  Sustained.

2    BY MR. LEVINE:

3    Q.    Without going into the details of the conversation,

4    what was the ultimate conclusion of that conversation that

16:18:45 5    caused you to take further investigative action?

6    A.    Ms. Liddy's computer had been infected with a virus.

7    Q.    Okay.

8          And upon learning that, what did you do next?

9    A.    I made an arrangement to visit her house, and I took

16:19:04 10    one of the computer forensics analysts from the FBI office

11    with me to go out and look at her computer.

12    Q.    Okay.  And what was the result of that analysis?

13    A.    We were able to determine that her computer was in

14    fact infected with the Bayrob Trojan.  We actually took the

16:19:22 15    computer back to our office to make a copy of it.  And I

16    ended up opening the investigation.

17    Q.    Okay.

18          So were you the only Special Agent investigating the

19    Bayrob Trojan in 2007?

16:19:34 20    A.    Yes, I was.

21    Q.    And have you been investigating the Bayrob Group ever

22    since?

23    A.    Yes.

24    Q.    So how long were you investigating the Bayrob Group

16:19:42 25    before the arrest of these Defendants?

1    **A.**    Approximately nine years.

2    **Q.**    Okay.

3          And during those nine years, roughly, how many search

4    warrants, subpoenas, other legal process did you obtain as

16:19:53 5    part of your investigation?

6    **A.**    There was hundreds of different legal process.

7    **Q.**    And besides Yvonne Liddy, as part of your

8    investigation, were you able to identify other US victims of

9    the Bayrob Group's eBay fraud?

16:20:07 10    **A.**    Yes.

11    **Q.**    How far -- roughly how many individual victims of the

12    Bayrob Group's eBay fraud were you able to identify through

13    the course of your investigation?

14    **A.**    There were hundreds of US victims of the online

16:20:19 15    auction fraud by the Bayrob Group.

16    **Q.**    Okay.

17          And in general, what methods do you use to identify

18    victims of the Bayrob Group's eBay fraud?

19    **A.**    There were multiple different ways of identifying

16:20:33 20    victims.  One way would be bank records.  If I spoke with a

21    victim, I would find out where they transferred the money

22    to, and I would get records from that particular bank

23    account.  And then analyzing that bank account, I might see

24    that they got four or five other transactions into that bank

16:20:52 25    account, that I would then know what was also associated

1    with the Bayrob Group.

2         I also did searches on IC3.

3    **Q.**    What is IC3?

4    **A.**    IC3 is the Internet Crime Complaint Center.  It is an

5    organization that works with the FBI.  There's a website

6    associated with it named IC3.gov, and what it is it's there

7    for victims of any type of cyber crime can go to that

8    website and fill out a complaint form, documenting what

9    happened to them so that law enforcement can then access

10   those records.

11   **Q.**    Okay.

12        So you talked about IC3 as one source of information

13   about victims to help identify them.  You talked about bank

14   accounts.  What other general ways do you use to identify

15   victims?

16   **A.**    A service that was used to communicate with victims of

17   the Bayrob Group was known as Read Notify and so we were:

18   Able to get records from Read Notify and analyze e-mails

19   that went through the Read Notify server.  And based on

20   those e-mails, the analysis of those e-mails, we identified:

21   More victims and more money mules associated with the Bayrob

22   Group.

23   **Q.**    Okay.

24        And eventually, were you able to identify command and

25   control servers associated with the Bayrob Group?

Diaz - Direct/Levine

**A.**    Yes.

     Servers that were used to control the Bayrob infected computers, the Bayrob botnet, we were able to identify the servers.  And on those servers was records --

16:22:29          MR. O'SHEA:  Objection.

               THE COURT:  Overruled.

               THE WITNESS:  There were records on the servers of victims that had been victimized by the Bayrob Group.

16:22:36          MR. O'SHEA:  Objection again, your Honor.

               THE COURT:  That answer will stand.

BY MR. LEVINE:

**Q.**    Okay.

     So let's go through some of these -- you talked about

16:22:44 four general methods of identifying victims; IC3, bank accounts, Read Notify, and the Command and Control Servers. So let's go through each of these in a little bit more detail.

     Tell me what is IC3?

16:22:58 **A.**    IC3 is the Internet Crime Complaint Center.

     By working with IC3, I can send IC3 a query.  I can tell IC3 I would like for them to search for any complaints that involved a particular e-mail address, a name, bank account, anything that would -- I could tee off have to

16:23:22 identify victims that would be associated with the Bayrob

Diaz - Direct/Levine

1    Group.

2         They could then search the database and provide all of

3    those complaints back to me.

4    Q.    Okay.

5         And I am now going to, with the permission from the

6    Judge, from your Honor, to approach.  I'm going to show you

7    what has been previously marked as Government's Exhibits

8    1480 to 1679.

9         So I would like you to just take a quick look at

10   Government's Exhibit 1480 to 1679 and let me ask, did you

11   have an opportunity to review these exhibits before coming

12   on to the stand today?

13   A.    Yes, I did.

14   Q.    All right.

15        Take a quick look and make sure they're still the

16   right ones there.  Let me know when you're satisfied it's

17   what you reviewed earlier.

18   A.    1480 through?

19   Q.    1480 through 1679.  Okay.

20        What is Government's Exhibit 1480 through 1679?

21   A.    These are all the printouts of the IC3 complaints that

22   are associated with the Bayrob Group.

23   Q.    Okay.  And from whom did you get these IC3 complaints?

24   A.    Heather Rollins is an individual that works at IC3 who

25   did all the searches for me.

1    **Q.**    Okay.  And do Government's Exhibit 1480 through 1679

2    contain fair and accurate copies of the IC3, IC3 complaints

3    provided to you by Heather Rollins for the Bayrob

4    investigation?

16:26:04   5    **A.**    Yes, they are.

6    **Q.**    Did you personally review these IC3 complaints?

7    **A.**    Yes, I did.

8    **Q.**    So having personally reviewed these IC3 complaints,

9    what type of information did victims include in these IC3

16:26:17  10   forms that helped you determine that they were victims of

11   the Bayrob Group and not victims of someone else doing

12   online fraud?

13                    MR. GOLDBERG:  Objection.

14                    THE COURT:  Overruled.  Please answer in

16:26:26  15   general terms, ma'am.

16                    THE WITNESS:  I would look for specific e-mail

17   addresses, specific bank accounts that were used to see, to

18   receive the wire transfers, specific names that they

19   communicated with, and then I would also look for things

16:26:42  20   that were clues to me that they were infected with the

21   Bayrob virus.

22   **Q.**    Okay.

23        Can you give us an example of a clue they were

24   infected with the Bayrob virus?

16:26:53  25   **A.**    Yes.  Many of the victims would say things like --

1          MR. GOLDBERG:  Objection.

2          MR. O'SHEA:  Objection.

3          THE COURT:  Sustained.

4          MR. GOLDBERG:  Without saying specifically

16:27:00 5   what the victim said, what would be a clue that they were

6   infected with the Bayrob virus.

7          THE WITNESS:  If there was a fake eBay website

8   that was used, if they felt like --

9          MR. GOLDBERG:  Objection.

16:27:17 10         THE COURT:  Sustained.

11  **Q.**    Without describing how any victim felt, what were the

12  markers that you might look for that would show this was a

13  Bayrob Group victim and not some other victim?

14  **A.**    Right.

16:27:28 15         Essentially, a fake website that they thought was

16  eBay.

17          MR. O'SHEA:  Objection.

18          THE WITNESS:  That they later determined was

19  not.

16:27:39 20  **Q.**    What about --

21          THE COURT:  One moment.

22          Sustained to the last part of that answer.  It will be

23  stricken.

24          MR. LEVINE:  "That they later determined" --

16:27:48 25         THE COURT:  Correct.

Diaz - Direct/Levine

1          MR. LEVINE:  Okay.

2     BY MR. LEVINE:

3     **Q.**     What about did -- if you saw indications of a Kodak

4     picture viewer attachment --

16:27:58 5     **A.**     Yes.

6               MR. GOLDBERG:  Objection.

7               MR. LEVINE:  I didn't finish the question.

8               THE COURT:  Let me hear the question, please.

9     BY MR. LEVINE:

16:28:05 10    **Q.**     If there were reports of a use of a Kodak picture

11    viewer, clicking on a Kodak picture viewer, would that to

12    you indicate a sign of the Bayrob Group?

13    **A.**     Yes, it would.

14              MR. GOLDBERG:  Objection.

16:28:16 15              THE COURT:  Sustained, sustained.  Rephrase

16    your question.

17    **Q.**     Were there any other signs that you -- that would help

18    you identify Bayrob Group infection?

19    **A.**     Yes, there was.

16:28:28 20    **Q.**     Can you give me some example -- an example or some?

21    **A.**     There were a couple of different other signs, the

22    Kodak people viewer being one of them.  If there was a link

23    that they were provided to look at pictures of the car, or

24    if there was an attachment in an e-mail that they were sent

16:28:49 25    to look at pictures of the car.

1    **Q.**    Okay.

2          Now, of those victims that made complaints through

3    IC3, roughly, how many were interviewed by you or other

4    members of the FBI?

16:29:02  5    **A.**    There was approximately 40 to 50 victims interviewed.

6    **Q.**    Okay.  And this is just from the IC3 population?

7    **A.**    Yes.

8    **Q.**    Okay.

9          So we talked about IC3 as the source for identifying

16:29:18 10    victims.  Let's now talk about Read Notify.  You mentioned

11    you identified victims through Read Notify.  What is Read

12    Notify?

13    **A.**    Read Notify is a service that's available on the

14    Internet, ReadNotify.com.  Anyone can sign up and use this

16:29:35 15    service.  And what it is, is if you were using Read Notify,

16    you can send e-mails from whatever e-mail account that you

17    use, whether it's Gmail, Yahoo, outlook, whatever you're

18    using, you can send your e-mails through the Read Notify

19    server.  And when those e-mails are received on the other

16:29:55 20    end from the person that you're sending to, you would get

21    notifications from Read Notify that the e-mail was received,

22    that it was opened, that it was deleted, that it was

23    forwarded, all different types of information about your

24    e-mail.  You would get notifications about.

16:30:13 25    **Q.**    Okay.

Diaz - Direct/Levine

1          And how did you determine that the Bayrob Group was

2      using Read Notify?

3      **A.**    I had been given e-mails that a victim had received

4      from a Bayrob Group member who was defrauding them online.

16:30:29 5      By analyzing the e-mail header of the e-mail, I was able to

6      determine that it had come from the Read Notify server.

7      **Q.**    And did you get in touch with Read Notify?

8      **A.**    Yes, I did.

9      **Q.**    And did Read Notify provide you with copies of e-mail

16:30:45 10     correspondence from the Bayrob Group?

11     **A.**    Yes, they did.

12     **Q.**    All right.  I'd like to now bring up what's been

13     previously marked as Government's Exhibit -- okay.  So I'm

14     going to bring up to you what has been marked previously

16:31:13 15     Government's Exhibit 1320.

16          Okay.  What is Government's Exhibit 1320?

17     **A.**    It is a CD.

18     **Q.**    Okay.  And a CD of what?

19     **A.**    It contains all of the e-mails that were provided by

16:31:46 20     Read Notify.

21     **Q.**    Okay.

22          And does Government's Exhibit 1320 contain fair and

23     accurate copies of the Bayrob e-mails you received from Read

24     Notify?

16:31:55 25     **A.**    Yes, it does.

Diaz - Direct/Levine

1    **Q.**    And did you review these e-mails to determine whether

2    they were actually e-mails to and from the Bayrob Group?

3    **A.**    Yes.

4    **Q.**    And based on your review, were they actually e-mails

16:32:05  5    to and from the Bayrob Group?

6                        MR. O'SHEA:  Objection.

7                        THE COURT:  Sustained.

8    <u>BY MR. LEVINE</u>:

9    **Q.**    How did you -- how did you review -- what things did

16:32:16  10    you look for to determine whether they were actually to and

11    from the Bayrob Group?

12    **A.**    All of the e-mails through the Read Notify server are

13    actually e-mails from the Bayrob Group.  So this disk would

14    not contain e-mails to the Bayrob Group.

16:32:31  15        And what I would look for were, again, specific e-mail

16    accounts that I knew the Bayrob Group was using, specific

17    names that I knew they were using.

18                        MR. O'SHEA:  Objection.

19                        THE COURT:  Overruled.

16:32:44  20                        THE WITNESS:  Specific bank accounts that I

21    knew to be associated with the Bayrob Group.  And then in

22    addition, they would use templates that they would copy and

23    paste into e-mails over and over and over again, sending to

24    hundreds of victims.  And so I knew that those were

16:33:01  25    templates that were used by the Bayrob Group.

1          MR. O'SHEA:  I'm going to object, Judge.

2          THE COURT:  I'm sorry?

3          MR. O'SHEA:  I'm sorry.  Again, objection.

4          THE COURT:  Overruled.  That answer will

16:33:12  5   stand.

6    **Q.**   Okay.

7          So based on that review, did you determine that the

8    e-mails provided by Read Notify were actually e-mails to and

9    from the Bayrob Group?

16:33:21 10         MR. O'SHEA:  Objection.

11          THE COURT:  Sustained.  Based --

12   **Q.**   I'm sorry.  You're right.

13          Based on that review, did you determine that the

14   e-mails were actually from the Bayrob Group?

16:33:35 15         MR. O'SHEA:  Objection.

16          THE COURT:  Overruled.

17          THE WITNESS:  Yes, I did.

18   **Q.**   Okay.

19          And approximately how many e-mails are on this CD?

16:33:45 20  **A.**   There are over 19,000 e-mails.

21   **Q.**   Now, are these, to clarify, are these e-mails between

22   members of the Bayrob Group?

23   **A.**   No.

24   **Q.**   Or are they e-mails between a member of the Bayrob

16:33:58 25  Group on one hand and a victim or a money mule on the other

Diaz - Direct/Levine

1    hand?

2                    MR. O'SHEA:  Objection.  Judge, can we

3    approach real quick?

4                    THE COURT:  You may.

16:34:04 5                    MR. O'SHEA:  Thank you.

6           (The following proceedings were held at side bar:)

7                    THE COURT:  Michael, on or off?

8                    MR. O'SHEA:  On.  I'm sorry.

9                    THE COURT:  Shirle, on.

16:34:24 10                   MR. O'SHEA:  The one thing I just noticed,

11   it's direct examination, that Brian -- he probably did it

12   involuntarily, but when he said to and from the Bayrob, he

13   pointed at our guys, and that's a leading question.  He did

14   it in front of the jury.

16:34:39 15                   THE COURT:  Well, I sustained his -- your

16   objection.  But, honestly, not because I saw him point to

17   your Defendant.  I -- if that happened, I just didn't see

18   it.  I sustained the objection because she had just

19   testified not "to" but only "from."  And that's why I

16:35:00 20   sustained the objection.

21       Go ahead.

22                   MR. O'SHEA:  Judge, this very second when I

23   stood up and he said the Bayrob Group and pointed at our

24   guy, that's a leading -- sorry.  That's a leading question.

16:35:12 25   He's pointing to our clients.

1        THE COURT:  Okay.

2        Well, I'm going to instruct all three of you on the

3   Government's side do not do that, if that occurred.  And I

4   don't know if it was done intentionally or not.  I'm not

16:35:26  5   even going to make inquiry.  From now on, don't do it.

6        MR. O'SHEA:  Thank you, Judge.

7        (Proceedings resumed within the hearing of the jury:)

8   BY MR. LEVINE:

9   **Q.**   Thank you, your Honor.  Okay.

16:35:49 10        Of those 19,000 e-mails that you reviewed, were they

11   all related to the fraud that we're talking about or any of

12   them just like ordering lunch or something like that?

13        MR. GOLDBERG:  Objection.

14        THE COURT:  Overruled.

16:36:04 15        THE WITNESS:  No, they were all related to the

16   fraud.

17   **Q.**   All right.

18        Now I'm not going to ask you and the jury to go

19   through 19,000 e-mails.  I'm sure the Judge will appreciate

16:36:19 20   that.  But, I want to ask you about a few of them.  And I'd

21   like to ask if you would please do me the kindness of

22   bringing up Government's Exhibit 1324.

23        THE COURT:  1324?

24        MR. LEVINE:  Yes.

16:36:34 25        MR. O'SHEA:  Judge --

1          THE COURT:  I'm sorry?

2          MR. O'SHEA:  Before that's published to the

3   jury, can Mr. Goldberg and I assume he's going to bring it

4   up on the screen and the jury's going to see it now before

5   it's admitted?

6          MR. LEVINE:  Not yet.

7          MR. O'SHEA:  Well, when you said bring it up,

8   maybe I read you the wrong way.

9          THE COURT:  Oh, okay.

10          MR. LEVINE:  I'm sorry.

11          THE COURT:  Ladies and gentlemen, you cannot

12   see it, correct?  There's nothing on your screens?  Okay.

13          MR. O'SHEA:  I misunderstood.

14          MR. LEVINE:  I will ask permission to publish

15   it before it will go to the jury, your Honor.

16          THE COURT:  Fair enough.

17          MR. LEVINE:  Thank you.

18   BY MR. LEVINE:

19   Q.    So I show you -- I hope it's on the screen.  No, not

20   yet?

21   A.    No, I don't see anything.

22          THE JURY:  It's on our screen.

23          MR. McDONOUGH:  Oh, oh.

24          THE COURT:  Is it off now?

25          THE JURY:  Yes.

1          THE COURT:  Can you see it?

2          THE WITNESS:  No.

3          MS. CHANDLER:  I took it down.  Now I have it

4     back up.

16:37:41 5          MR. LEVINE:  We will solve these problems in

6     short.

7          THE COURT:  All right.  We're good.

8          MR. LEVINE:  Okay.

9     **Q.**    Now, at a general level, what is Government's Exhibit

16:37:49 10    1324?

11    **A.**    This is an e-mail provided by Read Notify that was

12    associated with the Bayrob Group.

13    **Q.**    Okay.

14         And is Government's Exhibit 1324 a fair and accurate

16:38:01 15   copy of a Read Notify e-mail as it was produced to you by

16    Read Notify?

17    **A.**    Yes.

18    **Q.**    Okay.

19         MR. LEVINE:  And, your Honor, now subject to

16:38:09 20   additional authentication from the owner, operator of Read

21    Notify will be testifying next, although tomorrow likely,

22    and Tiberiu Danet, who will be testifying later, I move to

23    admit Government's Exhibit 1324.

24         MR. O'SHEA:  Objection.

16:38:25 25        THE COURT:  I think we're going to have to

1      wait.

2                      MR. LEVINE:  For -- can we have a side bar,

3      your Honor?

4                      THE COURT:  On that issue?

16:38:35  5         MR. LEVINE:  Yes.

6                      THE COURT:  Okay.

7           (The following proceedings were held at side bar:)

8                      MR. LEVINE:  So what is the -- what is the

9      objection?

16:39:01 10         MR. O'SHEA:  Let's get a hard copy of that up

11     here so we can look at it.

12                     MR. LEVINE:  Okay.

13                     THE COURT:  You just said subject to -- we

14     haven't heard them yet.  And I'm assuming that was the

16:39:15 15     ground for objecting.

16                     MR. LEVINE:  Okay.

17          In chambers at a pretrial conference, we discussed,

18     you suggested a procedure where we would conditionally

19     admit, subject to additional authentication later.

16:39:27 20                     THE COURT:  Oh -- only if Defense agreed.  And

21     I'm hearing they're not.

22                     MR. LEVINE:  Okay.

23          Well, the problem is we're going to have quite a few

24     witnesses that will provide different authentication --

16:39:39 25     different levels of authentication throughout the trial.

1    We're doing this with the understanding that if they're

2    ultimately not authenticated, that -- to your satisfaction,

3    then we have a problem.  So, but we are putting sort of,

4    based on state -- on Special Agent Diaz's testimony already

16:39:57  5    of how she identified this as a Bayrob -- can you hear me?

6        Based on Special Agent Diaz's testimony already is how

7    she identified this as a Bayrob Group e-mail from Read

8    Notify.  Read Notify's going to come testify tomorrow as to

9    how they identified it initially and that it's authentic and

16:40:19 10    I --

11            THE COURT:  Let me stop you.  I'm going to

12    stop you.

13        I'm confused here.  What do you plan on doing with

14    this right now?

16:40:29 15            MR. LEVINE:  To ask her some questions based

16    on what she learned from the e-mail.

17            MR. O'SHEA:  Okay.  I -- Judge, my concern has

18    not really been authentication.  It never really has been.

19    It has been about the hearsay.  And there are hearsay

16:40:52 20    statements in that e-mail, pure and simple.  And we're going

21    to object to the hearsay proffered issues that we talked

22    about probably ad nauseam on brief and publishing it to the

23    jury until a ruling is made relative to the hearsay element

24    of this is not fair because the jurors would have already

16:41:10 25    seen it.

1    So I think publicizing it too soon is the reason I'm

2    objecting.

3            MR. LEVINE:  Can I respond to that?

4            THE COURT:  Well, then I have to look at

16:41:21  5    every -- clearly you don't care about conditionally

6    admitting them into evidence.  That's what you just said.

7    If you're -- your problem is hearsay.  Well, the only way I

8    can make that determination is if I look at every document

9    you want to get into evidence and determine if there's

16:41:40 10    hearsay.

11            MR. LEVINE:  Yes.

12            THE COURT:  It's as simple as that.

13            MR. LEVINE:  Your Honor, these are very simple

14    on hearsay.  All of the Read Notify e-mails are from Bayrob.

16:41:49 15    They are all in furtherance of the conspiracy and Special

16    Agent Diaz just testified that, that they all are about the

17    fraud.  None of them are about ordering lunch or something

18    different.  That's why I asked her that question, to lay the

19    foundation.

16:42:02 20            THE COURT:  Well, but you can still have

21    hearsay within a document that you're trying to offer for

22    proof of furtherance of the conspiracy.

23            MR. LEVINE:  So what there is is statements in

24    furtherance of the conspiracy, the Bayrob Group statements.

16:42:15 25    And any statements by the victim are not going to go into,

1    but they're just offered for context.

2              THE COURT:  But, Mr. Levine, I'm going to just

3    take your word for it?  Don't I have to look at them?

4              MR. LEVINE:  You can look at them, yes.

16:42:29  5    THE COURT:  I mean I have to.

6              MR. O'SHEA:  Judge, may I also say --

7              THE COURT:  So I'm going to suggest that you

8    point out specifically to me what hearsay you are objecting

9    to.

16:42:38 10    MR. O'SHEA:  I can but, Judge, let me also say

11    that as I understand the coconspirator exception to the

12    hearsay rule, first and foremost, they must establish the

13    existence of the conspiracy.  I don't think that they've

14    done that yet so this is premature.

16:42:51 15    Secondly, that statement, that hearsay statement must

16    be in furtherance of the conspiracy.  Now I know all they

17    have to do is establish the existence of the conspiracy by

18    the preponderance of the evidence, but this is their first

19    witness.  They haven't done that yet.  So I think it's

16:43:10 20    premature.

21         And even so, Judge, even if it fits the exceptions

22    that are listed currently in the Federal Rules of Evidence

23    related to hearsay, it may still violate Crawford.  I can

24    identify exactly in that particular e-mail that we're

16:43:27 25    talking about where the hearsay statement is.

1    I don't think -- going back, I don't think they've

2    established a conspiracy yet or our guy is a part of this

3    conspiracy or anything.

4                    MR. LEVINE:  Your Honor, we addressed these in

16:43:40  5    two or three separate hearsay motions in advance.  One

6    specifically on the coconspirators exception, and then the

7    most recent one where we identified all the coconspirators'

8    statements that we wanted to introduce.

9             We presented case law showing the Court can decide in

16:43:55 10    advance of trial that the coconspirator exception applies,

11    subject to establishing the conspiracy through the course of

12    the trial.

13             We obviously believe that we're going to establish the

14    conspiracy.

16:44:07 15                    THE COURT:  The law is abundantly clear that I

16    can conditionally allow statements in anticipation of proof

17    of a conspiracy, and so I -- that objection is not well

18    taken.

19                    MR. LEVINE:  And on terms of proffer, the law

16:44:25 20    is also very clear that a statement in furtherance of the

21    conspiracy or a statement of a party opponent is not hearsay

22    and thus does not proffer --

23                    THE COURT:  You don't even have to argue that.

24    I'm going to say it again.

16:44:37 25             I know the Rules of Evidence.  I know the law.  But, I

1    can't take your word when you say there's no hearsay in

2    there.  All of the statements, we're not offering for the

3    truth of the matter asserted.  I need to look at it.  And

4    you need to identify to me what statements you want

16:44:57  5    redacted.

6                    MR. O'SHEA:  And here, Judge, in the classic

7    conspiracy situation, you've got a Person A, Joe, saying

8    this is what the Defendant B said to me.  You know, and that

9    was in furtherance of the conspiracy.  That's the

16:45:12  10   coconspirator.

11        Here they don't even -- they don't have any identity

12   of who made these statements.  They just say some computer

13   network with identifying persons or anything else like that.

14                   THE COURT:  You need to identify -- folks, I

16:45:28  15   don't have it.  Someone needs to show it to me.

16                   MR. LEVINE:  Will you identify so -- the

17   statement here I have written here.

18                   MR. O'SHEA:  Who's it from?

19                   THE COURT:  You know what?  I'm going to let

16:45:41  20   them go home.  We can't -- stay here.

21                   MR. O'SHEA:  Fair enough.

22        (Proceedings resumed within the hearing of the jury:)

23                   THE COURT:  Ladies and gentlemen, an issue has

24   arisen we're going to deal with outside of your hearing.  So

16:45:56  25   instead of making you wait any longer, we're going to

Diaz - Direct/Levine

1    adjourn for the evening.

2        Please remember the admonition.  Do not form any

3    opinion regarding this matter.  Do not talk about the case

4    amongst yourselves or with anyone else.

16:46:09 5        Please be downstairs tomorrow morning, downstairs, not

6    up here, downstairs in the jury room at 9:00.  We will call

7    for you at that time, and we will immediately begin as soon

8    as you are up.

9        Have a good evening, everyone.  Oh, folks, the

16:46:27 10   notebooks must stay in the jury room, in the jury room.  You

11   cannot take them home with you.

12       All rise for the jury.

13       (Proceedings in the absence of the jury:)

14       (The following proceedings were held at side bar:)

16:49:34 15           MR. O'SHEA:  First of all, it's -- it's no

16   question in my mind, Judge, okay -- well, I thought we were

17   kind of doing the sound thing.

18           THE COURT:  Yeah, but -- so she can hear.

19           MR. O'SHEA:  I see.  Got you.  And so that the

16:49:52 20   witness can't hear, too.  I got you.

21       So my thinking is, Judge, the bottom -- for instance,

22   to make the record clear --

23           THE COURT:  Okay.  For the record, we are

24   looking at Government's Exhibit 1324.  The Government has

16:50:04 25   provided me a copy.  Mr. O'Shea is now pointing out the

1      hearsay, what he believes to be hearsay in this document.

2                  MR. O'SHEA:  At the bottom of 1324, at the

3      bottom left-hand corner, it says stuff like, "I can't comply

4      with every request."  Anyway, "I sent you a Trojan.  I'm not

5      the fake e-mail kind of guy."  Surprisingly, out of 20 of

6      these e-mails, two more seem to be willingly sent to, "To

7      send, LOL," which I think means Laugh Out Loud.

8          The next page is -- if we just go to like the second

9      paragraph from the top of the next page of 1324, it says, "I

10      suppose you give a nice percentage of what we burn together.

11      You can always verify if that's" -- pardon me, "fucker got

12      burned.  Simply call, though I have no way to" -- clearly

13      these are statements offered for their truth of the matter.

14      Clearly they are hearsay.

15          The question is, A, do they fit a definition, and I

16      assume they're going to use the coconspirator exception, but

17      I -- as I argued before, they haven't established the

18      conspiracy by the preponderance of the evidence yet.

19          And secondly, they don't even tell you who they're

20      from, Judge.  It's from some entity without identifying the

21      person or anything else.

22                  MR. LEVINE:  So that's why we have offered

23      them under the coconspirator exception.  They're in

24      furtherance of the conspiracy.  If we knew specifically

25      which one of them made the statement, we would have offered

Diaz - Direct/Levine

1    it on the statement of a party opponent, but it is somebody

2    within the group.  And it's clearly with a victim being --

3    you can see how they're being -- I don't know how to

4    characterize it, but I provide significant information about

16:51:52  5    the group, including that they're -- there are five of them,

6    about five guys doing this is what they said.

7                THE COURT:  Okay.

8        This clearly is a statement in furtherance of a

9    conspiracy.  Therefore, your objection based on hearsay is

16:52:08 10    not well taken.

11                MR. O'SHEA:  Now the only -- my next proffer,

12    my exception to that Judge --

13                THE COURT:  Sure.

14                MR. O'SHEA:  Based on the Crawford analysis

16:52:18 15    and that is that because the Government has yet to identify

16    the individual from whom that came from, our ability,

17    Mr. Goldberg's and I, right to confront and cross-examine

18    that human being or whoever it was is non-existent and,

19    therefore, a Crawford violation.

16:52:37 20                MR. LEVINE:  Your Honor, we briefed this

21    issue, and I think you just indicated you -- that you didn't

22    see a Crawford issue.  The answer to this is that the

23    801(d), which is statements of a party opponent in

24    furtherance of the conspiracy, an admission, those are all

16:52:56 25    considered not hearsay and Crawford doesn't apply to them.

Diaz - Direct/Levine

1   The law is very clear in the Sixth Circuit and every other

2   circuit throughout this issue.  I think the Supreme Court

3   has even addressed it.

4                   THE COURT:  I agree with the Government.  Your

16:53:07  5   objection is not well taken.

6                   MR. O'SHEA:  Okay.  But further -- thank

7   you --

8                   MR. GOLDBERG:  For the record, Mr. Nicolescu

9   makes the same objection.  Thank you.

16:53:22 10                   THE COURT:  Overruled for the same reason.

11                   MR. GOLDBERG:  Of course.

12                   THE COURT:  All right.  Thank you.

13                   MR. LEVINE:  Thank you, your Honor.

14                   THE COURT:  So because -- we're off the

16:53:31 15   record.

16           (Proceedings resumed within the hearing of the jury:)

17                   THE COURT:  We're in adjournment, folks.

18           (Proceedings adjourned at 4:53 p.m.)

19

20

21

22

23

24

25

Diaz - Direct/Levine

1    DIRECT EXAMINATION OF STACY DIAZ                    34

2    OPENING STATEMENTS ON BEHALF OF THE GOVERNMENT      8

3    OPENING STATEMENTS ON BEHALF OF NICOLESCU           23

4    OPENING STATEMENTS ON BEHALF OF RADU MICLAUS        27

5

6                   C E R T I F I C A T E

7            I certify that the foregoing is a correct

8    transcript from the record of proceedings in the

9    above-entitled matter.

10

11

12

13   s/Shirle Perkins_____
     Shirle M. Perkins, RDR, CRR
14   U.S. District Court - Room 7-189
     801 West Superior Avenue
15   Cleveland, Ohio 44113
     (216) 357-7106
16

17

18

19

20

21

22

23

24

25