```
1              IN THE DISTRICT COURT OF THE UNITED STATES
                  FOR THE NORTHERN DISTRICT OF OHIO
2                          EASTERN DIVISION

3

     UNITED STATES OF AMERICA,      )
4                                   )
                   Plaintiff,       )    Judge Gaughan
5                                   )    Cleveland, Ohio
               vs.                  )
6                                   )    Number 1:16CR224
     BOGDAN NICOLESCU,              )
7    RADU MICLAUS,                  )
                                    )
8              Defendants.

9
                           - - - - -
10              TRANSCRIPT OF PROCEEDINGS HAD BEFORE

11             THE HONORABLE PATRICIA ANNE GAUGHAN

12                    JUDGE OF SAID COURT,

13              ON THURSDAY, MARCH 28, 2019

14                        Volume 4
                           - - - - -
15

16

17

18
     Official Court Reporter:        Shirle M. Perkins, RDR, CRR
19                                   U.S. District Court
                                     801 West Superior, #7-189
20                                   Cleveland, OH 44113-1829
                                     (216) 357-7106
21

22

23
     Proceedings recorded by mechanical stenography; transcript
24   produced by computer-aided transcription.

25
```

```
1    APPEARANCES:

2    For the Government:          DUNCAN T. BROWN,
                                  BRIAN MCDONOUGH,
3                                 Assistant U.S. Attorneys
                                  801 West Superior Avenue
4                                 Cleveland, OH 44113
                                  (216) 622-3600
5
                                  BRIAN LEVINE,
6                                 U.S. Department of Justice -
                                  Criminal Division
7                                 Ste. 600
                                  1301 New York Avenue
8                                 Washington, DC 20530
                                  (202) 616-5227
9
     For Bogdan Nicolescu:        MICHAEL GOLDBERG, ESQ.,
10                                Goldberg & O'Shea
                                  Suite 450
11                                323 Lake Place
                                  Cleveland, OH 44113
12                                (216) 696-4514

13   For Radu Miclaus:           MICHAEL J.  O'SHEA, ESQ.,
                                  Lipson O'Shea
14                                110 Hoyt Block Bldg.
                                  700 West St. Clair Avenue
15                                Cleveland, OH 44113
                                  (216) 241-0011
16

17

18

19

20

21

22

23

24

25
```

1          THURSDAY SESSION, MARCH 28, 2019, AT 9:03 A.M.

2          (Proceedings in the absence of the jury:)

3                  THE COURT:  As I've indicated to all counsel

4     off the record, Juror Number 3 has indicated that she is too

09:15:35  5     ill to come into court.

6          And Mary will correct me if I'm wrong, my judicial

7     assistant, but Natalie, the jury room administrator,

8     indicated that she refuses to come in.  And this is the same

9     woman who said, I believe it was yesterday or the day

09:16:00 10     before, that she wanted to go home because she was sick.

11          On behalf of the Government, what is your pleasure?

12                  MR. BROWN:  Your Honor, on behalf of the

13     Government, I think we're forced to recommend Juror 3 be

14     excused and Alternate Number 1 be seated as Juror Number 3.

09:16:19 15                  THE COURT:  Mr. Goldberg?

16                  MR. GOLDBERG:  Your Honor, I think that's the

17     only course we really can take.  So we would not waive any

18     objection to excusing her.

19                  THE COURT:  Mr. O'Shea.

09:16:29 20                  MR. O'SHEA:  I agree and Ester-C for everybody

21     on the jury pool, Judge.

22          (Proceedings resumed in the presence of the jury:)

23                  THE COURT:  Good morning, ladies and

24     gentlemen.

09:18:38 25          Ladies and gentlemen, I apologize for the delay this

1    morning.  However, as you can see, we had a juror issue.  We

2    had to thoroughly address that issue on the record but

3    outside of your presence, and a decision had to be made.

4         We have, in fact, decided, Ms. Miller, you are now

09:19:06  5    Juror Number 3.  And the original Juror Number 3 has been

6    excused for cause.

7         But I want to reiterate if -- it wasn't an automatic

8    decision.  It was a decision made after thorough discussion,

9    investigation, et cetera.

09:19:28 10         Mr. Goldberg, you may proceed.

11              MR. GOLDBERG:  Thank you.

12              CROSS-EXAMINATION OF LIAM OMURCHU

13    BY MR. GOLDBERG:

14    Q.   Good morning, Mr. Omurchu.

09:19:36 15    A.   Good morning.

16    Q.   I promise I don't have too much today but a few things

17    I want to go back over.

18         Now, you indicated that you have corresponded with the

19    FBI in the U.S. Attorney's Office in reference to this case?

09:19:52 20    A.   Yes.

21    Q.   And by corresponding, I mean phone calls, meetings,

22    things like that.

23    A.   Yes.

24    Q.   What about e-mails?

09:20:00 25    A.   Yes.

557

Omurchu - Cross/Goldberg

1    **Q.**    Okay.

2         So were you asked specific questions and responded

3    with specific answers regarding technical issues by e-mail?

4    **A.**    Yes, I believe so.

09:20:12 5    **Q.**    Okay.

6         And did you ever prepare a report or anything in

7    writing regarding your part of the investigation of the

8    Bayrob virus?

9    **A.**    Yes.

09:20:24 10    **Q.**    And who did you provide that to?

11    **A.**    To the FBI and to Romanian law enforcement.

12    **Q.**    When did you do that?

13    **A.**    Maybe 2013.

14              MR. GOLDBERG:  Your Honor, may we have a

09:20:43 15    moment?

16              THE COURT:  Of course.

17         (Counsel conferring.)

18              MR. GOLDBERG:  May we approach, your Honor?

19              THE COURT:  You may.

09:20:51 20    (The following proceedings were held at side bar:)

21              THE COURT:  Hang on.  Do you want to talk off

22    the record first?

23              MR. GOLDBERG:  Well, let's -- let me say what

24    my problem is.

09:21:33 25         So in discovery and in the notice of discovery, 16, I

Omurchu - Cross/Goldberg

1  believe, it's (1)(a) -- I don't know what the expert rule

2  is -- the Government identified Mr. Omurchu as an expert in

3  his deep technical knowledge, and I agree.  He's an expert.

4  I think there's a duty to provide counsel under Jencks Act

09:22:03  5  with any prior statements of a witness.  There's also a duty

6  to provide any expert reports prepared by that witness.

7  I've received neither.

8      I've received a sum total of, I got Mr. Omurchu's

9  resumé, I got a couple of notes from FBI meetings with him,

09:22:27 10  and that's it.  And so there's a -- apparently he prepared a

11  report in this case, and I've never seen it.

12              MR. O'SHEA:  Let me supplement that by saying

13  last week I prepared subpoenas, sent it around to everybody

14  in the prosecution group, that I had e-mailed to this

09:22:49 15  witness saying bring us copies of everything that you have,

16  you know, exchange between the FBI --

17              MR. BROWN:  Your Honor, I think there might be

18  a question about what is a report.  I don't know if we're

19  talking about an expert report.  I asked both agents.  They

09:23:06 20  don't believe that they received an expert report.  If he's

21  talked about his actions, I think the testimony stands for

22  itself that they did have conversations about that.  But, my

23  understanding is at some point in 2013, he provided the FBI

24  with documents.  Those documents were turned over to the

09:23:26 25  Defense very early on as part of the ongoing discovery.

Omurchu - Cross/Goldberg

1    So whatever he turned over to the Defense at that time

2    in 2013 were provided, but it's always been my understanding

3    that there is no formal report prepared or given to the FBI.

4    I've informed the agents to double check their files

09:23:47  5    for such a report, but if it's a question of the description

6    of what it is, I don't believe they've -- a formal expert

7    report was provided.

8    MR. GOLDBERG:  Okay.

9    Well, it's still a prior statement of a witness and he

09:24:05  10    said that he corresponded, answered questions by e-mail.

11    That's prior statement of a witness made to law enforcement.

12    He said he reduced his investigation to some kind of

13    writing.  And if -- and I believe that's a prior statement

14    by a witness, if not an expert report.  But I believe it's

09:24:24  15    an expert report.  So --

16    MR. BROWN:  If you're talking about articles

17    he's written or published as part of his duties at Symantec,

18    those are publicly available, your Honor.

19    THE COURT:  Okay.

09:24:36  20    MR. GOLDBERG:  I'm not concerned with the

21    articles.  I've read his articles.

22    THE COURT:  Let's first find out what exactly,

23    pin down exactly what he has so-called written.

24    Based on the answers, you are then going to have to do

09:24:55  25    a second search or find out if he has anything on him.  And

Omurchu - Cross/Goldberg

1    I will instruct that he is not to leave.  And if we have to

2    recall him after you review information, we will -- I will

3    permit that.  So he cannot leave until we close this issue.

4              MR. BROWN:  Your Honor, if I can grab one of

09:25:22  5    the agents.

6              THE COURT:  Sure.

7              MR. BROWN:  While testimony is given.

8              THE COURT:  Sure, sure.

9              MR. GOLDBERG:  Thank you very much, your

09:25:30 10    Honor.

11         (Proceedings resumed within the hearing of the jury:)

12    BY MR. GOLDBERG:

13    Q.    Okay.  So excuse me.  Have to be very, very precise

14    about what you provided to the justice, the FBI and the U.S.

09:25:51 15    Attorney's Office.

16         So you said that you did reduce your investigation to

17    some kind of writing?

18    A.    Yes.

19    Q.    Okay.

09:25:58 20         So was that in the form of an e-mail, a formal report

21    or something else?

22    A.    So the formal report, I recall two formal reports that

23    I sent for sure.  And there was e-mails.  I e-mailed as

24    well.

09:26:19 25    Q.    And to whom did those e-mails go?

Omurchu - Cross/Goldberg

1    **A.**    To Ryan MacFarlane, and I don't recall exactly who

2    else.

3    **Q.**    Okay.

4          But, I imagine that in your work, that it would not be

09:26:39 5    something that you would -- it would be unusual when working

6    with law enforcement to reduce your findings and your

7    investigation to writing, correct?

8    **A.**    Yes.

9    **Q.**    And does that take a particular form that you fill out

09:26:55 10   or is it basically just open prostyle where you're writing

11   what you did and what happened?

12   **A.**    It's normally in the form of a report, like a sort of

13   presentation.

14   **Q.**    A presentation?

09:27:09 15   **A.**    Um-hum.

16   **Q.**    Okay.

17         Like Power Point presentation or more a report saying

18   on this date, I took these actions, and here is a screenshot

19   of that?

09:27:22 20   **A.**    No, the -- a PDF of our research results.  I recall a

21   PDF of our research results, and I recall creating a Power

22   Point with results of our research as well.

23   **Q.**    Okay.

24         What about written out in Paragraph form, what you

09:27:46 25   did, who worked on the file, where evidence that you

1    collected was stored, did you do that?

2    **A.**    Yes.

3    **Q.**    Okay.

4         And is that something that you have to pass up the

09:28:03  5    line at Symantec to -- to the lawyers or something you can

6    send directly from its creation by you to law enforcement?

7    **A.**    We would normally never provide any information like

8    that outside of the company.

9    **Q.**    Okay --

09:28:23 10         THE COURT:  I'm sorry.  Would you say that one

11    more time, sir.

12         THE WITNESS:  As far as I'm aware, we would

13    not provide that type of information outside of the company.

14    **Q.**    Okay.

09:28:31 15         THE COURT:  Outside of company?

16         THE WITNESS:  The company.

17    **Q.**    I understand what you're saying.  You wouldn't send it

18    off to the law firm that may represent Symantec, is that

19    what you're saying?

09:28:40 20    **A.**    No, I'm saying we wouldn't send it to anyone.

21    **Q.**    What about -- what about the FBI and law enforcement?

22    **A.**    No.

23    **Q.**    Okay.  Did you do that in this case?

24    **A.**    No.

09:28:50 25    **Q.**    Okay.

1      What did you send -- what was contained in the two

2   e-mails you sent to law enforcement?

3   **A.**   So in the first report that I sent, which I seem to

4   recall was in 2008, it was a report of what we had found

09:29:08 5   from our investigation, screenshots of the malware, domain

6   names that had been registered, what our opinion was of what

7   the malware did.

8   **Q.**   Your opinion, based on your experience in this field

9   and --

09:29:26 10   **A.**   Yeah.

11   **Q.**   Your technical knowledge?

12   **A.**   Yes.

13   **Q.**   Okay.

14   **A.**   And again, I don't recall exactly what I sent in 2013,

09:29:38 15   but I did present -- I presented on the topic, I don't

16   recall what I sent to law enforcement.

17   **Q.**   Okay.  But you sent something in writing?

18   **A.**   Yes.

19   **Q.**   Okay.

09:29:53 20      And besides those two -- you're calling them reports,

21   I think.  Have you ever seen those again in your preparation

22   for your testimony here?

23   **A.**   No, I don't think so.

24   **Q.**   Okay.

09:30:08 25      Besides those two reports, did you exchange e-mails

Omurchu - Cross/Goldberg

1    with Special Agent MacFarlane, Special Agent Diaz, or any of

2    the US Attorneys assigned to this case?

3    **A.**    Yes.

4    **Q.**    Okay.

09:30:25  5         And can you approximate how many of those there were?

6    **A.**    I don't know.  Maybe 20.

7    **Q.**    20?

8         And were they basically concerned with travel

9    arrangements and meals while you're in Cleveland?

09:30:46 10  **A.**    There was various different things discussed there.

11   **Q.**    So -- but that wasn't all 20 of them?

12   **A.**    No.

13   **Q.**    Was it -- were the e-mails concerned with technical

14   issues that you could be asked about in court and how you

09:30:59 15  would answer?

16   **A.**    Yeah.  I really don't recall exactly what was in the

17   e-mails.

18   **Q.**    Okay.

19        We can agree that you sent two reports and at least 20

09:31:12 20  e-mails to the prosecution team, someone on the prosecution

21   team, during your involvement in this case?

22   **A.**    Yes.

23   **Q.**    Had you sent anything else besides the things I just

24   mentioned to the prosecution team, meaning the Department of

09:31:29 25  Justice, the FBI, the US Attorney's Office?

| | |
|---|---|
| 1 | **A.**    To the best that I can recall, that's it. |
| 2 | **Q.**    And we can agree that everything in those e-mails, |
| 3 | apart from logistics of getting to Cleveland and things you |
| 4 | needed for that, concerned the substance of your testimony |
| 09:31:59 5 | in court over the last few days? |
| 6 | MR. LEVINE:  Objection. |
| 7 | THE COURT:  Sustained. |
| 8 | **Q.**    Well, it concerned your technical knowledge of the |
| 9 | Bayrob Group, correct? |
| 09:32:15 10 | MR. LEVINE:  Objection. |
| 11 | THE COURT:  Rephrase your question. |
| 12 | **Q.**    Do you recall what the substantive e-mails concerned? |
| 13 | MR. LEVINE:  Objection. |
| 14 | THE COURT:  Overruled.  You may answer that. |
| 09:32:28 15 | THE WITNESS:  Your question again? |
| 16 | **Q.**    So apart from the logistics e-mails, the substantive |
| 17 | e-mails, if you can give me a basic outline of what they |
| 18 | concerned. |
| 19 | MR. LEVINE:  Objection, your Honor. |
| 09:32:46 20 | THE COURT:  Overruled. |
| 21 | THE WITNESS:  I'm trying to recall. |
| 22 | The e-mails would certainly -- some e-mails were |
| 23 | related to the technical details of what I had seen in the |
| 24 | Bayrob analysis, yeah. |
| 09:33:14 25 | **Q.**    And what you testified to over the last three days |

Omurchu - Cross/Goldberg

1    now?

2    A.    Yes.

3    Q.    Okay.

4          What else would the e-mails concern or be relating to?

09:33:22 5    A.    I don't recall anything else.

6    Q.    Okay.

7          You recall -- my last question about this.  Do you

8    recall specific questions in the e-mails that you could

9    expect to be asked during your direct examination?

09:33:45 10   A.    No.

11   Q.    Okay.

12         At some point, you did meet with the Department of

13   Justice, either Mr. Levine or the S Attorney's Office,

14   correct?

09:33:55 15   A.    Yes.

16   Q.    And how many times did that occur?

17   A.    I don't know.  I can't recall.

18   Q.    Well, I mean as Mr. Levine asked yesterday I'm going

19   to ask you, is it more than five?

09:34:14 20   A.    Yeah.  Maybe about five.  I honestly can't remember.

21   Q.    Were those meetings in Cleveland or Los Angeles or

22   somewhere else?

23   A.    I recall in Cleveland.

24   Q.    Okay.  When was that?

09:34:26 25   A.    In preparation for trial, two days ago.

Omurchu - Cross/Goldberg

1    **Q.**   Okay.  Besides that, the rest were in L.A.?

2    **A.**   I don't recall meeting anybody in L.A., meeting

3    anybody else.

4    **Q.**   Okay.

09:34:43 5       Well, you had at least three or four other meetings,

6    correct, besides the one in Cleveland?

7    **A.**   I honestly can't recall.

8    **Q.**   Okay.

9        Well, it wasn't just a one meeting, right; it wasn't

09:35:00 10  just the one face-to-face meeting this week?

11   **A.**   I have met Brian Levine yes on several occasions.

12   **Q.**   Okay.

13       And during those occasions, it was to discuss this

14   case, and your testimony?

09:35:14 15  **A.**   Yes.

16   **Q.**   Right?  And the questions you were asked yesterday by

17   Mr. Levine and the day before when he went through your

18   direct examination, you had heard most of those questions

19   previous to entering the court?

09:35:33 20                  MR. LEVINE:  Objection.

21                  THE COURT:  Overruled.

22                  THE WITNESS:  Yes.

23   **Q.**   Yeah.  He had gone through this with you, right?

24   **A.**   Yes.

09:35:38 25  **Q.**   He had gone through his questions and your answers,

1    right?

2    **A.**    Yes.

3    **Q.**    Right.

4          So you and I never met until yesterday, right?

09:35:46 5    **A.**    That's correct.

6    **Q.**    You recall us meeting, but we've never spoken, right?

7    **A.**    That's correct.

8    **Q.**    Did the Department of Justice give you any guidance

9    about talking to the Defense in this case?

09:36:02 10   **A.**    No.

11   **Q.**    They didn't --

12   **A.**    But --

13   **Q.**    Go ahead.

14   **A.**    No, they didn't.

09:36:06 15   **Q.**    Okay.

16         They didn't tell you what -- they didn't say what to

17   do if someone tried to contact you?

18   **A.**    No.

19   **Q.**    What about if someone served you with a subpoena?

09:36:14 20   **A.**    No.

21   **Q.**    Okay.  Have you testified before in a criminal case?

22   **A.**    No, I have not.

23   **Q.**    Okay.

24         I'm going to direct your attention to a couple of

09:36:35 25   exhibits that we discussed yesterday.  Here, let me just

Omurchu - Cross/Goldberg

1    talk about it first.  I want to refer to the exact exhibit.

2    Excuse me.

3         You were asked about the Yahoo note application?

4    A.   Yes.

09:37:07  5    Q.   And that was an application where you indicated you

6    observed multiple members of Bayrob logging on and adding to

7    the document?

8    A.   Yes.

9    Q.   It's like a shared document, correct?

09:37:28 10   A.   Yes.

11   Q.   So in order for -- and do you record who logged on and

12   when?

13   A.   Yes.

14   Q.   Okay.

09:37:36 15        And did you provide that information to the FBI or to

16   law enforcement?

17   A.   I provided a summary of my findings there, yes.

18   Q.   Okay.

19        And did we see that in court yesterday?

09:37:50 20   A.   No.

21   Q.   And the specific -- were you able to observe the

22   actual IP address from which each one of those Bayrob

23   members logged on from?

24   A.   I could see the -- I could see an IP address that --

09:38:22 25   Q.   I'm sorry?

Omurchu - Cross/Goldberg

1    **A.**    I could see an IP address --

2    **Q.**    Yeah.

3    **A.**    -- that was being used.

4    **Q.**    And you --

09:38:28  5    **A.**    Yes.

6    **Q.**    -- and you -- and did you geolocate any of those?

7    **A.**    I geolocated lots of IP addresses during my

8    investigation.

9    **Q.**    Okay.

09:38:37 10        And would you assume that, based on your investigation

11    and your work on this case, that that would have been a

12    proxy IP address?

13    **A.**    I -- from my analysis, I could at times determine

14    which IP addresses were proxies and which IP addresses were

09:38:57 15    not.

16    **Q.**    Okay.

17        And do you have any of that information for those

18    log-ons on the Yahoo Notebook?

19    **A.**    I believe from my investigation that I checked those

09:39:13 20    IP addresses and that they were proxies, but I would have to

21    go back and confirm if I could.

22    **Q.**    So could -- while you were watching this activity on

23    your infected machine, you could see log-ons by the various

24    parties on to the same Yahoo account, correct?

09:39:33 25                MR. LEVINE:  Objection.

Omurchu - Cross/Goldberg

1        THE COURT:  Overruled.  You may answer that.

2        THE WITNESS:  Yes.

3    **Q.**    Okay.

4        So that would mean logically that each Bayrob member

09:39:46  5   that logged on to that account had the user name and

6    password for that account?

7    **A.**    Yes.

8    **Q.**    And that's how they would do that, correct?

9    **A.**    Yes.

09:39:52 10   **Q.**    So if you have a user name and a password for any

11   particular e-mail account, Yahoo, America Online, GMX

12   account, you could log on and send and receive e-mails as

13   that person?

14   **A.**    What do you mean by --

09:40:14 15   **Q.**    Well, if I had -- let's say I had your e-mail address

16   at Symantec and the password.  I can go on and send e-mails

17   to whoever I want to as you?

18   **A.**    Yes.

19   **Q.**    At least the address would be from you, right?

09:40:26 20   **A.**    Yes.

21   **Q.**    And so there -- there's no way -- nothing that you

22   know about, the GMX server, AOL service, Yahoo server that

23   automatically confirms that the person logging on is one

24   distinct individual and not several individuals?

09:40:55 25   **A.**    That's correct.

Omurchu - Cross/Goldberg

1    **Q.**    This Yahoo Note is the only place where you actually

2    saw that happen, right?

3                    MR. LEVINE:  Objection.

4                    THE COURT:  Overruled.  Is that true, sir?

09:41:11  5                    MR. LEVINE:  Saw what happened?

6    **Q.**    Saw --

7                    THE COURT:  If he doesn't understand -- if you

8    don't understand the question, you can certainly ask him to

9    clarify.

09:41:19 10    **Q.**    Was that not an understandable question?

11    **A.**    I'm sorry.  Could you repeat the question?

12    **Q.**    Yeah.

13          The only place you saw what you knew were distinct

14    individuals logging onto the same user name and password was

09:41:32 15    with regard to the Yahoo Notes that you testified to?

16    **A.**    I don't recall -- yeah, I don't recall if that's the

17    only occasion.

18    **Q.**    Well, that's the only one you've testified to?

19    **A.**    Yes, that's correct.

09:41:51 20    **Q.**    And I'm just going to refer you to an exhibit so the

21    record's clear.

22                    MR. GOLDBERG:  If I can just have a moment,

23    your Honor.

24                    THE COURT:  Certainly.

09:42:00 25                    MR. GOLDBERG:  I apologize.

Omurchu - Cross/Goldberg

1    **Q.**    Well, while I look for that, let me ask you this.  You

2    said you witnessed -- I think the number was 100 e-mail

3    exchanges between members of the Bayrob Group through your

4    infected server?

09:43:14  5    **A.**    Yes.

6    **Q.**    During the course of time you were monitoring?

7    **A.**    Yes.

8    **Q.**    Okay.

9          And were you able to discern whether those e-mails --

09:43:28  10   whether each e-mail address was being utilized by one

11   distinct individual?

12   **A.**    I don't recall seeing in any of my analysis -- I can't

13   say for sure.

14   **Q.**    Well, I mean that would have been something that would

09:43:57  15   have been useful to your investigation if multiple people

16   were using the same e-mail moniker, right?

17   **A.**    Yes.

18   **Q.**    And it's something that you -- we have to assume you

19   looked for?

09:44:09  20   **A.**    I did not look for that.

21   **Q.**    Okay.

22         And --

23              THE COURT:  Sir, would you repeat that answer

24   again.

09:44:15  25              THE WITNESS:  I did not look for that.

Omurchu - Cross/Goldberg

1          THE COURT:  You did not?

2              THE WITNESS:  I did not, no.

3              THE COURT:  Thank you.

4    Q.   Okay.

09:44:28  5         And the exhibit I was referring to, the Yahoo Notepad,

6    that's Exhibit 1445 for the record.  And if you don't mind

7    showing that just to the witness, to make sure we're talking

8    about the same thing.

9              THE COURT:  To everyone or just the witness?

09:44:44 10             MR. GOLDBERG:  Actually we could show it to

11   everybody.  Thank you.

12   Q.   Okay.

13        That's Exhibit 1445.  And that's the Yahoo Notepad

14   that we were just discussing, correct?

09:44:56 15  A.   Yes.

16   Q.   And that is your screenshot of a document that you

17   took off of the server, correct?

18   A.   Yes.

19   Q.   And that's a document that was accessed by multiple

09:45:11 20  people using one Yahoo sign-in and log-in?

21   A.   And that's what I saw in my analysis.

22   Q.   Okay.

23        So turning now to your analysis, using Shark Wire or

24   Wire Shark, sorry?

09:45:31 25  A.   Yes.

1    **Q.**    That's Exhibit 1443.  If you can show that to the

2    witness.  I believe that's been published to the jury.

3    Okay.  You remember seeing this yesterday?

4    **A.**    Yes, I do.

09:45:57 5    **Q.**    Okay.

6          And I'm looking at the top -- the top.  This is a

7    screenshot from your computer, not from the server, correct?

8    **A.**    That's right.

9    **Q.**    Okay.

09:46:10 10          We know that because it has -- it's running -- it's

11    running the program, correct?

12    **A.**    Yes.

13    **Q.**    It's running Wire Shark?

14    **A.**    Yes.

09:46:27 15    **Q.**    And we have -- at the top there is a -- a line of

16    commands that you could give to Wire Shark to capture.  I

17    assume there's a save command, correct?

18    **A.**    Yes.

19    **Q.**    And Wire Shark can record in an accessible format

09:46:56 20    everything that goes through your -- your machine?

21    **A.**    Yes.

22    **Q.**    As it's being proxied, correct?

23    **A.**    Yes.

24    **Q.**    But that's not something that you did, correct?

09:47:08 25    **A.**    No.

Omurchu - Cross/Goldberg

1    **Q.**    And you recorded certain things, correct?

2    **A.**    Yes.

3    **Q.**    And you still have those files?

4    **A.**    Some of them.

09:47:19 5    **Q.**    And what did you -- what did you do with the rest of

6    them?

7    **A.**    Well, deleted them.

8    **Q.**    Okay.

9           And in the course of -- how long did you run Wire

09:47:32 10   Shark on the infected machines?

11   **A.**    About eight years.

12   **Q.**    Okay.  Eight years.

13          And of -- so eight years would be 100 percent of the

14   time that you -- that you use Wire Shark?

09:47:59 15   **A.**    I --

16   **Q.**    I mean I'm just trying to --

17   **A.**    Roughly, yes.

18   **Q.**    Whatever time you used Wire Shark, that's 100 percent.

19          What percentage, if you can give me, did you actually

09:48:12 20   record?

21   **A.**    The -- all of it.

22   **Q.**    Okay.

23          And how much did you, in a percentage, keep?

24   **A.**    I don't know.

09:48:27 25   **Q.**    Did you provide everything you recorded to the

577

Omurchu - Cross/Goldberg

1      Government?

2    **A.**    No.

3    **Q.**    And at some point, you deleted most of it?

4    **A.**    I deleted some of it.

09:48:42  5    **Q.**    Okay.

6          And that would have been throughout the investigation

7    or was that after September 28th, 2016?

8    **A.**    Throughout the investigation.

9    **Q.**    Did you delete any of it after September 28, 2016?

09:49:04 10    **A.**    I don't -- I don't recall.

11    **Q.**    Okay.

12          Turning your attention to the Romanian proxies you

13    discussed and you said you had a machine actually in Romania

14    that was intentionally infected?

09:49:28 15    **A.**    Yes.

16    **Q.**    Okay.  And that machine, was it running Wire Shark as

17    well, were you able to access that?

18    **A.**    Yes.

19    **Q.**    And was that a separate Wire Shark file than the one

09:49:39 20    we're looking at in the exhibit you show?

21          And listen, if I'm asking a question that doesn't make

22    sense, tell me and I'll try to --

23    **A.**    Yeah, yeah.  I would say so.

24    **Q.**    It's the same file, same recording?

09:49:56 25    **A.**    No, it's a separate recording.

Omurchu - Cross/Goldberg

1    **Q.**    It's separate.  Okay.

2          And did you keep any of that material?

3    **A.**    Yes.

4    **Q.**    And did you provide that to the Government?

09:50:08 5    **A.**    No.

6    **Q.**    Okay.

7          And so did you end up deleting it?

8    **A.**    When the investigation -- some of it.

9    **Q.**    I'm sorry?

09:50:23 10   **A.**    Some of it.

11   **Q.**    You deleted some of it?

12   **A.**    Yes.

13   **Q.**    Okay.

14          And with regard to that -- those servers, were they --

09:50:35 15   you indicated they were located in the Bucharest and Brasov

16   area, correct, based on your geolocation?

17   **A.**    Sorry.  What was based where?

18   **Q.**    All right.  You did a geolocation search?

19   **A.**    Yes.

09:50:54 20   **Q.**    For the proxies that were coming into your computer at

21   one point?

22   **A.**    Yes.

23   **Q.**    And we saw a map and there's a bunch of pins in the

24   United States and there's a bunch of pins in Romania?

09:51:06 25   **A.**    Yes.

Omurchu - Cross/Goldberg

1    **Q.**    And many of those Romanian pins were in the areas of

2    Bucharest and you also indicated Brasov?

3    **A.**    No, that's not what I said.

4    **Q.**    Okay.  Remind me what you said then.

09:51:19    5    **A.**    The IP addresses that my machine was asked to connect

6    to were in Romania and the U.S.

7    **Q.**    Okay.  But, the Romania IP addresses were geolocated

8    to Bucharest?

9    **A.**    Some of them.  They were located all over Romania.

09:51:41    10    **Q.**    And the geolocation, is that something that is

11    reliable to the point where you -- it cannot be manipulated

12    or cannot be obfuscated?

13    **A.**    No, I mean it's -- it is generally reliable, but there

14    are mistakes in the database.  So it's not perfect.

09:52:04    15    **Q.**    The mistakes in the database that would show say a

16    server that's in Casper, Wyoming, would show up in Dallas,

17    Texas, or Hawaii or something, a mistake of data entry?

18    **A.**    Yes.

19    **Q.**    Okay.

09:52:23    20         You assume from your investigation that those were the

21    initial proxy machines accessed by the Bayrob Group because

22    they were in Romania, right?

23    **A.**    So I -- I'm not sure.  I'm not sure of your question.

24    I think.

09:52:44    25    **Q.**    All right.  Here I'll go back.

Omurchu - Cross/Goldberg

1    You indicated yesterday that you -- at one point, you

2    had three of your machines proxying each other?

3    **A.**    Yes.

4    **Q.**    I'm thinking of it like information is coming into

09:52:58  5    one, going tho another one, going through another one.

6    **A.**    Yes.

7    **Q.**    And going out somewhere else, right?

8    **A.**    Yes.

9    **Q.**    And you were able to follow the first machine that the

09:53:08 10    signal came into back to a machine in Romania?

11    **A.**    Yes.

12    **Q.**    Okay.

13    And you indicated that that was the first proxy, that

14    was the first proxy machine?

09:53:18 15    **A.**    Yes.

16    **Q.**    And that was based on -- that wasn't based on any

17    digital information; that was based on your assumption that

18    this -- that the Bayrob Group originated in Romania,

19    correct?

09:53:34 20    MR. LEVINE:  Objection.

21    THE COURT:  Overruled.  Is that correct, sir?

22    THE WITNESS:  No, that's not correct.

23    **Q.**    So it was based on digital data?

24    **A.**    Yes.

09:53:40 25    **Q.**    And you could tell that there was no proxy prior to

Omurchu - Cross/Goldberg

1    the Romanian machines being accessed?

2    **A.**    No Bayrob proxy, yes.

3    **Q.**    No Bayrob proxy?

4    **A.**    No Bayrob proxy.

09:53:56  5    **Q.**    Okay.

6          So wasn't a big part of the testimony in this case

7    that you cannot follow proxies backwards past the last

8    machine?  I mean is that -- tell me if I'm wrong.  You --

9    when a -- when you're getting a proxy access to your

09:54:19 10    machine, you can follow it back to the previous machine,

11    correct?

12    **A.**    Yes.

13    **Q.**    And then the problem is you can't go back to the

14    machine prior to that?

09:54:28 15    **A.**    Yes, that's right.

16    **Q.**    Okay.

17          I'm going to show you Exhibit -- an exhibit we saw

18    yesterday, 1425.  Do you recall that?

19    **A.**    Yes, I do.

09:54:59 20    **Q.**    Okay.

21          And you went through the various plug-ins and you'll

22    correct me if I'm calling it by the wrong name.  These are

23    plug-ins?

24    **A.**    Yes.

09:55:09 25    **Q.**    And these are -- these are programs that tell the

1    botnet to do something that are in the original code or they

2    are sent down by the command and control server?

3    **A.**    They're sent about down by the command and control

4    server.

09:55:31 5    **Q.**    Okay.

6        So the data you collected on Wire Shark calculated

7    these -- the times used, the column that says times used?

8    **A.**    Yes.

9    **Q.**    Okay.

09:55:47 10        And that's not based on your personal calculation,

11    that's based on a computer calculation?

12    **A.**    Yes.

13    **Q.**    Okay.

14        The summary to the right, that's based on your

09:56:00 15    understanding of what the particular plug-in did?

16    **A.**    Yes.

17    **Q.**    Those are your words, correct?

18    **A.**    Those are mine or other analysts in Symantec's words,

19    yes.

09:56:14 20    **Q.**    Those are human being's words that --

21    **A.**    Yes.

22    **Q.**    -- that helped you work on this case?

23    **A.**    Yes.

24    **Q.**    And that's based on the name or is that based on

09:56:28 25    actually watching those actions take place?

Omurchu - Cross/Goldberg

1    **A.**    It's based on analysis of the code that was in those

2    plug-in's.

3    **Q.**    Just the codes.  So nobody actually saw your -- your

4    infected proxied machine actually going through the German

09:56:48 5    phone book?

6    **A.**    Yes, I did see that.

7    **Q.**    You did see that?

8    **A.**    Yes.

9    **Q.**    Okay.

09:56:52 10        Did you see all of the actions that are written in

11    that?

12    **A.**    No, not all of them.

13    **Q.**    So I just happen to pick one you did see.  What

14    about -- what about Australia, did you watch that?

09:57:05 15    **A.**    Yes.

16    **Q.**    Okay.

17        So the actions that involved the phone books are stuff

18    you actually -- are actions you actually witnessed your

19    machine doing, not just code?

09:57:21 20    **A.**    Yes.

21    **Q.**    Okay.

22        But it's safe to say that there are actions listed in

23    the summary portion of this exhibit that you did not

24    actually see, correct?

09:57:37 25    **A.**    That's likely correct, yes.

Omurchu - Cross/Goldberg

1    **Q.**    Yeah.  But, you -- you saw code or it wouldn't be on

2    this?

3    **A.**    Yes.

4    **Q.**    But you didn't actually see it?

09:57:45  5    **A.**    Yes.

6    **Q.**    Okay.

7    Now, you mentioned also that you -- you can take that

8    down.  Thank you.  You mentioned 400,000 machines as being

9    the number that you -- that you believe -- number of

09:58:02 10    machines infected by the Bayrob virus at some point?

11    **A.**    Yes.

12    **Q.**    So that would be at one time, that would be over the

13    course of the eight years?

14    **A.**    At one time, I saw around 400,000 infected machines.

09:58:19 15    **Q.**    When was that?

16    **A.**    2016, maybe.

17    **Q.**    Okay.  2016.  And you saw that because of some data

18    that was coming back into your infected machine or that was

19    on the command and control server?

09:58:40 20    **A.**    Some data was coming into my infected machine from the

21    command and control server.

22    **Q.**    And was that data recorded on Wire Shark?

23    **A.**    I -- yes, I would say so.

24    **Q.**    Do you still have it?

09:58:55 25    **A.**    I don't know.

Omurchu - Cross/Goldberg

1    **Q.**    I mean isn't that a key bit of information as well?

2    **A.**    Yes.

3    **Q.**    I mean is it -- is that protocol in your lab that when

4    you're done investigating a particular threat, you just get

09:59:14  5    rid of the information?

6    **A.**    That would be common in our investigations, yes.

7    **Q.**    Especially when people are arrested, right?

8    **A.**    In any situation.

9    **Q.**    Okay.

09:59:28 10            We talked a little bit yesterday about sharing

11    information from -- that you gather from the lab with other

12    competitors, McAfee and Kaspersky are two that come to mind

13    offhand.

14            You shared the information about the Bayrob virus

09:59:47 15    itself, correct, just the raw information that you -- the

16    code you were able to have placed on your infected computer?

17    **A.**    We shared code and we shared analysis.

18    **Q.**    You shared your analysis with them?

19    **A.**    Yes.

10:00:01 20    **Q.**    Okay.

21            Did you share all your analysis with them or --

22    **A.**    No, portions of it.

23    **Q.**    You shared analysis enough for them to be aware of the

24    threat and to see the initial layer of analysis, but you

10:00:17 25    didn't show them all your analysis?

Omurchu - Cross/Goldberg

1    **A.**    No.

2    **Q.**    Because that's proprietary?

3    **A.**    I don't know if that was the reason.

4    **Q.**    At some point, there's a line what you share and what

10:00:31  5    you don't, right?

6    **A.**    Yes, there's some line.

7    **Q.**    Yeah.  And that line is partially, at least, for

8    competitive advantage over these companies that are also

9    looking for the same customers?

10:00:42 10    **A.**    Yes, I'd say that's true.

11    **Q.**    I just have a couple more questions.

12         1441 is the list of the domain names, correct?

13    **A.**    Yes.

14    **Q.**    And you said that you observed the Bayrob or you

10:01:11 15    observed infected machines connecting or your machine

16    connecting to each one of those?

17    **A.**    Yes.

18    **Q.**    Did you save that code or that stream of

19    communication?

10:01:23 20    **A.**    Yes, I believe I did.

21    **Q.**    And did you provide that to the Government?

22    **A.**    No.

23    **Q.**    Okay.  You still have it?

24    **A.**    I think so.

10:01:34 25    **Q.**    Somewhere back in California?

Omurchu - Cross/Goldberg

1   **A.**   Yes.

2   **Q.**   Is it accessible to you here?

3   **A.**   No.

4   **Q.**   So let me get this -- so at some point, you had to

10:01:51  5   provide this information to the Government that represent

6   these domain names, correct?

7   **A.**   Yes.

8   **Q.**   So you can take that down.  Thank you.

9        Did you provide that information to the Government in

10:02:05 10   a face-to-face meeting, or in an e-mail, or some other form?

11              MR. LEVINE:  Objection.

12              THE COURT:  Overruled.  What form, sir?

13              THE WITNESS:  I believe it was e-mail.  I

14   don't recall.  I think it was e-mail.

10:02:22 15   **Q.**   Okay.  So you -- that you typed out yourself?

16   **A.**   I --

17   **Q.**   Or somebody?

18   **A.**   I don't recall, yeah.

19   **Q.**   Somebody, either you or someone who works for you was

10:02:34 20   given the assignment of writing down each domain name that

21   was supposedly accessed by your infected computer, right?

22   **A.**   Yes.

23   **Q.**   And so they took the list that you have somewhere in

24   California maybe, you can't get now, wrote them down and

10:02:51 25   e-mailed them off to one of the guys sitting at this table?

588

Omurchu - Cross/Goldberg

1          MR. LEVINE:  Objection.

2          THE COURT:  Overruled.  Is that true, sir?

3          THE WITNESS:  We -- I don't recall exactly the

4    process of what it was that was done, but I know that we saw

10:03:06  5    those -- the domain names.  I don't recall exactly if it was

6    an e-mail that we responded to.  I can't recall off the top

7    of my head.

8    **Q.**    Okay.

9          But, because this is a really important issue in this

10:03:19 10   case, wouldn't you agree?

11   **A.**    That those domain names are accessed by the Bayrob --

12   **Q.**    Yeah.

13   **A.**    Yes.

14   **Q.**    Okay.

10:03:28 15        Now you got all this technology and all this stuff

16   that I don't understand at your fingertips out there at

17   Symantec, right?

18   **A.**    I have -- yes.

19   **Q.**    Okay.

10:03:39 20        So my understanding of how this information got to the

21   U.S. Government was a human being looked at a screen, wrote

22   down the names, either typed, handwrote them, morse code

23   whatever it was, human interface, wrote them down, sent them

24   off to the Government in some form?

10:04:01 25   **A.**    We -- we --

589

Omurchu - Cross/Goldberg

1    **Q.**    I know you didn't use a fax machine.  Put it that way.

2    **A.**    Yeah, I confirmed that those addresses were in the --

3    were accessed by the Bayrob Group.

4    **Q.**    Okay.

10:04:16  5    You confirmed it and then it was either yourself or

6    someone else, took that information and wrote it down, like

7    I would write an e-mail or write a letter to somebody and

8    provided that information to the Government, correct?

9    **A.**    I don't recall how that information was provided.

10:04:37 10    **Q.**    Well, you do know that the actual Shark Wire recording

11    of accessing domain names was not provided to the

12    Government?

13    **A.**    Yes.

14    **Q.**    You were asked about a few things that -- I'm not sure

10:05:02 15    I understand.  So I'm going to ask you about them.

16    Off the Record, Pigeon and Jabber, correct?

17    **A.**    Yes.

18    **Q.**    Okay.

19    Jabber is a messaging application like WhatsApp or

10:05:18 20    iMessenger, correct?

21    **A.**    Yes.

22    **Q.**    And it can be run from a private server, correct?

23    **A.**    Yes.

24    **Q.**    And that private server can be located either on a

10:05:31 25    server forum or private residence, can be anywhere, right?

Omurchu - Cross/Goldberg

1    **A.**    Yes.

2    **Q.**    Off the Record is an add-on that allows an encryption

3    of messages sent over whatever platform it's added on to,

4    correct?

10:05:47 5    **A.**    Yes.

6    **Q.**    And that's in -- Off the Record is in general use,

7    there's nothing necessarily insidious about that?

8    **A.**    That's correct.

9    **Q.**    And I can have that -- I could add Off the Record to

10:06:00 10    WhatsApp, right?

11    **A.**    I believe so.

12    **Q.**    Okay.  Or what about iMessage?

13    **A.**    I don't know exactly where you can add Off the Record

14    but you can add it to several different chat programs.

10:06:13 15    **Q.**    I mean Apple probably has their own version of Off the

16    Record that you could use with iMessage?

17    **A.**    Yes.  Specifically for iMessage, I don't think you can

18    use OTR with iMessage.

19    **Q.**    Yeah, but it would be very typical for Apple to have

10:06:33 20    their own encryption?

21    **A.**    Yes.

22    **Q.**    Because they like getting the money through the

23    application?

24    **A.**    Yes.

10:06:40 25    **Q.**    Have you -- are you any more familiar with Jabber than

Omurchu - Cross/Goldberg

1    just casually or have you ever used it?

2    **A.**    I have used it.

3    **Q.**    You've used it?  And you've used it in business or in

4    personal?

10:06:58 5    **A.**    In business.

6    **Q.**    All right.

7         And did you use it utilizing the Off the Record

8    encryption add-on?

9    **A.**    No.

10:07:10 10   **Q.**    Where was the server?  Was the server maintained by

11   Symantec?

12   **A.**    I don't know.

13   **Q.**    But was it used for Symantec business?

14   **A.**    Yes.

10:07:18 15   **Q.**    With your colleagues?

16   **A.**    Yes.

17   **Q.**    And anybody that had a log on to a -- to the Jabber

18   server could send and receive messages to other people on

19   it, correct?

10:07:30 20   **A.**    Yes.

21   **Q.**    So if -- but if somebody had your log on, they could

22   send and receive messages as you presumably?

23   **A.**    Yes.

24              MR. GOLDBERG:  Nothing further.

10:07:40 25              THE COURT:  Mr. O'Shea.

Omurchu - Cross/O'Shea

1      <u>CROSS-EXAMINATION OF LIAM OMURCHU</u>

2    <u>BY MR. O'SHEA:</u>

3    **Q.**    Good morning, sir.

4    **A.**    Good morning.

10:08:03  5    **Q.**    First question I ask you is, and I'm going to base

6    these questions generally on what you know about the

7    Internet and files and the like, based on your expertise

8    here.  Okay?

9    **A.**    All right.

10:08:16 10    **Q.**    All right.

11         Now, can you explain to the ladies and gentlemen of

12    the jury how -- why before we had pop-up ads, you know,

13    prohibition stuff, why pop-up ads would appear on somebody's

14    screen that they didn't ask for?  How would that technology

10:08:37 15    work, sir?

16    **A.**    I mean there's lots of ways to do it generally.

17    Someone would write some code on a web page that would, when

18    you visit the web page, would pop up an advertisement or

19    something on your computer.  That's one way.  Another way is

10:08:57 20    for malware to run on your machine and to add pop-up

21    windows, you don't know where they came from, with whatever

22    in them.

23    **Q.**    You'll agree with me that pop-up ads are not

24    necessarily illegal, right?

10:09:14 25    **A.**    Yes.

1  **Q.**   Okay.

2        And that a lot of times what vendors do is from their

3  computers say where they are, they just, because you had the

4  audacity to go to their website, download files onto your

5  computer so they could advertise you, am I right about that?

6  **A.**   Yes.

7  **Q.**   Okay.

8        And they didn't get the permission of the person to do

9  that, right?

10  **A.**   That's correct.

11  **Q.**   All right.

12        Now, even if you visit, for instance, Facebook today,

13  for those that do it, and in the past, you had bought

14  something online, ads from that very same company you bought

15  something from a month ago would pop up on the right side of

16  Facebook, right?

17  **A.**   The term pop up, the word pop up has --

18  **Q.**   How about appear?

19  **A.**   Appear, yes.

20  **Q.**   Any time I ask a question like that, just say let me

21  explain.  Okay?

22  **A.**   Okay.

23  **Q.**   So if I'm, you know, for some reason if I look on to a

24  Facebook page, and I looked to my right and go, "Gee,

25  there's Joan's Leather Company.  We just bought some shoes

Omurchu - Cross/O'Shea

1    from them a month ago.  How did they know how to advertise

2    on the Facebook page that I was visiting?"  And the answer

3    to that is?

4                        MR. LEVINE:  Objection.

10:10:37  5                        THE COURT:  Let me hear the question.

6    Q.    Okay.

7          Isn't the answer to that, that commercial providers,

8    without people's permission, are going into their computers

9    planting things like cookies and files so those ads pop up?

10:10:53 10   Am I right?

11                        MR. LEVINE:  Objection.

12                        THE COURT:  Overruled.

13                        THE WITNESS:  I would argue with the

14   permission aspect of that statement.

10:11:01 15  Q.    Well, some people, they didn't knock on their door,

16   you know, figuratively speaking, and say, "By the way, I'd

17   like to plant files on your computer so I can advertise,"

18   right?

19                        MR. LEVINE:  Objection.

10:11:11 20                        THE COURT:  Overruled.  You may answer that.

21                        THE WITNESS:  Well, from my experience, if you

22   signed up, for example, on Facebook and you see ads on

23   Facebook, you have agreed to see those ads as part of your

24   signing up to Facebook.  So there has been permission

10:11:28 25   granted in that case, for example.

Omurchu - Cross/O'Shea

1    **Q.**   Let me get more specific if I can, sir.

2         No one gave the specific permission to a specific

3    vendor to find out where they had been before and post ads

4    specifically to prior purchases, did they?

10:11:48  5              MR. LEVINE:  Objection.

6              THE COURT:  Overruled.

7              THE WITNESS:  Yes, I think they do give that

8    permission.

9    **Q.**   Oh, you do?  Okay.

10:11:53 10        The way that technology works though is that without

11   your knowledge, you, the purchaser, these vendors can find

12   out, because the cookies they plant on your computer and

13   files, again without your permission, what you have done in

14   the past, am I right about it?

10:12:14 15             MR. LEVINE:  Objection.

16             THE COURT:  One-word reason.

17             MR. LEVINE:  Misstates.

18             THE COURT:  Oh -- overruled.  He -- he can

19   always correct the attorney.

10:12:29 20             THE WITNESS:  Again, the permission aspect of

21   that statement, I would argue with.

22   **Q.**   Okay.

23        Is it your position then as the -- in the office that

24   you have with Symantec, that any time somebody goes to a

10:12:48 25   website and purchases anything, they're giving permission to

Omurchu - Cross/O'Shea

1    any vendor to know about their prior purchases and allow

2    those files and those cookies to be planted on your

3    computer?  Are you saying that, sir?

4    **A.**    I'm saying that it's a case-by-case basis, and it

10:13:04  5    depends on the scenario.

6    **Q.**    Okay.

7        Well how about, if you'll excuse the expression, a

8    70-year-old woman living in Rocky River went and bought her

9    nephew a Christmas gift; you think she really said to

10:13:18  10    herself, "Yeah, send me all that stuff"?  You really think

11    that?

12                    MR. LEVINE:  Objection.

13                    THE COURT:  Sustained.

14    **Q.**    Now, explain if you can, sir, what a P-U-P is?

10:13:32  15    **A.**    It's a term, computer security term, a term that we

16    use in the security industry to describe a Potentially

17    Unwanted Program.

18    **Q.**    Okay.

19        And Symantec, amongst other things that it does, has a

10:13:50  20    program, do they not, correct me if I'm wrong, that people

21    can plant on their computer to prevent potentially unwanted

22    programs which are primarily marketing programs, right?

23    **A.**    Yes.

24    **Q.**    Okay.

10:14:03  25        So without you knowing it, you, the consumer, you, the

1    citizen, there could be a P-U-P, Potentially Unwanted

2    Program on your computer without your knowledge, right?

3    **A.**    Yes.

4    **Q.**    And the programs that, in part, Symantec designed, I

10:14:24  5    think -- did I hear you, like 400 of them or how many do you

6    guys have?

7    **A.**    Yeah, over 100.

8    **Q.**    Okay.

9          One of them is designed to prevent that from

10:14:33 10    happening, right?

11    **A.**    Yes.

12    **Q.**    And unless you have a program like that on your

13    computer, it could happen to you, right?

14    **A.**    Yes.

10:14:39 15    **Q.**    And there's actually stuff called pop-up blockers,

16    right?

17    **A.**    Yes.

18    **Q.**    Okay.

19          Designed again to prevent this from happening, right?

10:14:49 20    **A.**    Yes.

21    **Q.**    Okay.  What's a P-U-M?

22    **A.**    I don't know.

23    **Q.**    Okay.  All right.

24          Let's say that somebody buys a new printer for their

10:15:04 25    office or their home, and let's say it's a Brother printer,

Omurchu - Cross/O'Shea

1    and you get the CD installation, right?  They don't just

2    send you the driver for that printer, they'll send you a

3    bunch of other programs they want you to install as well,

4    right?

10:15:17  5    **A.**    Yes.

6    **Q.**    Including, but not limited to, at times antivirus

7    software, right?

8    **A.**    Yes.

9    **Q.**    And if you're not careful when you hit the button, it

10:15:28 10    will install everything, right?

11    **A.**    Yes.

12    **Q.**    Again, this is all done for commercial and marketing

13    purposes, am I right, sir?

14    **A.**    Yes, I would say so.

10:15:39 15    **Q.**    Like, for instance, if I went and bought your very

16    well known program called Norton Antivirus, at the same time

17    that you're downloading that, they're also trying to get you

18    to download a thing called LifeLock, am I correct about

19    that?

10:15:58 20    **A.**    LifeLock is another Symantec program, yes.

21    **Q.**    But they want you to download that when you're

22    downloading the antivirus software, too, right?

23    **A.**    I don't actually know the -- if they do that or not,

24    but I would assume that's not unusual.

10:16:10 25    **Q.**    Okay.

1          And I think we went over this a little bit.  We talked

2     about ad pop-ups.  What's spyware?

3     **A.**     Spyware is another term that we use in the security

4     industry and -- to talk about software on your computer that

10:16:29 5     will spy on you, spy on your activity.

6     **Q.**     And it's done for commercial purposes primarily,

7     right?  People want to know what you're doing and they're

8     sending that information back up to people so that you will

9     get ads and e-mails, am I right?

10:16:41 10     **A.**     Yes, it's primarily commercial.

11     **Q.**     One of the programs that you have is designed to

12     prevent spyware from being on your computer, am I right?

13     **A.**     Yes.

14     **Q.**     All right.

10:16:54 15          I think this came up yesterday.  You're the person

16     that named this collection of individuals behind what we're

17     here for today; you named them the Bayrob Group, am I right?

18     **A.**     Yes.

19     **Q.**     At the time that you named it, did you know how many

10:17:14 20     people were in the group?

21     **A.**     When I named it, I named the piece of software I was

22     looking at.

23     **Q.**     Okay.  All right.

24          We keep hearing this term Bayrob Group throughout the

10:17:28 25     course of this trial, and I think questions were asked of

1    you yesterday where you were asked questions about the

2    Bayrob Group, am I right?

3    **A.**    Yes.

4    **Q.**    Okay.  And this is the group that you named, am I

10:17:46  5    right?

6    **A.**    Yes.

7    **Q.**    Okay.

8          Correct me if I'm wrong.  It's almost savvy enough,

9    and I think the accusation is here that the Bayrob Group did

10:18:04  10    it.  Anybody can steal a user name and a password, am I

11    right?

12                    MR. LEVINE:  Objection.

13    **Q.**    Well, anybody with knowledge on how to do it could

14    steal a user name and password, am I right, sir?

10:18:18  15    **A.**    Yes.

16    **Q.**    Okay.

17          And we all know that to do a -- those things these

18    days to log on to anything, buy groceries I think you can

19    buy groceries at Heinen's by going on a computer and using a

10:18:36  20    user name and password.

21    **A.**    Yes, very common.

22    **Q.**    And user name password is what we generally call --

23    correct me if I'm wrong -- one-step authentication as

24    opposed to two-step authentication, right?

10:18:48  25    **A.**    Yes.

Omurchu - Cross/O'Shea

1    **Q.**    And it's become -- tell the jury if I'm right or

2    wrong -- it's become so common and so easy to take a user

3    name and passwords, that now the industry has developed

4    what's called two-step or second-step authentication, am I

5    right about that, sir?

6    **A.**    Two-step authentication is used quite a lot now.

7    **Q.**    Just so we can educate the jury a little bit, what is

8    that because of this user name password thing that we're

9    having?

10   **A.**    Two-step authentication requires two pieces of

11   information instead of one.

12   **Q.**    Okay.

13        And, for instance, when you log on to something,

14   certain people out there no longer just let you use a user

15   name and password anymore; you have to engage in a second

16   level of authentication, am I right?

17   **A.**    Yes.

18   **Q.**    And that can involve sending a text to your phone,

19   making you have a jump drive you carry around with you, am I

20   right, sir?

21   **A.**    Yes.

22   **Q.**    And that is -- you correct me if I'm wrong -- that's

23   because user name and password have become so easy to abuse,

24   misplace, and steal, am I right?

25   **A.**    I would say, you know, easy is a relative term, but --

Omurchu - Cross/O'Shea

1    **Q.**    Sure.

2    **A.**    But for technical people, it would be easiest.

3    **Q.**    And some people, I think it's commonly suggested that

4    you don't write down your pins for your cards, your user

10:20:19  5    name and passwords, and leave them where other people can

6    see it; is that right?

7    **A.**    Yes.

8    **Q.**    Because if someone gets, for instance, the user name

9    or password for your Yahoo or Google account, they can log

10:20:29 10    in -- I think Mr. Goldberg asked about this -- as you,

11    posing as you, and send e-mails out to people, right?

12    **A.**    Yes.

13    **Q.**    And the people receiving those e-mails would think

14    they're from you?

10:20:44 15    **A.**    Yes.

16    **Q.**    Yesterday we had a witness, or I think earlier this

17    week, sorry -- it's Thursday -- that talked about this thing

18    called IP addresses and how an IP address can change, for

19    instance, when a modem is shut down for awhile or when you

10:21:18 20    simply take your laptop and you move it to another location,

21    am I right?

22    **A.**    Yes.

23    **Q.**    So what are the two types of IP addresses?  I think

24    there's two but you correct me if I'm wrong.

10:21:29 25    **A.**    Are you talking about the different versions?  There's

Omurchu - Cross/O'Shea

1    IP-4 and IP-6.  Is that what you mean?

2    **Q.**    Isn't there one called static and dynamic?

3    **A.**    Yes there's static a dynamic.

4    **Q.**    Tell us what that is again.

10:21:42  5    **A.**    Static is an IP address that doesn't change -- doesn't

6    change so you -- if you have it, you keep it.

7    **Q.**    Regardless of where you might be?

8    **A.**    Yes, I believe so.

9    **Q.**    Okay.

10:21:55  10    **A.**    And then dynamic is something you only have for a

11    short amount of time and then, for example, if you turn off

12    your computer and you restart it, you would get a different

13    IP address.

14    **Q.**    All right.

10:22:07  15         For the benefit of the ladies and gentlemen of the

16    jury, how are most people's laptops they have at their

17    homes, are they static or dynamic?

18    **A.**    I -- I'm not an expert on that.  I would assume

19    they're dynamic.

10:22:23  20    **Q.**    Okay.  And what does that mean then?

21    **A.**    It means that you can have a different IP address

22    today than you had yesterday.

23    **Q.**    Okay.

24         Now, I have noticed from, you know, this -- you know

10:22:50  25    what Google is, do you not, sir?

Omurchu - Cross/O'Shea

1   **A.**    Yes.

2   **Q.**    Okay.

3         And if I Google, for instance, the term Bayrob and

4   Liam Omurchu -- am I pronouncing your last name correctly?

10:23:02  5   **A.**    Omurchu.

6   **Q.**    Omurchu.  I apologize, sir.  I should know better.

7         That you have written in the past about this Bayrob

8   business, am I right about, that sir?

9   **A.**    Yes.

10:23:15 10   **Q.**    As early as I think -- you correct me if I'm wrong --

11   like 2008, 2007, right?

12   **A.**    Yes.

13   **Q.**    And back then, you had a picture of yourself at that

14   time.  You were clean shaven, am I right?

10:23:26 15   **A.**    Yes.

16   **Q.**    Okay.

17         And you have written about how like, for instance,

18   there was a release in March of 2007 where you talked about

19   Bayrob.  And the reason you were doing this was to say to

10:23:42 20   folks, A, there's this Bayrob out there amongst other

21   Trojans and malware that might be out there and, B, buy

22   Symantec and we'll protect you, something to that effect, am

23   I right?

24   **A.**    Yes.

10:24:00 25   **Q.**    Now, during all of this, just out of curiosity,

Omurchu - Cross/O'Shea

1    Symantec is a company.  With you in the position you were

2    in, were you attempting to upgrade the Symantec antivirus

3    software to prevent Bayrob infestations?

4    **A.**    Yes.

10:24:36  5    **Q.**    Okay.

6         And there was a little bit of difficulty in doing

7    that, am I right?

8    **A.**    Yes.

9    **Q.**    And you correct me if I'm wrong, you're in the

10:24:46 10    business, that some of these computer programmers that are

11    designing viruses, they have a bit of an ego, don't they?

12    They want to be smarter than everybody?

13    **A.**    Yes.

14    **Q.**    Okay.

10:25:00 15         Now, let me ask you this.  Yesterday, Mr. Levine asked

16    you a lot of questions.  And I'm not going to put them up

17    again, about some of the comments that were stuck in some of

18    the computer code we were looking at yesterday that were

19    sort of personal, sexually-explicit attacks upon you

10:25:30 20    personally, right?

21    **A.**    Yes.

22    **Q.**    Is that part of that ego that we're talking about

23    where they're saying I know he's listening, I'm going to

24    toss him a little comment to drive him a little crazy?

10:25:40 25              MR. LEVINE:  Objection.

Omurchu - Cross/O'Shea

1   Q.   Am I right?

2           THE COURT:  Sustained.

3   Q.   Why do you think they were communicating with your

4   name if you know?

10:25:46   5           MR. LEVINE:  Objection.

6           THE COURT:  Sustained.

7   Q.   All right.

8       Let me ask you this.  Why did you tell the jury

9   yesterday about those terms on this stand with questions

10:25:57  10   asked of you by the Prosecutor?  Why?

11           MR. LEVINE:  Objection.

12           THE COURT:  Sustained.

13   Q.   All right.

14       You didn't attempt by having those explicit statements

10:26:07  15   read to the jury amongst all the other statements in the

16   e-mails to drive their emotions, did you, sir?

17           MR. LEVINE:  Objection.

18           THE COURT:  Sustained.

19           MR. O'SHEA:  Judge, I can do it on my computer

10:26:50  20   if I'm able to switch presentation over here or I can just

21   ask the Government to do it, but there's two exhibits that

22   I'd like to show to the jury and to the witness that have

23   already been shown.

24           THE COURT:  I think Sue would be happy to do

10:27:04  25   it.

Omurchu - Cross/O'Shea

1          MR. O'SHEA:  Oh, thank you.  Why don't you

2    show Exhibit 4, 1442, which is the map that we saw

3    yesterday.

4    **Q.**   Do you see 1442, sir?

10:27:26  5    **A.**   Yes, I do.

6    **Q.**   See if I can work this.  All right.

7          I'm going to have access to a little arrow like this

8    now for the time being.  Can you see where I'm doing that?

9    **A.**   Yes, I can.

10:27:38 10   **Q.**   Now, yesterday, you were asked about this cluster.  Do

11   you remember this in or around Romania, am I right about

12   that, sir?

13   **A.**   Yes.

14   **Q.**   And each of those little pin heads or pop ups were --

10:27:52 15   where you could locate -- correct me if I'm wrong and if I

16   lose you on the terminology.  Absolutely stop me and correct

17   me -- that were -- that demonstrates where you think servers

18   were or proxy servers were, am I right?

19   **A.**   These arrows indicate infected computers that I was

10:28:12 20   asked to connect to.

21   **Q.**   Okay.  All right.

22         Now, there's a -- how many do you see -- I know you

23   might have to squint a little bit, but like I did with my

24   glasses, sir, how many pin heads -- I don't want to call

10:28:24 25   them that, markers do you see there in Romania?

1    **A.**    I don't know, about 10 maybe.

2    **Q.**    Okay.

3          So let's jump across the pond and look up and down the

4    east coast of the United States.  How many do you see there?

10:28:43 5    Count them real quick.

6    **A.**    About 15.

7    **Q.**    Okay.  More than Romania, right?

8    **A.**    Yes.

9    **Q.**    And if we go all across the United States, there's a

10:28:53 10    lot more than -- in Romania, right?

11    **A.**    Yes.

12    **Q.**    Including looks like even out by you over on the west

13    coast, am I right about that?

14    **A.**    Yes.

10:29:02 15    **Q.**    So just because we have infected computers, so to

16    speak, in Romania doesn't necessarily automatically, based

17    upon your own map, insinuate that it had to be coming from

18    Romania, right?

19    **A.**    It -- just based off of this map, no.

10:29:29 20    **Q.**    Okay.

21              MR. O'SHEA:  1873.

22              THE COURT:  Did you say 1873?

23              MR. O'SHEA:  I did, your Honor.  I'm sorry.

24              THE COURT:  That's all right.

10:29:45 25    **Q.**    Now, 1873, sir, is a demonstrative exhibit prepared by

Omurchu - Cross/O'Shea

```
         1    the United States of America, am I right about that, sir?

         2    A.     Yes.

         3    Q.     Okay.  And you saw this yesterday, am I right?

         4    A.     Yes.

10:30:02 5    Q.     All right.

         6           Now at the top here, C and C means command and control

         7    server, right?

         8    A.     Yes.

         9    Q.     And then there's these things called relay servers?

10:30:14 10   A.     Yes.

         11   Q.     Parent nodes, right?

         12   A.     Yes.

         13   Q.     And are these -- I don't see them on the thing, but

         14   are those called children nodes?

10:30:23 15   A.     Yes, you could use that term.

         16   Q.     Okay.

         17          Now, when we go back to that map, we go back to that

         18   map again, real quick?  Just so I understand it correctly,

         19   are these dots, what are they in that series of what -- that

10:30:44 20   we just saw in the other exhibit?

         21   A.     I believe those are parent nodes.

         22   Q.     Okay.

         23          And if I understood the questions yesterday, any one

         24   of those computers can communicate with the other in the

10:31:03 25   botnet and send commands, am I right?
```

Omurchu - Cross/O'Shea

1    **A.**    Yes.

2    **Q.**    Just so I understand you correctly, sir, from all the

3    information that you had at the time that you were

4    communicating with the FBI, you couldn't tell how many human

10:31:35 5    beings might be involved with this group, could you?

6    **A.**    I could see some hacker handles, and I could see

7    distinct hacker handles.

8          So I had a -- I had an idea.

9    **Q.**    Okay.

10:31:52 10          Getting back to this question I asked you before, you

11    were asked some questions about how some communications were

12    done through this Yahoo account.  Remember those questions,

13    sir?

14    **A.**    Yes.

10:32:04 15    **Q.**    And all one person would need to get on to that Yahoo

16    account is a user name and password, am I right?

17    **A.**    Yes.

18    **Q.**    And so you, as you sit there right now, in this

19    courtroom right here in Cleveland, have no idea how many

10:32:20 20    people have user names and passwords to that particular

21    Yahoo account, am I right, sir?

22    **A.**    That's correct.

23    **Q.**    Let me ask you a little bit about Twitter.  We all

24    know a lot more about Twitter than the last three years than

10:32:56 25    we ever want to know I imagine, but tell the ladies and

1    gentlemen how a Twitter account works.  What is a Twitter

2    account designed for?

3    **A.**    It's designed for sending messages publicly.

4    **Q.**    Okay.

10:33:12  5        And when you tweet something on Twitter, can you limit

6    it to who you -- who sees it?

7    **A.**    Yes.

8    **Q.**    Okay.  And -- but in order for someone to see it, they

9    have to be what's called a follower of you, do they not?

10:33:33 10   **A.**    No, I don't think so.

11   **Q.**    Okay.

12        In order to get on your Twitter account, though, you

13   need this thing called a user name and password, right?

14   **A.**    Yes.

10:33:46 15   **Q.**    And if you want to, you can sign up for that two-step

16   authentication business as well on Twitter, can you not?

17   **A.**    Yes.

18   **Q.**    But you don't have to, right?

19   **A.**    No.

10:33:54 20   **Q.**    Okay.

21        So if somebody sets up a Twitter account, and they

22   have a user name and password, you can log on to that

23   Twitter account for this computer, this computer, any

24   computer as long as you have the user name and password, am

10:34:09 25   I right?

Omurchu - Cross/O'Shea

1    **A.**    Yes.

2    **Q.**    And once on that account, generally speaking, you can

3    change the picture, determine what message is sent, am I

4    right?

10:34:20 5   **A.**    Yes.

6    **Q.**    You can change what goes into a user's profile

7    information about themselves once you have the user name and

8    password?

9    **A.**    Yes.

10:34:39 10  **Q.**    Have you ever been over to Romania?

11   **A.**    No.

12   **Q.**    Do you know how common or uncommon the name bog is in

13   Romania, sir?

14   **A.**    I do not know.

10:35:10 15  **Q.**    I've got one last series of questions.

16          So I understand, in a company called Symantec, when

17   you are doing your work, I assume, sir, that like police

18   officers, like FBI agents, you don't assume that your memory

19   will remember everything that you've done, am I right, you

10:35:30 20  keep notes, you record your doings, am I right?

21   **A.**    Yes.

22   **Q.**    And the reason you do that is so you can report to,

23   excuse the expression, superiors as well as people working

24   under you so you can communicate with them on a regular

10:35:46 25  basis, right?

Omurchu - Cross/O'Shea

1    **A.**    Yes.

2    **Q.**    Just so I understand you.  Maybe -- blame me, don't

3    blame anybody else, I'm trying to narrow down a little bit

4    more about the questions that Mr. Goldberg asked you about

10:35:58  5    how you keep records of what you do in your capacity.  All

6    right?

7        So for instance, certain police and Government

8    organizations, there are forms, they actually give them for

9    a number and they say, you know, any time you're

10:36:14 10    communicating about a particular subject or a particular

11    case, you do this form number as opposed to that form

12    number, et cetera.  All right?

13        Is there anything internal in Symantec similar to that

14    in a sense that if I want to talk about, for instance, the

10:36:29 15    Bayrob Group, I'm going to do it and I'm going to keep my

16    memorandums and report in a certain folder, in a certain

17    format, or in a certain form type.  Is there any type of

18    protocol like that there?

19    **A.**    We have a program internally to record our work.

10:36:46 20    **Q.**    Okay.  What's it called?

21    **A.**    Well, it's currently called -- sorry, going blank.

22    There's two.  One is Confluence.

23    **Q.**    What's it called?

24    **A.**    Confluence.

10:37:02 25    **Q.**    Spell that for the Court Reporter.

Omurchu - Cross/O'Shea

1    **A.**    C-O-N-F-L-U-E-N-C-E.

2    **Q.**    Confluence.  Okay.  Got it.

3    **A.**    Yeah.  And the other one is Gira.

4    **Q.**    How do you spell that?

10:37:15  5    **A.**    G-I-R-A.

6    **Q.**    How are they different and how are they --

7    **A.**    One is a ticketing system and one is like a web page

8    system.

9    **Q.**    Okay.  Are they internal?

10:37:28  10    **A.**    Yes.

11    **Q.**    Are they somewhat partially or totally encrypted so

12    others can't read them outside the organization?

13    **A.**    I presume they're protected.

14    **Q.**    Okay.  All right.

10:37:41  15         And do you regularly communicate with your people

16    laterally above and below you through e-mails?

17    **A.**    Yes.

18    **Q.**    Is there also an internal chat program where you can

19    chat intra company there at Symantec?

10:37:58  20    **A.**    Yes.

21    **Q.**    What's that called?

22    **A.**    It's -- I'm forgetting the name of it right now.

23    **Q.**    If you recall it in a few minutes, just tell me.

24    Okay?  I know that's how it works.  Can't remember the movie

10:38:14  25    you saw last night sometimes.  I get foggy.  But does that

1    chat program use PGP, Pretty Good Privacy, you think?

2    **A.**    I don't know.

3    **Q.**    Okay.

4          During the course from 2007, including the present day

10:38:38 5    you used one or all of those formats in order to keep the

6    folks at Symantec updated about what you're doing, right?

7    **A.**    Well, I would say yes.

8    **Q.**    Okay.

9          For instance, you can't just say I'm flying to

10:39:01 10    Cleveland tomorrow and assuming you get somebody to pay for

11    it and Symantec just says just go.  You have to tell them

12    why you're going, right?

13    **A.**    Yes.

14    **Q.**    And that's part of that ongoing folder and file that

10:39:12 15    you're keeping in the context of anything related to this

16    thing called Bayrob, am I right?

17    **A.**    Yes.

18    **Q.**    Okay.

19          And that stuff is probably kept these days in order to

10:39:23 20    cut down on trees, unless necessary, primarily digitally and

21    not necessarily in a paper file in a file drawer anywhere,

22    am I right?

23    **A.**    Yes.

24    **Q.**    Okay.

10:39:33 25          And a lot of that stuff through technology like, you

Omurchu - Cross/O'Shea

```
         1   know, like a Dropbox or I think Microsoft has a thing called

         2   reports, you can access that information from just about

         3   anywhere from a laptop as long as you log in, from even your

         4   phone or your tablet device, am I right?

10:39:56 5   A.    Yes.

         6   Q.    About a week ago or so, did you get an e-mail from me,

         7   sir?

         8   A.    Yes, I did.

         9   Q.    And attached was a document called a subpoena.  Am I

10:40:08 10  right?

        11   A.    Yes.

        12   Q.    And it says, you know, when you come to Cleveland,

        13   would you bring me a plethora of documents, did it not?

        14   A.    Yes.

10:40:17 15  Q.    Okay.  Did you bring them?

        16   A.    No.

        17   Q.    Okay.

        18              MR. O'SHEA:  I think I'm done, Judge.  Just a

        19   moment.

10:40:41 20        (Counsel and client conferring.)

        21              MR. O'SHEA:  Thank you.  Nothing further.

        22   Thank you, sir.

        23              THE COURT:  Folks, we're going to take a short

        24   morning recess.  Please remember the admonition.

10:41:03 25        All rise for the jury.
```

Omurchu - Redirect/Levine

1      (Thereupon, a recess was taken.)

2           THE COURT:  Redirect, Mr. Levine.

3           MR. LEVINE:  Thank you, your Honor.

4        REDIRECT EXAMINATION OF LIAM OMURCHU

11:01:59  5   BY MR. LEVINE:

6   **Q.**   Mr. Omurchu, on cross-examination, you were asked

7   about the fact that the Cryptomining slowed down your

8   computer.

9        Do you recall that?

11:02:08  10  **A.**   Yes.

11  **Q.**   And you pointed out that made it very hard to use.  Do

12  you recall that?

13  **A.**   Yes.

14  **Q.**   And that someone would know then that they might have

11:02:19  15  a virus.  Do you recall that?

16  **A.**   Yes.

17  **Q.**   Now, was that a problem, the problem of slowing down

18  computers to that degree, something that the Bayrob Group

19  was able to mitigate over time?

11:02:34  20  **A.**   Yes.

21  **Q.**   All right.

22        You were asked on cross-examination about the

23  volume -- about whether you saved everything from your

24  investigation from 2007 to the present.

11:02:51  25       Do you recall that?

A.    Yes.

Q.    How many different strains of the Bayrob virus were
you investigating?  I believe you said testimony was tens of
thousands?

A.    Yes.

Q.    And was -- was Bayrob the only virus that Symantec was
investigating between 2007 and the present?

A.    No.

Q.    How many other different viruses were you
investigating between 2007 and the present?

A.    Symantec?

Q.    Yes.

A.    Millions.

Q.    Millions?  And did each of those millions of virus
have many strands as well?

A.    Yes.

Q.    And if you were to preserve and save all the data just
related to Bayrob during your -- between 2007 and the
present, would we be talking about terabytes of information?

A.    Yes.

Q.    What is a terabyte?

A.    It's a large amount of data.

Q.    Okay.  How does it compare -- how many gigabytes are
in a terabyte?

A.    A thousand.

Omurchu - Redirect/Levine

1    **Q.**    Okay.  All right.

2          You were on cross-examination, you were also asked

3    about your communications with the FBI since 2008.  Do you

4    recall that?

11:04:08  5    **A.**    Yes.

6    **Q.**    Do you recall that in 2008, Symantec published a

7    report about Bayrob on its website?

8    **A.**    Yes.

9    **Q.**    And do you recall that Special Agent Diaz, then

11:04:20 10   Special Agent Lough, contacted you in 2008 to see if you had

11   an updated copy of that report, and you said you didn't?

12                   MR. GOLDBERG:  Objection.

13                   THE COURT:  Now, I'm going to allow that.

14                   THE WITNESS:  That sounds correct, yes.

11:04:34 15   **Q.**    Okay.

16          And do you recall any other conversations or

17   interactions with the FBI between 2008 and 2013?

18   **A.**    No.

19   **Q.**    You mentioned you may have sent or received

11:04:55 20   approximately 20 e-mails between you and the FBI.  Do you

21   recall that?

22   **A.**    Yes.

23   **Q.**    Now, of those approximately 20 e-mails, how many of

24   them would you say were scheduling phone calls?

11:05:08 25   **A.**    Honestly I can't remember.

1    **Q.**   Well, it was some of them?

2    **A.**   Some of them, yes.

3    **Q.**   And how many of them would you say were sending us

4    your exhibits?

11:05:21  5    **A.**   Very few.

6    **Q.**   But some of them were you sending us your exhibits,

7    correct?

8    **A.**   Yes.

9    **Q.**   And did those e-mails have any content or were you

11:05:31 10    just attaching your exhibits and sending them to us?

11    **A.**   I did -- I think I was just sending them -- sending

12    the attachments.

13    **Q.**   Okay.  And virtually -- strike that.

14          The vast majority of the exhibits that I showed you

11:05:50 15    during your direct, were those exhibits that you created?

16    **A.**   Yes.

17    **Q.**   And you sent them to us, correct?

18    **A.**   Yes.

19    **Q.**   All right.

11:05:59 20          You talked about having five meetings with

21    approximately five meetings with the Government; is that

22    correct?

23    **A.**   Yes.

24    **Q.**   Isn't it true the first time you and I met

11:06:12 25    face-to-face was when you arrived here for this trial?  Let

1    me ask it this way.

2         Do you recall having met me in person prior to you

3    coming here for trial?

4    **A.**    I think we met maybe one time before.

11:06:31  5    **Q.**    Okay.

6         Do you recall -- do you have any recollection as to

7    when that was?

8    **A.**    I can't really say.

9    **Q.**    Okay.  I don't recall either.

11:06:50 10              MR. O'SHEA:  Objection.

11              THE COURT:  Sustained.  That will be stricken,

12   folks.  Disregard that statement from counsel.

13   **Q.**    Now the meetings that you were referring to, those

14   were phone conversations, correct?

11:07:02 15   **A.**    Sorry.

16   **Q.**    The five or so meetings you're referring to?

17   **A.**    Uh-huh.

18   **Q.**    At least four of those were phone conversations,

19   correct?

11:07:13 20              MR. GOLDBERG:  Object to the form.

21              THE COURT:  Sustained.

22   BY MR. LEVINE:

23   **Q.**    Were those phone conversations?

24   **A.**    I had phone conversations, yes.

11:07:29 25              MR. O'SHEA:  Objection.

1          THE COURT:  Overruled.

2  **Q.**    Were the purpose of those conversations so that you

3  could teach me about your investigation or so that I could

4  teach you about something?

11:07:37 5  **A.**    So I could teach you.

6  **Q.**    And when we first started speaking, did I know --

7  strike that.

8       You were asked about the date you received via Wire

9  Shark.  Do you recall that?

11:08:07 10  **A.**    Yes.

11  **Q.**    And you were asked if everything was accessible; is

12  that correct?

13  **A.**    Yes.

14  **Q.**    Was any of the data you were receiving over Wire Shark

11:08:19 15  encrypted?

16  **A.**    Yes.

17  **Q.**    What data did you receive over Wire Shark was

18  encrypted?

19  **A.**    Lots of different data.

11:08:28 20  **Q.**    And included in that lots and lots of data was that

21  almost all the communication between the Bayrob Group?

22  **A.**    Yes.

23          MR. GOLDBERG:  Objection, your Honor.

24          THE COURT:  Overruled.  The answer will stand.

11:08:40 25  **Q.**    Okay.

1    You were asked about the map that shows the

2  geolocation in the United States and in Romania.  Do you

3  recall that?

4  **A.**   Yes.

11:08:51  5  **Q.**   Was that map and those -- that geolocation your only

6  basis for believing the Bayrob Group was in Romania?

7  **A.**   No.

8  **Q.**   What other data points did you consider?

9  **A.**   I considered the fact that my machine -- I considered

11:09:20 10  lots of different facts, but including the fact that I

11  thought it was unusual that I would -- my machine would only

12  be asked to connect to machines in two different locations

13  and not all over the world.

14  **Q.**   Did you also consider the fact that it was Romanian

11:09:39 15  words in the malware code itself?

16  **A.**   Yes.

17          MR. GOLDBERG:  Objection.

18          THE COURT:  Sustained.  Disregard that last

19  answer, folks.

11:09:47 20  **Q.**   Besides the geolocation, what other factors did you

21  consider?

22  **A.**   Well, lots of -- lots of different factors, including

23  the fact that Romanian words were found -- that I found

24  Romanian words in the malware and I suspected that was

11:10:04 25  significant.

1    **Q.**    In the encrypted e-mails that you saw between members

2    of the Bayrob Group, were the subject -- were any of the

3    subject line or attachment names in Romanian?

4    **A.**    Sorry.  Can you repeat the question?

11:10:21    5    **Q.**    In the encrypted e-mails you saw between members of

6    the Bayrob Group, were any of the subject lines or

7    attachment names in Romanian?

8    **A.**    Yes.

9    **Q.**    And were there other factors you considered that led

11:10:38   10    you to believe that they were in Romania?

11    **A.**    Yes.

12    **Q.**    I'd like to bring up Exhibit 1441, please, Sue.  And

13    Exhibit 1441, you may recall from direct and from

14    cross-examination, this is a list of domain names; is that

11:11:03   15    correct?

16    **A.**    Yes.

17    **Q.**    And this list of domain names is from Paragraph 168 of

18    the indictment?

19    **A.**    Yes.

11:11:10   20    **Q.**    Do you recall that I sent you this list of domain

21    names?

22    **A.**    Yes.

23    **Q.**    And I asked you whether you saw your computer infected

24    with your -- infected computer communicating with any of

11:11:26   25    those domain names?

1              MR. GOLDBERG:  Objection.

2              THE COURT:  Sustained.

3    Q.    What question did I ask you when I sent you that?

4              MR. GOLDBERG:  Objection.  May we approach,

11:11:32  5    your Honor?

6              THE COURT:  Sustained.

7    Q.    What were you asked to do with that list of domain

8    names?

9              MR. GOLDBERG:  Objection.

11:11:41 10              THE COURT:  Sustained.

11    Q.    How did you determine whether your computer, your

12    infected computer had communicated with any of those domain

13    names?

14    A.    I looked to see if we had seen from the infected

11:12:10 15    machines reaching out to these domain names.

16    Q.    And were you able to confirm?

17    A.    Yes.

18    Q.    Now, the reports that you mentioned, you may have

19    provided to the FBI about the Bayrob Group.  Do you recall

11:12:30 20    testifying to that on direct -- on cross-examination?  I'm

21    sorry.

22    A.    Yes.

23    Q.    Do you recall whether those reports were also publicly

24    published on the Symantec website?

11:12:42 25    A.    No, they were not.

Omurchu - Redirect/Levine

1        MR. GOLDBERG:  I'm sorry.

2        THE WITNESS:  No, they were not.

3   **Q.**   So during cross-examination, you were asked about the

4   fact that if you use antivirus, you can protect yourself

11:13:03 5   from getting malware; is that correct?

6   **A.**   Yes.

7   **Q.**   Based on your investigation, was the Bayrob Group

8   doing everything they could think of to thwart antivirus?

9        MR. GOLDBERG:  Objection.

11:13:15 10        THE COURT:  Sustained.

11   **Q.**   Based on your investigation, was the Bayrob malware

12   continually updated to prevent antivirus from --

13        MR. GOLDBERG:  Objection.

14   **Q.**   -- detecting it?

11:13:28 15        THE COURT:  Sustained.

16   **Q.**   What did your investigation show about the Bayrob

17   Trojan and how -- and its impact with antivirus?

18        MR. GOLDBERG:  Objection.

19        THE COURT:  Overruled.

11:13:41 20        THE WITNESS:  My investigation showed that

21   Bayrob was continuously updated to try and evade the

22   protection we were providing.

23   **Q.**   Okay.

24        You were asked on cross-examination if you knew how

11:13:53 25   many people were behind the group.  Do you recall that?

Omurchu - Redirect/Levine

1    **A.**    Yes.

2    **Q.**    Did you -- you also testified that you saw encrypted

3    e-mails between members of the group; is that correct?

4    **A.**    Yes.

11:14:05 5    **Q.**    Based on your analysis of the Bayrob Trojan, it --

6    strike that.

7         During your cross-examination, you were asked about

8    two step or two-step authentication.  Do you recall that?

9    **A.**    Yes.

11:14:25 10    **Q.**    Based on your analysis of the Bayrob Trojan, could the

11    Bayrob Group using the -- strike that.

12         If someone was infected with the Bayrob Trojan, could

13    the Bayrob Group see what was going on on that person's

14    computer?

11:14:42 15    **A.**    Yes.

16    **Q.**    And would that be true whether they used two-factor

17    authentication or not?

18    **A.**    Yes.

19    **Q.**    You recall on cross-examination you were asked about

11:14:57 20    static versus dynamic IP addresses?

21    **A.**    Yes.

22    **Q.**    Whether someone is using a static or dynamic IP

23    address, if they're not using any kind of proxy to conceal

24    their identity, could the provider who provides that IP

11:15:14 25    address identify who they provided that IP address to?

1          MR. GOLDBERG:  Objection.

2          THE COURT:  Sustained.

3    Q.    The question -- let me rephrase the question.  Can

4    a -- if someone is not using a proxy of any type, can a

11:15:38  5    provider typically identify the IP address they have

6    assigned to someone?

7          MR. GOLDBERG:  Objection.

8          THE COURT:  Typically?

9          MR. LEVINE:  Let me just take that word out.

11:15:52  10   Q.    Can a provider identify an IP address they provided to

11   someone if they're not using a proxy?

12         MR. GOLDBERG:  Objection.

13         THE COURT:  No, overruled.

14         THE WITNESS:  Yes.

11:15:59  15   Q.    And would that be true with the static or dynamic IP

16   address?

17   A.    Yes.

18   Q.    Do you -- do you have an e-mail account with a public

19   provider like Google or Yahoo or GMX?

11:16:35  20   A.    Yes.

21   Q.    That you use for personal use?

22   A.    Yes.

23   Q.    And in general, does -- do those accounts with Google

24   and Yahoo and GMX, do they come with end-to-end encryption

11:16:50  25   by default?

Omurchu - Redirect/Levine

1    **A.**    Some of them do, yes.

2    **Q.**    Does Gmail come with encryption by default?

3    **A.**    Yes, I think so.

4    **Q.**    Let's talk about what end-to-end encryption is versus

11:17:04  5    encryption?

6    **A.**    Okay.

7    **Q.**    What -- what is the difference between standard

8    encryption and end-to-end encryption?

9    **A.**    Sorry.  I'd like to change my answer to the last

11:17:15 10    question.

11    **Q.**    Okay.  Clarify.

12    **A.**    I believe that when you send e-mail with Gmail, that

13    it's not encrypted from end to end.

14    **Q.**    Okay.  What is the difference between regular

11:17:28 15    encryption and end-to-end encryption?

16    **A.**    Regular encryption means that it will be encrypted at

17    some point during its life span and maybe when it's being

18    transferred from one place to another to be encrypted but

19    when it arrives at the other end, it's not encrypted.

11:17:51 20    End-to-end encryption means nobody between the receiver and

21    the sender and the receiver can see the content.

22    **Q.**    Okay.

23        So if I send an e-mail over Gmail, for example, to

24    somebody else, Yahoo mail, could Google and Yahoo see a copy

11:18:13 25    of that e-mail and produce it if they got the right legal

1    process?

2                    MR. GOLDBERG:  Objection.

3                    THE COURT:  Sustained.

4    Q.    If I send an e-mail over to Gmail or Yahoo, does

11:18:26   5    Google or Yahoo have the ability to see that e-mail?

6                    MR. GOLDBERG:  Objection.

7                    THE COURT:  Side bar.

8         (The following proceedings were held at side bar:)

9                    THE COURT:  Mr. Goldberg, what's the basis of

11:18:46  10    your objection?

11                    MR. GOLDBERG:  He's asking the witness for

12    something that's out of his field.  He's asking what

13    somebody else knows or has the ability to do, Number 1.  And

14    I think he's also been leading this entire redirect.

11:19:01  15                    THE COURT:  I honestly, with all due respect,

16    you've lost me.

17                    MR. LEVINE:  Okay.

18                    THE COURT:  You've lost me.  Where are you

19    going with this?  What's the purpose of this particular

11:19:14  20    questioning?

21                    MR. LEVINE:  I'll move on.  I'll move on.

22                    THE COURT:  You're sure?

23                    MR. LEVINE:  Yes.

24                    THE COURT:  Okay.

11:19:21  25         (Proceedings resumed within the hearing of the jury:)

Omurchu - Redirect/Levine

1    **Q.**    Mr. Omurchu, on cross-examination, you were asked

2    whether you received a subpoena from Defense counsel.

3         Do you recall that?

4    **A.**    Yes.

5    **Q.**    And did you provide that subpoena to Symantec's legal

6    counsel?

7    **A.**    I did.

8    **Q.**    And is that what you would do in your normal course?

9    **A.**    Yes.

10                  MR. LEVINE:  No further questions, your Honor.

11                  THE COURT:  Based on those questions,

12   Mr. Goldberg.

13                  MR. GOLDBERG:  Thank you.

14

15

16

17

18

19

20

21

22

23

24

25

1    RECROSS-EXAMINATION OF LEE OMURCHU

2  BY MR. GOLDBERG:

3  **Q.**    A couple questions about storage.  You were asked

4  about terabytes.  Terabytes is a thousand gigabytes,

11:20:15  5  correct?

6  **A.**    Yes.

7  **Q.**    My phone is probably 164 gigabytes, right, something

8  like that?

9  **A.**    Okay.

11:20:20  10  **Q.**    But Symantec's in the business of monitoring threats

11  and monitoring the Internet for malware or insidious

12  threats, correct?

13  **A.**    Yes.

14  **Q.**    You've got basically unlimited storage capacity

11:20:38  15  available to you?

16  **A.**    Basically.

17  **Q.**    Basically.

18        So the implication from Mr. Levine's questions, you

19  couldn't possibly have kept all that stuff, just isn't true,

11:20:49  20  you could have if you wanted to?

21              MR. LEVINE:  Objection.

22              THE COURT:  Sustained.

23  **Q.**    You could have kept every bit of information in your

24  ten years of investigation of Bayrob if you chose to?

11:20:59  25              MR. LEVINE:  Objection.

Omurchu - Recross/Goldberg

```
 1              THE COURT:  Overruled.

 2    Q.    You have the capacity, correct?

 3    A.    From the capacity point of view, yes.

 4    Q.    Yes.  So you ever see one of these?

 5    A.    Yes.

 6    Q.    What is it?

 7    A.    A hard drive.

 8    Q.    Okay.

 9          And it plugs into a computer and you can access it?

10    A.    Yes.

11    Q.    Okay.  Can you tell by looking at this hard drive the

12    capacity?

13    A.    I don't see it written there.

14    Q.    Okay.

15          Are you -- do you work with these type of hard drives?

16    A.    Yes.

17    Q.    Okay.  So these will typically hold four terabytes?

18    A.    Yes, they can.

19    Q.    So a terabyte's a lot of information, this holds four

20    of those, right?

21    A.    Yes.

22    Q.    For the record, it's about the size of a VHR video

23    cam.  Anyone remembers what those are, VHS?  Thanks.

24    A.    Yes.

25    Q.    Okay.
```

1    How many of these can you fit in this room, you think?

2  **A.**   Lots.

3  **Q.**   Okay.  Thousands.  And, therefore, a thousands times

4  four terabytes of data can be stored, correct?

11:22:22 5  **A.**   Yes.

6  **Q.**   Okay.

7    You were asked a couple questions about what you sent

8  to the FBI in 2008, and you said it wasn't what was

9  published on the website, correct, as it relates to the

11:22:43 10  Bayrob information?

11  **A.**   We created a port at that time.  I can't remember if

12  that was the exact same -- I think it was the same that I

13  sent to the FBI.

14  **Q.**   You sent -- you created a --

11:22:56 15  **A.**   Public report.

16  **Q.**   Public report?

17  **A.**   And -- yeah, and I think -- I think it was public.

18  **Q.**   Okay.

19    Now, a couple minutes ago, Mr. Levine asked you was

11:23:11 20  what you put out to the public the same thing you sent to

21  the FBI and you said no.  Are you changing your answer now?

22  And I'm not trying to trick you, just -- I thought that's

23  what I just heard.

24  **A.**   Sorry, can you -- can you expand a little bit on that?

11:23:29 25  **Q.**   Yeah.

```
 1          So Mr. Levine asked you a couple moments ago about
 2     sending a report to the FBI in 2008?
 3     A.    Um-hum.
 4     Q.    Preliminary investigation?
 5     A.    Yeah.
 6     Q.    Of Bayrob.  And he asked you was that the same report
 7     that was published -- that was on the public website,
 8     Symantec's public website, and your answer was emphatically
 9     no.  I asked -- I stopped and said what was that answer and
10     you said no.
11          Is that still your answer?
12     A.    You know, I can't recall exactly and if we made that
13     report public or not.  It was made in a format that we
14     normally use for publication.  If we actually published it
15     or not, I don't -- I don't believe we did.
16     Q.    Okay.
17          So it was something distinct from what I could get off
18     of the Internet?
19               MR. LEVINE:  Objection.
20     Q.    As far as you know?
21               THE COURT:  Overruled.  Is that correct, sir,
22     if you know?
23               THE WITNESS:  I honestly don't recall.  We may
24     have published it.  I don't recall.
25     Q.    Do you remember specifically corresponding with the
```

Omurchu - Recross/Goldberg

1      FBI regarding the Bayrob investigation in 2008?

2      **A.**    Yes.

3      **Q.**    And you remember sending them materials and a report

4      relative to your investigation?

11:25:12 5    **A.**    Yes.

6      **Q.**    But you cannot state whether or not with certainty

7      that that was the same thing that was publicly available,

8      that may not be?

9      **A.**    Yes.

11:25:21 10   **Q.**    And if it's not, would you have retained a copy of

11     that?

12     **A.**    I don't know.

13     **Q.**    Okay.  Let's move on.

14            The next time you sent something to the FBI was after

11:25:37 15   2013, correct?

16     **A.**    Yes.

17     **Q.**    Between 2008 and 2013, you did your thing, they did

18     theirs?

19     **A.**    Yes.

11:25:44 20   **Q.**    As far as you know?

21     **A.**    Yes.

22     **Q.**    Okay.

23            So then you said you sent them a Power Point, correct?

24     That's what you said on cross-exam this morning?

11:26:04 25   **A.**    Yes, maybe -- it's a long time ago.  I can't remember

Omurchu - Recross/Goldberg

1    exactly.

2    **Q.**    It was only two hours ago that I asked you the

3    question and you said you sent Power Point?

4    **A.**    The -- exactly what happened on what date is difficult

11:26:16 5    for me to recall.

6    **Q.**    I'm not talking about an exact date.  All I'm looking

7    for is what you sent them and if you've got a year or a

8    two-year period.  I'm fine with that.  You said you sent a

9    Power Point, correct?

11:26:32 10    **A.**    I suspect that's what happened, but I really can't

11    confirm.

12    **Q.**    So you're changing that answer as well from this

13    morning because this morning, you said it's not a Power

14    Point.  You remember that?

11:26:42 15    **A.**    Honestly, I cannot recall.

16    **Q.**    You can't recall this morning what you said or you

17    can't recall in general?

18                    MR. LEVINE:  Objection.

19                    THE COURT:  Just clarify your answer, sir,

11:26:55 20    please.  What aren't you recalling?

21                    THE WITNESS:  I don't recall the exact

22    specifics of what I did or did not send.  I can't -- you

23    know, I can't recall exactly what happened.  It was six,

24    seven years ago.  I just don't recall it exactly.

11:27:16 25    **Q.**    But we can agree that this morning when you were asked

Omurchu - Recross/Goldberg

1    about it, you said you sent a report and then later on a

2    Power Point?

3    **A.**    I know that a Power Point was created.  I don't recall

4    if that was sent or not.

11:27:37 5    **Q.**    Do you recall telling me two hours ago it was sent to

6    the FBI?

7                    MR. LEVINE:  Objection.

8                    THE COURT:  Is that true, sir?  Overruled.

9                    THE WITNESS:  I don't know.

11:27:50 10    **Q.**    Okay.

11         The Power Point that was created contained screenshots

12    and some of the exhibits that we saw here in court?

13                    MR. LEVINE:  Objection.

14                    THE COURT:  Overruled.  Is that true, sir?

11:28:14 15    During his testimony?

16                    MR. GOLDBERG:  Well, during -- he doesn't

17    remember.

18                    THE COURT:  Well, you know what then?

19    Sustained.  Rephrase your question.

11:28:24 20    **Q.**    You don't recall creating a Power Point now, correct?

21    **A.**    I don't -- sorry.  Say the question again.

22    **Q.**    You don't recall preparing a Power Point for law

23    enforcement relative to the Bayrob virus right now as we're

24    sitting in court at 11:28 A.M.?

11:28:46 25    **A.**    I recall creating a Power Point about the Bayrob

1    virus, yes.

2    **Q.**    You recall the contents of that Power Point?

3    **A.**    Some of it, yes.

4    **Q.**    Okay.

11:28:54  5           Did it contain copy?  Do you remember whether it

6    contained copies of the exhibits we saw here in court?

7    **A.**    I don't recall.

8    **Q.**    Do you recall whether or not it contained your

9    findings, thoughts, opinions, regarding the Bayrob virus?

11:29:22 10   **A.**    Yes, it did.

11   **Q.**    Based on your years of research of the Bayrob Group

12   virus?

13   **A.**    Yes.

14   **Q.**    And the only thing specifically you can't recall is

11:29:36 15   whether or not you sent that to the FBI?

16   **A.**    Yes.

17   **Q.**    And you still have that Power Point?

18   **A.**    I believe so.

19   **Q.**    Would that be available to you from Cleveland?

11:30:01 20   **A.**    I don't know.

21   **Q.**    Okay.

22          So we talked about other things that you were able to

23   witness through the Wire Shark software package, such as

24   log-ons by different individuals to the same e-mail

11:30:18 25   address -- same e-mail user ID and password, correct?

Omurchu - Recross/Goldberg

1    **A.**   Yes.

2    **Q.**   You didn't bring that data, recorded data with you to

3    court, correct?

4    **A.**   Correct.

11:30:30  5    **Q.**   You didn't provide that data to the FBI, correct?

6                    MR. LEVINE:  Objection.

7                    THE COURT:  Overruled.

8                    THE WITNESS:  I believe I did provide that

9    information to the FBI.

11:30:46  10    **Q.**   Okay.

11         You made sure you brought the screenshot showing the

12    insults directed at you, correct?

13                    MR. LEVINE:  Objection, your Honor.

14                    THE COURT:  Sustained.

11:31:03  15    **Q.**   You brought the screenshot showing the insults

16    directed at you?

17                    MR. LEVINE:  Objection.

18                    THE COURT:  Sustained.

19    **Q.**   Okay.  Just one more subject, a couple questions.

11:31:33  20         Talking about your -- infected computer being

21    requested to connect to another computer in Romania, you

22    were asked some questions about that by Mr. Levine, correct?

23    **A.**   Yes.

24    **Q.**   Okay.

11:31:50  25         And those were geolocated by you through a publicly

1    available geolocation source?

2    **A.**    Yes.

3    **Q.**    And it's your belief that those were your original

4    source, the original proxy is the first proxy of the Bayrob

11:32:21  5    Group, correct?

6    **A.**    I don't understand the question.

7    **Q.**    Okay.

8         So you were asked a couple questions about the proxies

9    in Romania and whether you believe that that was the

11:32:43 10    original sign-on box, the original proxy in the chain.

11    **A.**    Yes.

12    **Q.**    And it's your opinion that they were, correct?

13    **A.**    Yes.

14    **Q.**    And that's based on the fact that those proxy IP

11:32:54 15    addresses were not contained in the database of IP addresses

16    that you were able to pull down from the command and control

17    server, correct?

18    **A.**    Yes.

19    **Q.**    Okay.  That's the only reason?

11:33:05 20    **A.**    Yes.

21    **Q.**    And so if the Bayrob members did post the IP addresses

22    of these particular servers in Romania, on to the command

23    and control server, then you wouldn't -- you wouldn't know

24    about those particular servers?

11:33:22 25    **A.**    That's correct.

1    **Q.**    And there is no reason why the Bayrob Group could have

2    used a series of servers prior to the Romanian servers that

3    just -- the IP addresses just weren't in the database?

4    **A.**    That's correct.

11:33:39   5               MR. GOLDBERG:  Thank you.  I have nothing

6    further.

7               THE COURT:  Recross, Mr. O'Shea.

8               MR. O'SHEA:  Thank you.

9               RECROSS-EXAMINATION OF LIAM OMURCHU

11:33:47  10    BY MR. O'SHEA:

11    **Q.**    Still good morning, sir.

12         I'm going to ask you one quick question.  It's about

13    IP addresses and I'm going to follow up on what Mr. Goldberg

14    was asking about.

11:34:03  15         Let's assume that, you know, when I got up here just

16    before I did, sir, I kind of -- there's seven laptops out in

17    this room right now.  I assume they're all connected through

18    the same modem.

19         Do all seven of those laptops have the same IP

11:34:19  20    address, at least as we speak here right now, sir?

21    **A.**    No.

22    **Q.**    Okay.  If I go to a Starbuck's, however, and I'm using

23    their free Wi-Fi, I go to any coffee house that provides

24    free Wi-Fi for the caffeine drinking folks that are working

11:34:36  25    on their own and say that Starbucks has seven laptops

1    operating at that particular moment or this moment, do those

2    seven laptops all have the same, at least for that time

3    being, IP address?

4    **A.**    No.

11:34:53  5    **Q.**    Are they all separate, seven separate IP addresses?

6    **A.**    Yes.

7    **Q.**    So are those IP addresses forever addresses or if they

8    close the laptop and they go down the street to the other

9    Starbucks or to a competitor and open up, they're going to

11:35:09 10    have a different IP address, right?

11    **A.**    Yes.

12    **Q.**    And so if you or the federal government with resources

13    comes in to the Starbucks and says I want a history of

14    people that logged in here, all you're going to get is an IP

11:35:25 15    address; it's not going to tell you the laptop or anything

16    else of the person, am I right?

17    **A.**    Sorry.  I lost focus there.  Could you repeat that

18    question?

19    **Q.**    That's okay.  It was a long question.  Let me reword

11:35:37 20    it.

21        So let's say the federal government comes into that

22    Starbucks and says hey, I want to know all the -- we noticed

23    your IP address has something on it.  We want all the

24    laptops that were used there on a particular day.  Right?

11:35:54 25    All they're going to get is the fact that a laptop with a

1    hard drive connects through that Starbucks on that

2    particular day, it's not going to say who the owner is, what

3    their address is, or anything else, right?

4              MR. LEVINE:  Objection.

11:36:06  5              THE COURT:  Sustained.

6    Q.   All right.

7         Now -- to follow up on what Mr. Goldberg said, right

8    after there was some arrests made in this case, you wrote a

9    blog on the Symantec blog website, did you not?

11:36:34 10   A.   Yes.

11   Q.   Okay.

12              MR. O'SHEA:  May I approach the witness, your

13   Honor?

14              THE COURT:  Of course.  You don't have to ask.

11:36:40 15              MR. O'SHEA:  Thank you.

16   Q.   Just in an attempt to refresh your recollection, tell

17   me if this looks familiar as something that you either

18   authored yourself or participated in the authoring?

19              MR. LEVINE:  Your Honor, may we have a copy of

11:36:53 20   it?

21              THE WITNESS:  Yes, it is.

22              MR. LEVINE:  May we see a copy?

23              THE COURT:  Certainly.

24              MR. LEVINE:  Your Honor?

11:37:06 25              THE COURT:  Well, let me hear a question.

Omurchu - Recross/O'Shea

1          MR. O'SHEA:  Sure.  All right.

2     BY MR. O'SHEA:

3     **Q.**    This article from the Symantec official blog says it's

4     dated December 16, 2016.  Am I right?  Let me just ask you

11:37:23  5     that.

6     **A.**    Yes.

7     **Q.**    All right.

8          And the Symantec employee is you, am I right?

9     **A.**    There was multiple people involved in this document.

11:37:35 10     **Q.**    Were you the primary editor, determiner of the final

11     contents, sir?

12     **A.**    No, I was not.

13     **Q.**    Who was?

14     **A.**    I don't know.  There's a content team that actually

11:37:45 15     published these blogs.

16     **Q.**    Was I right when -- were you right before when you

17     said you participated -- excuse me -- participated in the

18     authorship of this document?

19     **A.**    Yes, yes, yes.

11:37:55 20     **Q.**    All right.

21          Now, on this second page, do you talk --

22          THE COURT:  This is not recollection,

23     refreshing recollection.

24     **Q.**    Let me ask you this.

11:38:06 25          During the process of writing this article, did you --

| | |
|---|---|
| 1 | did the people at Symantec state that -- |
| 2 | MR. LEVINE:  Objection, your Honor. |
| 3 | **Q.**    There was a -- |
| 4 | THE COURT:  One moment.  One moment. |
| 11:38:18  5 | MR. O'SHEA:  There was an -- |
| 6 | THE COURT:  One moment.  One moment. |
| 7 | Mr. O'Shea, one moment.  Are you starting to quote |
| 8 | from the article? |
| 9 | MR. O'SHEA:  No.  I'm going to ask him some |
| 11:38:26 10 | fact questions and see if the article refreshes his |
| 11 | recollection. |
| 12 | THE COURT:  Side bar. |
| 13 | (The following proceedings were held at side bar:) |
| 14 | MR. O'SHEA:  Here's -- |
| 11:38:52 15 | THE COURT:  What are you doing? |
| 16 | MR. O'SHEA:  Here's all, this article says |
| 17 | that this is an eight-year -- sorry, sorry -- an eight-year |
| 18 | law enforcement investigation which was assisted -- law |
| 19 | enforcement which was assisted by Symantec.  Okay.  That's |
| 11:39:06 20 | what they wrote on their -- here it is, Judge.  Their |
| 21 | official blog.  Okay?  Because I think he -- to be honest |
| 22 | with, you he was getting a little sketchy with Mr. Goldberg |
| 23 | about what type of communication he was having with the FBI. |
| 24 | It looks like that FBI contact goes back eight years, |
| 11:39:27 25 | according to their official blog.  Just -- let me finish, |

1    Brian.

2                    MR. LEVINE:  You show me that.

3                    MR. O'SHEA:  Sure.

4                    MR. LEVINE:  Doesn't sound like what he just

5    said.

6                    MR. O'SHEA:  There it is.  Their official blog

7    says -- I underlined it there.

8                    MR. LEVINE:  Eight-year law enforcement

9    investigation, assisted -- was assisted by Symantec.

10                   MR. O'SHEA:  That's exactly my point.

11                   MR. LEVINE:  This is a press release.

12                   THE COURT:  One moment, one moment.

13                   MR. LEVINE:  Yes, ma'am.

14                   THE COURT:  Finish.

15                   MR. O'SHEA:  On Page 3, it says -- they've got

16   grass roots and all this stuff in the article about these

17   guys and what they did.  It says Bayrob first came to our

18   attention in 2007.

19        Again, this is Symantec talking, Page 5.  Page 5,

20   Judge, actually has a cut out of -- from one of the exhibits

21   in this trial where on the right-hand side, they say

22   Symantec's team is a big hand coop chicken smart."  So they

23   got that.

24                   THE COURT:  Okay.  I'm going to stop you.

25        Is it your intention to use this to impeach him?

|   |   |
|---|---|
| 1 | MR. O'SHEA:  Yes, based on the -- |
| 2 | THE COURT:  And he just said that he is not |
| 3 | the sole author, that this was a group of people.  So let me |
| 4 | stop right there. |
| 11:40:53 5 | For that reason alone, you can't impeach him with |
| 6 | this.  Let me go further and say based upon the actual |
| 7 | statement in this document that you have read into the |
| 8 | record, it's not impeachment material.  He didn't say |
| 9 | anything to the contrary.  I'm not going to allow it. |
| 11:41:19 10 | MR. O'SHEA:  Okay. |
| 11 | Let me tell you, Judge, I -- I'm pretty sure, based on |
| 12 | the other articles that I have, that he was the actual |
| 13 | author of this.  But, I'll -- I just like to -- may I at |
| 14 | least clarify with him a little bit about who -- what other |
| 11:41:34 15 | human beings -- |
| 16 | THE COURT:  But I went further and said so |
| 17 | far, nothing you have said to me contradicts anything he |
| 18 | said on the witness stand. |
| 19 | MR. O'SHEA:  May I respectfully submit, Judge, |
| 11:41:50 20 | with all due respect to the Court, that I think that he got |
| 21 | very sketchy with Mr. Levine and Mr. Goldberg about what |
| 22 | type of contact they were having with the FBI. |
| 23 | THE COURT:  You have to be a lot more specific |
| 24 | about a statement in there that contradicts something he |
| 11:42:05 25 | said.  Saying that he was sketchy doesn't cut it. |

1          MR. O'SHEA:  Okay.

2          THE COURT:  Okay?

3      (Proceedings resumed within the hearing of the jury:)

4  BY MR. O'SHEA:

11:42:32  5  **Q.**    Let me ask you a question, a direct question.

6  **A.**    Sure.

7  **Q.**    Was Symantec and/or you, as an employee of Symantec,

8  cooperating with the FBI in connection with this type of

9  case, this particular group, since 2007?

11:42:51 10          MR. LEVINE:  Objection.

11  **Q.**    Yes or no?

12          THE COURT:  Overruled.  You may answer that.

13          THE WITNESS:  I don't know what you mean by

14  cooperation.

11:43:04 15  **Q.**    Were you assisting?

16  **A.**    We sent information in 2008 and again in 2013.

17  **Q.**    Okay.

18      Would it refresh your recollection, sir, as to what

19  your own company with your assistance put --

11:43:23 20          MR. LEVINE:  Objection, your Honor.

21          THE COURT:  Sustained, sustained.

22          MR. O'SHEA:  Okay.  All right.

23  BY MR. O'SHEA:

24  **Q.**    Now let me ask you this, sir.  As part of your

11:43:34 25  investigations, is it essential to you that you be as

1    thorough as possible?

2    **A.**    Yes.

3    **Q.**    Is it essential that you have all the information that

4    you could potentially use in order to make empirical

11:43:50  5    objective-based objections, sir?

6    **A.**    Yes.

7    **Q.**    Now, Mr. Levine asked you real quickly about a

8    subpoena that I think you acknowledge that you got from me,

9    just before you sat down, right?  Remember that?

11:44:08  10    **A.**    Yes.

11    **Q.**    And I think your response was, "I sent it to legal."

12    Am I right about that, sir?

13    **A.**    Yes.

14    **Q.**    Okay.

11:44:17  15        Did that subpoena ask you to bring all documents

16    reviewed by you in connection with all stories regarding the

17    alleged Bayrob Group, sir?

18    **A.**    I believe that's what it said.

19    **Q.**    Okay.

11:44:28  20        Did it also ask for all documents of any kind

21    whatsoever exchanged between you and the United States

22    Government official concerning the Bayrob Group, did it ask

23    you to bring those?

24            MR. LEVINE:  Objection.

11:44:38  25            THE COURT:  Overruled.

Omurchu - Recross/O'Shea

1          THE WITNESS:  Yes, I believe it did.

2    **Q.**    Okay.

3          Did it also ask, Item 3, all documents of any kind

4    whatsoever exchanged between you and any foreign official

11:44:47  5    regarding the Bayrob Group?

6    **A.**    Yes, I believe so that, too.

7    **Q.**    All right.

8          And your response to that, Symantec's response to that

9    was to send it to legal and to not bring them, right?

11:45:01  10    **A.**    Yes, I sent it to legal.

11          MR. O'SHEA:  Thank you.

12          MR. LEVINE:  Your Honor, redirect from that

13    last topic very briefly?

14          THE COURT:  This is re-redirect.

11:45:14  15          MR. LEVINE:  Re-redirect.  However many re's,

16    they're all in there.

17          (Laughter.)

18

19

20

21

22

23

24

25

Omurchu - Re-Redirect/Levine

1        RE-REDIRECT EXAMINATION OF LIAM OMURCHU

2    BY MR. LEVINE:

3    Q.    Mr. Omurchu, when did you receive this subpoena that

4    we're talking about?

11:45:25  5    A.    Last Friday around 4:00 P.M.

6    Q.    How did you receive it?

7    A.    Via e-mail.

8    Q.    And when -- you received it on Friday at 4:00 P.M.

9    Was that 4:00 P.M. west coast time?

11:45:36 10   A.    Yes.

11   Q.    So is that 7:00 P.M. east coast time?

12   A.    Yes.

13   Q.    And when did that subpoena ask for your document

14   response by?

11:45:45 15   A.    When I traveled here.

16   Q.    Was there a specific date and time -- did it not ask

17   for your response by 5:30 P.M. that day?

18   A.    I actually don't recall that.

19   Q.    Okay.  Did the subpoena get your name correct?

11:46:14 20   A.    There was lots of spelling mistakes in the subpoena.

21   My name may have been spelled incorrectly.

22   Q.    Was some of the -- were there errors in the specific

23   requests that were asked in that subpoena?

24   A.    My personal opinion is yes, but my legal counsel would

11:46:33 25   be the person to make the decision on that.

Omurchu - Re-Redirect/Levine

1    **Q.**    Well, I'm just asking about writing receipts, like

2    spellings.

3    **A.**    Yes.

4    **Q.**    What the words are.  Were you listed in the subpoena

11:46:45  5    as Mr. M-I-C-A-U?  Was the Defendant listed as

6    Mr. M-I-C-A-U?

7    **A.**    Yes.

8    **Q.**    Did it use the words "storties," S-T-O-R-T-I-E-S?

9    **A.**    Yes.

11:47:01 10    **Q.**    So you sent the subpoena to your legal counsel?

11    **A.**    Yes.

12              MR. LEVINE:  No further questions, your Honor.

13              MR. O'SHEA:  Can I follow up on that, Judge?

14              THE COURT:  One moment.

11:47:10 15              MR. GOLDBERG:  I have nothing based on that,

16    your Honor.

17

18

19

20

21

22

23

24

25

1           RE-RECROSS-EXAMINATION OF LIAM OMURCHU

2    BY MR. O'SHEA:

3    **Q.**    Just so I'm clear, sir, you knew, despite what

4    Mr. Levine just asked you, that that subpoena, even though

11:47:18 5    your last name wasn't technically spelled correctly, it was

6    to you, right?

7                 MR. LEVINE:  Objection, your Honor.

8                  THE COURT:  Overruled.  You may answer.

9                  THE WITNESS:  It came to my e-mail address.

11:47:30 10    **Q.**    Exactly.  It came to your e-mail address that had been

11    supplied to us by the Government.  So you knew the subpoena

12    was to you regardless of what Mr. Levine just said to you,

13    right?

14    **A.**    I assumed it was, yes.

11:47:40 15    **Q.**    And when we e-mailed it to you, we e-mailed it to you

16    at -- on the address line that my signature line has my

17    name, address, landline, cellphone, and e-mail address, does

18    it not, sir?

19    **A.**    I believe so.

11:47:54 20    **Q.**    Did you or did anyone at your legal department, to the

21    best of your knowledge, ever pick up the phone, e-mail me or

22    anybody at my office, about a response to that, sir, yes or

23    no?

24    **A.**    I don't know.

11:48:08 25                 MR. LEVINE:  Objection.

1          THE COURT:  The "I don't know" will stand.

2          MR. O'SHEA:  Nothing further.  Thank you.

3          MR. LEVINE:  No further -- nothing further

4    from the Government.

11:48:19  5          THE COURT:  You may step down, sir.

6       Ladies and gentlemen, given the hour, I believe we

7    will take our luncheon recess at this time.

8       Please be downstairs at 1:00.  We will call for you at

9    that time.  Have a good lunch, everyone, and remember the

11:48:35 10   admonition.

11       All rise for the jury.

12          (Thereupon, a luncheon recess was had.)

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | THURSDAY SESSION, MARCH 28, 2019, AT 12:52 P.M. |
| 2 | (Proceedings in the absence of the jury:) |
| 3 | THE COURT:  Mr. Goldberg, Mr. O'Shea, you had |
| 4 | brought up a discovery issue when we were at side bar with |
| 12:59:06  5 | this last witness, and Mr. Levine had asked for the |
| 6 | opportunity to perhaps clarify matters during redirect |
| 7 | examination. |
| 8 | Do you still believe there's an issue?  And if so, |
| 9 | please spread on the record what the issue is. |
| 12:59:25 10 | MR. GOLDBERG:  I don't believe there's an |
| 11 | issue.  I do not believe it was clarified on redirect |
| 12 | examination, however. |
| 13 | THE COURT:  What -- I'm simply reporting what |
| 14 | occurred at side bar, that he asked for the opportunity to |
| 12:59:37 15 | clarify.  And so regardless of whether you think it was, is |
| 16 | there an issue, Mr. Goldberg, that I need to address? |
| 17 | MR. GOLDBERG:  No, your Honor.  I'll just |
| 18 | state for the record that I did make inquiry regarding any |
| 19 | possible expert reports of _Jencks_ material that wasn't in my |
| 12:59:58 20 | file, and I've been provided with disks and been provided |
| 21 | with verbal assurances by the Government that everything has |
| 22 | been turned over. |
| 23 | So obviously, I was never implying any bad faith on |
| 24 | their part.  And if -- I've received, for instance, |
| 13:00:20 25 | Mr. Omurchu's Power Point we were discussing, then I would |

1    stand corrected.  I never saw it to be truthful.  I don't

2    think it really makes a difference.  And I do believe that

3    the Government has complied with discovery.  So we're -- we

4    can move on from that.

13:00:38  5              THE COURT:  Mr. O'Shea?

6              MR. O'SHEA:  Judge, I agree with Mr. Goldberg,

7    save one thing.

8         I don't see any reason why the legal department at

9    Symantec gets to determine whether a subpoena is complied

13:00:50 10   with or not or acknowledged.  I don't.  And I don't know

11   where they think they get off doing that, Judge.  He made it

12   very clear he turned it over to them and implicit in his

13   response was that somebody at the legal department said you

14   don't even have to respond to this.

13:01:04 15             THE COURT:  But, Mr. O'Shea, you are not

16   asking anything of this Court, am I correct?

17             MR. O'SHEA:  Can I get back to you on that,

18   Judge?  Let me think about it overnight?  For right now, we

19   can keep going.  I'm going to keep my thoughts on that.

13:01:18 20             THE COURT:  Certainly.  I just want the record

21   to be clear as to why I didn't address this issue when it

22   originally came up.  Everyone was in agreement that we would

23   allow the examination to continue, specifically the

24   redirect.

13:01:33 25        And so as of right now, this Court is not being asked

```
 1          to do anything and I will not.  But, Mr. Brown, you look

 2          like you want to say something.

 3                         MR. BROWN:  Just --

 4                         THE COURT:  Even though it doesn't appear as

13:01:48  5  if there are any issues, but go ahead.

 6                         MR. BROWN:  Well, there is one issue.  Not

 7          horribly pressing or not to me horribly pressing but what is

 8          the Court's order in relation to Mr. Omurchu's hanging

 9          around Cleveland?

13:02:02 10                 THE COURT:  Oh, that's -- that's a very fair

11          question.

12               I am hearing that there are no discovery issues for me

13          to address.  So, Mr. O'Shea, regardless of your position or

14          what request you would have of me regarding the subpoena, is

13:02:25 15  there any reason why this witness needs to stay?

16                         MR. O'SHEA:  No.  I think anything that he

17          can -- we can do relative to him could be done

18          electronically, Judge.

19                         THE COURT:  And, Mr. Brown, you -- I'm glad

13:02:38 20  you did bring that up because I forgot that I had ordered

21          that.  He can leave.

22                         MR. BROWN:  He can leave?  Okay.  Thank you

23          very much, your Honor.

24                         THE COURT:  You're welcome.

13:02:56 25                 MR. BROWN:  Your Honor, I believe we have a
```

```
        1    stipulation to Government's Exhibit -- Government's witness,

        2    Paul Mueller.

        3                MR. GOLDBERG:  Which exhibit?

        4                MR. BROWN:  It would be --

13:03:38 5                THE COURT:  Is this a stipulation you just

        6    want to read to the jurors at the appropriate time?  You

        7    don't have to tell me in advance.

        8                MR. BROWN:  I think they just wanted to double

        9    check the exhibits.  It's a witness who's going to be

13:03:51 10   authenticating MD5 hash values of --

        11               THE COURT:  All right.  And off the record.

        12          (Discussion off the record.)

        13               THE COURT:  Ready?

        14               MR. BROWN:  We have the stipulations.

13:06:37 15               THE COURT:  Mike, you're ready?

        16               MR. O'SHEA:  Yes, ma'am.  I'm sorry.

        17               THE COURT:  Everyone's ready?

        18               MR. GOLDBERG:  Yes.

        19          (Proceedings resumed in the presence of the jury:)

13:08:56 20               THE COURT:  Mr. Brown, it's my understanding

        21   before, you call your next witness, that you have a

        22   stipulation for the Court and jurors.

        23          And, ladies and gentlemen, I remind you a

        24   stipulation's a fact agreed to by and between the parties.

13:09:10 25          You may proceed.
```

1          MR. BROWN:  Thank you, your Honor.

2          The Government and the parties, both Defendants, have

3      stipulated and agreed that the testimony that was going to

4      be offered by Special Agent Paul Mueller, that the data or

13:09:27  5      the MD5 hash values authenticating the date obtained during

6      PIN traps and Title III wire interceptions matched the hash

7      values of the data sent to the FBI case agents in this case,

8      which means that the data was authentic from the time of

9      interception to the time of review.  Is that --

13:09:51 10          THE COURT:  Mr. Goldberg, is that your

11      understanding of the stipulation?

12          MR. GOLDBERG:  That is my understanding of the

13      stipulation, your Honor.

14          THE COURT:  Mr. O'Shea?

13:09:58 15          MR. O'SHEA:  I agree, yes.

16          THE COURT:  Call your next witness.

17          MR. BROWN:  Thank you, your Honor.

18      Your Honor, we call Daniel Saavedra, S-A-A-V-E-D-R-A.

19          THE COURT:  And, sir, if you would please

13:10:11 20      approach the podium.  And if you would please raise your

21      right hand.

22

23

24

25

661

Saavedra - Direct/Brown

1              DANIEL SAAVEDRA,

2      of lawful age, a witness called by the GOVERNMENT,

3            being first duly sworn, was examined

4               and testified as follows:

13:10:21  5        DIRECT EXAMINATION OF DANIEL SAAVEDRA

6    BY MR. BROWN:

7            THE COURT:  Sir, if you would please take the

8    seat right over there.

9    Q.   Good afternoon.  Mr. Saavedra.  Would you please state

13:10:42 10   your name and spell it for the record.

11   A.   Yes.

12        My name is Daniel G. Saavedra.  It's D-A-N-I-E-L, G is

13   the middle initial, Saavedra, spelled S, as in Sam, A-A-V,

14   as in Victor, E, D as in doctor, R-A.

13:11:01 15   Q.   Thank you.  Where -- just city and state, where do you

16   reside?

17   A.   Pardon?

18   Q.   Where do you reside?

19   A.   I reside in Brozo, Illinois.

13:11:09 20   Q.   Is that outside of Chicago?

21   A.   It's 100 miles outside of Chicago.

22   Q.   Okay.

23        And, Mr. Saavedra, I noticed you have a bit of an

24   accent.  Are you a native American -- native citizen of the

13:11:22 25   United States?

Saavedra - Direct/Brown

1    **A.**    No, I am not.  I was born in Bogota, Colombia.  I came

2    to this country in 1984, and I'm architect and I came to, in

3    search for a new opportunity here in the U.S.

4    **Q.**    Okay.

13:11:36  5         And just out of curiosity, what sort of buildings do

6    you design?

7    **A.**    I do medical facilities, health care, vocational and

8    some commercial.

9    **Q.**    Okay.  Any of the Cleveland Clinic buildings?

13:11:53 10   **A.**    I didn't understand.

11   **Q.**    Any of the Cleveland Clinic buildings?

12   **A.**    No.  I have not done any of that.  So similar, similar

13   health groups of Cleveland Clinic, yes.

14   **Q.**    Okay.

13:12:04 15        And now are you familiar with a company called eBay?

16   **A.**    Yes, I am.

17   **Q.**    Okay.  And to you, what is eBay?

18   **A.**    How I use eBay?

19   **Q.**    Or what you know eBay to be, what kind of --

13:12:23 20   **A.**    It's an online place to bid for merchandise and

21   different items.

22   **Q.**    Okay.

23        And do you, in fact, use eBay to purchase things?

24   **A.**    Oh, yeah.

13:12:33 25   **Q.**    Okay.  Personal things, business items?

1    **A.**    Probably 99 percent personal things.

2    **Q.**    Okay.

3          And just very generally, what sort of items do you

4    purchase on eBay?

13:12:47 5    **A.**    Pretty much everything.  I purchase art work, I

6    purchase personal things, I collect paints, automobiles, and

7    I collect art work as well.  So I have purchased probably

8    1500 items in eBay.

9    **Q.**    Okay.

13:13:07 10          Do you use other sites similar to eBay, like Amazon?

11    **A.**    Oh, yeah.

12    **Q.**    Are those fair to say e-commerce sites?

13    **A.**    Yes.

14    **Q.**    Okay.

13:13:14 15          And how would you describe your comfort level with

16    shopping online?

17    **A.**    I'm pretty savvy on that.

18    **Q.**    Okay.  Have you ever been defrauded?

19    **A.**    Yes.

13:13:24 20    **Q.**    On the websites?  Okay.  And we'll talk about that in

21    a minute.

22          Have you ever purchased a car on eBay?

23    **A.**    Yes, twice.

24    **Q.**    Okay.

13:13:35 25          What -- let's talk about the first time.  What type of

Saavedra - Direct/Brown

1    car did you buy?

2    **A.**    The first time I purchased a -- it's called a

3    Volkswagen, 1991 Camper West Vale, they don't produce those

4    cars anymore.  And it's -- it's a camper and a really nice

13:13:57  5    car.  So that was a very pleasant experience.

6    **Q.**    Okay.  Is that the like a van?

7    **A.**    The one that pops up, the roof pops up, and you can

8    use it as camping.

9    **Q.**    Okay.  It's not the old hippy VW?

13:14:12 10    **A.**    No, not the old -- not the old with the thing in the

11    front.  So no flowers or anything like that, so.

12        (Laughter.)

13    **Q.**    Okay.  Very good.

14        And how did you buy it online, what did you do to buy

13:14:28 15    the camper van?

16    **A.**    We use the eBay.  I bid on the website, and I bid on

17    the ad.  And at the end, basically in the last two seconds,

18    we won the -- because we were watching it until the end, and

19    we won the car.

13:14:47 20    **Q.**    So it was an actual auction?

21    **A.**    Yes.

22    **Q.**    Typing in?

23    **A.**    Correct.

24    **Q.**    Were you typing in incrementally larger bids as time

13:14:56 25    went on or did you have like one big bid and it would bid

Saavedra - Direct/Brown

1   for you?

2   **A.**    We -- it will bid for us when we put a maximum bid and

3   it will continue to do it as the last moment.

4   **Q.**    Okay.

13:15:07 5        And how did you pay for that van?

6   **A.**    We paid through the eBay account, through the

7   regular -- I don't know what it was at that time PayPal but

8   basically through eBay.

9   **Q.**    And how did you pick up your van or how was it

13:15:26 10  delivered?

11  **A.**    We picked it up in Washington, D.C.

12  **Q.**    Okay.

13  **A.**    We went and picked it up in Washington, D.C., and we

14  got it.

13:15:35 15 **Q.**    Okay.

16        And did you, in fact, then -- did you drive it back to

17  Chicago?

18  **A.**    Yeah.

19  **Q.**    How would you describe that transaction?

13:15:47 20 **A.**    I'm sorry.  As I expected, it was pleasant.  It was

21  very nice.

22  **Q.**    Okay.  And about what year was that?

23  **A.**    2009, 8, I believe.

24  **Q.**    Now, based on that transaction, did you ever buy a car

13:16:10 25 on eBay again?

666

Saavedra - Direct/Brown

1    **A.**    I tried.

2    **Q.**    Okay.  What do you mean by tried?

3    **A.**    I sold a car, a Mercedes Benz.  I don't remember the

4    year right now.  I sold a Mercedes Benz convertible, and I

13:16:26  5    click on the picture and request -- ask -- there was only

6    one picture.  I asked for more pictures of the -- of the

7    car.  They would send to me to my e-mail and the account on

8    eBay, and we look at the pictures and it was very, very nice

9    car.  And so we agree at a -- to purchase it for the listing

13:16:50 10    price that was $9500 and something, and --

11    **Q.**    Okay.  Can I stop you right there?

12          When you say "we," who was involved in that?

13    **A.**    My wife and I.

14    **Q.**    Okay.  So your wife and you were looking for a car?

13:17:02 15    **A.**    Yes.

16    **Q.**    Okay.

17          And what sort of criteria did you use to buy the kind

18    of car you wanted on eBay?

19    **A.**    I like nice cars, and I drive cars that are Audis and

13:17:20 20    Mercedes and that is the criteria we were looking for.

21          And we look into a car that we wanted and searched for

22    all of the cars on eBay.  And we looked at that one.  It was

23    attractive, it was nice.  And we started the transaction

24    that way.

13:17:39 25    **Q.**    Okay.

667

Saavedra - Direct/Brown

1    And what drew you to the car that you and your wife

2    focused on?

3    **A.**    It was the night.  The color we wanted was a blue

4    color.  It was convertible.  And the price was good.

13:17:54 5    **Q.**    Okay.

6    Could I show you what's been marked as Government's

7    Exhibit 2216.  And this should be for everybody.

8                    MS. CHANDLER:  Okay.

9    **Q.**    In fact, if you look at 2216, do you recognize this?

13:18:14 10    **A.**    Yep.  That's the car that I was trying to buy.

11    **Q.**    Okay.

12    And, in fact, is this the web page you saw?

13    **A.**    Yes.

14    **Q.**    Okay.  And that's the -- what -- is it a 2005 AMC

13:18:28 15    Mercedes?

16    **A.**    Correct.

17    **Q.**    Convertible?

18    **A.**    Convertible.

19    **Q.**    Nice blue?

13:18:32 20    **A.**    Um-hum.

21    **Q.**    Okay.  And what was the list price of that?

22    **A.**    $9500 it says there.

23    **Q.**    Okay.

24    And where was it listed for sale?

13:18:43 25    **A.**    On eBay.

Saavedra - Direct/Brown

1   **Q.**   No, but physically where in the United States was it?

2   **A.**   I -- I don't know.

3   **Q.**   Okay.

4   **A.**   I don't know.  I -- normally I don't check on that.

13:18:56  5   **Q.**   Okay.  Now --

6   **A.**   It says Oregon on the listing.  So I had no --

7   **Q.**   Okay.  But, that's like sort of the van was in DC?

8   **A.**   Yeah.

9   **Q.**   This car might have been in Oregon?

13:19:09 10   **A.**   Yeah.

11   **Q.**   Okay.

12       When you decided to buy it, what did you and your wife

13   do once you made the decision to buy the car?  Did you do

14   the auction or did you do the Buy It Now?

13:19:19 15   **A.**   When we -- when we did the buy now, we clicked the

16   information that was on the site, and they asked us to get

17   the money then through the eBay escrow agent.  And I say

18   that's not the way I normally do this.  So I got suspicious

19   about that.  So I click on the page that I had in front of

13:19:47 20   me for the "Ask eBay," and asked about this transaction,

21   asked about the -- if this was a reputable -- a reputable

22   eBay member.  One thing that I noticed, it took a little bit

23   for them to answer me.  But, they did answer, eBay -- what I

24   was thinking at the moment, that it was eBay -- answered and

13:20:18 25   said yeah, this is an eBay lister for many years, and they

Saavedra - Direct/Brown

1    had -- they are very reputable, and the transaction could be

2    done through eBay escrow agent.

3    **Q.**    Okay.

4         Now in 2009, when you bought the van, did you have the

13:20:36 5    option of the eBay escrow agent?

6    **A.**    No.

7    **Q.**    Okay.  So this was a new function for you?

8    **A.**    Right.

9    **Q.**    Okay.

13:20:42 10        By the way, what kind of device or computer were you

11   using when you went to this page?

12   **A.**    When we went to this page, we were in -- on location

13   in New York, and I had a small laptop, very small laptop,

14   and that was the one that I used, and that is the one in

13:20:59 15   which I received the pictures when I asked more pictures for

16   this because it had only one picture.  That is the one that

17   I opened, in that computer.

18   **Q.**    Okay.

19        Now, in fact, when you were looking into the eBay

13:21:15 20   agent, did you go to eBay help?  You said you had a

21   conversation with eBay about --

22   **A.**    Yeah, and I click on the page that I had there at the

23   moment.

24   **Q.**    Okay.

13:21:25 25        So could we look at 2219?  Okay.  Is this -- looking

Saavedra - Direct/Brown

1    at 2219, do you recognize this?

2    **A.**    Yes.

3    **Q.**    Okay.

4          And, in fact, is this the chat you had when you had

13:21:41 5    questions about the legitimacy of the trans --

6    **A.**    Correct.

7    **Q.**    And you wanted to know more about the seller?

8    **A.**    Correct.

9    **Q.**    Okay.  So could you walk us through that?  So you

13:21:51 10    clicked on eBay chat help?

11    **A.**    Yes, I click and I say I am -- I'm buying this -- this

12    car.  They're asking me to do the transaction basically

13    through an escrow, and I would like to know if this is a --

14    a legitimate lister.

13:22:14 15    **Q.**    Okay.  And they had an e-mail address here of

16    BIMWOERIX40?

17    **A.**    Correct.

18    **Q.**    And is 106 the rating that he had, or that --

19    BIMWOERIX, or whatever that word would be pronounced, was

13:22:30 20    like the rating, 106?  Do you see that, sir?

21    **A.**    Yes, correct.

22    **Q.**    Okay.

23          And is it fair to say without going through line by

24    line that Sal S., your rep, but yeah, he's legit?

13:22:43 25    **A.**    Yeah.

Saavedra - Direct/Brown

1    **Q.**    So did you, in fact, go ahead with the sale?

2    **A.**    Yes.

3    **Q.**    And if we can look at 2220.  Okay.  Is this the wire

4    transfer you sent?

13:22:58 5    **A.**    Correct.

6    **Q.**    Okay.

7          Now did you send it to BIMWOERIX, whatever that is, or

8    did they give you some -- did eBay tell you to send it to

9    another address?

13:23:07 10    **A.**    They -- I sent it through the e-mail or the escrow

11    agent they told me to send it.

12    **Q.**    Okay.  Now, are you familiar with wire transfers?

13    **A.**    Yes.

14    **Q.**    Do you use those in your business?

13:23:19 15    **A.**    Yes, I do that in my business.  I send money to my

16    family pretty much every month.

17    **Q.**    Okay.

18          So is it fair to say you're comfortable with

19    transferring money literally all over the world?

13:23:33 20    **A.**    Yes, I am.

21    **Q.**    Okay.

22          And so when did you send that?  Did you save a copy of

23    your wire transfer?

24    **A.**    Yes.

13:23:46 25    **Q.**    And then you also had what's written up here in the

Saavedra - Direct/Brown

1   corner IMAD number?

2   **A.**   Correct.

3   **Q.**   Is that something normally associated with a wire

4   transfer when you send it?

13:23:56  5   **A.**   Correct.

6   **Q.**   Is that based on your knowledge and experience like a

7   tracking number?

8   **A.**   Yeah, it's -- it's like the digital image for the

9   transaction and the digital image for the bank to identify

13:24:11  10  where it's going to be received and how.

11  **Q.**   Okay.

12       And so you sent your 9500 to your transfer agent, and

13  then what happened?

14  **A.**   Then they told me that the car will be -- that -- they

13:24:29  15  told me that -- I think the person that I was dealing with

16  was a female, based on the transaction, that she -- that she

17  answered, "I am on vacation and I will, when I get back from

18  vacation, I will send the car to you.  It is included in the

19  price of delivery.  It's all of that.  So it is not very far

13:24:52  20  from where -- from where you are.  So you will be receiving

21  the car in approximately five to ten days."

22  **Q.**   Okay.  In fact, did that happen?

23  **A.**   No, it didn't happen.  So after that, I asked -- no,

24  excuse me.  Probably two or three days after this

13:25:12  25  transaction happened, they e-mail me again, and they told me

1    that eBay had retained the check and not allowed them to

2    retain the funds and not allow them to collect the funds,

3    that they had put the money in escrow and eBay, and they

4    wanted me to send another $9500 for -- because eBay has

13:25:41 5    retained the money.

6         So that is when I went to my Mercedes and Audi dealer

7    and gave them -- I said, "I am doing this transaction

8    online, and I am getting very nervous about this.  Could you

9    please check these VIN number on the Mercedes Benz?"  And he

13:26:04 10   checked that number, and that number did not appear

11   anywhere.  He said that car has never been -- that car is

12   not real.  That VIN number is not real, and you basically

13   have been taken by someone, so I --

14                  MR. O'SHEA:  Objection.

13:26:24 15                  THE WITNESS:  I went back to my office.

16                  MR. BROWN:  Your Honor, there's a --

17                  MR. O'SHEA:  Objection.

18                  THE COURT:  Sustained.

19   BY MR. BROWN:

13:26:31 20   Q.    Okay.  Could we look at 2218?  This is an invoice from

21   eBay, correct?

22   A.    Yes, correct.

23   Q.    Could we zoom in on the bottom half?  Okay.

24         Now, okay.  This invoice, is there a VIN number

13:26:53 25   associated with this car?

674

Saavedra - Direct/Brown

1    **A.**    Yeah, it's right there on the list of the car.

2    **Q.**    Okay.

3          Without saying what the response was, did you take

4    steps to verify this VIN number?

13:27:04 5    **A.**    I did.

6    **Q.**    Based on, again, not telling the jury what the

7    response was, based on that, did you take any actions based

8    on the fact you believed that this car was not real?

9    **A.**    I went to my local FBI, but that was after I

13:27:27 10   respond -- responded to them.

11   **Q.**    Okay.

12         Now, however in the interim before you went to the

13   Mercedes, did you, in fact, send a second check?

14   **A.**    No, I did not.

13:27:37 15   **Q.**    Okay.  But, was it BIMWOERIX requesting the second

16   check?

17   **A.**    Yes.

18   **Q.**    Okay.

19         And did you have e-mail conversations with BIMWOERIX?

13:27:46 20   **A.**    Yes, I told them that I had sent the check, and I told

21   them that I had sent it to a, specifically the way that

22   the -- they were doing the wire transfer was done.  I gave

23   him -- I gave them all of the information, and because I was

24   basically at this moment playing with them.

13:28:12 25   **Q.**    Okay.

1          Now did you, in fact, save copies of your

2     conversations with BIMWOERIX?

3     **A.**    Yes.

4     **Q.**    And could we look at Exhibit Number 2215?  And have

13:28:31 5     you reviewed this?  Do you recognize this?

6     **A.**    Yes, that's my -- my e-mail.

7     **Q.**    Okay.

8          And is this a log of your e-mails with BIMWOERIX?

9     **A.**    Correct.

13:28:45 10     **Q.**    Is it a fair and accurate copy of the conversation?

11     **A.**    Absolutely.

12     **Q.**    Is there -- what does BIMWOERIX tell you in these

13     e-mails?

14     **A.**    They tell me that they have not received the money,

13:29:00 15     although I am telling them that I did send it.  And they

16     kept asking for this, but they tell me to send another

17     $9,000 something to them, and I say I did send this to you.

18     **Q.**    So this is where you're sort of going back and forth

19     with them about -- did you ever receive the $9500 check

13:29:24 20     back?

21     **A.**    No.

22     **Q.**    Okay.  And -- sorry.  You actually then had a check

23     with eBay, right?

24     **A.**    I did.

13:29:39 25     **Q.**    Okay.  And that at the same time you're having a chat

Saavedra - Direct/Brown

1    with BIMWOERIX?

2    **A.**    Yes.

3    **Q.**    Okay.

4          And when you had that chat, the second chat, if we

13:29:48  5    could pull up 2207.  Is this the second chat you had with

6    eBay?  Do you recognize that.

7    **A.**    Yes.

8    **Q.**    And is this a fair and accurate copy of the chat you

9    had, the second chat you had with eBay?

13:30:08 10    **A.**    That's correct.

11    **Q.**    Okay.

12          Were you using the same computer you used to purchase

13    the car?

14    **A.**    Yeah, actually they -- when they infected two of my

13:30:20 15    computers, one in my office and one the laptop.

16    **Q.**    Okay.  And how do you know both were infected?

17    **A.**    Because I check in my -- and another one of the

18    computers in my office, I access my eBay account, and I

19    realized that this transaction had -- on all of these

13:30:40 20    information that I had here on the purchases were not in

21    that computer.

22    **Q.**    So you were -- is it fair to say that you were not

23    able to see the chats or the record of your transaction in a

24    third computer?

13:30:56 25    **A.**    No.

Saavedra - Direct/Brown

1    **Q.**    Okay.

2    **A.**    So that is when I call my IT person for the office and

3    we got all of this.

4    **Q.**    Okay.

13:31:05 5         So you called a computer specialist?

6    **A.**    Um-hum.

7    **Q.**    Fair to say?  And that's when you found a virus?

8    Okay.

9         Now, did you also -- could you take a look at 1406?

13:31:29 10   1406.  If you could go down to the bottom.  Do you recognize

11   these e-mails?  I'm sorry.  The font's a little small.

12   **A.**    Yes.

13   **Q.**    And are these e-mails you had with BIMWOERIX?

14   **A.**    Correct.

13:31:48 15  **Q.**    And are these, in fact, e-mails sent to you by

16   BIMWOERIX and your responses?

17   **A.**    Correct.

18   **Q.**    And are these the fair and accurate copies of the

19   e-mail logs you kept?

13:31:56 20  **A.**    Yes, they are.

21   **Q.**    Okay.

22        And is it -- is it fair to say you're talking about

23   sending money to BIMWOERIX on to eBay?

24   **A.**    Um-hum.

13:32:04 25  **Q.**    For the purchase of the car?

Saavedra - Direct/Brown

| | | |
|---|---|---|
| 1 | **A.** | Yes. |
| 2 | **Q.** | Okay. |
| 3 | | And you -- you, in fact, signed one "God bless you"? |
| 4 | **A.** | Pardon? |
| 13:32:12 5 | **Q.** | You signed one of the e-mails, "God bless you"? |
| 6 | **A.** | Yeah. |
| 7 | **Q.** | Trying to be nice?  You're not?  Okay. |
| 8 | | Based on those e-mails, did you ever get the car? |
| 9 | **A.** | No. |
| 13:32:25 10 | **Q.** | Okay. |
| 11 | | And you never got the return of your money? |
| 12 | **A.** | No. |
| 13 | **Q.** | Okay. |

14          And now, did there, in fact, come a time when from

13:32:36 15   another noninfected computer, you were able to contact eBay?

16      **A.**   It was pretty much immediately, I contacted eBay.

17   They told me that --

18                   MR. GOLDBERG:  Objection.

19                   THE COURT:  Sustained.

13:32:49 20   **Q.**   Okay.  If you could take a look at 2212.

21      **A.**   Okay.  Sorry, I -- I don't know the procedures as well

22   as you do.

23                   MR. BROWN:  Not at all.

24                   THE COURT:  You're not supposed to.  You're

13:32:59 25   fine.

1    BY MR. BROWN:

2    Q.   You're looking at 2212, is this -- do you recognize

3    this?

4    A.   Yes.

13:33:07 5    Q.   What do you recognize it to be?

6    A.   It's the real eBay help when I search in the computer.

7    Q.   And is this a fair and accurate chat you had with

8    eBay?

9    A.   Yes, that's correct.

13:33:22 10    Q.   Okay.

11        Did they assign you -- just looking at this, does this

12   look different than the eBay chat you had with the infected

13   computers?

14   A.   I did not notice at the moment but since then, I have

13:33:43 15   noticed that it has different times and checks, and a little

16   bit different than the previous one.

17   Q.   Okay.

18        And did you -- did you inform eBay about the multiple

19   computers you used?

13:33:58 20   A.   Yes.

21   Q.   Okay.  Did -- and based on that, were you able to do

22   anything to how to get the car, the money back based on

23   eBay's chats?

24   A.   No.

13:34:10 25   Q.   Okay.

Saavedra - Direct/Brown

1      Now, I'm sorry to bounce back and forth like this.

2   Going back to 1406, you printed out this e-mail, correct?

3   **A.**   Correct.

4   **Q.**   And did you add anything to the -- this exhibit or did

13:34:26 5   you hit the print button and it came out?

6   **A.**   Yes, all of these e-mails, I printed from my computer

7   based on the file that the IT person saved for me after they

8   cleaned the computers.

9   **Q.**   Okay.

13:34:41 10      So we're going to ask you to do a little reading.  If

11   you -- Sue, if you could blow up, zoom in on these couple of

12   lines here.

13      If we're looking at 1406, could you read the line that

14   says X-mailer?

13:35:08 15   **A.**   Which one?

16   **Q.**   It's three lines, four lines from the top of your

17   screen, stops -- it's highlighted now.  X-mailer?

18   **A.**   Yes, X-mailer Courier 3.50.00.09.1098

19   http://www.rosecitysoftware.com.

13:35:33 20   **Q.**   Okay.  Thank you very much.

21      MR. BROWN:  I have no further questions at

22   this time, your Honor.  Thank you, your Honor.

23      THE COURT:  Cross-examination, Mr. Goldberg.

24      MR. GOLDBERG:  Thank you, your Honor.  Thank

13:35:48 25   you for your time, sir, no cross.

Saavedra - Cross/O'Shea

1        THE WITNESS:  Thank you.

2            CROSS-EXAMINATION OF DANIEL SAAVEDRA

3    BY MR. O'SHEA:

4    **Q.**   Sir, you know what happens on Monday here in

13:35:54 5    Cleveland?

6    **A.**   No, I have no idea.

7            MR. BROWN:  Objection, your Honor.

8    **Q.**   All right.  Who's a better team, the White Sox or --

9            MR. BROWN:  Objection.

13:36:01 10           THE COURT:  I'll sustain that.

11        (Laughter.)

12           THE COURT:  Take the Fifth.

13           THE WITNESS:  I cannot say the White Sox at

14    all.

13:36:12 15        (Laughter.)

16           MR. O'SHEA:  Thank you.

17           THE COURT:  You may step down.  Watch your

18    step, sir.

19           THE WITNESS:  Otherwise, I would be divorced

13:36:18 20    from my wife.

21        (Laughter.)

22           THE COURT:  We don't want that.  Call your

23    next witness.

24           MR. BROWN:  Your Honor, the United States

13:36:28 25    Government calls Donna Wolfe.

682

Wolfe - Direct/McDonough

1          Your Honor, we need a minute to move everything.

2                   THE COURT:  That's fine.  Done?

3          Please step up to the podium, ma'am.  And please raise

4     your right hand.

13:37:43 5                        DONNA WOLFE,

6       of lawful age, a witness called by the GOVERNMENT,

7              being first duly sworn, was examined

8                   and testified as follows:

9              DIRECT EXAMINATION OF DONNA WOLFE

13:37:51 10                 THE COURT:  Please take a seat right over

11     there, ma'am.

12     BY MR. McDONOUGH:

13     Q.    Good afternoon.

14          If you could slide forward and you can actually pull

13:38:15 15     that microphone close to you as well.

16     A.    Okay.

17     Q.    Could you please state your name and spell your name

18     for the benefit of our Court Reporter?

19     A.    Donna Wolfe, D-O-N-N-A, W-O-L-F-E.

13:38:31 20     Q.    Donna, back in the summer of 2013, did you receive

21     wire transfers in your bank accounts that you withdrew and

22     sent via Western Union overseas?

23     A.    Yes, I did.

24     Q.    Before we get into those details, could you tell us

13:38:53 25     where were you born?

Wolfe - Direct/McDonough

1    **A.**    Cherry Point, North Carolina.

2    **Q.**    Okay.

3          And can you tell us, where did you go to school?

4    **A.**    Well, I graduated from high school at John Marshal in

5    Cleveland, Ohio.

6    **Q.**    Okay.

7          And how did you go from Cherry Point, North Carolina,

8    to John Marshal here in Cleveland?

9    **A.**    I was a Marine brat.  My dad was in the Marines, and

10   we traveled, depending on where he was stationed at, so.

11   **Q.**    All right.  Where -- after high school, what did you

12   do?

13   **A.**    Well, after high school, I worked for the Post Office

14   for a couple years.  And then I got married and moved to

15   Florida with my husband, and then we started a family in

16   Florida, and we lived there for about ten years, and then we

17   had some marital problems and we wound up divorcing and I

18   moved back up to Ohio.  I had family in Ohio.

19   **Q.**    Okay.

20   **A.**    And then continued raising my family.

21   **Q.**    Okay.

22          How many children do you have in your family?

23   **A.**    I have -- well, I have two daughters of my first

24   marriage, and then I have three children from a --

25   stepchildren from a second -- well, my third marriage.

684

1    **Q.**    Okay.  When you moved back to Ohio --

2    **A.**    Um-hum.

3    **Q.**    -- where were you employed?

4    **A.**    Well, I started child care business, and I ran that

13:40:23  5    for about 17 years.  And then I got older and wanted to

6    retire from that, and I started working with disabled

7    children, mainly autistic children working with autistic

8    children in their home, and with the elderly also, home

9    care.

13:40:56 10    **Q.**    Did you have to go for any training or schooling

11    for --

12    **A.**    Oh, yeah.

13    **Q.**    -- that type of work?

14    **A.**    Oh, yes.

13:41:03 15    **Q.**    Where was your child care business?

16    **A.**    That was in my home.  I was County certified.

17    **Q.**    Okay.  And where was that located?

18    **A.**    That was in Lakewood.

19    **Q.**    Okay.

13:41:11 20    And then working with the disabled children, where did

21    you do that?

22    **A.**    I did that at their homes.  I worked with them --

23    well, I had disabled children in my home, too, as I was

24    running the child care business, but then, I started working

13:41:27 25    with children in their home with their parents.

Wolfe - Direct/McDonough

1    **Q.**    Okay.

2          What did you do after that, employment wise?

3    **A.**    Then I started working as a political canvasser and, I

4    traveled the country working on different political

13:41:47 5    campaigns.

6    **Q.**    What did you do as a political canvasser?

7    **A.**    I would gather signatures on petitions and either that

8    would help a particular issue be placed on the ballot, it

9    was represented by a proponent, or I would help an

13:42:06 10   individual be able to run for office.

11   **Q.**    Okay.

12         Did there come a point when you ended up coming back

13   to the State of Ohio?

14   **A.**    Yeah.  Usually these campaigns would last no more than

13:42:18 15   30 days.

16   **Q.**    Okay.

17         Are you familiar with a website called Craig's List?

18   **A.**    Yes, I am.

19   **Q.**    How are you familiar with the Craig's List website?

13:42:35 20   **A.**    Well, during one of the times when I was home from a

21   campaign, my granddaughter, who was a teenager at the

22   time --

23   **Q.**    I'm going to stop you for a second.  I might have you

24   push that microphone a little bit toward me actually.

13:42:48 25   **A.**    Okay.

Wolfe - Direct/McDonough

1    **Q.**    Okay.

2    **A.**    What about now?

3    **Q.**    I think that sounds good.  Thank you.

4    **A.**    Better?  Okay.

13:42:55  5    **Q.**    Thank you.

6    **A.**    Anyway my granddaughter wanted to get a job for the

7    summer, and she asked me to help her set up a Craig's List

8    ad looking for a position.  And so I did.  And I was

9    actually contacted by a company that -- or I was either

13:43:21  10    contacted or I saw an ad or they contacted me and introduced

11    themselves, called a company called Global Partners, and

12    they were looking for someone to help them transfer money,

13    to help people be able to buy products in Europe.

14    **Q.**    Okay.

13:43:43  15    And you found this ad from Global Partners on the

16    Craig's List website?

17    **A.**    Yes.

18    **Q.**    Were you contacted by Global Partners?

19    **A.**    Yes, I was.

13:43:58  20    **Q.**    How were you contacted?

21    **A.**    I was phoned.  Someone from Global Partners called me.

22    **Q.**    Okay.  Did you receive any documents from Global

23    Partners?

24    **A.**    Yes, they were -- I received a contract and a 1099.

13:44:22  25    **Q.**    Okay.

Wolfe - Direct/McDonough

| | | |
|---|---|---|
| 1 | **A.** | And I needed to fill it out and fax it back to them. |
| 2 | **Q.** | Okay. |
| 3 | | How did Global Partners send you the document? |
| 4 | **A.** | E-mailed it, they e-mailed it to me. |
| 13:44:39 5 | **Q.** | How did Global Partners have your e-mail address? |
| 6 | **A.** | I gave them my e-mail address. |
| 7 | **Q.** | What was your e-mail address? |
| 8 | **A.** | Apluscaring@yahoo.com. |
| 9 | **Q.** | With -- sorry. |
| 13:44:52 10 | **A.** | A Plus, A-P-L-U-S, C-A-R-I-N-G at Yahoo.com. |
| 11 | **Q.** | At that time, were you familiar with the address of |
| 12 | | 4735 Broadview Road in Cleveland, Ohio? |
| 13 | **A.** | Yes, that was my address. |
| 14 | **Q.** | All right. |
| 13:45:12 15 | | Did you sign any paperwork with Global Partners? |
| 16 | **A.** | Yes, I did. |
| 17 | **Q.** | Now, you mentioned that you were -- received a |
| 18 | | telephone call? |
| 19 | **A.** | Yes. |
| 13:45:21 20 | **Q.** | Did Global Partners call you or did you call them? |
| 21 | **A.** | They called me, from the ad that I placed for my |
| 22 | | granddaughter. |
| 23 | **Q.** | Did you recognize the voice on the other end? |
| 24 | **A.** | No, I didn't recognize the voice. |
| 13:45:36 25 | **Q.** | Was the voice male or female? |

Wolfe - Direct/McDonough

1    **A.**    Oh, it was a male.

2    **Q.**    Could you tell the age of the person?

3    **A.**    Like in his 30's.

4    **Q.**    Okay.  What language did the person speak?

13:45:55 5    **A.**    He had like a German accent.

6    **Q.**    Okay.

7            Did you go ahead and sign the paperwork from Global

8    Partners?

9    **A.**    Yes, I did.

13:46:06 10   **Q.**    Are you familiar with a Martin.SteinBG@gmail.com?

11   **A.**    Martin Steinberg, yes.

12   **Q.**    How are you familiar with that?

13   **A.**    That was the person who called me, introduced himself,

14   introduced his company, and sent me the documents.

13:46:27 15   **Q.**    Okay.

16           MR. McDONOUGH:  Your Honor, the Government

17   would like to -- or, Sue, would you please pull up

18   Government's Exhibit 1733.  And, Sue, if you could please

19   zoom on the first half, top half of that document.

13:47:02 20   **Q.**    Showing you what's been marked as Government's Exhibit

21   1733, do you recognize this document?

22   **A.**    I recognize the document.

23   **Q.**    I'm sorry.  Page 12.  I apologize, Sue.  1733, Page

24   12?

13:47:21 25   **A.**    Yes.

Wolfe - Direct/McDonough

1    **Q.**    And if you could please zoom in on the top half there.

2    Okay.  How do you recognize this document?

3    **A.**    That's the -- that's the contract that I had with --

4    that's the contract that I had with Global Partners.

13:47:37 5    **Q.**    Okay.

6          Did you end up typing in your name there or was that

7    filled in for you?

8    **A.**    That was filled in for me.

9    **Q.**    Okay.  How about the address?  Was that typed in or

13:47:53 10   was that filled in for you?

11   **A.**    The top was filled in, but the bottom, I wrote.

12   **Q.**    Okay.

13         What was your understanding of what you were signing

14   up for in this agreement?

13:48:09 15   **A.**    My understanding was that I was going to transfer

16   money to individuals to help other individuals be able to

17   purchase products or be part of an auction -- or just help

18   with -- well, you know, what they needed to acquire.

19   **Q.**    Okay.

13:48:40 20        What was the bank account information provided for?

21   **A.**    That bank account was my bank account, and that was so

22   that they could wire the -- wire the money that they needed

23   to purchase things with to my bank.

24   **Q.**    What was the name of your bank?

13:48:56 25   **A.**    US Bank.

Wolfe - Direct/McDonough

1    **Q.**    Okay.  Did you provide a routing number?

2    **A.**    Yes, I did.

3    **Q.**    Did you provide an account number?

4    **A.**    Yes, I did.

13:49:05 5    **Q.**    What are the last four digits of your account number?

6    **A.**    1134.

7    **Q.**    Okay.  Was that a single or a joint account?

8    **A.**    Single account.

9    **Q.**    Okay.  Did you provide the bank address information?

13:49:21 10    **A.**    Yes, I did.

11    **Q.**    And what was your bank account address, your bank

12    address information?

13    **A.**    2132 Brookpark Road, Cleveland, Ohio 44134.

14    **Q.**    Okay.

13:49:34 15           And then if we could please, Sue, zoom out of that.

16    And then -- zoom in on the bottom half of the exhibit.

17           What was your understanding of how quickly you had to

18    transfer funds from your account to overseas?

19    **A.**    Very quickly.

13:50:05 20    **Q.**    All right.

21    **A.**    Very, very quickly.  If I -- very quickly.  As soon as

22    I could.

23    **Q.**    Okay.

24           What was your understanding of how much you were to be

13:50:18 25    paid for rendering this service?

Wolfe - Direct/McDonough

1    **A.**    6 percent of the wire transfer.

2    **Q.**    How would you calculate 6 percent of the wire

3    transfer?

4    **A.**    Well, they -- they calculated it because they already

13:50:36  5    had how much trans -- how much the transfer for who I was to

6    send it to, and what the wire transfer fee would be.

7    **Q.**    Okay.

8         In the agreement, there was an option to get 10

9    percent if you wanted to receive a check from Global

13:51:02 10    Partners?

11    **A.**    Yes.

12    **Q.**    Did you ever elect to receive a 10 percent commission

13    and receive a check?

14    **A.**    No.

13:51:10 15    **Q.**    Okay.  All right.  Is that your signature printed name

16    and date on this form?

17    **A.**    Yes.

18    **Q.**    What date did you sign it?

19    **A.**    6-10-13.

13:51:22 20    **Q.**    Okay.

21         And if we could zoom out.  And if we could just go to

22    the first three lines on the top, if we could zoom in.

23    Okay.

24         The Global Partners provide you with a fax number?

13:51:37 25    **A.**    Yes.

Wolfe - Direct/McDonough

1    **Q.**   And there was also an e-mail?

2    **A.**   Yes.

3    **Q.**   Do you see both of those?

4    **A.**   Yes.

13:51:42  5    **Q.**   Okay.

6          Now I'd like to go through a series of transactions,

7    summer of 2013.

8    **A.**   Okay.

9    **Q.**   All right?

13:52:00 10          Are you familiar with a Phone Number 216-212-9189?

11   **A.**   Yes.

12   **Q.**   How are you familiar?

13   **A.**   That was a phone number, that was my phone number.

14   **Q.**   Okay.  Was that a smartphone?

13:52:17 15  **A.**   I don't think it was smart -- I think it was just a

16   regular cellphone.

17   **Q.**   Okay.  Did that cellphone have the ability to text?

18   **A.**   Yes.

19   **Q.**   Okay.  Are you familiar with the name Keleman Donath?

13:52:38 20  **A.**   I -- his name is on e-mails that were sent to me.

21   **Q.**   Okay.

22   **A.**   But I never understood that it was from him.  I always

23   thought it was from Martin Steinberg.

24   **Q.**   Okay.  So you would get text messages on your phone

13:52:53 25  with instructions?

Wolfe - Direct/McDonough

1    **A.**    Yes.

2    **Q.**    Would you get e-mails with instructions?

3    **A.**    Yes.

4    **Q.**    From whom did you think you were receiving these

13:53:03  5    instructions?

6    **A.**    Martin Steinberg.

7    **Q.**    Okay.  And, Sue, if we could pull up Government's

8    Exhibit 225.  All right.  You recognize this, Donna?

9    **A.**    Yes.

13:53:47  10    **Q.**    What is it?

11    **A.**    This is a notification that there was going to be

12    another transfer, a wire transfer to my bank account, and

13    that I would be notified as to what to do, you know, later

14    on.

13:54:06  15    **Q.**    216-212-9189, that's your cellphone?

16    **A.**    Um-hum, that was a cellphone.

17    **Q.**    And you would receive the text messages?

18    **A.**    Yes.

19    **Q.**    And this is an example of a text message you received

13:54:17  20    from Keleman Donath?

21    **A.**    Correct.

22    **Q.**    Okay.

23         What was the date that you received this text message?

24    **A.**    It was June 25th, 2013.

13:54:30  25    **Q.**    Okay.

694

Wolfe - Direct/McDonough

1        Can you describe what was the process when you would

2   get a text message like this that there was a transfer

3   coming?

4   **A.**    I would check with my bank, and then they would notify

13:54:51 5   me also.  They would say check with your bank.

6   **Q.**    Okay.  Your bank at that time was US Bank?

7   **A.**    US Bank.

8   **Q.**    Okay.  How would you check with your bank?

9   **A.**    I would call them.

13:55:02 10   **Q.**    And what would you ask your bank?

11   **A.**    I would ask them if there was a wire transfer --

12   **Q.**    Okay.

13   **A.**    -- in my account.

14   **Q.**    Okay.

13:55:09 15        And if -- based on that, if there was a wire transfer

16   to your account, what would you do?

17   **A.**    Well, I would go to the bank, and I would pull the --

18   well, you know, I would always get a text telling me

19   information.  Go to the bank, get the money, take it to the

13:55:29 20   Western Union, these are the people that you're going to be

21   sending it to, this is how much money you're going to be

22   sending, this is going to be the fee, and you have to do it

23   like right now.

24   **Q.**    Okay.  So there was -- we'll go through an example

13:55:45 25   here.  If we could go to Government's Exhibit 2253, Page 2.

Wolfe - Direct/McDonough

1    And if we could zoom in, please.

2         You recognize this?

3    A.    Yes.

4    Q.    What is this?

13:56:02  5    A.    Which is the -- on the same day, "Please check a Post

6    It now.  They're telling me how much the amount is.  Kindly

7    let me know."  So I would check and let them know if it's

8    been posted.

9    Q.    Okay.  Would you communicate with Keleman Donath via

13:56:21 10    text message or e-mail?

11    A.    Text message.

12    Q.    Okay.

13         And then you mentioned you would go ahead and receive

14    some instructions as well, correct?

13:56:30 15    A.    Correct.

16    Q.    So what time was this notification from Keleman

17    Donath?

18    A.    This was at 4:16.

19    Q.    Okay.

13:56:40 20         Turning to 2253, Page 3.  All right.  What time was

21    this next one?

22    A.    4:35.

23    Q.    And what information did you receive from Keleman

24    Donath?

13:56:55 25    A.    Now he's saying he's e-mailing the instruction.  "They

696

Wolfe - Direct/McDonough

1    are the same recipients as last time but the amount would be

2    2400, 2400, and 2370.  Please reply to confirm the receipt."

3    **Q.**    What does 2400 2400 and 2370 represent?

4    **A.**    So this would be the amount of money that I would send

13:57:18 5    to the same recipients that I had sent money to for the

6    pre -- for a previous wire transfer.

7    **Q.**    Okay.

8    **A.**    And --

9    **Q.**    And below that, earlier on at 6:21 in the morning, did

13:57:37 10   you send a text message to Keleman Donath?

11   **A.**    Yes.

12   **Q.**    And what did you --

13   **A.**    Yes, it says, "Okay.  I'll transfer you the transfer

14   numbers and the Western Union receipts with the previous

13:57:49 15   receipts."

16   **Q.**    Okay.

17          Why would you be sending the transfer numbers and the

18   Western Union receipts to Keleman Donath?

19   **A.**    To prove that I -- that I transferred the money.

13:58:02 20   **Q.**    Okay.

21          Turning to Government's Exhibit 2253 Page 4.  And

22   we're going to start at the bottom.  You do a reply to

23   Keleman Donath saying the bank is --

24   **A.**    "Closed now.  I'll have to transfer tomorrow."

13:58:30 25   **Q.**    And what does Keleman Donath tell you?

Wolfe - Direct/McDonough

**A.**    "Okay.  In the future when you get a transfer, you can
proceed to withdraw it if you can.  Just saying if you want
to get it done faster."

**Q.**    Okay.

Now, when you did go to the bank, how were you able to
withdraw the money?

**A.**    I -- well, I guess I wrote -- I just -- I don't
remember as much as -- I went in and said I had a wire
transfer.  I gave my name, my ID, and they looked it up on
my account.

**Q.**    So you went to the counter?

**A.**    Yes.

**Q.**    Okay.

**A.**    I went to the counter.

**Q.**    And you had -- you'd have the amount to withdraw?

**A.**    Yes.

**Q.**    And then after you got -- withdrew the cash, where
would you then go?

**A.**    Then I would go to the Western Union, and I would have
instructions at that point.

**Q.**    Okay.  Let's go ahead.

Showing you Government's Exhibit 2253, Page 5.

**A.**    Okay.  So this --

**Q.**    Okay.  This is from you to Keleman Donath.  You were
providing them with what?

Wolfe - Direct/McDonough

1    **A.**    I'm providing them with the money transfer tracking

2    numbers.  That's my name, and then those are the names of

3    the people that I wired the amounts of money to, and how

4    much money it was, and the wire transfer tracking numbers.

14:00:16 5    **Q.**    Okay.

6          And in this one -- to whom did you wire transfer the

7    money?

8    **A.**    Well, the first one is Laura Andreea Fagarasu, and

9    this -- there should be a third one here also, and then the

14:00:32 10   second one is Patricia Cosmin Nicolae.

11   **Q.**    Okay.

12         And after Fagarasu's name, there's a series of

13   numbers.  What are those?

14   **A.**    That's the money transfer tracking numbers.

14:00:46 15   **Q.**    And what's the money transfer tracking number?

16   **A.**    That is the identification that Western Union applies

17   to the wire transfer.

18   **Q.**    Okay.

19         And if we could go to Government's Exhibit 1735, Page

14:01:11 20   114.  You recognize what this is?

21   **A.**    Yes.  That's a receipt from Western Union.

22   **Q.**    Okay.  If we could zoom in on the upper left quadrant.

23   Thank you, Sue.

24         Do you recognize what this is?

14:01:43 25   **A.**    Yes, that's a receipt from Cashland Financial

699

Wolfe - Direct/McDonough

| | |
|---|---|
| 1 | Services.  They are an operator for Western Union. |
| 2 | **Q.**   Is there a control number on that receipt? |
| 3 | **A.**   Yes, there is. |
| 4 | **Q.**   Where did you get that receipt? |
| 14:02:01 5 | **A.**   I got that from Cashland Financial Services. |
| 6 | **Q.**   Okay.  And if we could zoom out, please.  And zoom in |
| 7 | please to the lower left-hand quadrant. |
| 8 | What name is listed as the sender? |
| 9 | **A.**   Donna Wolfe, myself. |
| 14:02:27 10 | **Q.**   And to whom are you sending it? |
| 11 | **A.**   Laura Andreea Fagarasu. |
| 12 | **Q.**   Okay. |
| 13 | And the amount that you sent was? |
| 14 | **A.**   $2370. |
| 14:02:40 15 | **Q.**   What is the transfer fee? |
| 16 | **A.**   That is what Western Union charges. |
| 17 | **Q.**   Okay. |
| 18 | Were you provided instructions on the transfer fee? |
| 19 | **A.**   Yes, I was. |
| 14:02:48 20 | **Q.**   Okay. |
| 21 | And then if you could zoom out, please.  And then in |
| 22 | the, just the middle right section, is there a signature |
| 23 | there?  Do you recognize that signature? |
| 24 | **A.**   That's my signature. |
| 14:03:07 25 | **Q.**   Okay. |

700

Wolfe - Direct/McDonough

```
              1        And if we could zoom out.  So at this point, you have
              2    actually -- this was not your first transaction?
              3    A.   No.
              4    Q.   There were a couple in advance, correct?
14:03:19      5    A.   Yes.
              6    Q.   Going to Government's Exhibit 1735, Page 111.  If we
              7    could zoom in the top half of this.  You recognize this?
              8    A.   Yes.
              9    Q.   All right.  And where is this Western Union receipt
14:03:43     10    from?
             11    A.   This is from a Check and Go in downtown Cleveland.
             12    Q.   Okay.
             13         Why would you go to a different location?
             14    A.   I just -- well, I happened to be downtown.
14:03:53     15    Q.   Okay.
             16         And the -- to whom did you wire transfer money on --
             17    for this transaction?
             18    A.   Teodor Iowan.
             19    Q.   Okay.  And the amount?
14:04:03     20    A.   $2400.
             21    Q.   Okay.
             22         If we could go to Government's Exhibit 1735, Page 112.
             23    And if we could zoom in to the lower left quadrant.  Okay.
             24    And to whom are you sending the Western Union money here?
14:04:28     25    A.   Patricia Cosmin Nicolae.
```

701

Wolfe - Direct/McDonough

1    **Q.**   And the amount?

2    **A.**   $2400.

3    **Q.**   Okay.

4         And if we could go back to Government's Exhibit 2253,

14:04:40 5    Page 5.  And do you recognize the name, Petrica Cosmin

6    Nicolae?

7    **A.**   Yes, I do, that -- that is one of the people I was

8    instructed to send $2400 to.

9    **Q.**   All right.

14:05:02 10        Going to Government's Exhibit 2353 Page 7.  What was

11   this date?

12   **A.**   I'm sorry.  What did you say?

13   **Q.**   What date did you receive this instruction?

14   **A.**   June 27, 2013.

14:05:20 15   **Q.**   All right.

16        What were your instructions for this transaction?

17   **A.**   I was to send $2360 to Teodor Ioan in Bucharest,

18   Romania.

19   **Q.**   All right.  What time did you receive this

14:05:39 20   communication?

21   **A.**   1:48 P.M.

22   **Q.**   Okay.

23        2253, Page 8, please.  Five minutes later, what was

24   the next instruction that you received?

14:05:59 25   **A.**   To send $2360 to Petrica Cosmin Nicolae in Bucharest,

Wolfe - Direct/McDonough

1   Romania.

2   **Q.**    All right.  You mentioned earlier that there was

3   the -- had to do this quickly?

4   **A.**    Quickly.

14:06:20  5   **Q.**    Okay.

6        How quickly did you have to withdraw the money and get

7   it to Western Union?

8   **A.**    It was never fast enough.  It was like you just had to

9   get this done immediately.  You cannot -- I mean this was --

14:06:38  10   you know, this was a job.  This is -- it was very, very

11   important you get this done very, very fast or people are

12   going to be getting very upset.

13   **Q.**    Okay.

14        If we could go to Government's Exhibit 1735, Page 118.

14:06:59  15   And if we could zoom in on the upper left.  To whom did you

16   send the money?

17   **A.**    Petrica Cosmin Nicolae.

18   **Q.**    Okay.  And if we could zoom in into the upper right.

19        What date did you send the money?

14:07:28  20   **A.**    6-27.

21   **Q.**    At what time?

22   **A.**    3:57.

23   **Q.**    Okay.

24        So within two hours, you're withdrawing and going to

14:07:37  25   Western Union?

Wolfe - Direct/McDonough

1    **A.**    Yes.

2    **Q.**    Okay.

3            Government's Exhibit 2253, Page 9.  What was the third

4    instruction you received?

14:07:51 5    **A.**    Third.  "Send to Laura Andreea Fagarasu, Bucharest,

6    Romania."

7    **Q.**    Okay.

8            And Government's Exhibit 1735, Page 119.  And would

9    you please zoom on the upper right corner.  To whom did you

14:08:20 10    send the money here?

11    **A.**    Laura Andreea Fagarasu.

12    **Q.**    Your understanding was that when you're withdrawing

13    money and sending it to Western Union, you are providing

14    what service?

14:08:43 15    **A.**    A service for the person who is sending me the money

16    to be able to purchase whatever it is that they needed to

17    purchase.  So I'm -- in Romania.

18    **Q.**    Okay.

19    **A.**    They're helping them do whatever they need to do in

14:09:01 20    Romania.

21    **Q.**    Did you ever receive any complaints from the people

22    who wire transferred money into your account?

23    **A.**    So I got complaints, yes --

24    **Q.**    Okay.  Yes.

14:09:19 25    **A.**    Yes.

Wolfe - Direct/McDonough

1   Q.   Turning to Government's Exhibit 2253, Page 10.

2              MR. O'SHEA:  Objection.

3              THE COURT:  As to this exhibit?

4              MR. O'SHEA:  Yes.

14:09:40 5          THE COURT:  Take it down, please.

6              MR. McDONOUGH:  May we approach, your Honor?

7              THE COURT:  You may.

8          (Discussion at side bar off the record.)

9              THE COURT:  Mr. O'Shea, you are withdrawing

14:10:36 10 your objection?

11             MR. O'SHEA:  Yes, ma'am.  Sorry, Judge.

12             THE COURT:  That's all right.

13  BY MR. McDONOUGH:

14  Q.   July 3rd, you received a communication from a Keleman

14:10:55 15 Donath?

16  A.   Yes.

17  Q.   And what -- could you please read what the

18  communication was?

19  A.   Sure.  "We have received some complaints from one of

14:11:02 20 our customers regarding our transactions.  They may request

21  the funds back but please keep in mind that our company has

22  a no refund policy.  You do not have to return any of those

23  funds."

24  Q.   Okay.  What time did you receive this?

14:11:20 25 A.   July 3rd, 3:39 P.M.

Wolfe - Direct/McDonough

1    **Q.**   And 2253, Page 11.  Please.

2          What further instructions did they -- did you receive

3    from Keleman Donath?

4    **A.**   "However, for your protection please withdraw any

5    remaining balance from the US Bank account and close that

6    account and any other account you may have with US Bank."

7    **Q.**   Did you ever lose money at US Bank as a result of

8    these transactions?

9    **A.**   Yes.

10   **Q.**   How did you lose money?

11   **A.**   Because I had -- I had what's the word?  I had

12   transactions being processed.  So when I had to close the

13   account, which I didn't know about, then I had bounced

14   checks.  I -- and then I had -- I had to incur fees and I

15   had -- so, yeah, I did lose money.

16   **Q.**   Okay.

17         Did US Bank ever pull money out of your account for

18   any of these transactions as to US Bank?

19   **A.**   I don't know.  I don't know for sure if he did or not.

20   **Q.**   The account at US Bank, was it a checking account,

21   savings account?

22   **A.**   It was a checking account.

23   **Q.**   Okay.

24         Government's Exhibit 2253, Page 12.  If we could

25   please zoom in on the top.  And if we start at the bottom,

Wolfe - Direct/McDonough

1    you had asked a question to Keleman Donath.  What was your

2    question?

3    **A.**    I said, "Can I open another at US Bank?"

4    **Q.**    Another what?

14:13:20  5    **A.**    Another account.

6    **Q.**    What was the response?

7    **A.**    "No, later.  Perhaps later."

8    **Q.**    Okay.  I'm sorry.  Above it.

9    **A.**    Oh.  "No.  Close everything at US Bank and let me know

14:13:33 10    which other banks you have."  But there's another -- he

11    did --

12    **Q.**    All right.

13    **A.**    -- write me again.

14    **Q.**    We'll get to that one in a second.

15    **A.**    Okay.

16    **Q.**    Did you have any other bank accounts at this time

17    besides US Bank?

18    **A.**    I also had a custodial account that I had to close as

19    well.

14:13:48 20    **Q.**    What's a custodial account?

21    **A.**    I'm responsible for providing all the financial

22    assistance for my daughter.

23    **Q.**    Okay.

24    **A.**    And I had to close her account as well because it was

14:14:01 25    in the US Bank.

Wolfe - Direct/McDonough

1    **Q.**   Okay.

2          And you had to provide the custodial account for your

3    daughter for what reason?

4    **A.**   Because she's disabled.

14:14:09  5    **Q.**   You have a disabled --

6    **A.**   So I -- yeah, I have a disabled daughter.

7    **Q.**   Okay.

8          Government's Exhibit 2253, Page 13.  Did you end up

9    opening a new account?

14:14:23 10   **A.**   Yes, I did.

11   **Q.**   Which bank?

12   **A.**   With Charter One Bank.

13   **Q.**   In your name?

14   **A.**   In my name.

14:14:29 15   **Q.**   What were the last four digits of your bank account at

16   Charter One Bank?

17   **A.**   0118.

18   **Q.**   After you provided that information, what did Keleman

19   Donath want or request?

14:14:45 20   **A.**   "What is the bank address?"

21   **Q.**   Okay.

22          Government's Exhibit 2253, Page 14.  Did you provide

23   the address?

24   **A.**   I provided the address, and he also asked if the

14:14:59 25   routing is correct for wire transfers.

Wolfe - Direct/McDonough

1    **Q.**    Okay.

2          And now I'd like to go to some specific transactions,

3    which are parts of the accounts of this indictment.  If you

4    could go to Government's Exhibit 2253, Page 15.  Okay.

14:15:30  5          What was the date of this communication from Keleman

6    Donath?

7    **A.**    July 5th, 2013.

8    **Q.**    All right.  What did Keleman Donath ask?

9    **A.**    "Hello, Donna.  Did by chance a transfer of $7858.50

14:15:44 10   post to your Charter One account?"

11   **Q.**    Okay.

12          Government's Exhibit 2253, Page 16.  What did you

13   receive from Keleman Donath?

14   **A.**    "No problem today.  It was sent.  I have confirmation

14:16:03 15   now.  Originator is Donald K. Patterson from Webster, New

16   York, amount $7878.50.  Please withdraw."

17   **Q.**    Government's Exhibit 2253, Page 17, please.  Okay.

18          What did Keleman Donath ask?

19   **A.**    "I will send instructions via e-mail.  What commission

14:16:29 20   plan are you choosing this time?  6 percent immediate or 10

21   percent payable as check."

22   **Q.**    And what option did you choose?

23   **A.**    6 percent.

24   **Q.**    Government's Exhibit 2253, Page 18.  What did Keleman

14:16:49 25   Donath ask?

Wolfe - Direct/McDonough

1    **A.**    "E-Mail sent, same recipients, send $2360 plus pay

2    $55.28 transfer fee to each of them."

3    **Q.**    Okay.

4           Now, you mentioned that that 6 percent commission you

14:17:03 5    took?

6    **A.**    Um-hum.

7    **Q.**    Who calculated that?

8    **A.**    He did.

9    **Q.**    Keleman Donath?

14:17:11 10    **A.**    Keleman Donath.

11    **Q.**    Who you believed to be?

12    **A.**    Martin Steinberg.

13    **Q.**    Okay.

14           So when you withdrew the cash from the bank this time

14:17:19 15    Charter One, or what have you, you would then go to Western

16    Union?

17    **A.**    Yes.

18    **Q.**    When you followed these instructions of breaking them

19    down and paying the transfer fees --

14:17:31 20    **A.**    Yes.

21    **Q.**    -- did you have money left over?

22    **A.**    Yes.

23    **Q.**    How much money did you have left over?

24    **A.**    That would be 6 percent.

14:17:37 25    **Q.**    Okay.  Government's Exhibit 2253 Page 19.

Wolfe - Direct/McDonough

1        And if we start at the bottom, July 6th, 1:01 A.M.

2    what was your response?

3    **A.**    "I can't get to may e-mail.  Can you text me their

4    names please?  I'm sorry to be such a bother."

14:18:01  5    **Q.**    Okay.  And the response above?

6    **A.**    "It's all right.  All of them have the city of

7    Bucharest, the country Romania.  Their names are -- I'll

8    write first the first name and then the last name."

9    **Q.**    All right.  Government's Exhibit 2253 Page 20.

14:18:22 10    **A.**    The first name, Teodor Iowan, the second name, Petrica

11    Cosmin Nicolae, and the third, Laura Andreea Fagarasu.

12    **Q.**    Okay.

13        Government's Exhibit 1735, Page 133.  And if we could

14    zoom to the middle third on the left side please, Sue.  And

14:18:56 15    to whom did you send the money?

16    **A.**    I sent the -- to Petrica Cosmin Nicolae.

17    **Q.**    Okay.  And Government's Exhibit 1735, Page 134 and the

18    top half, please.  And to whom did you send this?

19    **A.**    Laura Andreea Fagarasu, $2300.

14:19:17 20    **Q.**    Okay.

21        All the wire transfers you received in this case came

22    from outside the State of Ohio?

23    **A.**    Yes.

24    **Q.**    And at the time, all of your bank accounts were

14:19:34 25    located in Cleveland, Ohio, Cuyahoga County, Northern

Wolfe - Direct/McDonough

1    District of Ohio?

2    **A.**    Yes.

3    **Q.**    Okay.

4          Then regarding Account 3, we go to Government's

14:19:46 5    Exhibit 2253, Page 21.  When did you receive this?

6    **A.**    July 6, 2013.

7    **Q.**    Okay.  And what were the instructions?

8    **A.**    "Hello, Donna.  A customer sent today a new transfer

9    to your account.  Ryan Martin from Seal Beach, California.

14:20:13 10    Amount, $9269.  Please let me know if it posted.  Thanks."

11    **Q.**    Okay.

12          Government's Exhibit 1735, Page 136.  If we could zoom

13    in on that, please.  All right.  And to whom did you send

14    here?

14:20:33 15    **A.**    I sent $2838 to Teodor Iowan.

16    **Q.**    Did you ever talk to Teodor Iowan?

17    **A.**    No.

18    **Q.**    Did Teodor Ioan ever contact you?

19    **A.**    No.

14:20:51 20    **Q.**    Government's Exhibit 1735, Page 138.  And if we could

21    zoom in on the right side.  Okay.  I apologize, Sue.  Let me

22    have the middle third.

23          And to whom did you send money here?

24    **A.**    Laura Andreea Fagarasu.

14:21:17 25    **Q.**    Okay.

Wolfe - Direct/McDonough

1      Could you describe the procedure when you'd go into
2  Western Union of what -- of how you were able to send the
3  money?
4  **A.**    Well, they have forms that you fill out.  And then I
14:21:39 5  would go to the teller and give them the form and hand them
6  the money, the transfer amount and then the transfer fee.
7  **Q.**    Okay.
8  **A.**    And my ID.
9  **Q.**    Okay.  You had to provide identification?
14:21:52 10  **A.**    Yes.
11  **Q.**    Okay.  Was there a dollar limit at Western Union?
12  **A.**    If there was, they didn't tell me I was past the
13  limit.
14  **Q.**    Okay.
14:22:07 15      What was the -- if you recall the maximum amount of
16  money that you would ever send via Western Union in one
17  transaction?
18  **A.**    I don't recall the maximum amount.  But, this looks
19  like a really large amount, $2,838.  That looks like a lot.
14:22:26 20  That might have been the maximum amount.
21  **Q.**    Did it ever go over $3,000?
22  **A.**    No.
23  **Q.**    You would get these receipts that were from Western
24  Union?
14:22:42 25  **A.**    Yes.

Wolfe - Direct/McDonough

1    **Q.**    Once you got the receipts, how would you transmit

2    those to Keleman Donath?

3    **A.**    I would fax them.

4    **Q.**    Government's Exhibit 2253, Page 22.  What did you

14:23:03  5    receive from Keleman Donath?

6    **A.**    "I got two receipts already; the ones for Petrica and

7    Teodor.  Thanks."

8    **Q.**    And then Government's Exhibit 1735, Page 137.  Maybe

9    we could have the middle third.  Thank you.

14:23:26 10          To whom did you send the money?

11   **A.**    Petrica Cosmin Nicolae.

12   **Q.**    Okay.

13          And Government's Exhibit 2253 Page 23.  What did you

14   receive from Keleman Donath here?

14:23:47 15   **A.**    "Received the last receipt as well.  Thank you.  There

16   will also be another transfer for you tomorrow.  You're just

17   doing great."

18   **Q.**    Okay.

19          Now I'd like to talk to you about Count 4.

14:24:05 20   Government's Exhibit 2253, Page 24.  What instructions did

21   you receive from Keleman Donath?

22   **A.**    "The wire may already fill to your accounts.  The

23   sender is John Curtis and Sharon Gallo from Blythe,

24   California, amount $7254, sent from the Union Bank.  You

14:24:27 25   will need this info tomorrow.  If they ask, purpose of the

Wolfe - Direct/McDonough

1    wire is vehicle purchase."

2    **Q.**    Okay.  And what date did you receive that?

3    **A.**    July 8th at 5:00.

4    **Q.**    Okay.

5        Did you ever have any issue with a bank in the wire

6    transfer?

7    **A.**    Yes.

8    **Q.**    Okay.

9        What kind of issue would you have with your bank and

10   the wire transfer?

11   **A.**    Well, some -- one of the banks asked if there was an

12   issue with the sender of the wire, and I didn't think there

13   was.

14   **Q.**    Okay.

15       Did you ever have an issue transferring the money via

16   Western Union to any of the individuals?

17   **A.**    No.

18   **Q.**    Okay.

19       Government's Exhibit 2253, Page 25.  What did you

20   receive from Keleman Donath?

21   **A.**    "Oh, so basically the cash is stuck with Western Union

22   without they giving you MTCN number or is it with you?"

23   **Q.**    Okay.

24       Okay.  Do you know what that's referring to?

25   **A.**    No.

Wolfe - Direct/McDonough

1    **Q.**   Okay.  Government's Exhibit 2253 Page 27, please.

2          What did Keleman Donath ask you then?

3    **A.**   "Very good.  Just try another office tomorrow.  If

4    they ask too many questions, go to another one, but I'm sure

5    you already know how to handle things.  And be careful not

6    to burn the dinner."

7    **Q.**   What does "burn the dinner" refer to?

8    **A.**   I was cooking.  I don't remember this conversation.

9    **Q.**   Okay.  "Another office.  Another office."  What was

10   your understanding of that?

11   **A.**   Maybe -- I don't remember the conversation.

12   **Q.**   That's okay.

13   **A.**   Okay.

14   **Q.**   Government's Exhibit 1735, Page 140.

15          THE COURT:  You know, you can just refer to

16   the page.  You don't have to --

17          MR. McDONOUGH:  Okay.  Thank you.

18          THE COURT:  The same exhibit.

19   **Q.**   Page 140.  The middle third.  To whom did you send?

20   **A.**   I sent this to -- oh, to Teodor Iowan.

21   **Q.**   And -- 141 and it's -- the middle third again.

22   **A.**   The sender?

23   **Q.**   Yes.

24   **A.**   Petrica Cosmin Nicolae.

25   **Q.**   Okay.

716

Wolfe - Direct/McDonough

1          Can we actually, please, Sue, could you zoom out?

2     Could we go to the upper right quadrant this time?  What was

3     the location for this Western Union?

4     **A.**    4283 Fulton road.

14:27:39 5     **Q.**    Okay.

6     **A.**    Well, Cleveland, Ohio.

7     **Q.**    Okay.  Are you familiar with that address?

8     **A.**    I'm trying -- I should.  Let's see.  It's close to

9     where I live.

14:27:49 10    **Q.**    Okay.

11         And then if we could zoom out and go to Page 142.  I'm

12    sorry.  We go to the top -- top upper right quadrant again,

13    Sue.  Thank you.  Where was this location?

14    **A.**    2196 Brookpark Road, which is right -- very close to

14:28:10 15   my neighbor.

16    **Q.**    Okay.

17    **A.**    Very close.

18    **Q.**    Did you ever go to the same Western Union for all

19    three transactions?

14:28:21 20   **A.**    I don't think so.  I don't think you're allowed to

21    transfer that -- you know a total of that much money.

22    **Q.**    Okay.

23    **A.**    At one transfer station.

24    **Q.**    So on one assignment, you could go to up to three

14:28:38 25   different Western Unions?

Wolfe - Direct/McDonough

1    **A.**    Yes.

2    **Q.**    To send the money?

3    **A.**    Yes.

4    **Q.**    To Bucharest?

14:28:42  5    **A.**    Yes.

6    **Q.**    All right.

7                    THE COURT:  We're going to take an afternoon

8    recess now.  Please remember the admonition.

9            All rise for the jury.

14:28:54 10         (Thereupon, a recess was taken.)

11                    THE COURT:  You may continue.

12                    MR. McDONOUGH:  Your Honor, may we have the

13    Elmo, please.

14    BY MR. McDONOUGH:

14:59:18 15   **Q.**    Ms. Wolfe, do you see the table in front of you?

16    **A.**    Yes.

17    **Q.**    From July 5th, through August 11th, and we'll go

18    through those.

19    **A.**    Okay.  Yes.

14:59:34 20   **Q.**    Did you receive wire transfers from victims outside

21    the State of Ohio into your bank accounts at Charter One

22    Bank ending in 0118?

23    **A.**    Yes.

24    **Q.**    US Bank, ending in 1134?

15:00:06 25   **A.**    Yes.

Wolfe - Direct/McDonough

1    **Q.**    PNC Bank ending in 5205?

2    **A.**    Yes.

3    **Q.**    Key Bank?

4    **A.**    Yes.

15:00:27  5    **Q.**    From the time period of July 5, 2013, through August

6    11, 2013?

7    **A.**    Yes.

8    **Q.**    Did the funds that you received range from a minimum

9    of $2484 to a maximum of $12,500?

15:01:07  10    **A.**    Yes.

11    **Q.**    Upon receiving all of those wire transfers into your

12    account for that range and in various amounts, what did you

13    do with the funds?

14    **A.**    I wired them through Western Union to individuals that

15:01:31  15    I was instructed to send to.

16    **Q.**    Okay.

17         MR. McDONOUGH:  May we have the back table,

18    Government's laptop, please, your Honor?

19    **Q.**    Okay.

15:01:59  20         Did there come a point when you had concerns about the

21    legitimacy of your role in providing these transactions?

22    **A.**    Yes.

23    **Q.**    Turning your attention to Government's Exhibit 2253

24    Page 34.  Did you leave a voice mail with Keleman Donath?

15:02:35  25    **A.**    Yes.

Wolfe - Direct/McDonough

1    **Q.**   And Keleman.Donath@gmail.com?

2    **A.**   Yes.

3    **Q.**   What was your message?

4    **A.**   "Hi, Martin.  This is Donna.  Please answer your

15:02:46 5    phone.  I need to talk to you.  I need to know what you want

6    me to close these -- why you want me to close these

7    accounts" -- is what I meant.  "It doesn't sound -- it

8    doesn't sound like to meet at all.  Please call me back."

9    **Q.**   Okay.

15:03:07 10        Government's Exhibit -- Government Government's

11   Exhibit Page 35?

12        What was the response from Keleman Donath?

13   **A.**   "Hi, Donna.  I think there's again a problem with one

14   of the recent customers.  To avoid any headaches, please

15:03:24 15   close all accounts you have with Charter One now."

16   **Q.**   Would this be the second bank account you had to

17   close?

18   **A.**   Yes.

19   **Q.**   Was that a concern for you?

15:03:34 20   **A.**   It was.

21   **Q.**   Page 51.  What was your reply?

22   **A.**   "I can't keep doing this."

23   **Q.**   Page 36, what was the response?

24   **A.**   "Okay.  I understand.  But you need to close this

15:04:08 25   anyway.  Otherwise, there will be a lot of headaches later

Wolfe - Direct/McDonough

1    on.  If you want to quit, I understand perfectly.  If you

2    want to continue, I think we can increase the commission a

3    bit to 8 percent."

4    **Q.**    Okay.  What was your understanding of what was being

15:04:24 5    offered to you?

6    **A.**    Well, there was another sentence with this where he

7    was saying that --

8    **Q.**    Let me ask you this.  At this point, it was how much?

9    **A.**    6 percent.

15:04:40 10    **Q.**    Did your commission change?

11    **A.**    It -- yes, it did.

12    **Q.**    Did it go up or go down?

13    **A.**    It went up.

14    **Q.**    Page 52.  What did you state?

15:05:05 15    **A.**    "I thought this was a legitimate business."

16    **Q.**    Page 37.  What was the response that you got?

17    **A.**    "Yes, it is legitimate.  There is a customer who may

18    want a refund, although he signed a no refund policy.  So he

19    can make pressures on your bank and then your bank may try

15:05:33 20    to get his money from you.  If you close this account, this

21    can be avoided."

22    **Q.**    Did your bank ever try to get the money reversed from

23    your account?

24    **A.**    Not that I know of.

15:05:53 25    **Q.**    Okay.  Did you end up closing a bank account?

Wolfe - Direct/McDonough

1    **A.**    Yes, I did.

2    **Q.**    Page 38.

3    **A.**    "Also the quickest you close it, the better."

4    **Q.**    Who told you that?

15:06:13  5    **A.**    It's my understanding it was Martin Steinberg but it's

6    Keleman Donath.

7    **Q.**    Okay.  Page 53.  What did you reply?

8    **A.**    "I have transactions of my own that are being

9    processed.  I lost money the last time.  I'm going to lose

15:06:35 10    money this time.  I have a guardianship account."

11    **Q.**    Okay.  When you say guardianship account, is this what

12    you referred to before as that custodial account?

13    **A.**    Correct.

14    **Q.**    For your disabled --

15:06:47 15    **A.**    Daughter.

16    **Q.**    Okay.  And then it ended with the?

17    **A.**    The.

18    **Q.**    Page 54, please.

19    **A.**    "The wire transfers were processed on time.  And I

15:07:06 20    can't close it right away."

21    **Q.**    You say wire --

22    **A.**    I think it's -- I don't know what that word "W-U."  I

23    thought it was --

24    **Q.**    Okay.  But --

15:07:17 25    **A.**    "Were processed on time" because I did process them,

Wolfe - Direct/McDonough

1    which was my understanding, which was the problem was that I

2    wasn't transferring them fast enough.

3    **Q.**    Okay.  Did you go to any other --

4    **A.**    Oh, Western Union.

15:07:29 5    **Q.**    Well -- okay.

6    **A.**    Sorry.

7    **Q.**    No worries.  Page 39.  What were you asked?

8    **A.**    "How much money you lost?"

9    **Q.**    Page 55.  What was your reply?

15:07:57 10   **A.**    "My main concern is my guardianship account.  I am

11   responsible for someone else's financials and I can't keep

12   closing it."

13   **Q.**    Okay.

14        Why could you not keep closing that guardianship

15:08:09 15   account?

16   **A.**    Because it's -- I mean it's -- the bank does not want

17   these guardianships opened and closed.  They want -- it's --

18   **Q.**    Did you have to report the guardianship account to

19   anyone?

15:08:31 20   **A.**    Yes, I have to report this account to Social Security.

21   **Q.**    Okay.

22        Page 56.  What was your response?

23   **A.**    "There are only so many banks.  If I run out of banks,

24   then what?"

15:08:55 25   **Q.**    Okay.  Page 40.  What was the reply?

Wolfe - Direct/McDonough

1   **A.**   "Haven't figured that out, but after awhile, you'll be

2   able to use the same banks again."

3   **Q.**   Were you able to use the same banks again?

4   **A.**   No.

15:09:21  5   **Q.**   Page 57.

6          What was your -- what did you communicate?

7   **A.**   "I don't understand why the client would be upset when

8   I transferred the money so quickly."

9   **Q.**   Page 41.

15:09:53 10  **A.**   And his response?

11  **Q.**   His response.

12  **A.**   "He is not upset.  He may want a refund."

13  **Q.**   Page 42.  And what?

14  **A.**   And his response -- then he additionally, also he

15:10:16 15  said, "I would say there is a 20 percent chance every time.

16  I'm being honest here."

17  **Q.**   Page 44.

18  **A.**   And then he said, "Just variance, meaning it was bad

19  luck.  Theoretically, but every time the chances are above

15:10:36 20  20 percent.  Next time, chances dramatically drop."

21  **Q.**   What is referring to regarding the 20 percent chance

22  or the chance is dramatically dropped?

23  **A.**   Well, the way I read it was 20 percent of people that

24  were buying something would want a refund.  But, sometimes,

15:10:56 25  it will be less, and sometimes it would -- like he's saying

Wolfe - Direct/McDonough

1    next time, chances dramatically drop.

2    **Q.**    Okay.

3          Did you know what type of products were purportedly

4    being purchased by these people transferring money into your

15:11:12 5    account?

6    **A.**    The only thing I heard was a car.

7    **Q.**    Okay.

8          Was that during the -- during the conversations?

9    **A.**    Um-hm.

15:11:24 10   **Q.**    I'm sorry.  Is that a yes?

11   **A.**    I'm sorry.  Yes.

12   **Q.**    Okay.

13          Page 45 starting at the bottom, what was your

14   question?

15:11:38 15   **A.**    "What product?  I thought we were transferring money?"

16   **Q.**    And the response?

17   **A.**    "Our customers sell various products to, in the United

18   States.  That's where the money is from."

19   **Q.**    Okay.  Page 46.  Your reply?

15:11:58 20   **A.**    "I'm sorry.  I'm slow but I just don't understand."

21   **Q.**    Page 47, what were you told?

22   **A.**    I was saying, "The customers send money for purchases

23   they do from countries in Europe.  There is no refund policy

24   in place.  But, some of them, sometimes they don't

15:12:19 25   understand that.  They don't like the product and request a

Wolfe - Direct/McDonough

1    refund."

2    **Q.**    Page 58.  What did they further tell you?

3    **A.**    "So the customer is the person who wire transfers

4    money into my account.  Then the people who pick up the

5    money make purchases in behalf of the customer."

6    **Q.**    Okay.  And he ended with a B.  Okay.  Page 59.

7    **A.**    Because -- "because the transaction originates in my

8    bank account, I am held liable.  Correct?  This should have

9    been disclosed.  My bank accounts would be in jeopardy."

10   **Q.**    Okay.

11        You were telling them that you're liable?

12   **A.**    Right.

13   **Q.**    Okay.  How were you liable?

14   **A.**    Because he was saying that the people would come and

15   take money out of my bank account.

16   **Q.**    Okay.  Meaning that the --

17   **A.**    The people that wired the money into my account had

18   access to my account to pull money back out of my account.

19   **Q.**    Okay.  Did money ever get pulled out of your bank

20   account to go back to the person who transferred it in?

21   **A.**    No.

22   **Q.**    Okay.  Did you end up -- let me withdraw that.

23        And that ended with my bank accounts would be in J-E?

24   **A.**    Jeopardy.

25   **Q.**    Page 60.  What did you finish with?

Wolfe - Direct/McDonough

1    **A.**     Jeopardy.

2    **Q.**     Jeopardy.

3          What was your understanding of jeopardy for your

4    accounts?

15:14:01  5    **A.**     I was -- well, I was a little confused.  At that

6    point, I was -- they made me kind of -- I was confused.

7    **Q.**     Okay.

8    **A.**     And I was starting to think that because they had

9    access to deposit money into my account, that they could

15:14:26 10    also pull money out of my account.

11    **Q.**     Okay.  Page 48, please.

12    **A.**     And then he says, "No, the people that send the money

13    make the purchase.  The people receiving it are employees of

14    the company selling the products."

15:14:45 15    **Q.**     Okay.

16    **A.**     That was his response to my --

17    **Q.**     Okay.  Page 61.  What did you reply?

18    **A.**     And then I said, "Okay.  I am looking at my contract.

19    I don't see where I am held responsible for refunds.  Can't

15:15:04 20    I take this to my bank?"  I was talking about my contract.

21    **Q.**     And Page -- oh, the first document we had a chance to

22    go ahead and view?

23    **A.**     Yes, sir.

24    **Q.**     Can we pull up 1733, Page 12, please?

15:15:26 25          If we could zoom in on the lower third.  Can you read

Wolfe - Direct/McDonough

1    the last sentence of the second paragraph starting with, "If

2    the payment"?

3    **A.**     "If the payment processing is delayed, the transaction

4    agent will support a 1 percent daily penalty."

15:15:58 5    **Q.**     What's was your understanding of that line?

6    **A.**     If I did not have the funds forwarded to Global

7    Partners within two business days, I would receive -- I

8    would receive a 1 percent daily penalty.

9    **Q.**     Okay.

15:16:18 10           If we could please go to Government's Exhibit 2253,

11    Page 61.  What did you tell them?

12    **A.**     Okay.

13           "I am looking at my contract.  I don't see why I am

14    held responsible for refunds.  Can't I take this to my

15:16:42 15    bank?"

16    **Q.**     And Government's Exhibit 49.

17    **A.**     "No, just close the" --

18                    THE COURT:  Page?

19    **Q.**     Sorry, Page 49.

15:16:59 20    **A.**     "No, just close the account."

21    **Q.**     Okay.

22           Did you end up closing?

23    **A.**     I closed the account.

24    **Q.**     And you had accounts at all those various banks?

15:17:22 25    **A.**     Right.

Wolfe - Direct/McDonough

1     **Q.**     What was your understanding of what a wire transfer

2     was from the purchaser to your account?

3     **A.**     A deposit.

4     **Q.**     Okay.  Did you ever receive cash from a purchaser?

15:17:43 5     **A.**     Cash from a purchaser?

6     **Q.**     For example, did you ever receive a check from any of

7     the purchasers?

8     **A.**     Who are the purchasers?

9     **Q.**     Let me ask you this.  That was a bad question.  I

15:18:00 10    apologize.

11          The funds were always transferred into your bank

12    account?

13    **A.**     Yes, sir.

14    **Q.**     And they were -- how were they transferred?

15:18:09 15    **A.**     Electronically.

16    **Q.**     Did you ever receive cash from one of those people

17    who -- in lieu of transferring?

18    **A.**     No.

19    **Q.**     Okay.  Did you ever receive a check from someone

15:18:24 20    for -- to that transfer?

21    **A.**     No, sir.

22    **Q.**     Did you ever send a check to Europe?

23    **A.**     No, sir.

24    **Q.**     Did you ever wire transfer money to Bucharest?

15:18:37 25    **A.**     Yes, sir.  Well, a wire transfer -- no.

Wolfe - Direct/McDonough

1    **Q.**   Okay.

2         You used what service to do all the transfers to

3    Bucharest, Romania, Europe?

4    **A.**   Western Union.

15:18:50  5    **Q.**   Okay.

6              MR. McDONOUGH:  Thank you.  No further

7    questions.

8              THE COURT:  Cross-examination, Mr. Goldberg.

9              MR. GOLDBERG:  Thank you.  We don't have any

15:19:02 10    cross-examination.

11              THE COURT:  Mr. O'Shea?

12              MR. O'SHEA:  One moment, please, Judge.

13              THE COURT:  Certainly.

14

15

16

17

18

19

20

21

22

23

24

25

1          CROSS-EXAMINATION OF DONNA WOLFE

2     BY MR. O'SHEA:

3     Q.    Good afternoon, Ms. Wolfe.

4     A.    Good afternoon.

15:19:24 5   Q.    As relates to all the exhibits that were shown -- that

6     you showed us today and that you pointed to and recognized

7     on the screen there, ma'am, is it safe to say that prior to

8     your coming to testify here this afternoon, that you met

9     with the Prosecutors and they itemized what they were going

15:19:44 10  to do so it would flow easy, is that fair?

11    A.    I went over all -- everything that -- all the

12    evidence.

13    Q.    Okay.  How long did that take?

14    A.    Forty minutes, half an hour.

15:20:00 15  Q.    Okay.

16          And all those -- those messages from your phone, how

17    did you get them to the Prosecutor?  Do you remember those

18    text messages?

19                  MR. McDONOUGH:  Objection.  May we approach?

15:20:13 20                 MR. O'SHEA:  Okay.

21                  THE COURT:  All right.  I'm sorry?

22                  MR. O'SHEA:  I said okay if we could approach.

23    I answered the question for you.

24                  THE COURT:  Yes, you may.

15:20:55 25          (Discussion at side bar off the record.)

731

Wolfe - Cross/O'Shea

BY MR. O'SHEA:

Q.   Ma'am, let me ask the question a different way.  All
those text messages that you got done testifying about,
you're relatively confident they came from your phone at
that point in time, am I right?

A.   Yes, sir.

Q.   Now, I look at my cheat sheet, ma'am, and it looks
like it all happened back around 2013.  Am I right about
that?

A.   Yes.

Q.   Okay.  At least five years ago, right?

A.   Going to be six.

Q.   Okay.

     And you don't remember them personally, do you?  You
just had to have --

A.   I remember some of them.

Q.   Some of them but most of them you had to have your
memory refreshed by meeting with the Prosecutor and they
showed you, is that fair, ma'am?

A.   True, but I remember all of this very well.  And I
kept all of my receipts from my Western Union.

Q.   Okay.

A.   And turned those in to PNC Bank.

Q.   Okay.  Good.

     But you had to look at those text messages to remember

1   what you specifically said five years ago, is that fair?

2   **A.**   Once again, I remember this very well.  This is a very

3   important part of my life, and I feel really, really

4   remorseful and stupid that I got caught up in something as

15:22:17  5   crazy as this.  And don't think that last night was the only

6   night that I thought about this.  I probably thought about

7   this every other day, ever since all this came about.  Ever

8   since I found out I was caught up in something so nasty and

9   disgusting.

15:22:34  10   **Q.**   Okay.

11   **A.**   And I remember a lot of the conversations.  And I'll

12   never ever forget Martin Steinberg, even though he doesn't

13   even exist.

14   **Q.**   Okay.

15:22:41  15       Let me ask you this, ma'am, and I appreciate how you

16   wanted to tell me that response, but here, if -- with all

17   due respect to what you've been through, which, trust me,

18   everybody in this courtroom respects, but the question I

19   asked you, okay, on the stand, is a very specific question.

15:23:00  20   Okay?

21   **A.**   Yes.

22   **Q.**   And that specific question was, without the actual

23   text in front of you right now, would it be fair to me to

24   say I would not remember the text word for word five years

15:23:13  25   later; I remember generally what happened, but the specific

1    text word for word, I couldn't remember without those things

2    in front of me, is that fair?

3    **A.**    Maybe 50 percent fair.

4    **Q.**    Okay.  All right.

15:23:27 5         And is one of the questions asked of you by my

6    colleague, Mr. McDonough, he referred to people as victims.

7    Do you remember that when he asked you those questions?

8    **A.**    Yes, sir.

9    **Q.**    As you sit here today, you don't know what status they

15:23:52 10   had?  He just used that term, am I right about that, ma'am?

11   Calling them victims is something he did, but you're not

12   here to tell us that they're victims, are you?

13   **A.**    I already thought they were victims.

14   **Q.**    Okay.

15:24:03 15  **A.**    Before he said that.

16   **Q.**    Okay.

17        But, the term victims was a term he used when asking

18   you the question, am I right about that?

19   **A.**    You're right about that.  However, I already thought

15:24:15 20  of them as victims.

21   **Q.**    Okay.

22        But you didn't use that term; Mr. McDonough did, is

23   that --

24   **A.**    I've used that term before, referring to these people

15:24:23 25  when I spoke about them to other people.

1       **Q.**    Okay.

2           And -- but, I'm talking again, Ms. Wolfe, just about

3       what happened in this courtroom while you're sitting there.

4       All right?

15:24:33 5      **A.**    All right.

6       **Q.**    Let's look -- let's remember back a few moments ago

7       when Mr. McDonough was asking you these questions.

8       **A.**    Yes, sir.

9       **Q.**    He used the term victim, did he not?

15:24:43 10              MR. McDONOUGH:  Objection.

11              THE COURT:  I didn't hear what you said.

12              MR. McDONOUGH:  Oh.  Objection; asked,

13      answered.

14              THE COURT:  Oh, well -- overruled.  Last time.

15:24:55 15     **Q.**    Okay.

16          He was the one that used it, this man right here?

17      **A.**    Yes, sir.

18      **Q.**    Am I right about that, ma'am?

19      **A.**    Yes, he did.

15:25:02 20             MR. O'SHEA:  One moment, Judge.  I'm sorry.

21              THE COURT:  Certainly.

22      **Q.**    Again, going to the exhibits that were shown to you,

23      ma'am, some of them refer to various places where transfers

24      came from or transfers went to.  Do you remember that

15:25:27 25     questioning?

Wolfe - Cross/O'Shea

1    A.    Yes, sir.

2    Q.    Okay.

3          One of those locations geographically was Bucharest,

4    am I right about that?

15:25:34  5    A.    Yes, sir.

6    Q.    The only way --

7                MR. McDONOUGH:  Objection, Judge.  Bucharest.

8    Q.    Bucharest.  I mispronounced that.  Thank you,

9    Mr. McDonough.  Bucharest.

15:25:46 10          The only way you know that is based upon what's in the

11   text, am I right about that?  Because it said that location,

12   right?  That's how you think it was that location, right?

13   A.    I don't understand.

14   Q.    Okay.

15:25:59 15   A.    The question.

16   Q.    Let me ask this way.

17   A.    Okay.

18   Q.    And if you don't understand the question, please ask

19   again or tell me that.

15:26:11 20   A.    I will.

21   Q.    There were a number of exhibits shown to you with a

22   term Bucharest was actually -- or Bu --

23                THE COURT:  Bucharest.

24   Q.    Bucharest.  Thank you.

15:26:21 25          Bucharest was used.  Remember that?  They were --

1    **A.**    Yes, sir.

2    **Q.**    They were up on your screen.

3    **A.**    Yes, sir.

4    **Q.**    That text came from somebody else to you, am I right

15:26:29 5    about that?

6    **A.**    Yes, sir.

7    **Q.**    All right.

8          And you just followed the instructions given to you in

9    those texts, am I right about that?

15:26:37 10   **A.**    Yes, sir.

11   **Q.**    You don't know -- you're basing your assumption, okay,

12   correct me if I'm wrong, that those texts and those came

13   from Bucharest and that the transfers actually went to

14   Bucharest based entirely on what was on your screen, am I

15:26:54 15  right about that?

16   **A.**    Okay.  So if I understand your question, you're asking

17   me if I understand that the text came from Bucharest?

18   **Q.**    Well, here.  Again, it's my fault the question isn't

19   as clear as it should be.

15:27:08 20        Your presumption -- do you, presuming -- let me ask it

21   this way.  That those monies went to Bucharest?

22   **A.**    Yes, sir.

23   **Q.**    Is that an assumption, based upon the fact that it

24   said it in the text?

15:27:23 25  **A.**    No, it -- I assume it because I filled out a paper, a

1    form at Western Union.

2    **Q.**    Right?

3    **A.**    And I put that address in there.

4    **Q.**    Okay.  Other than --

5    **A.**    And I would assume that Western Union would send it to

6    the address that I wrote on their form.

7    **Q.**    Okay.

8          Other than that form, ma'am, and those texts where I

9    see that city that I can't pronounce the right way all

10   afternoon to save my life, that's the only documentation

11   whereby you presume that it actually went to that part of

12   the world, am I right about that?

13   **A.**    Or sometimes I got e-mails, too, not just texts.

14   **Q.**    But the e-mails came with letters that said locations,

15   right?

16   **A.**    Correct.

17   **Q.**    All right.

18         And you, I think indicated to me, ma'am, that -- and

19   we talked about victims before and you talked about how you

20   felt about it, and how bad you felt about it.

21         Your understanding of what happened in this money is

22   based entirely upon those documents, am I right about that?

23   **A.**    Yes, sir.

24              MR. O'SHEA:  Thank you.

25         Nothing further, Judge.

Wolfe - Cross/O'Shea

1              THE COURT:  Any real direct?

2              MR. McDONOUGH:  No, your Honor.

3              THE COURT:  You may step down, ma'am.  And

4      watch your step.

15:28:41  5              THE WITNESS:  Thank you.

6              THE COURT:  Call your next witness.

7              MR. LEVINE:  The Government calls William

8      Scott Hanna.

9              THE COURT:  Please step up to the podium, sir,

15:29:05 10    and please raise your right hand.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Hannon - Direct/Levine

1                          WILLIAM HANNON,

2           of lawful age, a witness called by the GOVERNMENT,

3                   being first duly sworn, was examined

4                        and testified as follows:

15:29:16  5           DIRECT EXAMINATION OF WILLIAM HANNON

6                    THE COURT:  Please take a seat right over

7      there, sir.

8      BY MR. LEVINE:

9      **Q.**    Good afternoon, Mr. Hannon.

15:29:31 10    **A.**    Good afternoon.

11     **Q.**    Could you please state and spell your last name for

12     the record?

13     **A.**    William Scott Hannon, W-I-L-L-I-A-M, S-C-O-T-T,

14     H-A-N-N-O-N.

15:29:48 15    **Q.**    And Mr. Hannon, what do you do?

16     **A.**    I'm a real estate professional.

17     **Q.**    What does that mean, you're a real estate?

18     **A.**    I do a lot of different things in the real estate

19     industry.  I'm a broker investor, I'm a landlord, various

15:30:01 20    other things.

21     **Q.**    Okay.

22           And I think you can move the microphone a little

23     closer to you or yourself a little closer to the microphone

24     just so we can hear.  All right.  Thank you.

15:30:10 25          Where do you live, Mr. Hannon?

Hannon - Direct/Levine

1    **A.**    Miami, Florida, 9160 West Bay Harbor Drive, Apartment

2    3, Harbor Island, Florida, South Florida.

3    **Q.**    Thank you very much.

4          Mr. Hannon, were you a victim of eBay fraud?

15:30:24 5    **A.**    Yes, I was.

6    **Q.**    In May and June of 2011, did you attempt to purchase a

7    jeep through eBay?

8    **A.**    Yes, I did.

9    **Q.**    I'm sorry.  What was your answer?

15:30:35 10    **A.**    Yes.

11    **Q.**    And when kind of jeep was it?

12    **A.**    It was a Rubicon.

13    **Q.**    Okay.

14          Could we please bring up Government's Exhibit 1451?

15:30:55 15    And if we could zoom in on from here down.  Is this -- what

16    is Government's Exhibit 1451?

17    **A.**    Looks like a -- looks like a printout of the listing

18    or part of it of the fake eBay listing for the Wrangler

19    Rubicon, which I was trying to purchase.

15:31:35 20    **Q.**    Okay.  And let me hand you a printed copy.

21    **A.**    Okay.  Great.  Thank you.

22    **Q.**    You're welcome.  Okay.

23          And is this a screenshot that you took?

24    **A.**    Yes, I believe so.

15:32:00 25    **Q.**    All right.

741

Hannon - Direct/Levine

1    And in this screenshot, did you send a message to the

2    seller of this Jeep Rubicon?

3    **A.**    Yes, I think I was asking him to explain the low

4    mileage.

15:32:19 5    **Q.**    What was the questions -- what questions did you ask

6    to the seller?

7    **A.**    I asked him to please explain the mileage and title

8    issues noted in the vehicle report, what part of Florida --

9    **Q.**    Could you -- the Court Reporter has to write down what

15:32:40 10    you're saying.  So please speak a little bit louder and into

11    the microphone.  That would be great.

12    **A.**    Yeah.

13    I was asking to simply explain the low mileage and

14    whatever title issues were noted in the vehicle report.

15:32:56 15    **Q.**    Okay.

16    Let's bring up Government's Exhibit 1452, please.  And

17    I'm going to hand you a copy of Government's Exhibit 1452 so

18    you'll have that in front of you.

19    **A.**    Thanks.

15:33:19 20    **Q.**    What is Government's Exhibit 1452?

21    **A.**    That looks like an e-mail I received from the

22    so-called seller responding to my eBay questions to him.

23    **Q.**    Okay.  And did you save this e-mail?

24    **A.**    Yes, I did.

15:33:42 25    **Q.**    Okay.

Hannon - Direct/Levine

1    And what did -- what did the seller say in response to

2  your e-mail?

3  **A.**    He's apologizing for answering so late.  Supposedly he

4  was on a business trip.  He's telling me that the Rubicon is

15:34:01  5  still available and claims that he couldn't get a deal done

6  with another buyer because he -- the loan wasn't approved.

7  He's still interested in selling the jeep, and he's sending

8  me some pictures of the vehicle.

9  **Q.**    Okay.

15:34:24 10    He says there I have also attached a few pictures of

11  the car; is that right?

12  **A.**    Correct.

13  **Q.**    Do you remember whether it was an attachment to this

14  e-mail?

15:34:35 15  **A.**    I'm pretty sure there was pictures.

16  **Q.**    Okay.

17    Do you remember whether or not you clicked on those

18  pictures?

19  **A.**    If it was pictures attached, I clicked on them.

15:34:43 20  **Q.**    Let's bring up Government's Exhibit 1453.  We'll zoom

21  in on that, please.  I'm going to bring you a hard copy.

22  This is a ten-page exhibit.

23  **A.**    Okay.

24  **Q.**    Can you tell me what is Government's Exhibit 1453?

15:35:22 25  **A.**    This is an e-mail from myself, a business e-mail

1    address of mine to my personal e-mail address.  And what I'm

2    doing is copying and pasting the actual fake eBay listing

3    for the vehicle, sending it to myself.

4    Q.    The eBay listing, did you know at the time it was a

5    fake e-mail listing?

6    A.    No, absolutely not.

7    Q.    Why are you e-mailing the listing to yourself?

8    A.    I'm trying to document because I'd never done such a

9    big transaction on eBay prior to this time and it -- it gave

10   me a little bit, a reason to want to be diligent in document

11   as much as I could.

12   Q.    And what was the listing price for this vehicle?

13   A.    $8250.

14   Q.    All right.  And can you zoom in on the payment

15   information there?  All right.

16         And can you please read to us what the payment

17   information was in the listing?  Actually before you read

18   that, this was the eBay listing after you had asked the

19   questions to the seller and received the e-mail that we

20   looked at?

21   A.    That's correct.

22   Q.    The e-mail that had the picture attachment to it?

23   A.    That's correct.

24   Q.    Okay.

25         If you could please read the payment information

Hannon - Direct/Levine

1    there.

2    **A.**    Bank transfer to eBay agent's account or supervised

3    bank transfer to seller's bank account.

4         It goes on to say, "eBay agent protection for large

15:37:06  5    transactions, we recommend choosing our new payment option,

6    which allows you to make the transfer to an eBay agent

7    account.  This account will act as an escrow account until

8    the item is received and inspected by the buyer.  The money

9    will not be sent to the seller until the buyer confirms that

15:37:22 10    the item is as advertised in this auction."

11   **Q.**    Okay.

12         And is there an item location there?

13   **A.**    Eugene, Oregon, U S.

14   **Q.**    Eugene, Oregon, is listed as the location of the item?

15:37:40 15   **A.**    Correct.

16   **Q.**    And what did you understand the item to be?

17   **A.**    The Wrangler Rubicon Jeep.

18   **Q.**    If we can zoom out now.  And if we could zoom in right

19   above here.  Looking at this -- at this zoomed in portion of

15:38:02 20   the eBay listing as it appeared at this time, how was the

21   seller's rating listed?

22   **A.**    100 percent positive.

23   **Q.**    Okay.  And how -- how many stars and feedback did he

24   have there?

15:38:18 25   **A.**    106.

Hannon - Direct/Levine

1    **Q.**    Okay.

2          And did eBay have him listed as a top-rated seller

3    according to this?

4    **A.**    Consistently receives highest buyer's rating.  Ships

15:38:32 5   items quickly.  Has earned a track record of excellent

6    service.

7    **Q.**    Okay.

8          Could we turn to Page 2 of this exhibit, please?  And

9    do you recognize Page 2 of this exhibit?

15:38:48 10  **A.**    Yes, I do.

11   **Q.**    What is Page 2?

12   **A.**    I believe it's a continuation of the same listing.

13   It's a further description of the vehicle in question.  Oh,

14   it's Carfax.  I'm sorry, yeah.

15:39:09 15  **Q.**    And what is Carfax?

16   **A.**    Carfax is an online service where it enables you to

17   look into the history of a given vehicle, either for sale or

18   for purchase.

19   **Q.**    When you say you can look into the history, what kind

15:39:32 20  of history?

21   **A.**    You can see how many owners it's had.  You can see

22   what mileage has been documented, see if it has been in

23   accidents, what services have been performed, different

24   times, given they'd been recorded by properly.

15:39:51 25  **Q.**    Okay.  Let's turn to Page 3 of the exhibit.  And -- so

Hannon - Direct/Levine

1    looking at Page 3 of the exhibit, did the seller provide a

2    Carfax here, purport to provide a Carfax here?

3    **A.**    Yes.

4    **Q.**    And according to the Carfax, did the vehicle check out

15:40:29 5    as legitimate and in good condition?

6    **A.**    Yes.

7    **Q.**    If we could turn to Page 3 of what's been previously

8    marked as Government's Exhibit 1454, and I'm going to hand

9    you a copy because this is a three-page exhibit.

15:41:09 10    **A.**    Great.

11    **Q.**    So on the third page of Government's Exhibit 1454, do

12    you recognize this exhibit?

13    **A.**    Yes, I do.

14    **Q.**    What is Government's Exhibit 1454?

15:41:24 15    **A.**    It's an e-mail from the proposed seller to me.

16    **Q.**    Okay.

17         So is this a June 2nd e-mail chain between you and the

18    seller regarding the jeep?

19    **A.**    Correct.

15:41:39 20    **Q.**    Okay.

21         And so looking at Page 3, do you continue to discuss

22    the jeep with the seller over e-mail?

23    **A.**    Yes, I did.

24    **Q.**    And on June 2nd, did the seller tell you that he had

15:41:53 25    purchased a Carfax report and posted it on the listing?

747

Hannon - Direct/Levine

1    **A.**    I'm sorry.  What was the --

2    **Q.**    On June 2nd?

3    **A.**    Repeat the question one more time, please.

4    **Q.**    The question is on June 2nd, did the seller tell you

15:42:20 5   he had purchased a Carfax report and posted on the listing?

6    **A.**    Yes.

7    **Q.**    Okay.

8         And on June 2nd, what did the seller say that you

9    should do in order to purchase the car?

15:42:34 10  **A.**    He said hit the -- use the "buy it now" option on

11   eBay.

12   **Q.**    Okay.

13        And why -- what reason did the seller give for using

14   the "buy it now" option?

15:42:45 15  **A.**    He's saying this way, our transaction will be

16   protected by eBay.

17   **Q.**    Okay.

18        If we go to Page 2 of the same exhibit, and you can --

19   you can -- it's easier to look at the hard copy, we can do

15:43:06 20  that as well.

21        Looking at the e-mail on the bottom, zoom in to the

22   e-mail on the bottom there.  On June 2nd at -- on or about

23   6:43 P.M., did you ask to speak to the seller by phone?

24   **A.**    Yes.

15:43:28 25  **Q.**    Why did you want to speak to the seller by phone?

1    **A.**    It would help me to get direct answers vocally.  It

2    would help me determine if I should trust this person.

3    **Q.**    Did you have concerns over whether this transaction

4    was legitimate or not?

15:43:50 5                    MR. GOLDBERG:  Objection.

6                    THE COURT:  Sustained.

7    **Q.**    Did you have any concerns regarding this transaction?

8                    MR. GOLDBERG:  Objection.

9                    THE COURT:  Sustained.  One moment, sir.

15:44:01 10                    THE WITNESS:  Yes, ma'am.

11   BY MR. LEVINE:

12   **Q.**    Why did you want to talk to the seller at this point?

13   **A.**    Any time I do any kind of a transaction that is

14   somewhat significant, especially being that this was online

15:44:21 15   and it was much more significant than I'd ever done online,

16   talking to someone gives you a sense of trust or distrust,

17   talking to someone directly allows you to hear tone of

18   voice, demeanor, determine things that make you feel

19   comfortable or uncomfortable.

15:44:43 20   **Q.**    Okay.

21        And you said that -- that this was the most

22   significant transaction you did online.  What was

23   significant -- in what way was this?

24   **A.**    The value, the amount of it, the value.

15:44:55 25   **Q.**    The amount of the transaction?

Hannon - Direct/Levine

1    **A.**    Correct.

2    **Q.**    Had you done other eBay purchases in the past?

3    **A.**    Many.

4    **Q.**    Many?  How many would you say you had done in the

15:45:02  5    past?

6    **A.**    Prior to this time, I don't know.  Currently, I think

7    I have 1200 --

8              MR. GOLDBERG:  Objection.

9              THE COURT:  Sustained.  You don't know, sir?

15:45:13 10              THE WITNESS:  Prior to this attempted

11    purchase, I don't recall exactly.

12              THE COURT:  All right.

13    BY MR. LEVINE:

14    **Q.**    Would you say you made more than ten purchases on eBay

15:45:22 15    prior to that?

16    **A.**    Yes.

17    **Q.**    More than a hundred?

18    **A.**    Yes.

19              MR. GOLDBERG:  Objection.

15:45:26 20              THE COURT:  Overruled.

21    **Q.**    More than 200?

22    **A.**    Probably.

23    **Q.**    Okay.

24        And what kinds of things had you purchased on eBay

15:45:34 25    prior to this?

Hannon - Direct/Levine

1   **A.**     Much smaller items.  Items valued at maybe $100 or

2   less, sometimes more than that.

3   **Q.**     Had you ever purchased or attempted to purchase a car

4   on eBay?

15:45:52 5   **A.**     Never, no.

6   **Q.**     Okay.

7         So if we could scroll up, please and see what the

8   seller's response was.  So how -- how did the seller respond

9   to your request to talk by phone?

15:46:06 10  **A.**     He's suggesting he prefers e-mail because it's easier

11  for him to track the conversation, track everything.  He

12  says -- he can call me tomorrow if necessary, provided I win

13  the auction.

14  **Q.**     Okay.

15:46:30 15        And if we could control up to the next e-mail, please.

16  And in the -- is this your -- an e-mail you sent in

17  response?

18  **A.**     Yes.

19  **Q.**     Okay.

15:46:46 20        And in this e-mail, did you continue to ask questions

21  about the vehicle?

22  **A.**     Yes.

23  **Q.**     And can you scroll down a little bit so they can see

24  the rest of it?  Can you read this part of the e-mail here

15:47:07 25  that you sent?

Hannon - Direct/Levine

1  **A.**    "And other than needing to know as much about any and

2  all items that may be considered wear and tear or more, I am

3  also concerned about two things.  Number 1, the vehicle/sale

4  does not qualify for eBay protection -- buyer protection.

15:47:27  5  And Number 2, I would like to speak to you at least by

6  phone.  Thanks, Scott."

7  **Q.**    And if we can now look at the seller's response on the

8  bottom of Page 1 and the top of Page 2.

9        Looking at the bottom of Page 1 here, did the seller

15:48:00  10  tell you about an option on eBay to send money to an eBay

11  agent to hold the money in escrow?

12  **A.**    Yes.

13  **Q.**    And did the seller also suggest you chat with eBay

14  Live Help to double check everything on the auction?

15:48:16  15  **A.**    Yes.

16  **Q.**    Before you went any further?  I'm sorry.  Could you

17  repeat the answer?

18  **A.**    Yes.

19  **Q.**    All right.

15:48:24  20        And did you chat with what you thought at the time was

21  eBay Live Help?

22  **A.**    Yes.

23  **Q.**    All right.

24        I want to bring up Government's Exhibit 1455.  What is

15:48:48  25  Government's Exhibit -- and you can zoom.  What is

Hannon - Direct/Levine

1    Government's Exhibit 1455?

2    **A.**    That's another forward -- I think it's a copy and

3    paste from my business e-mail account to my personal e-mail

4    account of the beginning of the fake eBay website chat

15:49:11  5    session.

6    **Q.**    All right.

7            And again, at the time, did you know this was a fake

8    eBay chat session?

9    **A.**    Absolutely not.

15:49:16 10    **Q.**    Why did you cut and paste the beginning of the chat

11    session into an e-mail and e-mail it to yourself?

12    **A.**    I think I copy and paste all of it.  This is probably

13    just the first part of it, and I couldn't get it all in one

14    e-mail.

15:49:29 15    **Q.**    Okay.  But, why did you cut and paste all of it then?

16    **A.**    I'm trying to document the entire transaction, as much

17    of it as possible.

18    **Q.**    And can we please bring up Government's Exhibit 1456?

19            Do you recognize Government's Exhibit 1456?

15:50:09 20    **A.**    Yes, I do.

21    **Q.**    What is Government's Exhibit 1456?

22    **A.**    This is the actual chat session.

23    **Q.**    All right.

24            And how did -- did you create -- how did you preserve

15:50:19 25    this session?

Hannon - Direct/Levine

1    **A.**    Copied and pasted it.

2    **Q.**    So you copied and pasted it from where to where?

3    **A.**    I copied it from the fake eBay website chat session

4    into an e-mail from myself to myself, documenting it.

15:50:39 5   **Q.**    Okay.

6         And is Government's Exhibit 1456 a fair and accurate

7    copy of your chat session with what you thought was eBay

8    Live Help?

9    **A.**    Yes.

15:50:47 10  **Q.**    All right.

11        In this chat, do you use the user ID reliable2011?

12   **A.**    Yes.

13   **Q.**    And what is that?

14   **A.**    That's my eBay -- it was my eBay call name at that

15:51:09 15  time.

16   **Q.**    Okay.  Reliable2011 was your eBay user name?

17   **A.**    Correct.

18   **Q.**    Were you chatting with someone purporting to be Monica

19   S?

15:51:19 20  **A.**    Correct.

21   **Q.**    Government's Exhibit 1456 is 11 pages long.  Roughly

22   how much time did you spend chatting with what you thought

23   was eBay Live Help?

24   **A.**    I can ball park probably a half hour, plus or minus,

15:51:35 25  maybe less, maybe longer.  It's tough to say.

Hannon - Direct/Levine

1    **Q.**    Okay.  If you could just speak up into the microphone

2    because the Court Reporter has to record what you're saying.

3    All right.

4         Can you explain why you spent so much time on this

15:51:52 5    chat?

6    **A.**    I was making sure I was doing the right thing.  I was

7    making sure I could trust the individual I was dealing with.

8    I was making sure that eBay was going to protect this

9    transaction.  I was relying on eBay and their reputation,

15:52:08 10   everything that I had experienced in being able to trust

11   eBay previous to this.  I was asking this Monica S, through

12   who I thought was an eBay rep, to confirm all of these

13   concerns and questions and assure me that I wasn't going to

14   make a big mistake here.

15:52:32 15   **Q.**    And at the bottom of Page 1 of this chat, what, if

16   anything, did Monica tell you to make you more comfortable

17   about the transaction?

18   **A.**    She writes this means you will not be sending the

19   money to the seller but to eBay.  Be assured your money is

15:52:52 20   safe with us and will not release the funds until you

21   approve the vehicle.  We cover title and registration

22   issues, representation and damage.

23   **Q.**    Okay.

24        And you write at the very bottom there, "We equals

15:53:12 25   eBay"?

Hannon - Direct/Levine

1    **A.**    "We equals eBay"?  Yes, I did.  And I'm asking to

2    confirm that when Monica says "we," I'm saying.

3    **Q.**    All right.  If we could go to Page 2 of this.

4         Looking at the top of Page 2, how much was eBay

15:53:36 5    purportedly charging to act as an escrow agent in this

6    transaction?

7    **A.**    .75 percent of the transaction.

8    **Q.**    .75?

9    **A.**    Correct.

15:53:47 10   **Q.**    So how much did that come out to?

11   **A.**    Just $61.98.

12   **Q.**    Okay.

13        And based on Monica's representations here, what did

14   you understand eBay's vehicle purchase protection program to

15:54:02 15   entail?

16   **A.**    I felt and I'm confirming here in various areas that

17   for any reason, within three days after receiving the

18   vehicle, if I wanted to send it back, I can send it back and

19   get my funds back.

15:54:26 20   **Q.**    Okay.

21        And under what circumstances does Monica indicate you

22   could return your vehicle and get your funds back?

23   **A.**    Monica replies lower down on that page, "The auction

24   states clear title.  So if it is not clear, you get refunded

15:54:54 25   or for any reason related to the seller, you are unable to

1  register it" -- let me see.  She continues down further,

2  "Misrepresentation, which in fact also includes what I have

3  stated above, but other general things that are stated in

4  the item's description and you find them not to be true."

15:55:21 5  **Q.**   And what is the third thing she indicates that you're

6  protected?

7  **A.**   Damage, if the vehicle is damaged, either body damage

8  or mechanical damage.

9  **Q.**   Okay.  If we could scroll on to the next page.

15:55:34 10  And what is your response at the top of the next page?

11  **A.**   I said, "Great.  So then I'm covered for everything

12  except buyer's remorse, correct?"  And Monica replies

13  correct.

14  **Q.**   Okay.

15:55:47 15  Looking at this page or Page 3, looking at Page 3,

16  what did Monica tell you about what security measures would

17  be in place for the transaction?

18  **A.**   She writes, "So now discuss the security measures that

19  will apply to your account."  I said, "Okay.  So tell me

15:56:20 20  about the security measures, please."

21  She replies, "To protect the community against

22  unauthorized account access, eBay has stated -- started

23  noting which computers members use.  For your protection, if

24  you attempt to sign in from an unknown computer, for

15:56:37 25  example, from a library or hotel, eBay may temporarily block

757

Hannon - Direct/Levine

1     your account access."

2          She continues, "Be advised that when choosing eBay

3     agent options, this auction will be restricted to this

4     computer only.  The auction will not be accessible from

15:56:55 5     other computers and this is for your security.  We want to

6     make sure nobody's able to hijack your account."

7     Q.   Okay.

8          So what was one of the security measures that Monica

9     indicated was in place was that you can only access the

15:57:12 10    auction from your computer?

11    A.   Correct.

12    Q.   Okay.

13         And was there another security measure that Monica

14    described?

15:57:18 15    A.   They would also link my phone number to the

16    transaction.

17    Q.   Okay.

18         And at the bottom of Page 3, did you tell Monica that

19    you were going to try to print or e-mail this page for a

15:57:43 20    record?

21    A.   Yes, last sentence, last reply, "Anyway, thank you for

22    all your help," exclamation point, exclamation point

23    exclamation point, "I'm going to try to print or e-mail

24    myself this page for a record."

15:58:04 25    Q.   And why did you want to e-mail yourself or print this

758

Hannon - Direct/Levine

1    page for a record?

2    **A.**    Just documenting the transaction, showing -- just in

3    case I would have an issue, I'm backing up all of the

4    confirmations I'm making through who I thought was eBay.

15:58:22 5    **Q.**    All right.  If we could turn to Page 4, please.  Thank

6    you so much, Sue.

7         Looking at Page 4, did Monica confirm your cellphone?

8    **A.**    Monica's on the -- on the second response to the top

9    is confirming a redacted portion of a -- a hard line phone

15:58:52 10    that possibly got folded to my cellphone if I wasn't at that

11    hard line at the time.

12              THE COURT:  You know, sir, I'm going to ask

13    you to pull the microphone back a little bit because when

14    you get too close, we get play back.

15:59:04 15              THE WITNESS:  Got you.

16              THE COURT:  Thank you.

17              THE WITNESS:  Yes, ma'am.

18    **Q.**    Okay.

19         So does Monica ask you if you would be able to take a

15:59:14 20    call at a particular number?

21    **A.**    Yes.

22    **Q.**    And what is the purpose of getting a call at that

23    particular number?

24    **A.**    I'm supposedly -- I'm supposed to receive a PIN number

15:59:32 25    from eBay through that number.

Hannon - Direct/Levine

1    **Q.**    So you were supposed to receive a call, an automated

2    call with a PIN number?

3    **A.**    That's correct.

4    **Q.**    Okay.  And did you receive that automatic call with a

15:59:47 5    PIN number?

6    **A.**    Yes, I did.

7    **Q.**    All right.  And did you provide that PIN number?

8    **A.**    Yes.

9    **Q.**    In this chat with Monica S?

15:59:54 10    **A.**    Yes, I did.

11    **Q.**    And what was the PIN number?

12    **A.**    8840.

13    **Q.**    And what was Monica's response to you entering the PIN

14    number?

16:00:06 15    **A.**    "Congratulations.  Your phone number has been verified

16    and linked to this transaction.  Thank you for helping to

17    make eBay a safe trading environment."

18    **Q.**    All right.  Let's move to Page 7, please.  Thank you

19    so much, Sue.

16:00:23 20          So moving to Page 7, did Monica help walk you through

21    the process of paying money to an eBay escrow agent?

22    **A.**    Yes.

23    **Q.**    Okay.

24          And on Page 7, did you express a concern about halfway

16:00:49 25    down the page that this is not an HTTPS protected page?

Hannon - Direct/Levine

1  **A.**    Yes.

2  **Q.**    Can you explain what the concern was?

3  **A.**    HTTPS is, I believe, a type of Internet protocol which

4  gives some protection to information that you want

5  protected.

6  **Q.**    How did you know to be concerned about that?

7  **A.**    Experience on the Internet.

8  **Q.**    And did Monica address your concern?

9  **A.**    More or less.  She responds, "It's our banking

10  information what you have there.  The information we

11  provided can only be used to transfer money to that account,

12  not withdraw from it."

13  **Q.**    Okay.  If we can go to Page 8, please.  And if we

14  could zoom in on the bottom half of the page.  That's fine.

15  That's perfect.  Thank you so much, Sue.

16       So the next day, did you have what we thought was

17  another eBay Live Help chat this time with Jonathan P?

18  **A.**    Yes.

19  **Q.**    And if we could go to Page 9.  Looking at Page 9, why

20  did you have this chat with Jonathan P?

21  **A.**    Looks like I wanted to confirm the sale because I

22  wasn't receiving e-mails through eBay.  I was expressing

23  some concern about that, I believe.

24  **Q.**    Okay.  If we could scroll down so we see the end.

25  Okay.  That's fine.

1    Now towards the bottom of Page 9, did Jonathan

2    indicate that eBay was, "Working on a new design, sorry

3    about that, these features will be implemented soon"?

4    Towards the middle there.

16:03:38 5    **A.**    Yes.  Jonathan says, "We're still working on a new

6    design.  Sorry about that.  These features will be

7    implemented soon."

8    **Q.**    And what was your response to that?

9    **A.**    I said I was concerned that the whole transaction

16:03:54 10    could be -- could have been fishing fraud.  I continue on to

11    say, "Can you verify the sale for me, pending payment, of

12    course?"

13    Jonathan P.  Responds, "We're aware of this kind of

14    fraud.  However, that requires fake e-mails.  Please

16:04:13 15    disregard any such e-mails."  And then he continues on to

16    say, "Yes.  I am hereby confirming sale."

17    **Q.**    So he confirms the sale.  Had you received any e-mails

18    that you thought were fake?

19    **A.**    I didn't believe at the time they were fake but I was

16:04:35 20    trying to confirm that they weren't.  So, you know, making

21    sure.

22    **Q.**    Okay.

23    And did Jonathan on this page of your chat confirm the

24    information for the eBay agent?

16:04:50 25    **A.**    Yes.

Hannon - Direct/Levine

1    **Q.**   And looking at this page, who was the eBay agent?

2    **A.**   Ashley Parton.

3    **Q.**   Okay.  Can you read the full information?

4    **A.**   Ashley Parton.  Her address was 4248 North Colorado,

16:05:06  5  Kansas City, Missouri, 64117.

6    **Q.**   And what was the total amount that was due?

7    **A.**   $8311.88.

8    **Q.**   Okay.

9         And if we could scroll down a little bit more.  Could

16:05:20 10  you read where you start -- where you say, "Cross your

11   fingers for me, please"?

12   **A.**   "Cross your fingers for me, please.  First time I'm

13   doing such a big transaction over the Internet.  Site

14   unseen."  And I.

16:05:33 15  **Q.**   What was Jonathan's response to that?

16   **A.**   "No need for concern.  You're protected with us.  We

17   will not release the money to seller until you approve for

18   us to do so."

19   **Q.**   And did Jonathan also reiterate that you'll have to be

16:05:49 20  using this computer?

21   **A.**   Yes.

22   **Q.**   If we could move to Government's Exhibit 1457, please.

23   Okay.  And I will hand you a hard copy.

24        Government's Exhibit 1457 is an eight-page exhibit.

16:06:31 25  You'd tell us what Government's Exhibit 1457 is?

Hannon - Direct/Levine

1    **A.**    Another e-mail from myself to myself, my business

2    e-mail address to my personal, and it is the vehicle

3    purchase protection.

4    **Q.**    So how did you -- where did that text come from?

16:06:47  5    **A.**    The fake eBay account or the fake eBay site that I was

6    getting it from.

7    **Q.**    And again, at the time, did you know it was a fake

8    eBay site?

9    **A.**    Absolutely not.

16:06:57 10    **Q.**    So did you -- how did you get the text from fake eBay

11    site onto this e-mail?

12    **A.**    I would have copied and pasted it.

13    **Q.**    Why did you do that?

14    **A.**    Documenting this transaction.

16:07:10 15    **Q.**    Okay.  So after chatting with what you thought were

16    live eBay agents, did you attempt to purchase the jeep?

17    **A.**    Yes.

18    **Q.**    And I'd like you -- like to bring up Exhibit 1458.

19    And what is -- you recognize Government's Exhibit 1458?

16:07:34 20    **A.**    Yes.

21    **Q.**    What is Government's Exhibit 1458?

22    **A.**    Another e-mail from myself to myself, and it is --

23    it's an invoice.

24    **Q.**    Okay.  What is this an invoice for?

16:07:53 25    **A.**    For the Jeep Rubicon, Wrangler Rubicon I'm trying to

Hannon - Direct/Levine

1    purchase on the fake eBay website.

2    **Q.**    Looking at the bottom of the exhibit, who does the

3    invoice list as the seller?

4    **A.**    Savio Barreto.

16:08:11  5    **Q.**    Can you spell that for the record, please?

6    **A.**    S-A-V-I-O, B-A-R-R-E-T-O.

7    **Q.**    And looking at the bottom exhibit, who does the

8    invoice list as the buyer?

9    **A.**    Myself, William Scott Hannon.

16:08:28 10    **Q.**    And looking at the bottom right of the exhibit, how

11    does eBay indicate payment must be made?

12    **A.**    Bank to bank, electronic wire transfer.

13    **Q.**    And what was the price that you were to pay for the

14    vehicle on this invoice?  If we could zoom out.

16:08:49 15    **A.**    $8250.

16          I don't think that reflects the additional fee that he

17    added on.

18    **Q.**    And we'll get to that?

19    **A.**    Right.

16:09:02 20    **Q.**    So did you make a bank-to-bank electronic wire

21    transfer?

22    **A.**    Yes, I did.

23    **Q.**    I'm showing you what's been previously marked as

24    Government's Exhibit 1459.  What is Government's Exhibit

16:09:27 25    1459?

Hannon - Direct/Levine

1   **A.**    This is a -- I believe the beginning of the wire

2   transfer documentation that is used when you go to the bank

3   and ask to make a wire transfer.

4   **Q.**    Okay.  I'm going to hand you a hard copy because this

16:09:51 5   is a five-page exhibit.

6   **A.**    Okay.

7   **Q.**    And is this wire transfer documentation from your

8   bank?

9   **A.**    Yes.

16:10:06 10  **Q.**    What was your bank at that time?

11  **A.**    SunTrust.

12  **Q.**    If we could turn to Page 3 of the exhibit.  And if we

13  could zoom in a little bit.

14        Looking at Page 3, what was the payment amount?

16:10:32 15  **A.**    $8311.88.

16  **Q.**    And is that number a little higher than on the invoice

17  we just looked at?

18  **A.**    Yes.

19  **Q.**    Do you know why that is?

16:10:43 20  **A.**    There was the fee for the fake eBay trustee.

21  **Q.**    Okay.

22        And again, at the time, did you know that the eBay

23  escrow agent or trustee, as you put it, was fake?

24  **A.**    Absolutely not.

16:10:59 25  **Q.**    Who is the debit party listed as?

1   **A.**    Myself, William Scott Hannon.

2   **Q.**    And who is the beneficiary listed as?

3   **A.**    Ashley Parton, North Colorado, Kansas City, Missouri.

4   **Q.**    Is Ashley the same person you were told to pay

16:11:19 5   through, whom you thought was the eBay Live Chat?

6   **A.**    Yes.

7   **Q.**    All right.  If we could bring up Government's Exhibit

8   1460, please.

9       What is Government's Exhibit 1460?

16:11:37 10  **A.**    This looks like a -- it's my bank account statement.

11  **Q.**    Okay.

12      And looking at the June 3rd transaction under debits,

13  does this statement show wire transfer from you for

14  $8,311.88?

16:12:00 15  **A.**    Yes, it does.

16  **Q.**    And was that the wire transfer you made to Ashley

17  Parton?

18  **A.**    Yes, it was.

19  **Q.**    At some point, after sending this wire, did you

16:12:11 20  realize that you had been the victim of a scam?

21  **A.**    After sending it, yes, I absolutely realized.

22  **Q.**    How soon after sending the wire did you realize this?

23  **A.**    It was not long after.  Probably within 48 hours plus

24  or minus.

16:12:28 25  **Q.**    What caused you to realize it?

767

Hannon - Direct/Levine

1    **A.**    I believe I had just loaded on to my computer a new

2    virus protection program that wound up deleting this fake --

3    or deleted Trojans on my computer, which prevented my access

4    to the fake eBay website.

16:12:51  5    **Q.**    Are you saying within 48 hours or so of this

6    transaction, you downloaded malware protection on to your

7    computer?

8    **A.**    Yep.

9    **Q.**    It's unfortunate timing?

16:13:05 10    **A.**    Yes, it is.

11    **Q.**    Do you recall what brand of antivirus protection you

12    downloaded?

13    **A.**    I think it was McAfee software.

14    **Q.**    Okay.  Can you spell that for the Court Reporter?

16:13:15 15    **A.**    M-c-A-F-F-E, I think.

16    **Q.**    Okay.

17             And what happened when you installed the McAfee

18    antivirus protection?

19    **A.**    Goes through your computer, and it pulls out what they

16:13:30 20    call malware, which is problematic software that may have

21    been inadvertently loaded on your computer that would get

22    you to do foolish things like I wound up doing.

23             I believe it -- it deleted or isolated what you call

24    Trojans which when clicked on can lead you to a false

16:14:06 25    website, things like that.

Hannon - Direct/Levine

1    **Q.**    And how do you know it deleted these Trojans?

2    **A.**    It tells you, it announces it.

3    **Q.**    And "it" being McAfee?

4    **A.**    Yes.

16:14:15 5    **Q.**    I want to show you what's been previously marked as

6    Government's Exhibit 1409.  And I'm going to hand you a hard

7    copy of this exhibit, six-page exhibit.  And I'd like to go

8    to the top of Page 5 of this exhibit.

9         What is Government's Exhibit 1409?  Not just that

16:15:45 10    portion.  What is the whole --

11    **A.**    Yeah, it looks like more e-mail correspondence between

12    myself and the supposed seller.

13    **Q.**    Okay.

14         So at -- on June 13, 2011, at 9:31 A.M., what did you

16:16:06 15    write to the seller?

16    **A.**    "I'm curious.  What do you usually tell your victims

17    when they -- when they say they never got the vehicle?"

18    **Q.**    Okay.

19         And if we could zoom out now.  And if we could go to

16:16:20 20    the -- scroll up to the prior page.  And if we could zoom in

21    on the entire response to that.  And if you could read to us

22    how the seller responded, please?

23    **A.**    Says, "I usually tell them to send it twice, but you

24    remove the Trojan.  So I guess no.  Two times for you or X2

16:16:52 25    for you."

1    He continues, he says, "Victim.  Dot, dot, dot.

2    Victim.  Exclamation point, exclamation point.  What did I

3    ever do to victimize you, huh?  Did I stab you, steal from

4    you?  Is that what you call it?  Well, the way I see it is

16:17:12  5    that I just told you a story and you bought it.  Nobody was

6    forcing you into anything or perhaps you might even call it

7    harassment, though even harassment is simply a way to

8    exercise your right to free speech.  Nobody forces you into

9    listening.  That's what they do in Hollywood.  They tell you

16:17:33  10   stories, and you pay them, billions, just simply bullshit

11   stories, and you don't call them criminals.  But, I have to

12   hand it to you, you are a smart and educated person.  I am

13   amazed that you ever sent anything.  My usual clients are

14   some white trash pieces of shit that can't even spell right

16:17:57  15   and probably speak with an accent more atrocious than mine."

16            MR. O'SHEA:  Objection.  Can we approach,

17   Judge?

18            THE COURT:  On that?

19            MR. O'SHEA:  Yeah.

16:18:10  20            THE COURT:  No.

21   Q.    Can you finish, please?

22   A.    Yeah.

23        "I guess what I'm trying to say is that we're both on

24   the same side here.  Don't be blaming me because you were

16:18:21  25   stupid once.  Who do you hate more, me or all those

Hannon - Direct/Levine

1    uneducated piece of shit crackers you run into everyday?

2    Get stuck on them at every traffic jam, at every shopping

3    mall, on every street, on every hall.  Me, I take their

4    monies and put them to rest."

16:18:49  5    **Q.**    When the seller said you removed the Trojan, was that

6    accurate?

7    **A.**    Yeah.

8    **Q.**    Why were you engaging him at this point?

9    **A.**    There was still some element of hope that there's

16:19:16 10    some -- there may still be -- there may be some element of

11    decency in the individual and I'm hoping to possibly

12    communicate and get my money back.

13    **Q.**    I'd like to look at part of your response here.  If

14    you could just read.

16:19:49 15                    MR. GOLDBERG:  Objection.

16                    MR. LEVINE:  This portion of your response.

17                    THE COURT:  I'm sorry?

18                    MR. GOLDBERG:  Objection, your Honor.

19                    THE COURT:  So you've not agreed to this, to

16:19:56 20    it being shown?

21                    MR. GOLDBERG:  I don't think we have.

22                    THE COURT:  Please shut it down.  Side bar,

23    then.

24            (The following proceedings were held at side bar:)

16:20:14 25                    THE COURT:  I thought everything's being shown

1      was done with agreement.

2                  MR. LEVINE:  I did.  This was one of the --

3      this was one of the exhibits that was on the list that was

4      provided to Defense counsel before the witness took the

16:20:26  5      stand.

6                  MR. GOLDBERG:  He handed me a piece of paper.

7      We came back from lunch.  And he told me these are the

8      exhibits, so.

9                  THE COURT:  Okay.  Yeah -- that -- we all

16:20:38 10      agreed everything would be given the night before and that

11      we would -- that anything that was shown on the computer to

12      myself and the jury was documents that y'all had agreed we

13      could all -- they could see.

14           So let's stick with that practice.  May I see the

16:21:01 15      document?

16                  MR. LEVINE:  It's on the witness' table.  Your

17      Honor, as you'll note this witness was not --

18                  THE COURT:  I need -- I need the document.

19                  MR. LEVINE:  It is --

16:21:16 20                  THE COURT:  What is it?  Duncan, I'll pull it.

21      What is it?

22                  MR. LEVINE:  1409.

23                  THE COURT:  You know, would you put it up for

24      me, please?

16:22:41 25                  MR. GOLDBERG:  Your Honor, I'm not going -- I

1    don't know where this exhibit exactly came from because I

2    don't think it came from the witness.  It probably was some

3    kind of subpoena response, Number 1.  Number 2, he did go

4    through some of this back and forth with the seller, the

16:23:05 5    spoof seller, but this next paragraph, I mean the point's

6    been made that this is a -- this -- he wants his money back

7    and this back and forth is irrelevant at this --

8                THE COURT:  Yeah, yeah.  What's the point of

9    this one?  I mean this goes into great detail about --

16:23:25 10   although I believe activity of this victim.

11               MR. LEVINE:  So I don't want -- I want the

12   victim to just read his comment.  It leads to the opposing

13   party coconspirator's statement and the coconspirator's

14   statement --

16:23:44 15              THE COURT:  But you can do that by simply

16   saying did you send them an e-mail expressing your disgust,

17   your anger, et cetera.

18               MR. LEVINE:  I can do that?

19               THE COURT:  Yeah.

16:23:56 20              MR. LEVINE:  All right.

21               MR. O'SHEA:  The basis of my objection is that

22   this is 404(b) stuff.  I mean it's just -- unless I get to

23   ask the witness, like I tried to do this --

24               THE COURT:  I think I just ruled in your favor

16:24:07 25   on this.

Hannon - Direct/Levine

1        MR. O'SHEA:  I just wanted to state the basis

2   of my objection.

3        (Proceedings resumed within the hearing of the jury:)

4        MR. LEVINE:  Do you still have a hard copy of

16:24:30  5   the exhibit up?

6        THE WITNESS:  Yes.

7   Q.    When the -- when the seller wrote the response to you

8   that we just saw, what was your -- without reading it, what

9   was your reaction?

16:24:46 10  A.    My -- my emotional reaction is a little bit

11  astonishment, and I'm -- to me, I'm thinking and wondering,

12  and I questioned why they don't put the effort that they're

13  doing to do this criminal activity, since they're so versed

14  in computer science and Internet and put it towards

16:25:50 15  something that they can profit from legitimately.

16  Q.    Okay.

17        And can you read what the seller's response to that

18  reaction was?

19        MR. O'SHEA:  Objection.

16:26:03 20       THE COURT:  Overruled.

21        MR. LEVINE:  Is it up for the jury?

22        THE COURT:  Oh, I'm sorry.

23        THE WITNESS:  He responds, "Clients was

24  sarcasm obviously."  Because he originally referred to his

16:26:32 25  victims as being clients.

1    MR. GOLDBERG:  Objection.

2    **Q.**    If you could just read it and --

3    **A.**    Yeah, clients --

4    **Q.**    I'll ask you a follow-up question?

16:26:38  5    **A.**    "Clients with sarcasm obviously.  How can I tell

6    you're not white trash?  You should read the other e-mails I

7    get.  Ha, ha, ha.  They really deserve it.  And I can never

8    figure out how the hell they got such amounts of cash on

9    their hands.  White trash's life savings, that's a good one

16:26:59 10    considering the fact that they stole it from us."

11    MR. O'SHEA:  Objection.

12    THE COURT:  Overruled.

13    THE WITNESS:  "Well not them personally but it

14    was given to them in our own deficit by our dear leaders,

16:27:13 15    Mark Goldberg, Martin Bergstein, Mark Bloomberg, what was

16    it, Mark Zuckerburg, okay.  What's the difference?  Not that

17    I hate Jews.  They're on our --

18    MR. O'SHEA:  Objection.

19    THE WITNESS:  -- they're on our -- they're on

16:27:28 20    our side, but still it's funny.  Anyway the guy is a joke.

21    He isn't any more real than Brittany Osama or 911.  He's

22    just the main actor on one of our leader's scam.  Just like

23    I do mine on you, they do theirs on us.

24    Do you have any idea how much work I put into this?  I

16:27:52 25    don't think there's any job that will require that much.  Of

1    course, there's no job that pays that much either, but this

2    isn't a job.  It's more like an enterprise, which is exactly

3    what you're suggesting I should do.  I'm doing it.  You're

4    just hung on this thing that it has to be legal.  Well, why?

16:28:16 5    Look where it got you.  As for the white trash, I'm sure

6    they'll grow to anything that they are being told.  Oh,

7    well, I know, this to be true.

8        "So anyway if you have financial problems, are sick of

9    the white trash, the law or whatever the fuck else, why

16:28:36 10    don't you join me?  I'm sure I can figure out a job for you.

11    I'm serious."

12    **Q.**    Did you ever get your jeep?

13    **A.**    No.

14    **Q.**    Did you ever get your $85,000 back?

16:28:56 15    **A.**    No.

16            MR. LEVINE:  No further questions for this

17    witness.

18            THE COURT:  Mr. Goldberg, cross-examination?

19            MR. GOLDBERG:  Thank you, your Honor.  I don't

16:29:01 20    have any questions.

21            THE COURT:  And, Mr. O'Shea.

22            MR. O'SHEA:  Just two questions.

23

24

25

Hannon - Cross/O'Shea

CROSS-EXAMINATION OF WILLIAM HANNON

BY MR. O'SHEA:

Q.    First question, sir, the antivirus protection you said you used to locate this virus was made by McAfee?

A.    I believe so.

Q.    Not by Symantec, right?

A.    I believe it was McAfee but it's been awhile.  I don't have anything documented in front of me to confirm, bury --

Q.    Why is McAfee in your head then?

A.    It's just what I currently recall.

Q.    Okay.

      Do you have any idea -- well, do you remember you were asked questions about trying to buy the jeep, transferring the money and not getting the jeep or the money back, right?

A.    Yep.

Q.    Do you have any idea why you were asked questions about these insulting comments that were going back and forth between you and this person?

              MR. LEVINE:  Objection.

              THE COURT:  Sustained.

              MR. O'SHEA:  Nothing further, Judge.

              MR. LEVINE:  No redirect, your Honor.

              THE COURT:  You may step down, sir.  Watch your step.

      Folks, we will adjourn for the evening.

Hannon - Cross/O'Shea

1          Please remember the admonition.  Do not form any

2     opinion and do not talk about the case.

3          I am going to ask you to be downstairs tomorrow

4     morning at 9:00.  We will call for you up as a group.

16:30:19 5          Tomorrow for lunch, we are going to take a recess at

6     11:55.  I have a very important telephone conference I must

7     be a part of at noon.  So your lunch will be from 11:55

8     until 1:30 tomorrow.

9          Also, folks, on Monday, you will not be asked to

16:30:43 10    arrive here until 12:30.  Just want to -- so you can plan

11    ahead.  Have a good evening, everyone.

12          All rise for the jury.

13          (Proceedings in the absence of the jury:)

14

15

16

17

18

19

20

21

22

23

24

25

778

1          THE COURT:  We're going to do exhibits from

2     yesterday and today.

3          1422 was shown to the jury.  I assume it should be

4     admitted, and I'm going to assume it as I go down the list

16:31:55  5     unless you stop me and tell me that I'm incorrect.

6               MR. GOLDBERG:  That's fine, your Honor.

7               THE COURT:  Thank you.

8          1423, 1424, 25, 26, 27, 28, 29, 30, 31, 32, 33 -- if

9     I'm going too fast, somebody stop me -- did I say 33?  34,

16:32:30 10     35, 36, 37, 38, 39, 40.  All admitted.

11          1873 I believe is demonstrative only.  May I assume,

12     Mr. Levine, Mr. McDonough, you are not offering that?

13               MR. LEVINE:  If you'll just hold for a moment,

14     your Honor.

16:32:58 15               MR. McDONOUGH:  If it's demonstrative,

16     correct, your Honor.  We're just confirming that.

17               MR. O'SHEA:  Well, let me --

18               MR. LEVINE:  That's correct, your Honor.

19               DEPUTY CLERK:  It's on the screen.

16:33:20 20               MR. LEVINE:  Oh.  Yes.  Well, at this point.

21               MR. O'SHEA:  But I -- I don't have an

22     objection to it going to the jury.

23               THE COURT:  Well, I'm asking if it's being

24     offered, and I thought I heard them say they want to offer

16:33:32 25     it.

1          MR. LEVINE:  We'll offer it.

2          THE COURT:  You're going to offer it?

3          MR. LEVINE:  We'll offer it.

4          THE COURT:  Mr. Goldberg?

16:33:36  5          MR. GOLDBERG:  No objection, Judge.

6          MR. O'SHEA:  No objection Judge.

7          THE COURT:  Then 1873 is in.

8      1441, is it being offered?

9          MR. LEVINE:  It's being offered, yes.

16:33:59 10         THE COURT:  Mr. Goldberg?

11         MR. GOLDBERG:  Your Honor, I believe Mr.

12   O'Shea and I both object to Exhibit 1841.

13         MR. O'SHEA:  That's the list?

14         MR. GOLDBERG:  Yes.

16:34:17 15         MR. O'SHEA:  Yes, we talked about that Judge.

16   We agreed they could show it but we were going to argue

17   admissibility later.  That's that cut and paste.

18         THE COURT:  I'm well aware.

19         MR. O'SHEA:  Okay.  Thank you, Judge.

16:34:28 20         THE COURT:  Yeah.

21     Do you want -- okay.  Mr. Levine, tell me why it's

22   admissible.

23         MR. LEVINE:  May I ask the basis of the

24   objections?

16:34:39 25         THE COURT:  Well, no.  I'm asking you, what is

1    the basis for you to offer it.  It's a page from the

2    indictment.

3                    MR. LEVINE:  Okay.

4         So there's three things.  One, will show evidence,

16:34:49  5    relevance, authenticity.  They're saying best evidence, of

6    course.  All right.

7         So relevance.  A part of the indictment, we have to

8    establish that they registered domain -- some of these

9    domain names.

16:35:02 10                    THE COURT:  Okay.  Let me stop you there.

11    Isn't the entire indictment relevant?

12                    MR. LEVINE:  Yes, but we're not offering the

13    entire indictment, your Honor; just offering this table

14    within the indictment, and as I indicated --

16:35:14 15                    THE COURT:  So you're highlighting one portion

16    of the indictment because we are all in agreement the entire

17    indictment is going.

18                    MR. LEVINE:  Yes, but --

19         Well, so my colleagues point out that they are going

16:35:32 20    to get the indictment, and I understand that.  But,

21    Mr. Omurchu's testimony related to this exhibit that he saw

22    each of these domains, that he saw his infected computer

23    being asked to connect out to each of these domains, and so

24    the relevance and the reason to have it separately is for

16:35:53 25    jury ease.  They can see that he was referring to this list

781

1    of domains in Exhibit 1441.  So that's the relevance.

2              Do you want me to go to hearsay or authentication?

3                      THE COURT:  You can do whatever you want.

4                      MR. LEVINE:  Yes.

16:36:09  5    So one could think of it as my colleague points out as

6    a summary to help with jury deliberations.

7                      THE COURT:  Mr. Goldberg?

8                      MR. GOLDBERG:  Your Honor, as the Court

9    pointed out, it -- it doesn't add anything.  It was created

16:36:24 10    by a witness who on cross-examination was less than clear as

11    to how these websites were actually recorded and then

12    transmitted to the U.S. Attorney.

13              It tracks the indictment, and the Government can stand

14    up at closing, put these on -- put these on the big screen

16:36:50 15    and go through them and refer to them and refer to the

16    indictment.  Sending it back as an exhibit, I do not think

17    is appropriate.

18              It's -- I mean I've got a problem with the actual

19    authentication testimony of the witness, but I also think it

16:37:09 20    is -- it's unfairly prejudicial.

21                      THE COURT:  Mr. O'Shea, you're objecting as

22    well?

23                      MR. O'SHEA:  Yes, Judge.

24              And may I also say, Judge, by way of analogy, this

16:37:18 25    obviously implies to being an important part of the

1    indictment.  Let's say that there were -- I mean I haven't

2    counted them, Judge, but I think --

3                MR. GOLDBERG:  70.

4                MR. O'SHEA:  How many?

16:37:27   5                MR. GOLDBERG:  76.

6                THE COURT:  Regardless, just quickly state

7    your basis.

8                MR. O'SHEA:  Let's say there were 76 felonious

9    assaults that had happened, and that the Government or the

16:37:38  10    Prosecution wanted to use a chart and say this is an exhibit

11    rather than the testimony and the recollection of the

12    witness.  I just don't think it's appropriate.

13                THE COURT:  I am not allowing it.  Certainly,

14    it can be used during closing argument as demonstrative

16:37:55  15    evidence, summary, et cetera, but it's -- it's not coming in

16    as an actual exhibit.

17                MR. LEVINE:  Okay.

18                THE COURT:  1443, 1442.

19                MR. LEVINE:  Yes.

16:38:10  20                THE COURT:  1444, 1445, 1446, 1447.

21                MR. O'SHEA:  Can we go back a little bit?

22                THE COURT:  Yes.

23                MR. O'SHEA:  Let's start with the first one

24    you talked about, Judge.  Was that 1447?

16:38:41  25                THE COURT:  Well, no, after the exhibit I'm

783

1       not allowing, which is 1441, I said 1443.  I'm doing them in

2       the order in which they came up in trial.

3                       MR. O'SHEA:  And, Judge, so you know, I'm a

4       little slow to react because --

16:38:56 5              THE COURT:  That's fine.  I'll slow down.

6                       MR. O'SHEA:  Okay.

7                       THE COURT:  I said before, if I'm going too

8       fast, just raise your hand and I'll slow down.

9                       MR. O'SHEA:  Okay.  Can I see -- what was the

16:39:06 10     first one you said, Judge, after 1441?

11                      MR. GOLDBERG:  1443.

12                      MR. O'SHEA:  Can I see 1443?

13          I don't have an objection.

14                      THE COURT:  1442?

16:39:26 15                     MR. O'SHEA:  Can I see?

16                      MR. GOLDBERG:  That's the map.

17                      MR. O'SHEA:  No objection.

18                      THE COURT:  Again, these were all shown.  So

19      if I -- you don't even have to say that.  I'm going to just

16:39:35 20     keep going unless I hear objection.

21          1444?

22                      MR. O'SHEA:  Can I see that?

23                      THE COURT:  1445.  1446.  1447.

24                      MR. O'SHEA:  Judge, I personally can't recall

16:40:21 25     whether the jury actually saw this and in this format.  But,

1    you see how at the top it has Omurchu?

2              THE COURT:  They -- they were shown it.

3              MR. O'SHEA:  But I don't think they were shown

4    the top.  I think we argued about that.

16:40:38 5              MR. McDONOUGH:  You're --

6              MR. LEVINE:  The top should be redacted.  The

7    way we handled it live was zoom in so they never saw the

8    top.

9              THE COURT:  That's right.

16:40:46 10              MR. LEVINE:  So we will --

11              THE COURT:  If it's redacted and produced in

12    the same fashion as it was shown, any objection, Mr. O'Shea?

13              MR. O'SHEA:  No.

14              THE COURT:  And, Mr. Goldberg?

16:40:56 15              MR. GOLDBERG:  No.

16              THE COURT:  All right.

17         So Mr. Levine, Mr. Duncan -- I mean Mr. Brown, one of

18    you will make sure that's redacted?

19              MR. BROWN:  Headers, yes, your Honor.

16:41:10 20              THE COURT:  Yes.  I should be talking to Ms.

21    Chandler back there.

22              MR. BROWN:  She'll do it and we'll take the

23    credit, your Honor.

24         (Laughter.)

16:41:18 25              THE COURT:  1448, 1449, and 1450, that ends

785

         1    yesterday's.  All right.  Now today, 2216, 2219.

         2              MR. GOLDBERG:  Can you give me one minute,

         3    Judge?

         4              THE COURT:  Yes.

16:42:24 5              MR. GOLDBERG:  No objection.

         6        There's some handwriting on there that wasn't

         7    discussed.  Probably the witness probably wrote it on here.

         8    Correct?

         9              MR. BROWN:  Correct.  We can pull that off.

16:42:37 10             MR. GOLDBERG:  All right.  So with that

        11    redaction, I have no objection.

        12             MR. BROWN:  19?

        13             MR. GOLDBERG:  2216.

        14             THE COURT:  Mr. O'Shea, you're good?

16:42:47 15             MR. O'SHEA:  I'm good.  Thank you, Judge.

        16             MR. BROWN:  I think it says eBay, yeah.

        17             THE COURT:  Okay.  The handwriting will be

        18    redacted.  2219, 2220, 2218.  2215.  2207.  1406.  2212.

        19    1733 -- sorry.

16:43:58 20             MR. McDONOUGH:  Excuse me.  For 1733, just

        21    Page 12 was the relevant one for Donna Wolfe.

        22             MR. O'SHEA:  Yeah.  Why don't we just hold off

        23    in admitting 12 for now because there's other -- right,

        24    there's other people that are going to testify?  And if

16:44:24 25    you're only offering for right now Page 12, which is what I

1    circled too, I'm fine admitting Page 12, but I assume they

2    might want to do more of it later.  So I'll do it.  However

3    we want to do it.

4                THE COURT:  You don't want to offer it now,

16:44:38  5    you don't have to.

6                MR. McDONOUGH:  No, at this time, I'm just

7    offering Page 12.

8                THE COURT:  All right.

9                MR. McDONOUGH:  Of Exhibit --

16:44:46 10                THE COURT:  All right.  2253.

11                MR. O'SHEA:  Judge, I was writing these down

12    as they happened.  It looks like they only show of 2253

13    Pages 7, 8, 9, 10, 12, 13, 14 and 15 through 20.

14                THE COURT:  And I'm assuming you're only

16:45:08 15    offering what you showed.

16                MR. McDONOUGH:  That is correct, your Honor.

17    And I would be happy for 2253 to -- I know at one point

18    during the direct, I ended up cutting some.  So I would be

19    happy to provide the Court, if we could revisit that --

16:45:28 20    those pages from 2253 and the pages from 1735, I would offer

21    everything that I showed.

22                MR. BROWN:  I was taking notes on that, too.

23    And I think Mr. O'Shea probably missed a few but we can sit

24    down and --

16:45:43 25                THE COURT:  Are you going to be using them

                    1    with any other witness?

                    2                MR. McDONOUGH:  With those -- no, your Honor.

                    3                THE COURT:  All right.  Let's be specific.

                    4    2253.  What pages?

16:45:56  5                MR. BROWN:  2, 3, 4, 5, 7, 8, 9, 10, 11, 12,

                    6    13, 14, 15, 16, 17, 18, 19, 20, then I've got 133.

                    7                THE COURT:  I'm sorry?

                    8                MR. BROWN:  Sorry, 21, 22, 23, 24, 25, 27, 34,

                    9    51, 36, 52, 37, 38.

16:46:51 10                THE COURT:  37?

                  11                MR. BROWN:  37, yeah.  I'm sorry.  These were

                  12    the ones where they were going back and forth.  They're kind

                  13    of --

                  14                THE COURT:  All right.

16:46:59 15                MR. BROWN:  Yeah, 37, 38, 53, 54, 39, 55, 56,

                  16    40, 57.

                  17                MS. CHANDLER:  Slow down a minute.

                  18                MR. BROWN:  Sorry.

                  19                MS. CHANDLER:  55, 56?

16:47:17 20                MR. BROWN:  40, 57, 41, 42, 44, 45, 46.

                  21                THE COURT:  How many more do you have?

                  22                MR. BROWN:  Maybe eight.

                  23                THE COURT:  You know what, let's do this.

                  24    You -- you put together 2253 and 1735, the pages that you

16:47:49 25    are offering, and then show them to opposing counsel, and

| | |
|---|---|
| 1 | I'm just going to indicate they're offered and admitted. If |
| 2 | there's any issues, we can re-address them. |
| 3 | MR. BROWN: We'll e-mail that tonight, your |
| 4 | Honor. |
| 16:48:06 5 | THE COURT: Okay. |
| 6 | 1451, 52, 53. |
| 7 | MR. O'SHEA: I'll catch up with you if I may. |
| 8 | THE COURT: Sure, sure. |
| 9 | MR. O'SHEA: I'm caught up, Judge. |
| 16:48:45 10 | THE COURT: All right. 54, 1454. 55. 56. |
| 11 | 57. 58. 59. And 60. And then 1409. |
| 12 | MR. O'SHEA: How many pages is 1409? |
| 13 | THE COURT: I know I did not allow a part of |
| 14 | 1409. So I'll have to redact that. |
| 16:49:31 15 | MR. LEVINE: We will redact that portion, your |
| 16 | Honor. |
| 17 | MR. O'SHEA: Judge, for the record, when it |
| 18 | comes to this, I don't know if you want to discuss it now, |
| 19 | but these references starting on Page 2, all the way to the |
| 16:49:42 20 | end, about white trash, stupid, smart, educated, has nothing |
| 21 | to do with the case. |
| 22 | THE COURT: Okay. Those -- all of that has |
| 23 | already been shown to the jury. Am I correct? |
| 24 | MR. O'SHEA: It was. |
| 16:49:54 25 | THE COURT: Okay. I just want to make sure |

1     there's nothing I haven't seen.

2          I think your objection's already been noted and I

3     overruled it.  I am going to allow it.

4                    MR. O'SHEA:  Okay.

16:50:05 5              MR. GOLDBERG:  And just for the record,

6     Nicolescu objects to this exhibit.

7                    THE COURT:  Fair enough.

8          On behalf of the Government, I don't believe there

9     were any other exhibits discussed yesterday or today.  Did I

16:50:22 10    miss anything?

11                    MR. LEVINE:  I think that's right.  We will

12    review our records and confirm.

13                    THE COURT:  If Sue says I'm right, I'm right.

14         (Laughter.)

16:50:32 15              THE COURT:  Mr. Goldberg, did I miss anything?

16                    MR. GOLDBERG:  I don't think so, Judge.

17                    MR. O'SHEA:  I defer to Mr. Goldberg.

18                    THE COURT:  All right.

19                    MR. GOLDBERG:  As usual.

16:50:40 20         (Laughter.)

21                    THE COURT:  We'll see you tomorrow morning

22    then.

23                    MR. BROWN:  Thank you, your Honor.

24                    MR. McDONOUGH:  Thank you, your Honor.

16:50:45 25         (Proceedings adjourned at 4:50 p.m.)

238February 13, 2020

790

```
1    CROSS-EXAMINATION OF LIAM OMURCHU          556

2    CROSS-EXAMINATION OF LIAM OMURCHU          592

3    REDIRECT EXAMINATION OF LIAM OMURCHU       617

4    RECROSS-EXAMINATION OF LEE OMURCHU         632

5    RECROSS-EXAMINATION OF LIAM OMURCHU        642

6    REDIRECT EXAMINATION OF LIAM OMURCHU       651

7    REDIRECT EXAMINATION OF LIAM OMURCHU       652

8    RECROSS-EXAMINATION OF LIAM OMURCHU        654

9    DIRECT EXAMINATION OF DANIEL SAAVEDRA      661

10   CROSS-EXAMINATION OF DANIEL SAAVEDRA       681

11   DIRECT EXAMINATION OF DONNA WOLFE          682

12   CROSS-EXAMINATION OF DONNA WOLFE           730

13   DIRECT EXAMINATION OF WILLIAM HANNON       739

14   CROSS-EXAMINATION OF WILLIAM HANNON        776
```

16              C E R T I F I C A T E

17          I certify that the foregoing is a correct

18   transcript from the record of proceedings in the

19   above-entitled matter.

23   s/Shirle Perkins_____
     Shirle M. Perkins, RDR, CRR
24   U.S. District Court - Room 7-189
     801 West Superior Avenue
25   Cleveland, Ohio 44113
     (216) 357-7106