```
 1                    IN THE DISTRICT COURT OF THE UNITED STATES
                        FOR THE NORTHERN DISTRICT OF OHIO
 2                            EASTERN DIVISION

 3
      UNITED STATES OF AMERICA,      )
 4                                   )
                   Plaintiff,        )    Judge Gaughan
 5                                   )    Cleveland, Ohio
             vs.                     )
 6                                   )    Number 1:16CR224
      BOGDAN NICOLESCU,              )
 7    RADU MICLAUS,                  )
                                     )
 8            Defendants.

 9

10                           - - - - -
11              TRANSCRIPT OF PROCEEDINGS HAD BEFORE

12            THE HONORABLE PATRICIA ANNE GAUGHAN

13                   JUDGE OF SAID COURT,

14              ON FRIDAY, MARCH 29, 2019

15                        Volume 5
                         - - - - -
16

17

18

19    Official Court Reporter:        Shirle M. Perkins, RDR, CRR
                                      U.S. District Court
20                                    801 West Superior, #7-189
                                      Cleveland, OH 44113-1829
21                                    (216) 357-7106

22

23

24    Proceedings recorded by mechanical stenography; transcript
      produced by computer-aided transcription.
25
```

```
 1    APPEARANCES:

 2


 3    For the Government:            DUNCAN T. BROWN,
                                     BRIAN MCDONOUGH,
 4                                   Assistant U.S. Attorneys
                                     801 West Superior Avenue
 5                                   Cleveland, OH 44113
                                     (216) 622-3600
 6
                                     BRIAN LEVINE,
 7                                   U.S. Department of Justice -
                                     Criminal Division
 8                                   Ste. 600
                                     1301 New York Avenue
 9                                   Washington, DC 20530
                                     (202) 616-5227
10
      For Bogdan Nicolescu:         MICHAEL GOLDBERG, ESQ.,
11                                   Goldberg & O'Shea
                                     Suite 450
12                                   323 Lake Place
                                     Cleveland, OH 44113
13                                   (216) 696-4514

14    For Radu Miclaus:             MICHAEL J.  O'SHEA, ESQ.,
                                     Lipson O'Shea
15                                   110 Hoyt Block Bldg.
                                     700 West St. Clair Avenue
16                                   Cleveland, OH 44113
                                     (216) 241-0011

17

18

19

20

21

22

23

24

25
```

1      FRIDAY SESSION, MARCH 29, 2019, AT 8:39 A.M.

2                  THE COURT:  Good morning, ladies and

3      gentlemen.  Please be the seated.  Call your next witness.

4                  MR. McDONOUGH:  Your Honor, the United States

09:14:59 5     of America would call Donald Patterson.

6                  THE COURT:  Please step up to the podium, sir.

7      And please raise your right hand.

8                           DONALD PATTERSON,

9          of lawful age, a witness called by the GOVERNMENT,

10                  being first duly sworn, was examined

11                      and testified as follows:

12            DIRECT EXAMINATION OF DONALD PATTERSON

13     BY MR. McDONOUGH:

14     **Q.**    Good morning.  That seat, you can adjust it and you

09:15:47 15    can slide that microphone in front of you.

16            Could you please state your name and spell your name

17     for the benefit of our Court Reporter?

18     **A.**    The name is Donald Patterson.  D-O-N-A-L-D,

19     P-A-T-T-E-R-S-O-N.

09:16:03 20    **Q.**    By whom are you employed?

21     **A.**    Employed by Doyle Chevrolet.

22     **Q.**    In what capacity?

23     **A.**    I'm a general sales manager.

24     **Q.**    Where is Doyle Chevrolet?

09:16:15 25    **A.**    Western New York.

Patterson - Direct/McDonough

1    **Q.**    And how long have you been a general sales manager at

2    Doyle Chevrolet in New York?

3    **A.**    Seven years.

4    **Q.**    Prior to being a general sales manager, where did you

09:16:31 5    work?

6    **A.**    I worked at a dealership called Bob Johnson Chevrolet

7    for 23 years.

8    **Q.**    And what did you do at the Bob Johnson dealership?

9    **A.**    My last position was general sales manager there.

09:16:42 10    **Q.**    Same job, general sales manager?

11    **A.**    Yes.

12    **Q.**    What kind of -- what dealership was that?

13    **A.**    Bob Johnson Chevrolet.

14    **Q.**    Oh, Bob Johnson Chevrolet.  Chevy and Chevy.  Prior to

09:16:53 15    Bob Johnson Chevrolet, what did you do?

16    **A.**    I worked for Wegman's Food Markets.

17    **Q.**    Okay.  What did you do for the Wegman's Food Markets?

18    **A.**    Last position was a produce manager.

19    **Q.**    All right.

09:17:07 20       What are your duties and responsibilities as a general

21    sales manager at the Chevy dealership?

22    **A.**    I'm in charge of all sales at the dealership.  Sales

23    manager, sales people, hiring, firing.

24    **Q.**    Okay.

09:17:24 25       Can you tell us a little bit about your educational

1     background?

2     **A.**     Graduated from high school and went and had

3     associate's degree in marketing from a Community College.

4     **Q.**     Okay.  Now, where is Webster, New York?

09:17:41  5     **A.**     That is a northeastern suburb of Rochester.

6     **Q.**     How did you get from the suburb of Rochester to

7     beautiful Cleveland, Ohio?

8     **A.**     I drove.

9     **Q.**     Okay.

09:17:52  10         Are you familiar with eBay?

11     **A.**     Yes.

12     **Q.**     How are you familiar with eBay?

13     **A.**     Well, I made one and one only purchase on eBay, and it

14     turned out to be a fraudulent purchase.

09:18:09  15     **Q.**     Okay.  I want to take you back to July of 2013.

16         Did you have a computer?

17     **A.**     Yes, I did.  I had a laptop at home.

18     **Q.**     Okay.

19         And by the way, do you have a family at home?

09:18:28  20     **A.**     Yes, I do.  I have a wife and three children.

21     **Q.**     Okay.  How old are your three kids?

22     **A.**     29, 32 and 35.

23     **Q.**     And what do your three children do?

24     **A.**     My oldest is a teacher.  My middle one is a social

09:18:42  25     worker and runs a group home, and my youngest son is a

1    mechanic.

2    **Q.**    Okay.  And your child is a teacher.  What kind of

3    teacher?

4    **A.**    Elementary education, special ed.

09:18:52  5    **Q.**    And your child who's a social worker for a group home,

6    what type of group home?

7    **A.**    It's a group home for functioning adults to get them

8    into the community.

9    **Q.**    All right.  And your son, who is a mechanic?

09:19:04  10    **A.**    It's an auto mechanic at a local car dealership.

11    **Q.**    Chevy?

12    **A.**    It is Chevy also, yes.

13    **Q.**    All right.

14    **A.**    We're a Chevy family.

09:19:13  15         (Laughter.)

16    **Q.**    All right.  And your wife, what does she do?

17    **A.**    She's a fine dining server.

18    **Q.**    All right.

19         So going back to July, 2013, for what purpose were you

09:19:28  20    going on eBay?

21    **A.**    I had -- just on eBay Motors looking at cars.

22    **Q.**    Okay.

23         What kind of cars were you looking for?

24    **A.**    I had found a '68 Chevy Camaro, yellow black vinyl

09:19:44  25    top, something that -- a car I always dreamed of.

Patterson - Direct/McDonough

1     **Q.**   Okay.

2          Did you have a Chevy Camaro, a '68 Chevy Camaro at the

3     dealership?

4     **A.**   No, we didn't.

09:19:53 5   **Q.**   Okay.  What was your first car?

6     **A.**   Actually a '68 Chevy Impala.

7     **Q.**   '68 Chevy Impala.  Okay.

8          How did you find the '68 Chevy Camaro on eBay?

9     **A.**   I was just going -- as I went on to eBay Motors, I

09:20:15 10   found vehicles and had seen this car and brought that up,

11    looked at pictures, and just kind of interested me and was

12    just kind of looking at it for about a week.

13    **Q.**   Okay.  Did that auction end?

14    **A.**   Yes, it did.

09:20:30 15   **Q.**   Did you have to create an account on eBay Motors?

16    **A.**   When I purchased, I did.

17    **Q.**   Okay.

18         So for -- when initially when that auction expired,

19    you saw it, and the auction expired?

09:20:46 20   **A.**   Yeah.  As I was doing research on it, there was a key

21    contact seller, and I had e-mail response with seller going

22    back and forth.

23    **Q.**   Okay.

24         You e-mailed the seller or they e-mailed you?  How did

09:21:04 25   that work?

Patterson - Direct/McDonough

1    **A.**    I e-mailed the seller and the seller e-mailed me back.

2    **Q.**    Did you get a response from that seller?

3    **A.**    Yes, we had a little bit of conversation about the

4    car.

09:21:15 5    **Q.**    What questions did you have for the seller?

6    **A.**    Just condition of the car and just trying to find out

7    a little more information about it.

8    **Q.**    What was the response from the seller to your

9    questions?

09:21:27 10    **A.**    Well, pretty positive, you know, just that they needed

11    to sell the car, they needed the money, starting a family

12    type deal and needed to sell the car.

13    **Q.**    All right.  Did you receive any pictures?

14    **A.**    Yes.

09:21:42 15    **Q.**    Pictures from whom?

16    **A.**    From the seller.

17    **Q.**    All right.  Do you recall the name of the seller?

18    **A.**    The name on eBay was Bolt Posi, which for a car bought

19    I, forget that's a fitting name.  And the e-mail address was

09:22:00 20    KarenWheeler@aol.com.

21    **Q.**    The seller's name was Bolt Posi.  That's B-O-L-T,

22    space P-O-S-I?

23    **A.**    Yeah, Bolt Posi '99.

24    **Q.**    Okay.

09:22:14 25    And you mentioned having something to do with a car?

Patterson - Direct/McDonough

1    **A.**    Yes.  The car is also looking at Positraction.

2    **Q.**    Positraction?

3    **A.**    Yes.

4    **Q.**    What's Positraction?

09:22:26  5    **A.**    It's basically a limited slip differential where the

6    rear wheels will go with the same time as the fuel-slip.

7    **Q.**    And the e-mail address was an e-mail address at

8    aol.com?

9    **A.**    Right.

09:22:43  10    **Q.**    All right.

11        Did you have an opportunity to purchase the '68 Chevy

12    Camaro?

13    **A.**    After I let the auction expire, you always have second

14    thoughts, "I should have done that or not," and I received

09:23:04  15    an e-mail saying the car -- from the seller saying the car

16    was going to go back on eBay on July 3rd or 4th.

17    **Q.**    Okay.

18    **A.**    And if I was still interested in it, you know.  And I

19    said yeah, actually I was.  Asked a couple more questions,

09:23:20  20    and based on more pictures, reviewed the pictures and had

21    made a decision to myself when it goes back on that I would

22    buy it.

23    **Q.**    Did you attempt to purchase the car?

24    **A.**    Yes, I did.

09:23:33  25    **Q.**    And did you put a bid on it or did you do something

1    else?

2    **A.**    They put it in there at a "buy it now" price, and on

3    July 4th, I hit "buy it now."

4    **Q.**    Okay.

5         Do you recall what the "buy it now" price was for the

6    '68 Chevy Camaro?

7    **A.**    $7800.

8    **Q.**    Okay.  Was that a good deal?

9    **A.**    Yes.

10   **Q.**    How good of a deal was it?

11   **A.**    Depending on condition, like the car has a huge

12   reference what it could be worth, I didn't expect the car to

13   be perfect.  I figured the condition it was going to be in,

14   that it would probably be worth about $15,000.

15   **Q.**    Okay.

16        What was your intent for the use of the '68 Chevy

17   Camaro?

18   **A.**    Put it in the garage.  Drive it now and then.

19   **Q.**    Okay.  All right.

20        Prior to this purchase, had you ever made a purchase

21   on eBay before?

22   **A.**    No.

23   **Q.**    What happened after you clicked the "buy it now"

24   button?

25   **A.**    I click "buy it now," put in my -- my information,

Patterson - Direct/McDonough

1    received information from them that the next process would

2    be that I would wire money to a seller's agent, the seller's

3    agent would hold the money, they would deliver the car

4    through a company called XCB Transport, and the -- when the

09:25:11  5    car arrived to me, then that agent would lease the funds to

6    the seller.

7    **Q.**   Okay.

8         How did you make the wire transfer for the purchase?

9    **A.**   I went to my local bank, which was ESL Federal Credit

09:25:26 10   Union, and I wired the money.

11   **Q.**   ES&L or ESL?

12   **A.**   ESL.

13   **Q.**   ESL Federal Credit Union?

14   **A.**   Yes, sir.

09:25:39 15   **Q.**   All right.

16        Is that -- where was that credit union located?

17   **A.**   It's located in Rochester, New York.  It is a credit

18   union that was opened by Eastment Kodak Corporation.

19   **Q.**   When did you go to your credit union?

09:25:58 20   **A.**   I went there the following day, which is July 5th.

21   **Q.**   How did you make the wire transfer?

22   **A.**   I took the money out of my account and transferred it

23   to Donna Wolfe, I believe was the agent's name, and it was

24   in Brooklyn, Ohio.

09:26:17 25   **Q.**   How did you get Donna Wolfe's name?

1    **A.**    I got it from this eBay, saying this would be the

2    seller's agent between me and the seller and who would

3    handle the money.

4    **Q.**    Did you get Donna Wolfe's bank account information?

09:26:36   5    **A.**    Yes, I did.

6    **Q.**    Did you provide all the information to your credit

7    union?

8    **A.**    Yes, I did.

9    **Q.**    Did you get a receipt from your credit union?

09:26:43  10    **A.**    Yes, I did.

11    **Q.**    Sue, may we have Exhibit 1734, please, Page 1?

12              MR. McDONOUGH:  May I approach the witness,

13    your Honor?

14              THE COURT:  You may.

09:27:48  15    **Q.**    Showing you what's been marked for identification

16    purposes as Government's Exhibit 1734, do you recognize

17    this?

18    **A.**    Yes, I do.

19    **Q.**    What is it?

09:27:57  20    **A.**    That is my receipt for my wire transfer, total amount

21    of $7878.50, which went from my account to Donna Wolfe's

22    account.

23    **Q.**    Okay.

24              Is your residence listed on there?

09:28:17  25    **A.**    Yes, it is.

1   **Q.**   Okay.

2        And what city is your residence?

3   **A.**   Webster, New York.

4   **Q.**   Is the ESL Credit Union location listed on there?

09:28:29  5   **A.**   Chestnut Street, Rochester.

6   **Q.**   Handwriting on there?

7   **A.**   Yes, my handwriting.

8   **Q.**   You recognize that?

9   **A.**   Yes, I do.

09:28:36 10   **Q.**   What does that handwriting indicate?

11   **A.**   It was just notes to myself, the phone number for EBay

12   Motors, invoice number for the vehicle, and the item number,

13   which was the '68 Chevy Camaro.

14   **Q.**   Okay.

09:28:55 15        Did you have to send any faxes regarding this wire

16   transfer?

17   **A.**   Yes.

18        After I sent the wire transfer, I was informed that I

19   should fax the receipt to EBay Motors and that is the

09:29:16 20   866-929-3886 number.

21   **Q.**   That's a fax number?

22   **A.**   Yes.

23   **Q.**   Who told you to fax this to EBay Motors?

24   **A.**   Again, it was on the instructions on the computer from

09:29:25 25   eBay.

Patterson - Direct/McDonough

1    **Q.**    And that would have been both the seller Bolt Posi or

2    the Karen Wheeler@aol.com?

3    **A.**    Correct.

4    **Q.**    All right.

09:29:39 5            When were you to receive the '68 Chevy Camaro?

6    **A.**    On or about by July 16th.

7    **Q.**    Were you provided instructions regarding the delivery

8    of the Camaro?

9    **A.**    Yes, I was -- the company's name was XCB Transport,

09:29:57 10   and they were going to deliver the car to my house.  I did

11   go online and check out XCB Transport.  It had a nice

12   website.  They gave me a tracking number for the vehicle,

13   and they gave me updates when it was shipped and where it

14   was.

09:30:15 15   **Q.**    Were you able to track the vehicle as it was being

16   shipped?

17   **A.**    Yes, I was.

18   **Q.**    Did there come a point when you had concerns?

19   **A.**    Yeah, when the car didn't show up and I went online to

09:30:29 20   check the status, and the car was put on what they call a

21   seller's poll.

22   **Q.**    Where did you see the information that the car was on

23   a seller's poll?

24   **A.**    That would have been on the XCB Transport website.

09:30:44 25   **Q.**    Was there a phone number for XCB Transport?

Patterson - Direct/McDonough

1    **A.**    Yes, there was.

2    **Q.**    Did you call that phone number?

3    **A.**    Several times, and it always went to a voice mail.

4    **Q.**    You ever reach anybody?

5    **A.**    Never talked to anybody.

6    **Q.**    What was -- do you recall what the message was on the

7    voice mail?

8    **A.**    Just said, "Reached XCB Transport.  Please leave a

9    message, along with your tracking number with whatever your

10   concern was."

11   **Q.**    Was that voice a -- could you tell if it was a -- a

12   computer voice mail, a computer voice or human voice?

13   **A.**    Sounded like a computer voice, like a recording.

14   **Q.**    Could you tell if it was a male or female?

15   **A.**    Definitely male.

16   **Q.**    Okay.  Could you tell what language it was in?

17   **A.**    It's -- it sounded normal.

18   **Q.**    Okay.

19        You left a couple messages.  Did you get -- did you

20   have any contact with KarenWheeler@aol.com, the seller, Bolt

21   Posi?

22   **A.**    Yes, I received an e-mail from the seller saying that

23   they ran into a financial problem and could not pay the

24   transport company, and that I was going to receive an

25   automatic refund from eBay, but if I still wanted the car, I

Patterson - Direct/McDonough

1    could send them $500 less and still purchase the car.

2    **Q.**   You were instructed that eBay was going to refund you?

3    **A.**   Correct, and it couldn't be stopped because the check

4    was already in the mail.

09:32:29  5    **Q.**   The check was in the mail?

6    **A.**   Yes.

7    **Q.**   How long was the eBay -- or the refund check from eBay

8    supposed to get to you?

9    **A.**   They said five to seven days.

09:32:41 10    **Q.**   Okay.

11         And you mentioned you had an opportunity to -- for a

12    $500 discount?

13    **A.**   Yes, they offered me, said my money was already coming

14    back to me.  They didn't have money to ship the car.  If I

09:32:54 15    wanted to purchase it, I could purchase it for $500 less,

16    and rewire the money.

17    **Q.**   Send another wire transfer to the seller?

18    **A.**   Correct.

19    **Q.**   For $500 less?

09:33:05 20    **A.**   Correct.

21    **Q.**   Which would have been?

22    **A.**   $7300.

23    **Q.**   Okay.  So a total of?

24    **A.**   The first 78 and then 73 more.

09:33:17 25    **Q.**   14?

Patterson - Direct/McDonough

**A.**    51.

**Q.**    $15,000.  Did you do a second wire transfer?

**A.**    No, at that point, obviously, I was becoming a little suspicious of what was going on.

09:33:28 **Q.**    Okay.  What did you do?

**A.**    I decided maybe you know, try and find -- which is not an easy thing to do, find a phone number to talk to a person at eBay and --

**Q.**    Did you contact eBay?

09:33:44 **A.**    Yes, I did.

**Q.**    Okay.  What did -- what did you tell eBay?

**A.**    I told eBay that I had to purchase the car on one of their auctions, and I gave them an item number, and they said well --

09:34:01 **Q.**    No.  Without telling me what they said, they provided you with information?

**A.**    Yes, they did.

**Q.**    Based on that information, what did you do?

**A.**    Based on that information, I realized that I had been

09:34:15 a victim of some sort of scam, and I called the Webster Police Department.

**Q.**    Did you make a report at Webster Police Department?

**A.**    Yes, I did.

**Q.**    Do you know someone by the name of Officer Shane

09:34:33 Conrad?

1  **A.**    Yes.  Officer Conrad came to my house and filled out a

2  report.

3  **Q.**    The police came out to your house?

4  **A.**    Yes, they did.

09:34:41 5  **Q.**    Okay.

6          Did you provide Officer Conrad with all your info?

7  **A.**    Yes, I did.

8  **Q.**    Yes or no, did the police provide you with any advice?

9  **A.**    Yes.

09:34:53 10  **Q.**    Based on that advice, what did you do?

11  **A.**    I went online to a website called IC3, which is an

12  Internet crime website and filled out a report, saying I was

13  a victim.

14  **Q.**    Did you provide all the information again on the

09:35:17 15  IC3.gov website on a complaint form?

16  **A.**    Yes, I did.

17  **Q.**    Okay.

18          Were you able to go back to the XCB Transport auto

19  transport site?

09:36:14 20  **A.**    At the time this was going on, yes, that site was

21  still open and still running.

22  **Q.**    Okay.

23          Did you ever receive your $7878.50 back?

24  **A.**    No, sir.

09:36:27 25  **Q.**    And to this day, have you ever gone back on the eBay

1    website?

2    **A.**    No, not a chance.

3    **Q.**    Okay.

4              MR. McDONOUGH:  No further questions.

09:36:37  5         THE COURT:  Cross-examination, Mr. Goldberg.

6              MR. GOLDBERG:  Thank you.  A couple questions,

7    Mr. Patterson.  Good morning.

8              CROSS-EXAMINATION OF DONALD PATTERSON

9    BY MR. GOLDBERG:

09:36:48 10   **Q.**    Did you ever, in trying to resolve this problem,

11   access the chat -- any chat application with eBay Live?

12   **A.**    Yes.

13   **Q.**    Did you save a record of those chats?

14   **A.**    At the time it happened, I had a record of those

09:37:07 15  chats.  I do not have that anymore.

16   **Q.**    And with regard to the various actions you took to

17   make this purchase, did you save any of the web pages or any

18   of the screenshots from any of that process?

19   **A.**    I do not have any of those.

09:37:29 20       Back to the web chat, I did do several chats when I

21   was looking for the car and also found out that there's no

22   such thing as eBay Chat or a web chat with eBay.

23   **Q.**    Okay.  But you didn't keep any of that?

24   **A.**    No, sir.

09:37:43 25  **Q.**    And you said that you went to some -- to a website.  I

Patterson - Cross/Goldberg

1    forgot the name of it, the shipping company.  Did you -- did

2    you take a web -- take a screenshot of that website?

3    **A.**    No, I did not take a screenshot.

4    **Q.**    Did the Webster police or anybody ask to look at your

09:38:09  5    computer?

6    **A.**    No, sir.

7                    MR. GOLDBERG:  Thank you.  Nothing further.

8                    MR. O'SHEA:  No questions.

9                    MR. McDONOUGH:  I have nothing based on that,

09:38:20 10    your Honor.

11                    THE COURT:  You may step down, sir.  Watch

12    your step.

13                    THE WITNESS:  Thank you.

14                    THE COURT:  Call your next witness.

09:38:29 15                    MR. LEVINE:  The United States of America

16    calls Eoin Miller.  Eoin Miller.

17                    THE COURT:  Please step up to the podium, sir.

18    And please raise your right hand.

19

20

21

22

23

24

25

Miller - Direct/Levine

1                    ROBERT EOIN MILLER,

2         of lawful age, a witness called by the GOVERNMENT,

3               being first duly sworn, was examined

4                    and testified as follows:

09:39:25 5          DIRECT EXAMINATION OF ROBERT EOIN MILLER

6    BY MR. LEVINE:

7    **Q.**    Good morning, Mr. Miller.

8    **A.**    Good morning.

9    **Q.**    Would you please state and spell your name for the

09:39:51 10  record.

11   **A.**    Sure.  It's Robert Eoin Miller, E-O-I-N is how I spell

12   Eoin.

13   **Q.**    E-I-O-N?

14   **A.**    E-O-I-N.

09:40:01 15  **Q.**    E-O-I-N.  Okay.

16               THE COURT:  Wait.  What?  E-O-I-N.  Thank you.

17               THE WITNESS:  Yes.

18   **Q.**    All right.

19               THE COURT:  And, sir, I'm sorry.  Your first

09:40:07 20  name is Robert?

21               THE WITNESS:  Yes, ma'am.

22               THE COURT:  Thank you.

23   **Q.**    Between 2011 and 2015, did you work for a company

24   called America Online?

09:40:20 25  **A.**    Yes, sir.

Miller - Direct/Levine

1    **Q.**    Okay.  Is America Online sometimes referred to as AOL?

2    **A.**    Yes, sir.

3    **Q.**    During that time frame, was America Online trying to

4    collect information about the Bayrob Group?

5    **A.**    Yes, sir.

6    **Q.**    And did you assist in that collection effort?

7    **A.**    I did, indeed.

8    **Q.**    I'm sorry?

9    **A.**    I did, indeed.  Yes.

10   **Q.**    Okay.  Thank you.

11          Why during that time frame was AOL collecting

12   information about the Bayrob Group?

13   **A.**    Because they were performing crimes across our

14   network.

15   **Q.**    What crimes were they performing across your network?

16                   MR. GOLDBERG:  Objection.

17                   THE COURT:  Overruled.  You may answer.

18                   THE WITNESS:  They were selling vehicles that

19   didn't exist on eBay.

20   **Q.**    Okay.  Were they doing other types of things as well?

21   **A.**    Wire fraud that was associated to vehicles that didn't

22   exist.

23   **Q.**    Okay.  What was your job with AOL at the time?

24   **A.**    I was a member of the Computer Emergency Response

25   Team.

Miller - Direct/Levine

1  **Q.**   The Computer Emergency Response Team.  What is -- what

2  is the Computer Emergency Response Team?

3  **A.**   We deal in attempting to identify and eliminate

4  threats against our own network and also our clients and

09:41:41  5  customers.

6  **Q.**   Okay.  And what was -- what was your title?

7  **A.**   I was a senior security engineer, or sorry, principal

8  security engineer.

9  **Q.**   Principal security engineer?

09:41:56  10  **A.**   Yes, sir.

11  **Q.**   Is that right?

12       What does a principal security engineer do?

13  **A.**   Day to day was monitoring networks and identifying bad

14  things happening and attempting to stop them.

09:42:11  15  **Q.**   So when you say monitoring networks, are you referring

16  to the AOL network?

17  **A.**   Yes, sir.

18  **Q.**   And what do you mean by monitoring the network?

19  **A.**   We had devices that were set up to analyze and record

09:42:25  20  network traffic that was traversing our network.

21  **Q.**   By network trafficking, are you just referring to

22  Internet activity?

23  **A.**   Yes.

24  **Q.**   Now, how did you learn how to do this?  Had you worked

09:42:40  25  at other -- strike that.

Miller - Direct/Levine

1    How did you learn how to collect this kind of network

2    information?

3    **A.**    Self taught.

4    **Q.**    You taught yourself?

09:42:50 5    **A.**    Yes, sir.

6    **Q.**    Okay.

7    And had you done that with other companies besides

8    America Online?

9    **A.**    Yes, sir.

09:42:56 10    **Q.**    What companies have you done that for?

11    **A.**    Prior to AOL, I did it at a Department of Interior.  I

12    built out all the network security monitoring gear for them.

13    **Q.**    Okay.  Hold on.  You said the Department of Interior?

14    **A.**    Yes, sir.

09:43:13 15    **Q.**    Is that the United States Department of Interior?

16    **A.**    Yes, sir.

17    **Q.**    For those of us who don't know, what is the United

18    States Department of Interior?

19    **A.**    It is -- it's often referred to as the department of

09:43:26 20    everything else.  Quite often, there's quite a few bureaus

21    within it, like Bureau of Land Management, Bureau of

22    Reclamation, Bureau of Indian Affairs.  I believe there's

23    about 12 or so bureaus, and we monitored about 80,000

24    federal employees and help stop, you know, break in attempts

09:43:48 25    from foreign governments and do investigations on that.

1    **Q.**    Okay.

2          And besides the US Department of Interior, did you do

3    this type of work at any other company prior -- company or

4    agency prior to coming to America Online?

09:44:03  5    **A.**    I believe yes, at Federal Home Loan Bank, quite a long

6    time ago when I was on the defensive side of things, very

7    long ago.

8    **Q.**    What was the -- what is the Federal Home Loan Bank?

9    **A.**    It's just a bank that deals with primarily, at least

09:44:23 10    at the office I was at, they just had like long-term and

11    short-term trading debts that would deal in bonds backing

12    home loans as far as I know.

13    **Q.**    Okay.

14          And what did you do while you were with the Federal

09:44:35 15    Home Loan Bank?

16    **A.**    I was an assist admin there.  So I did a lot of

17    desktop support and also built out the intrusion detection

18    system that would monitor the network to find infected

19    computers, and then I'd rebuild them.

09:44:49 20    **Q.**    What is an assist admin?

21    **A.**    A system administrator.  So just like help desk guy

22    that comes around and fix your computer for you or help you

23    change your password, stuff like that.

24    **Q.**    Okay.

09:44:59 25          And did you do any work for the department of defense?

Miller - Direct/Levine

1    **A.**    Yes.

2    **Q.**    What work did you do for the Department of Defense?

3    **A.**    I broke into systems for them before they were being

4    blessed to be deployed.

09:45:17  5    **Q.**    So they would ask you to break into their systems?

6    **A.**    Yes, sir.

7    **Q.**    Why would they ask you to break into their systems.

8    **A.**    To ensure that it wasn't easy or to help close any

9    holes potentially before they would put any information on

09:45:31 10    it that would be harmful to the Government if it closed?

11    **Q.**    And were you able to break into the Department of

12    Defense's systems?

13    **A.**    Nearly every time, yes.

14    **Q.**    So approximately when did you begin collecting

09:45:56 15    information on the Bayrob Group?

16    **A.**    I believe that was in 2013.

17    **Q.**    Okay.

18           And did you continue to collect information about the

19    Bayrob Group the entire time you were at America Online?

09:46:11 20    **A.**    Not the entire time, no -- or from that point forward?

21    **Q.**    From that point forward, yes.

22    **A.**    As it -- as it cropped up, yes.

23    **Q.**    Okay.  As it cropped up was your answer?

24    **A.**    Yes.

09:46:24 25    **Q.**    What do you mean by that?

1    **A.**    As we found more activity, we continued to collect

2    that information and store it.

3    **Q.**    Okay.

4         And as part of your collection, did you attempt to

09:46:35 5    record the Bayrob Group's activity on America Online?

6    **A.**    Yes.

7    **Q.**    How did you know when to hit the record button to

8    start recording their activity?

9    **A.**    We recorded all activity on our network.

09:46:48 10    **Q.**    All activity by who you suspected to be the Bayrob

11    Group?

12    **A.**    All activity as in all activity, period.

13    **Q.**    So -- how did you know which of that activity was

14    Bayrob Group?

09:47:02 15    **A.**    Based upon signatures that we developed in order to

16    identify accounts as being used by the Bayrob Group.

17    **Q.**    Okay.

18         If we could bring up Government's Exhibit 13 -- sorry

19    1732, please.  And if we could zoom in on the -- zoom in on

09:47:24 20    the -- Mr. Miller, what is this we're looking at here?

21    **A.**    These are Snort signatures.  Snort is an in intrusion

22    detection system.  So basically it looks at network traffic

23    and it looks for specific words.  And if that word is inside

24    of a network session, it will let us know that that

09:47:54 25    happened, and it will create a log of that occurring.

1   **Q.**   So does Exhibit 1732 contain the signatures that you

2   were looking for on the AOL network as being related to the

3   Bayrob Group?

4   **A.**   A subset of them or a portion of them, yes.

09:48:11 5   **Q.**   Okay.

6   **A.**   As it's displayed right now.

7   **Q.**   Okay.  If we were to look at the entire -- let me hand

8   you the entire exhibit which is two pages.  Does the entire

9   exhibit, two-page exhibit contain all of the signatures you

09:48:40 10   were using to search for the Bayrob Group or is that also

11   just a subset?

12   **A.**   No.  This appears to be it -- oh, no, yeah, this is it

13   in total, yes.

14   **Q.**   Okay.

09:48:51 15   So some of what we're seeing -- what are we seeing up

16   here on the screen in terms of which signatures are we

17   seeing up here right now?

18   **A.**   The majority of which are two account names that were

19   being used by the Bayrob Group.

09:49:08 20   **Q.**   Okay.

21   And if we can highlight this one.  Now was one of the

22   signatures that you were looking for Minolta9797 with an

23   "at" sign afterwards?

24   **A.**   Yes, sir.

09:49:29 25   **Q.**   And why were you looking for that signature?

1    **A.**    This was an online handle or name that was associated

2    with the Bayrob Group that we had identified.

3    **Q.**    And why is there just an "at" symbol but no suffix to

4    that like, GMX.com as we see lower?

09:49:51  5    **A.**    We had identified several accounts that had the same

6    user name but they would be at different domains.  So we

7    identified Minolta9797@yahoo.com, also at GMX.com and also

8    at AOL.com, for instance.  So depending -- since the actor

9    would continuously use the same user name, we wanted to be

09:50:13 10    able to identify that, regardless of domain name.

11    **Q.**    Okay.

12        And I want to show you another one of these.  If we

13    could highlight this one.  And what is this other signature

14    we're highlighting here?

09:50:34 15    **A.**    That would be the same type idea where we're looking

16    for RA101PUTIN at -- which is a user name that we identified

17    being involved in Bayrob Group activity, and we would create

18    a log of it whenever we saw that string or word being passed

19    over the network.

09:50:55 20    **Q.**    Okay.

21        And, again, you just end with an "at" symbol, is that

22    for the same reason you described for Minolta9797?

23    **A.**    Correct.

24    **Q.**    Okay.

09:51:08 25        And if we can zoom out a little bit.  And if we could

Miller - Direct/Levine

1    just zoom in at the -- so one of these -- highlight eBay

2    Live Chat entitled, what is that?

3    **A.**    That was for when the web page that would come back to

4    a user would include eBay Live Chat, like those specific

09:51:57  5    words inside of the title of a web page.

6    **Q.**    Okay.  And why did you have that alert?

7    **A.**    I believe that was for the page that would be used in

8    order to communicate with an infected user and impersonate

9    eBay.

09:52:15 10    **Q.**    Okay.  That was the page that the Bayrob Group used to

11    communicate?

12    **A.**    Yes, correct.

13    **Q.**    Okay.

14         And so some of the alerts you have here aren't tied to

09:52:26 15    specific e-mail addresses?

16    **A.**    Correct.

17    **Q.**    All right.

18         So if we could zoom out.  So the -- your network was

19    set to do what when any of these different filters were

09:53:06 20    triggered?

21    **A.**    Any time we saw any of these words being transmitted

22    between computers across our network, it would create a log

23    of it and log that specific instance and then send that log

24    to us so that we had knowledge that that occurred on our

09:53:02 25    network.

1   **Q.**   As a general matter, what type of things did you see

2   in the log that you -- that you received from this -- from

3   these alerts?

4   **A.**   I'm sorry.  You might need to be a bit more specific.

09:53:20  5   **Q.**   What type of activity, just generally, what type of

6   activity did you see in this log?

7   **A.**   This would be related to anything that was Bayrob

8   activity that we observed.

9   **Q.**   So, for example, did you see any botnet activity?

09:53:37 10           MR. GOLDBERG:  Objection.

11           THE COURT:  Sustained.

12   **Q.**   What kinds of activities did you see?

13   **A.**   We would see infected computers, the accessing of

14   command and control systems and just -- and also

09:53:55 15   e-mail-related traffic.

16   **Q.**   Okay.

17      I'd like to bring up what the Government has marked as

18   1739.  And what is Government's Exhibit 1739?

19   **A.**   This is the abbreviated -- sorry.

09:54:21 20   **Q.**   And keep going.

21   **A.**   Okay.

22      This is an abbreviated log of mail-related activity

23   that was observed transmitted across our network.

24   **Q.**   All right.

09:54:34 25      So when you say mail-related activity, are you

Miller - Direct/Levine

1    referring to e-mails?

2    **A.**    Yes.

3    **Q.**    Okay.

4         And were these all e-mails that were detected based on

09:54:44 5   the alert system we just looked at?

6    **A.**    Correct.

7    **Q.**    Okay.

8         And you -- if we zoom, if we could zoom all the way

9    out, what are the different fields we're seeing here?

09:55:02 10  Starting to the -- to -- the date there, is that the daily

11   e-mail?

12   **A.**    This would have been the date that the network

13   occurred.  So for the most part, yes.

14   **Q.**    It's the daily e-mail?

09:55:18 15  **A.**    Yes.

16   **Q.**    And the time there is time of e-mail?

17   **A.**    Yes.

18   **Q.**    And then you have -- what is that next column after

19   the time?

09:55:26 20  **A.**    That is an IP address, and then separated with a colon

21   and then the port number from the IP address that started

22   the network session.  So it's just like the source computer.

23   **Q.**    Okay.

24        So that's where the e-mail is coming from?

09:55:42 25  **A.**    Correct.

Miller - Direct/Levine

1    **Q.**    Okay.  And what is on the other side of that?

2    **A.**    That would be the destination mail server that the

3    client is transmitting the e-mail to.

4    **Q.**    So would that typically -- when you say the

09:55:55  5    destination mail server, would that typically be GMX.com and

6    gmail.com?

7    **A.**    Correct, yes.

8    **Q.**    And the "from" is the -- what is the "from" column

9    there?

09:56:06 10    **A.**    The "from" would be the from address in the e-mail

11    that is being sent.

12    **Q.**    And what is the "to" address?

13    **A.**    The "to" would be the to address that the e-mail is

14    being sent.

09:56:17 15    **Q.**    And what is the at -- the column begins S-U-B-J?

16    **A.**    That would be the subject of the e-mail that is being

17    sent.

18    **Q.**    Okay.

19        Now, what monikers -- what different monikers did you

09:56:40 20    see e-mailing each other, or rather, what different e-mail

21    addresses did you see e-mailing each other in this

22    Government's Exhibit?

23    **A.**    Most of them are -- all of them are related to Bayrob

24    Group activity, such as MasterFraud, AmightSA, Minolta9797,

09:56:59 25    and a handful of others.

1   **Q.**   Okay.

2       Now, this exhibit shows the subject line of messages.

3   In general, were you able to see the content of e-mails as

4   well?

09:57:11  5   **A.**   No.

6   **Q.**   Why not?

7   **A.**   The contents of the e-mails were encrypted.

8   **Q.**   What about any attachments to the e-mails, were they

9   usually encrypted?

09:57:23 10   **A.**   Usually, yes.

11   **Q.**   And was America Online encrypted?  There's e-mails or

12   attachments?

13   **A.**   No.

14   **Q.**   How did they get encrypted?

09:57:32 15   **A.**   They were encrypted by the people sending the e-mails.

16   **Q.**   How can one encrypt messages over a non- encrypted

17   e-mail server?

18   **A.**   Various types of software you can install, most

19   commonly PGP, and that one is for Pretty Good Privacy.

09:57:52 20       And basically, you share your -- you share your public

21   use with somebody else, and then you can encrypt a message

22   and send it to them and they can read it, but it can't be

23   read off line or in transit by anyone else without the keys.

24   **Q.**   And could you tell what type of encryption the Bayrob

09:58:11 25   Group was using in their e-mails?

Miller - Direct/Levine

1   **A.**   Yes.

2   **Q.**   What kind of encryption was it?

3   **A.**   PGP-based encryption.

4   **Q.**   Is that a type of encryption that you would -- America

09:58:21 5   Online had the ability to decrypt?

6   **A.**   No.

7   **Q.**   Was the Bayrob Group also having chats over America

8   Online?

9   **A.**   From what I can recall, yes.

09:58:32 10   **Q.**   And do you recall whether those chats were also

11   encrypted?

12   **A.**   Yes.

13   **Q.**   And you remember -- do you know what type of

14   encryption they were using for those chats?

09:58:44 15   **A.**   There was a piece of software referred to as an Off

16   the Record or OTR, and that would encrypt the message before

17   it was sent to the messaging server.

18   **Q.**   Okay.

19       So that's something -- that's not a part of AOL?

09:58:58 20   **A.**   No.

21   **Q.**   Someone would have to download that themselves?

22   **A.**   Yes.

23   **Q.**   Now, did the Bayrob Group ever transmit an e-mail

24   across America Online's network where the attachment was not

09:59:13 25   encrypted?

Miller - Direct/Levine

1  **A.**  Yes.

2  **Q.**  All right.

3  I'd like to bring up Government's Exhibit 1741.  What

4  is Government's Exhibit 1741?

09:59:41  5  **A.**  This is a copy of the network session that included an

6  e-mail attachment known as amounts.xls.

7  **Q.**  Is this the e-mail that contained the unencrypted

8  attachment?

9  **A.**  Yes.

09:59:59  10  **Q.**  Okay.  So if you would please highlight, Sue, the XLS.

11  Thank you, Sue.

12  Mr. Miller, could you please read the -- first of all,

13  what is the X-mailer?  What does that mean?

14  **A.**  That is an additional header that is added to an SMTP

10:00:27  15  session or network session.

16  **Q.**  Does that line show what mail program the person is

17  utilizing to send a message?

18  **A.**  Yes, it can, yes.

19  **Q.**  Can you read that X-mailer header for us?

10:00:39  20  **A.**  Sure.

21  It's Courier 3.50.00.09.1098 and then the URL for

22  rosecitysoftware.com.

23  **Q.**  Okay.  Thank you.

24  Now, what is the date that this e-mail was sent?

10:00:56  25  **A.**  This was sent on the -- on the 23rd of August.

Miller - Direct/Levine

1    **Q.**    Okay.

2    **A.**    Of 2013.

3    **Q.**    Okay.  And who sent the e-mail?

4    **A.**    The "from" address is RA101PUTIN@GMX.com.

10:01:16  5    **Q.**    And who is the recipient of the e-mail?

6    **A.**    It is AmightySA@gmail.com.

7    **Q.**    What is the subject line?

8    **A.**    The subject line is "Amounts Final."

9    **Q.**    Okay.

10:01:30 10           And was there -- you said there was an attachment that

11   is not encrypted?

12   **A.**    Correct.

13   **Q.**    Was there any text in the body of the e-mail itself?

14   **A.**    No.

10:01:43 15   **Q.**    Okay.

16           So if we could look at Page 23 of the exhibit.  And

17   actually, I'm sorry.  Before we do that, if you could just

18   scroll down.  Can you tell us Pages 121 to 22, it looks like

19   this, can you tell us what that is?

10:02:06 20   **A.**    This is the attachment to the e-mail with the file

21   name amounts.xls.

22   **Q.**    What does XLS mean?

23   **A.**    That is the common file extension for Excel

24   spreadsheet documents in Microsoft Word.

10:02:23 25   **Q.**    So Microsoft Excel?

Miller - Direct/Levine

1    **A.**    Yes.

2    **Q.**    How come that doesn't look anything like Microsoft

3    Excel?

4    **A.**    In order to transmit the file attachment, the e-mail

10:02:36  5    protocol will take the file and encode it in something

6    called Bate 64 Encoding, and that just helps -- that's how

7    this mail protocol operates and it will use that to then

8    transport the file attachment to the destination server.

9    **Q.**    So in order to see it the way we would normally see it

10:02:54 10    in Excel, do we have to look at in Excel, is that the idea?

11    **A.**    Yes.  You would have to take this long string and then

12    decode it and then save it as a dot XLS file and open it

13    with Microsoft Excel.

14    **Q.**    Okay.  Let's go to Page 23 of this exhibit now.  What

10:03:16 15    is Page 23 of Exhibit 1741?

16    **A.**    This is the amounts.xls spreadsheet as opened up with

17    Microsoft Excel.

18    **Q.**    Based on the information you collected about the

19    Bayrob Group over the course of your time at America Online,

10:04:08 20    do you have any understanding of what this spreadsheet is?

21    **A.**    Yes.

22    **Q.**    What is it?

23              MR. O'SHEA:  Objection.

24              THE COURT:  Sustained.

10:04:21 25    **Q.**    Okay.

Miller - Direct/Levine

1          In the first column of the spreadsheet, do we see

2     e-mail addresses?

3     **A.**     Yes.

4     **Q.**     And in the second column of the spreadsheet, what do

10:04:36 5    we see there?

6     **A.**     These are the names associated with the people that

7     own the e-mail addresses.

8                    MR. GOLDBERG:  Objection.

9                    THE COURT:  Sustained.

10:04:42 10   **Q.**     Just generally, what do you see?

11    **A.**     We see names of people.

12    **Q.**     Okay.  And then the next row, generally?

13    **A.**     Dollar amounts.

14                    MR. GOLDBERG:  Objection.

10:04:53 15   **Q.**     Okay.  And then?

16                    THE COURT:  Overruled.  That answer will

17    stand.

18    BY MR. LEVINE:

19    **Q.**     And then the next row, generally what do we see?

10:05:01 20   **A.**     Names of individuals.

21                    MR. GOLDBERG:  Objection.

22                    THE COURT:  I'll allow that.

23    **Q.**     Okay.

24          Let us go now to Page 24 of Government's Exhibit 1741.

10:05:21 25   Is this the end of the same spreadsheet?

Miller - Direct/Levine

**A.**   Yes.

**Q.**   All right.  Let's turn to Page 25.

What are we looking at on Page 25 of Exhibit 1741?

**A.**   Generally or specific row or --

**Q.**   Generally.

**A.**   Generally, it appears to be a ledger spreadsheet.

MR. GOLDBERG:  Objection.

THE COURT:  Sustained.

**Q.**   Is Page 25 another tab of the Excel worksheet attached to the e-mail we looked at?

**A.**   Yes.

**Q.**   Okay.

And based on your data collection at America Online, do the names in the left-hand side column have any meaning to you?

**A.**   Yes.

**Q.**   What do they mean to you?

MR. GOLDBERG:  Objection.

THE COURT:  Overruled.

THE WITNESS:  They are shorthand versions of other online handles that we had seen associated with the Bayrob Group.

**Q.**   What is an online handle?

**A.**   For instance, the -- like Minolta9797, MasterFraud, things of that nature that we'd seen in the previous exhibit

Miller - Direct/Levine

1    for the signatures, these are shorthand versions of those

2    same monikers.

3    **Q.**    Okay.  Thank you.  Now -- you can take this down?

4    Thank you, Sue.

10:07:18  5        I'd like to go to what's been previously marked as

6    Government's Exhibit 1740.  And if we could zoom in on just

7    the -- this last column.  And maybe I should get you the

8    whole exhibit but the question is generally, what is Exhibit

9    1740?

10:08:02 10  **A.**    This is the collection of -- or a shorthand log of all

11   the user names and passwords that were seen transmitted

12   across our network involving authentication to mail servers

13   by members of the Bayrob Group.

14   **Q.**    And what was the password for MasterFraud@GMX.com?

10:08:27 15  **A.**    Gimme Back, G-I-M-M-E, B-A-C-K.

16   **Q.**    The password for Minolta9797@aol.com?

17   **A.**    It was a Kill 66 Bill.

18   **Q.**    And --

19            THE COURT:  Did you say Kill 66 Bill?

10:08:46 20            THE WITNESS:  Yes, your Honor.

21            THE COURT:  Thank you.

22   BY MR. LEVINE:

23   **Q.**    Okay.

24        And if we can -- if we could move to this amount.

10:09:17 25  Okay.  Was this what you were collecting based on the

Miller - Direct/Levine

1    signatures that we looked at a little while ago here?

2    **A.**    Yes.

3    **Q.**    Now, regarding the Minolta9797@aol.com account, you

4    said the password was Kill 66 Bill, correct?

10:09:44 5    **A.**    Yes.

6    **Q.**    Did you see that password change over time or did it

7    stay Kill 66 Bill?

8    **A.**    It stayed that same value, yes.

9    **Q.**    Okay.

10:09:56 10          Did something significant in your investigation -- in

11    your data collection occur on May 13, 2013?

12    **A.**    Yes.

13    **Q.**    What happened on that day?

14    **A.**    We observed an attempt to log into web mail, with the

10:10:14 15    same password as we had seen previously with Minolta9797,

16    but this time, it was associated with a different e-mail

17    address.

18    **Q.**    Okay.  I'd like to bring up Government's Exhibit 1742.

19    And if we could just zoom in -- Mr. Miller, what is

10:10:48 20    Government's Exhibit 1742?

21    **A.**    This is an abridged version -- this is an abridged

22    version of web traffic that was observed.

23    **Q.**    And is this the web traffic you were just referring

24    to?

10:11:02 25    **A.**    Yes.

1    **Q.**    And when you say web traffic, you mean access over the

2    Internet on AOL?

3    **A.**    Yes, Internet browsing.

4    **Q.**    Okay.

10:11:14    5         And you said it's an abridged version.  So I'm going

6    to ask you does this exhibit fairly and accurately summarize

7    the Internet traffic you captured on May 13, 2013 that you

8    found significant?

9    **A.**    Absolutely.

10:11:28   10    **Q.**    And is the underlying traffic from which this summary

11    was created too voluminous and complex for the jury to

12    reasonably review at this trial?

13    **A.**    Absolutely.

14    **Q.**    Okay.

10:11:38   15         So let me understand -- let's try and understand

16    what's going on here.  So what does Connection 1 mean at the

17    top?

18    **A.**    That was just the first network connection that was

19    observed.

10:11:52   20    **Q.**    Okay.  And what is -- what is start there?

21    **A.**    That would be the start time stamp of the beginning of

22    the network connection that was observed.

23    **Q.**    Okay.  And what is the end there?

24    **A.**    That would be the end time stamp of when the network

10:12:08   25    connection ceased.

Miller - Direct/Levine

1    **Q.**    So this -- this transaction, this network traffic was

2    on May 13, 2013?

3    **A.**    Correct.

4    **Q.**    And how should I read those times?

10:12:23 5    **A.**    As in terms of like --

6    **Q.**    Is that -- is that 2:27 P.M.?

7    **A.**    Yes, yeah.  This is a 24-hour clock.

8    **Q.**    Okay.  So it's a 24-hour clock.  So its start time is

9    2:27 P.M. and that -- then is the rest of that like time and

10:12:42 10   seconds and milliseconds and something like that?

11   **A.**    Yes.

12   **Q.**    And what does UTC mean?

13   **A.**    That's a -- it's a universal time or basically you can

14   think of it like time as it would be in like London,

10:12:56 15   England.

16   **Q.**    Okay.

17          Is that a common time to use in the computer world?

18   **A.**    Very common, yes.

19   **Q.**    Okay.  UTC it is called?

10:13:07 20   **A.**    Yes.

21   **Q.**    So start time is 2:27 and the end time is what?

22   **A.**    2:28 and 36 seconds.

23   **Q.**    So this whole exhibit that we're looking at here

24   relates to a 90-second, approximately a 90-second period of

10:13:24 25   time?

Miller - Direct/Levine

1    **A.**    Yes.

2    **Q.**    Okay.

3         And now we see a -- tell us what you see in that red

4    line that follows below.

10:13:32 5    **A.**    The first one, that would be the IP address of AOL

6    where the source address came from.  And then colon, the

7    port number from that system, and then the destination IP

8    address of the remote web server, and then colon, the port

9    number, and 80 is the common web server report.

10:13:55 10    **Q.**    Okay.

11        So let's just break this down a little bit.  The first

12    IP address there, that's AOL's IP address?

13    **A.**    Yes.

14    **Q.**    And you said the other IP address after the hour was

10:14:07 15    the destination.  Do you know what that destination is?

16    What is it?

17    **A.**    The IP address for www.gmx.com.

18    **Q.**    What is www.gmx.com?

19    **A.**    A website that does free e-mail, much like AOL or

10:14:26 20    Google.

21    **Q.**    Okay.  So it's a free e-mail website?

22    **A.**    Yes.

23    **Q.**    Okay.  So this shows an Internet connection from AOL

24    to GMX.com?

10:14:39 25    **A.**    Yes.

Miller - Direct/Levine

1    **Q.**    And then in blue, it appears to be the reverse?

2    **A.**    Yes.

3    **Q.**    What -- why is that?

4    **A.**    As you're logging network traffic, every single

10:14:50   5    request and response basically equates to two sessions.  So

6    you have the outgoing session and then the incoming session.

7    So it's like asking a question, and then receiving the

8    response.  So the blue line is like the response line.

9    **Q.**    Okay.

10:15:05  10    And now we have three red blocks of text here on --

11    and you start with the "refer."  You understand what I'm

12    saying about the three red blocks of text?

13    **A.**    Yes, sir.

14    **Q.**    Let's zoom in, Sue, if we can zoom in on the red text

10:15:24  15    there.  I do not want to go through every line of this, but

16    can you tell us what this represents?

17    **A.**    This is a portion of the network traffic, and this

18    portion is the headers of a web request, and then also the

19    content of the body of the web request.

10:15:50  20    **Q.**    Okay.

21    So in English, in English what happened right here,

22    what does this show happened in real life?

23    **A.**    This shows someone logging in to www.gmx.com with the

24    user name RaduSPR and a password of Kill 66 Bill or

10:16:11  25    attempting to, sorry.

1  **Q.**    So this shows a person going to GMX.com and then

2  entering what as the user name?

3  **A.**    The user name was Radu S-P-R.

4  **Q.**    And can we highlight that, Sue, please?  Just the user

10:16:38 5  name and password, what he just said.  That's fine.

6  Perfect.  Okay.

7       And then -- and then how do you know that that's the

8  user name?

9  **A.**    That would be because of this request, that would be

10:16:50 10  the value that was put into the user name field on GMX

11  website.

12  **Q.**    Okay.

13       And then what was the password entered after that user

14  name?

10:17:00 15  **A.**    It was Kill 66 Bill.

16  **Q.**    Okay.

17       So let's now, before we go on to the next one, log in

18  means what it sounds like?

19  **A.**    Yes.

10:17:14 20  **Q.**    What does it mean?

21  **A.**    It means the log in button was clicked.

22  **Q.**    Okay.

23       So let's go down -- scroll down to the next red block.

24  Okay.  All right.  So this is the second referer block; is

10:17:41 25  that correct?

Miller - Direct/Levine

1   **A.**   Yes.

2   **Q.**   And without getting into the check call stuff we don't

3   understand here, in the real world, what does this show

4   somebody doing?

10:17:48   5   **A.**   This shows somebody attempting to log in to GMX.com

6   with the user name Minolta9797, and then the percent sign 40

7   is a URL encoding of the "at" symbol, like you see in a user

8   name address.com.  So this is Minolta9797@gmx.c.

9   **Q.**   Why is it "dot C" and not at --

10:18:20 10   **A.**   Because this log in attempt was not completely filled

11   out.  It was just hit enter.

12   **Q.**   The person hit enter too quickly?

13   **A.**   Yes, before completing, typing it, yes.

14   **Q.**   So if we could zoom back, is this block, that second

10:18:38 15   block we saw highlighted, Minolta9797, is this the same user

16   session as in the first block with the RaduSPR block?

17   **A.**   Yes.

18   **Q.**   All right.  So now let's zoom into the third session,

19   please.  And what does this show that the -- first of all,

10:19:06 20   the same user as the first two?

21   **A.**   Which user?

22   **Q.**   The same as the first two referrers?

23   **A.**   Yes.

24   **Q.**   Okay.

10:19:17 25   And what does this show happening during that user

Miller - Direct/Levine

1    session?

2    **A.**    This is the third attempt, and in this attempt, the

3    user name is Minolta9797, and the password is Kill 66 Bill.

4    **Q.**    Okay.

5          And did it log -- did -- was the user able to log on

6    based on that?

7    **A.**    Yes.

8    **Q.**    When you say it was a third attempt, the third attempt

9    at what?

10   **A.**    Attempting to log in to GMX.com's web mail.

11   **Q.**    Okay.

12         If you could zoom out, please.  Collectively what do

13   those three red refer entries show to you?

14   **A.**    That a single network session had one person attempt

15   to log into GMX's website using two different user names

16   with the same password and also the same password for

17   Minolta9797@aol.com.

18   **Q.**    And what does that suggest to you?

19                MR. GOLDBERG:  Objection.

20                THE COURT:  Overruled.  Go ahead.

21                THE WITNESS:  It's the same person.

22   **Q.**    Explain.

23   **A.**    In my experience, this would be activity all coming

24   from the same person.

25   **Q.**    The same user?

1    **A.**    Yes.

2    **Q.**    All right.

3          And based -- let's go now to Connection 5.  What is

4    Connection 5 relative to Connection 1?

10:20:57  5    **A.**    This would be the fifth network session that was seen

6    during the connection to AOL's network.

7    **Q.**    But is this going on by the same user session?

8    **A.**    Yes.

9    **Q.**    Okay.  So is it simultaneous to what we saw above?

10:21:16 10    **A.**    Yes.

11    **Q.**    Let's actually zoom out again.  Let's take a look at

12    the time.  So where is the start time of Connection 5?

13    **A.**    That would be on the same day at 2:26 and 9 seconds.

14    **Q.**    Okay.  What was the end time?

10:21:37 15    **A.**    That would have been at 2:38 and 9 seconds.

16    **Q.**    Okay.

17          So the range of time in Connection 5 is something like

18    how many minutes?

19    **A.**    About 12 minutes.

10:21:53 20    **Q.**    Okay.

21          And -- but the range in Connection 1 you said was only

22    about 90 seconds; is that right?

23    **A.**    Correct.

24    **Q.**    So did that -- those 90 seconds in Connection 1 take

10:22:06 25    place some time within the approximately 12 minutes of

Miller - Direct/Levine

1    Connection 5?

2    **A.**    Yes.

3    **Q.**    Okay.  By the same user session?

4    **A.**    Yes.

10:22:13  5    **Q.**    Okay.

6         Now let's zoom in on the Connection 5.  What does this

7    Connection 5 show?

8    **A.**    This shows someone loading their buddy list and friend

9    list of -- from Yahoo Messenger.

10:22:29  10   **Q.**    Okay.

11        And who is the Yahoo Messenger -- what is the Yahoo

12   Messenger user loading up the buddy list?

13   **A.**    The User ID, Minolta9797.

14   **Q.**    Okay.  And is one of the friends User ID MasterFraud1?

10:22:50  15   **A.**    Yes.

16   **Q.**    Let me ask you what is Yahoo Messenger?

17   **A.**    Instant messaging application.  There are some other

18   ones like ICQ or AOL Instant Messenger or Facebook

19   Messenger, G-chat, allows for talking back and forth, like

10:23:10  20   text messaging.

21   **Q.**    Okay.

22        So there's a simultaneous log on to Yahoo Instant

23   Messenger while the first session is going on; is that

24   right?

10:23:20  25   **A.**    Correct.

Miller - Direct/Levine

**Q.**    All right.

And one of Minolta9797's friends on Yahoo Messenger is MasterFraud1 and one is Minolta9797?

**A.**    Yes.

**Q.**    And another is Minolta 9977?

**A.**    Yes.

**Q.**    And another is RaduSPR, R-A-D-U-S-P-R?

**A.**    Yes.

**Q.**    Now, would that mean that the user Minolta9797 listed himself as a friend?

**A.**    Yes.

**Q.**    Is -- in your experience, is that common?

**A.**    Yes.

**Q.**    Do you do that?

**A.**    Yes.

**Q.**    What -- why do you do that?

**A.**    If I have multiple accounts, sometimes I want to send information from one account to another, or I want to see if I left myself log in somewhere.

MR. LEVINE:  No further questions.

THE COURT:  Cross-examination, Mr. Goldberg.

MR. GOLDBERG:  Thank you, your Honor.

Miller - Cross/Goldberg

1        CROSS-EXAMINATION OF ROBERT EOIN MILLER

2    BY MR. GOLDBERG:

3    **Q.**    Good morning, sir.

4    **A.**    Good morning sir.

5    **Q.**    You're going through your background, and I missed are

6    you still with AOL?

7    **A.**    Yes, sir.

8    **Q.**    Where do you work now?

9    **A.**    I work for a company called Rabbit 7.

10   **Q.**    And is that in the IT world?

11   **A.**    Yes, sir.

12   **Q.**    Okay.

13        And your job there, is it related to security?

14   **A.**    Yes, sir.

15   **Q.**    Okay.  All right.

16        So back in 2013, you indicated that you had been doing

17   some investigation regarding what you call the Bayrob Group,

18   correct?

19   **A.**    Yes, I was performing.

20   **Q.**    eBay Fraud Group?  Did you have that name Bayrob or

21   not?

22   **A.**    Did I create the name?

23   **Q.**    No.  Did you know that name?

24   **A.**    Did I -- I was made aware of it, yes.

25   **Q.**    Okay.  Who made you aware of that name?

Miller - Cross/Goldberg

1    **A.**    We received an abuse complaint.

2    **Q.**    Okay.  You received an abuse complaint from a user?

3    **A.**    No.

4    **Q.**    From a security provider?

10:25:47  5    **A.**    Yes.

6    **Q.**    Which one would that be?

7    **A.**    It was at the time, I recall, I-Defense.

8    **Q.**    All right.

9          So when you received that abuse complaint, was that

10:26:01 10   the first time you became aware?

11   **A.**    Yes.

12   **Q.**    And when was that?

13   **A.**    It would have been in 2013.

14   **Q.**    Okay.

10:26:08 15         And pursuant to that abuse report, were there

16   specifics contained in that report in terms of user names,

17   passwords, online monikers?

18   **A.**    No.

19   **Q.**    Did you retain a copy of that report?

10:26:33 20   **A.**    It was a instant message from someone, and they only

21   contained an IP address.

22   **Q.**    Okay.  And -- it did not have any contact with the

23   FBI?

24   **A.**    No.

10:26:47 25   **Q.**    And as a result of that, you began to monitor --

Miller - Cross/Goldberg

1  well -- sorry.  Let me back up.  It -- it contained an IP

2  address to what?

3  **A.**    An AOL IP address.

4  **Q.**    Would that be your server or would that be user

5  server?

6  **A.**    It was from a range of IP addresses that were assigned

7  to network users for authenticating the AOL.

8  **Q.**    And that's all you got?

9  **A.**    Correct.

10  **Q.**    To alert you to this?

11  **A.**    Yes.

12  **Q.**    So then you came up with a list of keywords, for lack

13  of a better word, keywords for the -- for your network

14  monitoring to look for?

15  **A.**    Yes.

16  **Q.**    And you came up with those yourself or how did you

17  come up with those words?

18  **A.**    I came up with them, yes.

19  **Q.**    And you weren't guided by any law enforcement or any

20  third party?

21  **A.**    No.

22  **Q.**    Okay.

23        And if you didn't have a technical keyword or a

24  particular -- did you have a particular keyword, then -- let

25  me back up.

Miller - Cross/Goldberg

1       This is a ton of traffic you're monitoring, correct?

2    **A.**   Yes.

3    **Q.**   And AOL retains all of that for how long?

4    **A.**   Depending on network utilization, it was in the

10:28:10  5   neighborhood, for that network, between two and three weeks.

6    **Q.**   Okay.

7       So but this would be -- do you have an estimate and

8    amount of terabytes or gigabytes of data?

9    **A.**   Over -- like over all that would be transmitted across

10:28:29 10   the network?

11   **Q.**   Yeah.

12   **A.**   Yeah, I wouldn't have -- I wouldn't be able to recall

13   that specifically.

14   **Q.**   Okay.

10:28:35 15   But you have basically the giant ocean of data, AOL's

16   traffic all over the world, right?

17   **A.**   Yes.

18   **Q.**   And you are looking for specific keywords that

19   traffic?

10:28:48 20   **A.**   Yes.

21   **Q.**   And only traffic related to those specific keywords is

22   going to be singled out for your further attention, correct?

23   **A.**   Yes.

24   **Q.**   And at some point, you collected a list of -- I

10:29:05 25   noticed on that you -- there was a collection of a number of

Miller - Cross/Goldberg

1    e-mail addresses?

2    **A.**    Yes.

3    **Q.**    Okay.

4          So when you started off this process, you didn't have

10:29:16  5    those e-mail addresses and they were developed later?

6    **A.**    Correct.

7    **Q.**    Okay.

8          So you looked at your first batch of information,

9    found more information, and then added to it?

10:29:27 10    **A.**    Yes.

11    **Q.**    Okay.

12          Is this a -- something that you would do on a regular

13    basis for AOL?

14    **A.**    Yes.

10:29:37 15    **Q.**    This exact thing where you would get alerted to some

16    kind of issue and then you would build a list of relevant

17    keywords?

18    **A.**    Yes.

19    **Q.**    Okay.  Is that something you do now for your current

10:29:51 20    employer?

21    **A.**    Not in the same manner, but in certain aspects, yes.

22    **Q.**    Okay.

23          And at some point, you were contacted by the FBI

24    relative to the investigation of the Bayrob Group, correct?

10:30:15 25    **A.**    From my recollection, we reached out to them.

Miller - Cross/Goldberg

1    **Q.**    Okay.

2          And you said that you had some information that you

3    had gathered, right?

4    **A.**    Correct.

10:30:23  5    **Q.**    And then they -- did you just turn it over to them?

6    **A.**    No, not directly.

7    **Q.**    No?

8    **A.**    In those terms, no.

9    **Q.**    So you remember who you spoke to at the FBI?

10:30:37 10    **A.**    A few people, yes.

11    **Q.**    Okay.

12          Over the course -- was it a few different

13    conversations, I assume?

14    **A.**    Two or more meetings, yes.

10:30:46 15    **Q.**    So you had actually face-to-face meetings?

16    **A.**    Yes.

17    **Q.**    In Virginia?

18    **A.**    Yes.

19    **Q.**    And your offices are in northern Virginia, Hernden or

10:30:56 20    something?

21    **A.**    Dulles, yeah.  But, yes, all intents and purposes,

22    yes.

23    **Q.**    They came to you and you told them what you found, I

24    assume that?

10:31:03 25                MR. LEVINE:  Objection, your Honor.

Miller - Cross/Goldberg

1          THE COURT:  Let me hear the question.

2     **Q.**    I assume you showed them what your investigation

3     was -- was showing you, correct?

4          THE COURT:  Overruled.  Is anything wrong with

10:31:19 5    that question, sir?  Can you answer it?

6          THE WITNESS:  As far as I can tell.  Could you

7     repeat the question?

8     **Q.**    You made a couple phone calls to the FBI, right?

9     **A.**    No.

10:31:28 10   **Q.**    Okay.  They called you?

11    **A.**    No.

12    **Q.**    Okay.  How did you get in touch with the FBI first

13    time?

14    **A.**    Our legal team reached out to them as far as -- as far

10:31:38 15   as I know.

16    **Q.**    Got it.  All right.

17         You sent it up the chain and legal reached out to the

18    FBI?

19    **A.**    Correct.

10:31:44 20   **Q.**    The FBI came out to see you in Dulles?

21    **A.**    Correct.

22    **Q.**    You sat down with them and you showed them some of the

23    stuff you've shown us here this morning?

24    **A.**    Correct.

10:31:53 25   **Q.**    And did you just turn over those files to the FBI that

Miller - Cross/Goldberg

1  day?

2  **A.**  No.

3  **Q.**  Why not?

4  **A.**  Because in order for us to provide anything, we

10:32:04 5  require a search warrant.

6  **Q.**  You require a search warrant, but you already showed

7  them everything?

8  **A.**  No.

9  **Q.**  Well, you told them what you saw, correct?

10:32:14 10  **A.**  Yes.

11  **Q.**  You showed them the list of names and the list of

12  e-mail addresses at that meeting, correct?

13          MR. LEVINE:  Objection, your Honor.

14          THE COURT:  Overruled.  Is that correct, sir

10:32:26 15  or not?

16          THE WITNESS:  Potentially.

17  **Q.**  Yeah.  I mean I know you didn't show them the whole

18  however many pages or however many gigabytes of data you

19  had, but you showed them the basic information that you had,

10:32:41 20  correct?

21  **A.**  To a varying degree, yes.

22  **Q.**  You showed them the GMX log in names, right?

23  **A.**  No.

24  **Q.**  You don't recall -- do you recall what you showed

10:32:56 25  them?

1  **A.**    That -- that specific thing had not occurred yet at

2  the time.

3  **Q.**    Okay.

4          THE COURT:  Mr. Goldberg, is this a good place

10:33:05 5  to take a break?

6          MR. GOLDBERG:  That's fine, your Honor.

7          THE COURT:  Folks, please remember the

8  admonition, we're going to take our morning recess.

9      All rise for the jury.

10:33:13 10      (Thereupon, a recess was taken.)

11          THE COURT:  Mr. Goldberg, you may continue,

12  sir.

13          MR. GOLDBERG:  Thank you.

14  BY MR. GOLDBERG:

10:53:26 15  **Q.**    Mr. Miller, I had a chance to go back and look at my

16  notes.  So maybe I can make this a little bit easier at this

17  point.

18      You indicated that just now in your cross that you got

19  an instant message or some kind of message about eBay fraud

10:53:46 20  and that caused you to start investigating this, correct?

21  **A.**    We -- I received an abuse notification about an IP

22  address that was owned by AOL.

23  **Q.**    Okay.  And who provided you that abuse notification?

24  **A.**    It was a company, I-Defense.

10:54:05 25  **Q.**    I'm sorry?

Miller - Cross/Goldberg

1    **A.**    I-Defense.

2    **Q.**    I-Defense.  And is that associated with AOL?

3    **A.**    No.

4    **Q.**    So you said that AOL maintains records of all of its

10:54:20 5    traffic over its network for about three weeks?

6    **A.**    Depending on which network, yes.

7    **Q.**    Well, what -- what do you mean, which network?

8    **A.**    AOL has various types of networks.

9    **Q.**    Tell me the different types because I don't know.

10:54:38 10    **A.**    We have some that are like internal so that would be

11    for employees.

12    **Q.**    Okay.  I'm talking about the people that have AOL on

13    their computers for e-mail and for the news and for instant

14    messaging at the time, that number, that one network or more

10:55:00 15    than one?

16    **A.**    We would consider that to be a single network, yes.

17    **Q.**    Okay.

18          And that's the biggest part of the network traffic at

19    AOL handle would be the consumers all over the world, right?

10:55:11 20    **A.**    No.

21    **Q.**    What would be the biggest net -- traffic?

22    **A.**    We would also have -- like our mail systems have quite

23    a bit of traffic.

24    **Q.**    Your mail system for users or internal?

10:55:24 25    **A.**    For users, yes.

Miller - Cross/Goldberg

1    **Q.**    I'm talking about that, too?

2    **A.**    That's -- that's a separate network.

3    **Q.**    Okay.  That's a separate network?

4    **A.**    Yes.

10:55:31  5    **Q.**    And you monitor that network for three years as well?

6    **A.**    We monitor that network, but it does not have the same

7    amount of disk capture.

8    **Q.**    Okay.  How much does that have?

9    **A.**    That one I don't believe had any at the time.

10:55:45 10    **Q.**    So at that -- 2013, when you got this notice, you were

11    not able to go back even one day to look at AOL user

12    e-mails?

13    **A.**    To -- I'm not sure I understand the question.

14    **Q.**    You wanted to go back and see -- collect subject lines

10:56:13 15    on e-mail sent from AOL users over your network, you

16    couldn't go back even one day to look for those?

17    **A.**    Me personally?

18    **Q.**    Well, doing your job.

19    **A.**    If it's not in the -- if it's not in the network

10:56:33 20    traffic, then no.

21    **Q.**    Well, what I assume it would be in the network

22    traffic, right, I mean -- I'm not intentionally trying to be

23    stupid.  I'm just trying to figure out exactly what you can

24    look at and what you can't.  Okay.  So in 2013, was AOL

10:56:50 25    maintaining a storage of user traffic?

1    **A.**    Yes.

2    **Q.**    Were they maintaining storage of user e-mails?

3    **A.**    Yes.  And as in we don't delete our users' e-mail,

4    like we provide free web mail services and if you e-mail

10:57:12 5    someone, then the e-mail stays there until you delete it.

6    **Q.**    And when it's deleted, is it completely off the system

7    or is it still available to AOL?

8    **A.**    I wouldn't be able to answer that question.

9    **Q.**    Okay.  All right.

10:57:25 10    So -- but the network traffic itself that we're

11    talking about here today in the exhibits that you discussed

12    with Mr. Levine earlier, that had about a three-week look

13    back?

14    **A.**    Yes, thereabouts.

10:57:39 15    **Q.**    I'm not going to hold you to 21 days.  Around that,

16    right?  Has that changed since?

17    **A.**    I'm not aware -- as far as I know, all of the -- that

18    system and that network has been decommissioned.

19    **Q.**    Okay.

10:57:53 20    And when you would get an inquiry like this about

21    potential fraud and start looking back at network activity,

22    is that something that the users of your network have agreed

23    to as part of their user agreement?

24    **A.**    Yes.

10:58:18 25    **Q.**    Okay.

Miller - Cross/Goldberg

1            And then -- I know that you don't deal with the -- you

2    deal with the user name agreement at all, that's something

3    you're familiar with?

4    **A.**    Mildly, yes.

5    **Q.**    Just to the extent that you know, you can go back and

6    look at anything you want?

7    **A.**    Yes.

8    **Q.**    Okay.

9            So you got this abuse notification and what I've heard

10   so far is that it involved eBay fraud over your network,

11   correct?

12   **A.**    We received an abuse complaint about a specific IP

13   address that was owned by AOL.

14   **Q.**    Okay.

15           So when you said in your direct you were collecting

16   information regarding Bayrob Group because Bayrob was

17   exiting crimes across your network, that was information

18   that you had learned later, throughout the investigation,

19   that wasn't information you had right when you started?

20   **A.**    It may have been.  I'm not entirely --

21   **Q.**    All right.  So it may have been.

22           I'm just trying to narrow down.  You said all right,

23   we got an abuse notification about an IP address.  Okay?

24   Well, it seems to me you got more information than that,

25   right?

1    **A.**    Yes.

2    **Q.**    Okay.

3        So let's cross that up.  It wasn't just an IP address.

4    What else did you get when you started looking at this

10:59:48 5    network traffic?

6    **A.**    I received an abuse complaint about an IP address at

7    AOL.

8    **Q.**    And that's it?

9    **A.**    Yes.

10:59:59 10    **Q.**    Okay.

11        And what was the next thing you did?

12    **A.**    I reviewed the network traffic involving that IP

13    address.

14    **Q.**    And then you developed a list of things to look for in

11:00:10 15    the network?

16    **A.**    Correct.

17    **Q.**    Okay.

18        So going back to the -- do you have -- do you recall a

19    date specific?

11:00:21 20    **A.**    Early 2013.

21    **Q.**    Okay.  So this was early 2013, you have not received

22    any contact from law enforcement, correct?

23    **A.**    That is correct.

24    **Q.**    You had just received this abuse notification about an

11:00:39 25    IP address.  You started looking at that IP address.  Did

Miller - Cross/Goldberg

1    you start saving from the network traffic everything from

2    that IP address from the beginning of your investigation?

3    **A.**    I believe so, yes.

4    **Q.**    Okay.  There we go.  That's what I was trying to get

11:00:55 5    at.

6         So now, beginning of 2013 forward, you're saving

7    everything relating to the IP address, and at some point.

8    You meet with the FBI?

9    **A.**    We save everything from every IP address for three

11:01:09 10    weeks, as I stated previously.

11    **Q.**    Right.  But -- of course.  But that no longer applied

12    to this IP address because now you're saving everything from

13    that IP address forever?

14    **A.**    No.

11:01:21 15    **Q.**    Okay.

16    **A.**    The IP address specifically is given out at random to

17    different users.

18    **Q.**    Okay.

19    **A.**    So if another user received that same IP address at a

11:01:32 20    later date, that data would not have been collected and then

21    put into this collection.

22    **Q.**    So you collected keywords from the IP address when you

23    looked at it originally, developed the keywords to search

24    your network for, correct?

11:01:48 25    **A.**    Yes.

1    **Q.**    And then what did you do?

2    **A.**    Then I reviewed that as the hits occurred from that

3    point forward.

4    **Q.**    And did you -- how did you record the network traffic

5    related to those hits?

6    **A.**    The -- just for the hit itself or for the hit itself,

7    we used a network intrusion detection system and that is

8    what allowed us to identify specific words that we saw on

9    network traffic, and then generate an alert, which I would

10   review.

11   **Q.**    Okay.

12        And at some point, based on that, you started

13   recording and amassing information, relating to these

14   keywords?

15   **A.**    We always recorded everything, as I stated previously.

16   **Q.**    Yeah, but for permanent use?

17   **A.**    I'm not sure I understand the question.

18   **Q.**    Well, you know, I'm trying to figure out when you

19   started the tape rolling that eventually went to the FBI.

20   When did that start?

21   **A.**    The tape was always rolling as I stated previously.

22   **Q.**    Right.

23        But, you said it only rolled for three weeks.  When

24   did you -- when did you hit, keep, or when did you decide to

25   like maintain everything?

Miller - Cross/Goldberg

**A.**    As we flagged user accounts, that -- all of that
network traffic for that session would be saved to another
instance.

**Q.**    Okay.

**A.**    And then this was -- that would never go away.

**Q.**    User account.  But when you isolated the user
accounts, that's when you did it?

**A.**    Yes.

**Q.**    And you isolated the user accounts based on your
initial investigation of the traffic from the original IP
address?

**A.**    Yes.

**Q.**    Okay.  Thank you.

         So how long after you started this investigation did
you isolate the user accounts?

**A.**    After I started?  Instantaneously.

**Q.**    Pretty quickly?

**A.**    Yes.

**Q.**    Okay.

         And when did you first come into contact with law
enforcement regarding this matter?

**A.**    I'd have to go back and look at e-mails, but it would
have been some time in late 2013, I assume.

**Q.**    By that time, you had six, eight, ten months of
information?

Miller - Cross/Goldberg

1    **A.**    Possibly, yes.  I don't have an exact time.

2    **Q.**    All right.  Can we see Exhibit 1732, please?  So you

3    were shown this during your direct examination.  You

4    remember that, Mr. Miller?

11:04:31  5    **A.**    Yes.

6    **Q.**    So at the top, where we have the first line that goes

7    all the way across -- you have to help me here because this

8    is not my field as it is yours.  We can zoom in on the top

9    line if you don't mind.  Thank you.  All the way across.

11:05:01 10    That's good enough.  Down a couple lines.  That's great.

11    Thank you.

12          So we're zoomed in on 1732.  Is this code

13    automatically generated or is it based on something that you

14    input?

11:05:19 15    **A.**    I wrote this, yes.

16    **Q.**    Okay.

17          And tell me what it means in -- in layman terms.  Read

18    the line in layman's terms so I can understand what you

19    wrote.

11:05:33 20    **A.**    Like a brief synopsis or --

21    **Q.**    Okay.

22          So "Alert HTTP," what does that mean?

23    **A.**    Alert is the -- this is like a rule for Snort or

24    Terracotta.  And this rule will generate an alert when the

11:05:53 25    protocol is of type HTTP.  So this will generate an alert on

Miller - Cross/Goldberg

1    web traffic if the rest of the rule is true.

2    **Q.**   Okay.

3         And, "Money sign home under score net," what does that

4    mean?

5    **A.**   That is a variable for the home net, which would be a

6    network that we have defined which would be the AOL network.

7    **Q.**   And then any --

8    **A.**   That is the source port.  So any port number.

9    **Q.**   Okay.

10        And then, "Money sign external under score net"?

11   **A.**   That would be the destination network address that we

12   have defined which would be anything that is not home net in

13   this instance.

14   **Q.**   Okay.

15        So basically, anything crossing your net?

16   **A.**   Any traffic in between a network that AOL owns and a

17   network that AOL does not own.

18   **Q.**   Okay.  Okay.

19        Any message, and then you have, quote, AOL fraud

20   Bayrob, what -- did you type that in, did you --

21   **A.**   Yes.

22   **Q.**   Did you put that?  Okay.  Where did that come from?

23   **A.**   I wrote it.

24   **Q.**   And the word Bayrob?

25   **A.**   Yes.

Miller - Cross/Goldberg

1    **Q.**    Where did you get that word from?

2    **A.**    I was informed that this activity was related to the

3    Bayrob Group.

4    **Q.**    Okay.

5         Was this the beginning of your work on this line of

6    code, the first thing that you did on the system to try to

7    look into this?

8    **A.**    No.

9    **Q.**    There were other things before this?

10   **A.**    Yes.

11   **Q.**    Like what?

12   **A.**    I would have had to have reviewed the traffic in order

13   to find this first and then write this rule.

14   **Q.**    Okay.  URI, what does that mean?

15   **A.**    It's basically like the User Request Line or the URL

16   like you type into the web browser, like Facebook.com back

17   slash, you know US Justice, something of that nature.

18   **Q.**    Okay.  "Tools stats P question mark"?

19   **A.**    That would be the URL.

20   **Q.**    Okay.

21        "User equals flow established, comma 2, underscore

22   server," what does that mean?

23   **A.**    Those are two different parts.  After user equals, and

24   then, quote, semi colon, that finishes the message field.

25   So the message is, "AOL fraud Bayrob URI tool stat user

Miller - Cross/Goldberg

1    equals," and that is the name of the rule.  And then after

2    that, where it says, "Flow colon established to underscore

3    server," that would indicate that a network session must be

4    established.  And the direct -- and the direction of the

5    network traffic must be to the server or from the client,

6    either/or.

7    **Q.**    Okay.

8         And the rest of the line, seems like it's a

9    repetition.  Is that just the -- the reverse flow?

10   **A.**    So the content field there specifically is what the

11   rule is actually looking for.  The message field that has

12   the same value in it is just the name that can be anything.

13   **Q.**    Okay.

14   **A.**    But the content field, there is what we're actually

15   looking for in order to generate an alert on this traffic.

16   **Q.**    Okay.

17        So you got your initial communication, you did your

18   initial look back for traffic you thought could be related

19   to fraud, and then you wrote this code to start collecting?

20   **A.**    We -- yes.

21   **Q.**    Okay.

22        And so I can assume that between the time you got the

23   abuse notification, when you wrote that code, someone gave

24   you the name, Bayrob?

25   **A.**    Yes.

Miller - Cross/Goldberg

1    **Q.**    You didn't get it from looking at your network

2    traffic, you got that from outside?

3    **A.**    Possibly, yes.

4    **Q.**    Well, you didn't get it from your network traffic,

11:10:13  5    right?  Nobody wrote Bayrob on any of the network traffic

6    you monitored at the beginning of this investigation,

7    correct?

8    **A.**    I'm sorry.  You have to repeat the question.

9    **Q.**    Nobody wrote the word Bayrob.  I mean that's not

11:10:28 10    something that you saw on the user traffic related to the IP

11    address that you were asked to look into for the abuse

12    notification, right?

13    **A.**    We were able to correlate traffic that we observed

14    with known indicators of the Bayrob Group, based on malware

11:10:45 15    and things of that nature.

16    **Q.**    Wasn't my question.  Now you're not listening to my

17    question.

18                    MR. LEVINE:  Objection, your Honor.

19                    THE COURT:  What?

11:10:53 20    **Q.**    Did you see --

21                    THE COURT:  Sustained to the comment.

22    **Q.**    Did you see the word Bayrob in the traffic that you

23    were observing as a result of the abuse ticket?

24    **A.**    Specifically, no.

11:11:07 25    **Q.**    Okay.

Miller - Cross/Goldberg

1    So someone gave you that word or else you wouldn't

2  have known it, right?

3  **A.**    We were able to uncover some of the activities related

4  to the known campaign known as Bayrob.

11:11:21  5  **Q.**    Okay.  Where did you -- where did you get the word

6  Bayrob?

7  **A.**    It was told to us and also we observed it in news

8  articles that were public.

9  **Q.**    Okay.

11:11:32  10    So it was told to you by whom?

11  **A.**    Several people.

12  **Q.**    What people?

13  **A.**    People from I-Defense and --

14  **Q.**    Sorry.  I didn't hear the answer.

11:11:42  15  **A.**    People from I-Defense and also meetings with other

16  people.

17  **Q.**    What other meetings with other people?

18  **A.**    Such as the FBI.

19  **Q.**    Okay.

11:11:50  20    So the FBI was one of the parties that gave you the

21  name Bayrob when you wrote that code, right?

22  **A.**    No, they confirmed the activity we observed to be part

23  of what is known as Bayrob.

24  **Q.**    Okay.

11:12:06  25    So you're saying when you wrote the code, you hadn't

Miller - Cross/Goldberg

1    met with the FBI yet?

2    **A.**    Correct.

3    **Q.**    You met with some other people and you got some public

4    sources that gave you the name Bayrob, and you used it to

11:12:19 5    designate a certain activity?

6    **A.**    Yes.

7    **Q.**    Okay.  And then you met with the FBI in late 2013,

8    correct?

9    **A.**    I believe so, yes.

11:12:32 10    **Q.**    And you personally run this meeting, right?

11    **A.**    Yes.

12    **Q.**    And it was in northern Virginia, and you were -- was

13    your legal team from AOL there as well?

14    **A.**    Yes.

11:12:41 15    **Q.**    Okay.

16         And FBI agents were there.  Who else was present?

17    **A.**    We had a few members of the Department of Justice.

18    **Q.**    Okay.  Was Mr. Levine there?

19    **A.**    Yes.

11:12:54 20    **Q.**    Okay.

21         And you had your research with you at the time related

22    to this investigation?

23    **A.**    Yes.

24    **Q.**    Okay.  And it wasn't in -- I assume it wasn't paper

11:13:08 25    form?

Miller - Cross/Goldberg

1      **A.**   No.

2      **Q.**   It was digital form, right?

3      **A.**   Yes.

4      **Q.**   And you were prepared to hand that over to the FBI at

11:13:14  5   the time?

6      **A.**   No.

7      **Q.**   Okay.

8             Because your lawyers said well, you can't do that,

9      right?

11:13:19 10   **A.**   Correct.

11     **Q.**   Okay.

12            But all they had to do was give you a subpoena and

13     then you'd turn it over?

14                    MR. LEVINE:  Objection, your Honor.

11:13:28 15                   THE COURT:  Overruled.  You may answer.

16                    THE WITNESS:  I didn't turn anything over

17     specifically to anyone.

18     **Q.**   Well -- okay.

19            The AOL turned it -- what you had produced over to the

11:13:41 20    FBI or the Department of Justice at some point, correct?

21                    MR. LEVINE:  Objection, your Honor.

22                    THE COURT:  Overruled.  Can you answer that,

23     sir?

24                    THE WITNESS:  I'm sorry, could you repeat the

11:13:50 25    question?  I'm sorry.

Miller - Cross/Goldberg

1          THE COURT:  That's all right.

2    Q.    You produced this information.  You had it with you at

3    the meeting, but you didn't give it to the Department of

4    Justice at that time, correct?

11:14:00 5    A.    Correct.

6    Q.    And during that meeting, it became evident that a

7    search warrant or subpoena had to be issued for what you had

8    already collected, right?

9    A.    I don't know the answer to that question.

11:14:13 10    Q.    Okay.

11          So they didn't -- not something that went through your

12    experience while you were at that meeting?

13    A.    Correct.

14    Q.    You didn't hear the word search warrant or -- or

11:14:24 15    subpoena?

16          MR. LEVINE:  Objection.

17          THE COURT:  Well, sustained.

18    Q.    Okay.

19          So at the point when you had the meeting with the FBI

11:14:35 20    and you had all this -- all this information saved

21    digitally, you know how much information there was in

22    gigabytes?

23    A.    I couldn't give an accurate ball park to that

24    estimate.

11:14:48 25    Q.    Okay.

Miller - Cross/Goldberg

1        And had you gotten the request from the FBI to go back

2    on the day you met with the FBI, the day that you met with

3    the Department of Justice, go back and get all the

4    information you can related to the same search parameters

11:15:09   5    that you used originally, you wouldn't have been able to

6    produce all that information, correct?

7                    MR. LEVINE:  Objection, your Honor.

8                    THE COURT:  Sustained.

9    Q.    Was the information that you had in your possession

11:15:24  10   for the FBI meeting still on the network traffic that's

11   normally retained by AOL?

12                   MR. LEVINE:  Objection, your Honor.

13                   THE COURT:  Overruled.

14                   THE WITNESS:  I'm sorry.  Could you repeat the

11:15:40  15   question?

16   Q.    Was the information that you had put away for this

17   investigation and with you at the FBI meeting, could you --

18   could you go back and get it from the general retained AOL

19   network?

11:15:59  20                   MR. LEVINE:  Objection, your Honor.

21   Q.    At that moment?

22                   THE COURT:  Overruled.  Do you know, sir?

23                   THE WITNESS:  Yes, and that's part of the

24   documents that have been submitted.

11:16:08  25   Q.    Okay.

Miller - Cross/Goldberg

1        What I'm saying is if you hadn't been collecting it

2    for eight months, would it still have been available?

3    **A.**    No.

4    **Q.**    All right.  Okay.  That -- thank you.  All right.  So

11:16:23 5    at some point, you left AOL's employment?

6    **A.**    Yes.

7    **Q.**    When was that?

8    **A.**    I believe that was late 2015.

9    **Q.**    Okay.

11:16:34 10        And you went to this new employment and why did you

11    leave AOL?

12    **A.**    The individual who got me to come over to AOL got me

13    to come over to somewhere else.

14    **Q.**    So they poached you away, in other words?

11:16:51 15    **A.**    Yes.  And then he quit and went back to AOL, so.

16        (Laughter.)

17            THE WITNESS:  I thank him daily.

18    **Q.**    You must like this job, you're still there.

19    **A.**    Oh, no.  I'm not there anymore.

11:17:04 20    **Q.**    Oh, you're not?

21    **A.**    No.

22    **Q.**    So you're now at the next job?

23    **A.**    Yes.

24    **Q.**    Okay.

11:17:08 25        And where is that located, like physically, like what

Miller - Cross/Goldberg

1    city?

2    **A.**    Outside of DC.

3    **Q.**    So same general area as AOL?

4    **A.**    Yes.

11:17:17  5    **Q.**    You talked about some encrypted e-mails now that went

6    across your system not being able to read them.  Is that

7    something that's unusual on the AOL system?

8    **A.**    I wouldn't say unusual, no.

9    **Q.**    Yeah.  I mean -- many legitimate businesses and

11:17:38  10    individuals choose to encrypt their e-mails, correct?

11    **A.**    Yes.

12    **Q.**    And the same thing goes for their instant messages,

13    right?

14    **A.**    Yes.

11:18:07  15    **Q.**    When you were asked to look at the abridged version of

16    the voluminous record of network traffic, which was 1742,

17    which show the attempted log in's, the three log in's,

18    that's part of a record that's enormous, correct?  Well, I

19    mean everything is relative in this field, so it's part of a

11:18:35  20    very large file?

21                MR. LEVINE:  Objection, your Honor.

22    **Q.**    It's part of a very large --

23                THE COURT:  You questioned on that, did you

24    not?

11:18:45  25                MR. LEVINE:  Your Honor, it's a very large

1    file.

2                    THE COURT:  Overruled.

3    BY MR. GOLDBERG:

4    Q.   That's why everything is relative?

11:18:53  5                    THE COURT:  Overruled.  Can you answer that,

6    sir?

7                    THE WITNESS:  I mean it's relative.  Like if

8    you were to print it out like every byte that was in there,

9    it would be a several-page document as it is submitted as

11:19:04 10   another exhibit.

11   Q.   Okay.  It would be -- you said several pages?

12   A.   Yes.  It wouldn't be -- excuse me.  It wouldn't be a

13   novel or an encyclopedia but --

14   Q.   It was a much larger file, boils down to 90 seconds of

11:19:28 15   and then twelve minutes of time?

16   A.   I don't understand that statement.

17   Q.   Okay.

18        Well, you testified that the log in attempts occurred

19   over 90 seconds, right?

11:19:39 20   A.   Yes.

21   Q.   And the chat session was about 12 minutes?

22   A.   Correct.

23   Q.   Right?

24        So you have a much larger file, much more activity,

11:19:49 25   but it was boiled down to that small amount for the purpose

Miller - Cross/Goldberg

1    of the exhibit that we see?

2    **A.**    Yes.

3    **Q.**    After your initial meeting with the FBI, how soon

4    after that did you -- well, did you have anything to do with

11:20:11 5    answering the search warrant or subpoena?

6    **A.**    Produced the data that I had already collected and

7    continued to collect to our legal team.

8    **Q.**    All right.  So it went up and out to wherever it was

9    going?

11:20:24 10    **A.**    Yes.

11    **Q.**    All right.

12          And then from then on, you were continuing to monitor

13    these accounts?

14    **A.**    Yes.

11:20:30 15    **Q.**    And IP addresses and everything else that was related

16    to what you could determine was the Bayrob?

17    **A.**    Yes.

18    **Q.**    How long did that go on for?

19    **A.**    A period of probably almost a year or so.

11:20:46 20    **Q.**    And did you meet with the FBI again?

21    **A.**    Yes.

22    **Q.**    And when was that?

23    **A.**    I couldn't remember specifically.  I'd have to go back

24    and check like messages.

11:21:04 25    **Q.**    Okay.

Miller - Cross/Goldberg

1    **A.**    But it was within six months, I think, of the previous

2    meeting.

3    **Q.**    Okay.

4           And was anybody else at the meeting besides the FBI?

11:21:15  5    **A.**    Yes.

6    **Q.**    Who?

7    **A.**    Romanian law enforcement.

8    **Q.**    Okay.  Anyone else?

9    **A.**    Not that I can recall.

11:21:21 10    **Q.**    And was that the only two times you met with the FBI

11    or were there others?

12    **A.**    Prior to anything involved in the trial or --

13    **Q.**    Well, we're going to get to that in a second, but,

14    yeah.

11:21:35 15    **A.**    Okay.

16           To the best of my recollection, two or more times,

17    yes.

18    **Q.**    Two -- you met with them two or more times?

19    **A.**    There may have been some phone calls and things of

11:21:46 20    that nature.

21    **Q.**    Okay.

22           Did you send e-mails in responses to specific

23    questions they may have asked?

24    **A.**    I don't recall that specifically.

11:21:54 25    **Q.**    Okay.

Miller - Cross/Goldberg

1          Now flashing forward to this case, when did you first

2     become aware that there was a legal case that involved your

3     investigation?

4     **A.**     I guess -- could you please define legal case?  I was

11:22:12 5     aware there was an active investigation for several years.

6     **Q.**     I appreciate that, yes.

7          When did you realize there was an actual criminal

8     matter that was filed in court and going to trial?

9     **A.**     And going to trial?

11:22:28 10     **Q.**     Well, going forward with a legal matter.

11     **A.**     That would have been some time around Thanksgiving in

12     2016.

13     **Q.**     Okay.

14          And at that point, were you asked to meet again with

11:22:41 15     the Department of Justice or the FBI?

16     **A.**     There were some phone calls.

17     **Q.**     Okay.

18          Were there -- was any face-to-face meeting leading up

19     to your testimony here today between --

11:22:54 20     **A.**     Yes -- well, sorry.

21     **Q.**     Between the phone calls and your testimony today?

22     **A.**     Were there face-to-face meetings between 2016 and

23     today in court?

24     **Q.**     Right.

11:23:07 25     **A.**     Yes.

Miller - Cross/Goldberg

1    **Q.**    With the Department of Justice or the FBI or the U.S.

2    Attorney's Office?

3    **A.**    Yes.

4    **Q.**    How many?

11:23:12 5    **A.**    Face-to-face, I'd say three.

6    **Q.**    Okay.

7         And the questions you were asked in court here today

8    by Mr. Levine, had you been asked those questions in those

9    meetings prior to coming into court?

11:23:33 10   **A.**    I don't think I completely understand.

11   **Q.**    All right.  The questions you were asked today, you've

12   heard them before, right?

13   **A.**    Some of them.

14   **Q.**    Yeah.  And they were asked by Mr. Levine or someone

11:23:42 15   working with Mr. Levine during your meetings, correct?

16   **A.**    Correct.

17   **Q.**    Okay.

18        And when was the last time that occurred?

19   **A.**    This morning.

11:23:56 20   **Q.**    So what time this morning did you meet with them?

21   **A.**    A little after 9:00.

22   **Q.**    Okay.

23        And so prior to coming into court here today, you met

24   with them to go over your testimony?

11:24:09 25   **A.**    Yes.

Miller - Cross/Goldberg

1    **Q.**    When did you get into town?

2    **A.**    Tuesday night.

3    **Q.**    Did you meet with them between Tuesday night and this

4    morning?

11:24:18 5    **A.**    Yes.

6    **Q.**    How many times?

7    **A.**    Once.

8    **Q.**    For how long?

9    **A.**    About an hour and a half.

11:24:23 10    **Q.**    Okay.

11           Did anybody that talked to you during those meetings

12    tell you anything about what was happening in this

13    courtroom?

14    **A.**    No.

11:24:39 15                    MR. GOLDBERG:  Thank you.  Nothing further.

16                    THE COURT:  Mr. O'Shea.

17                    MR. O'SHEA:  Thank you.

18

19

20

21

22

23

24

25

CROSS-EXAMINATION OF ROBERT EOIN MILLER

BY MR. O'SHEA:

**Q.**    I just have a couple of quick follow-up questions to Mr. Goldberg.  The first time in your life you heard the term Bayrob Group was when, before or after we saw these exhibits that we looked at today?

**A.**    Before looking at the exhibits or before generating, collecting, analyzing --

**Q.**    Okay.  I forget who I'm asking questions of.  You're a specific guy.  Okay.

(Laughter.)

**Q.**    I apologize.  Blame that on me.  Okay.

The exhibits that we looked at today that you testified about, they were created at some point in the past, were they not?

**A.**    Yes.

**Q.**    And they were created in connection with some of the activities that you yourself did, am I right about that?

**A.**    I don't understand the specifics of that question.

**Q.**    You had to do something in order for that data to be segregated and compiled, right?  You testified about that?

**A.**    Well, we recorded everything so.

**Q.**    All right.  And you had to go search for it, am I right?

**A.**    Yes.

1    **Q.**    And do you use like a bullying search type of

2    technology to go look for certain terms and computer codes?

3    **A.**    We have an ability to search through things, yes.

4    **Q.**    Okay.

11:26:09 5        And all right.  Before you did that search of code,

6    had you ever heard of the term Bayrob Group?

7    **A.**    Yes.

8    **Q.**    Okay.

9        And just so that I'm clear, where did you hear that

11:26:23 10    from; more specifically for your benefit, from whom?

11    **A.**    It was available publicly on various Symantec websites

12    where they had open investigations and articles written

13    about them and also from I-Defense.

14    **Q.**    Okay.

11:26:41 15        And Symantec was publishing on their blogs for a while

16    and using this term Bayrob Group, am I right?

17    **A.**    Yes.

18    **Q.**    All right.

19        Just so we get this straight, never during any of your

11:26:56 20    searches of the computer code that we heard you testify

21    about this morning did the term Bayrob Group ever come up in

22    the code, am I right about that?

23    **A.**    For the most part, yes.

24    **Q.**    Okay.

11:27:09 25        What do you mean by "the most part"?  I mean inside

Miller - Cross/O'Shea

1    the code was at times the term Bayrob Group?

2    **A.**    There were several network intrusion detection

3    signatures that were written that are attributable to

4    Bayrob.

11:27:22  5    **Q.**    Not attributed.  Using the term Bayrob.

6    **A.**    The signature itself did include that name, yes.

7    **Q.**    Okay.  All right.

8         Now, based on your level of understanding, if I'm at a

9    Starbucks and I'm logging in with my laptop online, and say

11:27:46 10    going to AOL, my laptop for a certain period of time will

11    have a thing called an IP address, will it not?

12    **A.**    Yes.

13    **Q.**    And to a certain degree, the IP address of that laptop

14    is determined by a device inside the Starbucks called the

11:28:05 15    modem, am I right?

16    **A.**    Yes, for all intents and purposes.

17    **Q.**    Okay.  All right.

18         Now if there are six or seven laptops logged on at the

19    Starbucks at the same time, will they all have the same

11:28:21 20    exact IP address?

21    **A.**    Depending on which IP address you're referring to.

22    **Q.**    Follow-up question.  Thank you.  I know who I'm

23    talking to.  Tell us the difference between -- and you tell

24    me if I'm wrong about the terminology -- between an external

11:28:34 25    IP address and sort of like an internal IP address?

**A.**     There would be several internal IP addresses, and they would go out through an external IP address.  So you would have, yeah, matting or masquerading, which is basically the ability to share a single public IP address among multiple computers behind it.

**Q.**     Okay.

So anywhere from two to, you know, somewhat of an indefinite amount of computers logged on, let's say the largest Starbucks in America could have for a certain period of time the same IP address.  Am I right?

**A.**     I'm sorry.  You have to repeat that.

**Q.**     Certainly.

Let's say that we have the biggest Starbucks in America.  We have anywhere from 2 to 100 laptops logged into their free Wi-Fi at the same time for a certain period of time.  All would have the same IP address, am I right?

**A.**     Yes.

**Q.**     All right.  User names and passwords.

Yesterday, we heard a little bit about two-tier authentication or two-step authentication.  You know what that is, don't you?

**A.**     Yes.

**Q.**     And was -- was two step -- by the way, am I calling it right, two-tier authentication?  What's the proper term?

**A.**     Commonly known as two-factor or dual-factor

1    authentication.

2    **Q.**    Thank you very much.  Dual-factor or two-factor

3    authentication.

4         That technology was developed because user names and

11:30:11  5    passwords were easy or becoming easier to obtain by people

6    who weren't authorized to have them, am I right about that?

7    **A.**    For all intents and purposes, yes.

8    **Q.**    Okay.

9         And what we see lots of times on the Internet are

11:30:27 10    these things that I think the term came up yesterday called

11    monikers.  Rather than people's real names like O'Shea,

12    you'll see whatever moniker I choose to use, be it Twitter,

13    AOL, Gmail, and the like, am I right about that?

14    **A.**    Yes.

11:30:43 15    **Q.**    The Internet is full of monikers, am I right about

16    that?

17    **A.**    Yes.

18    **Q.**    Now, you currently are an executive for somehow a

19    company called Rapid 7.  Am I right about that?

11:31:05 20    **A.**    Far from an executive, but yes, I work at Rapid 7.

21    **Q.**    All right.  And can I have Exhibit 1442 up?

22         Before I have you look at 1442, sir, did you go to the

23    EMEA Partner Summit in Portugal recently?

24    **A.**    Not to my knowledge.

11:31:33 25    **Q.**    Okay.  Is that something that Rapid 7 went to as an

Miller - Cross/O'Shea

1    organization?

2    **A.**    Not to my knowledge.

3    **Q.**    Okay.  How many people work for Rapid 7?

4    **A.**    Around 2200.

11:31:46  5    **Q.**    2200.  There we go.

6          Now part of what Rapid 7 does is supply the technology

7    that you've testified about today, all over the world, am I

8    right about that?

9    **A.**    I don't --

11:32:58  10          THE COURT:  Go ahead.

11          MR. O'SHEA:  Go ahead.  All right.

12    **Q.**    You said that Rapid 7 has about 2200 employees, to the

13    best of your understanding?

14    **A.**    Yes.

11:33:07  15    **Q.**    Do you have offices in multiple locations, sir?

16    **A.**    Yes.

17    **Q.**    What locations do you have those offices?

18    **A.**    Belfast, Dublin, Boston, Cambridge, just the same

19    really, but Alexandria, Austin, Texas, Los Angeles, and I

11:33:25  20    believe that's it.

21    **Q.**    Okay.

22          Are there computer -- is the Internet security issues

23    a worldwide issue, sir?

24    **A.**    Yes.

11:33:35  25    **Q.**    Okay.

|  |  |
|---|---|
| 1 | Is that one of the reasons that, to the best of your |
| 2 | understanding, Rapid 7 would have an office in Dublin? |
| 3 | MR. LEVINE:  Objection, your Honor. |
| 4 | THE COURT:  Sustained. |
| 11:33:47 5 | Q.    If you -- do you know why it has an office in Dublin? |
| 6 | MR. LEVINE:  Objection, your Honor. |
| 7 | THE COURT:  Sustained. |
| 8 | BY MR. O'SHEA: |
| 9 | Q.    Now, I'm going to ask you to take a look at, I think |
| 11:33:59 10 | it's Exhibit 1442.  Do you see that in front of you, sir? |
| 11 | A.    Map of the world? |
| 12 | Q.    Yes. |
| 13 | A.    Yes. |
| 14 | Q.    This was shown earlier by the United States |
| 11:34:11 15 | Government.  You see this arrow that I have here, sir? |
| 16 | A.    Yes. |
| 17 | Q.    Am I going essentially all over the world by doing |
| 18 | that little circular thing.  Do you see the red arrow? |
| 19 | A.    Yes. |
| 11:34:24 20 | Q.    All right.  You see how I'm circling the world? |
| 21 | A.    Europe and America, yes. |
| 22 | Q.    Okay.  All right. |
| 23 | (Laughter.) |
| 24 | MR. O'SHEA:  Again, I forget who I'm talking |
| 11:34:37 25 | to.  All right. |

1       (Laughter.)

2   Q.   Now, you're not aware of any of the connections that

3   were made through various computers, they say over in this

4   part of the world that I just circled, did you see that?

11:34:51 5   A.   In terms of what?

6   Q.   In terms of whether computers were connected in this

7   Bayrob stuff, that they were connected in this part of the

8   world, sir.  Did you -- were you aware of that at all in the

9   course of your investigation with AOL?

11:35:07 10   A.   I'm sorry.  I need maybe a bit more specifics to --

11   Q.   I'm not going to be any more specific, sir.

12       Did you -- were you aware in the course of your

13   investigation with this AOL business when you were employed

14   by them that there were connections potentially made by this

11:35:36 15   Bayrob group that you talked about all over the world,

16   including, but not limited to, that area of the world that I

17   just circled?  Are you aware of that?

18               MR. LEVINE:  Objection.

19               THE COURT:  Sustained.

11:35:44 20   Q.   Do you see this part of the map, sir, the United

21   States of America, am I getting that right?

22   A.   To the best of my knowledge, yes.

23   Q.   Okay.  All right.

24       With -- going back to what I talked about with -- all

11:36:51 25   right.  Let me finish this up if I can, sir.

Miller - Cross/O'Shea

1          Do you even know what the EMEA Partner Summit was in

2     Portugal?

3                    MR. LEVINE:  Objection, your Honor.

4                    THE COURT:  Sustained.

11:37:04  5   Q.    All right.

6          Does your -- the company you work for Rapid 7, work

7     with 85 partners from 27 countries around the world?

8                    MR. LEVINE:  Objection.

9                    THE COURT:  Sustained.

11:37:19  10  Q.    All right.

11         I notice, sir, that your e-mail address that was

12    supplied to us is a Gmail address, am I right about that?

13                   MR. LEVINE:  Objection, your Honor.

14                   THE COURT:  Sustained.

11:37:28  15  Q.    Just so I'm clear, as it relates to this exhibit we

16    saw, 1739 I believe, that just shows e-mail activity but

17    does not show the contents of the e-mails, am I right about

18    that, sir?

19                   MR. LEVINE:  Objection, your Honor.

11:37:48  20                 THE COURT:  Overruled.  Are you able to answer

21    that, sir?

22                   THE WITNESS:  I need to see the exhibit in

23    question again, please.

24    Q.    Okay.

11:37:55  25         Exhibit 1739 or 1737.  I'm not sure what it was.

Miller - Cross/O'Shea

1          MR. LEVINE:  1739.

2     **Q.**    You remember being asked questions about this exhibit,

3     sir, 1739?

4     **A.**    Yes.

5     **Q.**    Okay.

6          And as I understand it, you're not able to see the

7     content of e-mails, you're just able to see -- to use

8     layman's terms if I can with you -- you're just able to see

9     e-mail traffic, am I right about that?

10          MR. LEVINE:  Objection, your Honor.

11          THE COURT:  Overruled.  You may answer that,

12     sir.  Is that true?

13          THE WITNESS:  I'm sorry.  I need you to repeat

14     the question again.

15     **Q.**    Sure.

16          I'm looking at Exhibit 1739, sir.  That's an exhibit

17     you saw earlier in your direct testimony.  Am I right about

18     that?

19     **A.**    Yes.

20     **Q.**    You'll agree with me?  Okay.  Very good.

21          This exhibit, we're at the top.  We see headers roll

22     up.  This is an exhibit that shows that there's e-mail

23     exchanges and activity but it does not show us what the

24     content of those e-mails were.  Am I right about that?

25     **A.**    Correct.

1              MR. O'SHEA:  One moment please, Judge.

2              THE COURT:  Certainly.

3              MR. O'SHEA:  Thank you, sir.  No further

4     questions.

11:39:35 5          MR. LEVINE:  No redirect, your Honor.

6              THE COURT:  You may step down, sir.

7              THE WITNESS:  Thank you, your Honor.

8              THE COURT:  Thank you.  Watch your step.

9              THE WITNESS:  Do I --

11:39:46 10         THE COURT:  You can leave them right there and

11    I'll get them.

12          Ladies and gentlemen, instead of calling another

13    witness for just ten minutes, we're going to take our

14    luncheon recess at this point in time.

11:39:56 15         If you recall, I have a very important telephone

16    conference I must participate in.

17          So you're going to have a longer than normal lunch

18    hour.  I'll tell you what.  I'm going to ask you to be

19    downstairs at 1:15.  We will call for you at that time and

11:40:15 20   hopefully, I'll be able to leave the conference call if it's

21    still going on at that time and we will start up as soon as

22    they are up.

23          Have a good lunch, everyone.  Remember the admonition.

24    All rise for the jury.

11:40:26 25         (Thereupon, a luncheon recess was had.)

Miller - Cross/O'Shea

1       FRIDAY SESSION, MARCH 29, 2019, AT 1:18 P.M.

2              THE COURT:  Folks at the four tables, if you

3       have a phone near a mike, it's interfering with our Court

4       Reporter's ability to hear.  So if you could simply move

13:27:37 5      your phones away from the microphones.

6          It's my understanding the Government has -- would like

7       to read two stipulations.  Is that correct?

8              MR. BROWN:  That is correct, your Honor.  And

9       I'll hold my phone over here.

13:28:09 10         Thank you, your Honor.  The parties stipulate to two

11      witnesses.  The first witness is Michael Mazzone, and the

12      parties stipulate that the Cellebrite reports and excerpts

13      from the Cellebrite reports created by Mike Mazzone reflect

14      the true and accurate copies of data from the imaged phones.

13:28:35 15            THE COURT:  That's Mike Mazzone, M-A-Z --

16             MR. BROWN:  True and accurate copies -- sorry,

17      true and accurate copies of data from imaged phones.  He

18      would testify about the Cellebrite reports and that's --

19             THE COURT:  M-A-Z-Z-O-N-E?

13:28:48 20            MR. BROWN:  Yes, your Honor.

21             THE COURT:  Mr. Goldberg?

22             MR. O'SHEA:  That's correct, your Honor.

23             THE COURT:  Mr. O'Shea?

24             MR. O'SHEA:  That is so stipulated, your

13:28:56 25      Honor.

890

Miller - Cross/O'Shea

1                THE COURT:  Second stipulation.

2                MR. BROWN:  Concerns testimony that the

3      Government would have provided from Joseph Corrigan,

4      C-O-R-R-I-G-A-N, and the parties further stipulate that the

13:29:08 5      digital devices seized from Romanian and the copies of those

6      devices were not altered in any way after they were seized.

7      No programs or files were changed or added to these devices

8      after their seizure.

9                THE COURT:  Agreed, Mr. Goldberg?

13:29:22 10                MR. GOLDBERG:  Yes, your Honor.

11                THE COURT:  Mr. O'Shea?

12                MR. O'SHEA:  So stipulated, your Honor.

13                THE COURT:  All right.

14                MR. BROWN:  Thank you, your Honor.

13:29:26 15                THE COURT:  And call your next witness.

16                MR. BROWN:  Our next witness your Honor,

17      Mr. McDonough will do.

18                MR. McDONOUGH:  The United States of America

19      would call Sandra Buja.

13:29:46 20                THE COURT:  Please step up to the podium,

21      ma'am.  And please raise your right hand.

22

23

24

25

SANDRA BUJA,

of lawful age, a witness called by the GOVERNMENT,

being first duly sworn, was examined

and testified as follows:

DIRECT EXAMINATION OF SANDRA BUJA

THE COURT:  Please take a seat right over there, ma'am.

BY MR. McDONOUGH:

**Q.**     Good afternoon.  That microphone, you can adjust and pull in front of you.  Would you please state your name and spell your name for the benefit of our Court Reporter?

**A.**     Sandra Manios, Buja, S-A-N-D-R-A, M-A-N-I-O-S, B-U-J-A.

**Q.**     By whom are you employed?

**A.**     Wal-Mart.

**Q.**     What do you do for Wal-Mart?

**A.**     I'm a trademark attorney.  I oversee the intellectual property team, both the patent and the trademark side, and I manage a trademark portfolio.

**Q.**     Okay.

How long have you been a trademark attorney at Wal-Mart?

**A.**     For six years.

**Q.**     What is a trademark?

**A.**     So a trademark is -- it's a brand.  It's an indication

Buja - Direct/McDonough

1    of source for a product or a service.

2         I'll use my cup of water as an example.  Pepsi is a

3    trademark.  They're a design mark.  Their design logo is a

4    trademark.  And it's used to indicate the this water or

13:31:36  5    Pepsi was sourced by -- or soda was sourced by Pepsi versus

6    Coke, for example.

7    Q.   All right.

8         Are you the only trademark attorney for Wal-Mart?

9    A.   No, I'm not.

13:31:47  10   Q.   How many are there?

11   A.   There's five of us.

12   Q.   Okay.

13        What are your duties and responsibilities as a

14   trademark attorney at Wal-Mart?

13:31:58  15   A.   So I manage -- we divide the portfolio, and for my

16   portfolio, which includes the Wal-Mart retail brands, I

17   manage the portfolio in terms of making sure we have it

18   adequately protected, making sure that others are not

19   infringing on it and pursuing enforcement if it is being

13:32:21  20   infringed.

21   Q.   Okay.  When you say a portfolio --

22   A.   Um-hum.

23   Q.   -- what do you mean by that?

24   A.   So Wal-Mart has about 20,000 trademarks registered

13:32:34  25   around the world, probably about 700 in the United States.

Buja - Direct/McDonough

1    So it's a variety of trademarks.  We have trademarks

2    for our retail stores.  We have trademarks for products that

3    we sell.  You may be familiar with some of them, like Great

4    Value or Equate.  If you have pets, you might be familiar

13:32:54 5    with Ol' Roy or Pure Balance.

6    **Q.**   Okay.

7        Can you tell us a little bit about your educational

8    background?

9    **A.**   Yes.

13:33:05 10        I went to college at Boston University, and I got a

11    degree in political science, a bachelor of arts degree in

12    political science, and then I went to -- took a couple years

13    off to be a paralegal and then I went to school to be an

14    attorney at Suffolk University also in Boston.

13:33:26 15    **Q.**   What was your employment after law school?

16    **A.**   I started in New York in Manhattan with an insurance

17    defense firm for about a year and a half.  Then I moved to a

18    boutique trademark firm, and then I moved to the US Patent

19    and Trademark Office.  And I was with -- they call it the

13:33:48 20    PTO or USPTO -- I was with the PTO for seven years before I

21    went to Wal-Mart.

22    **Q.**   Okay.

23        So Wal-Mart poached you from the Government?

24    **A.**   No, I applied and was thankfully hired.

13:34:02 25    **Q.**   Okay.

Buja - Direct/McDonough

```
 1    A.    On April Fool's Day.

 2    Q.    What?

 3    A.    Don't know if the fool was on them or me.

 4          (Laughter.)

 5    Q.    What is the United States Patent and Trademark Office?

 6    A.    The USPTO is the Government agency that manages

 7    trademarks and patent registrations, and my practice focuses

 8    on trademarks.  I was on the trademark side of, I call it

 9    the trademark office.

10    Q.    In addition to trademarks, are there some other terms

11    like service marks, trade names, and service names?

12    A.    Yes, those are all including brand and logo,

13    interchangeable terms for a trademark.

14    Q.    Okay.

15          MR. McDONOUGH:  May I approach the witness,

16    your Honor?

17          THE COURT:  Of course.

18    Q.    Showing you what's been marked for identification

19    purposes as Government's Exhibit 1902, Pages 1 through 32,

20    do you recognize what those are?

21    A.    Yes, they are the USPTO registration certificates.

22    This certificate is for the Wal-Mart mark in particular.

23    Q.    What is a registration certificate?

24    A.    So it is the document that documents or certifies that

25    you have a registration, that the mark is federally
```

Buja - Direct/McDonough

1    protected.

2    **Q.**    Okay.

3          Have you had a chance to review all of those before

4    coming here today?

13:36:00  5    **A.**    Yes, I did.

6                MR. McDONOUGH:  Ms. Chandler, may we have

7    Government's Exhibit 1902, Page 1?

8          And if we could zoom in on the top half.

9          Okay.

13:36:22  10    **Q.**    Can you describe what is displayed on the monitor?

11    **A.**    It's the certified copy of the registration.

12    **Q.**    Okay.

13          Does each registration have a number?

14    **A.**    Yes, it does.

13:36:35  15    **Q.**    Okay.  And if we could zoom out, please.  If we could

16    go to Page 2, please.

17          What does -- what is Page 2?

18    **A.**    It is exactly what it's covered for the Wal-Mart

19    brand.  So what I mean by that is you list products and the

13:37:00  20    services that are protected under the brand, under this

21    particular registration.

22    **Q.**    Okay.

23          When you say you registered products and services

24    under the brand to protect them --

13:37:11  25    **A.**    Um-hum.

Buja - Direct/McDonough

**Q.**   -- what do you mean by that?

**A.**   I mean basically nobody else can use the word Wal-Mart
in connection with retail services.

**Q.**   Okay.

**A.**   Which is what this registration covers.

**Q.**   Does the registration apply to the type of the
letters, is it the letters Wal-Mart or the color or the --
what the front --

**A.**   What is protected under this registration?  I
understand what you're asking.

So it is a black and white registration for the word
Wal-Mart, for the whole word Wal-Mart, and what the black
and white registration means, it protects it for any font,
color, or style.  So Wal-Mart can use the word Wal-Mart in
any format it wants to use it.

**Q.**   Okay.

Does there indicate how long Wal-Mart has had a
registered certificate for Wal-Mart?

**A.**   Yes.  This particular registration was from 2014.

**Q.**   And how -- does it indicate how long Wal-Mart has had
this?

**A.**   It was first used in commerce, starting July 1, 1962.

**Q.**   Okay.

And if we could please zoom in on the paragraph of
text, starting with -- yes.  Thank you.  A lot of words

Buja - Direct/McDonough

1    there?

2    **A.**    Yes.

3    **Q.**    What is the requirement to list for the retail store

4    services?

13:38:51 5    **A.**    Yes.

6    **Q.**    What are we seeing here?

7    **A.**    So all you really have to do for the protection was to

8    list retail store services and/or online retail store

9    services, which are e-commerce.  But to -- so you can be

13:39:08 10    specific or you can be broad.  So we did both.  We listed it

11    broadly and listed specifically types of retail.  So we

12    retail, it's a department store, it's a grocery store, it's

13    a pharmacy, there's a bakery.  So we went through and listed

14    all the variety of products that we retail in our stores.

13:39:26 15    **Q.**    Okay.

16        How long does the certificate protect the Wal-Mart

17    brand?

18    **A.**    For ten years, but you have the right to renew it as

19    long as you are still using it in US commerce.

13:39:40 20    **Q.**    If we could zoom out, please.  And Page 3, please.  If

21    we could zoom in on the text.

22        And this is a continuation -- or I'm sorry.  What does

23    Page 3 indicate?

24    **A.**    It is a continuation of the certification, and it

13:40:07 25    indicates the main language I mentioned earlier, the more

Buja - Direct/McDonough

1    standard characters without claim to any particular font

2    style, size, or color.  That means that Wal-Mart can use the

3    mark in any font style, size, or color.

4    **Q.**    Okay.

13:40:23  5         Where -- I should say if we could go to Page 5,

6    please.  I'm sorry, excuse me.  Oh, yes, Page 5.

7         What is Page 5?

8    **A.**    Page 5 is actually -- I don't know what the correction

9    was, but Page 2 says corrected June 17, 2014.  So Page 5 was

13:40:53  10  the original certification.  And then it was corrected on

11   Page 2.

12   **Q.**    Okay.

13   **A.**    So it's -- it's essentially the same registration.

14   I'm not sure what the correction was.

13:41:04  15  **Q.**    Okay.

16        Could we -- split screen, is it possible with Page 2?

17   **A.**    Oh, I realize what the correction is.

18   **Q.**    Pulling those up side by side, you mentioned there was

19   a date to the correction.  Could you indicate where the

13:41:35  20  correction is?  There's a little red arrow if you want to

21   direct your finger.

22   **A.**    Okay.  Thank you.

23        So on Page 5, it says Arkansas is -- it's an Arkansas

24   corporation, were located in Arkansas but that is --

13:42:00  25  Wal-Mart is not incorporated in Arkansas.  We are

Buja - Direct/McDonough

1    incorporated in Delaware.  So the correction is noted there.

2    And then the state of incorporation was corrected to

3    Delaware corporation.

4    Q.    Okay.

5          Where do you work; Arkansas, Delaware?

6    A.    I work in Arkansas.

7    Q.    All right.

8          If we could go to Page 9, please.  Thank you.  All

9    right.  What is Page 9?

10   A.    So Page 9 is our logo, the design mark, which we refer

11   to as the spark.

12   Q.    Pardon me.  The --

13   A.    The spark.

14   Q.    The spark.  This is the Wal-Mart spark?

15   A.    Yes.

16   Q.    Okay.

17   A.    And again, it's in black and white.  So it gives

18   Wal-Mart rights to use the design in any color.

19   Q.    Okay.  How long has the Wal-Mart spark been protected

20   or when it was?

21   A.    Registration is for 2014.

22   Q.    Okay.

23   A.    And 2014, we -- we've kind of reregistered the mark

24   because our scope of services had expanded.  So we wanted to

25   make sure we covered those in the registrations.

Buja - Direct/McDonough

1    **Q.**    When you say scope of services, you mean?

2    **A.**    I mean we had expanded from just being a department

3    store, retail, to being a pharmacy, to offering financial

4    services.

13:43:43  5    **Q.**    Okay.

6         If we could go to Page 13.  What is Page 13?

7    **A.**    Page 13 is the certification registration for the

8    spark in connection with online retail and retail department

9    store services.

13:44:12  10   **Q.**    There was a separate one for the brick and mortar

11   store versus something online?

12   **A.**    Correct.

13   **Q.**    Okay.  When was the online spark first put into use?

14   **A.**    It was first used in US commerce on September 12th,

13:44:30  15   2007.

16   **Q.**    Okay.

17        Page 15, please.  What does Page 158 depict?

18   **A.**    Page 15 is that same mark, but in color because this

19   is the color that we actually used.  So we wanted to protect

13:44:48  20   the trade dress, which is the design aspect of the logo.

21   **Q.**    You say the design -- was it the trade design?

22   **A.**    Trade dress.

23   **Q.**    Trade dress?

24   **A.**    Trade dress is the design element of a trademark.

13:45:03  25   **Q.**    So for the spark, the trade dress is the fact it's got

1    the six little lines?

2    A.    Um-hum.

3    Q.    Is that a yes?

4    A.    The -- yes, sorry.  And the yellow is how it is

13:45:16  5    consistently used on the store front, on our website, has

6    the yellow color for the spark.  So we made sure we

7    protected it specifically in yellow so someone couldn't come

8    and try to use a similar design in yellow.

9    Q.    Okay.

13:45:34  10        Page 17, please.  What's Page 17?

11    A.    So Page 17 is the word Wal-Mart with the spark

12    combined in black and white and should explain that we try

13    to -- we try to protect our assets as comprehensively as we

14    can.

13:46:00  15        So our business clients can use it as broadly as they

16    can.  Sometimes they use the word Wal-Mart by itself.

17    Sometimes they use the spark by itself.  Sometimes they

18    combine them.  So we want to -- we want to protect every

19    aspect of that.

13:46:15  20    Q.    Okay.

21        What's the process for registering Wal-Mart, the

22    spark, in black and white, the color?

23    A.    You file a trademark application, and you submit in

24    each of your trademark, you list goods and services you are

13:46:34  25    protecting.  You have to demonstrate that you are using the

Buja - Direct/McDonough

1    mark in US commerce before it will register so you prove --

2    you provide evidence with a declaration that you are using

3    it with your dates of use.  And then you wait for the PTO to

4    take action on it.

13:46:52 5    **Q.**    Okay.

6          What was the first use of the -- this Wal-Mart spark

7    registration certificate?

8    **A.**    Sorry.  It was August 19, 2008.

9    **Q.**    Okay.

13:47:08 10          And Page 19, please.  What does this depict?

11    **A.**    This registration we file specifically to protect the

12    trade dress, the color combination of Wal-Mart.  So it's the

13    word Wal-Mart in blue, and the spark in yellow.

14    **Q.**    Okay.

13:47:31 15    **A.**    Which is the most frequent way you will see us use the

16    brand.

17    **Q.**    Are there -- does Wal-Mart have official colors for

18    its brand or logo?

19    **A.**    They are the blue, yellow, and white.

13:47:42 20    **Q.**    Page 21, please.  What is Page 21?

21    **A.**    Page 21 protects our tag line, which is another word

22    for trademark or a brand, which is, "Save Money, Live

23    Better."

24    **Q.**    Okay.  When was that first in use?

13:48:06 25    **A.**    It was first used September 11, 2007.

Buja - Direct/McDonough

1    **Q.**    Page 23.  What does this -- what's Page 23?

2    **A.**    Page 23 is another registration for "Save Money, Live

3    Better," adding additional services under the brand.

4    **Q.**    Okay.

13:48:36 5    And Page 26.  What is this -- what is Page 26?

6    **A.**    Page 26 is the same registration as the last, and it

7    was also corrected to correct the state of incorporation

8    from Arkansas to Delaware.

9    **Q.**    Page 30?  What is Page 30?

13:49:07 10    **A.**    Page 30 is our main lock up with the word mark

11    Wal-Mart, the spark design, and the "Save Money.  Live

12    Better" tag line, all in one format.

13    **Q.**    All three, the name, the spark, the tag line?

14    **A.**    Correct.

13:49:22 15    **Q.**    And Page 32?

16    **A.**    Page -- did you ask me?

17    **Q.**    Yes.  What is Page 32?

18    **A.**    Page 32 is also the full lock up of Wal-Mart spark,

19    "Save Money.  Live Better," covering a variety of retail

13:49:46 20    services.

21    **Q.**    Okay.

22    And when was that first put in use?

23    **A.**    It was first used June 24, 2008.

24    **Q.**    How long can you keep renewing them for the ten years?

13:49:58 25    **A.**    Your trademark will last as long as you use it.  So as

Buja - Direct/McDonough

1    long as you're using it when the -- when the registration is

2    due for renewal, you can renew it.

3    **Q.**    Okay.

4    Have you heard of the term class when it comes to a

5    trademark?

6    **A.**    Yes.

7    **Q.**    What does class mean?

8    **A.**    The class is the international classification system

9    that the U.S. and most international governments comply with

10   to categorize the goods and services.  There are 45 classes;

11   34 of them are for goods and ten of them are for services,

12   and they just help categorize so you can group similar types

13   of goods or similar types of services into one class.

14   **Q.**    Okay.

15   And what are the types of the classes that we've seen

16   in Government's Exhibit 1902, Pages 1 to 32?

17   **A.**    They are primarily Class 35, which is retail store

18   certificates and e-commerce.

19   **Q.**    So brick and mortar and online?

20   **A.**    Correct.

21   **Q.**    Okay.  Who is a rights holder?

22   **A.**    The rights holder is the trademark owner.

23   **Q.**    Okay.  Who is the trademark owner of the certificates

24   that we saw in Government's Exhibit 1902?

25   **A.**    They are Wal-Mart.  They are listed as Wal-Mart

Buja - Direct/McDonough

1    Stores, Inc., but we recently created a holding company.

2    **Q.**    Okay.

3    **A.**    And Wal-Mart actually changed its entity name from

4    Wal-Mart Stores, Inc. to Wal-Mart, Inc.  So when we went

13:51:41  5    through that change, we went ahead and created a holding

6    company to hold all of our intellectual property assets,

7    which is Wal-Mart Apollo, LLC.  So Wal-Mart Apollo, LLC, is

8    the current Wal-Mart entity that owns the brands.

9    **Q.**    So under Wal-Mart, there's a little company Wal-Mart

13:52:00  10    created called Wal-Mart Apollo?

11    **A.**    Correct.

12    **Q.**    LLC?

13    **A.**    Correct.

14    **Q.**    Limited?

13:52:05  15    **A.**    Limited Liability Company, yes.

16    **Q.**    And that little company owns all of the trademarks?

17    **A.**    Correct.  And Wal-Mart, Inc. is the exclusive licensee

18    of all those assets.

19    **Q.**    What's a licensee?

13:52:20  20    **A.**    Somebody who has written legal permission from the

21    rights holder, the owner, to use the mark.

22    **Q.**    Who does Wal-Mart give permission to use these

23    trademarks?

24    **A.**    Wal-Mart gives Wal-Mart permission to use the

13:52:35  25    trademarks for Wal-Mart.

Buja - Direct/McDonough

1    **Q.**    All right.

2          And there are Wal-Mart stores located in the United

3    States?

4    **A.**    Yes.

13:52:43 5    **Q.**    Anyplace else?

6    **A.**    Yes, I believe we operate in 27 countries.

7    **Q.**    27 countries.  Okay.  Have you heard of the primary

8    register of the United States Patent Trade Office?

9    **A.**    Yes.

13:52:59 10    **Q.**    What's that?

11    **A.**    It's the principal registration.

12    **Q.**    I'm sorry, principal?

13    **A.**    Yes, there's a principal register and a supplemental

14    register.  And the principal register, that is a mark that

13:53:12 15    is inherently qualified to be a trademark.  The supplemental

16    register is it doesn't inherently qualify to be a trademark,

17    but you can acquire trademark rights in it.  Usually, that's

18    for descriptive marks.

19          If you think of American Airlines, for example, as

13:53:35 20    descriptive of an airline that flies in America.  So that --

21    it would be unsupplemental unless they can show that they

22    have acquired trademark rights, which I think is safe to say

23    they have because we hear American Airlines, we think of an

24    airline brand.  You don't think that it's descriptive.

13:53:54 25    **Q.**    Okay.

Buja - Direct/McDonough

1    MR. McDONOUGH:  Approach the witness, your

2  Honor?

3    THE COURT:  Sure.

4    MR. McDONOUGH:  May we show Government's

13:54:26  5  Exhibit 1200?  All right.

6  Q.  Do you recognize what Government's Exhibit 1200 is?

7  A.  Yes.

8  Q.  Okay.

9    This is a screenshot regarding a page that was used by

13:54:57 10  the Bayrob Group.  It's spam e-mail to customers.  Okay?

11    Do you see any trademarks in Government's Exhibit

12  1200?

13  A.  Yes.

14  Q.  Can you describe the trademarks that you see?

13:55:15 15  A.  All of the trademarks we just covered from the Federal

16  Registration; the word Wal-Mart, the spark design, the tag

17  line, "Save Money, Live Better," the word Wal-Mart next to

18  the spark, and the entire, Wal-Mart spark, "Save Money Live

19  Better" lock up.

13:55:41 20  Q.  So approximately five?

21  A.  Yes.  So one, two, we have the spark in black and

22  white, and we had it in yellow, so three, and then "Save

23  Money.  Live Better" is four, the combination Wal-Mart and

24  spark is five, and then the lock up.  So we're talking at

13:56:01 25  least six.

Buja - Direct/McDonough

1    **Q.**    At least six on here?

2    **A.**    Um-hum.

3    **Q.**    Are the marks, trademarks on Exhibit 1200 identical or

4    indistinguishable from the genuine registered trademarks

13:56:16 5    that we just looked at in Government's Exhibit 1902?

6    **A.**    Yes, they are identical.

7    **Q.**    And were those trademarks in effect between the years

8    2007 and 2016?

9    **A.**    Yes, they were.

13:56:29 10    **Q.**    Are you able to tell if there's any differences

11    between the trademarks in this image and the genuine

12    trademarks registered by Wal-Mart, Incorporated or currently

13    owned by Wal-Mart Apollo, LLC, as those marks were in effect

14    between 2007 and 2016?

13:56:52 15    **A.**    There are no distinctions.  In fact, they even use the

16    Circled R. Registration.  We always use next to the spark

17    design.

18    **Q.**    Could we please zoom in on the spark.  What is --

19    sorry?

13:57:10 20    **A.**    That -- I'm sorry.

21    **Q.**    You mentioned the little R.  What's the little R?

22    **A.**    The Circled R is the notice of a federal registration.

23    So it is how we put others on notice that we have a

24    registration on this design.

13:57:26 25    **Q.**    Okay.  And if we could zoom out, please.

1    If we could go to Government's Exhibit 1257.

2              THE COURT:  1257?

3              MR. McDONOUGH:  1257, your Honor.  We have

4    one.

13:58:00 5              THE COURT:  Is this an addition?

6              MR. McDONOUGH:  It is, your Honor.  May I

7    approach the bench?

8              THE COURT:  Sure.

9    **Q.**    Showing you Government's Exhibit 1257, this is a page

13:58:23 10   sent by the Bayrob Group with links to infect users with the

11   virus.  Do you see any of Wal-Mart's trademarks on

12   Government's Exhibit 1257, Page 1?

13   **A.**    Yes.

14   **Q.**    Please identify those trademarks.

13:58:44 15   **A.**    It is the same; again, the same trademarks from the

16   registration certificates.  The word Wal-Mart that --

17   **Q.**    Excuse me.  Could we zoom in on the upper left corner,

18   Sue?

19   **A.**    The word Wal-Mart, the spark design, the spark design

13:59:07 20   in yellow, the "Save Money.  Live Better," Wal-Mart with the

21   spark design, and then the entire lock up of Wal-Mart spark,

22   "Save Money.  Live Better."

23   **Q.**    If we could zoom out, please.  You mentioned Wal-Mart

24   as an online presence?

13:59:28 25   **A.**    Yes.

Buja - Direct/McDonough

1    **Q.**    What's the e-commerce website for Wal-Mart?

2    **A.**    It is Wal-Mart.com.

3    **Q.**    Does Wal-Mart sell iPads and tablets?

4    **A.**    Yes, we do.

13:59:37  5    **Q.**    Electronics?

6    **A.**    Yes, we do.

7    **Q.**    Please go to Exhibit 1257, Page 2.

8          All right.

9          This is the second page, and this is a page for the

13:59:50  10   Bayrob Group to steal credit card information from users,

11   access this page to purchase products.  If we could zoom in

12   on the top left corner of the screen, please.

13         Do you see any Wal-Mart's trademarks in Government's

14   Exhibit 1257, Page 2?

14:00:11  15   **A.**    Yes, I do.

16   **Q.**    Could you please identify those trademarks?

17   **A.**    Yes.

18         Again, registered marks of the blue Wal-Mart, the

19   spark, the spark in yellow, "Save Money.  Live Better."

14:00:30  20   Wal-Mart with the spark and the combined lock up of Wal-Mart

21   spark, "Save Money.  Live Better."

22   **Q.**    Okay.

23         And Government's Exhibit 1257, Page 1 and Page 2, are

24   those trademarks identical or indistinguishable from the

14:00:46  25   genuine register trademarks that we looked at in

Buja - Direct/McDonough

1    Government's Exhibit 1902 that were in effect between the

2    years of 2007 and 2016?

3    **A.**    Yes, they are identical.  And again, they use it with

4    the registration notification, the federal registration

14:01:03 5    notification that we use.

6    **Q.**    Are you able to discern any differences between the

7    marks in this Government's Exhibit 1257, Page, 1 and 2 and

8    the genuine trademarks registered by Wal-Mart as those marks

9    were in effect between 2007 and 2016?

14:01:19 10    **A.**    There are no distinctions.

11    **Q.**    Did Wal-Mart give any person the permission to use any

12    of these trademarks to trick users into providing personal

13    information or to infect users with a virus?

14    **A.**    No, absolutely not.

14:01:43 15    **Q.**    Okay.

16          Would the unauthorized use of the Wal-Mart trademark

17    cause confusion, mistake, or deception with any user?

18                    MR. O'SHEA:  Objection.

19                    THE COURT:  Sustained.

14:02:03 20    **Q.**    Why does Wal-Mart protect its trademarks?

21    **A.**    We protect it so nobody can use a mark that is

22    confusingly similar to ours.  So that they don't

23    misappropriate our brand and our reputation.  The whole

24    point of a trademark is one, you can identify a source, you

14:02:25 25    know, you're shopping at Wal-Mart versus you're shopping at

Buja - Direct/McDonough

1    target versus you're shopping at Amazon.

2         But, if you -- but it's also your reputation.  Most of

3    us have a personal affiliation with brands.  We prefer

4    shopping at Wal-Mart or we prefer shopping at Target.  But,

14:02:47  5    we also -- that preference is based on our personal

6    experiences.  So if you have a negative experience, then

7    you're likely not to want to shop at that store.  I'll speak

8    to my own personal experience.  When Target had its credit

9    card breached for customer credit cards, I stopped shopping

14:03:09 10    at Wal -- at Target for a period because I was afraid that

11    my credit card information would be hacked.  So I waited

12    until I felt comfortable that they had identified where the

13    breach was coming from and had corrected it.

14         But, same thing at Wal-Mart, it -- it hurts our

14:03:30 15    reputation, our brand reputation, our customers' experience

16    in our stores.  It hurts our credibility.

17    Q.    Okay.

18         How is the Wal-Mart brand harmed when others use

19    Wal-Mart's trademarks without Wal-Mart's permission?

14:03:47 20    A.    It's the reputation of the brand.  We can't control

21    how other people are using our brand unless we give them

22    permission.  So we don't give other people permission to use

23    the Wal-Mart brand unless they're in a formal business

24    relationship with us.

14:04:01 25         If -- if you -- if you were to see this or if I were

Buja - Direct/McDonough

1    to see this, I would have been confused and shopped on it

2    and thought it was -- it was Wal-Mart.

3    **Q.**    Does Wal-Mart have a mission?

4    **A.**    Yes.

14:04:19  5    **Q.**    What is it?

6    **A.**    We our corporate principles are service to the

7    customer, striving for excellence, respect for the

8    individual, and integrity.  And if somebody were using our

9    brand in a way to basically damage or hurt our customers, it

14:04:40  10    violates every one of our corporate principles.

11    **Q.**    Thank you.

12                    MR. McDONOUGH:  No further questions.

13                    THE COURT:  Cross-examination, Mr. Goldberg.

14                    MR. GOLDBERG:  Your Honor, may we approach?

14:04:49  15                    THE COURT:  You may.

16            (Discussion at side bar off the record.)

17                    MR. GOLDBERG:  Thank you, your Honor.

18

19

20

21

22

23

24

25

1  CROSS-EXAMINATION OF SANDRA BUJA

2  BY MR. GOLDBERG:

3  Q.  Good afternoon.

4  A.  Good afternoon.

14:08:02  5  Q.  Pronounce your last name for me.

6  A.  Buja.

7  Q.  Buja.  Okay.

8  I'm Michael Goldberg.  I have some questions regarding

9  your testimony.  You indicated that these trademarks were

14:08:21 10  the first one, the Wal-Mart name was originally registered

11  in 1962, correct?

12  A.  That was when it was first used.

13  Q.  First used.  When was it first registered?

14  A.  Can I check the certificates?

14:08:34 15  Q.  You can look at anything you want.  Just tell me what

16  you're looking at.

17  A.  I don't see one of the original filings.  I see the

18  one that was registered in 2014 that we supplemented the

19  services that were covered under it.

14:09:29 20  Q.  Prior to 2014, Wal-Mart company had enforceable rights

21  on the name Wal-Mart?

22  A.  Correct.

23  Q.  So if somebody had a legitimate business and Wall was

24  their last name?

14:09:45 25  A.  Um-hum.

Buja - Cross/Goldberg

1    **Q.**    Like Mr. Walton?

2    **A.**    Um-hum.

3    **Q.**    Named Wal-Mart.  And if it was a mom and pop shop,

4    could -- would he be allowed to name the store Wal-Mart or

14:09:59 5    Wall Mark or something like that?

6    **A.**    No, they would not.  We have actually enforced against

7    entities that have tried to do that.

8    **Q.**    Okay.

9        And how do you go about enforcing that?

14:10:11 10    **A.**    Usually we send a C&D, cease and desist letter.

11    "You're infringing on Wal-Mart.  Wal-Mat has registered

12    rights on this asset and you cannot use it," and then they

13    will stop using it.

14    **Q.**    But isn't the essence of the -- the protection to

14:10:29 15    avoid confusion?  In other words, is someone really going to

16    be confused by a gas station on a country road where it says

17    Wall Mark with the billion dollar, multi-billion-dollar

18    company?

19    **A.**    A federal registration affords you your trademark

14:10:49 20    protection rights throughout the United States.  And

21    Wal-Mart actually operates throughout the United States.  We

22    have over 4,000 stores.  So yes, somebody would be confused

23    if they were using a mom and pop shop for a gas station.

24    And actually gas stations are protected under the Wal-Mart

14:11:08 25    brand as well.

Buja - Cross/Goldberg

1    **Q.**    Okay.  A gas station, anything retail?

2    **A.**    Anything retail, in addition to other services but

3    we're focusing on the retail right now.

4    **Q.**    But there are certain services that it wouldn't apply

14:11:22 5    to.  Or is it everything in the world?  I mean I can't have

6    a Wal-Mart, you know, rug cleaning service, right?

7    **A.**    So, under US law, if your mark is famous, it is

8    afforded additional protection.  If it is a registered mark,

9    and it is famous, it is afforded additional, a broader scope

14:11:45 10    of protection.

11    So even if you didn't have -- even if Wal-Mart didn't

12    have a federal registration for a particular good or a

13    particular service because it is a famous registered mark,

14    we would be able to enforce because it would be diluting the

14:12:03 15    value of the brand.

16    **Q.**    Just the name.  Not the logo, just the name?

17    **A.**    I would say both because they are both -- they're both

18    registered.  They're both entitled to broad scope of

19    protection.  They're both well known.

14:12:18 20    **Q.**    Okay.

21    Well, you said in your testimony that we trademark.

22    So no one else can use it, correct?

23    **A.**    Correct.

24    **Q.**    But there is exceptions to that rule, correct?

14:12:37 25    **A.**    Like what?  I'm not sure what you mean.

1    **Q.**    Let's say, for instance, you have -- since you asked

2    the question, let's say I'm protesting Wal-Mart's hiring

3    policies and I wanted to carry a sign out in front of

4    Wal-Mart saying don't shop at Wal-Mart.  Can you stop me

5    from using the word Wal-Mart on that sign?

6    **A.**    That would likely fall under First Amendment Freedom

7    of Speech.  You're allowed to not like Wal-Mart and protest

8    Wal-Mart.

9    **Q.**    Okay.

10        And could I use the service mark or use the --

11    **A.**    The federal registration?

12    **Q.**    Yeah.  What is the mark with the sun burst mark?  What

13    you call it?

14    **A.**    It's a spark.

15    **Q.**    A spark.  Can I use that, too, and be protected by the

16    First Amendment?

17    **A.**    It would be -- you could make an argument against it

18    because nobody would know the word spark, and you wouldn't

19    need to say spark to protest Wal-Mart.

20    **Q.**    No, not say it, use it, put it on my sign.

21    **A.**    I don't know the answer to that one.  So I'm reluctant

22    to say yes or no.

23    **Q.**    Just in your opinion, do you know -- you don't have --

24    it doesn't really have to be the right answer, just what's

25    your opinion?

Buja - Cross/Goldberg

1        MR. McDONOUGH:  Objection.

2        THE COURT:  Sustained.

3   **Q.**    What's your opinion?

4        MR. McDONOUGH:  Objection.

14:14:02 5        THE COURT:  Sustained.

6   **Q.**    Okay.

7        So what if somebody is doing a work of fiction,

8   whether it's a television script or something else that --

9   where you see the Wal-Mart name, don't they have a right to

14:14:25 10  use it in that context?

11  **A.**    Wal-Mart receives requests to use the mark in that

12  context often and we often say we're not authorizing it.

13  You should consult with an attorney as to whether or not you

14  have any fair use rights to use it.

14:14:41 15  **Q.**    Fair use rights.  What does that mean?

16  **A.**    It means, for example, freedom of speech, another

17  First Amendment --

18  **Q.**    Okay.

19       So -- but fair use would be -- what if I wanted to go

14:14:54 20  on Saturday Night Live and was hired on Saturday Night Live

21  and do a skit that mocked Wal-Mart.  Would I be able to

22  use -- would I be able to use the service marker or

23  trademark to do that?  Would I be able to use a blue vest

24  that says Wal-Mart on it?

14:15:14 25  **A.**    I would tell you to consult with an attorney on it.

Buja - Cross/Goldberg

1    **Q.**    Got you.

2    **A.**    Because I'm not going to authorize you to do it.

3    **Q.**    But can you stop it?

4    **A.**    It would probably fall under parody, under fair use,

14:15:30  5    yes.

6    **Q.**    Okay.

7          And that's an exception to the trademark.  Is a parody

8    exception?

9    **A.**    Correct.

14:15:38 10    **Q.**    What does that mean?

11    **A.**    It means you can -- if you needed to use a trademark

12    for mockery or to basically create a joke or contradict the

13    brand, you might be able to do that in the sense that --

14    Saturday Night Live is an excellent example in terms of, you

14:16:05 15    know, President Trump can't stop anybody from joking about

16    him on Saturday Night Live.  And there's --

17    **Q.**    He would like to.

18    **A.**    He probably would like to, but -- I forget where I was

19    going.

14:16:23 20    **Q.**    Parody.  You were explaining parody.

21    **A.**    Okay.

22    **Q.**    So I can use a protected mark to make fun or mock the

23    company that owns the mark, right?

24    **A.**    Or to protest, yes.

14:16:43 25    **Q.**    Or to protest.  But I can't use it in a commercial way

Buja - Cross/Goldberg

1    to benefit me?

2    **A.**    Correct.

3    **Q.**    Okay.

4         And does Wal-Mart -- has Wal-Mart had to protect or

14:17:00 5    establish its rights against other large companies that have

6    used similar marks?

7    **A.**    You're asking me if we've taken enforcement action

8    against other large companies for using one of the

9    registered marks that we covered?

14:17:20 10    **Q.**    Correct.

11    **A.**    Not that I -- not that I can recall or that I'm aware

12    of.

13    **Q.**    Okay.

14         So looking -- I was looking at this spark logo and it

14:17:35 15    looks like when my iPhone starts up, it does that for

16    awhile, right, goes round and round?

17    **A.**    Yeah, that's not --

18    **Q.**    But you know what I'm talking about, right?

19    **A.**    Right.

14:17:44 20    **Q.**    The phone loads.

21    **A.**    Um-hum.

22    **Q.**    You see something that looks like that and it kind of

23    spins like a clock?

24    **A.**    It's spinning like a circle with arrows going around

14:17:52 25    is usually what you see.

Buja - Cross/Goldberg

1    **Q.**    And there's been no confusion between Wal-Mart and

2    Apple?

3    **A.**    No, no.

4    **Q.**    So you testified that you have certain ethics and

14:18:17 5    certain company principles.

6    **A.**    Um-hum.

7    **Q.**    Were you aware or were you aware -- was the company

8    aware, as far as you know, about any use of the logos that

9    you saw in court here today by an entity that's been called

14:18:41 10    the Bayrob Group?

11    **A.**    I was not aware.

12    **Q.**    Did the company become aware -- well, you were not

13    aware of it.  Do you know whether or not the company was

14    aware or suffered any damage that you can quantify?

14:19:00 15    **A.**    I -- I'm not aware that the company knew of the

16    infringement, of the alleged infringement.

17    **Q.**    So if the company didn't know about the infringement,

18    then the damage that could be sustained is hypothetical,

19    correct?

14:19:19 20                    MR. McDONOUGH:  Objection.

21                    THE COURT:  Overruled.  I'll allow that.

22                    THE WITNESS:  No, it's not hypothetical.

23    **Q.**    It's not?

24    **A.**    Just because we don't know about it does not mean it's

14:19:31 25    hypothetical.  If the infringement took place and our

1    consumers logged on to this fake website and gave their

2    credit card information, then there's harm to the company,

3    whether or not the company was aware of it.

4    Q.    But you're not -- okay.  But, the company was never

14:19:48  5    aware of any lost sales, lost reputation, lost business of

6    any kind as a result of the, quote, Bayrob Group, correct?

7    A.    Not to my knowledge.  We were not aware.

8    Q.    So you don't have any numbers of customers' loss,

9    sales lost, damages sustained as a result of a, quote,

14:20:15 10    Bayrob Group, but it's a general reputation damage that the

11    company's possibly sustained?

12              MR. McDONOUGH:  Objection.

13              THE COURT:  Sustained.

14    Q.    You don't have any numbers, do you, to justify any

14:20:31 15    actual loss?

16              MR. McDONOUGH:  Objection.

17              THE COURT:  Sustained.

18    Q.    Do you have anything, any information that

19    demonstrates that there was an actual monetary loss to the

14:20:44 20    company because of the activities of the, quote, Bayrob

21    Group?

22              MR. McDONOUGH:  Objection.

23              THE COURT:  Sustained.

24    Q.    Do you -- can you quantify any loss at all as a result

14:21:02 25    of these entities?

Buja - Cross/Goldberg

1          MR. McDONOUGH:  Objection.

2          THE COURT:  Sustained.

3          MR. GOLDBERG:  May we approach, your Honor?

4      (The following proceedings were held at side bar:)

14:21:20  5          MR. GOLDBERG:  Are they not a victim?  I mean

6   I'm just asking a question about -- they're being presented

7   as a victim of the trademark counts, and I'm looking for

8   some quantification of damages.  And so I guess I have a

9   question about why I can't go there.

14:21:52 10      I said I'm trying to quantify damages.  They're the

11  victim of the --

12          MR. McDONOUGH:  Your Honor, the Government

13  would object to asking the witness for a legal conclusion in

14  terms of trying to quantify.

14:22:02 15          THE COURT:  Folks, she's been asked this

16  question.  She said she doesn't know.  The company didn't

17  know.  Move on.  You -- it's been asked and answered.

18          MR. GOLDBERG:  Okay.

19      (Proceedings resumed within the hearing of the jury:)

14:22:25 20          MR. GOLDBERG:  Thank you very much.  I have no

21  further questions.

22          THE WITNESS:  Thank you.

23          THE COURT:  Mr. O'Shea.

24

25

CROSS-EXAMINATION OF SANDRA BUJA

BY MR. O'SHEA:

**Q.**    The images that the Prosecution showed you -- let's say -- can I see Exhibit 1200, please?  Do you see 1200 in front of you, ma'am?

**A.**    Yes, I do.

**Q.**    Okay.

You know what a jpeg is by the way, what type of file that is, a picture file?

**A.**    Yes.

**Q.**    Okay.

And if I went to a Wal-Mart website and I did a thing called right click on it, and I click "save image," I could download the image that easily, am I right about that?

**A.**    Sometimes, yes, correct.

**Q.**    And that's why you probably have it trademarked so people can't do that, right?

**A.**    Correct.

**Q.**    But the ease of which even a lawyer from Cleveland, Ohio, could do it by right clicking, downloading, saving as an image, it's that simple, am I right about that?

**A.**    Yes.

**Q.**    Not complicated, right?

**A.**    Correct.

**Q.**    All right.

Buja - Cross/O'Shea

```
 1              And I could actually attempt to use that in a website
 2        that I build myself, am I right about that?
 3        A.    You could attempt to, yes.
 4        Q.    Okay.  And just so I'm clear, is it Ms. Buja?  Did I
14:23:52  5     say that right?
 6        A.    Correct.
 7        Q.    Thank you.
 8              You have no idea as you sit there on that witness
 9        stand when, if at all, any trademark of Wal-Mart was used by
14:24:07 10     anybody in this courtroom, am I right about that?
11                    MR. McDONOUGH:  Objection.
12                    THE COURT:  Overruled.  You may answer that.
13                    THE WITNESS:  You've been informed by --
14        Q.    Other than what you've been informed by the fellows
14:24:20 15     over at this table, okay, any -- any idea at all?
16        A.    With respect to this case or more broadly?
17        Q.    This case, this courtroom.
18        A.    No.
19        Q.    Okay.  All right.
14:24:34 20           Do you have any idea whatsoever, ma'am, whether or not
21        the -- what we see here on Exhibit 1200, is that in front of
22        you again, ma'am?
23        A.    Yes, it is.
24        Q.    You got it there, you have the hard copy?  Okay.
14:24:48 25           You also have it on the screen there, ma'am?
```

Buja - Cross/O'Shea

1    Everybody see it on the screen by the way?  Thank you.

2        Do you have any idea whether this trademark, this

3    image was altered in any way by anyone in this courtroom?

4    **A.**    No.

14:25:00  5  **Q.**    Okay.

6                MR. O'SHEA:  That's all I have, Judge.  Thank

7    you.  Thank you, ma'am.

8                THE COURT:  Any redirect?

9                MR. McDONOUGH:  No, your Honor.

14:25:05  10            THE COURT:  You may step down, ma'am.  Watch

11    your step.

12                THE WITNESS:  Thank you very much.

13                THE COURT:  Call your next witness.

14                MR. LEVINE:  The Government calls Monique

14:25:33  15  Liburd.

16                THE COURT:  Please step up to the podium,

17    ma'am.  Please raise your right hand.

18

19

20

21

22

23

24

25

Liburd - Direct/Levine

1                          MONIQUE LIBURD,

2          of lawful age, a witness called by the GOVERNMENT,

3                  being first duly sworn, was examined

4                        and testified as follows:

14:25:40  5           DIRECT EXAMINATION OF MONIQUE LIBURD

6      BY MR. LEVINE:

7      **Q.**    Good afternoon.

8      **A.**    Good afternoon.

9      **Q.**    Could you please state and spell your name for the

14:26:11 10   record?

11     **A.**    Monique, M-O-N-I-Q-U-E, Liburd, L-I-B-U-R-D, as in

12     dog.

13     **Q.**    All right.  Thank you.  And what do you do, Mrs.

14     Liburd?

14:26:26 15   **A.**    Trademark counsel at Google, LLC.

16     **Q.**    Google?

17     **A.**    Yes.

18     **Q.**    Is that the Google?

19     **A.**    Yes.

14:26:32 20   **Q.**    All right.

21          Well, if you are trademark counsel for Google, then

22     perhaps you can tell us what does Google do?

23     **A.**    So Google is a tech company, technology, mostly

24     Internet focus.  I think major things people would know

14:26:49 25   about Internet search services, cloud computing, hardware,

Liburd - Direct/Levine

1   advertising.

2   Q.   And as a trademark counsel for Google, what does your

3   job duty entail?

4   A.   So I'm responsible for trademark prosecution and

5   enforcement of the Google portfolio as well as the

6   geo-portfolio, which are our mapping products.  So I handle

7   everything from clearance to filing trademark applications

8   to going after infringers.  And another part of my job is

9   setting our platform policies to the extent other people's

10  brands appear on our products dealing with whether we would

11  take something down if something was infringing someone

12  else's trademarks on our products.

13  Q.   And you can move the mike just a little bit closer so

14  we can hear.  Thank you so much.

15  A.   Is that better?

16  Q.   I think it's better.  Yes.

17  A.   Okay.

18  Q.   Thank you.  Okay.  How long have you worked for

19  Google?

20  A.   I've been there six years and four months.

21  Q.   Okay.

22       And prior to working at Google, what other legal jobs

23  have you held?

24  A.   I was also trademark counsel at Chevron, and I was

25  associate at Morgan Lewis in Washington, D.C.

1    **Q.**    Okay.  Chevron Corporation, what is that?

2    **A.**    An oil and gas company.

3    **Q.**    Okay.  And Morgan Lewis, what is that?

4    **A.**    A law firm in Washington, D.C.

14:28:14  5    **Q.**    Okay.

6           And where do you work for Google, geographically?

7    Where is your office?

8    **A.**    I sit in San Francisco, California.

9    **Q.**    So did you fly in from San Francisco for this trial?

14:28:27 10    **A.**    I did.

11    **Q.**    Well, thank you so much.  We really appreciate that.

12           What degrees do you hold?

13    **A.**    I have a bachelor's of arts in psychology and a JD,

14    which is a law degree.

14:28:39 15    **Q.**    Okay.

16           Now, does Google hold various trademarks, service

17    marks, trade names and service names that it's registered on

18    the Principal Registry of the United States Patent and Trade

19    Office?

14:28:53 20    **A.**    We do.

21    **Q.**    Okay.

22           And for efficiency today, I'm just going to refer to

23    trademarks, service marks, trade names, and service name

24    just as trademark or marks.  Is that okay with you?

14:29:05 25    **A.**    Sure.

930

Liburd - Direct/Levine

1    **Q.**    Okay.  Great.  All right.

2         So now, I'm going to -- I'd like you to bring up --

3    I'm going to bring to the witness what has been marked as

4    Government's Exhibit 1906.

14:29:35 5         And have you had an opportunity to -- can you bring it

6    up, Sue?  Thank you.  You can take them out of the folder.

7    We'll wait.  Thank you.

8         Have you had an opportunity to review these before

9    coming to the stand today?

14:29:51 10   **A.**    Yes.

11   **Q.**    Okay.  So what is Government's Exhibit 1906?

12   **A.**    It's a collection of our word mark and stylized marks

13   for the Google and Gmail trademarks.

14   **Q.**    Okay.

14:30:06 15        And let's be clear.  How many different registration

16   certificates do you have there?

17   **A.**    There are eight.

18   **Q.**    Okay.

19        There are eight.  I'm guessing Google has more than

14:30:23 20   eight trademarks.  Is that right?

21   **A.**    Yes.

22   **Q.**    Roughly how many trademarks would you say Google has?

23   **A.**    Thousands.

24   **Q.**    Thousands.  Okay?

14:30:31 25   **A.**    13, 14,000, like a lot.

Liburd - Direct/Levine

1    **Q.**    I want you to review them all.  No.  Okay.  We'll

2    stick with these eight.  All right.

3          These Government Exhibit 1906 those eight trademark

4    registrations, a fair and accurate compilation of certified

14:30:48 5    copies of trademark registrations that Google registered on

6    the Principal Registry of the USPTO?

7    **A.**    Yes.

8    **Q.**    All right.

9          Now, I'd like to bring up Page 13 of Government's

14:31:05 10   Exhibit 1906.  And okay.  If you could tell us, please, what

11   mark is registered here on Page 13 of 1906?

12   **A.**    This is the Google word mark.

13   **Q.**    Okay.  And what does it mean that it's the Google word

14   mark?  What's a word mark?

14:31:30 15   **A.**    So I mean a word mark, I guess, is the broadest

16   protection one can get for a trademark.  You basically own

17   that particular word and any expression of that word so you

18   can alternatively file for a stylized logo, which would mean

19   you would only have, you know protection for the expression

14:31:48 20   of that word as it appears in the logo.  But, when you have

21   a word mark, you have, you know, the broadest protection.

22   So any color any stylization.  So this is the broadest

23   Google word mark.

24   **Q.**    Okay.  And when was this mark registered?

14:32:06 25   **A.**    It was registered -- I'm sorry.  I'm referring to the

Liburd - Direct/Levine

1   document.  Registered on January 20, 2004.

2   **Q.**   Okay.

3        And what was the first use date of this mark?

4   **A.**   Reclaimed September, 1997.

14:32:22  5   **Q.**   Okay.

6        And when was this mark filed on the USPTO's Principal

7   Registry?

8   **A.**   September 16, 1999.

9   **Q.**   Okay.

14:32:34 10        Let's go to Page 21 of the same exhibit.  And if you

11   could zoom in there.  Thank you so much, Sue.

12        Looking at Page 21 of Government's Exhibit 1906, what

13   mark is registered here?

14   **A.**   This is the Gmail word mark.

14:32:57 15   **Q.**   Okay.  And what is Gmail?

16   **A.**   Gmail is our e-mail service that Google offers free

17   for e-mail service.

18   **Q.**   When was this mark registered?

19   **A.**   This was registered October 3, 2006.

14:33:12 20   **Q.**   Okay.

21        And what was the first use date of this mark?

22   **A.**   January 20, 1998.

23   **Q.**   And when was this mark filed on the USPTO's Principal

24   Registry?

14:33:24 25   **A.**   April 2, 2004.

Liburd - Direct/Levine

**Q.**     Let's go to Page 15 of this exhibit, please.  Okay.
Look.  And if you can zoom in.  Thank you so much, Sue.

Looking at Page 15 of Government's Exhibit 1906, which
mark is registered here?

14:33:48 **A.**     So this is our -- one of our earlier versions of the
Google stylized logo.

**Q.**     And when was this mark registered?

**A.**     This was registered September 12, 2006.

**Q.**     And what was the first use date of this mark?

14:34:03 **A.**     November, 2000.

**Q.**     Okay.

And if we could turn to Page 16.  Looking at Page 16.
When was this mark filed under USPTO's Principal Registry?

**A.**     September 18, 2001.

14:34:26 **Q.**     Okay.

Now in general, we originally learned about classes.
What class or classes were the trademarks that we looked at
registered for?

**A.**     Typically, you know, we file lots of classes, but I
14:34:42 think the four most important classes for Google are Class
9, which is like software; Class 38, which would be
telecommunication services; 35, which would be advertising;
and 42, which is like creation and development of software
and hardware.

14:34:58 **Q.**     Okay.  And do your classes cover search?

934

Liburd - Direct/Levine

1    **A.**    Yes, Internet search engines, yes.

2    **Q.**    Do your classes also cover mail?

3    **A.**    Yes.

4    **Q.**    e-mail?

14:35:08 5    **A.**    Right.

6    **Q.**    Okay.

7          And have these marks been in use by Google in the

8    classes you referenced since their registration?

9    **A.**    Yes.

14:35:16 10    **Q.**    All right.

11          I want to show you what's been previously identified

12    as Government's Exhibit 1230.  Now, Government's Exhibit

13    1230 is a screenshot of a page that the Bayrob Group would

14    sometimes inject onto infected computers when those -- when

14:35:42 15    the users of those computers attempted to visit Google?

16                    MR. O'SHEA:  Objection.

17                    THE COURT:  Sustained.

18    **Q.**    So Exhibit 1230 is a screenshot of a page that would

19    sometimes be injected on to infected computers when users of

14:36:18 20    those computers attempted to visit Google.  My question for

21    you is do you see any of the -- of Google's marks on

22    Government's Exhibit 1230?

23    **A.**    I do.

24    **Q.**    All right.

14:36:31 25          Could you please take that -- it's a touch screen up

Liburd - Direct/Levine

1    there.

2    **A.**    Okay.

3    **Q.**    Could you touch -- we'll do one mark at a time.  Touch

4    a mark and show us one of Google's marks that you see on

14:36:44 5    that page.

6    **A.**    Okay.  We'll start here.

7    **Q.**    Okay.  And what mark do you see there?

8    **A.**    That's the Google mark.

9    **Q.**    Okay.  So that's one.  Let's keep -- is there a second

14:37:02 10    one?  And what's that mark?

11    **A.**    The Gmail mark.

12    **Q.**    Okay.  That's two.  Let's see.  Is there a third?

13    What is that mark?

14    **A.**    The Google stylized mark.

14:37:18 15    **Q.**    That's three.  Do you see any --

16    **A.**    Do you not want me to repeat marks?

17             THE COURT:  No.  Go ahead.

18             THE WITNESS:  Okay.  So there's another Gmail

19    reference here.

14:37:28 20    **Q.**    Okay that's four.  Is there another?

21    **A.**    This -- this is the Google Chrome logo.

22    **Q.**    Okay.  So we haven't looked at that one, but there is

23    -- that's a registered mark as well?

24    **A.**    Yes.

14:37:39 25    **Q.**    Okay.  That's five.  Do you see any other?

Liburd - Direct/Levine

1    **A.**    I mean these references to Chrome.

2    **Q.**    Chrome is six.  And another reference to Chrome?

3    **A.**    Yes.

4    **Q.**    Seven.  And another reference to Chrome.  That's

5    eight.  Are there any further?

6    **A.**    There's more references to Gmail in the text but --

7    **Q.**    Okay.  Well, we'll -- we'll stop there.  All right.

8          With respect to the marks that you identified, are

9    those marks identical or indistinguishable from the genuine

10   registered marks we just looked at as those marks were in

11   effect?

12   **A.**    I guess I take exception we didn't look at the Chrome

13   mark, but the Gmail and Google marks, yes.

14   **Q.**    And the Chrome mark is indistinguishable from the

15   trademark registration, the trademark for that mark?

16   **A.**    Yes.

17   **Q.**    Okay.

18          Are you able to discern any differences between the

19   marks in this image and the genuine marks registered by

20   Google?

21   **A.**    I cannot.

22   **Q.**    All right.

23          And did Google give any person permission to use these

24   marks to steal account credentials?

25   **A.**    Google did not.

Liburd - Direct/Levine

1   **Q.**   Okay.

2        Why does Google -- well, strike that.  I want to bring

3   up Government's Exhibit 1231, please.

4        Government's Exhibit 1231 is a screenshot of a page

14:39:22 5   that would sometimes be injected onto infected computers

6   when users of those visitors -- users of those computers

7   attempted to visit Google in order to convince people into

8   becoming money mules?

9             MR. O'SHEA:  Objection to the form of the

14:39:40 10  question.  Can I just counsel with Mr. --

11            THE COURT:  You may.

12            MR. O'SHEA:  All right.

13        (Counsel conferring.)

14            MR. O'SHEA:  I think we resolved it, Judge.

14:40:43 15  BY MR. LEVINE:

16  **Q.**   Can you identify any -- or do you see any of Google's

17  marks on Exhibit 1231?

18  **A.**   I do.

19  **Q.**   Can you use the arrow again on the touch screen to

14:40:57 20  show us those marks?

21        So what is the first mark you've identified?

22  **A.**   The Google stylized logo.

23  **Q.**   All right.  That's one.  What's that mark?

24  **A.**   The Google word mark.

14:41:15 25  **Q.**   Okay.

1    If you can show us the next one.  What is that one

2  that you identified?

3  **A.**    The Google word mark.

4  **Q.**    All right.  The next one, what's that one?

14:41:32 5  **A.**    The Google word mark again.

6  **Q.**    Okay.  The next one?

7  **A.**    Actually I don't see any others.

8  **Q.**    Okay.

9    With respect to the marks that you identified, are

14:41:47 10  those marks identical or indistinguishable from the general

11  registered marks we just looked at?

12  **A.**    Yes.

13  **Q.**    And are you able to discern any differences between

14  the marks in this image and the genuine marks registered by

14:42:00 15  Google?

16  **A.**    No.

17  **Q.**    Did Google give any person permission to use those

18  marks to trick users into becoming money mules?

19  **A.**    Google did not.

14:42:14 20  **Q.**    Why does Google protect its trademarks?

21  **A.**    Well, one of the main reasons any brand protects their

22  trademark but definitely Google specifically is to protect

23  our users, like trademarks are meant to be a source

24  identifier.  And so consumers should feel like when they see

14:42:32 25  a particular trademark, that they know that the good or

1    service they're getting from the provider of that good or

2    service actually came from them and that it's authentic.  So

3    Google, like many other brands, works hard to protect our

4    mark so people can trust our brand.

14:42:49 5    **Q.**    In general, how is Google harmed when others use

6    Google's marks like this without permission from Google?

7    **A.**    I think there's four main ways that brand owners

8    experience harm, Google specifically.

9        Definitely damage to our reputation.  Like to the

14:43:06 10   extent consumers can't trust your brand, they may -- like if

11   you had a bad experience with something that you thought

12   came from Google, even if it didn't, you may not want to use

13   our services anymore.  So we lose users, you know, when

14   people misuse our mark this in this way.

14:43:20 15       Brand equity, like Google's Number 1 asset is its

16   brand.  So to the extent the brand is losing value because

17   people aren't trusting it, like that actually does hurt our

18   bottle line, like our mark is just worth less.

19       From a resource's perspective, a trademark enforcement

14:43:35 20   is very expensive.  Like in a lot of countries, it costs a

21   lot of money to go after infringers.  Like you have to hire

22   investigators, we have to hire outside law firms to help us

23   go after them.

24       And then just resources, like I mean there are a lot

14:43:47 25   of things that people like myself, the paralegals on my

Liburd - Cross/Goldberg

1    team, the investigators internally, like there are things we

2    could be doing positively to build our brand when we're not

3    going after people who are misusing our marks.

4         So it's a drain on resources, like the more

14:44:01  5    enforcement we have to do, the less things we're doing to

6    build up and protect our brand.

7              MR. LEVINE:  No further questions for this

8    witness.

9              THE COURT:  Mr. Goldberg.

14:44:14 10              CROSS-EXAMINATION OF MONIQUE LIBURD

11    BY MR. GOLDBERG:

12    Q.   Good afternoon, a couple questions.

13         With regard to this litigation, were you aware of what

14    Mr. Levine referred to as the Bayrob Group prior to getting

14:44:25 15    notice to appear for this litigation?

16    A.   I was not.

17    Q.   Okay.  And how did you get notice to appear?

18    A.   We have a litigation -- like an internal investigation

19    support team, I think like a subpoena must have come in

14:44:39 20    through them, requesting like a trademark witness, and they

21    reached out to me.

22    Q.   You do this often?

23    A.   I do not.

24    Q.   Have you testified in court before?

14:44:47 25    A.   I have.

Liburd - Cross/Goldberg

1    **Q.**    And did you -- you mentioned ways that Google could be

2    hurt by misuse of its branding.  Are you aware of any

3    specific damages with regard to anything that Bayrob Group

4    may have done?

14:45:08 5    **A.**    I'm not.

6    **Q.**    You said that Google has word protection.  Is that how

7    you refer to it?

8    **A.**    That's one of the types of protections we have, yes.

9    **Q.**    That means the word Google is owned by Google and

14:45:24 10    can't be used for any other purpose?

11    **A.**    I mean it's --

12    **Q.**    I understand --

13    **A.**    -- trademarks are specific to goods and service.  So

14    the classes and the things that we haven't registered for,

14:45:36 15    like we have exclusive right to use the word Google in those

16    classes for those service.

17    **Q.**    What about -- what about when it's used as a verbal

18    Googling?

19    **A.**    So this actually recently has gone up pretty high in

14:45:51 20    the federal court.  In the U.S., it's been can declared that

21    even when Google is used as a verbal, they're using Google

22    to mean -- to use the Google search engine, like they're not

23    using it to meaning Yahoo or Bing, or other search engines

24    and so even if Google is being used as a verb, it's serving

14:46:08 25    as a source identifier.

Liburd - Cross/Goldberg

1    **Q.**    So you can't do it?

2    **A.**    You can do it, but it -- it still holds its ability to

3    serve as a source so it's not like a -- not generic just

4    because people have used it as a verb.

14:46:20  5    **Q.**    So if I went on a website that I owned, try Googling

6    us, would that be something that you can enforce against?

7    **A.**    I would probably send you a letter, yes.

8    **Q.**    Tell me to knock it off?

9    **A.**    I would ask you to knock it off, yes, very nicely.

14:46:38 10    **Q.**    I'm sure.

11           Okay.  Thank you.

12                    MR. GOLDBERG:  Nothing further, your Honor.

13                    THE COURT:  Mr. O'Shea.

14

15

16

17

18

19

20

21

22

23

24

25

CROSS-EXAMINATION OF MONIQUE LIBURD

BY MR. O'SHEA:

**Q.**    Thank you, ma'am.

Just before you -- another nice lawyer from Wal-Mart -- I'm going to ask you some of the same questions I asked that lawyer.

Google -- when I go to a Google page, you know, throughout the page, there will be that Google brand throughout, inserted throughout the web page, am I right about that?

**A.**    Yes.

**Q.**    And if I right click with my mouse on the windows based guy and I attempt to down, load that jpeg, I can download an image of a Google jpeg on my hard drive, can I?

**A.**    I'm not sure.  It might depend on the site.  It's very possible, but I don't know for sure.

**Q.**    And as you sit here -- and I'm not sure that Mr. Goldberg got this but covered the question.

Any idea whether anyone in this courtroom did anything with a Google image as you sit here today?

**A.**    No.

**Q.**    Okay.

And would you agree with me that the images that you looked on Exhibit 1906, 1230 and 1231, do you have hard copies up there, by the way, or do you have to have them on

944

Liburd - Cross/O'Shea

1       the screen?

2       **A.**     I think they have to come back on the screen.  I just

3       have the registrations.

4       **Q.**     All right.

5              And could you show the witness Exhibit 1230?  Do you

6       see Exhibit 1230?

7       **A.**     Yes.

8       **Q.**     All right.

9              And just so I understand it, none of those images, to

10      the best of your understanding, were -- that are Googling,

11      okay, that were covered by Exhibit 1902, which was a

12      trademark verification, none of those images, to the best of

13      your understanding, have been altered, am I right about

14      that?

15      **A.**     I'm sorry.  Would you mind rephrasing your question?

16      **Q.**     No problem.

17      **A.**     1902 is -- this is --

18      **Q.**     Let me do that.

19      **A.**     This is 1230.

20      **Q.**     Was is 1906?  I'm going to go back?  I think I wrote

21      it down wrong.  1906.  That's my fault.

22      **A.**     Oh, okay.

23      **Q.**     Let me see if I can help you.

24             You remember doing this business up here on the screen

25      yourself?

Liburd - Cross/O'Shea

**A.**     Yes.

**Q.**     And then I think we went over some other areas.

**A.**     Right.

**Q.**     On the screen.

14:49:14       And you -- I think you found about three images that
were Google-protected images on this picture, am I right
about that?

**A.**     I think it was a few more than that only because every
time the word mark was referenced counted.  So probably nine
14:49:30   or ten.

**Q.**     Nine or ten.  Fair enough.

       So to the best of your understanding, none of the
images themselves have been altered?  And what I mean by
that, let's go up to this one here.

14:49:39       I'm circling -- you see where I'm doing that with the
little fancy arrow?

**A.**     Yes.

**Q.**     And the G is a blue steel and the O is red, and the
other O is yellow, and then we have blue, green, red, am I
14:49:54   right about that?

**A.**     Yes.

**Q.**     I passed the driver's test, I guess.

       So none of that -- that is how the image always
appears and that's how it's protected, am I right?

14:50:03   **A.**     Yes.

Liburd - Cross/O'Shea

1    **Q.**    So the image we see here has not been altered, to the

2    best of your understanding, as it relates to what I just

3    said, am I right about that?

4    **A.**    Right.  To my untrained eye.  I'm sure a graphic

14:50:14  5    designer could have, tone color differences, you know, it

6    looks very similar to the ones in the registration.

7    **Q.**    Fair enough.  Can we do 1231?  All right.

8          Same question.  That Google up there to the -- you

9    know, it's the same blue, red, yellow, blue, green, red,

14:50:34  10    that we just talked about.  Am I right?

11    **A.**    Yes.

12    **Q.**    Okay.

13          And as it relates to both Exhibits 1230 and 1231, as

14    you just sit here on the stand this afternoon in Cleveland,

14:50:53  15    Ohio, you don't know who used those images, am I right?

16    **A.**    I do not.

17                    MR. O'SHEA:  All right.  Thank you.  Nothing

18    further.

19                    THE COURT:  Any redirect?

14:51:02  20                    MR. LEVINE:  No redirect, your Honor.

21                    THE COURT:  You may step down, ma'am.  Watch

22    your step.

23                    THE WITNESS:  Thank you.

24                    THE COURT:  Folks, we'll take our afternoon

14:51:11  25    recess.  Please remember the admonition.

1      All rise for the jury.

2          (Thereupon, a recess was taken.)

3              THE COURT:  Call your next witness.

4              MR. LEVINE:  The United States calls Shannon

15:15:43  5   Mo.

6              THE COURT:  Please step up to the podium,

7      ma'am, and please raise your right hand.

8                  SHANNON MO,

9        of lawful age, a witness called by the GOVERNMENT,

10              being first duly sworn, was examined

11                and testified as follows:

12          DIRECT EXAMINATION OF SHANNON MO

13              THE COURT:  Please take a seat right over

14      there, ma'am.  Right there.

15:16:07  15  BY MR. LEVINE:

16      Q.    Good afternoon.

17      A.    Good afternoon.

18      Q.    Ms. Mo, could you please state and spell your name for

19      the Court Reporter?

15:16:17  20  A.    Shannon Mo, S-H-A-N-N-O-N, last name, M-O.

21      Q.    Okay.  And what do you do, Ms. Mo?

22      A.    I'm the Assistant General Counsel, Trademarks and

23      Brand Protection for Yahoo.

24      Q.    And by -- what is Yahoo?

15:16:35  25  A.    Yahoo is an online digital media content company.  We

1    offer a variety of services that include e-mail and online

2    search engine.  We provide information to our users.  For

3    example, through Yahoo Sports, Yahoo Finance, Yahoo News.

4    **Q.**    And geographically, where in the world do you work for

15:17:01 5    Yahoo?

6    **A.**    I work in San Francisco, California.

7    **Q.**    Okay.  Now, what does your job duties entail?

8    **A.**    I'm responsible for protecting the Yahoo brand for

9    maintaining its strength so that consumers can have

15:17:21 10    confidence in what the brand is associated with.

11          That includes registering trademarks, protecting the

12    mark, and making sure that it's used appropriately around

13    the world.

14    **Q.**    And how long have you worked for Yahoo?

15:17:38 15    **A.**    Four and a half years, closer to five.

16    **Q.**    Prior to working at Yahoo, have you held any other

17    legal jobs?

18    **A.**    Yes.  I worked at a law firm, Daily Piper in San

19    Francisco.

15:17:51 20    **Q.**    Okay.

21          And does Yahoo hold various trademarks, service marks,

22    trade names, and service names that it's registered with the

23    United States Patent and Trade Office?

24    **A.**    Yes.

15:18:03 25    **Q.**    Okay.

Mo - Direct/Levine

1    And today, I'm just going to be referring to

2    trademarks or marks to refer to all of those.  Is that okay?

3  **A.**    Sure.

4  **Q.**    Okay.

15:18:14  5    And I'm going to hand you what the Government has

6    previously marked as Government's Exhibit 1905.  Could you

7    bring that up please, Sue?  Thank you.

8    And if -- if you would please take out the contents of

9    Government's Exhibit 1905.  Have you had a chance to review

15:18:38 10   the registration certificates, certified registrations prior

11   to getting on the stand today?

12  **A.**    Yes.

13  **Q.**    Okay.

14    So what is Government's Exhibit 1905?

15:18:53 15  **A.**    These are certified copies of our trademark

16   registrations issued by the US Patent and Trademark Office.

17  **Q.**    Okay.

18    And are those -- first of all, how many -- how many

19   certificates are there?

15:19:09 20  **A.**    Eight.

21  **Q.**    Okay.

22    Is it fair to say that Yahoo has more than eight

23   trademarks?

24  **A.**    Yes.

15:19:16 25  **Q.**    Roughly, how many trademarks does Yahoo have?

Mo - Direct/Levine

1    **A.**    Around the world?

2    **Q.**    Yes.

3    **A.**    Active, over 3500.

4    **Q.**    Okay.

5         So eight is a small subset of the 3500; is that right?

6    **A.**    Yes.

7    **Q.**    Okay.

8         But with respect to those eight, are those fair and

9    accurate certified copies of trademark registrations that

10   Yahoo registered with the Principal Register of the United

11   States Patent and Trade Office?

12   **A.**    Yes.

13   **Q.**    Okay.

14        Now, if we can bring up Page 7, please.  Which

15   registration is Page 7 of Government's Exhibit 1905?

16   **A.**    The --

17   **Q.**    Yes.

18   **A.**    This is the Yahoo word mark.

19   **Q.**    Okay.  And when was that word mark registered?

20   **A.**    February 25, 1997.

21   **Q.**    Okay.  And what -- well, strike that.

22        Let's look at Page 14.  If we can zoom in on that one.

23   What is Page 14 of Government's Exhibit 1905?

24   **A.**    This is the Yahoo trademark in our historical serif

25   front.

Mo - Direct/Levine

1    **Q.**   When was that one registered?

2    **A.**   February 25, 1997.

3    **Q.**   And could we look at Page 9, please.

4          And when was -- I'm sorry.  What -- what mark do we

5    see on Page 9 of Government's Exhibit 1905?

6    **A.**   This is our current stylized Yahoo trademark.

7    **Q.**   And when was that mark registered?

8    **A.**   June 16, 2015.

9    **Q.**   Okay.  And what was its first use?

10   **A.**   At least as early as September 30, 2013.

11   **Q.**   Okay.  You can take that down.

12         In what class -- and you don't need to give me the

13   numbers or anything like that, but in general, what class or

14   classes was your trademark or Yahoo's trademark registered

15   for?

16   **A.**   May I give the classes?

17   **Q.**   Sure.

18   **A.**   Okay.  9, 38, 41, 42.

19   **Q.**   Okay.  And what -- I'm sorry.

20   **A.**   45.

21   **Q.**   What do those numbers -- sounds like you're calling a

22   baseball game?

23         (Laughter.)

24   **Q.**   What do those numbers represent?

25   **A.**   Specific classes with the US Patent and Trademark

Mo - Direct/Levine

1    Office, used to identify indexing of information, providing

2    information, telecommunications services, advertising.

3    **Q.**    Okay.  And does it cover online search?

4    **A.**    Yes.

15:22:39 5    **Q.**    Does it cover e-mail?

6    **A.**    Yes.

7    **Q.**    All right.

8         And has the Yahoo marks or have the Yahoo marks been

9    in use by Yahoo in these classes since their registration?

15:22:52 10   **A.**    Yes.

11   **Q.**    All right.

12        I want to bring up what's been previously marked as

13   Government's Exhibit 2124.  Okay.

14        Do you see any of Yahoo's marks on Government's

15:23:13 15   Exhibit 2124?

16   **A.**    Yes.

17   **Q.**    If you could point on the screen to the marks that you

18   see, one at a time.  Okay.  Which mark is that?

19   **A.**    Our Yahoo stylized mark, the older one.

15:23:33 20   **Q.**    Okay.  What else do you see?

21   **A.**    I see reference to our mark here.

22   **Q.**    Okay.  And which one is that?

23   **A.**    That's our Yahoo mark used in word form.

24   **Q.**    Okay.  Where else, if any?

15:23:51 25   **A.**    As part of the e-mail address.

953

Mo - Direct/Levine

1    **Q.**    Okay.  Is it okay to include it as part of the e-mail

2    address?

3    **A.**    If it is an authorized e-mail address, then it is.

4    **Q.**    Okay.

15:24:06  5         And is an e-mail address authorized if you sign up at

6    Yahoo to get it?

7    **A.**    Yes.

8    **Q.**    Okay.

9         Anywhere else that you see it and is that the word

15:24:19 10   mark there?

11   **A.**    It is.

12   **Q.**    Okay.  And is it anywhere else?

13   **A.**    Not that I'm seeing.

14   **Q.**    Okay.  And you'll note in purple there you called

15:24:30 15   attention to the e-mail address.  There's a reference to a

16   Mr. Keleman Donath and a KelemanDonath@yahoo.com.  Do you

17   know who that is?

18   **A.**    I do not.

19   **Q.**    Okay.

15:24:46 20        With respect to the marks -- well, let's go on to the

21   next page.  Let's look at 2123, please.  Do you recognize

22   any of Yahoo's marks on 2123?

23   **A.**    Yes.

24   **Q.**    Can you please point to the marks that you see?  Which

15:25:13 25   one is that?

Mo - Direct/Levine

1   **A.**   That's our stylized mark.

2   **Q.**   Do you see it anywhere else?

3   **A.**   Yes, here.

4   **Q.**   Okay.  And which one is that?

15:25:25 5   **A.**   That is the state -- that's the same stylized mark.

6   **Q.**   All right.  Let's look at Government's Exhibit 2118.

7   Let's look at -- do you see the same two marks in

8   Government's Exhibit 2118?

9   **A.**   Yes.

15:25:53 10   **Q.**   Let's look at Government's Exhibit 1222.  And if you

11   could zoom in on the text there.  Do you see Yahoo's word

12   mark anywhere in Government's Exhibit 1222?

13   **A.**   Yes.

14   **Q.**   Where do you see it, if you'll point.  All right.

15:26:19 15   Thank you.

16        And if we could bring up Government's Exhibit 1439.

17   All right.  Could you go back to the last one?  Can you zoom

18   back in?  Do you see the Yahoo word mark anywhere else

19   besides the one you pointed out here, besides in the e-mail

15:26:55 20   addresses?

21   **A.**   No.

22   **Q.**   Okay.  Can we bring up Government's Exhibit 1439,

23   please?

24        Do you see the Yahoo mark anywhere on Government's

15:27:22 25   Exhibit 1439?

Mo - Direct/Levine

1    **A.**    Yes.

2    **Q.**    Could you tell us where you see -- would you point to

3    where you see it, please?  Okay.

4          And what -- which mark is that?

15:27:33 5    **A.**    That's our historical stylized mark.

6    **Q.**    Okay.

7          Do you see the Yahoo word mark anywhere in this

8    agreement or in this document?

9    **A.**    I see reference to our company name, Yahoo, Inc.

15:27:48 10   **Q.**    Okay.

11         Do you see Yahoo anywhere else in the document?

12   **A.**    No.

13   **Q.**    Okay.

14         With respect to the marks that you looked at in

15:28:05 15   Government's Exhibit 2124, 2123, 2118, 1222, and 1439, are

16   those marks identical or indistinguishable from the general

17   registered marks we just looked at?

18   **A.**    Yes.

19   **Q.**    Are you able to discern any difference between the

15:28:26 20   marks in these images and the genuine marks as registered by

21   Yahoo?

22   **A.**    No.

23   **Q.**    Did Yahoo give any person permission to use any of

24   these marks in order to trick users into providing personal

15:28:42 25   information to infect users with malware or to trick users

Mo - Direct/Levine

1    into becoming money mules?

2    **A.**    No.

3    **Q.**    Why does Yahoo protect its trademark?

4    **A.**    Our trademarks are a symbol of our brand, and we've

5    spent a great deal of time and energy and resources to

6    establish that brand and to earn the trust of our consumers.

7    So to associate that brand and, you know, the good will

8    associated -- built up behind it is really important to us

9    because it allows the community to trust the product and

10   service that we provide.

11   **Q.**    And as a general matter, how is Yahoo harmed when

12   others use Yahoo's marks in the way we just looked at

13   without permission from Yahoo?

14   **A.**    We're harmed because that trust is potentially

15   compromised by use and services that are not authorized,

16   that are not real, that are not -- that we don't stand

17   behind.

18            MR. LEVINE:  All right.  No further questions

19   of this witness.

20            THE COURT:  Mr. Goldberg.

21

22

23

24

25

Mo - Cross/Goldberg

CROSS-EXAMINATION OF SHANNON MO

BY MR. GOLDBERG:

**Q.**    Thank you.  Ms. Mo, good afternoon.

**A.**    Good afternoon.

**Q.**    Thank you for coming all the way to San Francisco.

**A.**    My pleasure.

**Q.**    We heard from someone from Google an hour ago.

        And she explained a similar position as you and she explained how the word Google was registered as a -- as a protective work, correct?

**A.**    Yes -- well, I wasn't there, but okay.

**Q.**    Yeah, and does -- does Yahoo have the same protection?

**A.**    Yes, the Yahoo word mark is protected.

**Q.**    It's -- the word Yahoo with an exclamation point?

**A.**    Yes.

**Q.**    Here's what I don't understand.  I don't think the word Google really existed as a noun prior to the late 90's, but the word Yahoo did.  How is it that you're able to protect a word that's already in use?

        MR. LEVINE:  Objection, your Honor.

        THE COURT:  Sustained.

**Q.**    Well, is there a difference between a word that's made up and a word that's already used in the English language in terms of its registration as a trademark?

**A.**    Yes.

Mo - Cross/Goldberg

1    **Q.**    What is that difference?

2    **A.**    Trademarks are issued for particular goods and

3    services, specific goods and services.  So a word can -- can

4    have a certain meaning, can also be arbitrary related to two

15:31:44 5    different services, goods and services.  So that's the

6    difference.

7    **Q.**    And is there a different process for marking,

8    trademarking an existing word versus one that's made up by

9    the company that's trying to establish the rights?

15:32:00 10    **A.**    The process with the US Patent and Trademark Office is

11    the same.

12    **Q.**    Okay.

13          So in your position as trademark counsel, you have to

14    enforce these rights on occasion, correct?

15:32:17 15    **A.**    Correct.

16    **Q.**    How do you do that?  What actions do you take?

17    **A.**    Can I ask you to --

18    **Q.**    Sure.

19    **A.**    -- clarify that.

15:32:31 20    **Q.**    You work in the -- you're an attorney, correct?

21    **A.**    Correct.

22    **Q.**    And so there are certain legal actions you can take,

23    ranging from I suppose a letter all the way to a lawsuit.

24    Is there anything else you can do to enforce your rights?

15:32:48 25    **A.**    There's a broad spectrum of options that we can take

Mo - Cross/Goldberg

1    to enforce our rights, depending on the circumstances.

2    **Q.**    And in your position, have you filed a suit outside of

3    the United States to enforce Yahoo's rights, say in Europe,

4    Asia, Australia?

15:33:14  5    **A.**    Yes.

6    **Q.**    Okay.

7         And where did those litigations usually occur?  They

8    occur -- is there a specific court for trademark

9    infringement or --

15:33:28 10                   MR. LEVINE:  Objection, your Honor.

11                   THE COURT:  Are you finished with the

12    question?

13                   MR. GOLDBERG:  No.

14                   THE COURT:  Go ahead.

15:33:32 15    **Q.**    Do you have to sue in the country where the trademark

16    is actually being put into commerce or do you -- is there a

17    centralized port for enforcing these rights?

18                   MR. LEVINE:  Objection.

19                   THE COURT:  Sustained.

15:33:50 20    **Q.**    So I saw on your filings that -- the trademark

21    filings, that Yahoo has protection over a number of

22    different services, correct; not just web searches, not just

23    advertising, but a number of things?  And I don't want to go

24    through them all, but it's not limited to just those two

15:34:12 25    areas, correct?

Mo - Cross/Goldberg

1    **A.**    Correct.

2    **Q.**    Do you know whether or not Yahoo ever -- has ever

3    offered any type of money transfer service?

4    **A.**    That are covered by the registrations?

15:34:29 5    **Q.**    Well, the business Yahoo, Inc.  Have they ever offered

6    a money transfer service as part of the array of services?

7    **A.**    Not to my knowledge.

8    **Q.**    Okay.

9            Now, the mark that we saw, the stylized, I think you

15:34:47 10   called it the stylized trademark with the Yahoo

11   registered -- sorry.  In 2013, do you know which one I'm

12   talking about?

13   **A.**    Not specifically.

14   **Q.**    Okay.  Okay.  You have Exhibit 1905 in front of you?

15:35:16 15   **A.**    Yes.

16   **Q.**    Okay.

17           Can you look at Page -- I guess -- Page 7?  Are you

18   looking at that?

19   **A.**    I think so.

15:35:42 20   **Q.**    Okay.

21   **A.**    I'm looking at the screen.

22   **Q.**    So is there -- is it up on the screen?  Okay.

23           What -- do you know what date that was registered,

24   that particular mark that we see on Page 7 of Exhibit 1905?

15:35:55 25   **A.**    February 25, 1997.

1    **Q.**    Okay.

2         And was it there, the one you testified to was

3    registered -- I have it -- if we could put up Page 2 of

4    1905.  Okay.

15:36:14    5         What are we looking at there?

6    **A.**    This is our Yahoo stylized mark.

7    **Q.**    I'm sorry?

8    **A.**    Yahoo stylized mark.

9    **Q.**    Okay.  Thank you.

15:36:27   10         And this was registered June 16th of 2015, correct?

11    **A.**    Correct.

12    **Q.**    And you said the first use was when?

13    **A.**    At least as early as September 30, 2013.

14    **Q.**    Okay.  So let me ask you this.

15:36:41   15         If somebody were to have had -- would have used that

16    mark prior to that date, 2013, would Yahoo have the right to

17    take action at that time?

18                   MR. LEVINE:  Objection.

19                   THE COURT:  Overruled.  You may answer that.

15:37:06   20                   THE WITNESS:  Yes, potentially.

21    **Q.**    All right.  So I guess the question is this:

22         Historically in 2015, you had become aware of someone

23    who used that mark in 2013 before Yahoo's first use, could

24    you have enforced your rights against that user?

15:37:29   25    **A.**    So our word mark registration's issued before this

Mo - Cross/Goldberg

1    stylized version.  So the word mark registration could be

2    used to enforce rights.

3    **Q.**    I'm sorry.  I didn't mean to cut you off.

4         You pursue it under the word mark not necessarily

5    under this registration?

6    **A.**    Potentially.

7    **Q.**    Okay.

8         So with regard to this litigation, when did you first

9    become aware that your presence, your company's presence was

10   needed in Cleveland for this trial?

11   **A.**    My presence, around September, October.

12   **Q.**    Okay.

13        And were you aware of litigation prior to that?  Prior

14   to you realizing that you had to be here, were you aware of

15   this litigation involved use allegedly of Yahoo's various

16   trademarks?

17   **A.**    Yes.

18   **Q.**    Okay.

19        And were you -- did the company suffer any particular

20   financial harm as a result of the actions of anybody related

21   to this litigation, if you know?  I mean -- here.  Let me

22   back up.

23        You're protecting -- your job is to protect the good

24   name of the company, basically, correct?

25   **A.**    Correct.

1　**Q.**　And with regard to the alleged misuse of these marks

2　that are issued in this litigation, are you aware of any

3　actual harm, monetary or otherwise, to Yahoo, Incorporated?

4　**A.**　Generally.

15:39:32 5　**Q.**　Yes.  You can answer that however you want -- feel is

6　appropriate.

7　**A.**　Yes.

8　**Q.**　Okay.  And what -- what's the nature of that harm?

9　**A.**　Any use of our mark by unauthorized parties would be

15:39:52 10　considered harm to the reputation -- potential harm to the

11　reputation and good will of our company and our name.

12　**Q.**　So you're talking about potential harm but not

13　something you could actually quantify?

14　**A.**　I don't think it's something I could quantify

15:40:12 15　specifically.

16　**Q.**　And as far as you know, has any legal action been

17　taken by Yahoo relative to any of the misuse alleged in this

18　case?

19　　　　　　　MR. LEVINE:  Objection, your Honor.

15:40:32 20　　　　　　　THE COURT:  Overruled.  You may answer that.

21　　　　　　　THE WITNESS:  May I ask you to repeat the

22　question, please?

23　**Q.**　Yeah.

24　　　　As far as you know, has any legal action for damages

15:40:42 25　been taken by Yahoo, Incorporated, with regard to any of the

1    actions at issue in this litigation?

2                    MR. LEVINE:  Objection, your Honor.

3                    THE COURT:  Overruled.  Do you know, ma'am;

4    yes or no?

15:40:55 5                    THE WITNESS:  Not that I'm aware of, no.

6                    MR. GOLDBERG:  Thank you.  Nothing further.

7                    THE COURT:  Mr. O'Shea?

8                    CROSS-EXAMINATION OF SHANNON MO

9    BY MR. O'SHEA:

15:41:10 10   Q.    Good afternoon, Ms. -- is it Mo?

11   A.    It is, good afternoon.

12   Q.    Good afternoon.  Thank you.

13         I apologize.  I'm going to ask you a lot of the same

14   questions I asked of the other witnesses who testified on

15:41:27 15   the same subject matter.  I'll go quickly.

16         You know what a jpeg is?  Like a file format of a

17   picture.  You have any idea what that is?

18   A.    Yes.

19   Q.    Okay.

15:41:37 20         And if I right click on a Yahoo image on a Yahoo page

21   or any page that's a Yahoo image, I can download the Yahood

22   jpeg image, can't I?

23   A.    Potentially.

24   Q.    Okay.  All right.

15:41:54 25         And these marks that you were shown on Exhibits 21,

Mo - Cross/O'Shea

1   24, 2123, 2118, 1222, and 1439, to the best of your

2   understanding -- and I know you don't have it up there and I

3   don't expect you to commit to memory, but they were shown to

4   you, all those images that you saw, the Yahoo images, did

15:42:21  5   they appear to be altered in any way or did they keep the

6   same scheme that Yahoo uses when it has those images?

7   **A.**    The Yahoo marks I saw on the screen?

8   **Q.**    Um-hum.

9   **A.**    They looked identical to our mark.

15:42:37 10   **Q.**    Okay.  Fair enough.

11       And just so that we're clear for purposes of your

12   testimony, ma'am, you don't have any idea about when any

13   person in this courtroom used those images, you yourself, am

14   I right about that?

15:42:52 15   **A.**    Yes.

16   **Q.**    Okay.  Now, can you bring up Exhibit 1222?

17       Now prior to this afternoon, ma'am, had you ever seen

18   Exhibit 122 before?

19   **A.**    No.

15:43:18 20   **Q.**    Okay.

21       Now, were you shown it before you testified here today

22   by some human being?  It's not a trick question, ma'am.

23   **A.**    No.

24   **Q.**    Okay.

15:43:27 25       Is what you're telling the ladies and gentlemen of the

Mo - Cross/O'Shea

1    jury the first time you ever saw in your life Exhibit 1222

2    was when you sat on the witness stand or did someone at

3    least give you a short preparation for what they might show

4    you at trial?

15:43:44  5    **A.**    I don't recall seeing this exhibit before.

6    **Q.**    Before you sat down here as opposed to when you

7    arrived here?

8    **A.**    Correct.

9    **Q.**    Okay.

15:43:54 10         So just so that I get your testimony accurately --

11    it's not a trick question, ma'am -- the first time you ever

12    saw this document that's marked as Exhibit 1222 was when you

13    sat down in that witness stand and never before.  Am I right

14    or am I wrong?

15:44:13 15    **A.**    As far as I recall, you're right.

16    **Q.**    Okay.  All right.

17         Have you ever seen anything similar to this exhibit we

18    have as Exhibit 1222 before today?  Have you ever seen it

19    before today, something like this?

15:44:28 20                   MR. LEVINE:  Objection.

21                   THE COURT:  Sustained.

22    **Q.**    Okay.

23         Now, could you scan back out Exhibit 1222?  Here's

24    what I'm going to do, ma'am.  Down here at the bottom, see

15:44:42 25    what I'm circling there?

Mo - Cross/O'Shea

1    **A.**    Yes.

2    **Q.**    Could you blow up what I was just circling by any

3    chance?  All right.

4         Do you see where it says copyright, the copyright

15:44:55  5    mark, 2013 Craigslist, Incorporated, do you see that?

6    **A.**    Yes.

7    **Q.**    Do you have any idea why Craigslist would have

8    copyright at the bottom of that page if you know?

9                   MR. LEVINE:  Objection, your Honor.

15:45:06 10                   THE COURT:  Sustained.

11                   MR. O'SHEA:  Thank you very much, ma'am.

12                   THE COURT:  Any redirect?

13                   MR. LEVINE:  No redirect, your Honor.

14                   THE COURT:  Ma'am, you may step down.  Watch

15:45:28 15    your step.

16                   THE WITNESS:  Thank you.

17                   THE COURT:  Call your next witness.

18                   MR. BROWN:  Thank you, your Honor.

19         The United States of America calls Bogdan Antonovici.

15:46:01 20                   THE COURT:  Please step up to the podium, sir.

21    Please step up to the podium.  And if you would please raise

22    your right hand.

23

24

25

1    BOGDAN ANTONOVICI,

2    of lawful age, a witness called by the GOVERNMENT,

3    being first duly sworn, was examined

4    and testified as follows:

15:46:16  5    DIRECT EXAMINATION OF BOGDAN-ANDREI ANTONOVICI-URBANKY

6    BY MR. BROWN:

7    THE COURT:  Please take a seat right over

8    there, sir.

9    MR. BROWN:  May I proceed, your Honor?

15:46:44 10    THE COURT:  Yes, you may.

11    MR. BROWN:  Thank you.

12    BY MR. BROWN:

13    Q.    Could you please state and spell your name for the

14    Court Reporter?

15:46:50 15    A.    Yes.

16    My name is Antonovici Bogdan.  That's a family name.

17    Actually, I'm Antonovici-Urbanky, sorry.  Bogdan-Andrei is

18    the first name.

19    Q.    Okay.  And could you move the microphone a little bit

15:47:02 20    closer to you?

21    A.    All right.

22    THE COURT:  I'm sorry, sir.  Would you tell us

23    your name again.

24    THE WITNESS:  Yeah.  First name is

15:47:11 25    Bogdan-Andrei, and the family name is Antonovici-Urbanky.

1    **Q.**    Could you please spell your first name?

2    **A.**    First name is B-O-G-D-A-N, dash, A-N-D-R-E-I.

3    **Q.**    And your last name, your family name?

4    **A.**    Family name is A-N-T-O-N-O-V-I-C-I, dash,

15:47:39 5    U-R-B-A-N-K-Y.

6    **Q.**    And where do you live?

7            THE COURT:  Would you be so kind just to pause

8    one moment.

9            MR. BROWN:  Absolutely, your Honor.

15:47:48 10            THE COURT:  Sir, A-N-T-O-N-O-V-I-C-I?

11            THE WITNESS:  Yes.

12            THE COURT:  U-R-B-A-N-K-Y?

13            THE WITNESS:  Yes.

14            THE COURT:  Thank you, sir.  I apologize.

15:47:59 15            THE WITNESS:  You're welcome.

16    **Q.**    Is it actually two words?

17    **A.**    Yes, two words, Antonovici-Urbanky.

18    **Q.**    Okay.  So Antonovici, dash, Urbanky.

19            THE COURT:  Thank you.

15:48:16 20    **Q.**    And where do you live, city and country?

21    **A.**    The city is -- Bucharest is the capital for Romania.

22    **Q.**    And were you asked to testify here today?

23    **A.**    Yes.

24    **Q.**    Did you help launder money from eBay auction fraud

15:48:34 25    with anyone in the courtroom today?

Antonovici-Urbanky - Direct/Brown

1              MR. GOLDBERG:  Objection.

2              MR. O'SHEA:  Objection.

3              THE COURT:  Overruled.

4              THE WITNESS:  Yes.

15:48:40  5    **Q.**    Who?

6    **A.**    Radu Miclaus and Bogdan Nicolescu.

7    **Q.**    How long did you work with Radu Miclaus and Bogdan

8    Nicolescu to help launder money from online eBay auction

9    fraud?

15:49:02 10              MR. GOLDBERG:  Objection.

11              MR. O'SHEA:  Objection.

12              THE COURT:  Overruled.

13              THE WITNESS:  Around four years plus another

14    two years or so.  So around six years.

15:49:15 15    **Q.**    Were there two separate periods?

16    **A.**    Yeah.

17    **Q.**    When you helped commit money laundering?

18    **A.**    Yes.

19              MR. GOLDBERG:  Objection.

15:49:21 20              MR. O'SHEA:  Objection.

21              MR. GOLDBERG:  May we approach, your Honor?

22              THE COURT:  You may.

23         (The following proceedings were held at side bar:)

24              MR. GOLDBERG:  The reason that I've objected

15:49:42 25    to the last couple questions is Mr. Brown went right into

1    leading the witness by using legal terms, "Launder money,"

2    without really laying a foundation for what this gentleman

3    actually did.  So I think that that is an improper way to

4    proceed with this examination.

15:50:04 5            THE COURT:  Well, simply by asking a question

6    that elicits a yes or no doesn't mean necessarily that it's

7    leading.  Had he asked the question, "Isn't it a fact that

8    you helped launder money with these two Defendants," then

9    yes, that would be a leading question.  But, the manner in

15:50:25 10   which Mr. Brown asked the question, in this Court's opinion,

11   it is not leading.

12          Regarding the legal conclusion of money launder, I'm

13   assuming, Mr. Brown, that you are going to get into the

14   specifics of that.  And clearly, if you don't, which would

15:50:52 15   be absurd for you not to, but if you don't, I will, of

16   course, strike his answer.

17            MR. BROWN:  Your Honor, we will eventually get

18   into that during his testimony.

19            THE COURT:  Off the record.

15:51:46 20        (Discussion held off the record.)

21        (Proceedings resumed within the hearing of the jury:)

22   BY MR. BROWN:

23   Q.    What period of time did you work with Radu Miclaus and

24   Bogdan Nicolescu?

15:52:09 25   A.    Roughly, because it was a long time ago, around 2004,

Antonovici-Urbanky - Direct/Brown

1   4 or 5, maybe 2009 or 2010.  And 2014, 2016.

2   **Q.**   Okay.

3        And again, I'm going to ask you to speak up.  But may

4   I repeat the answer to make sure I heard him correctly, your

15:52:34 5   Honor?

6              MR. O'SHEA:  Objection.

7              THE COURT:  Sir, would you repeat the answer

8   but keep your voice up?  I'm having a hard time hearing you

9   and I'm next to you.

15:52:44 10             THE WITNESS:  Sorry.

11       The first period was around 2004, 2005, and ended

12  around 2009, 2010, roughly, and the second one was between

13  2014, 2016.

14  **Q.**   Now, on September 28, 2016, did you meet with Special

15:53:09 15  Agents of the FBI in Romania?

16  **A.**   Yes, I did.

17  **Q.**   Do you see them in the court today?

18  **A.**   Yes.

19  **Q.**   And who are they?

15:53:17 20  **A.**   Special Agent Stacy Diaz and Ryan MacFarlane.

21  **Q.**   And did you meet with them in a Prosecutor's office?

22  **A.**   Yes.

23  **Q.**   During that meeting, did they ask you to provide

24  information about online eBay auction fraud?

15:53:38 25  **A.**   Yes.

Antonovici-Urbanky - Direct/Brown

1  **Q.**  What was your answer?

2  **A.**  That I can provide information about that.

3  **Q.**  On September 28, 2016, did they offer you anything?

4  **A.**  No.

15:53:55  5  **Q.**  For cooperation?

6  **A.**  No, no.

7  **Q.**  On September 28, 2016, did they make any promises or

8  guarantees about what would happen to you?

9  **A.**  No.

15:54:09 10  **Q.**  Do you understand that an agreement not to prosecute

11  you for your involvement with the online eBay auction fraud

12  you just talked about is dependent upon providing truthful

13  testimony and cooperation?

14  **A.**  Yes.

15:54:21 15  **Q.**  Do you understand that if you lie, that is not

16  truthful?

17  **A.**  Yes.

18  **Q.**  Do you understand that if you make something up to

19  help yourself, that is not truthful?

15:54:31 20  **A.**  Yes, I understand.

21  **Q.**  Do you understand that minimizing what happened or

22  what you did is not truthful?

23  **A.**  Yes.

24  **Q.**  What do you understand minimizing to mean?

15:54:43 25  **A.**  Basically saying that I done less than is real.

Antonovici-Urbanky - Direct/Brown

1    **Q.**    Okay.

2         And do you understand that any agreement to not

3    prosecute you for your involvement with Defendant Nicolescu

4    and Defendant Miclaus and their online eBay auction fraud is

15:55:04 5    contingent only upon your truthfulness under oath?

6    **A.**    Yes, I understand.

7    **Q.**    Is it your understanding that any promise of non-

8    prosecution covers only online eBay auction fraud with

9    Nicolescu and Miclaus that you're engaged in prior to

15:55:21 10    September 2016?

11    **A.**    Yes, I understand.

12    **Q.**    Are you still engaged in criminal activity in Romania?

13    **A.**    No.

14    **Q.**    Since meeting with the FBI in September of 2016, have

15:55:35 15    you committed any crime in Romania?

16    **A.**    No.

17    **Q.**    Have you ever been convicted, convicted of a crime in

18    Romania?

19    **A.**    No.

15:55:50 20    **Q.**    Have we met before?

21    **A.**    Yes.

22    **Q.**    How many times?

23    **A.**    Twice.

24    **Q.**    When?

15:55:56 25    **A.**    2018 in Romania, 2019 here.

Antonovici-Urbanky - Direct/Brown

1    **Q.**    Did I promise you anything?

2    **A.**    No.

3    **Q.**    In Romania?

4    **A.**    No, no.

15:56:06  5    **Q.**    Did I promise you anything last -- was it last night

6    we met?

7    **A.**    Yes, yes.

8    **Q.**    Did I promise you anything last night?

9    **A.**    No.

15:56:13 10    **Q.**    Did I give you anything of value?

11    **A.**    No.

12    **Q.**    Did I buy you a meal or give you money?

13    **A.**    No.

14    **Q.**    Who told you about a non-prosecution agreement if you

15:56:29 15    testified truthfully about your involvement with online eBay

16    auction fraud?

17    **A.**    You did.

18    **Q.**    Okay.  Was anything else promised?

19    **A.**    No.

15:56:41 20    **Q.**    Now you were flown to the United States; is that

21    correct?

22    **A.**    Yes.

23    **Q.**    And the Government paid for your flight?

24    **A.**    Yeah.

15:56:47 25    **Q.**    Is the Government paying for your hotel?

Antonovici-Urbanky - Direct/Brown

1     **A.**    Yes.

2     **Q.**    Is the Government giving you meals per diem while

3     testifying here?

4     **A.**    Yes.

15:56:54  5   **Q.**    And they're paying for your return ticket to Romania?

6     **A.**    Yes.

7     **Q.**    Did any of those benefits induce your testimony, the

8     ticket, the meal money, the hotel?

9              MR. O'SHEA:  Objection.

15:57:06 10             THE WITNESS:  Can you repeat that?  Sorry.

11             THE COURT:  One moment.  Overruled.  Did you

12    understand the question, sir?

13             THE WITNESS:  No.  That's why I --

14             THE COURT:  Go ahead.  I'm sorry.

15:57:14 15   BY MR. BROWN:

16    **Q.**    That you were given a plane ticket, a hotel, meal

17    money, is that making you testify a certain way today?

18    **A.**    No, no.

19    **Q.**    While you're here in Cleveland, are you leaving the

15:57:27 20   hotel?

21    **A.**    Yes.

22    **Q.**    Are you walking around downtown?

23    **A.**    Yes.

24    **Q.**    Seeing the sights?

15:57:32 25   **A.**    Yeah.

1    **Q.**    Have you gone shopping?

2    **A.**    A little bit, yeah.

3    **Q.**    Have you bought things?

4    **A.**    Yeah.

15:57:36  5    **Q.**    Is this a vacation for you?

6    **A.**    Not really, no.

7    **Q.**    Okay.  Did you bring your family?

8    **A.**    No.  That's why I'm saying it's not the vacation.  I'm

9    without my wife and my kid.

15:57:51 10    **Q.**    Okay.  And you have a daughter, correct?

11    **A.**    Yeah.

12    **Q.**    How old is she?

13    **A.**    Three.

14    **Q.**    Now let's talk about your life in Romania.  Do you

15:58:00 15    have a job currently?

16    **A.**    Yes.

17    **Q.**    What do you do?

18    **A.**    I have auto shop.

19            MR. BROWN:  Your Honor, may I approach?

15:58:07 20            THE WITNESS:  I'm sorry.  Okay.

21        Yeah, I do.  I have a business with my brother.

22    **Q.**    You have a business with your brother.  What kind of

23    business?

24    **A.**    It's a car shop and fixing cars and making interiors

15:58:32 25    for the cars.

Antonovici-Urbanky - Direct/Brown

1    **Q.**    Okay.  What kind of cars?

2    **A.**    Old cars.  It doesn't really matter.

3    **Q.**    And you said you have a daughter, you have a wife?

4    **A.**    Yeah.

15:58:40 5    **Q.**    How did you first meet Bogdan Nicolescu and Radu

6    Miclaus?

7    **A.**    We were in the same school, like fifth to eighth

8    degree, I guess.  Sorry.  My English is not perfect.

9    **Q.**    You mean grade?

15:59:15 10    **A.**    Grade.

11    **Q.**    The fifth to eighth grade?

12    **A.**    Yeah.

13    **Q.**    And roughly, what years were you in fifth to eighth

14    grade?

15:59:24 15    **A.**    So I'm 38 years old right now so it's more than 20

16    years right.  So '96, roughly.

17    **Q.**    Would that be about eighth grade '96?

18    **A.**    Yeah.

19    **Q.**    Okay.  All right.  I apologize.  I didn't mean to make

15:59:43 20    you do math today.

21           And was that in Bucharest?

22    **A.**    Yes.

23    **Q.**    How would you describe -- back between fifth and

24    eighth grade, how would you describe your relationship first

15:59:57 25    with Bogdan Nicolescu?

1   **A.**   Well, he's a -- I was in a good relationship with him

2   back then, not best friends or something, but he was a

3   lonely guy.  He was a lonely guy and not really very

4   friendly with kids, the person around us.  We were friends,

5   that's all.

6   **Q.**   Okay.  And again --

7   **A.**   But I was okay with him.  I mean I got along with him.

8   **Q.**   Okay.  Could I ask you to speak slower and also speak

9   up?

10  **A.**   Okay.

11  **Q.**   Thank you.

12  **A.**   You're welcome.

13  **Q.**   And how would you describe your relationship with Radu

14  Miclaus from fifth to eighth grade?

15  **A.**   Very good.  I mean he's really friendly guy and like

16  for -- I don't know, I'd say I had a very good relationship

17  over all.

18  **Q.**   Okay.

19         Now, did you go to school with either Nicolescu or

20  Miclaus beyond the eighth grade?

21  **A.**   No, no.

22  **Q.**   Did you maintain contact with them?  Would it be

23  called high school in Romania?

24  **A.**   Yeah, high school.

25  **Q.**   Did you maintain contact with them in high school?

Antonovici-Urbanky - Direct/Brown

1       **A.**    No, no.

2       **Q.**    Okay.

3              Did you know if in middle -- fifth to eighth grade or

4       high school if Nicolescu had any nicknames?

16:01:20  5   **A.**    Yes.

6       **Q.**    And what nickname did you know Nicolescu to have?

7       **A.**    O.B.

8       **Q.**    Letters O.B.?

9       **A.**    Yeah.

16:01:29 10  **Q.**    Was there any other spelling of that?

11      **A.**    Spelling like O and B.

12      **Q.**    Just -- do you know what that nickname was or how he

13      got it?

14      **A.**    I always asked about that, but it's -- maybe it's a

16:01:48 15  cartoon, maybe some movie star, I don't know.  I just

16      associated O.B. with something else.

17      **Q.**    What did you associate O.B. with?

18      **A.**    O.B. is like a female sample or something.  That's

19      what crosses my mind; of course, means different things.

16:02:10 20  **Q.**    Okay.

21             And do you know if other people in school use that

22      nickname?

23      **A.**    I don't know how many, but, yeah.

24      **Q.**    Was it something you normally called him?

16:02:21 25  **A.**    Yeah, yeah.

981

Antonovici-Urbanky - Direct/Brown

1    **Q.**    Instead of his first name?

2    **A.**    Yeah, because it's much easier -- my name is the same,

3    his the same, I just -- it was much easier to call him O.B.

4    than calling myself.

16:02:34  5    **Q.**    Okay.

6                    THE COURT:  Sir, a little bit louder for me,

7    please.

8                    THE WITNESS:  Okay.  Yeah.  Okay.

9    **Q.**    And, in fact, do you still call him O.B.?

16:02:44  10   **A.**    Yes.

11   **Q.**    Now, is O.B. a common name or nickname in Romania?

12                   MR. GOLDBERG:  Objection.

13                   THE COURT:  Sustained.

14   **Q.**    Okay.

16:02:53  15        Did you have any other friends who used the nickname

16   O.B.?

17   **A.**    No.

18   **Q.**    Had you -- have you ever had any other friends who

19   used the name O.B.?

16:03:02  20   **A.**    No.

21   **Q.**    Okay.

22        Now, how about Miclaus?  Did you have any nicknames

23   for him in fifth to eighth grade or high school?

24   **A.**    No.

16:03:14  25   **Q.**    Okay.  You just called him Radu?

Antonovici-Urbanky - Direct/Brown

1   **A.**   Yes.

2   **Q.**   Now, did there come a time when after high school --

3   sorry, withdraw that.

4         After high school, did you go to college?

16:03:26 5   **A.**   If I went to college -- yes.

6   **Q.**   And what sort of college did you go to?

7   **A.**   Tourism.

8   **Q.**   Tourism college?

9   **A.**   Yes.

16:03:35 10   **Q.**   Do you know if Nicolescu went to college?

11   **A.**   Yes, he did.

12   **Q.**   Do you know what kind of college he went to?

13   **A.**   Inform -- like computer information, information.  I'm

14   not sure how it's called in the U.S.

16:03:50 15            MR. GOLDBERG:  I couldn't understand.

16            THE COURT:  Would you repeat that.

17            THE WITNESS:  Yes, the college is like a

18   computer high -- college.

19   **Q.**   So a college?

16:03:59 20   **A.**   What you learn about computers and the program.

21   **Q.**   A college for computers and programming?

22   **A.**   Yes.

23   **Q.**   Did you finish college?

24   **A.**   No.

16:04:13 25   **Q.**   Do you know if Nicolescu finished college?

1     MR. GOLDBERG:  Objection.

2     THE COURT:  Sustained.

3 **Q.** Okay.

4   Did there come a time during your college years when

5 you got back into contact with Nicolescu?

6 **A.** Yes, yes, we did.

7 **Q.** At that time, was he still in college?

8 **A.** No.

9 **Q.** He graduated?

10 **A.** No.

11     MR. O'SHEA:  Objection.

12     THE COURT:  Overruled.

13 **Q.** He had not graduated?

14 **A.** No.

15 **Q.** Okay.

16   At that time, do you know if he was able to graduate?

17     MR. GOLDBERG:  Objection.

18     THE COURT:  Sustained.

19 **Q.** At that time, did you talk to him about future plans

20 that you and he might have?

21 **A.** Yes.

22 **Q.** Okay.

23   And what were your plans?  What do you -- what were

24 you wanting to do after dropping out of college?

25 **A.** Well, I didn't make any plans.  I was just trying to

Antonovici-Urbanky - Direct/Brown

1    make it through school, and that's all at that time.

2    **Q.**    Okay.

3          Now, about what -- what year did you start committing

4    frauds?

16:05:33 5   **A.**    Roughly around 2004.

6    **Q.**    2004?  And what sort of frauds were you committing?

7    **A.**    eBay frauds.

8    **Q.**    And what do you mean by eBay frauds?

9    **A.**    Listing items on the eBay websites.

16:05:55 10  **Q.**    What would you list on the eBay website?

11   **A.**    Vehicles.

12   **Q.**    What sort of vehicles?

13   **A.**    Normal cars, like jeeps and regular cars.

14   **Q.**    And did you own these cars that you posted?

16:06:14 15  **A.**    No.

16   **Q.**    Did you represent on your eBay page that you did own

17   these cars?

18   **A.**    Yes.

19   **Q.**    And did you offer them for sale?

16:06:23 20  **A.**    Yes.

21   **Q.**    Through auction or "buy it now"?

22   **A.**    Auction.

23   **Q.**    Okay.

24         And how would you post the images of the cars?

16:06:36 25  **A.**    It's a system on eBay that allows you to upload

Antonovici-Urbanky - Direct/Brown

1    pictures, and that automatically appear on the eBay website.

2    Q.    And where would you get the pictures of the cars?

3    A.    From the same website, from another -- from other

4    sellers.

5    Q.    So you're just right click on a photo and pace it onto

6    your eBay page?

7    A.    Yes.

8    Q.    Would you use your name?

9    A.    No.

10   Q.    Would you use a fake name?

11   A.    Yes.

12   Q.    Would you say that you're in Romania?

13   A.    No.

14   Q.    Where would you say you're located?

15   A.    In United States.

16   Q.    And would you, in fact, get people offering to buy

17   your cars?

18   A.    Yes.

19   Q.    And what would you have them do when they offered to

20   buy your cars?

21   A.    I talk to them through text, e-mail, and then offer

22   them a secure way to pay for the cars.

23   Q.    Okay.

24         And what secure way did you offer for them to pay for

25   the car?

Antonovici-Urbanky - Direct/Brown

1    **A.**    An escrow website.

2    **Q.**    Okay.

3          And what was -- what is in your understanding of an

4    escrow website?

16:07:57 5    **A.**    A website that's actually a compound that protects --

6    that keeps the money safe into their account until the

7    transaction is completed, until the buyer receives the

8    vehicle.

9    **Q.**    And, in fact, did the escrow company you used keep the

16:08:16 10   money safe until the buyer got their vehicle?

11   **A.**    That was the plan, yeah.

12   **Q.**    But, in fact, did the escrow company you used keep the

13   money safe until the buyer got their vehicle?

14   **A.**    In reality, no.

16:08:30 15   **Q.**    Pardon me?

16   **A.**    No, no.

17   **Q.**    What happened to the money when the person sent their

18   money to the escrow agent?

19   **A.**    The money was immediately forwarded to the Western

16:08:47 20   Union in Europe.

21   **Q.**    And what happened in -- or what happened in Europe

22   when the Western Union money arrived?

23   **A.**    I got the money.

24   **Q.**    You got the money?

16:08:59 25   **A.**    Yeah, some of the money, yeah.

Antonovici-Urbanky - Direct/Brown

1    **Q.**    How did you get some of the money?

2    **A.**    Some guy in Europe just picked up -- was picking up

3    the money and split it between -- his guys and me.

4    **Q.**    Okay.

5          So did you see this happen or how do you know this

6    happened?

7    **A.**    No, I didn't see it, but this is how he explained it

8    to me that the process works.

9    **Q.**    So a guy you knew had --

10              MR. GOLDBERG:  Objection.  Move to strike.

11              THE COURT:  Will be stricken.

12              MR. BROWN:  Thank you, your Honor.

13   **Q.**    And how much of that money would you receive?

14   **A.**    75 percent.

15   **Q.**    Do you know what happened to the other 25 percent?

16   **A.**    The guy in Europe kept it as his money, own money.

17   **Q.**    And what would happen, if anything, when a buyer

18   contacted you and said where's my car?

19   **A.**    I just stopped communicating after he sent the money,

20   I stopped communicating.

21   **Q.**    You took down the page?

22              THE COURT:  What was that, sir?

23              THE WITNESS:  After the money was sent through

24   escrow, I would just stop communicating with the buyer.

25

Antonovici-Urbanky - Direct/Brown

1    BY MR. BROWN:

2    **Q.**    Did you ever deliver any cars?

3    **A.**    No.

4    **Q.**    How long did you use this eBay scheme?

16:10:35  5    **A.**    About maybe four or five years until 2009, 2010.

6    **Q.**    And about how much money did you make during that time

7    period?

8    **A.**    A few thousand dollars a year, and of course, some few

9    thousand dollars from moving money for other persons,

16:11:06 10   forwarding money.

11                    MR. GOLDBERG:  Your Honor, may we approach?

12                    THE COURT:  You may.

13         (The following proceedings were held at side bar:)

14                    THE COURT:  Sir, we're having a difficult time

16:14:32 15   understanding everything you're saying.  I find it's a lot

16    easier to understand when you have a very loud voice.  So

17    even though to you it may feel like you're yelling, I ask

18    that you please do that.

19                    THE WITNESS:  Okay.  Sorry I have to repeat

16:14:51 20   that every time.

21                    THE COURT:  I'm sorry?

22                    THE WITNESS:  Sorry I have to repeat that

23    every time.

24                    THE COURT:  No, no.  That's fine.  No, that's

16:14:57 25   fine.  It's just that I have to make sure everybody hears,

1   particularly counsel over here.

2        So if you would just try to yell.  And I'll let you

3   know if you're too loud.  Go ahead, Mr. Brown.

4                MR. BROWN:  Thank you.

5   BY MR. BROWN:

6   Q.   So in total, about how much money from that criminal

7   scheme did you make between 2006 and 2010 approximately?

8   A.   Roughly maybe $300,000, roughly.  I'll talk louder.

9   Q.   Is $300,000 over four years, is that a lot of money in

10  Romania?

11  A.   Yes, it's a lot of money.

12  Q.   May I ask where the money went?

13  A.   Basically just a good life-style, like a car, like

14  traveling, nothing -- I don't know.  I haven't invested any

15  money or something.  I just spend it.

16  Q.   To buy cars?

17  A.   Yes.

18  Q.   How old were you about that time?

19  A.   I guess about -- around 25 or --

20  Q.   Travel?

21  A.   Yes.

22  Q.   Gambling?

23  A.   No.

24  Q.   Drugs?

25  A.   No.

Antonovici-Urbanky - Direct/Brown

1    **Q.**    Girlfriends?

2    **A.**    No.  I only have one -- one girlfriend.

3    **Q.**    Okay.  But that money's gone?

4    **A.**    Yeah.

16:16:31  5    **Q.**    Why did you do eBay fraud, holding yourself out to be

6    an American?

7    **A.**    Over?

8    **Q.**    Why did you represent -- why did you say you were an

9    American?

16:16:46  10    **A.**    So they could trust me, of course.

11    **Q.**    Was there something about eBay in America that made

12    you want to do fraud there compared to in Romania or some

13    other country?

14    **A.**    It's because we -- in Romania, we know that America --

16:17:09  15    America is a country where people have enough money to spend

16    on cars.  In Romania there are no -- the people are not

17    buying cars like over here.

18    **Q.**    Is it fair to say you --

19    **A.**    Expensive cars.

16:17:26  20    **Q.**    Pardon me?

21    Is it fair to say you thought Americans had a lot of

22    money?

23    **A.**    Yes.

24    **Q.**    Is it fair to say you thought Americans were easily

16:17:35  25    fooled?

Antonovici-Urbanky - Direct/Brown

**A.**    No.

**Q.**    Is it fair to say you thought you could make more money defrauding Americans than any other country?

**A.**    Yes, because of the language.

**Q.**    Now, I believe you said you were doing the eBay fraud. Were you doing any other type of criminal scheme at that time?  Does that year 2004 to 2010, 2000 -- that time frame?

**A.**    I was helping other people with moving their money, yeah.

**Q.**    What do you mean by helping people move money?

**A.**    Once a buyer picks up the vehicle, some other guys in Romania, they need a person to cash out the money for them.

**Q.**    And what do you mean by cash out the money?

**A.**    They receive their money in Romania, basically they were scamming people in U.S. and they needed a way of receiving the money in Romania.

**Q.**    So were you going to Western Union and picking up transfers?

**A.**    No.

**Q.**    Were you managing people going to Western Union and picking up transfers?

**A.**    No.

**Q.**    What were you doing then?

**A.**    I knew a person in Europe that lives in Germany, working in Germany, and he had the thing of people picking

Antonovici-Urbanky - Direct/Brown

1    up the money that were sent to Europe from U.S. to Europe.

2    **Q.**    So in this chain, is it fair to say that money would

3    be sent via Western Union to Europe?

4    **A.**    Yes.

5    **Q.**    And a person or persons would pick up their money from

6    Western Union?

7    **A.**    Yes.

8    **Q.**    Then those people would give the money to a guy?

9    **A.**    Yes.

10                   MR. O'SHEA:  Objection.

11   **Q.**    Right?

12                   MR. BROWN:  He testified guy.

13                   THE COURT:  Well, it's leading.

14                   MR. BROWN:  I'm sorry.

15                   THE COURT:  Sustained.

16   **Q.**    Okay.

17          So what would -- what would happen when those people

18   at Western Union picked up the money?

19   **A.**    They would hand the money to the guy in charge with

20   the thing of picking up the money, and then that guy -- it

21   was like the chief, I don't know how to describe it, will

22   hand me the money.

23   **Q.**    What would you do with that money?

24   **A.**    I would then split the money -- I mean I would keep my

25   percent and the rest I will hand to the -- hand them to the

Antonovici-Urbanky - Direct/Brown

1    Romanian guys.

2    **Q.**    So this was a service you were providing for people

3    doing other fraud schemes?

4    **A.**    Yes.

16:20:31 5    **Q.**    This is independent of your fraud scheme?

6    **A.**    Yes.

7    **Q.**    And that $300,000 figure, does that include the money

8    you were making from that -- that money moving service?

9    **A.**    Yes.

16:20:48 10    **Q.**    Okay.  And about how often, how many times a month

11    would you move money in that scheme?

12    **A.**    I can't say exact how many times, but a lot, a lot.  I

13    don't know, maybe each transfer, each transfer was better

14    than three.  So if -- if a guy would -- if a guy have sent,

16:21:20 15    sold an item on eBay or Craigslist, and he got like $9,000

16    for it, the transfer will come through Romania -- through

17    the split in three.  So three transfers at once.

18    **Q.**    Okay.

19          And how many -- how many transfers a month would you

16:21:40 20    handle on average; and again, I'm just going to ask you to

21    slow down and speak up.  And I'm moving away so you can yell

22    more at me or talk loudly at me.

23    **A.**    I can't say how many.  I mean I really don't remember

24    how many was that.  I mean we can do.

16:22:03 25    **Q.**    Did you --

Antonovici-Urbanky - Direct/Brown

1    **A.**    Because --

2    **Q.**    A regular job you had, was this a regular number of

3    times a month you would move money?

4    **A.**    Like what?

16:22:14  5    **Q.**    Would you do it every week, would you do it twice a

6    week?

7    **A.**    Every week, yeah, every week, every two weeks,

8    depends.  Sometimes I wouldn't -- got any transfers, like

9    maybe a month.  But sometimes I get maybe 10 transfers a

16:22:30 10    month.  It's not like a business.

11    **Q.**    Okay.

12        And between the money transfers and the online scams,

13    were you doing this full-time?  Was this your full-time job?

14    **A.**    Can you repeat?

16:22:44 15    **Q.**    Was -- was the money transfer and the online scam

16    full-time?  Were you doing this or did you have other jobs?

17    **A.**    It was a full-time.

18    **Q.**    And did you work -- was this like 9:00 to 5:00

19    everyday?

16:22:59 20    **A.**    You can say that, yeah.

21    **Q.**    Okay.  Did you take vacations?

22    **A.**    Yeah.

23    **Q.**    Okay.

24        Now, while you were doing this between 2004, 2010, how

16:23:20 25    would you go online to post your car?

Antonovici-Urbanky - Direct/Brown

1    **A.**    Using my computer and, of course, something to protect

2    my identity.

3    **Q.**    To protect?

4    **A.**    Protect my identity -- my real location.

16:23:39 5    **Q.**    Okay.

6         And how would you protect your geolocation?

7    **A.**    Using proxies.

8    **Q.**    What are the proxy -- what do you understand a proxy

9    to be?

16:23:49 10    **A.**    A proxy is a way of hiding the real -- your real

11    location by using another computer located in a different

12    location.

13    **Q.**    Did you understand if you had permission to use that

14    other computer in the other location?

16:24:09 15    **A.**    I -- yeah, I guess you can use them.  I'm not sure how

16    legal or illegal is a proxy.

17    **Q.**    Did you care?

18    **A.**    No.

19    **Q.**    And where did you get this proxy information?

16:24:22 20    **A.**    Either Googling for proxy and, of course, then

21    purchase like a, like each proxies with money.

22    **Q.**    Where would you find proxies to buy?

23    **A.**    It's like search for it and find websites that are

24    dedicated for providing the service.

16:24:48 25    **Q.**    Would you buy a proxy to use many times or just once?

Antonovici-Urbanky - Direct/Brown

1    **A.**    Many times.

2    **Q.**    And do you know where those proxies were geolocated?

3    **A.**    In the United States.

4    **Q.**    So it would -- is it fair to say by using a U.S.

16:25:09  5  proxy, it would make it look like you were in the U.S.?

6    **A.**    Yes, of course.  That was the -- that was the role.

7    **Q.**    Not just your seller location on the eBay ad but --

8    **A.**    Right.  It was protecting myself.

9    **Q.**    Okay.

16:25:24 10         Now, during that time period, you said you were

11   connected with Bogdan Nicolescu?

12   **A.**    Yes, I did.

13   **Q.**    When you met him again, did you talk about your

14   criminal activity?

16:25:48 15  **A.**    Yes, I did.

16   **Q.**    What did you say?

17   **A.**    We knew each other for a long time, since school, and

18   I didn't have any problem explaining what I'm doing for eBay

19   frauds.

16:26:09 20  **Q.**    e-mail?

21   **A.**    No, I would talk face-to-face.

22   **Q.**    Okay.

23         And without repeating what he said, based on his

24   reaction, did you continue to talk to him about eBay fraud?

16:26:23 25  **A.**    Yeah, yes.

1    **Q.**    Based on those conversations, did you start working

2    with him involving eBay fraud, like doing schemes involving

3    eBay fraud?

4                          MR. GOLDBERG:  Objection.

16:26:40  5                          THE COURT:  Sustained.

6    **Q.**    Based on those conversations, what happened next?

7    **A.**    He told me that his -- he was doing eBay frauds and

8    that's all.

9    **Q.**    Did you agree to work together at that point?

16:27:04 10    **A.**    Working together means that he needed someone to cash

11    out the money.

12    **Q.**    So is it fair to say that he wanted you to cash out

13    money?

14                          MR. GOLDBERG:  Objection.

16:27:14 15                          THE COURT:  Sustained.

16    **Q.**    Based on your conversations did you, in fact, start

17    working together?

18    **A.**    Yes.

19    **Q.**    Did you pay him to work with you?

16:27:33 20    **A.**    If I pay --

21    **Q.**    Did you pay Bogdan Nicolescu to work with you?

22    **A.**    No.  I mean he asked for help of --

23                          MR. GOLDBERG:  Objection.

24                          THE COURT:  Overruled.

16:27:46 25                          THE WITNESS:  He asked for help for getting

Antonovici-Urbanky - Direct/Brown

1    his money out of the frauds.

2    **Q.**    He asked you for help?

3    **A.**    Yeah.

4    **Q.**    Did you have to convince him to join you and work

16:27:57  5    together?

6                        MR. GOLDBERG:  Objection.

7                        THE WITNESS:  No, of course not.

8                        THE COURT:  Overruled.

9    BY MR. BROWN:

16:28:01 10    **Q.**    Did you have to threaten him?

11    **A.**    No.

12    **Q.**    Based on your conversations, was he a knowing

13    participant?

14    **A.**    Yes.

16:28:10 15                        MR. GOLDBERG:  Objection.

16                        THE COURT:  Overruled.

17                        THE WITNESS:  Yes.

18    **Q.**    And did he have a job for you to do?

19    **A.**    Yes.

16:28:18 20    **Q.**    What was that?

21    **A.**    To get his money out of the eBay schemes, scams.

22    **Q.**    And about what year was that, would you estimate?

23    **A.**    2004, 2005, roughly.  It's been a long time now.

24    **Q.**    And what sort of schemes was he doing?

16:28:40 25    **A.**    The same as I was doing.  I mean eBay scams, posting

Antonovici-Urbanky - Direct/Brown

1    at -- on eBay.

2    **Q.**    Okay.  Was utilizing the same templates?

3    **A.**    I don't know about that.

4    **Q.**    Okay.

5         And did there come a time when he talked about doing

6    more eBay schemes with you?

7                        MR. GOLDBERG:  Objection.

8                        THE COURT:  Sustained.

9    **Q.**    How long did you continue to cash out money for him

10   after you started working together?

11   **A.**    Roughly four or five years.

12   **Q.**    Yeah.  During that four or five years, what, if

13   anything, happened with how you did eBay schemes together?

14   **A.**    We didn't -- we didn't do scams together.

15   **Q.**    Did there come a time when you were cashing out more

16   money for him than when you began?

17   **A.**    Yes.

18   **Q.**    Did you become more successful?

19   **A.**    Yeah.

20   **Q.**    Did you ever talk to him about why you were cashing

21   out more money?

22   **A.**    Yes, yes.

23   **Q.**    And what was his response?

24                        MR. GOLDBERG:  Objection.

25                        THE COURT:  Overruled.

Antonovici-Urbanky - Direct/Brown

1          THE WITNESS:  He said he has a new way of

2   getting the scam -- the frauds completed.

3   Q.     Did he explain to you what the new way was?

4   A.     Yes.

16:29:58  5   Q.     What did he say was his new method?

6   A.     He showed me how the new method works.  Can I

7   continue?

8   Q.     Please.

9   A.     All right.

16:30:09 10          And it was -- he was working at the antivirus that

11   will show to the buyer a fake item into his account.

12   Q.     Did he demonstrate this virus to you?

13   A.     Yes.

14   Q.     Did he use his computer or your computer?

16:30:41 15   A.     His computer.

16   Q.     And could you explain what you saw when he said this

17   is my virus?

18   A.     I was blowed away.  I mean I couldn't understand how

19   that works, and if it's --

16:30:56 20   Q.     What did it look like?  What blew you away?

21   A.     Well, basically --

22          MR. GOLDBERG:  Objection.

23          THE COURT:  Overruled.

24          THE WITNESS:  I saw an item in the buyer's

16:31:10 25   account that was not on eBay site, that never existed there,

Antonovici-Urbanky - Direct/Brown

1       but still it was on the buyer's account for some reason.

2       **Q.**   Did it look like a real eBay auction?

3       **A.**   Yes, 100 percent.

4       **Q.**   Did he say where he found the virus?

5       **A.**   He made it.

6       **Q.**   He said he made it?

7       **A.**   Yeah.

8                   MR. BROWN:  Your Honor, you want to break for

9       the day?

10                  THE COURT:  Is this a good --

11                  MR. BROWN:  I think it is a good place.

12                  THE COURT:  All right.  It's only 4:30.

13                  MR. BROWN:  Mr. O'Shea had a -- I understand.

14                  THE COURT:  Since it's Friday, I'll be nice.

15                  MR. O'SHEA:  Thank you, your Honor.

16                  THE COURT:  Ladies and gentlemen, I'll tell

17      you again here.  You may not speak to any family member, any

18      friends, any acquaintance about anything that has gone on in

19      this courtroom, anything about the case at all, and do not

20      form any opinion regarding this matter.

21          Please be downstairs Monday at 12:30.  12:30.  So

22      please eat lunch before you come.  We will call for you at

23      that time.  And as soon as you are up, we will begin trial.

24          Have a great weekend, everyone.  All rise for the

25      jury.

```
 1          (Proceedings in the absence of the jury:)
 2              THE COURT:  Sir, you may not talk about this
 3    case, anything to do with this case with anybody over the
 4    weekend.  You understand that?  Of course, practical
 5    matters, yes.
 6              MR. BROWN:  Thank you, your Honor.
 7              THE COURT:  All right.  Please be seated.
 8    Let's go through exhibits.
 9         1734.  And tell me to slow down if I'm going too fast.
10    1732.  1739.  1741.  1740.  1742.  1902.  1200.  1257.
11    1906.  1230.  1231.  1905.  2124.  2123.  2118.  1222.
12         Since I didn't hear the Government correct me in terms
13    of offering and I didn't hear any objections, I will assume
14    that all of them are being offered and there are no
15    objections.
16              MR. McDONOUGH:  Your Honor, just to clarify,
17    for Government's Exhibit 1734, the Government is only
18    offering Page 1 of that exhibit.
19              MR. O'SHEA:  That was my understanding too,
20    Judge.
21              THE COURT:  Corrected.  Thank you.
22              MR. McDONOUGH:  Thank you, your Honor.
23              THE COURT:  Sue, did I miss something?
24              MS. CHANDLER:  I have a 1439.  Maybe it was --
25              THE COURT:  That was already --
```

1                    MS. CHANDLER:  -- previously admitted.

2                    THE COURT:  Yes, I have that marked, but then

3      I looked back, and I believe we addressed it on March 27th.

4      I already admitted it on March 27th.

16:36:29  5          MS. CHANDLER:  Thank you.

6                    MR. GOLDBERG:  That came in through Omurchu.

7                    MS. CHANDLER:  That's right.

8                    MR. GOLDBERG:  1439 is it?

9                    THE COURT:  I'd have to go back through my

16:36:57 10     notes.  Do you need to know that, Mr. Goldberg?

11                   MR. GOLDBERG:  No, your Honor.

12                   THE COURT:  Oh, all right.

13          Sue, did I miss anything?

14                   MS. CHANDLER:  No.  I'm in agreement.

16:37:17 15          THE COURT:  Good.  All right.  We'll see you

16     12:30 on Monday.

17                   MR. BROWN:  Thank you, your Honor.

18                   THE COURT:  Thank you.  Have a good weekend,

19     everybody.

16:45:04 20          (Proceedings adjourned at 4:45 p.m.)

21

22

23

24

25

1  DIRECT EXAMINATION OF DONALD PATTERSON                793

2  CROSS-EXAMINATION OF DONALD PATTERSON                 809

3  DIRECT EXAMINATION OF ROBERT EOIN MILLER              811

4  CROSS-EXAMINATION OF ROBERT EOIN MILLER               843

5  CROSS-EXAMINATION OF ROBERT EOIN MILLER               878

6  DIRECT EXAMINATION OF SANDRA BUJA                     891

7  CROSS-EXAMINATION OF SANDRA BUJA                      914

8  CROSS-EXAMINATION OF SANDRA BUJA                      924

9  DIRECT EXAMINATION OF MONIQUE LIBURD                  927

10 CROSS-EXAMINATION OF MONIQUE LIBURD                   940

11 CROSS-EXAMINATION OF MONIQUE LIBURD                   943

12 DIRECT EXAMINATION OF SHANNON MO                      947

13 CROSS-EXAMINATION OF SHANNON MO                       957

14 CROSS-EXAMINATION OF SHANNON MO                       964

15 DIRECT EXAMINATION OF BOGDAN-ANDREI                   968

16 ANTONOVICI-URBANKY

17

18              C E R T I F I C A T E

19        I certify that the foregoing is a correct
   transcript from the record of proceedings in the
20 above-entitled matter.

21

22 s/Shirle Perkins_____
   Shirle M. Perkins, RDR, CRR
23 U.S. District Court - Room 7-189
   801 West Superior Avenue
24 Cleveland, Ohio 44113
   (216) 357-7106
25