1    UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF OHIO
2         EASTERN DIVISION

3         - - - - -

4

5    UNITED STATES OF AMERICA,      )
                                    )
6              Plaintiff,           )
                                    )
7         vs.                       ) Case No. 1:16CR224
                                    )
8    BOGDAN NICOLESCU,              )
     RADU MICLAUS,                  )
9                                   )
               Defendants.          )
10

11        - - - - -

12

13        CONTINUED TRANSCRIPT OF TRIAL PROCEEDINGS HAD

14   BEFORE HONORABLE JUDGE PATRICIA A. GAUGHAN, JUDGE

15   OF SAID COURT, ON TUESDAY, APRIL 2ND, 2019,

16        COMMENCING AT 9:00 O'CLOCK A.M.

17        - - - - -

18        Volume 7, Pages 1146 through 1378

19        - - - - -

20

21

22

23   Court Reporter:        GEORGE J. STAIDUHAR
                            801 W. SUPERIOR AVE.,
24                          SUITE 7-184
                            CLEVELAND, OHIO 44113
25                          (216) 357-7128

1 APPEARANCES:

2  On behalf of the Government:

3   OFFICE OF THE U.S. ATTORNEY
   BY: DUNCAN T. BROWN, AUSA

4    BRIAN M. McDONOUGH, AUSA
   801 West Superior Ave., Suite 400

5   Cleveland, OH 44113

6

7    and

8   U.S. DEPARTMENT OF JUSTICE — CRIMINAL DIVISION
   BY: BRIAN L. LEVINE, SENIOR COUNSEL

9   1301 New York Avenue, Suite 600
   Washington, DC 20530

10

11  On behalf of Defendant Bogdan Nicolescu:

12   LAW OFFICE OF MICHAEL J. GOLDBERG
   BY: MICHAEL J. GOLDBERG, ESQ.

13   323 Lakeside Place, Suite 450
   Cleveland, OH 44113

14

15  On behalf of Defendant Radu Miclaus:

16   LIPSON O'SHEA
   BY: MICHAEL J. O'SHEA, ESQ.

17   110 Hoyt Block Building
   700 West St. Clair Avenue

18   Cleveland, OH 44113

19

20    - - - - -

21

22

23

24

25

1

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Amber Leavitt | 1194 | | | |
|   By Mr. Goldberg | | 1164 | | |
|   By Mr. O'Shea | | 1166 | | |
| Matthew Frost | 1172 | | | |
|   By Mr. Goldberg | | 1209 | | |
|   By Mr. O'Shea | | 1378 | | |
| Tiberiu Danet | 1242 | | | |

1149

Ms. Leavitt - Direct

1           P R O C E E D I N G S

2           THE COURT:  Okay.  Call your next witness.

3           MR. McDONOUGH:  United States of America

4     would call Amber Leavitt.

5           Please step up to the podium, Ma'am.  Please

6     raise your right hand.

7                      AMBER LEAVITT

8     called as a witness by and on behalf of the Government,

9     being first duly sworn, was examined and testified

10    as follows:

11          THE COURT:  Please take a seat right over

12    there.

13                 DIRECT EXAMINATION

14    BY MR. McDONOUGH:

15    Q.   Good morning.  Could you please state your name, and

16    spell your last name for the benefit of our court

17    reporter?

18    A.   Yes.  It is Amber Leavitt, A-m-b-e-r, L-e-a-v-i-t-t.

19    Q.   By whom are you employed?

20    A.   EBay, Inc.

21    Q.   In what capacity?

22    A.   I am employed as an attorney.

23          My official title is senior director of

24    global intellectual property.

25    Q.   How long have you been senior director of

Ms. Leavitt - Direct

1    intellectual property at eBay?

2    A.    For about three years.

3    Q.    What are your duties and responsibilities as senior

4    director of intellectual property?

5    A.    So I oversee management of the trademark and domain

6    portfolios for the company, and I also oversee our

7    anticounterfeiting and antiinfringement policies, and I

8    also am responsible for management of our verified rights

9    owner or VeRO program.

10   Q.    Okay.  How many trademark attorneys does eBay

11   have?

12   A.    You are looking at her.

13   Q.    Okay.  Do you have any support staff?

14   A.    I do have one trademark paralegal.

15   Q.    Okay.  You mentioned intellectual property.  What's

16   intellectual property?

17   A.    The way I would describe intellectual property is

18   inventions of the mind.

19   Q.    You mentioned you oversee trademark and domain

20   portfolios.

21              What are those?

22   A.    So the trademark portfolio is essentially a set of

23   trademarks that help us to identify our products and

24   services, and as part of that, I help to register those

25   marks and then enforce them against people who are using

Ms. Leavitt - Direct

1    them without authorization.

2    Q.    Okay.  How many trademarks does eBay have?

3    A.    Currently, we have around 1,400, either registered

4    or pending applications.

5    Q.    Okay.  You mentioned something about

6    anticounterfeiting policies and processes.  What can did

7    you mean by that?

8    A.    So those are basically the different things that we

9    do to try to prevent fake products from showing up on our

10   site.

11          So I think a good example is like a fake

12   purse or shoes.  We try to work to make sure those things

13   don't end up on the site in the first place.

14   Q.    And you mentioned the administration of verified

15   rights program.  What was that?

16   A.    Yes.  So the verified rights program is a notice and

17   takedown program, so if a brand, say Nike, sees that

18   there is a product on our site like a fake shoe, they can

19   use that program to report that as infringing their

20   intellectual property rights.

21   Q.    Is it Nike's responsibility to check through all the

22   eBay ads, or is it eBay's or both or none or —

23   A.    It is kind of an ecosystem, right?

24          So it is in our interest to prevent those

25   types of items from showing up on the site, so we do

Ms. Leavitt - Direct

1  various things to try to identify and then remove those

2  types of products?

3              But then, that's where we kind of partner

4  with rights owners, is we rely on them to help us

5  identify things that we might not otherwise know are

6  problematic.

7  Q.   Ecosystem is — what's that again, ecosystem?

8  A.   So it is kind of a cooperative relationship is how I

9  would describe it.

10  Q.   And eBay has partners?

11  A.   What do you mean by partners?

12  Q.   You mentioned in order for eBay's trademarks, do you

13  have to give permission to someone to go ahead and use

14  them?

15  A.   Yes, that's correct.

16  Q.   So you have partnerships or do you enter into — you

17  have partners when it comes to giving permission to use

18  the eBay trademarks?

19  A.   Yes.  We will license use of our marks and most

20  commonly it is for a business relationship or

21  partnership.

22  Q.   Can you give an example of eBay giving a license to

23  use the eBay trademark to another company?

24  A.   Yes.  I think one of the most recent examples is the

25  "Wreck-It Ralph 2" movie, the recent Disney movie.  EBay

Ms. Leavitt - Direct

1    is featured prominently in the movie, and we worked with

2    them on that partnership.

3    Q.    Okay.  So in the movie, "Wreck-It Ralph" used the

4    eBay trademark —

5    A.    Correct.

6    Q.    — with your permission?

7    A.    Correct.

8    Q.    How does somebody get permission to use the eBay

9    trademark?

10   A.    Basically, it goes through me.  If someone is

11   requesting permission, my paralegal and myself will

12   prepare the licensing terms.

13   Q.    Before you became the director of senior

14   intellectual property, what was your prior legal

15   experience?

16   A.    So prior to that, I actually held the title of

17   director of global intellectual property for eBay, and

18   then prior — for about three years, two, three years —

19   and then, prior to that, I was the senior intellectual

20   property counsel for eBay.

21   Q.    Okay.  So in total, how many years have you worked

22   for eBay?

23   A.    It will be nine years this June.

24   Q.    Where is eBay located?

25   A.    So eBay is headquartered in San Jose.  I am actually

Ms. Leavitt - Direct

1    based in the Salt Lake City office.

2    Q.   San Jose?

3    A.   California.

4    Q.   And they have an office in Salt Lake City.

5    A.   Correct.

6    Q.   Does eBay hold various trademarks, service marks,

7    trade names and service names that it has registered with

8    the United States Patent and Trademark Office?

9    A.   Yes.

10   Q.   Okay.  If I refer to all of those as trademarks?

11   A.   Correct.  That's fine.

12              MR. McDONOUGH:  May I approach the witness,

13   your Honor?

14              THE COURT:  You may.

15   BY MR. McDONOUGH:

16   Q.   Showing you what has been previously marked for

17   identification purposes is Government's Exhibit 1907.

18              Do you recognize Government's Exhibit

19   1907?

20   A.   Yes.

21   Q.   Have you seen those before?

22   A.   Yes.

23   Q.   What are those?

24   A.   These appear to be certified copies of our trademark

25   registrations that are held with the United States Patent

Ms. Leavitt - Direct

1    and Trademark Office.

2    Q.    Okay.  And is Government's Exhibit 1907, which

3    consists of pages 1 through 64, is that a fair and

4    accurate certified copy of trademark registrations that

5    eBay has registered with the principal register of the

6    United States Patent and Trademark Office?

7    A.    Yes.

8    Q.    I would like to take a look at a couple of those

9    with you.

10             Ms. Chandler, could you please pull up

11   Government's Exhibit 1907, page 2.  Do you recognize

12   this?

13   A.    Yes.

14   Q.    It is on the screen but — there will be a hard copy

15   in front of you.

16             What is this?

17   A.    So this is a copy of our registration with the

18   United States Patent and Trademark Office for our eBay

19   logo.

20   Q.    And how long — or when was this first put into use

21   by eBay?

22   A.    So for the first use, it was in 2012 of the eBay

23   mark.

24   Q.    Okay.  And there are classes that these trademarks

25   are registered for?

Ms. Leavitt - Direct

1    A.    Correct.

2    Q.    What's the classes here that eBay has registered

3    this for?

4    A.    You can see the classes are 35, 36, and 38.

5    Q.    And what are those?

6    A.    Different services.  So the classes are divided

7    into two groups.  So I believe it is class 1 through

8    34 is for actual hard goods, and 35 through beyond are

9    all four services.  So these are all for different

10   services.

11   Q.    And when was this trademark registered with the

12   United States Patent and Trademark Office?

13   A.    This was registered in September of 2013.

14   Q.    Okay.  If we can go to page 5, and if you can please

15   zoom in on the top half, what is this?

16   A.    This is a registration for the eBay ward mark.

17   Q.    All right.  The first one had different

18   colors.  This one is black and white.  Is there a

19   difference?

20   A.    Yes.  The first was for the actual logo, and this is

21   for the plain text use of eBay.

22   Q.    Okay.  When was this first used by eBay?

23   A.    So this was first used around 1995.

24   Q.    When was it registered with the United States Patent

25   and Trademark Office?

1157

Ms. Leavitt - Direct

1   A.   So this was registered in January of 1999.

2   Q.   Page 7, please.  What is page 7?

3   A.   So this is the registration for the buy-it-now

4   wordmark with the United States Patent and Trademark

5   Office.

6   Q.   When was that first used?

7   A.   This was first used in 1997.

8   Q.   And when did eBay register this patent on the

9   United States Patent and Trademark Office principal

10  registry?

11  A.   In September of 1999.

12  Q.   Page 15, what is this?

13  A.   So this is a copy of our registration for the

14  original eBay logo with the United States Patent and

15  Trademark Office.

16  Q.   Okay.  And first used?

17  A.   So this one was first used in 1998.

18  Q.   And registered?

19  A.   This is registered in January of 2001.

20  Q.   Okay.  Has that logo changed over time?

21  A.   Yes.

22  Q.   And page 49, what is this?

23  A.   So this is a registration for the buy-it-now

24  wordmark with the United States Patent and Trademark

25  Office.

Ms. Leavitt - Direct

1    Q.    First used?

2    A.    So this one was first used in 2000.

3    Q.    And first registered?

4    A.    This was registered in October of 2007.

5    Q.    Okay.  Have these trademarks been renewed over

6    time?

7    A.    Yes.

8    Q.    Over how long?

9    A.    What do you mean by how long?

10   Q.    How often do you have to renew a trademark?

11   A.    So every ten years.

12   Q.    Okay.  All right.  And have all these trademarks

13   been in use by eBay in that class since they have been

14   registered?

15   A.    Yes.

16   Q.    And now, I would like to show you a couple of

17   additional exhibits.

18            These have previously been identified, if we

19   could pull up Government's Exhibit 1431, page 80, please.

20   Thank you.  All right.

21            This is a template page that was used to

22   induce individuals to provide information.

23            Do you see —

24            MR. O'SHEA:  Objection to the form.

25            THE COURT:  Sustained.

Ms. Leavitt - Direct

1   BY MR. McDONOUGH:

2   Q.   Do you see any trademarks on page 8?

3   A.   Yes.

4   Q.   Can you please use the arrow, point out where the

5   trademarks are?

6   A.   Yes.  So that is the eBay logo mark.

7   Q.   Okay.  Does eBay use stars for its seller

8   ratings?

9   A.   Yes.

10  Q.   And if he could please zoom in on the fine print at

11  the bottom, please, Ms. Chandler.

12              Are there any trademarks in the fine

13  print?

14  A.   Yes.

15  Q.   Where would those be?

16  A.   You can see the word "eBay" is used many times.

17  Q.   What is the little — is there a little "c" there in

18  the bottom?  What's the "c"?

19  A.   That indicates it is a copyright.

20  Q.   If we could zoom out and zoom in on the upper left

21  "eBay" word.

22              Do you see anything to the right of the word

23  "eBay" there?

24  A.   The word "motors."

25  Q.   Between "eBay" and "motors," do you see anything?

Ms. Leavitt - Direct

1    A.   I see where you are saying.  It looks like it is

2    probably a TM.

3    Q.   What does a TM stand for?

4    A.   It is used to designate a trademark.

5    Q.   Okay.  All right.  If we could go to Government's

6    Exhibit 1432, page 15.

7              MR. McDONOUGH:  Your Honor, may we have the

8    Elmo?

9              THE COURT:  Certainly.

10   BY MR. McDONOUGH:

11   Q.   Showing you what has been marked for identification

12   purposes as Government's Exhibit 1432, do you recognize

13   this.

14   A.   Yes.  I recognize, it looks like a page from eBay.

15   Q.   Do you see any eBay trademark on Government's

16   Exhibit 1432?

17   A.   Yes.

18   Q.   Could you please point out where those are?

19   A.   Yes.  So this is the eBay logo.

20   Q.   Is there anything to the right of the eBay

21   logo?

22   A.   This appears to be — looks like a circle R

23   symbol.

24   Q.   Okay.  And what does the circle R symbol represent?

25   A.   That's used to designate a registered trademark.

1161

Ms. Leavitt - Direct

1    Q.    Okay.  Do you see any other trademarks on

2    Government's Exhibit 1432?

3    A.    Yes.

4    Q.    That's the buy-it-now trademark?

5    A.    Correct.

6    Q.    And then going to Government's Exhibit 1431, page

7    42, any eBay trademarks on this page?

8    A.    Yes.

9    Q.    Where would the eBay trademark be?

10   A.    This is the registered eBay logo.

11   Q.    Any other trademarks?

12   A.    Yes.  The eBay wordmark is used throughout the page

13   in different places.

14   Q.    All right.  And then, going to Government's Exhibit

15   1433, page 1, this is a screen shot.

16              Any eBay trademarks on this page?

17   A.    Yes.  The eBay wordmark is used in a couple of

18   different places.

19   Q.    And could you point out where that might be?

20   A.    It is right there, and then it is also used at the

21   bottom.

22   Q.    Okay.  With respect to those trademarks that you

23   identified, are those marks identical or

24   indistinguishable from the genuine trademarks as those

25   marks were in effect between the years 2007 and 2016?

Ms. Leavitt - Direct

1    A.    Yes.

2    Q.    Are you able to discern any differences between the

3    trademarks in those images and the genuine trademarks

4    registered by eBay as they were in effect between 2007

5    and 2016?

6    A.    No.

7    Q.    Did eBay give any person permission to use any of

8    those trademarks to trick users into providing personal

9    info or to infect users with a computer virus?

10   A.    No.

11   Q.    Does eBay protect its trademarks?

12   A.    Yes.

13   Q.    Why?

14   A.    Trademarks are essential for identifying a company's

15   goods or services, and so consumers come to associate a

16   trademark with a company?

17            And if our trademarks are used on goods or

18   services that are below our standards or problematic in

19   any way, that serves to harm our reputation as a

20   business.

21   Q.    How long has eBay been in business?

22   A.    Since 1995.

23   Q.    How many markets does eBay cover in the

24   United States or the world?

25   A.    I believe currently we are in about 190 markets

Ms. Leavitt - Direct

1   worldwide.

2   Q.   How did you find out about this case?

3   A.   I was contacted by the United States Attorney's

4   Office.

5   Q.   Okay.  Have you ever heard of the words "Bayrob

6   Group"?

7   A.   Yes.

8   Q.   How have you heard of that?

9   A.   In association with this case.

10  Q.   Okay.  Does your department, trademark department,

11  do any — did do any investigation regarding the Bayrob

12  Group?

13  A.   This type of criminal matter would be handled by a

14  different group within legal.

15  Q.   And when you say "within legal," what's legal?

16  A.   So we have a department within the company that is

17  made up of attorneys and paralegals and different legal

18  specialists who support different legal needs that the

19  company may have.

20  Q.   Did you do any work with the FBI in this

21  case?

22  A.   No.

23  Q.   Do you know, did your legal department do any work

24  with the FBI?

25  A.   Yes.

Ms. Leavitt – Cross

1     MR. McDONOUGH:  Thank you, no further

2  questions.

3     THE COURT:  Mr. Goldberg.

4           CROSS EXAMINATION

5  BY MR. GOLDBERG:

6  Q.   Couple questions.  Good morning.

7  A.   Good morning.

8  Q.   As trademark counsel, would your job include

9  initiating actions to recoup damages suffered by the

10  company as a result of trademark infringement?

11  A.   Depending on the context, yes.

12  Q.   And is it safe for me to assume that you took no

13  such action regarding any trademark infringements related

14  to the Bayrob Group in your office?

15  A.   Not myself personally.  It was handled by a

16  different group within legal.

17  Q.   Okay.  And that was in a civil case or some kind of

18  claim for money damages?

19  A.   I don't know that there is a claim for money

20  damages, but I know there is a different group in legal

21  that worked with the FBI on this case.

22  Q.   Right.  So the main context in which eBay defended

23  its trademark in this matter was through criminal action

24  with the FBI?

25  A.   That's correct.

Ms. Leavitt — Cross

1    Q.    And eBay sales last year were somewhere in the

2    neighborhood of $10 billion dollars?

3    A.    Probably more than that but —

4    Q.    What do you think it was?  Do you know?

5    A.    I would say tens of billions of dollars.

6    Q.    And you can't point to any particular money loss

7    associated with anything that the Bayrob Group, the

8    Defendants in this case or any other group associated

9    with Bayrob, may have taken?

10   A.    It is hard to attach a specific monetary to

11   reputational damage that is caused by infringers.

12   Q.    Right.  So the answer would be is, you can't —

13   A.    No.

14   Q.    — say any money damages?

15   A.    Not in this context, not a specific amount.

16   Q.    With regard to security — and I know this is not

17   your department, so if you don't know, that's fine —

18   with regard to security in the eBay system, is there an

19   automated program or automated framework that goes

20   through the listings to try to detect any type of fraud

21   or misrepresentation prior to the potential customer

22   seeing the material?

23   A.    We have a number of different systems in place to

24   identify different types of potential issues with

25   listings or with sellers.

Ms. Leavitt — Cross Cont'd

1    Q.   And are they automated, or are they actually checks
2    that are performed by people?
3    A.   It is a combination.
4    Q.   And that is completely separate from your
5    department, and if there is a trademark issue, that comes
6    to you?
7    A.   So my focus would be specifically on the systems
8    that are used to detect intellectual property
9    infringement, but there are other teams that have
10   different agreements.
11   Q.   Okay.  And intellectual property infringement, not
12   just on eBay's marks but on marks — the intellectual
13   property of items of manufacturers of items that are
14   being sold on eBay?
15   A.   Correct.
16            MR. GOLDBERG:  Thank you.  I have nothing
17   further.
18            THE COURT:  Cross, Mr. O'Shea?
19            MR. O'SHEA:  Thank you.
20            CROSS EXAMINATION CONTINUED
21   BY MR. O'SHEA:
22   Q.   Good morning, Ma'am.  Can you see me over
23   here?
24   A.   Yes, I can see you.
25   Q.   Can we show the witness Exhibit 1431 that she just

Ms. Leavitt - Cross Cont'd

1    saw, the page 80 part?

2                    MR. O'SHEA:  Do we have to do that on Elmo?

3                    THE COURT:  She just brought it up.

4                    MR. O'SHEA:  Thank you.

5    BY MR. O'SHEA:

6    Q.    All right.  Do you remember seeing this document

7    just a short while ago, Ma'am?

8    A.    Yes.

9    Q.    I think there was some discussion about this mark at

10   the top, eBay.  Do you see that, Ma'am?

11   A.    Yes.

12   Q.    Okay.  And right next to it — I am going to put

13   that thing on there if I can — do you see that

14   little — what was — see where that arrow is, do you see

15   that?

16   A.    Yes.

17   Q.    Pretty small?

18   A.    Yes.

19   Q.    And you have to really squint and look at it.  Am I

20   right about that?

21   A.    Yes.

22   Q.    Okay.  You don't expect the average person looking

23   at an internet screen to notice that mark, do you?

24                    MR. McDONOUGH:  Objection.

25                    THE COURT:  Sustained.

Ms. Leavitt – Cross Cont'd

1          MR. O'SHEA:  Okay.  All right.

2     BY MR. O'SHEA:

3     Q.   Now, looking at the bottom, Ma'am, do you see

4     all that?  Do you remember being asked questions about

5     that?

6     A.   Yes.

7     Q.   Okay.  That is what we call fine print, smaller

8     print than everything else.  Do you agree with me about

9     that, Ma'am?

10    A.   It is smaller than the print on the rest of the

11    page, correct.

12    Q.   Smallest print on the page, fair enough?

13    A.   Yes.

14    Q.   Ms. Leavitt — am I pronouncing that correctly?

15    A.   Yes, you are.

16    Q.   Ms. Leavitt, to the best of your understanding of

17    all the eBay exhibits you were shown while on direct

18    examination, do you see any alterations to any of those

19    marks?

20    A.   Not that I can tell based on the copy.

21    Q.   Okay.  And before you testified here this morning,

22    were you shown all these exhibits so you could be better

23    prepared to testify in front of the jury?

24    A.   Yes.

25    Q.   And who showed you those?

Ms. Leavitt - Cross Cont'd

1    A.    The prosecutor who was just questioning me.

2    Q.    Okay.  How long did that meeting take?

3    A.    Less than an hour.

4    Q.    Okay.  And during that meeting, you were like I am

5    doing here with this arrow here, you were shown, "be on

6    the lookout for this business and that trademark," all

7    that, the meeting was about that, right?

8    A.    It was more just making sure I could see the

9    trademarks on the different pages.

10   Q.    Okay.  So you knew exactly what to point to so we

11   wouldn't waste time on the stand.  Fair enough?

12   A.    Yes.

13   Q.    Now, do you know what a cookie is?

14   A.    Yes.

15   Q.    Does eBay plant cookies on people's web pages when

16   they visit eBay so the can better direct them to their

17   purchasing habits?

18   A.    I am not familiar with whether we do or not.

19   Q.    Okay.  Do you know why when you go to an eBay page

20   that certain products that you purchased in the past

21   might automatically pop up?

22   A.    No.  It is not my area of responsibility.

23   Q.    Okay.  Do you know — do you know as part of your

24   job responsibilities who secures your web pages, what

25   company?

1    A.    No.   It — well, it depends on the context.

2    Q.    Has it been Norton and Symantec in the past,

3    Ma'am?

4    A.    Symantec, yes, I am familiar with Symantec.   Norton

5    I am not a hundred percent on.

6              MR. O'SHEA:   Okay.   Thank you.   No further

7    questions.

8              THE COURT:   Redirect?

9              MR. McDONOUGH:   No, your Honor.

10             THE COURT:   Step down.   Call your next

11   witness.

12             MR. LEVINE:   Your Honor, we have a

13   stipulation we would like to put on the record.

14             THE COURT:   All right.

15             MR. LEVINE:   So the parties, the

16   United States and the Defendants stipulate that the

17   trademark witnesses from two other companies, Western

18   Union and Symantec, need not testify in this matter; that

19   witnesses from Western Union and Symantec would testify

20   that the trademark certifications marked as Government's

21   Exhibits 1901 and 1903 are fair and accurate compilations

22   of trademarks registered on the principal register of the

23   United States Patent and Trademark Office.

24             Witnesses from Western Union and Symantec

25   would further testify that Western Union and Symantec

1    marks appear on Government's Exhibits 1248, 1421, 2105,

2    2107, and 2108.

3            The marks on these exhibits are identical or

4    indistinguishable from the genuine registered marks by

5    Western Union and Symantec.

6            Further, these witnesses would testify that

7    neither Western Union nor Symantec gave the Defendants

8    permission to use any of their marks for purposes of

9    either tricking users into clicking on attachments and

10   getting malware or tricking users into becoming money

11   mules.

12           And finally, these witnesses would testify

13   that Western Union and Symantec are harmed when others

14   use their marks in this manner without permission of the

15   true owner of the mark.

16           THE COURT:  Mr. O'Shea?

17           MR. O'SHEA:  So stipulated.

18           THE COURT:  I'm sorry.  I'm sorry.

19   Mr. Goldberg first.

20           MR. GOLDBERG:  So stipulated.

21           THE COURT:  Mr. O'Shea?

22           MR. O'SHEA:  So stipulated Judge.

23           THE COURT:  And again, to remind you,

24   stipulations are facts agreed to by and between the

25   parties.

Mr. Frost - Direct

1          MR. LEVINE:  The United States would now

2    like to call Matthew Frost, your Honor.

3          THE COURT:  Mr. Frost, please step up to the

4    podium.

5                        MATTHEW FROST

6    called as a witness by and on behalf of the Government,

7    being first duly sworn, was examined and testified

8    as follows:

9          THE COURT:  Please take a seat over there.

10                    DIRECT EXAMINATION

11   BY MR. LEVINE:

12   Q.   Good morning.

13   A.   Good morning.

14   Q.   You have a little mike in front of you.  You can

15   move that mike a little closer to you.  And you can pull

16   it up a little bit so you can speak right into it, and

17   your chair moves a little bit.  We want to make sure

18   everybody can hear you.

19          If you would please state and spell your

20   last name for the court reporter?

21   A.   Matthew Frost, M-a-t-t-h-e-w, F-r-o-s-t.

22   Q.   Mr. Frost, what do you do?

23   A.   I am a computer forensic examiner for the Federal

24   Bureau of Investigation.

25   Q.   Okay.  And Forensic Examiner Frost were you

Mr. Frost - Direct

1   physically present in Romania during the search of Bogdan

2   Nicolescu residence?

3   A.    Yes.

4   Q.    And did you also make image copies of some of the

5   digital devices, the computers and hard drives found in

6   Bogdan Nicolescu's residence?

7   A.    Yes.

8   Q.    First, I want to go through your background.  What

9   is your educational background?

10  A.    I have both a Bachelors and a Master's Degree from

11  Idaho State University.  I have a Bachelor's Degree in

12  Economics and a Master's of Business Administration with

13  an emphasis in information assurance.

14  Q.    Okay.  What is an MBA with a Master's in information

15  assurance.  What is information assurance?

16  A.    Information assurance was additional classes I had

17  to take to get the emphasis with my masters, and

18  information assurance is the securing of data for large

19  corporations or businesses.  It is keeping the data safe

20  and secure.

21  Q.    Okay.  And prior to working with the FBI, did you

22  spend a couple of years in Eastern Europe?

23  A.    Yes, I did.

24  Q.    Can you tell us about that?

25  A.    Yes.  I lived in the Ukraine, and I was there for

Mr. Frost - Direct

1    two years from 2001 until 2003 on a church service

2    mission that was self-funded.

3    Q.    Okay.  And you said you worked for the FBI.  When

4    did you begin working for the FBI?

5    A.    My employment began in 2007.

6    Q.    Okay.  So that's about 12 years ago?

7    A.    Yes.

8    Q.    All right.  And where is your office with the

9    FBI?

10   A.    I am located in Pocatello, Idaho.

11   Q.    And is that where you came from to testify

12   today?

13   A.    Yes.

14   Q.    You said you were a forensic examiner.  What is a

15   forensic examiner?

16   A.    Forensic examiner is a computer tech position within

17   the FBI where we take devices that have been seized or

18   are given over for consent search with legal authority,

19   and I take those devices.

20              I make perfect copies of the data and then

21   extract data from these devices, whether it is a

22   cellphone, a computer, a GPS, whatever the data, extract

23   the data, and I make it available for agents to review or

24   turn it over to the Court or Court proceedings.

25   Q.    So you copy the data and make it available for

Mr. Frost - Direct

1    others to review?

2    A.    Yes.

3    Q.    And as a forensic examiner for the FBI roughly how

4    many computers and hard drives would you say you have

5    examined?

6    A.    Over my career it is thousands, over 6,000 devices.

7    Q.    Over 6,000 did you say?

8    A.    Yes.

9    Q.    And how many searches of businesses or residences

10   have you assisted with roughly?

11   A.    Dozens.

12   Q.    Do you have any certifications?

13   A.    Certifications?

14   Q.    Yes.

15   A.    So I am certified forensic examiner by the

16   FBI.

17   Q.    And do you have any other certifications?

18   A.    I have taken vendor training so training by an

19   outside entity from the FBI where you take a class, and

20   at the end of the class, there is a test and a

21   certification that comes with that test.

22   Q.    And is that a certification to use their particular

23   product?

24   A.    In some cases, their product or it is a knowledge

25   and a topic related to computer forensics.

Mr. Frost - Direct

1    Q.   Okay.  And have you attended trainings on visual

2    forensics?

3    A.   Yes.

4    Q.   Since you joined the FBI in 2007, approximately how

5    many trainings have you attended per year?

6    A.   It is probably about two per year, some years three

7    or four; some years one.

8    Q.   All right.  And how long was each of those

9    trainings?

10   A.   Each of them is usually a week of 8-hour days.

11   Q.   And do you train other FBI employees?

12   A.   Yes.  I am an instructor for the FBI on digital

13   forensics.

14   Q.   And what portions do you teach?

15   A.   Courses on cellphones, on introduction to forensics

16   or the beginner forensic courses and cyber courses.

17   Q.   And have you testified as an expert in federal court

18   before?

19   A.   Yes, I did.

20   Q.   And what was the general subject matter of that

21   case?

22   A.   The case was a child prostitution case.

23   Q.   Okay.  And did the Court qualify you as an expert in

24   that case?

25   A.   Yes, they did.

Mr. Frost - Direct

1   Q.   That was yes?

2   A.   Yes.

3   Q.   Had you received any awards through your work with

4   the FBI?

5   A.   Yes.  I received an award from the office of the

6   Director of National Intelligence.

7   Q.   And what was that award for?

8   A.   It was for work I did on the Alpha Bay case.

9   Q.   What is or was Alpha Bay?

10  A.   Alpha Bay is a dark web marketplace and dark web —

11  it is part of the worldwide web, and to get to it, you

12  have to use special software.  I kind of think of it

13  as a library.  So if the internet is the library

14  or the worldwide web, any websites you can freely go

15  to?

16          The dark web is a portion of that library

17  that you can only get to it if you know how to get there.

18  It is not restricted by any means, but to get there, you

19  have to know how to use the specialized software to

20  access that portion of the library or the dark web.

21  Q.   Okay.  And so this was a website on the dark

22  web?

23  A.   Correct.

24  Q.   And what was Alpha Bay doing on the dark web?

25          MR. GOLDBERG:  Objection.

Mr. Frost – Direct

1    THE COURT:  Overruled.  You may answer, sir.

2    THE WITNESS:  Thank you.

3    A.   Alpha Bay was a marketplace or an online store

4    front, if you will, where users could go and either buy

5    or sell various products, most of them illegal, drugs,

6    prostitution services.

7    You could hire a hit man, other illegal

8    things where you could pay and/or sell, you could buy or

9    sell items that you can't find readily available, and you

10   can pay in a way that tries to keep your identity

11   anonymous.

12   Q.   Could you buy stolen credit cards?

13   A.   Yes, you could.

14   Q.   And could you buy and sell stolen identities?

15   A.   Yes.

16   Q.   And when did you get this award related to your work

17   with Alpha Bay?

18   A.   I don't remember exactly.  The search was in 2017.

19   It was during 2018 sometime.  I didn't go to the awards

20   ceremony.  I just got notification and then the

21   certificate in the mail.

22   Q.   All right.  I want to take you now on your trip to

23   Romania.

24   Did you you travel to Romania in September

25   2016 to assist with the searches and arrests in the

Mr. Frost - Direct

1    Bayrob investigation?

2    A.    Yes.

3    Q.    Now, prior to traveling to Romania in September

4    2016, had you had any involvement in the Bayrob

5    investigation?

6    A.    No.

7    Q.    How did you get — end up getting roped into going

8    to Romania in 2016 to assist with the searches and

9    arrests in the Bayrob investigation?

10   A.    A request came in from our headquarters office.

11   They asked for people with knowledge on Linux operating

12   systems to assist in a large search.

13   Q.    What is Linux?

14   A.    Linux is an operating system, much like the windows

15   operating system is the operating system, that runs the

16   basic functions of a computer.

17             But Linux is a free and open source software

18   or an operating system that anyone can download use and

19   install on their computers for free.

20   Q.    Okay.  And did you have Linux experience?

21   A.    Yes.

22   Q.    And is Linux experience rare within the FBI?

23   A.    It is, yes.  Most of the examinations we get are

24   windows or Mack or cellphone related, so to be

25   specialized and have the knowledge for Linux it is

Mr. Frost - Direct

1   limited within the FBI.

2   Q.   When you got to Romania, were you assigned to a

3   particular search location?

4   A.   Yes, I was.

5   Q.   Which location were you assigned to?

6   A.   It was a residence in Brasov, Romania.

7   Q.   Do you know whose residence that was?

8   A.   It was —

9   Q.   Was it Bogdan Nicolescu?

10  A.   It was Bogdan Nicolescu, excuse me.

11  Q.   And when did you travel to Braosov, Romania?

12  A.   We traveled up to Brasov on the 27th of September.

13  Q.   And that's 2016?

14  A.   2016.

15  Q.   And who did you travel to Brasov with?

16  A.   With Special Agent Ryan MacFarlane and Peter Traven

17  from the FBI that was working out of the U.S. Embassy in

18  Romania.

19  Q.   Okay.  Peter Traven was working out of the U.S.

20  Embassy in Romania?

21  A.   Yes.

22  Q.   Were you involved in the search of Bogdan

23  Nicolescu's residence on September 28, 2016?

24  A.   Yes.

25  Q.   And how did you get to Bogdan Nicolescu's residence

Mr. Frost - Direct

1    on September 28, 2016?

2    A.    I traveled with Pete Traven in his embassy vehicle.

3    Q.    And approximately what time did you arrive at Bogdan

4    Nicolescu's residence on September 28?

5    A.    It was early morning.  I don't remember exact time.

6    It was between 5:00 a.m. and 6 a.m.  I know the hotel

7    breakfast wasn't available so it was early.

8    Q.    Why did you arrive so early in the morning?

9    A.    We arrived early in the morning, we — the FBI had a

10   cooperating source that was trying to keep members of the

11   group online.

12                MR. O'SHEA:  Objection.

13                THE COURT:  Sustained.

14   BY MR. LEVINE:

15   Q.    Generally, why 5:00 or 6:00 in the morning?

16   A.    We wanted to get there early in the morning so that

17   we could hopefully — we wanted to get a computer in an

18   unlocked state.

19   Q.    And did you have information to suggest that it was

20   more likely — that that was more likely to happen early

21   in the morning?

22   A.    Yes.

23   Q.    Now, how would you describe the area where

24   Bogdan Nicolescu's residence was located on September 28,

25   2016?

1  A.    The residence was outside of City Center.  It was a

2  personal residence or a home, an apartment building

3  towards the end of a street.  I remember it being dark,

4  early in the morning.  There were no lights on.

5  Q.    Okay.  I'm sorry.  Did you say it was a home or an

6  apartment building?

7  A.    It was a home, a personal dwelling.

8  Q.    And how would you describe the perimeter of Bogdan

9  Nicolescu's residence?

10  A.    The perimeter had a large concrete or cinder block

11  fence around with a large cast iron metal gate that led

12  to the driveway.

13  Q.    How tall would you say that wall was around the

14  residence?

15  A.    It was probably 6 or 8 feet tall.  It was taller

16  than I was.

17  Q.    And when you arrived at the house, were you able to

18  see anything inside the house?

19  A.    We couldn't see anything inside the residence.

20  Q.    Who attempted to enter the house first?

21  A.    The Romanian National Police had a team of folks

22  similar to like a SWAT team or a special tactics team

23  that entered the residence first.

24  Q.    Okay.  And roughly how many RNP attempted to enter

25  the house?

Mr. Frost — Direct

1    A.    I believe there were six on their team.

2    Q.    And how did they attempt to enter the house

3    initially?

4    A.    They went up to the — they were grouped into little

5    teams of two or three, and some were in the front, and

6    some in the back.  The first team or the breaching team

7    announced who they were and then hit the door with a

8    battering ram.

9    Q.    What is a battering ram?

10   A.    It was a large metal device that is used to

11   knock open a door if we don't have a key or if it is not

12   open.

13   Q.    And were the RNP able to break down the front door

14   with a battering ram?

15   A.    No.  The front door appeared to be reinforced.  They

16   hit it several times.  It took so long that I remember,

17   as we were sitting out in the cars waiting for the team

18   to enter the building, someone came to the window on the

19   second floor between the first and second floor and

20   started yelling down to them in Romanian.

21   Q.    Was that from the Nicolescu residence or someone in

22   another house?

23   A.    That was from the Nicolescu residence they were

24   trying to enter.

25   Q.    Okay.  Were the RNP ever able to get into the

Mr. Frost - Direct

1    house?

2    A.    Yes.  After the failed attempt on the front door,

3    they went around back and entered through the back.

4    Q.    Did you see how they were able to enter in through

5    the back?

6    A.    Yes.  The back of the home had a — it is like a

7    French door that swung open, and they broke the latch

8    mechanism between the two doors, and they freely swung

9    open, and they entered.

10   Q.    Okay.  And at some point, did you enter the

11   house?

12   A.    Yes.  We —

13   Q.    When did you enter the house?

14   A.    I entered the home after the Romanian National

15   Police had gone through the entire residence and what was

16   usually termed as they cleared the house, as in they

17   verified there were no threats to the rest of the team,

18   to come into the building;

19            That everyone in the home was accounted for,

20   and all the areas posed no imminent threat to the rest of

21   the team coming in.

22   Q.    Okay.  And did you enter through the broken glass

23   door in the back?

24   A.    Yes, we did.

25   Q.    Once you entered, who was in the house?

Mr. Frost — Direct

1  A.    When I entered, the Romanian National Police were in

2  the house, and the — the person that was in the home

3  that had been yelling from the window was there with

4  them.

5  Q.    And who was that person?

6  A.    He was in handcuffs.  That was Bogdan Nicolescu.

7  Q.    He was in handcuffs at that point?

8  A.    Yes, he was.

9  Q.    And who else was in the home?

10  A.    The Romanian National Police, myself, and Pete

11  Traven.

12  Q.    And was anyone else in the home?

13  A.    No one else was in the home.

14  Q.    And you said Nicolescu was in handcuffs at the time

15  you entered?

16  A.    Correct.

17  Q.    Was he handcuffed the whole time, or did they come

18  off at some point?

19  A.    We were at the residence for several hours that day,

20  and at the beginning of the search, as we went around

21  from room to room, he was in handcuffs.

22       Towards the end of the search, as we were

23  completing and gathering all the items that had been

24  seized, he was not in handcuffs, and he was free to move

25  about the home with the escort from the Romanian National

1186

Mr. Frost - Direct

1  Police.

2  Q.   And do you know when you got there, was Nicolescu

3  given an opportunity to contact a lawyer or a trusted

4  person?

5  A.   Yes.

6  Q.   Okay.  And did any lawyer or trusted person show

7  up?

8  A.   Yes.  We waited — we didn't do any of the work.  We

9  didn't touch the computer systems or go through any

10  items.  We waited for — I can't remember the exact

11  amount of time we indicated waited.  It was a little

12  while.

13          I remember I could have gone back to the

14  hotel and got breakfast, but I don't know how long it

15  was.

16  Q.   So you waited, but you remember it was long enough

17  that you could have gone back and gotten breakfast during

18  that time?

19  A.   Yes.  I had a Granola bar that was in my bag.

20  Q.   Okay.  Were you involved in the search of the

21  house?

22  A.   I assisted the Romanian National Police with the

23  search.

24  Q.   So what did that assistance look like?

25  A.   We were a guest in the country.  The Romanians had

1    the legal authority to search the house, and I was there

2    as the technical expert for the FBI to verify their

3    procedures and that the evidence matched our procedures

4    so nothing was contaminated or tainted or not used

5    correctly.

6    Q.    But what did you do?  Physically what did you do

7    during the search?

8    A.    So we went from room to room in the home and located

9    all computer equipment that could have stored information

10   or data that we could have searched later.

11   Q.    So you went from room to room with the RNP?

12   A.    Yes.

13   Q.    And in general how would you describe the inside of

14   Nicolescu's house?

15   A.    It was a larger residence, main floor.  There was an

16   office type area on the main floor, kitchen in between

17   the first and second floor.  Upstairs there were three

18   bedrooms, two bathrooms.

19   Q.    Two bathrooms upstairs?

20   A.    Yes.

21   Q.    Okay.  And you said there was a kitchen area

22   between the first and second floor.  Can you explain

23   that?

24   A.    Yeah.  It was kind of an offset.  So if you entered

25   the home, there was a living room, family room area, and

Mr. Frost - Direct

1    you went up a stairs part way, and there was a kitchen

2    and dining room area and went up the rest of the stairs

3    into the living quarters, bedrooms, bathrooms.

4    Q.    And was there also a basement or garage level?

5    A.    There was down the stairs, yes.

6    Q.    And so who went around to each of these rooms?

7    A.    The Romanian National Police, myself, and Bogdan

8    Nicolescu was escorted with the police in every room we

9    went to.

10    Q.    And was Special Agent Ryan MacFarlane there as

11    well?

12    A.    Yes, he was.

13    Q.    And what would happen in each room?

14    A.    In each room, we identified computer systems,

15    cellphones, the networking gear, and initially, we

16    located, determined if it was on or off.  We looked to

17    see if they were in a state that they were unlocked or if

18    the screen was opened or if you had to type in a password

19    to access the computer system.

20    Q.    And once they found the device that they potentially

21    wanted to seize, what would they do with it?

22    A.    Once we located the device, we wrote the identifying

23    information off of it, serial numbers, make and models,

24    any identifiable marks, and then all of them were locked

25    or in an offstate.  So we weren't able to access any of

Mr. Frost - Direct

1    the data on scene.  So they were either shut down or

2    unplugged, or if they were already unplugged, they were

3    moved to a central location that they could be cataloged

4    for seizure.

5    Q.    And did the RNP find hard drives and computers

6    throughout the house?

7    A.    Yes.

8    Q.    Could you tell if any of the computers around the

9    house were connected?

10   A.    Yes.  There was a network for — there was cables

11   going from an area in the kitchen, kind of the back of

12   the kitchen, where some of the computer equipment was

13   with a router?

14              And there were cables running outside the

15   kitchen around to the office area and up to other areas

16   of the home.  So the computers were connected.  Some of

17   them were connected in a wired fashion.

18   Q.    So these were physical network cables?

19   A.    Yes.

20   Q.    And in your experience having done many of these

21   searches was that unusual?

22   A.    It was —

23              MR. GOLDBERG:  Objection.

24              THE COURT:  Sustained.

25

Mr. Frost - Direct

1    BY MR. LEVINE:

2    Q.    Have you ever seen computers networked like this in

3    the search of a home?

4    A.    Not exactly like this, no.

5    Q.    In 2016, the year you did the search, how would you

6    typically see computers in a house connected?

7                MR. GOLDBERG:  Objection.

8                THE COURT:  Overruled.  You may answer.

9    A.    Usually, in a residence, there is a central location

10   where the router will sit, and there may be one computer

11   connected physically, and there is a wireless network

12   where all the other devices connect wirelessly.

13   Q.    In your training and experience, is there any reason

14   to use network cables running around the house instead of

15   wireless as you just described?

16               MR. GOLDBERG:  Objection.

17               THE COURT:  Overruled.

18   A.    Wireless is less secure as in everyone that is in

19   the radius of the broadcast can see the broadcast, and

20   depending on if the wireless is encrypted, they are more

21   secured.  They might be able to access the network and

22   connect that way.  Usually, hardline connections are

23   quicker as in there is other traffic and transport pass

24   over wires than wireless.

25   Q.    Okay.  So quicker and more secure?

Mr. Frost - Direct

1    A.    Yes.

2    Q.    All right.  So did you have a chance to review the

3    digital devices on this hand dolly that is in front of

4    you last night?

5    A.    Yes, I did.

6    Q.    And does this dolly or hand truck contain some of

7    the digital devices found in Bogdan Nicolescu's residence

8    on September 28, 2016?

9    A.    Yes.

10   Q.    I want to go through some of these with you.

11                First, I am bringing the witness what has

12   previously been marked as Government's Exhibit 1.  What

13   is Government's Exhibit 1?

14   A.    It is an Asus cellphone.

15   Q.    Okay.  And where was it recovered?

16   A.    This was located upstairs in the bedroom.

17   Q.    The bedroom in Bogdan Nicolescu's residence?

18   A.    Yes.

19   Q.    And how do you know this is that cellphone?

20   A.    When I was in Romania, I took the back off, and

21   there is identifying information on the back of the phone

22   that is like a serial number.

23   Q.    And to save time, did you review all the serial

24   numbers on the different devices we have here and compare

25   them to your notes to confirm they are the same serial

Mr. Frost - Direct

1    numbers?

2    A.    Yes.  These items match the serial numbers that I

3    recorded when I was on scene in Romania.

4    Q.    I am showing you now Government's Exhibit 65, and

5    can you tell us what is Government's Exhibit 65?

6    A.    This is a Samsung cellphone.

7    Q.    And where was Government's Exhibit 65 recovered?

8    A.    It was also upstairs in the residence in the

9    bedroom.

10   Q.    Okay.  And that was the residence being Bogdan

11   Nicolescu's residence?

12   A.    Yes.

13   Q.    And I am showing you what has previously been marked

14   as Government's Exhibit 2041.  Do you recognize

15   Government's Exhibit 2041?

16   A.    Yes.  It is an Acer laptop.

17   Q.    And where was the Acer laptop recovered?

18   A.    This was also upstairs in the residence in the

19   bedroom.

20             MR. GOLDBERG:  What was the number on that?

21             MR. LEVINE:  2041.

22             MR. GOLDBERG:  Thank you.

23   BY MR. LEVINE:

24   Q.    And showing you what has previously been marked as

25   Government's Exhibit 2042, what is Government's Exhibit

1   2042?

2   A.   This is a think pad laptop from de novo.

3   Q.   And where was Government's Exhibit 2042 recovered?

4   A.   This was also in the residence, in the bedroom

5   upstairs.

6   Q.   Okay.  And I am showing you a hard drive that has

7   previously been marked as Government's Exhibit 2003.

8           Do you recognize Government's Exhibit

9   2003?

10  A.   Yes.  That's a Samsung hard drive.

11  Q.   Okay.  And where was that Samsung hard drive located

12  or recovered?

13  A.   This was located in the office of the residence

14  downstairs on the main floor.

15  Q.   Was it in a computer or just sitting in the

16  office?

17  A.   It was just a bare hard drive sitting out.

18  Q.   Okay.  And let me show you — I am showing you now

19  what has just been marked as Government's Exhibit 2046.

20  What is Government's Exhibit 2046?

21  A.   This is a ZTE router.

22  Q.   And where was that located?

23  A.   This was in the kitchen.

24  Q.   The kitchen of the Nicolescu residence?

25  A.   Yes.

Mr. Frost - Direct

1    Q.    And then — now, we are going to test the limits of

2    my strength.

3                  With the great assistance of Assistant

4    United States Attorney McDonough, I am showing you

5    what has previously been marked as Government's Exhibit

6    2040.  Do you recognize that it is an HP desktop

7    computer?

8    A.    Yes.

9    Q.    And where was that located?

10   A.    This was located in the kitchen in close proximity

11   to the router kind of in the back of the kitchen.

12   Q.    Okay.  So I am not going to lift this.

13                  I am pointing to a tower, computer tower

14   marked as Government's Exhibit 2038?

15                  THE COURT:  Did you say 2038?

16                  MR. LEVINE:  2038.

17   BY MR. LEVINE:

18   Q.    What is Government's Exhibit 2038?

19   A.    2038 is a large black computer or server is what I

20   would term it.

21   Q.    What is a server?  How is that different from a

22   computer?

23   A.    Server differs from a personal computer.  Usually,

24   based on size, you can tell the power, processing

25   capacity.  It is able to handle more connections, more

Mr. Frost - Direct

1    computations.  It has got a bigger power supply to handle

2    more stuff going on inside the system and, hence,

3    cooling, so it doesn't overheat.

4    Q.    So it is an enhanced computer?

5    A.    Yes.

6    Q.    And where was that located?

7    A.    This was located upstairs in the residence in one of

8    the bedrooms.

9    Q.    And how many hard drives were in this computer or

10   server?

11   A.    Five.

12   Q.    Five.  Is that standard for a personal computer to

13   have five hard drives?

14              MR. GOLDBERG:  Objection.

15              THE COURT:  Overruled.

16              THE WITNESS:  No.  That is not standard.

17   BY MR. LEVINE:

18   Q.    How many hard drives does a personal computer

19   usually have?

20   A.    Personal computer usually has a single hard drive

21   when it comes from the factory, sometimes two.

22   Q.    And what was the sizes of the hard drives in this

23   computer?

24   A.    I don't remember the exact range.  They range from

25   500 gigabytes to a terabyte or two terabyte.

Mr. Frost - Direct

1   Q.   What is a terabyte?

2   A.   A terabyte is a thousand gigabytes.  A gigabyte is a

3   thousand megabytes.  So if we talk about size in

4   something, we know like a music CD holds 700 megabytes of

5   data.  So a terabyte would be many, many times that,

6   where you could store hundreds, if not thousands, of CDs

7   on a single terabyte.

8   Q.   If we were to compare in terms of paper in terms of

9   trees, do you remember how many trees that would be?

10  A.   They approximated it would be about 50,000 trees cut

11  down turned into paper if you were going to take a

12  terabyte in documents and print them all out.

13  Q.   So we won't print them today.

14              Were any of these five drives encrypted?

15  A.   Yes.

16  Q.   How many of the five drives in here were encrypted?

17  A.   All five were encrypted.

18  Q.   And what type of encryption was used?

19  A.   LUKS encryption.

20  Q.   What is LUKS encryption?

21  A.   LUKS encryption is the type of encryption that is

22  used on Linux systems and the encryption is like the lock

23  on the room in a house.  They look at a hard drive as a

24  home, it is partitioned or broken down into segments like

25  rooms in a house, and each room in the house can have a

Mr. Frost - Direct

1    door that is either open or close and can have a lock.

2    So you can't unlock it unless you have the password or a

3    way to get into that room.

4    Q.    Did the FBI try to unlock these rooms to use your

5    metaphor?

6    A.    Yes.

7    Q.    And was the FBI able to decrypt any of the hard

8    drives on this computer?

9    A.    No.

10   Q.    When the computer was seized, was it in this shape,

11   kind of dented a little bit?

12   A.    It was not.

13   Q.    How did that happen?

14   A.    We — when we seized it and it was in Romania, it

15   was in pristine — well, it was in a lot better

16   condition, not broke or bashed in.  During shipment, it

17   was likely dropped.  Something caused the damage to

18   happen.  However, the drives inside the computer were all

19   still — we were able to read those drives, and they were

20   accessible.

21   Q.    When you say you could read them and accessible were

22   they still encrypted?

23   A.    Yes.  I could look and see the rooms and see they

24   were encrypted, but I couldn't get to the data inside

25   those encrypted partitions.

Mr. Frost - Direct

1  Q.    Is it possible that any of the damage caused to this

2  computer in transit caused any of those hard drives to

3  become encrypted?

4  A.    No.

5  Q.    Okay.  We are going to take this one down.  I am

6  going to ask the witness to come down to look at this

7  one.  Okay.  Computer Forensic Examiner Frost, what is —

8  what is the Government's Exhibit number?

9  A.    2039.

10  Q.    And what is Government's Exhibit 2039?

11  A.    2039 is — it is a Dell Power Edge server.

12  Q.    Okay.  And was this found in Bogdan Nicolesu's home

13  as well?

14  A.    Yes.

15  Q.    Where was this found in Bogdan Nicolescu's home?

16  A.    This was located in what we termed the office on the

17  main floor.

18  Q.    And how many drives, hard drives are there inside

19  this computer?

20  A.    There were eight hard drives inside this computer.

21  Q.    Eight hard drives.

22          And what was the size of the hard drives in

23  this computer?

24  A.    This computer had two terabyte hard drives, a total

25  of 16 terabytes of storage.

Mr. Frost - Direct

1    Q.    So 16 terabytes of hard drives in this computer in

2    total?

3    A.    Yes.

4    Q.    And was there anything unusual about how this

5    computer was set up?

6    A.    The setup was a server designed to accommodate large

7    amounts of storage like — the only time I have seen a

8    setup similar to this is when I entered a data center or

9    a business.

10   Q.    And what is a data center?

11   A.    Data center is where companies host their content

12   that has power and cooling, and they stack lots and lots

13   of servers in a manner that can be connected to the

14   internet so the data can be accessed.

15   Q.    Okay.  When this computer was seized, was it all put

16   together like this?

17   A.    It was not.  The case was open and the hard drives,

18   the ones that are on the inside, four of them, were

19   hanging out, and the ones in the front here were inside

20   of it.

21   Q.    Okay.  So did it appear as though it was just being

22   put together?

23   A.    Yes.  It looked like it was being worked on or maybe

24   assembled.

25   Q.    And have you ever seen a computer like this one in a

1  residence?

2             MR. GOLDBERG:  Objection.

3             THE COURT:  May I see you at side bar?

4             (Side bar held on the record.)

5             THE COURT:  I agree he is an expert, but I

6  know you've objected to a couple questions similar to

7  this one.

8             MR. GOLDBERG:  Right.

9             THE COURT:  And I am assuming the basis is,

10  it is really not part of his expertise.

11             MR. GOLDBERG:  Correct.  And I could be

12  wrong — and I know I will be corrected — but I never

13  received an expert report saying that this opinion that

14  these machines are not found in residences on a regular

15  basis.

16             MR. LEVINE:  He was notified as an expert.

17  His resume was provided.  It said — I believe my

18  recollection that it said he would testify about the

19  devices he identified in the residence.

20             THE COURT:  The problem I am having — and I

21  have given you great latitude up to now — I agree he is

22  an expert.  But I still think you need a little more

23  foundation for some of these questions, particularly in

24  this area.  And that's why I, again, I have given great

25  latitude, but now it is like —

Mr. Frost - Direct

1      MR. LEVINE:  I will lay more foundation.

2      MR. GOLDBERG:  Your Honor, do you think we

3  can take a break?

4      THE COURT:  We are off the record.

5      (Discussion held off the record.)

6      (Side bar concluded.)

7  BY MR. LEVINE:

8  Q.    Forensic Examiner Frost, can you demonstrate how the

9  hard drives are put into this computer?

10  A.    Certainly.  On the front four of the hard drives are

11  located in the bays on the front of the server that can

12  easily be pulled out and switched out.

13      Systems like this are designed, so if a

14  drive goes bad, you can pull it out, replace the drive,

15  stick it back in, and then the data rebuilds itself

16  because of the way the system is set up.

17      All the data is put across all the drives

18  and not just one hard drive or a single point of failure.

19  So like I say, in a data center or businesses where loss

20  of data is critical, four of them go here, and the other

21  ones are connected with power and data connected right

22  here.  So that's how they all go.

23  BY MR. LEVINE:

24  Q.    So is this computer also expandable in that you

25  could add more, bigger hard drives or more hard

Mr. Frost — Direct

1  drives?

2  A.   Yes.  Yes, it is.

3  Q.   Okay.  And if he — I know this is heavy, but if we

4  could just turn it around so we can see this side, can

5  you explain what we are seeing up at the top of the back

6  of this exhibit?

7  A.   Certainly.  These are two power supplies for the

8  server.  So it has two power supplies.  In case one of

9  the power supplies goes bad or stops working, it won't

10  kill the server as redundant power supplies coming from

11  two sources.

12        So again, in the event of a failure on one

13  of them, it would still be able to work while you replace

14  the power supply to restore it to its full operating

15  order.

16  Q.   And is that a standard feature of a standard

17  computer?

18  A.   No.

19        MR. GOLDBERG:  Objection.

20        MR. O'SHEA:  Objection.

21        THE COURT:  Sustained.

22  BY MR. LEVINE:

23  Q.   In your experience where have you seen a dual power

24  supply like this?

25        MR. GOLDBERG:  Objection.

Mr. Frost - Direct

1    THE COURT:  Overruled.

2    A.    Dual power supplies are located on computers or

3    servers where, if one drive goes bad, you will lose data.

4    So on computers or servers, oftentimes in data centers

5    where you need two power supplies so that — I'm sorry.

6         They are loaded on computers that are —

7    they want the user, the owner wants them to be on all the

8    time, so if one of them goes bad, it doesn't kill their

9    server.

10   Q.    So where failure is not an option.

11   A.    Correct.

12        MR. LEVINE:  Okay.  Your Honor, now would be

13   a good time to take a break.

14        THE COURT:    Ladies and gentlemen, we

15   will take our morning recess.  Please remember the

16   admonition.

17        (Recess had.)

18        THE COURT:  Please be seated.  You may

19   continue, Mr. Levine.

20   BY MR. LEVINE:

21   Q.    Forensic Examiner Frost, I am going to hand you a

22   hard copy of Government's Exhibit 5 and bring that up and

23   then show the ladies and gentlemen of the jury,

24   Mr. Frost, what is Government's Exhibit 5?

25   A.    I am sorry.  Can I move this microphone?  The cable

Mr. Frost - Direct

1   is like bound on this side, and it is like I am stuck in

2   the corner.

3              THE COURT:  Sure go right ahead.

4              (Pause.)

5   Q.   All right.  If you just speak into the microphone,

6   hopefully we will be able to hear.

7              So I showed you Government's Exhibit 5.  Can

8   you tell us what Government's Exhibit is?

9   A.   Yes.  It is a document that we sign when we were in

10  the residence as we were going through the process of

11  gathering all the items, and before we left, we signed

12  each page of this document.

13  Q.   All right.  And is it an inventory form?

14  A.   A lot of it is in Romanian but —

15  Q.   You will see halfway through is the translation

16  copy?

17  A.   Yes.  A lot of it is serial numbers and items that

18  we located in the residence, and they were entered in by

19  the Romanian National Police before we left, and yes, it

20  looks like it has an inventory of all the items that were

21  seized.

22  Q.   Were you physically present when the Romanian

23  National Police inventoried the devices they were going

24  to seize from Mr. Nicolescu's home?

25  A.   Yes.

Mr. Frost — Direct

1    Q.    And can you describe that process?

2    A.    Yeah.  So each of the items, it was located in the

3    residence and then brought to a central location inside

4    on the main floor, and we — each of the items were

5    brought down.

6              We recorded the information off of it,

7    serial number, identifying information, and then each

8    item was packaged up with this bag for larger items, and

9    they put a string around it and took this wax stick

10   candle thing and a lighter, and they melted wax from the

11   candle on to the string where it was tied on the evidence

12   item.

13             Then, one of the Romanian National Police

14   guys had this stamp or seal they pressed into the wax, so

15   they knew it was sealed by him.  And when it was opened,

16   it would break the wax seal.

17   Q.    And who was watching this inventory processing?

18   A.    I was watching.

19   Q.    Who else?

20   A.    The Romanian National Police, Nicolescu was

21   standing there with the escort from the Romanian National

22   Police.

23   Q.    And what about Special Agent Macfarlane?

24   A.    Yes.  He was there, also.

25   Q.    And were you taking your own notes on each device

Mr. Frost - Direct

1  collected?

2  A.    Yes.

3  Q.    And what were you recording?

4  A.    I was recording the same information, put which room

5  it was located in, and I numbered the items, recorded

6  what the item was and any the identifiable information

7  and the serial number.

8  Q.    Okay.  And did you sign every page of Government's

9  Exhibit 5?

10  A.    Yes.

11  Q.    Okay.  Can you use the arrow to show us where your

12  signature is on this front page?

13  A.    Yeah.  That's me, Matthew Frost.

14  Q.    Okay.  Did Bogdan Nicolescu sign every page of the

15  inventory form as well?

16  A.    He did sign after all of us signed.

17  Q.    And was Bogdan Nicolescu handcuffed at the time he

18  signed every page?

19  A.    He was not.

20  Q.    Did you see Bogdan Nicolescu raise any objection to

21  the search or to the inventory?

22          MR. GOLDBERG:  Objection.

23          THE COURT:  Sustained.

24  BY MR. LEVINE:

25  Q.    Did you see Nicolescu threatened by the RNP or

Mr. Frost — Direct

1      anyone else?

2                  MR. GOLDBERG:  Objection.

3                  THE COURT:  Sustained.

4      BY MR. LEVINE:

5      Q.   What did you see in terms of Nicolescu and his —

6      the time at which he was signing the form?

7      A.   He — at this point in time, like I said, the

8      handcuffs had been removed, and he was following us

9      everywhere we went inside the residence, and as we

10     signed, he was there.  And then, once we completed

11     signatures, he went to the documents and signed them,

12     also.

13     Q.   Okay.  Once the RNP had inventoried all the items

14     and in the bags, did they take them away?

15     A.   Yes.

16     Q.   And before leaving the residence, did Nicolescu do

17     anything?

18     A.   Yes.

19     Q.   What did he do?

20     A.   He — after we had packaged all the items and the

21     Romanian National Police took the items, he went

22     throughout the home with a small bag and collecting some

23     small personal items, like an overnight bag, a shirt and

24     some other items inside this little bag.

25                  He was quite methodical on what he decided

Mr. Frost - Direct

1    to take.  It took quite a while and went back and forth

2    and seemed like he was trying to decide what to take and

3    not to take for the trip.

4    Q.   Okay.  And when you got back to the United States,

5    did you make forensic copies of some of the computers,

6    hard drives, and other devices that were seized in

7    Romania?

8    A.   Yes.

9    Q.   And did you make copies of the devices seized from

10   Nicolescu's house or other devices, too?

11   A.   I made copies of both items from Nicolescu's house

12   and other items that had been seized from other locations

13   within Romania.

14   Q.   Okay.  And I would like to show you what has

15   previously been marked as Government's Exhibit 2045, and

16   I will hand you a hard copy and bring that up.  And if

17   you could go to page 2.

18            MR. LEVINE:  Thank you so much, Sue.  And if

19   we can also go to page 3, page 4.

20   BY MR. LEVINE:

21   Q.   Okay.  Let's go back to page 2.

22            Does Government's Exhibit — first of all,

23   what is Government's Exhibit 2045?

24   A.   This is a certificate of authenticity that I wrote

25   about the devices that I imaged and processed; a little

Mr. Frost - Cross

1   bit of my background, who I am, what I do, my experience,

2   and then the items and how I labeled them and what they

3   were and where they came from.

4   Q.   Okay.  Does Government's Exhibit 2045 contain a fair

5   and accurate list of all the computers, hard drives, and

6   other devices you made forensic copies of as part of this

7   investigation?

8   A.   Yes.

9   Q.   And did you make complete and accurate copies of all

10  the digital devices referenced in Government's Exhibit

11  2045?

12  A.   Yes.

13  Q.   Have all the digital devices you reviewed been

14  returned to Cleveland FBI?

15  A.   Yes.

16  Q.   And have all the digital copies you created been

17  provided to Cleveland FBI?

18  A.   Yes.

19          MR. LEVINE:  No further questions for this

20  witness, your Honor.

21          THE COURT:  Cross examination, Mr. Goldberg?

22          MR. GOLDBERG:  Thank you.

23                  CROSS EXAMINATION

24  BY MR. GOLDBERG:

25  Q.   Good morning, Mr. Frost.

Mr. Frost — Cross

1  A.   Good morning.

2  Q.   Couple questions:

3          You were present at the search of this home

4  in Braosov, correct?

5  A.   Yes.

6  Q.   And do you regularly accompany police officers

7  or the FBI on searches that involve breaching a

8  house or breaking a door down?  Do you regularly do

9  that?

10          Is that regularly part of your job?

11  A.   Yes.  I regularly execute searches —

12  Q.   And you do this in the United States, or do you do

13  this outside the United States?

14  A.   Both within the United States and outside the

15  United States.

16  Q.   So you described the house as having a fence around

17  the outside with an iron gate, correct?

18  A.   Yes.

19  Q.   Now, that iron gate was open?

20  A.   No.

21  Q.   So the police had to open the iron gate that was by

22  the street?

23  A.   The — when we got to the residence, the gate was

24  closed, and the Romania National Police, I don't remember

25  exactly, but I believe they went up and over the walls to

Mr. Frost – Cross

1    get in because the gate was locked.

2    Q.    You don't remember how they got through the gate, or

3    you don't remember whether it was locked?

4    A.    I don't remember exactly, but what I do remember,

5    once they cleared and came back, we went through the

6    gate.

7    Q.    So you don't know how the gate was opened

8    necessarily?

9    A.    Correct.

10   Q.    So you entered the house, and you made an inventory

11   of just your own personal inventory of just the

12   electronics, or did you make an inventory of everything

13   in the home?

14   A.    I made the inventory of the items that we were going

15   to seize.

16   Q.    Okay.  Well, there were other items besides

17   electronics that were seized in the search, correct,

18   personal items, credit cards, bank account information,

19   things like that?

20   A.    Yes, there were other items.  I was present during

21   the search, and my focus was just on the electronic

22   items.

23   Q.    Right.  You focused on the electronic items, but you

24   signed the search warrant on every page that contains

25   everything that was taken in the search, correct?

Mr. Frost — Cross

1      A.    Yes.

2      Q.    All right.  So prior to this search being executed,

3      were you briefed on this investigation?

4      A.    Yes.

5      Q.    Were you aware that the house that was going to

6      be searched was rented by someone other than

7      Mr. Nicolescu?

8      A.    I don't know who owned or leased or rented the home.

9      All I know is who was in the home when I showed up.

10     Q.    You keep saying Mr. Nicolescu's house.  That's

11     because that's who was there when you went in,

12     correct?

13     A.    Correct.

14     Q.    But there was property belonging to other

15     individuals in that house when it was searched,

16     correct?

17     A.    I don't know who owned any of the items.

18     Q.    Well, let me ask you this:

19                 Do you know whose name the internet service

20     connected to that house was in?

21                 MR. O'SHEA:  Object.

22                 THE COURT:  Overruled.

23                 THE WITNESS:  I do not.

24     BY MR. GOLDBERG:

25     Q.    Okay.  And that wouldn't be part of your

Mr. Frost - Cross

1    investigation.  You wouldn't be interested in that?

2    A.    So I am not the investigator.  I don't do the

3    investigations.  I was there solely there in Romania to

4    assist the Romanian National Police execute the search

5    for digital devices.

6    Q.    Right.  But your job is to secure, search,

7    secure and search the individual electronic devices,

8    correct?

9    A.    Yes.

10   Q.    And isn't — isn't it relevant what internet service

11   is connected to any of these devices?  Isn't that

12   relevant to your inquiry?

13   A.    Again, I was there assisting the Romanian National

14   Police with their search warrant.  I don't know if they

15   asked for the FBI's assistance or we asked for their

16   assistance.

17              I was asked to come in, and I don't

18   investigate; all I do is identify devices that contain

19   digital storage, and then I assist with their legal

20   process.  Again, I don't know Romanian law.  I was there

21   assisting the Romania National Police execute their

22   search warrant in their country.

23   Q.    So one last question on this:  In terms of what you

24   were doing on this case, the source of the internet

25   connection into the house was not important to you.  I

Mr. Frost - Cross

1    think that's what you just said.

2    A.    I didn't say it was not important to me.  We seized

3    all digital devices we felt might contain evidence, and

4    we took the router with us.

5    Q.    And the router was connected to an outside internet

6    source, correct?

7    A.    I didn't get on the network.  I don't know where the

8    source was.  I know it was connected to the home.

9    Q.    And I am holding up Government's Exhibit 2046.  This

10   is the wireless router, correct?

11   A.    That is a router.  I don't know if it is wireless.

12   I don't see an antenna coming off it.

13   Q.    Is this the only router that you seized in the

14   house?

15   A.    Without verifying with my notes, I can't compare it.

16   I know that was a router seized from the house.

17   Q.    And this router was connected to a cable that

18   supplied, presumably supplied an internet connection,

19   correct?

20   A.    Yes.  Routers connect two separate networks.  So one

21   network connects to another network, and it routes

22   traffic between those two networks.

23   Q.    So 2046 had to be connected to an outside source of

24   the internet, correct?

25   A.    If it was the router connecting the internet and the

Mr. Frost — Cross

1   home, then, yes, it would have been connected to an

2   internet source.

3   Q.   Do you know if this was that one?

4   A.   Again, I don't know.  We didn't get inside the

5   devices while we were on scene.  I just know it was

6   connected inside the home.

7   Q.   Okay.  What was it connected to?

8   A.   Network cables running through various machines that

9   — it was in the kitchen where the HP computer was, and

10  there were other computer cables running outside the home

11  to other parts of the home.

12  Q.   Do you know which machines specifically were plugged

13  into this router?

14  A.   I do not.

15  Q.   Now, you talked about these two larger computers

16  that are on the dolly, Government's Exhibit 2039 and 2038

17  a few minutes ago, correct?

18  A.   Yes.

19  Q.   So 2038 was the one that has been damaged, and your

20  testimony was, it didn't look like this when it was

21  sitting in the house, correct?

22  A.   That is correct.

23  Q.   And somehow between Braosov and — let me put it

24  this way:  You didn't image this computer at the time it

25  was seized, correct?

Mr. Frost - Cross

1   A.   Yes.

2   Q.   You did?

3   A.   That is correct.  I did not image it at the time it

4   was seized.

5   Q.   When did you image it?

6   A.   It was imaged in Pocatello when I received it in

7   2017.

8   Q.   So when you saw it in the house in Brasov in 2016,

9   it was not imaged?

10  A.   Correct.

11  Q.   Is this the way you usually receive evidence seized

12  by the FBI at your lab?

13  A.   So we seize evidence, when we get it to Pocatello,

14  it is usually shipped to us, and every once in a while

15  items are damaged.  When I receive them, I inventory

16  them, take pictures just to verify everything before I

17  touch them and start them.

18  Q.   But this doesn't look like damage that would have

19  been — would have been normally — would have been

20  associated with a normal inspection of the machine,

21  correct?

22              MR. LEVINE:  Objection.

23              THE COURT:  Overruled.  Can you answer that,

24  sir?

25  A.   If you can rephrase.

1217

Mr. Frost — Cross

1    Q.    Normally when a machine is seized, it may be

2    disassembled, looked at, the interior may be viewed,

3    right?

4    A.    Yes.

5    Q.    And that's done using a screwdriver and maybe

6    pliers, other things?

7    A.    Yes.

8    Q.    It is not normally rolled down a hill, right?

9              MR. LEVINE:  Objection.

10             THE COURT:  Sustained.

11   BY MR. GOLDBERG:

12   Q.    It is not normally beaten up like this —

13             MR. LEVINE:  Objection.

14             THE COURT:  Sustained.

15   BY MR. GOLDBERG:

16   Q.    Does it normally look like this?

17   A.    When you say "normally," there is all sorts of

18   different searches that I have been on, and when items

19   are in the control that entire time, it doesn't look like

20   that.  I have received computers that have been damaged

21   and broken.  I have received several servers from

22   international shipping that, when I received them, the

23   metal frames had been damaged, and there was physical

24   damage that wasn't there when I was in the country?

25             But during the international shipment

Mr. Frost — Cross

1    process, sometime when it wasn't in my custody, damage

2    had been inflicted to the systems.

3    Q.   All right.  So you were able to image the data that

4    was on 2038, correct?

5    A.   Yes.  I imaged the drives inside the system.

6    Q.   Just the drives?

7    A.   Yes.

8    Q.   And did you give us a number for the amount of

9    gigabytes total contained of memory, contained in this

10   image?

11   A.   Memory like RAM or memory storage on the hard

12   drive?

13   Q.   Storage.

14   A.   I don't know the exact number without referring to

15   my notes.  I imaged them in 2017, January-February time

16   frame.  They were, like I said, between 500 gigabytes and

17   a terabyte or two terabytes roughly.

18   Q.   And do you know how much storage capacity is

19   required to store, let's say, a high definition feature

20   length movie?

21   A.   High definition, Blue Ray, HDVD, there is different

22   definitions of high definition, 720p, 1080p.

23   Q.   So you could use up to four to five gigabytes of

24   storage space to store one feature length movie if it is

25   the right type of media.

Mr. Frost — Cross

1   A.   On a DVD, yeah, 4.7 gigabytes.

2   Q.   4.5, something like that?

3   A.   Yeah.

4   Q.   And you imaged the data on this device, 2039, and

5   you indicated that the hard drives were encrypted?

6   A.   Yes.

7   Q.   Encryption is something that is available —

8   encryption programs are available as a source on the

9   internet?

10  A.   Yes.

11  Q.   And is there anything illegal about encrypting

12  a machine, a computer that contains a lot of

13  information?

14  A.   No.

15  Q.   And at the end of the day, you weren't able to image

16  any actual data contained in 2038, Exhibit 2038?

17  A.    Image the data, so we imaged all the data.  I just

18  couldn't view —

19  Q.   From your investigation, you can't say what is on

20  the storage media in this computer?

21  A.   Correct.

22  Q.   And you are familiar with what was the state of the

23  art in terms of the technology for various computer

24  devices in 2016, correct?

25  A.   Yes.

Mr. Frost — Cross

1    Q.   So what was the age on this machine, at least on the

2    tower, Government's Exhibit 2038?

3    A.   I don't know the age on the tower itself.  There was

4    just a black box that is not a Dell or HP that I could

5    look up and see when that model was created.

6    Q.   And there is no serial number right on the back of

7    the tower itself right here, can you tell?

8    A.   I believe there is a serial number, yes.

9    Q.   Did you look up when this particular machine was

10   built?

11   A.   I did not.

12   Q.   Would you agree with me that the machine, when you

13   saw it, appeared to be several years old?

14   A.   The tower itself — are you asking for the age of

15   the tower?

16   Q.   I am asking about the age of the tower, if it is

17   brand new?

18   A.   The tower itself, I don't know what the age of it

19   is.  A black tower, it could be brand knew.

20   Q.   But you didn't look it up.  You don't know?

21   A.   No.  I have to have a specific model.

22   Q.   What about each of the hard drives that were

23   contained inside, 2038, did you look at the age of those

24   items?

25   A.   I took off all identifying information from the

Mr. Frost − Cross

1    drives, and I don't recall what year they were, produced.

2    Q.    Okay.  But none of this technology that we are

3    talking about, specifically 2038 and any of the hard

4    drives that were contained, were cutting edge, up to date

5    items.  These were items that had been available in the

6    marketplace for a while, correct?

7    A.    Yes.  They were available in the marketplace.

8    Q.    And there is nothing on this computer, 2038, that

9    was not available freely on the internet or at most

10   computer oriented stores, correct?

11   A.    Freely on the internet available to purchase to

12   anyone?

13   Q.    I don't mean for free.  You can go on the internet

14   and purchase all this?

15   A.    Yes.

16   Q.    And I could probably go into Comp USA out in

17   Mayfield and pickup all this as well?

18   A.    Yes.

19   Q.    Okay.  Now, you had an opportunity to image the

20   contents of the other large machine, 2039, as well,

21   correct?

22   A.    Yes.

23   Q.    Was there anything encrypted or unencrypted

24   contained on any of the hard drives in this

25   machine?

Mr. Frost — Cross

1   A.    Yes.  There was data on the hard drives.

2   Q.    Okay.  But it was unencrypted?

3   A.    Yes.

4   Q.    Do you know whether this machine was in recent

5   use?

6   A.    I don't know when it was last used.

7   Q.    Okay.  Was it connected to any other machine when

8   you arrived at the premises?

9   A.    I don't recall.

10   Q.    Wouldn't that be an important piece of information

11   for this investigation, whether — what you had called a

12   server was connected to another server?

13   A.    That's a piece of information I would usually get.

14   Usually, when I enter a search scene, I take pictures or

15   we have a photographer that goes through each room and

16   takes pictures of how we located and what condition it

17   was in.

18           Because I was a guest in Romania and they

19   were lead on the search, they were in charge of the

20   search, and I was a guest in their country.  I am not

21   familiar with laws and customs on the legal — to take

22   pictures or not take pictures.  So I didn't take any

23   pictures myself.  I was just there assisting the

24   Romanians.

25   Q.    So your notes don't contain information about

Mr. Frost — Cross

1    connections between machines; only about connections
2    between some of the machines and the router?
3    A.    My notes contained identifying information where it
4    was located.
5    Q.    Okay.  So you've called these servers, and you call
6    them servers because of anything particular with the
7    towers themselves?
8    A.    The way they are built and the server grade, Dell.
9    Q.    Server grade, Dell.  And that's the 2038, right?
10   A.    The Dell is the —
11   Q.    The second.  It is server grade because it has the
12   dual power supplies, correct, among other things?
13   A.    Yes.
14   Q.    Okay.  But you don't know whether or not this Dell
15   was in use at the time that you entered the premises,
16   correct?
17   A.    It was powered offline to the residence.
18   Q.    All right.  But it was also partially disassembled,
19   correct?
20   A.    It was disassembled, yes, but you can run drives
21   with them open outside the system.
22   Q.    Was it connected to a power source?
23   A.    I don't recall.
24   Q.    Okay.  And this was — this home in Braosov was a
25   regular one-family house, correct?

Mr. Frost — Cross

1          MR. LEVINE:  Objection.

2    Q.    As far as you know, if you know.

3          THE COURT:  Overruled, if you know.

4    A.    It was my first time in Romania.  It appeared to be

5    a home like you would find in America.  I don't know if

6    that's common in Romania or not.

7    Q.    I am sorry to use the word "regular."  So it looked

8    like a common home to you?

9    A.    It was a house.

10   Q.    Did you see a generator or any secondary power

11   source?

12   A.    I did not.

13   Q.    So even though this computer has dual power sources

14   to drive the redundancy, you also need dual power inputs

15   in order for that to make a difference.  You need a dual

16   power source, correct?

17   A.    Yes.  If the grid itself goes down, then you would

18   need a secondary power source to power the computer.

19   Q.    And that was not present as far as you know?

20   A.    Correct.

21   Q.    Now, there is nothing illegal about having a server

22   in your home, correct?

23   A.    That's correct.

24   Q.    And in fact, the internet is made up of millions of

25   servers, some of which are commercial and some

Mr. Frost — Cross

1    home-based, right?

2    A.    Yes.

3    Q.    There could be millions of home-based servers all

4    over the word?

5    A.    I am not familiar.  I haven't been everywhere in the

6    world.

7    Q.    All right.  But they exist.  It is not uncommon to

8    find a server that is not on a server from AOL but at

9    someone's home?

10   A.    It is uncommon for me to locate a server outside of

11   a base or data center.

12   Q.    And servers are used by companies like — and I am

13   guessing — Netflex probably has their own servers that

14   are accessed when you stream a movie, correct?

15   A.    Yes.

16   Q.    And that would be like a media server, correct?

17   A.    Yes.

18   Q.    And there are file servers, which allows access from

19   other machines or from outside on the internet just to

20   view files, correct?

21   A.    Yes.

22   Q.    And people use, researchers use servers or high

23   capacity computers to solve physics equations if that's

24   what they need to do, correct?

25   A.    Yes.

Mr. Frost — Cross

1    Q.   Or collate genetic research, correct?

2    A.   Yes.

3    Q.   And somebody who lives — would you say Brasov

4    was a bustling metropolis or kind of an out-of-the-way

5    place?

6    A.    It was removed from Bucharest, the main city, that

7    was smaller, but it was nice.

8    Q.    And would somebody be able to use a high capacity

9    machine such as 2038 with all that memory to use for

10   gaming?

11                  MR. LEVINE:  Objection, your Honor.

12                  THE COURT:  Sustained.

13   BY MR. GOLDBERG:

14   Q.   A person using this machine and the amount of

15   capacity, would they be able to store movies, a number of

16   movies on it?

17   A.   Yes.

18   Q.   Would they be able to play high definition modern

19   video type games on it?

20   A.   The — I would have to check and look at the

21   graphics card.  Usually, a graphics card is a component

22   of the system, and gaming machines or the system itself

23   costs a thousand dollars.  The graphics cost a thousand

24   dollars because that's where all the computations happen.

25                  So if I look at the system, I could look at

Mr. Frost − Cross

1    the graphics card, do some search and see.

2    Q.    Did you happen to look to see if there was a

3    graphics card?

4    A.    There is a graphics card.  I don't recall — there

5    was not a big huge one with lots of memory and multiple

6    fans.

7    Q.    But servers are utilized in the gaming world to host

8    and play online games?

9    A.    Yes.

10   Q.    And some of those games require a lot of data.  I

11   know everything is relative, but compared to ten years

12   ago, the games that are now available require much higher

13   capacity?

14   A.    Yes, they do.

15   Q.    You indicated at some point Mr. Nicolescu was

16   allowed, permitted by the Romania police to contact a

17   lawyer or a trusted friend?

18   A.    Yes.  They were talking in Romanian.  I am not sure

19   what the conversation was.

20   Q.    Do you know if Mr. Nicolescu was ever able to

21   contact anyone?

22   A.    I again don't know who he talked to or what was

23   said.  I know somebody showed up at the residence, and

24   they were talking Romanian.  I don't know who that person

25   was.

Mr. Frost - Cross

1    Q.    Okay.  But eventually, the Romanian National Police
2    were able to proceed?
3    A.    Correct.
4    Q.    And Mr. Nicolescu, as far as you could tell, didn't
5    object to them conducting their business, doing their
6    work, searching the house?
7    A.    That is correct.
8                    MR. O'SHEA:  I would like to have one
9    moment, your Honor.
10                   THE COURT:  You may.
11                   (Pause.)
12                   MR. GOLDBERG:  If I may approach?
13                   THE COURT:  You may.
14   BY MR. GOLDBERG:
15   Q.    The government showed you Exhibit 5, was the actual
16   search warrant with the translation.
17                   Do you remember seeing that a few minutes
18   ago?
19   A.    Yes.
20   Q.    And you indicated you signed each page?
21   A.    Uh, yes.
22   Q.    Okay.  And did you actually read each page before
23   you signed it?
24   A.    The document that was presented was in Romanian
25   again.  The items that I saw serial numbers were items I

Mr. Frost - Cross

1    referenced and recognized.

2                    Again, we were guests in their country,

3    and they said because we were adversary at the scene, we

4    had to search the document or sign the document, excuse

5    me.

6    Q.    Okay.  So you just signed it, but you really didn't

7    know what it said other than the serial numbers?

8    A.    Correct.

9    Q.    Were you aware when you sign a document

10   that there was a number of items belonging to

11   Mr. Nicolescu, personal items taken in the search, not

12   computers necessarily but things like bank cards or

13   papers?

14   A.    Yes.  There were items that weren't the digital

15   items.

16   Q.    So you noticed that when you signed it.  You must

17   have also noticed there were items belonging to

18   Mr. Nicolescu that were taken into the search?

19                    MR. O'SHEA:  Object.

20                    THE COURT:  Overruled.

21   A.    Again, I don't know who the documents belonged to.

22   I just know they were at the residence.

23   Q.    You just said you saw there were personal items,

24   papers taken belonging to Mr. Nicolescu.  You said you

25   noticed that before you signed this.

MR. Frost - Cross Cont'd

1    So I am asking, since you noticed

2  Mr. Nicolescu's name, did you notice that Mr. Radu

3  Miclaus's name is also on the search warrant for items

4  taken in the search?

5    MR. O'SHEA:  Object.

6    THE COURT:  Overruled.

7  A.   Again, it was two years ago.  I don't remember

8  everything that was on there but I did review the

9  document and then I signed like I was asked to?

10    MR. GOLDBERG:  Thank you.  Nothing further,

11  your Honor.

12    MR. O'SHEA:  One moment, Judge.

13    THE COURT:  Certainly.

14    (Pause.)

15    CROSS EXAMINATION CONTINUED

16  BY MR. O'SHEA:

17  Q.   Good morning, Agent Frost.

18  A.   I am an examiner; not an agent.

19  Q.   I'm sorry?

20  A.   I am not an agent.  I am just an examiner.

21  Q.   You are an examiner.  I thought you were going to

22  tell me your name wasn't Frost.

23    Thank you for the work that you do for the

24  FBI by the way.

25    Can you tell the ladies and gentlemen of the

MR. Frost - Cross Cont'd

1  jury the difference between cloning and imaging a hard

2  drive.  Is there a difference?

3           Let me start with that question.

4  A.    Yes.

5  Q.    Tell us the difference.

6  A.    When you clone a hard drive, you take the hard

7  drive, and you copy it exactly the way it is on the drive

8  and put it on the same size drive, so it is an exact

9  copy.

10  Q.    Okay.  And IS cloning a more accurate way of getting

11  a copy of a drive than just simply imaging it then,

12  stated it another way.

13  A.    When you say a more accurate, are you talking about

14  the clone versus imaging the drive?

15  Q.    Yes, sir.  The cloning, you have more stuff.  It

16  is much more accurate than an image.  Am I right about

17  that?

18  A.    Well, an image captures the data inside the drive

19  and makes an exact copy, just puts it in a different

20  format.

21  Q.    Okay.  And how is it different than cloning because

22  cloning has got more data?  It is actually like an exact

23  duplicate of the target drive, am I right, cloning?

24  A.    So, yes.  When you clone it, you copy off all the

25  data and put it back on the same exact the way it was.

MR. Frost - Cross Cont'd

1  When you image it, you take it and put it in a format

2  that — it copies all the data again.

3              It just puts it in a format that compresses

4  things if there is empty space on the drive.  Imaging is

5  a more efficient way.  I wouldn't say it is a better way.

6              Both times when you clone a drive or when

7  you image a drive, there is a verification process we go

8  through to verify the original matches the copy, whether

9  it is a clone or an image.

10  Q.   Okay.  But so I understand the technology, the clone

11  is an exact copy of the target drive where the mere image

12  drive is mostly that, but it is more efficient to review

13  it.  Am I right about that?

14              MR. LEVINE:  Objection.

15              THE COURT:  Overruled.  Is that correct,

16  sir?

17              THE WITNESS:  That was a long question.

18  Can.  You repeat that question?

19  BY MR. O'SHEA:

20  Q.   Okay.  Let me back up.

21              The imaging work that you did, you created a

22  mirror of the drive or a clone drive of these computers

23  that were received?

24  A.   I created image copies.

25  Q.   Okay.  You did not do cloning.  Am I right?

MR. Frost - Cross Cont'd

1   A.   Correct.

2   Q.   You were not tasked with that responsibility.  Am I

3   right?

4   A.   Yes.

5   Q.   Had you been tasked with that responsibility, would

6   you have done it?

7              MR. LEVINE:  Objection.

8              THE COURT:  Sustained.

9   BY MR. O'SHEA:

10  Q.   Now, before one either images or clones a hard

11  drive, any device, cellphone, computer, is it a good idea

12  to shut the device down before any equipment is attached

13  to that computer or device, sir?

14             MR. LEVINE:  Objection.

15             THE COURT:  Overruled.  You may answer

16  that.

17  A.   It depends on the type of imaging you are doing and

18  what the original device is and what techniques and

19  methods are available, whether you capture it live while

20  it is on or capture, and some things don't matter whether

21  it is on or off and some things do matter.

22  Q.   You correct me if I am wrong.

23             If you don't shut the device down, then

24  while you are attached to it, that computer, the target

25  computer or drive or device is also doing what it

MR. Frost - Cross Cont'd

1    normally does if it is just standing alone.  Am I

2    right?

3                   MR. LEVINE:  Objection, your Honor.

4                   THE COURT:  Overruled.  Did you understand

5    the question, sir.

6                   THE WITNESS:  Yes.  So if a system is on,

7    again, it depends on how many drives, what's connected,

8    what the system is doing.  It can be making edits to the

9    original that is there while it is running.

10   Q.   Okay.  Is that why sometimes the best protocol is to

11   shut the device off before you start any imaging or

12   cloning process?

13   A.   Again, it depends on the circumstance.

14   Q.   How about in this circumstance?

15   A.   In this circumstance, if the computers were on and

16   we were able to access them in an unencrypted state, then

17   we would have imaged them live on scene and captured the

18   data when it was accessible as opposed to imaging when it

19   was turned off, and everything is then encrypted or in

20   the state it was when it is turned off, whether it is

21   encrypted or unencrypted.

22   Q.   Okay.  Well, you were there that day I gathered from

23   your direct testimony, sir.

24                   Were the computers left on or shut off while

25   you were there?

1235

MR. Frost - Cross Cont'd

1    A.    Some of them were on; some of them were off.

2    Q.    Okay.  Were some of them shut off by the agents, or

3    were they already off when you got there?

4    A.    Some of them were already off when we got there.

5    Q.    Do you know who shut them off?

6    A.    No.

7    Q.    After you got there, did some of the machines get

8    shut off?

9    A.    Yes.

10   Q.    And they got shut off, I assume — correct me if I

11   am wrong — they got shut off because they were being

12   seized and cataloged with evidence with the idea at some

13   point they would be imaged.

14            Am I right about that, sir?

15   A.    Yes.  The Romanian National Police shut everything

16   down we were going to take.

17   Q.    Now, when one images or clones a hard drive, hard

18   drives are built into things called sectors.  Am I right

19   about that, sir?

20   A.    Yes.

21   Q.    Okay.  And some sectors are more important than

22   other sectors.  Am I right about that?

23   A.    If you are referring to storing the data or

24   running the system, the data is stored throughout the

25   drive.

MR. Frost - Cross Cont'd

1    Q.    Okay.  Well, for instance, when you are doing this

2    type of imaging or cloning the important files to

3    extract, are these temporary files, history logs and

4    browser artifacts.  Am I right about that, sir?

5    A.    It depends on the investigation, but those can be

6    important.

7    Q.    How about this investigation?

8    A.    Yes.  We would like to have had those.

9    Q.    And it is also important to get registry files and

10   system metadata.  Am I right about that?

11   A.    If you are talking about windows registry, then,

12   yes, you would find a registry on a windows system, a

13   Linux system.

14   Q.    And what is a blocker device, sir?  That is

15   referenced, I believe, in one of the exhibits that you

16   looked at.  What's a blocker?

17   A.    Are you referring to a write blocker?

18   Q.    Well, I think — you were asked questions about

19   Exhibit 2045, which is a certificate of authenticity.  Do

20   you remember that line of questioning, sir?

21   A.    Yes.

22   Q.    Okay.  And on paragraph 7, there is something called

23   a write blocker.  Tell us what a write blocker is in the

24   context of that document, sir.

25   A.    Yeah.  So a write blocker is, that is a standard

MR. Frost - Cross Cont'd

1   operating procedure.  When we are able to image a drive

2   and it is not powered off, we will connect it to a

3   separate device that we performance verify, and this

4   device, it is a one-way traffic device.

5               So we are able to read the data off the

6   drive.  We are not able to write data back to the drive.

7   That's why it is a write blocker.  It blocks all writes.

8               And all of my equipment each year, we

9   performance verify that all the drives won't allow writes

10  to go on to the evidence drive and only allow one way

11  data from the original to the copy.

12  Q.   Okay.  And as part of the extraction process when

13  you are doing forensic evaluations of computers

14  generally, can you actually determine whether a computer

15  has a thing called a cookie on it?

16  A.   Can I — if the cookie is there and I am able to

17  read the drive and locate it, then, yes, I can determine

18  if there is a cookie on the drive.

19  Q.   Tell us what a cookie is.

20  A.   Cookies are left by — when you do internet

21  browsing, it will leave a cookie on your system, and that

22  this is one way a website can track you've been there.

23  It stores some of the information, knows you have been

24  there before.

25  Q.   So if I have a computer at home or my wife or

MR. Frost - Cross Cont'd

1    children do and they go to an internet site like

2    Yahoo, Facebook, without that, that is temporarily

3    planting files on their computer so it can track them,

4    right?

5                    MR. LEVINE:  Objection, your Honor.

6                    THE COURT:  Overruled.  You may answer.

7    A.    Depending on the browser setup.  Some browsers are

8    set up so it won't store cookies.  Some are set up if you

9    visit a website by using the producer, you are using and

10   accessing their website, and the cookie is dropped on

11   your machine.

12   Q.    Unless you have the ability to change the settings

13   on your browsers, unless you know to set them in a

14   certain way, those cookies will be planted on your

15   computer without your permission, am I right?

16                   MR. LEVINE:  Objection, your Honor.

17                   THE COURT:  Sustained.

18   BY MR. O'SHEA:

19   Q.    And I think Mr. Goldberg went over this a little

20   bit, too.  Large hard drives or multiple hard drives

21   themselves are not illegal, right?

22   A.    Correct.

23   Q.    As a matter of fact, they are very common in the

24   music and movie industry in order to store large amounts

25   of data.  Am I right?

MR. Frost - Cross Cont'd

1          MR. LEVINE:  Objection, your Honor.

2          THE COURT:  Overruled.

3   A.    So if you are talking a movie industry that's

4   producing content, they probably have massive evasive

5   storage.

6   Q.    Okay.  And that's not illegal, right?

7   A.    Correct.

8   Q.    And same with music, people like Pandora and stuff

9   like that, they have to have massive hard drives to store

10  all their information.  Am I right about that?

11  A.    Yes.

12  Q.    And I think Mr. Goldberg went through it, encrypted

13  devices, be they phones, be they laptops, desktops,

14  servers are not illegal, right?

15  A.    In the United States, no.

16  Q.    And just so we are clear, I think this same

17  document, 2045 that you have in front of you, sir, in the

18  first paragraph of that document, you make reference to

19  the fact that you have been involved with about 6,000

20  imaging tasks.  Am I right about that?

21  A.    Yes.

22  Q.    Now, as it relates to these specific items here on

23  this cart, the exhibits we heard them and again, 2046,

24  2039, 2038 and the others, you don't specifically

25  remember these devices, where they were or anything from

MR. Frost - Cross Cont'd

1   your own memory given that you have done 6,000 of these

2   things.

3              You relied on reviewing documents and

4   preparing for your testimony here this morning.  Am I

5   right, sir?

6   A.    Usually, that's correct.  I do remember specifically

7   —

8   Q.    The dented one?

9   A.    The Dell server because the drives were out, and I

10  guess it is just vivid that I remember that.

11  Q.    Other than that, without the assistance of the

12  paperwork that has been supplied to you, it would be

13  unfair to you in light of the volume you do for you to

14  remember everything about this particular case.  Am I

15  right about that?

16             MR. LEVINE:  Objection, your Honor.

17             THE COURT:  Overruled.

18  A.    Correct.  I take notes and review later and document

19  my process.

20  Q.    And you take the notes, so if it comes to tasks like

21  this, you are able to refresh your recollection.  Am I

22  right about that?

23  A.    Yes.

24  Q.    And last couple inquiries, sir, or maybe just one

25  depending on your answer.

1241

MR. Frost - Cross Cont'd

1              As you sat there this morning, you indicated

2      to us that you don't know — that you personally have no

3      idea who owned what at that house that day.  Am I right

4      about that?

5      A.   Correct.  I don't know who owned it.  All I know is

6      who was there when we arrived.

7              MR. O'SHEA:  Thank you.  Nothing further,

8      Judge.

9              THE COURT:  Redirect?

10              MR. LEVINE:  No redirect, your Honor.

11              THE COURT:  You may step down, sir.  Watch

12      your step.  Do you want to call another witness at this

13      point?

14              MR. LEVINE:  May we approach, your Honor.

15              (Discussion held off the record.)

16              THE COURT:  Ladies and gentlemen we are

17      going to take our luncheon recess.  Please remember the

18      admonition.  Please be downstairs at 1:00 o'clock.  All

19      rise for the jury.

20              (Luncheon recess taken.)

21                      - - - - -

22

23

24

25

Mr. Tiberiu Danet - Direct

1                    AFTERNOON SESSION

2                    THE COURT:  Please seated.  Please call your

3    next witness.

4                    MR. BROWN:  Thank you, your Honor.  The

5    United States calls Tiberiu Danet.

6                    THE COURT:  Sir, if you would please — I

7    will ask you to stand again, I'm sorry.  Please raise

8    your right hand.

9                         TIBERIU DANET

10   called as a witness by and on behalf of the Government,

11   being first duly sworn, was examined and testified

12   as follows:

13                   THE WITNESS:  Yes, I swear.

14                   THE COURT:  Please take a seat.  Now, you

15   may begin.

16                   DIRECT EXAMINATION

17   BY MR. BROWN:

18   Q.    Thank you, your Honor.  Would you please state your

19   name, and spell it for the court reporter?

20   A.    My name is Tiberiu Danet, T-i-b-e-r-i-u, D-a-n-e-t.

21   Q.    If I could ask you just when you answer to speak

22   loudly and also fairly slowly?

23   A.    Yes.

24   Q.    Thank you.  And where were you born, Mr. Danet?

25   A.    I was born in Romania in Bucharest.

Mr. Tiberiu Danet — Direct

1    Q.   And up until 2016, where did you reside?

2    A.   In Bucharest in Romania.

3    Q.   How old are you?

4    A.   I am almost 34 next month.

5    Q.   Okay.  And how far have you gotten in

6    school?

7    A.   I have earned a Master's Degree.

8    Q.   In what?

9    A.   Computer science.

10   Q.   Now, what is your high school experience?  Did you

11   go to school year?

12   A.   International computer in high school, Bucharest.

13   Q.   Is that a private high school?

14   A.   Private high school.

15   Q.   And did it specialize in any field?

16   A.   The class I went to was a class where all the

17   students got scholarships for different subjects like

18   some in mathematics, some in biology, some in computer

19   science.

20   Q.   And what was your scholarship in?

21   A.   Well, I first started when I finished the eighth

22   class, I was within mathematics, so I got into

23   mathematics.  They gave me a scholarship for mathematics

24   but eventually, I started to study computer science.

25   Q.   Okay.  And was this a hard school to get in?  Was it

Mr. Tiberiu Danet - Direct

1    difficult?

2    A.    I wouldn't say necessarily.  I don't know if anybody

3    really wanted to — the way they work, they would pick

4    the students they wanted.

5    Q.    So it was selective?

6    A.    Yes.

7    Q.    Now, while you were there, did you participate in

8    any extracurricular activities?

9    A.    Yes.  That's how actually they would provide the

10   professors, from like the state high schools would come

11   there and teach you outside of class, the specific

12   subject you are studying.

13   Q.    Okay.  And did you take any of those specialty

14   subjects?

15   A.    Yes, mathematics and computer science program.

16   Q.    And were there any, like, school teams or activities

17   surrounding computer science?

18   A.    Yes.

19   Q.    And did you participate in those?

20   A.    Yes.

21   Q.    What activity did you do?

22   A.    Well, I forgot how many hours a week but probably

23   like eight, at least eight hours a week, somebody, like I

24   said, some professor or maybe somebody that had just

25   finished high school and was very good at computer

Mr. Tiberiu Danet - Direct

1  science would come teach.

2  Q.   Okay.

3  A.   So most of the programming and coding.

4  Q.   And were there any competitions or activities

5  surrounding coding or programming?

6  A.   Yes.  Everybody was training to go to the national

7  contests for what they are called Olympiad National for

8  math.

9  Q.   And did you go to the National Olympiad?

10  A.   Yes, every year from ninth to twelfth grade.

11  Q.   And would your team represent the school or city, or

12  how would that work?

13  A.   First, you represent — there would be different

14  stages.  First, you go and are competing against students

15  from the same city.  And then, if you qualify to the next

16  phase, the national phase, you go there, and there would

17  be further — then you could qualify for a team, a select

18  team of select students that would go on to represent

19  Romania.

20  Q.   And is it fair to say you got to know the guys you

21  were on the national team that you were with?

22  A.   Yes.  Everybody pretty much new each other like the

23  best.

24  Q.   Was Bogdan Nicolescu on your team?

25  A.   I met him there when I was in the ninth grade, he

Mr. Tiberiu Danet - Direct

1    was three years older, so twelfth grade.

2    Q.    So you got to know him is it fair to say when you

3    were doing your Olympiad?

4                   MR. GOLDBERG:  Objection.

5                   THE COURT:  Sustained, sustained.

6    BY MR. BROWN:

7    Q.    Is that the first time you met Bogdan Nicolescu?

8    A.    Yes.

9    Q.    How would you describe your relationship as

10   teammates?

11   A.    Nothing special.  I mean, just we just talked about

12   the subjects.  He had the subjects, and he was given

13   those that were much harder than mine.  There probably

14   were 20 —

15                  MR. GOLDBERG:  Objection.

16                  THE COURT:  One moment.  Next question.

17   BY MR. BROWN:

18   Q.    Yes.  So you got to know him on the Olympiad team?

19   A.    Yes.

20   Q.    Approximately what year was this?

21   A.    1999 if I am not mistaken.

22   Q.    So you graduated high school in 2003?

23   A.    Yes.

24   Q.    And from 1999 to 2003, did you maintain contact with

25   Mr. Nicolescu?

Mr. Tiberiu Danet - Direct

1    A.    No.

2    Q.    What did you do upon graduating from high

3    school?

4    A.    I went to college, university.

5    Q.    What college?

6    A.    University of Bucharest faculty of mathematics and

7    informatics.

8    Q.    And by informatics, what do you mean by that?

9    A.    It is a term used for computer science.

10    Q.    And when did you graduate college?

11    A.    2007, and then I did a Master's Degree for three

12    years more in the same university.

13    Q.    Okay.  And in the same field?

14    A.    Databases.

15    Q.    And what do you mean by databases?

16    A.    It is a term for holding different kind of data.

17    Q.    Is it a field within computer science?

18    A.    Yeah, it is a field.

19    Q.    So it is sort of a subspecialty of a larger

20    computer —

21    A.    Yeah, subspecialty.

22    Q.    And what sort of information is taught in a

23    databases course of study?

24    A.    How to structure a database, relationships between

25    how to build the database tables, relationships within

1248

Mr. Tiberiu Danet — Direct

1    tables that hold data, how to best structure one, how to
2    optimize it, how to search a database and so on.
3    Q.    Is it fair to say, in general, it is accessing and
4    organizing data?
5    A.    Yes.
6    Q.    Now, while you were at college, did there come a
7    time when you reacquainted yourself with Mr. Nicolescu?
8    A.    Yes.  It was — I can't remember the year.
9    Q.    Were you in graduate or an undergraduate program?
10   A.    So undergraduate before the Master's.  I am not
11   familiar with the term.
12   Q.    Yes.  I'm sorry.
13              Was it before you graduated college or when
14   you were in your Master's program?
15   A.    It was before I graduated college.
16   Q.    Okay.  And how did you meet him again?
17   A.    He was also a classmate during high school with my
18   brother, so they would sometimes meet each other.  I
19   think I just went out with my brother once, and that's
20   when I met him again.
21   Q.    And do you recall that first time you met him?
22   A.    Excuse me?
23   Q.    Do you recall the first time you met him while you
24   were in college?
25   A.    It has been — it has been a long time.  I don't

Mr. Tiberiu Danet - Direct

1  know.

2  Q.   Do you recall the circumstances, not the date

3  necessarily?

4  A.   Yeah.  I remember he gave me a ride in his car that

5  he had at that time.

6  Q.   Okay.  Do you recall what kind of car it was?

7  A.   It was a BMW, M5.

8  Q.   And this was when you were an undergrad.  Is that

9  correct?

10  A.   Yes, yes.

11  Q.   So he would have been a few years older than you?

12  A.   Yeah.  He is three years older.

13  Q.   Are you familiar with cars?

14  A.   Yes.

15  Q.   Were you impressed by the BMW, M5?

16          MR. GOLDBERG:  Objection.

17          THE COURT:  Sustained.

18  BY MR. BROWN:

19  Q.   You said he gave you a ride.  Do you recall where

20  you went?

21  A.   Just around town, around Bucharest.

22  Q.   Do you know if at that time he was working?

23  A.   I don't know.

24  Q.   Do you know at that time if he was in college?

25  A.   I know that he dropped out of college after — in

Mr. Tiberiu Danet - Direct

1    his first year, after his first year.

2    Q.    After you went on this ride with him, did there come

3    a time when you saw him again?

4    A.    Yeah, pretty much.  I can't remember.  It was like a

5    social, either we went out to eat or something —

6    Q.    Okay.  And do you recall, would you talk together

7    when you went out to eat?

8    A.    Well, obviously, I was impressed compared to me,

9    yeah, like with his car and everything, and we started

10   talking about what he was doing.

11   Q.    And what did he say he was doing?

12   A.    Well, he didn't — he didn't tell me exactly what he

13   was doing, but since he knew me from — before he knew

14   that I was good at programming, and we started talking

15   about like what I been doing in the meantime.

16              Then he proposed that I do something for him

17   on the website.

18   Q.    What sort of things did he propose you do for

19   him?

20   A.    He said he needed a website, and that he could pay

21   me for it if I could do it for him.

22   Q.    And at that time when you were in college, did you

23   know how to design websites?

24   A.    Yes.

25   Q.    Did you know how to program computers?

Mr. Tiberiu Danet – Direct

1    A.    Yes.

2    Q.    Did you have specific programming knowledge?

3    A.    Yes.

4    Q.    What sorts of knowledge did you have about

5    programming computers?

6    A.    Well, obviously, what you needed for the national

7    contest, I had been talking about where I done pretty

8    good.  You had to know algorithms.  You had to know

9    programming languages, maybe C, or they had Pascal back

10   then, and then during — in college, I learned whether by

11   myself or from the courses a little bit of web design,

12   web programming, databases.

13   Q.    While you were in college for the graduate program,

14   did you have any internships?

15   A.    I did an internship at Google in 2006.

16   Q.    Okay.  And when you interned at Google, did you go

17   to California?

18   A.    Yes, in California.

19   Q.    How long was that Google internship?

20   A.    Lasted for three or four months.

21   Q.    And what sorts of things did Google —

22   generally speaking, what sorts of things did you

23   do at Google?

24   A.    We had to follow — you had like a mentor, and he

25   would give you the assignment for that internship, and

Mr. Tiberiu Danet — Direct

1    last three or four months.  I worked on something

2    involving pattern matching.

3              Just a simple example, they were working on

4    things like when you search for a person's name, that is

5    a famous person's name, you say when was this person

6    born, it would give you the result, the year, or when did

7    this person die, or you know, in Google, you prompt the

8    results, and they also have some written specific

9    answers.

10   Q.   So you were working on search engine type

11   matters?

12   A.   Yes, in a sense.

13   Q.   So is it fair to say it was about finding data and

14   returning data —

15   A.   Yes.

16   Q.   — over multiple databases?

17   A.   Yes.  Somebody already worked on that, and I was

18   following up with his work.

19   Q.   Now, going back to Mr. Nicolescu, so he asked you to

20   design a web page?

21   A.   A website.

22   Q.   Okay.  What — what did he ask you to design, what

23   specifically?

24   A.   Escrow website.

25   Q.   A NASCAR?

Mr. Tiberiu Danet - Direct

1   A.   Escrow.

2   Q.   Oh, Escrow.  I'm sorry?

3   A.   Yes.

4   Q.   Did he describe to you what he expected the website

5   to do?

6   A.   Yes.  He gave me pretty detailed specifications, not

7   on how it looked but what the purpose of the website

8   would be.

9   Q.   The functionality?

10  A.   Yes, the functionality.

11  Q.   And what did he want the functionality to be?

12  A.   Basically, it would serve as a — it would show the

13  users that wanted to buy specific vehicles.  I mean, the

14  scope of it was — the purpose was —

15            MR. GOLDBERG:  Objection.

16            THE COURT:  Sustained.

17  BY MR. BROWN:

18  Q.   Did he give you direction on how he wanted the page

19  to function?  I will take small steps here?

20  A.   Yes.  People would sign up, and they would be given

21  a link, and then, by following that link, they would be

22  able to see some seller's vehicle information, and then

23  they would be able to buy this vehicle by placing money

24  in an escrow account.

25  Q.   So an escrow account is an account that holds

Mr. Tiberiu Danet - Direct

1   money —

2   A.   The website would hold the money.

3   Q.   Okay.  And as part of the escrow account, did you

4   have to link it to a sale site, or was it a standalone

5   website?

6   A.   No.  It was a standalone website.

7   Q.   Okay.  And did he at that time tell you he was in

8   the escrowing business?

9               MR. GOLDBERG:  Objection.

10              THE COURT:  Sustained.

11  BY MR. BROWN:

12  Q.   Did he tell you this website was for a business of

13  his?

14              MR. GOLDBERG:  Objection.

15  A.   No.

16              THE COURT:  Sustained.

17  BY MR. BROWN:

18  Q.   Do you know why or did you, in fact, make the escrow

19  website?

20  A.   Yes, I did make.

21  Q.   Okay.  Did he pay you for it?

22  A.   Yes.

23  Q.   How much did he pay you?

24  A.   Around $2,000 Euros.

25  Q.   Was that a lot of money to you at that time?

1255

Mr. Tiberiu Danet – Direct

1          MR. GOLDBERG:  Objection.

2          THE COURT:  Overruled.

3          THE WITNESS:  Yes, a lot of money.  For

4   example I —

5          MR. GOLDBERG:  Objection.

6          THE COURT:  Sustained.

7   BY MR. BROWN:

8   Q.   Did you have a job at that time?

9   A.   I had a job before working part-time, small software

10  company, and I was making 400 Euros a month working four

11  hours a day.

12  Q.   And how long did this website take you to make?

13  A.   A couple of days, maybe a week.

14  Q.   So 2,000 Euros for one week worked?

15  A.   Yes.

16  Q.   Okay.  Did you ever see the escrow site work?

17  A.   Yes.

18  Q.   Do you know — do you know if this escrow website

19  was put on the internet?

20  A.   Yes, it was.

21  Q.   Okay.  And was it linked to other eCommerce

22  sites?

23  A.   No.  It was a standalone website.

24  Q.   When you made that escrow site, what was your

25  understanding of who the clients were?  Who was using

Mr. Tiberiu Danet - Direct

1    it?

2                    MR. GOLDBERG:  Objection.

3                    THE COURT:  Overruled.

4    A.    People wanting to buy vehicles.

5    Q.    Okay.

6    A.    So it was designed only for vehicles, nothing

7    else.

8    Q.    And did you know Mr. Nicolescu to have vehicles he

9    was selling?

10                   MR. GOLDBERG:  Objection.

11                   THE COURT:  Sustained.

12   BY MR. BROWN:

13   Q.    Do you know if Mr. Nicolescu was working with

14   somebody who was selling vehicles?

15                   MR. GOLDBERG:  Objection.

16                   THE COURT:  Sustained.

17   BY MR. BROWN:

18   Q.    Did Mr. Nicolescu ask you to do any additional work

19   after that?

20   A.    Yes.  Eventually, we started talking — I mean, I

21   had a rough idea.  He started confiding in me.  It was

22   not like he first told me about the escrow website or

23   anything.  He didn't tell me anything more.

24                   So I knew it was about people usually from

25   America because the website had —

Mr. Tiberiu Danet – Direct

1          MR. GOLDBERG:  Objection.

2          THE COURT:  Overruled.  Go ahead, sir.

3   A.    — a state and a city section, so there was no

4   like, if you signed up on their website, you couldn't —

5   or I don't remember exactly, but I don't know if you

6   could have chosen another country besides the

7   United States.

8   Q.    Okay.  Did you design the website to be just for

9   American clients?

10  A.    That's what I remember.  It has been a long time

11  though, but, yes.

12  Q.    And is that — was that in response to

13  Mr. Nicolescu's request that you make the website look

14  like that?

15  A.    Yes.

16  Q.    Did he tell you that the website was just to be for

17  cars?

18  A.    Yes.

19  Q.    Okay.  What was the next job he had you do?

20  A.    Well, eventually, he started talking to me more

21  about what he was doing for money.  The next job —

22  again, it has been a long time.  I can't remember

23  exactly the next job — but I remember that I made a

24  website for digital cameras, that supposedly sold digital

25  cameras.

Mr. Tiberiu Danet - Direct

1    Q.   Was Mr. Nicolescu selling digital cameras?

2              MR. GOLDBERG:  Objection.

3              THE COURT:  Sustained.

4    BY MR. BROWN:

5    Q.   Did you create the website for a business

6    Mr. Nicolescu asked you about or said that he needed a

7    website for?

8              MR. GOLDBERG:  Objection.

9              THE COURT:  I am going to sustain that.  You

10   will have to rephrase.

11             MR. BROWN:  Okay.

12   BY MR. BROWN:

13   Q.   Mr. Nicolescu asked you to make another website,

14   correct?

15   A.   Yes.

16   Q.   Was it a website similar to the one you had made to

17   receive payments for items?

18   A.   No.

19   Q.   No.  What sort of website was it?

20   A.   People who just entered their credit card

21   information to buy digital cameras.

22   Q.   Was this a website Mr. Nicolescu owned?

23             MR. GOLDBERG:  Objection.

24   BY MR. BROWN:

25   Q.   Did he say this was for a website he owned, or did

1259

Mr. Tiberiu Danet - Direct

1    you do this —

2    A.   No.

3    Q.   — acting as contractor —

4              MR. GOLDBERG:  Objection.

5              THE COURT:  Sustained.

6    Q.   — in processing payment — okay.

7              So the website you made processed payments,

8    correct?

9    A.   No, it didn't.

10   Q.   What did it do?

11   A.   It just read the payment information and added to a

12   text file.

13   Q.   So it would take credit card information and add it

14   to a text file?

15   A.   Yes.

16   Q.   Did it ever process a payment?

17   A.   No.

18   Q.   Okay.  When you made the website for the

19   automobiles, did you — was that the same thing?  Did it

20   just add the money to a text file, or what happened with

21   that?

22             MR. GOLDBERG:  Objection.

23             THE COURT:  Sustained.

24   BY MR. BROWN:

25   Q.   Okay.  What do you mean "adding credit card data to

Mr. Tiberiu Danet - Direct

1   a text file"?

2   A.    Just adding it to sort of simple data.  You just —

3   again, you would have a summary of all the credit card

4   information entered in the website.

5   Q.    So did you pass the credit card information on to —

6   did the website that you designed pass the credit card

7   information on to a camera store?

8                 MR. GOLDBERG:  Objection.

9                 THE COURT:  Sustained.

10  BY MR. BROWN:

11  Q.    Did you design the website to pass the credit card

12  information on to a camera store?

13                MR. GOLDBERG:  Objection.

14                THE COURT:  Overruled.

15  A.    No.

16  Q.    Did the website you designed have any connection to

17  a retail store?

18                MR. GOLDBERG:  Objection.

19                THE COURT:  Overruled.

20  A.    No.

21  Q.    Were you told to design a website that was able to

22  connect to a retail store?

23  A.    No.

24  Q.    Were you told in the original escrow job to connect

25  the escrow web page to a bank?

Mr. Tiberiu Danet — Direct

1          MR. GOLDBERG:  Objection.

2          THE COURT:  Overruled.

3   A.    No.

4   Q.    Were you told to design the escrow web page to

5   connect to an auto dealer?

6   A.    No.

7   Q.    Based on what you were told to do on either of those

8   websites, did you design a website capable of engaging in

9   any eCommerce?

10         MR. GOLDBERG:  Objection.

11         THE COURT:  Specifically his website?

12         MR. BROWN:  Correct, the two he designed.

13         THE COURT:  Overruled.

14         THE WITNESS:  No.  Didn't connect to

15   anything, none of those.

16         THE COURT:  Overruled.

17   BY MR. BROWN:

18   Q.    Did those two websites you designed collect payment

19   data or credit card data?

20   A.    Just the camera one, the digital camera one.

21   Q.    Did you ever ask Mr. Nicolescu what kind of business

22   he was engaging in that would require those two types of

23   websites?

24         MR. GOLDBERG:  Objection.

25         THE COURT:  Overruled.

Mr. Tiberiu Danet - Direct

1   A.   No.  I didn't have to.  Eventually, he told me

2   himself.

3   Q.   What did he tell you?

4   A.   Well, he started talking about cars being sold on

5   eBay, collecting the money, basically teaching me what he

6   was doing up to the amount.

7   Q.   When he started talking to you about the topics,

8   what was your reaction, if anything?

9   A.   I was just impressed with the money he was making.

10  Q.   So he kept paying you money?

11  A.   He paid me money, but I was impressed with the money

12  he had made so far to be able to afford the car, for

13  example.

14  Q.   How much money did he tell you he was making?

15  A.   He didn't tell me how much he was making.  I know

16  that car was worth like $20,000.

17  Q.   And did he describe what he was doing?  Like did he

18  have a phrase for what he was doing?

19  A.   No.  He didn't have one phrase to sum it up.

20  Q.   Okay.  Based on what you knew, your two websites you

21  designed were doing, did you think there was any

22  legitimate commerce being transacted?

23            MR. GOLDBERG:  Objection.

24            THE COURT:  Sustained.

25

Mr. Tiberiu Danet - Direct

1    BY MR. BROWN:

2    Q.    Did he ask you to make any more web pages?

3    A.    Eventually, yes, but I don't remember if it was at

4    that point.

5    Q.    What sort of web pages did he eventually ask you to

6    make?

7    A.    Web page that looked like the log-in page of Yahoo,

8    AOL, Facebook, Google, modifying a website that looked

9    like work-from-home website, basically trying to hire

10   people to work from home.  I can't remember anything else

11   right now.

12   Q.    Now, do you remember approximately what year that

13   would have been when he was talking to you about these

14   other types of websites?

15   A.    This was late in 2012, '13.

16   Q.    Okay.  So between 2007 when you met him again, when

17   you were in college, and 2012, you just made two

18   websites?

19   A.    No.  I did more than that.  I mean — no.

20   Q.    So let's go back to 2007.  You make those two

21   websites.

22   A.    Yeah.

23   Q.    What's the next thing you do for him?

24   A.    Eventually, he told me the scheme he was involved in

25   for making money.

Mr. Tiberiu Danet – Direct

1    Q.   And how did he describe that scheme to you?

2    A.   It was like a classical eBay fraud.

3    Q.   Upon hearing that, what was your reaction, if

4    anything?

5    A.   I was interested in it because I knew he was making

6    a lot of money.

7    Q.   What sorts of things did he ask you to do to go

8    along with the classic eBay fraud?

9    A.   Well, for example, the web page for the digital

10   cameras was needed for the credit cards, so he could

11   create with —

12              MR. GOLDBERG:  Objection.

13              THE COURT:  Overruled.

14   BY MR. BROWN:

15   Q.   Did you help him create web pages that would collect

16   credit card data?

17   A.   Yes.

18   Q.   Did you help him create pages that would organize

19   the credit card data?

20   A.   Yes.

21   Q.   Did you help him create web pages that would then

22   access that credit card data?

23   A.   No.  The information was used —

24              MR. GOLDBERG:  Objection.

25              THE COURT:  Sustained.

Mr. Tiberiu Danet - Direct

1   BY MR. BROWN:

2   Q.   Okay.  What sorts of functionality did he ask you to

3   help him create for these frauds?

4   A.   I hadn't really created any functionality at the

5   beginning.  I was just following his steps for doing the

6   exact thing he was doing.

7              The only thing that was required were credit

8   card information, and that was the reason that he wanted

9   the digital cameras website.

10  Q.   Now, were you doing the same thing with automobiles?

11              MR. GOLDBERG:  Objection.

12  Q.   Did he have you create pages for any other items

13  other than digital cameras?

14  A.   No.

15  Q.   Okay.  So that first escrow website you had designed

16  for him, did he do anything like that with you in 2007

17  again?

18  A.   I don't understand the question.

19  Q.   Okay.  Were there any other frauds he was having you

20  help with other than the digital camera and credit card

21  fraud?

22              MR. GOLDBERG:  Objection.

23              THE COURT:  Overruled.

24  A.   Help him, no.  Eventually, he showed me the eBay

25  scheme.

Mr. Tiberiu Danet - Direct

1    Q.    And what do you mean by that?  What did he show

2    you?

3    A.    The steps that you would need to take to make money

4    from trying to sell vehicles that were non existent.

5    Q.    Okay. and do you recall approximately what year he

6    showed you those steps?

7    A.    It was shortly after the escrow website.

8    Q.    Okay.  Sometime in 2007?

9    A.    I would say so.

10   Q.    And what were the steps he showed you?

11   A.    The first step would be to create an account with

12   eBay, and for that you needed a credit card.  Then, you

13   would list an ad, create a listing with eBay for a

14   vehicle, and the details for that listing you would get

15   from an actual expired listing.

16              Then, people started inquiring about the

17   car.  For that, you had to list at a very low price, so

18   something maybe half of the price of the actual car, and

19   then, you would have to contact the interested buyers

20   from an e-mail and tell them that, even though the

21   listing on the website might have ended already, that the

22   car is still available, and they can still buy it.

23              Then, you would give them an account for a

24   third person that resided in America saying that either

25   it is you or you are away on a trip, and that they would

Mr. Tiberiu Danet — Direct

1   get the vehicle after they send the money to that

2   respective account.  If they did, obviously, they would

3   not receive — this is where the escrow website would

4   come in handy because you tell them that that account is

5   actually an escrow account, and that the money would be

6   held safely until they got the vehicle.

7   Q.   And upon hearing those steps, were you — did you

8   agree to work with him?

9   A.   I did.

10   Q.   Okay.  And at that point, you knew that you would be

11   engaging in eBay fraud?

12   A.   Yes, I did.

13            MR. O'SHEA:  Objection.

14            THE COURT:  Overruled.

15   BY MR. BROWN:

16   Q.   Because at that time, you did not have cars to sell

17   on eBay, correct?

18   A.   No.

19   Q.   And at that time, you understood that the car

20   information was coming from expired sites?

21   A.   Yes.

22   Q.   So you knew that those were not real cars,

23   correct?

24   A.   Yes, I did.

25   Q.   Now, when you said you needed the credit card

Mr. Tiberiu Danet - Direct

1    information, where did you get the credit card

2    information to open the account?

3    A.    At first or even after that, you could buy credit

4    card information for like $3 or $5 apiece, but with that

5    website, you didn't need that if it worked because it

6    didn't always work.

7    Q.    And which website are we talking about?

8    A.    The digital camera website for collecting credit

9    card information.

10   Q.    And that's the one you made, correct?

11   A.    Yes.

12   Q.    And so you would go through the process of creating

13   an eBay listing?

14   A.    Yes.

15   Q.    And where did you get photos for those listings?

16   A.    From an actual listing from eBay.

17   Q.    So you would have to go on to eBay and copy and

18   paste?

19   A.    Copy pictures, the description, add to the

20   description, add ons and so on.

21   Q.    And same with the detail, right, the listing

22   information?

23   A.    Yeah.

24   Q.    And where would you get the names to use or the

25   seller's name and seller's location?

Mr. Tiberiu Danet – Direct

1   A.   You just make it up.

2   Q.   Okay.  And how would you find somebody in America to

3   accept a payment to send you?

4   A.   First, I wasn't aware of how that happened.  I just

5   — Nicolescu would have somebody that would have such

6   accounts.

7            MR. GOLDBERG:  Objection.

8            THE COURT:  Overruled.

9   Q.   Now, was that a labor intensive process?

10            MR. GOLDBERG:  Objection.

11   Q.   Were there a lot of —

12            THE COURT:  Sustained.

13   Q.   Were there a lot of steps you have to take to sell a

14   fake car?

15            MR. GOLDBERG:  Objection.

16            THE COURT:  Sustained.

17   BY MR. BROWN:

18   Q.   Every time you wanted to list a car, did you have to

19   go through each of those steps step by step?

20   A.   Yes.

21   Q.   So each time you wanted to list a car on eBay, you

22   had to go out into eBay and find a photo?

23   A.   Yes.  You have to first choose a car that you

24   thought looked nice and list, create the account, and

25   list it?  Yeah, it took a lot of time.

Mr. Tiberiu Danet – Direct

1    Q.    About how much time did it take to make a listing at

2    that point in time in 2007?

3    A.    I don't know, say —

4                MR. GOLDBERG:  Objection.

5                THE COURT:  Sustained.

6    A.    — half an hour.

7    Q.    Okay.  Did you and Nicolescu ever talk about

8    changing that process?

9                MR. GOLDBERG:  Objection.

10   BY MR. BROWN:

11   Q.    Did you and Nicolescu ever have conversations about

12   the fraud scheme?

13   A.    Yes, starting from the beginning when he showed it

14   to me.

15   Q.    And based on those conversations, did you do

16   anything to change the fraud scheme?

17   A.    Eventually, yes, but — eventually later not in

18   2007.

19   Q.    Okay.  When?  When would these changes have been

20   made?

21   A.    When he decided that this classic scheme isn't

22   enough, and it would be — to look much better if the

23   users would see an actual listing on eBay, and let me

24   explain that.

25                I forgot to say, to tell you a step, the way

Mr. Tiberiu Danet - Direct

1  you originally make the buyers send the money was to send

2  an e-mail that was actually a fake e-mail looking like it

3  came from eBay, but this — I mean, people could see that

4  it was not actually from eBay.

5            They would look at the address, so it was —

6  some people would not send the money because they didn't

7  trust the sender — but eventually, we took it to a step

8  where they would be able to see if they would go on their

9  computer on eBay.com, there was a way to get to a listing

10 that looked exactly how we wanted it to look, so it

11 looked very authentic.

12 Q.   And what was that process?  How did that happen?

13 What was that process?

14 A.   We started with making a virus or Trojan that would

15 be installed on the victim's computer.  Actually, it was

16 sent by e-mail, and whoever ran it would get infected

17 with this Trojan, and this Trojan would allow us to make

18 a listing that looked authentic right on eBay's website,

19 even if it was not on eBay's website.

20 Q.   And who wrote that Trojan?

21 A.   Nicolescu.

22 Q.   He created the Trojan?

23 A.   Yes.

24 Q.   Did you help?

25 A.   Some parts.

Mr. Tiberiu Danet - Direct

1    Q.    Okay.   And how would the Trojan get on to a victim's
2    computer?
3    A.    Instead of when people would contact you like you
4    still have to list an original car advertisement on eBay
5    and when people contacted you for it, you just send them
6    a link or attachment containing that Trojan.
7    Q.    And how was the Trojan designed so people would
8    click on it?
9    A.    It looked like a picture viewer, and it actually
10   contained the pictures of the car that the buyer
11   was interested in, but silently, it could install the
12   virus.
13   Q.    So when a person clicked on the picture of the car,
14   the virus would launch?
15   A.    No.   He would have to run an executable, and then
16   the picture viewer would pop up.   You would be able to
17   cycle through pictures, but in the meantime, in the
18   background, Trojan was installed.
19   Q.    And what picture of yours did you use?
20   A.    It was custom made.   It was not — but it looked
21   like a Kodak.   It had the icon from Kodak and the
22   name.
23   Q.    And did you write that executable, or did
24   Mr. Nicolescu?
25   A.    Nicolescu did.

Mr. Tiberiu Danet — Direct

1    Q.    Now, once the executable, once the virus was opened,

2    what happened to the victim's computer?

3    A.    Nothing besides — it didn't do anything to the

4    computer besides the fact it would allow us to put the

5    fake listing right on eBay's website so to speak.

6    Q.    Okay.

7    A.    But only on that computer.  If they would go to

8    another computer, they would not be able to see the

9    listing we wanted them to see.

10   Q.    And what was the benefit of taking over that

11   computer with an eBay option?

12   A.    Because before doing that, most of them were saying

13   that they can't find the — that they had received the

14   e-mail that was fake.

15               The second chance offer, that's how it was

16   called, but they can't find anything about it on the eBay

17   website.

18               So after receiving that e-mail, most of the

19   people who were going to the eBay website to find

20   something about that, they were not able to find

21   anything.

22               So by placing an actual listing with a "buy

23   now" button on eBay that actually wasn't on eBay, but

24   they would see it as being on eBay, they were more

25   trustful to use it.

Mr. Tiberiu Danet — Direct

1   Q.   And prior to launching the virus, did you understand

2   how it worked?  You knew it would take over a computer,

3   correct?

4              MR. GOLDBERG:  Objection.

5              THE COURT:  Sustained.

6   BY MR. BROWN:

7   Q.   Were you, as you are writing code, were you aware of

8   what the code would do?

9   A.   I was aware what the code would do, but I was the

10  one that wrote the web interface for the Trojan.  So I

11  was not designing it or coding the actual Trojan; I was

12  just — I just coded, for example, pages that had been on

13  the back end on our server that would allow us to see who

14  ran the virus, like from what I see and changing

15  information regarding the vehicle.

16             I could change what the user actually sees,

17  like you could change the car's picture, the car's

18  description on the fly.

19  Q.   So your role was sort of to support the virus?

20  A.   Yes.

21             MR. GOLDBERG:  Objection.

22             THE COURT:  Sustained.

23  BY MR. BROWN:

24  Q.   What was your role in relation to the virus?

25  A.   I was following his specifications.  Nicolescu was

Mr. Tiberiu Danet - Direct

1  designing the Trojan, and I was following specifications

2  to create .PHP files in the back end on our server that

3  would sustain this Trojan, that would help it work.

4  Q.    Okay.  And what is a .PHP file?

5  A.    It is a page interpreted by a web server, basically

6  a web page, a dynamic web page.

7  Q.    So you were creating web pages that helped the virus

8  run?

9  A.    Yes.

10  Q.    Did these web pages also help organize data

11  collected by the virus?

12             MR. GOLDBERG:  Objection.

13             THE COURT:  Sustained.

14             MR. GOLDBERG:  May we approach, your Honor?

15             THE COURT:  You may.

16             (Side bar held on the record:)

17             MR. GOLDBERG:  Thank you, your Honor.  We

18  are about 50 minutes into this examination and I have

19  interposed many objections, most based on the leading

20  nature of the questions.

21             And I think what has become obvious is that

22  the Government is leading the witness, and when an

23  objection is sustained, the witness already knows what

24  the Government is getting at.

25             So I am asking the Court to, if the Court

Mr. Tiberiu Danet - Direct

1    would instruct the Government to limit its leading

2    questions, so I don't have to object to every question,

3    and the witness is not, in fact, led?

4              THE COURT:  You are, in fact, doing an

5    extraordinary amount of leading, and I am going to

6    instruct you to stop it.

7              MR. BROWN:  Yes, ma'am.

8              (Side bar concluded.)

9    BY MR. BROWN:

10   Q.   What did your web pages do with the virus?

11   A.   They would be able to show the infected computer,

12   they would be able to alter information shown to those

13   infected computers regarding the eBay details, like car

14   picture, car detail, account where the money was supposed

15   to be wired to.

16   Q.   How did your web pages support the virus?

17   A.   The Trojan accessed those web pages — for example,

18   the Trojan was installed on the computer.  Then — and it

19   was giving us the specific ID, every car, like our

20   vehicles had a specific ID.

21              And then, this Trojan had to request

22   information from the server, the central server regarding

23   the — regarding this information.  The server would get

24   based on that idea would get information from the

25   database, and it would extract detail from the — like

Mr. Tiberiu Danet - Direct

1   the car description.  It would send it back to the

2   infected computer, and the infected computer would save

3   it to the hard disk and display.  So everything — the

4   Trojan would get everything from the server or most

5   everything.

6   Q.   And who created the auction ID?

7               MR. GOLDBERG:  Objection.

8               THE COURT:  Sustained.

9   BY MR. BROWN:

10  Q.   Where did the auction IDs come from?

11  A.   They were just named data that we made up, and

12  everybody make up — for example, if somebody — if I

13  would post an auction, I make up an ID with a prefix of

14  pay M1, and everybody create an ID with their prefix,

15  like with their alias prefix of whatever.

16  Q.   And how did your websites help the auction process

17  operate?

18  A.   Are you referring to these web pages?

19  Q.   No, no.  As the web pages were working, what was the

20  result in the fraud, in the eBay fraud?

21              MR. GOLDBERG:  Objection.

22              THE COURT:  Overruled.

23  A.   Well, these were — you needed to support the

24  Trojan.  The Trojan has no meaning if it can't get data

25  from somewhere.  But again, I was not the one — I

Mr. Tiberiu Danet - Direct

1    created some of those web pages, not all of them.

2    Q.    How many people were creating web pages?

3    A.    At that point at the beginning or after that?

4    Q.    At the beginning.

5    A.    Just me and Nicolescu.

6    Q.    Did there come a time when there were other

7    people?

8    A.    Yeah, later.

9    Q.    How much later?

10   A.    Probably 2012 or maybe '11.

11   Q.    And do you know why other people joined?

12   A.    Nah.  I was not given that information.  It was

13   Nicolesu's decision to get people to join.

14              MR. GOLDBERG:  Objection.

15              THE COURT:  Overruled.

16   BY MR. BROWN:

17   Q.    And did you talk to those people as well?

18   A.    No.  I never knew.  I chatted with one of them.

19   Q.    Who?

20   A.    His nickname was Linx, I think it was — he was

21   pretty good at programming.  I didn't know him at

22   all.

23   Q.    And how long did you participate in this fraud

24   scheme?

25   A.    From 2007 to 2016, but it was something that

Mr. Tiberiu Danet - Direct

1    went —

2                    MR. GOLDBERG:  Objection.

3                    THE COURT:  Sustained.

4    BY MR. BROWN:

5    Q.   And let's jump ahead to 2016.

6                    September 20th, 2016, what happened that

7    day?

8    A.   I was arrested that day.

9    Q.   And do you know why you were arrested?

10   A.   For participating in this scheme.

11   Q.   And as a result of your arrest, were you extradited

12   to the United States?

13   A.   Yes, ten and a half months later.

14   Q.   And in fact, also, as a result of that arrest, your

15   apartment was searched, correct?

16   A.   Yes.

17   Q.   And were you present for your extradition

18   proceeding?

19   A.   I was held in jail in Romania, and yeah, there were

20   a few court hearings regarding the extradition.

21   Q.   And the result was you were extradited to America?

22   A.   Yes.

23   Q.   Now, when you came to America, did you have an

24   attorney represent you?

25   A.   Yes.

Mr. Tiberiu Danet — Direct

1    Q.    Did you talk to your attorney?

2    A.    Yes, frequently.

3    Q.    And did you talk to him about the case?

4    A.    Of course.

5    Q.    Did you talk to him about the evidence?

6    A.    Yes.

7    Q.    Did you talk to him about strategies without

8    detailing what those strategies were?

9    A.    Yes.

10   Q.    Did there come a time when you entered a plea of

11   guilty in this case?

12   A.    Yes.

13   Q.    And was it a plea of guilty in open Court or subject

14   to a plea agreement?

15   A.    It was subject to a plea agreement.

16   Q.    Okay.  And was that plea agreement with the

17   United States of America, Northern District of Ohio?

18   A.    Yes.

19   Q.    And in fact, was that plea agreement signed by

20   you?

21   A.    Yes, I signed.

22   Q.    Signed by your attorney?

23   A.    Yes.

24   Q.    Signed by me?

25   A.    Yes.

Mr. Tiberiu Danet - Direct

1  Q.   What do you understand that plea agreement to

2  be?

3  A.   Regarding the time or charges or account or —

4  Q.   We will get to all of it, but let's start with

5  time.  What do you understand the plea agreement to be

6  for time?

7  A.   So the plea agreement is for nine to 12 years.

8  Q.   Nine to 12 years?

9  A.   Yeah.

10  Q.   And who do you understand that that decision to rest

11  with, what that sentence will be?

12  A.   Solely with the Judge.

13  Q.   Do you understand that to rest with me?

14  A.   No.

15  Q.   Only with the Judge?

16  A.   Yes.

17  Q.   What do you understand the maximum amount of time

18  you could have gotten was?

19  A.   Well, that was pretty vague, but I was advised by my

20  attorneys to take this, so it was more than 12 years.

21  Q.   Do you know how much more?

22  A.   Not exactly.

23  Q.   Okay.  Were you made any additional promises other

24  than your sentence would be between nine and 12 years?

25  A.   No.

Mr. Tiberiu Danet - Direct

1   Q.   Were you made any other — any guarantees of

2   anything?

3   A.   No.

4   Q.   How many times have we met?

5   A.   Five, six times.

6   Q.   And during those times, were you given any

7   benefits?

8   A.   Such as what?  No.

9   Q.   Well, you were purchased lunch, correct?

10  A.   Yes.  I was purchased lunch.

11  Q.   Did we meet in jail or elsewhere?

12  A.   Elsewhere.

13  Q.   Did we meet in an FBI office?

14  A.   Yes.

15  Q.   Were you in custody at the time?

16  A.   Yes.

17  Q.   You were not allowed to walk around the

18  neighborhood?

19  A.   If I was what?

20  Q.   Were you allowed to leave the office, the FBI

21  office?

22  A.   No.

23  Q.   Were you allowed to leave the presence of an FBI

24  agent?

25  A.   No.

Mr. Tiberiu Danet — Direct

1    Q.    Was that a benefit to you, to be taken out of jail

2    to an FBI office?

3    A.    No, quite the opposite.

4    Q.    Okay.  Was the lunch that you were provided a

5    benefit?

6    A.    I had to have one for the day, so I don't consider

7    it a benefit.

8    Q.    Were you made any promises about anybody in

9    Romania?

10   A.    No.

11   Q.    Were you made any promises about what might happen

12   to you when you return to Romania?

13   A.    No.

14   Q.    Were you — what do you understand your

15   responsibility under the plea agreement to be?

16   A.    My responsibility, I just pled guilty to the counts

17   I was guilty of.

18   Q.    Were you expected to do anything else under the

19   terms of the plea agreement?

20            MR. GOLDBERG:  Objection.

21            THE COURT:  Overruled.

22   A.    Yeah.  I was expected to cooperate.

23   Q.    What do you understand cooperation to be?

24   A.    Everything, including this testimony where I am

25   supposed to tell the truth.

Mr. Tiberiu Danet - Direct

1   Q.   Were you asked to provide information prior to

2   today?

3   A.   Yes.

4   Q.   Information about the case?

5   A.   Yes.

6   Q.   Information about your knowledge of the case?

7   A.   Yes.

8   Q.   Were you asked to identify people involved in the

9   case?

10  A.   Yes.

11  Q.   Did those people include members of your family?

12  A.   Yes.

13  Q.   Did you provide that information?

14  A.   Yes, I did.

15  Q.   Were you asked to provide passwords to accounts?

16  A.   Yeah.

17  Q.   Did you provide that information?

18  A.   Yes, to the best of my knowledge.

19  Q.   Do you know if all of the passwords you provided

20  worked?

21  A.   As far as I know, no, not all of them did.

22  Q.   Did you provide additional information about the

23  passwords that didn't work?

24  A.   Yes.  I was given a laptop where I worked inside the

25  jail trying to see what went wrong.

Mr. Tiberiu Danet — Direct

1  Q.   When you say you were given a laptop, was it

2  accessible to the internet?

3  A.   No.

4  Q.   Was it working?

5  A.   Yes.  It was working.

6  Q.   But it couldn't connect to the internet?

7  A.   No, it couldn't.

8  Q.   Did it have programs loaded on it?

9  A.   No.  It just had a virtual machine with my system on

10  it, my — a copy of my system, so I would be able to

11  access.

12  Q.   Did you have to give it back to the FBI?

13  A.   I think it is still in the jail right now.

14  Q.   Did you have to give it to somebody in the jail?

15  A.   It sits in an area, it is called a video

16  conferencing area.  One is constantly there, and I would

17  go except for the weekends, and I would go there

18  sometimes during the week for just an hour or two or

19  during the week, four hours.

20  Q.   So it was under supervision?

21  A.   Yes, except for the weekend.

22  Q.   Were you allowed to take the computer out of this

23  room?

24  A.   No.

25  Q.   Now, also, were you required to provide the

Mr. Tiberiu Danet — Direct

1    monikers, the nicknames of everybody in the

2    group?

3    A.    Yes.

4    Q.    Including your family members' monikers?

5    A.    Yes.

6    Q.    And were any promises made about any of the other

7    people you provided information about?

8    A.    None.

9    Q.    Were you provided with a statement of facts as part

10   of this plea agreement?

11   A.    Yes.

12   Q.    Did you have a chance to review those statement of

13   facts?

14   A.    Yes.  I actually made a few statements I didn't

15   agree with.

16   Q.    Were you able to discuss with your attorney

17   statement of facts?

18   A.    Yes.

19   Q.    And as part of the plea agreement, did you agree

20   with the statement of facts as they were presented to you

21   on the day of the plea?

22   A.    Yes.

23   Q.    As part of the plea agreement, did you talk about

24   virtual private networks?

25            MR. GOLDBERG:  Objection.

Mr. Tiberiu Danet – Direct

1      THE COURT:  Overruled.  Answer that yes or

2   no, sir, if you remember.

3      THE WITNESS:  Yes.

4   BY MR. BROWN:

5   Q.   Did you admit to knowing what a virtual private

6   network is?

7      MR. GOLDBERG:  Objection.

8      THE COURT:  Overruled.  You may answer that

9   yes or no.

10      THE WITNESS:  Yes.

11   BY MR. BROWN:

12   Q.   As part of the eBay fraud that you were engaged in,

13   did you use virtual private networks?

14   A.   Yes.

15   Q.   How did you use virtual private networks.

16   A.   Virtual private network would allow me and the

17   others to stay anonymous.

18   Q.   How?

19   A.   That's basically what a virtual private network

20   does.  You have — you buy an account with like private

21   internet access, and by logging in, you have a different

22   IP that couldn't be traced back to you when using the

23   internet.

24   Q.   And when you say you and the others, were those

25   others members engaged in the same fraud you were engaged

Mr. Tiberiu Danet - Direct

1   in?

2   A.    Yes.

3   Q.    And were they — were you using virtual private

4   networks — how long were you using these virtual private

5   networks during the fraud scheme?

6   A.    All the time among other things.

7   Q.    Okay.  Starting in 2007?

8   A.    Yes, 2007.

9   Q.    Up until the time of your arrest?

10  A.    Yes.

11  Q.    Was that the sole way you would communicate with

12  members of the fraud scheme?

13  A.    You mean through virtual private network?

14  Q.    Yes.

15  A.    No, but it was just — the only way at the beginning

16  where we would communicate about the scheme.

17  Q.    Why?

18  A.    So that it couldn't be traced back to us.

19  Q.    And what sort of ways would you hide your identity

20  when you were using a VPN?

21  A.    Well, there are multiple steps besides using that

22  VPN for obscuring our actual location and IP address that

23  identifies the location.

24  Q.    And what are those steps?

25  A.    It began from something simple going to something

Mr. Tiberiu Danet — Direct

1    more complex towards the end.

2    Q.    Okay.  What was the simple beginning?

3    A.    The simple beginning was using the Tour network.  It

4    is a public service that allows you to do the same thing.

5    This was the first step, and the second step was using

6    AOL's Compuserve, a type of virtual private network.

7    Q.    Okay.  And on the AOL Compuserve, did you have a

8    name you used?

9    A.    Yes.  But I can't remember it.  This was only used

10   in 2007.

11   Q.    Okay.  And then, you moved on to another means?

12   A.    Yes.

13   Q.    AOL Compuserve, or did you still use the Tour

14   network?

15   A.    Would still use the Tour, yes, but there were a lot

16   more other steps.

17   Q.    And what were those steps after 2007?

18   A.    It changed during time.  I can't remember every

19   precise way to connect to the internet during each year,

20   but I know what it ended up being.

21   Q.    What did it end up being?

22   A.    Some of the members of the conspiracy would have

23   antennas that would connect with Wi-Fi networks belonging

24   to, say, neighbors.  So you would connect through that.

25   That was the first step.

Mr. Tiberiu Danet - Direct

1          The second step was further connecting from

2    multiple — actually two other servers.

3    Q.   Are those the VPN servers you were talking about?

4    A.   No.  Actually, I am wrong.  No.  There were these

5    two other servers, were actually computers and technical

6    computers?

7          But before that, after connecting to the

8    Wi-Fi, we would connect to Tour and then to these two

9    other computers that belonged — that were actually

10   infected computers, then a VPN, and there were like five

11   steps.

12   Q.   Okay.  And when you say infected computer, do you

13   mean a computer infected with the virus?

14   A.   Yes, with the virus.

15   Q.   With the virus Mr. Nicolescu designed to

16   do —

17               MR. GOLDBERG:  Objection.

18               THE COURT:  Sustained.

19   BY MR. BROWN:

20   Q.   Was that the same virus that you knew about in

21   2007?

22               MR. GOLDBERG:  Objection.

23               THE COURT:  Overruled.

24   A.   Yes.  It was the same virus, but it got different

25   functionality towards the end.  This functionality of

Mr. Tiberiu Danet − Direct

1   connecting through it was not available in 2007.

2   Q.   Who added that functionality?

3   A.   Nicolescu did.

4   Q.   Did you work on that functionality?

5   A.   No.

6   Q.   Again, what is the Tour network?

7   A.   It is a network of thousands of computers, computers

8   that allows you just like a VPN to stay anonymous.

9   Basically, instead of making a connection from your house

10  to the internet, it goes through like a couple of

11  computers until it connects itself.  And wherever you

12  connect it, it can face it back because it goes through

13  different notes.

14  Q.   Does it change the appearance of your IP address?

15  Is that what you mean?

16  A.   Yeah.

17  Q.   So is it fair to say you log on to the Tour network

18  with IP address 1, 2, 3, 4, and you leave the Tour

19  network with IP address 5, 6, 7, 8?

20  A.   Yes.  It is usually with the Tour network.  If you

21  don't set it up at all, it is used as a different address

22  all the time.

23           MR. BROWN:  Can we pull up 1874 at this

24  time?

25

Mr. Tiberiu Danet - Direct

1    BY MR. BROWN:

2    Q.   Okay.  So here is — could you describe what we are

3    looking at here?

4    A.   Yes.  That's exactly right.  From our computers, we

5    connect to Wi-Fi network or open Wi-Fi network that

6    doesn't have an encryption key.

7    Q.   And at that step, is that the laptop of the house?

8    A.   Yes.  It doesn't have to be a laptop.

9    Q.   Was that normally your house or somebody else's

10   house?

11   A.   Everybody followed the same steps that is connected

12   to the internet.

13   Q.   Okay.  So then, after the step at the house, then

14   what happened?

15   A.   Connecting to the Wi-Fi network.  Actually, first

16   you would connect to, say — it would say one week this

17   antenna right here.  That belonged to me or Nicolescu or

18   somebody else was using for a week?

19             And then we would connect to that person's

20   house; then through his house to that antenna, then to

21   the Tour network that same infected computer and VPN, so

22   it was basically pretty much untraceable.  And at the end

23   of the week, we change the antenna of the connection so

24   it wouldn't be used too much.

25   Q.   Where are you getting the antenna?

1293

Mr. Tiberiu Danet - Direct

1   A.    They are bought.

2   Q.    By the people you were working with?

3   A.    Actually, I think they were bought by Nicolescu who

4   had given all the members —

5               MR. GOLDBERG:  Objection.

6               THE COURT:  Sustained.

7   BY MR. BROWN:

8   Q.    Now, once you were on, let's say, the server at the

9   top of the left, what would you do when you would VPN

10  into a server?

11  A.    All the connections that you would make after this

12  VPN, you had the IT from the VPN, so it was untraceable.

13  Even if this was identified, the IP of the VPN, it

14  couldn't go back so many steps to go back to you.

15  Q.    So let's look at some of these logo.

16               EBay, what is the benefit of having an

17  anonymous address on eBay for your scheme?

18  A.    Besides not using your own, so that you can be

19  identified.  You could connect, you could have an IP that

20  belonged to a certain American state.  Say, if you create

21  an account in California, you usually need an IP address

22  that would belong to California.

23  Q.    And why would you want your IP address to match your

24  listing?

25  A.    So that everything would look correct.  Usually when

Mr. Tiberiu Danet - Direct

1    it is somebody from California, they would have a
2    California IP.
3    Q.    And how about with the gmail address or the gmail
4    icon?  What's the benefit of using an anonymous VPN to go
5    on to gmail?
6    A.    Well, again, for not using your own IP, give you a
7    chance to use a different IP every time.  But actually,
8    after the VPN, you could connect to every website on the
9    internet using that IP.
10                It was not just gmail or Facebook or all the
11   items that are presented here.  And most of the times
12   before accessing such a website, again, you choose a
13   server, a process server, something that allows you to
14   connect to those websites that would belong to the
15   location that you needed it to belong to; be it Facebook
16   or gmail or Craigslist.  If I wanted a server from
17   Georgia, I would be able to get an IP from Georgia.
18   Q.    Now, what is the call fire icon that you see here?
19   Does that mean anything to you?
20   A.    It is an online faxing service.  It will be able to
21   receive faxes.
22   Q.    And was that, in fact, used by you or the other
23   members when you were doing fraud?
24   A.    Yes.
25   Q.    Why?

Mr. Tiberiu Danet — Direct

1   A.   The buyers wouldn't — would be requested to send a

2   fax with the receipt from their bank, with the actual

3   wire transfer details so that we could verify.

4   Q.   So you could get a fax number?

5   A.   Yes.  You can get a fax number that you can check

6   online.

7   Q.   And it would not come back to Romania, the number

8   wouldn't.  It would be a U.S. looking number?

9   A.   Yes, it is a U.S. looking number.

10  Q.   But you would be able to get whatever syntax?

11  A.   Yes.  You log in on cold fire and see the images.

12  Q.   And what about Craigslist?  What did the group use

13  the VPN to log on anonymously under Craigslist?

14  A.   For a short while Craigslist was used to list

15  vehicles just like on eBay with the purpose of getting

16  interested buyers e-mail.

17  Q.   Was it used for anything else?

18  A.   I think at one point it was used for —

19          MR. GOLDBERG:  Objection.

20          THE COURT:  Sustained.

21  BY MR. BROWN:

22  Q.   And what is, if you know, GMX?

23  A.   It is an e-mail service.

24  Q.   And what was the benefit for the group of using the

25  VPN to log on to GMX anonymously?

Mr. Tiberiu Danet - Direct

1    A.   Well, again, collectively, for all these services,

2    it was to stay anonymous.  That was the bottom line.

3    Q.   Could you repeat that?

4    A.   So for all these services listed, the bottom end for

5    everything else, the benefit of using the VPN and all the

6    chain of connections above was to stay anonymous.

7    Q.   Okay.

8              MR. BROWN:  Can I approach the Defendant or

9    the witness?

10             THE COURT:  Yes.

11   BY MR. BROWN:

12   Q.   Would you please take a look at Exhibit 1415?

13   A.   Yes.

14   Q.   Do you recognize what that is?

15   A.   Yes.  It is —

16   Q.   I'm sorry.  Can you explain what that is?

17   A.   It is a Wi-Fi antenna.  It is just like this one but

18   much more powerful.

19   Q.   Okay.  And is that the same sort of Wi-Fi antenna

20   you used in the first step —

21   A.   Yes.

22   Q.   — that you just described?

23   A.   Yes.

24   Q.   And could you explain to the jury how you would do

25   it?

Mr. Tiberiu Danet - Direct

1    A.    Um —

2    Q.    How would you physically set it up?

3    A.    You would have to try a lot, and sometimes with a

4    poor connection you would have trouble connecting to some

5    of the Wi-Fi networks.

6              You have to tilt it or put it in a stable

7    place in a position until it worked.

8    Q.    So let's take a step back.  What is the part you are

9    holding in your right hand right now?

10   A.    This is the antenna.

11   Q.    That's a big orange square.

12   A.    Yes.

13   Q.    And where would you point an antenna if you were in

14   your apartment?

15   A.    Say I had an apartment building, that way I could

16   try pointing it like this or rotating like this or

17   tilting it like this until I get the best signal.

18   Q.    And what's the purpose of that big orange

19   square?

20   A.    It has good reception compared to the little

21   thing.

22   Q.    And the little thing you are pointing to, can you

23   describe this?

24   A.    This is probably the router, the antenna, they're

25   called antenna.

Mr. Tiberiu Danet - Direct

1    Q.    So it is a two-piece device.  It has got two

2    antennas, one is a big orange square and the other —

3    A.    There are three antennas.

4    Q.    Three antennas?

5    A.    This is the fold one that it comes with.  It comes

6    with three antennas like this.  This is the — the more

7    powerful antenna.

8    Q.    And what does the antenna pull in?

9    A.    The signal from the Wi-Fi.

10   Q.    Just like a TV antenna but for Wi-Fi?

11   A.    Yeah.  It is like any antenna.

12   Q.    And what is the white box with all the antennas?

13   A.    This is the router, what you have in your house, and

14   all the internet connections go through it.

15   Q.    And once you find a Wi-Fi signal using one or all

16   three of those antennas, what's the next step you take?

17   A.    Depending on the Wi-Fi network, you maybe have to

18   break the encryption if you could.

19   Q.    Okay.  So it might be encrypted.  That's where you

20   have to type in a password?

21   A.    Yes.

22   Q.    And how would you do that?  How do you break

23   encryption?

24            MR. GOLDBERG:  Objection.

25            THE COURT:  Overruled.

Mr. Tiberiu Danet - Direct

1    BY MR. BROWN:

2    Q.    You specifically.

3    A.    There is two or usually two types of protocols used

4    for encrypting, and one of them is prone to be incorrect.

5    So one of them is very poor, and some people still use

6    that.  Actually, the router comes defaulted with that

7    setting on to delete the protocol.  So that is cracked

8    easily if you get a good signal to the Wi-Fi spot.

9    Q.    And if it doesn't have encryption?

10   A.    Then, it is only to put in any password, and you

11   just connect to the Wi-Fi network just like in a public

12   place.

13   Q.    Okay.  Now, how did you send e-mails to members of

14   the group?  Like —

15   A.    Regarding — whenever I was communicating about the

16   scheme, I would go through all of this chain to connect

17   to the internet, and then I will send my e-mail.

18   Q.    And did you have an e-mail address you used when you

19   were talking about the criminal online eBay auction

20   scheme?

21   A.    Yes.

22   Q.    What was your e-mail?

23   A.    The last one I had was amightysa@gmail.com.

24   Q.    And what did sa in amightysa stand for?

25   A.    Really nothing.  It was just amighty wasn't

Mr. Tiberiu Danet — Direct

1    available, so I just typed two more letters.

2    Q.    Okay.  And that was a gmail?

3    A.    Yes.  Previously, I think I had the same handle at

4    GMX.

5    Q.    Okay.  And by "handle" you mean e-mail names?

6    A.    Yes, what comes before that.

7              MR. BROWN:  Your Honor, may I approach the

8    witness to take that back?

9              THE COURT:  You may.

10   BY MR. BROWN:

11   Q.    And by the time you were using amightysa@gmail.com,

12   about how many were you communicating with concerning the

13   criminal scheme?

14   A.    Personally about four.

15   Q.    Okay.  And which e-mail addresses were you

16   communicating with?

17   A.    Most commonly Master Fraud at GMX.com, and then the

18   Minolta 9797.  I forget the domain, if it was aol.com or

19   not.

20   Q.    Who were the other two?

21   A.    My brother.

22   Q.    What was his e-mail address?

23   A.    The handle was — he changed it at least once.  One

24   of the handles was r-a-d-o-b-d-s.

25   Q.    And what were the other ones he used?

Mr. Tiberiu Danet - Direct

1   A.   Rasputin.

2   Q.   And how was Rasputin spelled?

3   A.   R-a-s-p-u-t-i-n.

4   Q.   Were any numbers used in it?

5   A.   I can't recall.

6   Q.   And who was the fourth person?

7   A.   I communicated with Linx.

8   Q.   Linx?

9   A.   Linx is the — his real name is Catalin Dima,

10  another person that did some coding, some or beginning in

11  2012, I think, for a couple of years.

12  Q.   And your brother's name is what?

13  A.   Valentin.

14  Q.   Also Danet?

15  A.   Yes.

16  Q.   And when you communicated with him, you used

17  amightysa?

18  A.   Yes.

19  Q.   Did you ever use a personal more identifiable e-mail

20  name?

21  A.   Yes, but not for communicating anything regarding

22  this.

23  Q.   Okay.  And was that the same with them, did you ever

24  send criminal e-mails to any other handle?

25          MR. GOLDBERG:  Objection.

Mr. Tiberiu Danet - Direct

1        THE COURT:  Sustained.

2   BY MR. BROWN:

3   Q.   When you would communicate with them about criminal

4   matters, would you always end in the process you just

5   described?

6        MR. GOLDBERG:  Objection.

7        THE COURT:  Sustained.

8   Q.   How would you send an e-mail to one of those four

9   e-mail addresses concerning criminal activity?

10        MR. O'SHEA:  Objection.

11  Q.   Could you describe the steps?

12        THE COURT:  Sustained.

13  BY MR. BROWN:

14  Q.   Other than e-mail, did you communicate about

15  criminal activities with those four individuals?

16        MR. O'SHEA:  Objection.

17        THE COURT:  Side bar.

18        (Side bar held on the record.)

19        MR. O'SHEA:  Look, I know there is a

20  conspiracy count, but the questions are way too vague and

21  leading.

22        THE COURT:  The problem I am having with the

23  questions is the broad term "criminal activity."

24        MR. BROWN:  I can take that out and just ask

25  how you communicate with the four.

Mr. Tiberiu Danet — Direct

1       THE COURT:  The reason I sustained the

2   objections is because of the broadness of it without any

3   specificity.

4       MR. BROWN:  Thank you, your Honor.

5       (Side bar concluded.)

6   BY MR. BROWN:

7   Q.   How else would you communicate with those four

8   individuals?

9   A.   Regarding the criminal scheme or just personally?

10  Q.   Let's start with personally.

11  A.   Personally, through phone, through a chip server,

12  where we had different handles, and we would connect

13  normally.  So that is like from your phone, from your

14  computer, from your own IP.

15  Q.   Okay.  And what were those personal handles that you

16  had for, first, let's start with Master Fraud?

17  A.   So Nicolescu had on this chat server that was

18  actually installed in my house, he had the user name

19  obe.

20  Q.   And how about Minolta 9797?

21  A.   Nicolescu had the handle for —

22      MR. GOLDBERG:  Objection.

23      THE COURT:  Overruled.

24  A.   F-e-r-d-y.  Everybody had a different handle from

25  the mobile to connect to.  The mobile had one handle.

Mr. Tiberiu Danet - Direct

1   The computer or laptop that was connected had a different

2   handle.

3   Q.   How about your brother?

4   A.   He had Balint, B-a-l-i-n-t.

5   Q.   Okay.  And how about Catalin Dima?

6   A.   I don't know.  I didn't communicate with him

7   personally.

8   Q.   And what was your handle, your personal handle?

9   A.   Romeo.

10  Q.   Now, you said you would use telephones.  Again, this

11  is personal telephones?

12  A.   Yes.

13  Q.   And you said a chat server?

14  A.   Yes.

15  Q.   What chat server?

16  A.   Jabber chat server.

17  Q.   Jabber.

18  A.   Yeah.  That's a — yeah, that's a protocol.

19  Q.   And what is a Jabber chat server?

20  A.   It is a chat server that there is a few, I mean,

21  more than a few public Jabber servers that you can use

22  for free, but you can also install your own if you want

23  to service them.

24  Q.   Okay.  And how do you communicate over a

25  chat server?  What does that communication look

Mr. Tiberiu Danet - Direct

1   like?

2   A.    Just like any other chat communication on Facebook

3   or laptop.

4   Q.    Like text message?

5   A.    Yes.  Short text messages.

6   Q.    Okay.  And was this Jabber server open to the

7   public, or did you have to log in?

8   A.    Yes.  It was open to the public.

9   Q.    But the one in your house?

10  A.    Yes.

11  Q.    So anybody could access the one in your house?

12  A.    Yes.

13  Q.    You said you also had names for — or I'm sorry.

14              That's the way you communicated for

15  personal, and you said there was a way you communicated

16  for criminal conversations?

17  A.    Yes.

18  Q.    And what were those methods?

19  A.    Well, whenever I would discuss anything related

20  to this criminal scheme, I would always go through

21  this chain in connecting like that every time and then

22  e-mail.

23  Q.    Was it always e-mail?

24  A.    No.  Could be another chat server, but it had

25  different handles.  It was not a personal one, just

Mr. Tiberiu Danet - Direct

1    another one.

2    Q.    Okay.  And what chat server was that?

3    A.    It changed during the time.

4    Q.    Okay.  And in 2016, what chat server were you using

5    for criminal communications?

6                    MR. O'SHEA:  Objection.

7                    THE COURT:  Overruled.  Based upon his prior

8    answer, I am going to allow it.

9                    THE WITNESS:  I don't recall.  It was

10   different servers, but I can't recall the name or the

11   domain because it changed.

12   BY MR. BROWN:

13   Q.    Do you recall the program that you used?

14   A.    Yeah.  For windows Pidgin.

15   Q.    Pidgin?

16   A.    Yeah.

17   Q.    And was that open to the public?

18   A.    Yes, it was public available software.

19   Q.    So anybody could log on to Pidgin and see your

20   communications?

21   A.    No.  You would have your own user name and

22   password.  Anybody could use Pidgin as a software.  We

23   had our own account.

24   Q.    But could users of Pidgin see your communications to

25   other members just out in the open?

Mr. Tiberiu Danet - Direct

1    A.    No.

2    Q.    How did you prevent that from happening?

3    A.    You don't have to prevent it; just like logging in

4    with your password, you have your own account.  These

5    communications were encrypted, too.

6    Q.    Okay.  So you had to have — you only communicated

7    with people in your account?

8    A.    Yes, only with people in your account.

9    Q.    A contact list?

10   A.    Yes.

11   Q.    And you also said they were also encrypted?

12   A.    Yes.

13   Q.    What encryption program did you use.

14   A.    It is called OTR, off the record.

15   Q.    And what was your user name for Pidgin OTR?

16   A.    On my personal or my — because I was using Pidgin

17   with my personal server, with handle Romeo, but I was

18   using the same setup on the account that I was using for

19   criminal.

20   Q.    Okay.  How about criminal since we established

21   criminal?

22              MR. GOLDBERG:  Objection.

23              THE COURT:  Overruled.

24              THE WITNESS:  It was the same for me

25   amightysa.

Mr. Tiberiu Danet - Direct

1    BY MR. BROWN:

2    Q.    And what handles did you communicate with on the

3    criminal Pidgin?

4                MR. O'SHEA:  Objection.

5                THE COURT:  Again, based upon his answer

6    several answers ago, I am going to overrule the

7    objection.

8    A.    One of the — again, these user names change so

9    often that I don't remember all of them, but for example,

10   Nicolescu because I was communicating with him through

11   the server.

12               MR. GOLDBERG:  Objection.

13               THE COURT:  Overruled.

14   A.    Had at one time Master Fraud, the same as the

15   e-mail, but at another point change to something Q W W X

16   or something like that, and Miclaus had —

17               MR. O'SHEA:  Objection.

18               THE COURT:  Overruled.

19               THE WITNESS:  Minolta, the same — Minolta

20   9797 had the same as his e-mail.  I know there was my

21   brother was using a variation of Rasputin, but it had

22   some dollars in it.  It is hard to remember all the

23   numbers and dollars in the user name.

24   BY MR. BROWN:

25   Q.    Now, were you able — withdraw that.

Mr. Tiberiu Danet - Direct

1          MR. BROWN:  Your Honor, I'm sorry.  I am
2    just trying to figure out the order of my questions with
3    the afternoon break coming up, and I didn't want to jump
4    into it.
5          THE COURT:  Are you asking that —
6          MR. BROWN:  No, no.
7          THE COURT:  — to break at this point
8    because I am happy to.
9          MR. BROWN:  Unless you would like to, your
10   Honor.  It is 2:30.
11         THE COURT:  I think it is closer to 2:40,
12   and I am planning on 2:45.  So we will take a break now.
13   Folks, remember the admonition.  All rise for the jury.
14              (Recess had.)
15         THE COURT:  Please be seated.  Mr. Brown,
16   you may continue.
17         MR. BROWN:  Thank you, your Honor.
18   BY MR. BROWN:
19   Q.   Now, before the break, we were talking about a
20   Jabber server in your house.
21              Do you recall that?
22   A.   Yes.
23   Q.   And you said it was open to the public?
24   A.   Yes.
25   Q.   Could anybody log on to your Jabber server?

Mr. Tiberiu Danet - Direct

1    A.   If you knew the address, the domain name, yes.

2    I mean, you would create an account first and then log

3    in.

4    Q.   So not everybody could log in?

5                MR. O'SHEA:  Objection to the form of the

6    question.

7                THE COURT:  Sustained.

8    BY MR. BROWN:

9    Q.   It was password protected?

10   A.   You needed to create an account, which you could

11   do.

12   Q.   And with whom would you have to create an account?

13   A.   By knowing the address of the server, you would just

14   put it in Pidgin and hit the create account button, and

15   you could create an account.

16   Q.   So is it fair to say because it was in your

17   apartment you controlled the server, correct?

18               MR. O'SHEA:  Objection to the form of the

19   question.

20               THE COURT:  Sustained.

21   BY MR. BROWN:

22   Q.   Did you control the server?

23   A.   What do you mean by "control"?

24   Q.   Could you control who knew the address?

25   A.   The address, if anybody wanted to register, they

Mr. Tiberiu Danet — Direct

1  could register, but it would be hard to know the address

2  if somebody didn't tell you.

3  Q.    So it was not an obvious address?

4  A.    Yes.

5  Q.    And how about the criminal Jabber server, was that

6  open?

7            MR. GOLDBERG:  Objection.

8            THE COURT:  Overruled.

9  A.    No.  I don't think it was.  It was changed several

10  times, so it was not one server during the whole period.

11  Sometimes it was changed monthly.

12  Q.    And what was the purpose of changing it monthly?

13  A.    One of the reasons was that the server on which it

14  was installed would be disconnected by whoever sold it

15  because the credit card information or —

16  Q.    Whose credit card did you use to register it?

17  A.    Credit cards obtained through websites like the one

18  I discussed about or through other means by using the

19  Trojan.

20  Q.    So stolen credit cards?

21  A.    Yes.

22  Q.    And about — when were you using the Jabber server,

23  about what time period?

24  A.    The criminal, for the criminal?

25  Q.    Yeah, criminal.

Mr. Tiberiu Danet - Direct

1    A.    At least four or five years prior to my arrest.

2    Q.    So somewhere between 2011 to 2016?

3               MR. GOLDBERG:  Objection.

4               THE COURT:  Sustained.

5    BY MR. BROWN:

6    Q.    So for that — so you were getting at that time

7    credit cards from the Bayrob Trojan?

8               MR. GOLDBERG:  Objection.

9               THE COURT:  Sustained.  Watch the leading.

10              MR. BROWN:  I'm sorry, your Honor.

11   BY MR. BROWN:

12   Q.    How could you get credit cards from the Bayrob

13   Trojan?

14   A.    There were several methods.  For example, one of

15   them, when users or the infected computers would visit

16   popular websites such as Facebook or instead of, let's

17   say, Facebook — there were others, too — they would get

18   a page that was not authentic, that required them to

19   verify their account by putting in their credit card

20   information.

21   Q.    And how did the Trojan use that page?  How did it

22   present that page to somebody?

23   A.    Based on Nicolesu's input.  If that computer was

24   selected to be shown such a page, it would be shown that

25   page once when visiting Facebook.com, and if the user

Mr. Tiberiu Danet - Direct

1    would input their credit card information and click next,

2    it would just say "okay.  Your account was verified."

3              It would, of course, save the credit card,

4    and then next time the user accesses the same website, it

5    would go to the default, the actual Facebook.com.

6    Q.   And did that kind of page appear only on an infected

7    computer?

8              MR. GOLDBERG:  Objection.

9              THE COURT:  Overruled.  You may answer.

10   A.   Yes, only on the infected computer.

11   Q.   So the Trojan could collect that kind of credit card

12   information on infected computers?

13             MR. GOLDBERG:  Objection.

14             THE COURT:  Sustained.

15   BY MR. BROWN:

16   Q.   What happened to the credit card information after

17   it was pulled off of your Facebook, for example?  Where

18   would it go?

19   A.    It would be saved in a file, and it would be used

20   either for buying domain names or servers maybe for the

21   infrastructure or, for example, the faxing service

22   account, anything that required a pay.

23   Q.   Where was this file?

24   A.   Excuse me?

25   Q.   Where was the file?  You said it was saved in a

Mr. Tiberiu Danet - Direct

1   file.

2   A.   It was saved on the central server and then

3   downloaded from there.

4   Q.   Okay.  What do you mean by "central server"?

5   A.   There was a server that would — we would use

6   to monitor the Trojan, such as computers, the list

7   of computers, and then activity relating to the

8   Trojan.

9   Q.   Okay.  And could I show you 1873, which has already

10  been shown to the jury?  Okay.

11              Do you recognize this diagram?  Do you

12  recognize what's being displayed in this diagram?

13  A.   Yes.

14  Q.   Okay.  What is the top line in this exhibit?

15  A.   Such a server I mentioned, command and control

16  server.

17  Q.   So top line is central server.  And what is this

18  relationship to the next two lines?

19  A.   Well, to be honest, I don't know exactly what the

20  second line is.  There were servers bought with the

21  OS Omnis and Blue Host.

22  Q.   What would you call those servers?

23  A.   They were used for different things like later

24  cryptomining tools.  Even the Jabber server was installed

25  on something else and the central server.

Mr. Tiberiu Danet – Direct

1    Q.   Okay.  Would those — what's marked as relay

2    servers, would those servers communicate with the central

3    command and server?

4                 MR. GOLDBERG:  Objection.

5                 THE COURT:  Sustained.

6                 MR. GOLDBERG:  I object to the use — it is

7    leading.  He is having it up —

8                 THE COURT:  No.  I will allow it to be used,

9    but please watch the leading.

10                 MR. BROWN:  Yes, your Honor.

11   BY MR. BROWN:

12   Q.   What is the bottom row?

13   A.   Just infected computers so I guess.

14   Q.   What information would you have on the central

15   server?

16   A.   I personally or —

17   Q.   Let's start with you personally.

18   A.   All the .PHP files I mentioned at the beginning that

19   support Trojan, they were installed on the C & C server.

20   Everything that allowed us — like tables that allowed us

21   to see the infected computers and all the actions you

22   could take for every computer, like say have it show that

23   Facebook page.  That's one action, have that specific

24   computer.

25                 That's all on the central server along with

Mr. Tiberiu Danet — Direct

1    a lot of other things like the escrow website, a copy of

2    it was there, too.  There is just a lot.

3    Q.    And when you say a central server would see the

4    infected computer, what do you mean by that?

5    A.    There was a list every infected computer would, say,

6    ping another server, and it would show up, it would

7    update like every, say, ten minutes.  It has been changed

8    up.  Every ten minutes it would send a signal it was

9    online and see whenever a computer was online or not.

10   There were different colors like red for online and red

11   for offline; green for online, that sort of thing.

12   Q.    And what do you mean my an infected computer would

13   ping?

14   A.    It would just send a signal to this server saying "I

15   am online, I am connected to the internet."

16   Q.    So there was a program on the central server that

17   pinged infected computers?

18            MR. GOLDBERG:  Objection.

19            THE COURT:  Sustained.

20   BY MR. BROWN:

21   Q.    How would the central server ping as you described

22   it the infected computer?

23   A.    The infected computer would ping the server, and

24   from the server, there was a .PHP page that allowed to

25   see all these computer.

Mr. Tiberiu Danet — Direct

1    Q.   And again, what is a .PHP page?

2    A.   It was called the ping dash view.PHP.

3    Q.   And who created the ping page?

4    A.   I did.

5    Q.   I would like to pull up Exhibit 1446, page 2.  This

6    is Exhibit 1446, page 2.

7              Do you recognize this?

8    A.   Yes.

9    Q.   What do you recognize it to be?

10   A.   It is just what I said, a table of the infected

11   computers with the location, with their opt sign, which

12   is like how long they have been connected to the

13   internet, their estimated internet speed, version of the

14   software, so this was 000, so it means it was the first

15   version.

16   Q.   Of what software?

17   A.   Of the Trojan.

18   Q.   So looking at sort of the pink column, what is

19   that?

20   A.   Which one?

21   Q.   The pink column marked IP.

22   A.   That's the IP of the infected computer, and with the

23   last digits are the open port so you could connect.

24   Q.   And what is the green column entitled "relay"?

25   A.   Some of the infected computers you couldn't connect

Mr. Tiberiu Danet - Direct

1    to them directly.  There is a list of the ones you could

2    connect directly, but some of them — and the IP is the

3    same as the relay in all of them.

4                    In some of them, you had to connect through

5    another computer, and that was called a relay.  But

6    again, this is a list of — there is no such infected

7    computer here.

8    Q.    Okay.  Where would the relay be in relation to the

9    central computer and the infected computer?

10   A.    The relay — the relay proxy server would be again

11   one of the infected computers, but like I said, for some

12   infected computers, it would be a difference.  If you

13   wanted to connect to an infected computer, sometimes you

14   could do it directly; sometimes you had to go through

15   another infected computer.  That was the relay.

16   Q.    Okay.  So the communication between an infected

17   computer and the central sometimes went through a

18   relay?

19   A.    Yes.

20   Q.    It was not always a straight direct line.

21   A.    Yes.

22   Q.    What was the purpose of that?

23   A.    Well, this was coded by Nicolescu, but I know that

24   some computers you could just not with the firewalls and

25   everything, some infected computers you couldn't open a

1319

Mr. Tiberiu Danet - Direct

1  port just to connect to them, so you needed to do this

2  bypass through another computer.

3  Q.   Okay.  Then, can you tell us, what's the next column

4  entitled "action"?

5  A.   The P was a ping to the infected computer, and it

6  would check if it is online.

7  Q.   Okay.

8  A.   DH was something that helped you connect through a

9  relay.  If you clicked it, it would display another

10  field, and I am afraid to say I don't know what the A

11  is.

12  Q.   And what is the host column?

13  A.   The host column is just the — every IP has a host

14  name.

15  Q.   Now, can you tell looking at Exhibit 1446-2 where

16  the command or the central server is located?

17  A.   If you look at the address bar, it has got the

18  IP 6720514206.

19  Q.   And what is that?

20  A.   It is an IP address.  It is a server.  It is a

21  computer located online.

22  Q.   And this is an example of the web page interface?

23              MR. O'SHEA:  Object.

24              THE COURT:  Sustained.

25

Mr. Tiberiu Danet - Direct

1    BY MR. BROWN:

2    Q.    You designed this?

3    A.    Yes.

4    Q.    And this is a web interface?

5                MR. O'SHEA:  Object.

6                THE COURT:  Sustained.

7    BY MR. BROWN:

8    Q.    Were there other types of .PHP files on the central

9    computer, on the central server?  I'm sorry.

10   A.    Yes, a lot.

11   Q.    What types of .PHP files were on the central

12   server?

13   A.    You mean names or —

14   Q.    Functions.

15   A.    For example, I don't remember each name, what the

16   file was, whatever file, but there was one there for

17   each.  The Trojan computer would connect to some domain

18   names at first to get its initial information, and you

19   could — that was called HSD.PHP, and you could change

20   those domain names from the interface, but there were

21   tens of pages like that.  It was very complex.

22   Q.    Did the — what purpose did the .PHP pages serve for

23   the Trojan?

24   A.    Two purposes:  One was a page such as this that

25   would help us see information about the network, and

Mr. Tiberiu Danet — Direct

1    another type of file was the files that the computer

2    would connect to to get information from the server.

3    Q.    Okay.  And what kind of file was that?

4    A.    What do you mean?

5    Q.    Like what type of file?

6    A.    .PHP file.

7    Q.    .PHP file?

8    A.    Yes.

9    Q.    And what types of functions did those .PHP files

10   perform?

11   A.    For example, each computer had a list of arrivals,

12   key and name.  For example, city and state, the ones

13   shown here were actually arrivals.

14              So there was an update to say that it was

15   called fire .PHP, and that would be displayed for a

16   specific IP, all the arrivals.

17   Q.    And what was the purpose of having that information

18   on the central server?

19   A.    This information had to be stored somewhere because

20   it couldn't be stored on the infected computers.

21   Q.    Why not?

22   A.    Because there was things saved on the infected

23   computer, too, but you have to have a server to control

24   the whole array of computers.  You have to have something

25   with a database where you put on the information you get

Mr. Tiberiu Danet – Direct

1     from the computers and from which you managed the

2     botnet.

3     Q.    You mentioned a botnet.  What is a botnet?

4     A.    A botnet is a collection of a network of computers,

5     a network of bots, infected computers.

6     Q.    And who controls the botnet?

7     A.    Whoever has access to the central server.

8     Q.    Did the four people, including yourself, have a

9     central computer or central server?

10                    MR. GOLDBERG:  Objection.

11                    THE COURT:  Overruled.

12    A.    No.  There is one central server.

13    Q.    For your group?

14    A.    Yes.

15    Q.    And did that central server control a botnet?

16    A.    Yes.

17    Q.    Why did your group have a botnet.

18    A.    Well, it evolved to be a botnet from something else.

19    Initially, it was not a botnet.  Like when you say

20    "botnet," you think about — you think about

21    functionality such as the one I previously mentioned.

22                    MR. GOLDBERG:  Objection.

23                    THE COURT:  Sustained.

24    BY MR. BROWN:

25    Q.    Initially what was — you said initially it was not

1323

Mr. Tiberiu Danet - Direct

1  a botnet?

2  A.   Yes.

3  Q.   Initially what was it?

4  A.   Initially is what I first mentioned.  It was

5  just something that would be eBay pages on people's

6  computers.

7  Q.   When did it become a botnet?

8  A.   At the end of — actually, in 2014, around that.

9  Q.   And —

10  A.   Or before that, but it was solely a botnet like

11  there was no eBay scheme involved after 2013.

12  Q.   So what happened in 2013 to change your group's

13  behavior from eBay to a botnet?

14  A.   It was a multitude of reasons.  One of them was, it

15  became harder to maintain the eBay scheme.  I personally

16  didn't want to do that no more.  I was over like — I had

17  done it too long.  I was overtricking people to sell them

18  cars.

19  Q.   Let me stop you.

20        Why did it become too hard in 2013 to do the

21  eBay scheme?

22  A.   It was more difficult for one to list things on

23  eBay, to list the cars on eBay.  That was one of the

24  reasons.

25  Q.   Why?

Mr. Tiberiu Danet - Direct

1  A.    Because of eBay's procedures, they would just

2  identify like not illegal but auctions, such as the ones

3  we posted, and they would take them down almost

4  immediately, so it was not effective.

5  Q.    The fraudulent part?

6  A.    Yes.

7  Q.    And what else happened in 2013 to change the Trojan

8  from an eBay fraud to a botnet?

9  A.    Well, I was again in 2013, for example, I had a

10  surgery.  So I was not online for about three months or

11  four months.  When I came back in 2014, Nicolescu and

12  someone else were already working towards just building a

13  botnet instead of doing the eBay scheme.

14  Q.    Did you join them in their efforts?

15  A.    Eventually, I did.

16  Q.    Why?

17  A.    This for me, it became something that was more

18  technological oriented than what happened before, and it

19  was just getting a lot of information, sorting and

20  something that challenged me, the technology from a tech

21  point.

22  Q.    What kind of information was the botnet collecting

23  at that point?

24  A.    Credit card information, log-ins such as e-mail

25  log-ins, gmail log-ins, Yahoo log-ins, eBay.  Then even

Mr. Tiberiu Danet - Direct

1    web history.

2    Q.    How was it collecting the credit card information,

3    the log-in information, and those other types of

4    information?

5    A.    I explained it previously with the Facebook example.

6    For example, you could make a computer display.  When the

7    user went to e-mail instead of displaying the authentic

8    gmail page to display a fake e-mail page, and the user

9    was then transferred to the central command server and

10   saved.

11   Q.    So it was presenting fake credential pages?

12   A.    Yes.

13   Q.    How was it doing that?

14   A.    Nicolescu called them injections.  It was just a

15   list of domain names that were intercepted and displaying

16   fake pages.

17   Q.    And once that web page was injected, it could

18   collect or it looked like a real page?

19   A.    It looked exactly like a real page.

20   Q.    And a user would type in their information?

21   A.    Yes.

22   Q.    And what would happen with that information?

23   A.    It would be saved.

24   Q.    It would be what?

25   A.    Saved.

Mr. Tiberiu Danet − Direct

1  Q.   Saved?

2  A.   Yes.

3  Q.   Where?

4  A.   On the central server.

5  Q.   And how many injections, how much information was

6  coming in daily?

7  A.   Depends whether you wanted to collect one day, you

8  would send this request to the infected computers to

9  collect gmail information, and you could get it that day

10  or the following day you would even tens of —

11  Q.   Tens of thousands of —

12  A.   Yeah, or 10,000, I would say 10,000.

13  Q.   Of credentials?

14  A.   Yes, 10.

15            MR. GOLDBERG:  Objection.

16            THE COURT:  Sustained.

17  BY MR. BROWN:

18  Q.   Was that information when you received it on the

19  central server organized by hand.

20  A.   No.  It was — you needed additional software to go

21  through it, parse it, sort it, and so on.

22  Q.   And who wrote that software?

23  A.   I did.

24  Q.   And how could that information be sorted?

25  A.   You need certain algorithms.  The log-in was not the

Mr. Tiberiu Danet – Direct

1    most difficult part.  A lot of information was received

2    from people's web history, and that was really hard to

3    sort because it was huge.

4    Q.    So you were also collecting web history?

5    A.    Yes.

6    Q.    What do you mean by web history?

7    A.    Pages that people went to, like just the addresses,

8    not images or anything like that.

9    Q.    How did the botnet or Trojan know to collect web

10   history?

11   A.    It is a modified version of Firefox, a web browser

12   that was installed in place of the normal Firefox

13   software.

14   Q.    So in addition to these injection web pages, it

15   would inject a fake Firefox?

16   A.    Yeah.  It would just uninstall their Firefox browser

17   and install another one that was exactly the same only

18   had this additional function.

19   Q.    And what is Firefox again?

20   A.    A web browser just like Internet Explorer, anything

21   used to access the website.

22   Q.    So the Trojan could create a fake Firefox?

23              MR. GOLDBERG:  Objection.

24              THE COURT:  Sustained.

25

Mr. Tiberiu Danet - Direct

1    BY MR. BROWN:

2    Q.    It injected a Firefox?

3                   MR. GOLDBERG:  Objection.

4                   THE COURT:  Sustained.

5    BY MR. BROWN:

6    Q.    And when that web history came back, what happened

7    with that information?

8    A.    That could be parts for again, for a user name

9    because that's sometimes available in web history or for

10   giving credit cards, but there was a lot of work to do

11   that because the amount of information received from so

12   many computers, that was totally huge.

13   Q.    And how was that information processed?

14   A.    Through certain software running on the central

15   server.

16   Q.    And who created that software?

17   A.    I did.  Nicolescu helped me a little bit.

18   Q.    What about your background made it possible for you

19   to write that software?

20   A.    I would say mostly the algorythmic knowledge that I

21   gained during my high school and college years.

22   Q.    Are these databases?

23   A.    No.  This is a database right there.  (Indicating.)

24   Q.    Pardon me?

25   A.    This is a database.  (Indicating.)

Mr. Tiberiu Danet - Direct

1    Q.    Would information be put in databases?

2    A.    Yes.

3    Q.    What's the benefit of putting large amounts of data

4    in databases?

5    A.    You can continue to store and search through them.

6    You can very easily search for information.

7    Q.    Now, once you collected data through all

8    these various methods, were those computers still

9    infected?

10   A.    Yes.

11   Q.    Were they still part of the botnet?

12   A.    Yes.

13   Q.    What would you do with the botnet in addition to

14   collecting information, if anything?

15   A.    Starting in 2014, there was cryptomining of

16   cryptocurrency.  Some of the computers, not all,

17   would mine cryptocurrency.  They used their power to

18   processing power to earn cryptocurrency such as bitcoin

19   or others.

20   Q.    And what's the benefit of using a botnet in

21   cryptomining?

22   A.    Because instead of using one computer, processing

23   one computer is processing power or better said, the more

24   power you have, the more cryptocurrency you win by

25   mining.  So by joining the power of thousands of

Mr. Tiberiu Danet - Direct

1    computers or tens of thousands of computers, you have a

2    really, depending on the cryptocurrency, you have a

3    higher chance of gaining something.

4    Q.   By the time of your arrest, how many bots were in

5    your botnet?

6    A.   More than a hundred thousand.

7    Q.   Okay.  And were you making money from cryptomining?

8    A.   Yes.  But that didn't start when cryptomining

9    started; this started later.

10               MR. GOLDBERG:  Objection.

11               THE COURT:  Sustained.

12   BY MR. BROWN:

13   Q.   At that time, were you still using amightysa to

14   communicate criminally with members of your group —

15               MR. O'SHEA:  Objection.

16   Q.   — at the time of your arrest?

17   A.   Yes.

18               THE COURT:  Overruled.

19   Q.   And approximately how many people at the time of

20   your arrest were in your group?

21   A.   At least four.

22   Q.   Four?

23   A.   Yes.

24   Q.   And how many of those group of four were writing

25   programs to support the botnet?

Mr. Tiberiu Danet - Direct

1          MR. GOLDBERG:  Objection.

2          THE COURT:  Overruled.  How many, if any?

3          THE WITNESS:  Two.

4    BY MR. BROWN:

5    Q.   How many, if any, were involved in the daily

6    maintenance of the botnet?

7    A.   Three.

8    Q.   Now, I would like to direct your attention to

9    Government's Exhibit 367.

10          THE COURT:  You do not want the jurors to

11   see it?

12          MR. BROWN:  Not yet.  I just want to confirm

13   my handwriting is correct.

14   BY MR. BROWN:

15   Q.   Do you recognize this?

16   A.   Yes.  It is the part of the chat communications on

17   my home Jabber chat server.

18   Q.   Is this what you called a criminal Jabber?

19          MR. GOLDBERG:  Objection.

20          THE COURT:  Sustained.

21   Q.   Is — does this contain hundreds of Jabber chats?

22          MR. GOLDBERG:  Objection.

23          THE COURT:  Sustained.

24   BY MR. BROWN:

25   Q.   Is this a compilation of your — all of your

Mr. Tiberiu Danet - Direct

1    chats?

2              MR. O'SHEA:  Objection.

3              THE COURT:  Sustained.

4    BY MR. BROWN:

5    Q.   Have you reviewed this document?

6    A.   Yes.

7    Q.   Does it contain a copy of your Jabber chats?

8              MR. O'SHEA:  Object.

9              MR. GOLDBERG:  Objection.

10             THE COURT:  Sustained.

11   BY MR. BROWN:

12   Q.   What is it?

13   A.   It is a table of some, not all, the communications

14   that went through this server.  Actually, it is — I

15   think there is — it contains just my communications.  If

16   you go to the other pages, I could —

17   Q.   From what you reviewed, is it a fair representation

18   of your chat logs?

19   A.   Yes.

20   Q.   Okay.  And this is in a format that is easy for you

21   to review?

22   A.   Yes.  It is from, to, and the message from the

23   computer.

24   Q.   If I could have you look at page 667 —

25             MR. BROWN:  Could I show this to the jury,

Mr. Tiberiu Danet — Direct

1    your Honor?

2                    MR. GOLDBERG:  Objection.

3                    MR. O'SHEA:  Objection.  Which pages?

4                        (Discussion off the record.)

5                    MR. O'SHEA:  Let's do them one at a time.

6                    MR. BROWN:  This will be 667.

7                    MR. GOLDBERG:  Objection.

8                    THE COURT:  One moment.

9                    MR. GOLDBERG:  May we approach?

10                   THE COURT:  Yes.  Mr. Brown, I didn't hear

11   what you just said.

12                   MR. BROWN:  I have line numbers for the

13   pages.

14                   THE COURT:  Okay.  But you want to

15   specifically publish 667?

16                   Mr. Goldberg, you are objecting?

17                   MR. GOLDBERG:  I am.

18                   THE COURT:  All right.  Side bar.

19                       (Side bar held on the record.)

20                   THE COURT:  Sue, would you go back to 667

21   for me?  I'm sorry.  Okay.

22                   MR. BROWN:  Your Honor, these are

23   communications between co-conspirators between Danet and

24   Miclaus and Nicolescu.  I will be pulling up specific

25   lines.

Mr. Tiberiu Danet - Direct

1          MR. GOLDBERG:  The exhibit is not just

2  between co-conspirators but a bunch of other people, too,

3  and he said when he looked at it, he could only identify

4  it as some but not all of the communications on the

5  Jabber server.

6          And then, you said, was this a very accurate

7  copy of these messages, and he said yes, but it is really

8  not because it doesn't include everything; it is just

9  what the Government cherrypicked.

10          THE COURT:  Well, do you have the entire —

11          MR. GOLDBERG:  I am sure that we have in the

12  disclosures the entire Jabber chat.

13          THE COURT:  Right.  So it is your position

14  that you want this witness to view them all and to say

15  that they are all fair and accurate and then have the

16  Government cherrypick?

17          MR. GOLDBERG:  It is my position that this

18  is more leading of the witness by showing him an exhibit

19  that just is part of a much larger file that just

20  contains certain conversations.

21          Also, it is not limited to just the criminal

22  conspiracy.  There is lots of extraneous statements and

23  conversations in the exhibit as well.  That's 700 pages

24  long, your Honor.

25          THE COURT:  Okay.  But the Government at

Mr. Tiberiu Danet - Direct

1    this point is asking only to publish this particular

2    page.

3              MR. BROWN:  I have several pages and several

4    lines within the pages.  So we can highlight or zoom in

5    on specific lines.

6              THE COURT:  Okay.  And you have communicated

7    those pages and lines to defense counsel?

8              MR. BROWN:  I just did, your Honor.

9              MR. GOLDBERG:  You identified a 700-page

10   exhibit, and now we are going to pull out a few pages

11   from that, and that was identified last night.  But I

12   think what counsel is about to say, we know what's

13   relevant to this case in these chats.  It is not like it

14   is a mystery.

15             I know what pages he is going to.  It is a

16   large exhibit.  If he goes to the pages, which are going

17   to be conversations between the witness and allegedly my

18   client — I don't think between him and Mr. O'Shea's

19   client — but my client and the witness, so I know

20   about those, but this was a large exhibit identified last

21   night.

22             THE COURT:  But I apologize, Mr. Goldberg.

23   I am confused here.  The Government is going to point out

24   conversation between this witness and your client.

25             MR. GOLDBERG:  I am assuming.

Mr. Tiberiu Danet – Direct

1      THE COURT:  Please tell me the basis for

2  your objection.

3      MR. GOLDBERG:  The basis for my original

4  objection?

5      THE COURT:  No, no.

6      MR. GOLDBERG:  I don't have an objection —

7      THE COURT:  Do you have an objection to the

8  Government showing him conversation between you and —

9  between the witness and your client.

10      MR. GOLDBERG:  Not a good one.

11      THE COURT:  Okay.  So I will allow you to

12  point out conversation between this witness and his

13  client.

14      MR. BROWN:  Yes, your Honor.

15      THE COURT:  All right.  And do you have any

16  further conversation you want out?

17      MR. BROWN:  In this exhibit, no.  However,

18  we have e-mail addresses that have been testified to with

19  just subject lines and occasionally an attachment with

20  e-mail addresses that have been, I believe, all

21  identified in his testimony.

22      THE COURT:  So specifically as to

23  Mr. Goldberg's client.

24      MR. BROWN:  Yes, your Honor.

25      THE COURT:  Any objection to those?

Mr. Tiberiu Danet - Direct

1              MR. GOLDBERG:  No, not on the basis —

2              THE COURT:  As to Mr. O'Shea's client?

3              MR. BROWN:  Correct, your Honor, same for

4    him.

5              THE COURT:  Any objection?

6              MR. O'SHEA:  Here is what I suggest.

7              How many pages of that exhibit are we

8    talking about, Duncan?

9              MR. BROWN:  Seven or eight.

10             MR. O'SHEA:  In order to move it along

11   before they are published to the jury, show them, and I

12   will say objection.  And you can make a ruling based on

13   the side bar, and I am preserved for the record.

14             My objection would be constant insinuation

15   that it is Nicolescu or Miclaus in the form of the

16   question is unfair to the facts.  All they have is what

17   they call monikers or e-mail addresses.

18             I don't have a problem saying this is to

19   this e-mail address, but to name these people as an

20   assumed fact is an improper question in my opinion.

21             THE COURT:  You have to have the witness

22   identify who the conversation is between.  And again,

23   watch the leading.

24             MR. BROWN:  I will, your Honor.

25                  (Side bar concluded.)

Mr. Tiberiu Danet — Direct

1      THE COURT:  For the record, very specific as

2  to what you would like Mr. Goldberg and Mr. O'Shea to

3  look at.

4      MR. BROWN:  Yes, your Honor.

5      If we could pull up the page, before

6  publishing to the jury, page 668, line 114 and 99.

7      THE COURT:  11 —

8      MR. BROWN:  4,99.

9      THE COURT:  99.  Okay.  Mr. Goldberg, do you

10  see it?  Ms. Chandler, you are unable to isolate it?

11      MS. CHANDLER:  Correct.

12      THE COURT:  Then we will not publish it to

13  the jury.  However, you can have testimony regarding

14  it.

15      Why don't we just have testimony?  We will

16  do it the old fashioned way when I started in the

17  business.

18  BY MR. BROWN:

19  Q.   What is — what was your Jabber handle?

20  A.   Romeo and Romeo Mobile.

21  Q.   And what was the difference between those two?

22  A.   The first one I was using from my laptop; the second

23  one from my phone.

24  Q.   And did you have communications with Defendant

25  Nicolescu over Jabber?

Mr. Tiberiu Danet - Direct

1    A.    Yes.

2    Q.    What did you know his Jabber name to be?

3    A.    Obe and Obe Mobile.

4    Q.    Okay.  Did you know any other names?

5    A.    On the Jabber server?

6    Q.    Yes.

7    A.    No.

8    Q.    Could we close that?

9          Could you pull up Government's Exhibit 1852

10   without publishing to the jury first?  Looking at 1852,

11   what is this?

12   A.    It is a list of e-mails sent from my e-mail

13   account.

14   Q.    And did you review this document prior to Court?

15   A.    Yes.

16   Q.    And is this an accurate representation of

17   e-mails from between March 22nd, 2013, and August 15th,

18   2014?

19   A.    Yes.

20   Q.    And again, what is your e-mail address in this

21   exhibit?

22   A.    Amightysa@gmail.com.

23   Q.    And what e-mail address did you know Bogdan

24   Nicolescu to be?

25   A.    Master Fraud at GMX.com.

Mr. Tiberiu Danet – Direct

1    Q.    And I don't think we have done this yet.

2                 Do you see Bogdan Nicolescu in Court

3    today?

4    A.    Yes.

5    Q.    Could you point him out and describe what he is

6    wearing?

7    A.    Gentleman with the glasses wearing a blue shirt.

8    Q.    Does he have a tie on?

9    A.    No.

10   Q.    Does he have a suit?

11   A.    Yes.

12   Q.    What color?

13   A.    Dark blue or black.  I can't see.

14               MR. BROWN:  Can the record reflect the

15   witness identified Bogdan Nicolescu?

16               THE COURT:  Front table or back table?

17               THE WITNESS:  Front table.

18               THE COURT:  Record may so reflect.

19   BY MR. BROWN:

20   Q.    In our looking at April 19, 2013, do you see that

21   line?  I'm sorry —

22   A.    April 2014?

23   Q.    Do you see April 19, 2014, do you see that?

24   A.    Yes.

25   Q.    And do you see there is also an e-mail for a

Mr. Tiberiu Danet - Direct

1    Minolta 9797?

2                    MR. O'SHEA:  Objection to the form.

3                    THE COURT:  Sustained.

4    BY MR. BROWN:

5    Q.    Do you see at the bottom e-mail or second from the

6    bottom who is that e-mail involving?

7    A.    The second from the bottom?

8    Q.    Yes.

9    A.    Minolta 9797 at GMX.com?

10   Q.    Yes.

11   A.    Minolta 9797 was the handle of Miclaus.

12   Q.    And do you see — do you know his full name?

13   A.    Yes, Radu Miclaus.

14   Q.    And do you see Radu Miclaus in Court today?

15   A.    Yes.

16   Q.    Could you point him out and describe what he is

17   wearing?

18   A.    He is the Defendant in the back table, blue — light

19   blue shirt.

20   Q.    Does he have a suit?

21   A.    Yes.

22   Q.    And does he have a tie?

23   A.    No.

24   Q.    Does he have any glasses?

25   A.    No.

Mr. Tiberiu Danet - Direct

1    MR. BROWN:  Could the record reflect the

2    witness pointed out Miclaus?

3    THE COURT:  Record may so reflect.

4    MR. BROWN:  Thank you.

5    BY MR. BROWN:

6    Q.    And actually, the middle e-mail, what is the subject

7    of that?

8    A.    Yahoo hosting, you mean, the middle, yes,

9    yeah.

10   Q.    What is the subject line?

11   A.    Yahoo hosting.

12   Q.    And does that mean anything to you?

13   A.    Yes.

14   Q.    What does that mean to you?

15   A.    At one point, we needed to create a lot of the Yahoo

16   domain names that it bought from Yahoo, and it became so

17   cumbersome that we — that I made kind of a tool that

18   would help you create them instead of doing it by hand,

19   like going through the process, choosing a user name,

20   putting in the credit card information.

21                This tool would help you create it faster by

22   just putting all the information in one page, and it

23   would create the domain name.

24   Q.    And looking at the bottom entry, do you recognize

25   that e-mail?

Mr. Tiberiu Danet - Direct

1    A.    All the .PHP?

2    Q.    Yes.  And what, if anything, does that mean?

3    A.    Yes.  That was one of the .PHP pages I mentioned

4    that was located on the control server, that basically

5    contained mostly everything to communicate with the

6    infected computers.

7    Q.    Now, if we can look at March 5th, 2014.  Okay.  Do

8    you recognize the middle e-mail 5:28:34?

9    A.    It is an e-mail that has a name with the name Casper

10   d-e-p-s.r-a-r, which is an archive of files.

11   Q.    And what is .PGP, what does that mean to you?

12   A.    .PGP, the attachment was encrypted using the key to

13   .PGP.  .PGP stands for creating good privacy.  It is a

14   software.

15   Q.    Okay.  And what is Casper if you know?

16   A.    Casper is also a software.

17   Q.    And what does Casper do?

18   A.    It enables you to control a web browser like

19   clicking, virtually clicking buttons, entering

20   information into a browser without actually having to do

21   it by hand.

22   Q.    Okay.  And what is d-e-p or d-e-p-s?

23   A.    It was short for dependencies.

24   Q.    And what's that?

25   A.    What's called a dependency, something that a program

Mr. Tiberiu Danet — Direct

1   relied on.  If it needed certain files to work, that

2   would be a dependency.

3   Q.   And is that something that's commercially available,

4   the dependency program.

5   A.   It is commonly used.

6   Q.   The software that was — I will withdraw that

7   question.

8           Could we look at 24 June 2013, page 1?

9           MR. O'SHEA:  Which page?

10          MR. BROWN:  24 June 2013.

11          THE COURT:  Are we in the same exhibit?

12          MR. BROWN:  Yes, your Honor, we are.

13  BY MR. BROWN:

14  Q.   Okay.  And could you look at the line for the middle

15  24 June 2013?

16  A.   Yes.

17  Q.   Okay.  And who is that to?

18  A.   Ra101Putin, was another one of my brother's e-mail

19  addresses.  The second one is Master Fraud, Nicolescu.

20  Q.   And what's the subject line of that?

21  A.   "How to spam."

22  Q.   Okay.  And what, if anything, did that mean to

23  you?

24  A.   It was spam, means sending unsolicited e-mails to a

25  lot of addresses.  Probably everyone that has an e-mail

Mr. Tiberiu Danet — Direct

1   receives spam, a lot of spam messages.  This was a guide

2   how to use the botnet to send such e-mails.

3   Q.   Now, looking at June 24, 2014, and do you recognize

4   that line?

5   A.   Yes.

6              MS. CHANDLER:  This is July?

7   Q.   And who is that from?

8   A.   It is from Nicolescu to me.

9   Q.   And what is the subject matter?

10  A.   Polon.

11  Q.   And what does that mean to you?

12  A.   It is short for Polonex, which is a website that

13  allows you to change, to exchange one cryptocurrency for

14  another.

15  Q.   Okay.  And if we go up to June 14th — June 16th, do

16  you recognize this e-mail?

17  A.   Yes.

18  Q.   And who is that between?

19  A.   It is from Nicolescu to Miclaus and me.

20  Q.   And what is the subject?

21  A.   "Bitcoin exchange."

22  Q.   And what is the attachment?

23  A.   The attachment is archive.  That contains a

24  multitude of files, more than one file.  And by the

25  name of it, it contains accounts for bitcoin exchange

Mr. Tiberiu Danet – Direct

1  websites.

2  Q.   Okay.  At this point with your group — or was the

3  group doing bitcoin mining?

4  A.   Yes.  But without much success.

5  Q.   And did these e-mails discuss the bitcoin mining?

6  A.   Yes.

7           MR. GOLDBERG:  Objection.

8           THE COURT:  Sustained.

9  BY MR. BROWN:

10  Q.   Now, if we could pull up Exhibit 1851 without

11  publishing to the jury, do you recognize this?

12  A.   The whole page?

13  Q.   Yeah.  Have you reviewed 1851, Exhibit 1851?

14  A.   Yes, I have.

15  Q.   Do you recognize it?

16  A.   Yes.

17  Q.   What do you recognize it to be?

18  A.   The same thing, a list of e-mails sent between me

19  and others.

20  Q.   Okay.  Now, could we look — could we highlight

21  2 December 2014?  Do you recognize the e-mail on December

22  2nd, 2014?

23  A.   Yes.

24  Q.   And —

25           MR. BROWN:  Could we publish this at this

Mr. Tiberiu Danet - Direct

1    point?

2    BY MR. BROWN:

3    Q.    What is the subject line?

4    A.    E-mailing, and that's the name of a file, lib p-f-f.

5    Q.    What is L-i-b-p-f-f?

6    A.    L-i-b-p-f-f is a public library that allows you to

7    extract e-mails from the Outlook account, from a computer

8    that has Outlook installed.

9                 THE COURT:  The jurors are not seeing this,

10   Mr. Brown.

11                MR. BROWN:  I thought they were seeing

12   this.

13                THE COURT:  No, not based upon —

14                MR. BROWN:  I thought I asked to publish

15   it.

16                THE COURT:  But based on our conversation

17   over at side bar, I don't know where we are at with this

18   issue.  Side bar.

19                 (Side bar held off the record.)

20                THE COURT:  So Mr. Goldberg, you are not

21   objecting to this being published?

22                MR. GOLDBERG:  I am not.  Go ahead.

23                THE COURT:  Mr. O'Shea, the same?

24                MR. O'SHEA:  Same.

25                THE COURT:  And yet, Mr. O'Shea, you are

Mr. Tiberiu Danet - Direct

1    reserving your right to argue admissibility.

2                    MR. O'SHEA:  Yes, ma'am.

3                    THE COURT:  All right.

4                    MR. BROWN:  Your Honor, could we have a

5    five-minute break to figure out a computer problem.

6                    THE COURT:  Sure.  All rise for the jury.

7    Short recess, folks.

8                    (Recess had.)

9                    THE COURT:  Please be seated.  You may

10   continue.

11                   MR. BROWN:  Thank you.

12   BY MR. BROWN:

13   Q.   Can you please take a look at Exhibit 367?  Do you

14   recall these?  Do you know what these are?

15   A.   Yes.

16   Q.   What are they?

17   A.   They are chats from my mobile.

18   Q.   And to whom are they sent or between?

19   A.   Between me and Nicolescu.

20   Q.   And again, what is your moniker here?

21   A.   Romeo-Mobile.

22   Q.   Okay.  And what does that -Mobile mean?

23   A.   That it is the account that I used on my phone.

24   Q.   Looking at — looking at line 26579, could you read

25   what the subject line say?

Mr. Tiberiu Danet - Direct

1   A.   In English, "well, you do the JS."

2   Q.   And what, if anything, does that mean to you?

3   A.   Actually, the translation is more like, well, you

4   pass the JS."  JS is —

5            MR. GOLDBERG:  Objection.

6            THE COURT:  Sustained.

7   BY MR. BROWN:

8   Q.   Do you know what JS means?

9   A.   JavaScript.

10  Q.   And what's that?

11  A.   It is a programming language.

12  Q.   And was that programming language used by the

13  group?

14  A.   Yes, a lot.

15           MR. GOLDBERG:  Objection.

16           THE COURT:  That's all right.  Overruled.

17  BY MR. BROWN:

18  Q.   What was the purpose of using JavaScript?

19  A.   JavaScript has to do with the web pages, modifying

20  the web pages, that sort of thing.  Here, in particular,

21  it is what is used to program the virtual processor, the

22  one that I said you don't need to type or move the mouse.

23  You just do it using code.

24  Q.   Okay.  And could you look at line 26577?  What's the

25  subject of that?

Mr. Tiberiu Danet — Direct

1    A.    But I'm saying when you run the plug-in —

2    Q.    And what does that mean?

3    A.    There were several plug-ins ran on the —

4              MR. GOLDBERG:  Objection.

5              THE COURT:  Was there an objection?

6              MR. GOLDBERG:  Objection, your Honor.

7              THE COURT:  I didn't hear it.  Overruled.

8    A.    There were several plug-ins to run by the infected

9    computers.

10   Q.    Okay.  And I apologize, is that a subject line, or

11   what did I just have you read?

12   A.    It is a chat message.

13   Q.    Okay.  But called a chat subject line?

14   A.    Yeah.

15   Q.    And is that you responding to obe?

16             MR. GOLDBERG:  Objection.

17             THE COURT:  Sustained.

18   BY MR. BROWN:

19   Q.    Do you know who typed — but I'm saying when you run

20   the plug-in?

21             MR. GOLDBERG:  Objection.

22             THE COURT:  Overruled.  Do you know, sir?

23             THE WITNESS:  Yes.

24   BY MR. BROWN:

25   Q.    Who was it?

Mr. Tiberiu Danet - Direct

1   A.   Me, because the lines that started in upper case
2   character come from my phone, because I had the setting
3   when you type on your phone, it capitalizes your first
4   character.
5   Q.   And can we go to page 716?  And could you look at
6   line 26530?
7   A.   Yes.
8   Q.   And what is that chat?
9   A.   A miner force.
10  Q.   What did that mean to you, if anything?
11  A.   This was a file located on the server that would
12  mine cryptocurrency.
13  Q.   Did it do anything else?
14  A.   No, but it mined different cryptocurrencies, not
15  just one.
16  Q.   And when you say "on the server," what do you mean
17  by that?
18  A.   On the central server, on that what was connected to
19  the botnet.
20  Q.   Okay.  Now, could you look at 26532, and what does
21  it say?
22  A.   It says run pipe s-t-d-i-n.
23  Q.   And what, if anything, does that mean to you?
24  A.   Apart from a typo, be instead of end run pipe,
25  s-t-d-i-n something contained in the code.

Mr. Tiberiu Danet - Direct

1   Q.   And, in fact, 26538, could you read that?

2   A.   "And I run with run pipe."

3   Q.   Does that refer to the line you just read?

4   A.   Yes.

5   Q.   Now, if we could look at page 717, and could you

6   look at 26555, and what does that say?

7   A.   Yes.

8   Q.   And what does that say?

9   A.   "Doesn't that d-e-p depends on JS."

10  Q.   And what is a d-e-p, what does that mean to you, if

11  anything?

12  A.   It is short for dependence.

13  Q.   And if you look at 26560, what does that say?

14  A.   "When you do that .exe.d-e-p.

15  Q.   And what is a .e-x-e.d-e-p if you know.

16  A.   It is part of the file name contained by all the

17  plug-ins on the central computer server.

18  Q.   And is a d-e-p a file you used with this group?

19  A.   Yes.  It is a name that is held on.

20           MR. GOLDBERG:  Objection.

21           THE COURT:  Overruled.

22  BY MR. BROWN:

23  Q.   And is this actually an extension?

24           MR. GOLDBERG:  Objection.

25  Q.   Or what is it?

Mr. Tiberiu Danet - Direct

1        THE COURT:  Sustained.

2    BY MR. BROWN:

3    Q.    Okay.  What form does the file take?

4    A.    For example, .e-x-e.d-e-p is an encrypted executable

5    file.

6    Q.    And if you look at line 26567, could you read that?

7    A.    "For every JS."

8    Q.    And again, what does JS mean to you, if anything?

9    A.    JavaScript.

10   Q.    And do you know what that chat was about or that

11   comment was about?

12   A.    The whole conversation is about how to run —

13              MR. GOLDBERG:  Objection.

14              THE COURT:  Sustained.

15   BY MR. BROWN:

16   Q.    Okay.  Could we please take a look at page 732?

17   Could we look at line 26941.  Could you read that,

18   please?

19   A.    "I see that it's still extracting something."

20   Q.    And what does that mean to you, if anything?

21   A.    It means that there are still new e-mails

22   being extracted for them to be sent from infected

23   computers.

24   Q.    And if you look at 26943, could you read that?

25   A.    "And s-q-l."

Mr. Tiberiu Danet - Direct

1    Q.    And what, if anything, does s-q-l mean to you?

2    A.    S-q-l is a database format and software.

3    Q.    Is that a database you are familiar with?

4    A.    Yes.  It is the database we used on the central

5    server.

6    Q.    And what did you use that database for?

7    A.    To store everything related to the botnet.

8    Q.    Okay.

9    A.    Every data.

10   Q.    And if you look at line 26946 —

11   A.    Yes.

12   Q.    Could you read that?

13   A.    "With epoll."

14   Q.    And what does that mean to you?

15   A.    Epoll was something that Nicolescu made was on the

16   server, and it had to do with relaying the proxy servers.

17   I don't have any more details, but it is something that

18   was used on the server.

19   Q.    And if you could look at line 26947, and could you

20   read that?

21   A.    The one that constantly gave a ping.

22   Q.    And what, if anything, does that mean to you?

23   A.    It means that there was something that constantly

24   sent a signal, a signal to the server.

25   Q.    Can we look at page 733 and look at line 26966?  I'm

Mr. Tiberiu Danet - Direct

1    sorry, I transposed my handwriting.

2                   Could we look at 26981?  All right.  And

3    what does that say?

4    A.    "And I think the power is more important anyway."

5    Q.    Okay.  What, if anything, does that mean to you?

6    A.    It means that Nicolescu considered power more

7    important than anything else, I suppose, such as

8    mine.

9    Q.    If we look back up to 26972, can you read that?

10   A.    "This way the VPS will work."

11   Q.    And what does "VPS" mean to you?

12   A.    The virtual private server.  It is a server that you

13   buy.

14   Q.    And if you look at line 26973?

15   A.    Yes.  It says "up to a hundred K."

16   Q.    And what, if anything, does that mean?

17   A.    A hundred K means 100,000, and those two lines

18   combined means that the server, that the central server

19   will hold up to a hundred thousand infected computers

20   maintaining 100,000 infected computers.

21   Q.    Okay.  And if you look at the next line 26974, what

22   does that say?

23   A.    "Without problem."

24   Q.    And what does that mean?

25   A.    That it will hold without problem up to 100,000

1356

Mr. Tiberiu Danet — Direct

1  computers.

2  Q.   And if you look at line 26978, could you read that?

3  A.   "Now we really have power."

4  Q.   Okay.  And is that — do you know if that's to you

5  or from you?

6  A.   It is to me.

7  Q.   Okay.  And who is it from?

8  A.   Nicolescu.

9  Q.   Couple questions:  How would you access the central

10  server?

11  A.   You need a user name and password and connect to

12  that using the user name.

13  Q.   How many people that you knew of had user names and

14  passwords for the central server?

15  A.   That I knew of three.  It changed during the course

16  of time, so it depends on the —

17  Q.   At the height, how many at the most?

18  A.   Probably more than three or four.

19  Q.   Okay.  And who were those four?

20  A.   Nicolescu, me, Miclaus, sometimes Linx when he was

21  — so another person when he was around.  That's what I

22  am aware of.  There could be others.

23  Q.   Nobody else?

24  A.   That I know of, no.

25  Q.   Now, was there just one central server?

Mr. Tiberiu Danet - Direct

1   A.   Yes.  It was one server, and whenever it would go

2   down because of — I don't — say credit card errors

3   because this server was — they took it down because the

4   credit card doesn't work any more.  It would be set up

5   somewhere else and copied.  The information was being

6   copied.  So its location has been changed by, but the

7   content was the same.

8   Q.   When you go to the central server, did it look like

9   a regular desktop?

10                  MR. GOLDBERG:  Objection.

11                  THE COURT:  Overruled.

12  A.   No.  It is a screen just containing text.

13  Q.   How would you know when you are on the central

14  server where to go?

15  A.   Because I knew the structure of the folders, the

16  files.

17  Q.   Was there an internal structure on the central

18  server?

19  A.   Yes.  There were folders, different folders, and

20  subfolders.  Everything had a structure.

21  Q.   Could we take a look before publishing to the jury

22  at Exhibit 2203?

23                  THE COURT:  Before publishing?

24                  MR. BROWN:  Yes.  I just want to confirm

25  with the witness.  2203.

Mr. Tiberiu Danet – Direct

1    BY MR. BROWN:

2    Q.   Do you recognize this?

3    A.   Yes.  It is —

4    Q.   What is it?

5    A.   It is a part of this structure of a sub sub sub sub

6    folder.

7    Q.   And is it a fair and accurate representation of a

8    substructure?

9    A.   Yes.

10   Q.   And do you recognize the description on the top of

11   the page?

12   A.   Yes.

13   Q.   Was that on the central server?

14   A.   Yes, it is on the central server.

15              MR. BROWN:  And can I publish this to the

16   jury?

17              MR. GOLDBERG:  No objection?

18              MR. O'SHEA:  No objection.

19   BY MR. BROWN:

20   Q.   Could you describe to the jury what 2203 is?

21   A.   It is a list of folders and inner folders, and they

22   contain files about structure.  Each of the names, links,

23   MF was actually a user, one of us or one of the

24   nicknames.

25   Q.   Okay.  And is this a directory?

Mr. Tiberiu Danet − Direct

1          MR. GOLDBERG:  Objection.

2   A.    Yes.

3          THE COURT:  Sustained.

4   BY MR. BROWN:

5   Q.    What is this?

6   A.    It is a directory and subdirectories.

7   Q.    Okay.  What does a directory do?

8   A.    It holds files for other directories.

9   Q.    And what does a subdirectory do?

10  A.    The same thing.  They can be nasty.

11         Like a directory can contain other

12  directories, too, and those directories can contain

13  directories, too, up to —

14  Q.    Like a file cabinet that holds files?

15         MR. O'SHEA:  Objection.

16         THE COURT:  Sustained.

17  BY MR. BROWN:

18  Q.    Is what you are looking at a subdirectory?

19  A.    Yes.  It is a subdirectory of the directory listed

20  on top.

21  Q.    What is the directory listed on top?

22  A.    Well, there is more, Phantom JS flash work space, so

23  the subdirectory is called "work space."

24  Q.    And what is a work space?  What does that mean to

25  you?

Mr. Tiberiu Danet - Direct

1    A.    In this case, it contains files about — for each

2    user, it contains files necessary for things like the

3    Yahoo subdirectory of Amy; would contain files maybe to

4    create Yahoo domain names by the user Amy and so on.

5    Q.    And who is Amy?

6    A.    It was short for amightysa, so that's me.

7    Q.    And who is Linx?

8    A.    Linx is Dima Catalin.

9    Q.    And who are or is MF?

10   A.    MF is Nicolescu.

11   Q.    And who is Min?

12                MR. O'SHEA:  Objection.

13                THE COURT:  Overruled.

14   A.    M-i-n is short for Minolta.  It is Miclaus.

15   Q.    And who is natiune, n-a-t-i-u-n-e?

16   A.    It is pronounced natiune meaning nation.  It is a

17   person that was brought into this by Miclaus, but I never

18   knew.

19                MR. GOLDBERG:  Objection.

20   Q.    Do you know the name of that?

21                THE COURT:  One moment.  Overruled.  But do

22   a follow-up.

23   BY MR. BROWN:

24   Q.    Do you know who that nickname —

25   A.    No.  I only know the nickname.

Mr. Tiberiu Danet — Direct

1   Q.   And who is next?

2   A.   Raul.

3   Q.   Do you know who Raul is?

4   A.   Yes, that's my brother.

5   Q.   And who is next?

6   A.   Sasha, I have no idea.

7   Q.   And do you know who is next?

8   A.   T-r-x.  Again, I have no idea.

9   Q.   And who are the next four?

10  A.   User 1, 2, 3, 4, I don't know, but they look like

11  test directories, but I don't know.

12  Q.   Is this part of the central server that is password

13  protected?

14  A.   Yes.

15  Q.   You can only get to this part with the password

16  user?

17  A.   Yes.  You need a credential.

18          MR. GOLDBERG:  Objection.

19          THE COURT:  Sustained.

20  BY MR. BROWN:

21  Q.   And do you know if the AOL and Yahoo, were those

22  files used in the botnet?

23  A.   They were used for creating quicker accounts with

24  those services instead of doing it manually.

25  Q.   Could we look at finally Exhibit 380?

Mr. Tiberiu Danet - Direct

1      THE COURT:  I'm sorry.  380?

2      MR. BROWN:  3-8-0, yes.

3  BY MR. BROWN:

4  Q.   And do you recognize this?

5  A.   Yes.  It is another list of chat messages between my

6  Mobile phone and my user account and Nicolescu.

7  Q.   Okay.  And is it a fair and accurate copy of your

8  chat —

9      MR. GOLDBERG:  Objection.

10  Q.   — of your phone?

11      MR. GOLDBERG:  Objection.

12      THE COURT:  Start over and ask your

13  question, please.

14  BY MR. BROWN:

15  Q.   Do you recognize this?

16  A.   Yeah.

17  Q.   What is it?

18  A.   It is a list of chat messages between me and

19  Nicolescu.

20  Q.   Okay.  What is it?

21  A.   A list of chat messages between my phone and

22  Nicolescu.

23  Q.   Is it a fair and accurate representation of chat

24  messages between those two phones?

25  A.   Yes.

Mr. Tiberiu Danet - Direct

1   Q.   Okay.  And could you please zoom in on the third and
2   fourth lines?  Okay.
3                  And looking at the middle line, could you
4   read what that says?
5   A.   It says "I have one card LOL.  LOL I took one card
6   from 20K e-mails."
7   Q.   Okay.  And what, if anything does that mean to
8   you?
9   A.   That out of 20,000 e-mails sent to people, one card
10  was the wrong credit card information was obtained.
11  Q.   Okay.  Could you read the next line?
12  A.   "Uh-huh, the bad ones, Vanghelie.
13  Q.   Okay.  And what, if anything, does that mean to
14  you?
15  A.   Vanghelie was a file, Vanghelie.txt was a file
16  containing credit cards on the server.
17  Q.   And what kind of credit cards, if you know, did it
18  contain?
19  A.   Excuse me?
20  Q.   On what server was the Vanghelie?
21  A.   The central server.
22  Q.   Okay.  And do you know where the credit cards it
23  contained came from?
24  A.   Spam e-mail.
25  Q.   Okay.  And were those spams sent by the

1    botnet?

2    A.    Yes.

3    Q.    As part of the botnet scam?

4    A.    Yes.

5                MR. GOLDBERG:  Objection.

6                THE COURT:  Sustained.

7    BY MR. BROWN:

8    Q.    And who named the file Vanghelie?

9    A.    Nicolescu did.  Vanghelie is the name of a mayor in

10   Romania known for his stupidity.

11               MR. BROWN:  No further questions.  Thank

12   you, your Honor.

13               THE COURT:  Ladies and gentlemen, we are

14   going to adjourn for the evening.

15               Now, I know people have been asking Mary

16   approximately when the trial will be concluded.  During

17   voir dire, I indicated that we anticipated this being a

18   two, two and-a-half week trial.  I can represent to you

19   that we are on target; we are on schedule.

20               So we do anticipate that the case will be in

21   your hands at approximately a little less than the two

22   and-a-half week mark.  But this case is not over.

23               Do not discuss it amongst yourselves or with

24   anyone else.  Do not form any opinion regarding this

25   matter.  Please be downstairs at 9:00 a.m. tomorrow.  We

1    will call for you and bring you up as a group.

2                    Have a good evening.  All rise for the jury.

3                    (Jury out.)

4                    THE COURT:  Okay, folks.  Please be seated.

5                    Let's go over the exhibits for the day, and

6    consistent with what we have done in the past, I will

7    simply state the number and assume that it is being

8    offered and assume there is no objection unless you tell

9    me to the contrary.

10                   And if I am going too fast, you let me know.

11   Not —

12                   MR. O'SHEA:  Judge — I'm sorry.

13                   THE COURT:  That's all right.

14                   MR. O'SHEA:  Before we begin this — and I

15   know we do this with extreme efficiency — having said

16   that, I already said at side bar that it can be one

17   exhibit, but we will slow down when we —

18                   THE COURT:  Yes, definitely.  I marked it

19   down.

20                   MR. O'SHEA:  Thank you, Judge.

21                   THE COURT:  1907, 1901, 1903, 1248, 1421,

22   2105, 2107, 2108, 1, 65, 2041.

23                   MR. GOLDBERG:  Could we see 65?

24                   THE COURT:  Sure.

25                   MS. CHANDLER:  I believe 65 was a physical

1     exhibit on the cart.

2                 THE COURT:  65 is the Samsung phone.

3                 MR. GOLDBERG:  Okay.

4                 THE COURT:  2041.

5                 MR. McDONOUGH:  Acer laptop.

6                 THE COURT:  2042.

7                 MR. McDONOUGH:  Laptop.

8                 THE COURT:  2003.

9                 MR. McDONOUGH:  Samsung hard drive.

10                THE COURT:  2046.

11                MR. McDONOUGH:  Router.

12                THE COURT:  2040, desktop.

13                MS. CHANDLER:  That must be the HP desktop.

14                MR. BROWN:  HP desktop.

15                THE COURT:  2038, 2039, 5.

16                MS. CHANDLER:  That's the one I got.

17                THE COURT:  2045.

18                MR. O'SHEA:  Yes, objection to 5, only as

19    references to my client, which we could probably get by

20    redaction.  I think if we scroll down there is references

21    to my client saying that this is his.

22                MS. CHANDLER:  I assume you want the English

23    version.

24                THE COURT:  You know, folks, we need to be

25    careful because everything is on the record here.  If you

1    want to have a private conversation, just say so, and

2    then George will not put it on the record.

3                    MR. O'SHEA:  I don't have — I am fine with

4    doing this on the record myself.  Michael, I don't know

5    about you.

6                    MR. GOLDBERG:  Yeah, I —

7                    THE COURT:  You are asking, Mr. O'Shea,

8    you are asking that any reference to your client be

9    redacted?

10                    MR. O'SHEA:  Yes.

11                    THE COURT:  Government?

12                    MR. BROWN:  Yeah, we object.

13                    MR. O'SHEA:  Here is the thing.  If I am not

14    mistaken, this was — is this the search of Danet's

15    place?

16                    MR. GOLDBERG:  It is the search of

17    Nicolescu's place.

18                    MR. O'SHEA:  My client wasn't there.  They

19    didn't interview my client there and talk to him there,

20    and they are just referencing things there.  It is all

21    hearsay.  There is no foundation placed for how his name

22    got there or anything else nor any testimony.

23                    THE COURT:  You wanted to speak,

24    Mr. Goldberg?

25                    MR. GOLDBERG:  Yeah.  I would object just to

1    the record in and of itself.  It is a legal document,

2    search warrant, inventory.  I don't think it has any

3    independent evidentiary value, and it is translated in a

4    foreign language.

5              I think whatever probative value it would

6    have would be outweighed by unfair prejudice.  So I would

7    object to search warrant and the return being put in

8    evidence at all.

9              MR. LEVINE:  So this is not search warrant,

10   your Honor.  This is just the inventory taken in the

11   house.  We separately marked the search warrant, but we

12   did not introduce it.

13             I heard an objection to the fact it is a

14   foreign document that has been translated, but we have a

15   stipulation as to the accuracy of the translation.  I

16   heard a 403 prejudice objection.  I don't see this as

17   really prejudicial.

18             It is just a list of what was found in the

19   house.  The agent who was there during the search

20   testified as to the circumstances under which this was

21   obtained.  So I don't think it is objectionable, your

22   Honor.

23             THE COURT:  Specifically, there is an

24   objection of hearsay, and I believe Mr. O'Shea is

25   indicating that the only way any items can be identified

1    as being his client's is through hearsay.

2            MR. LEVINE:  So we addressed this in our

3    hearsay motion, and we can address it now —

4            THE COURT:  I don't believe — correct me if

5    I am wrong — I don't believe I granted a motion pretrial

6    allowing this exhibit into evidence.

7            MR. LEVINE:  No.  But that's why I am

8    addressing it now.

9            To the extent that the only person who could

10   have indicated that it was the item belonged to Miclaus

11   rather than Nicolescu, that would be the statement of the

12   opposing party, and that would be the statement of

13   Nicolescu.

14           THE COURT:  Wait a minute.  I am to assume

15   Nicolescu told the agents at the home that this

16   particular item belongs to Miclaus?

17           MR. LEVINE:  In fact, if you look at the

18   items listed there, they are bank cards that have — I

19   mean, you have to look at the individual statements.

20           THE COURT:  But that's why I am turning to

21   you because, let me tell you, the objection is based on

22   hearsay.  And I cannot assume that a co-Defendant said

23   "this was Miclaus' item."  So you need to go through item

24   by item and convince me that it is not based on hearsay.

25           MR. O'SHEA:  Judge, in fairness to them

1    there are some items that they found that are listed

2    there that have my client's name on them.  So I get that,

3    and I might be confused — and this might be my fault,

4    there was another — it looks like search warrant return

5    that we went over with one of the witnesses.

6              I think the forensic guy that came in

7    today, that lists items that are referenced as being my

8    client.

9              THE COURT:  Look it, if you are going to

10   object, we need to go through item by item because I do

11   not accept the argument that the prejudicial effect

12   outweighs the probative value.  I do not accept that, the

13   authentication argument.

14             The only argument I am considering is the

15   hearsay argument.  Therefore, we have to go through item

16   by item and determine if we have a hearsay problem.

17   So —

18             MR. BROWN:  Your Honor, I believe the

19   reference by Miclaus — and I just did a quick scan — I

20   believe the reference to Miclaus is that at some point he

21   and Nicolescu rented the apartment.  It looks like there

22   is an attribution of Nicolescu items found in X room or

23   Y room.  It doesn't say this is Miclaus' backpack or this

24   is —

25             THE COURT:  Let me say it again.

1    MR. LEVINE:  Why don't we take this offline,

2  and Mr. O'Shea will look at the specific lines and which

3  ones are prejudicial.

4    THE COURT:  That's fine.

5    2045.

6    MR. O'SHEA:  That's what I was talking

7  about, same thing.  We will go over that the same way.

8    THE COURT:  I will hold 2045 back.

9    1874, is that demonstrative only, or are you

10  offering it?

11    MR. LEVINE:  Yes.  We are offering that,

12  your Honor.

13    MR. BROWN:  Yes, we are offering it, your

14  Honor.

15    MR. GOLDBERG:  Is it substantive evidence.

16  I don't have a problem with this being shown to

17  explain the testimony during the course of a trial,

18  during argument, but as a substantive exhibit, I would

19  object.

20    MR. O'SHEA:  And here is my supplement to

21  what Michael just said, Judge, and that is that the

22  witness himself was even kind of sketchy about what it

23  all meant.  I don't think the witness even provided

24  enough foundation assuming it could be admitted.

25    THE COURT:  1874 will not be admitted into

1    evidence.  This is not the type of, quote unquote,

2    summary as envisioned by our rules.  That's purely a

3    demonstrative piece of evidence.  But certainly, you can

4    use it during questioning of further witnesses and during

5    closing argument.

6              1415, are you offering that?

7              MS. CHANDLER:  The directional antenna.

8              MR. GOLDBERG:  I object to the directional

9    antenna.  I think he was talking about it in general.  He

10   identified it.  He said it was a directional antenna, but

11   if it was seized from one of the Defendants, there needs

12   to be more foundation.

13             MR. BROWN:  We will provide another witness

14   tomorrow.

15             THE COURT:  So you are not offering it at

16   this time?

17             MR. BROWN:  No, your Honor.

18             THE COURT:  All right.  Now, we have the

19   exhibits that were the subject of side bar conferences.

20             So let me group them.  367, 1852, 1851, 2203

21   and 380.

22             MR. O'SHEA:  3-8-0, Judge?

23             THE COURT:  380.

24             MR. O'SHEA:  I just didn't hear you.

25             THE COURT:  So 367.

1373

1   MR. BROWN:  367, your Honor, we would be

2   offering 715, 716, 717, 732, 733, 734.

3   THE COURT:  Could you slow down just a

4   bit?

5   MR. BROWN:  Absolutely.

6   THE COURT:  715 to 717?

7   MR. BROWN:  Yes.

8   THE COURT:  732 to 7 —

9   MR. BROWN:  —34.

10  THE COURT:  734.

11  MR. BROWN:  Yes.

12  MR. GOLDBERG:  Those are Jabber chats.

13  MR. BROWN:  Yes.

14  THE COURT:  Whenever you are ready,

15  Mr. Goldberg.

16  MR. GOLDBERG:  I am not objecting.

17  THE COURT:  Mr. O'Shea?

18  MR. O'SHEA:  I am objecting and here is why.

19  It is in itself native format.  This thing, as I

20  understand it, is a cellphone from Danet's phone at the

21  Miami airport.  Am I correct?

22  THE COURT:  Is that Government?

23  MR. McDONOUGH:  Yes, yes.

24  THE COURT:  Go ahead.

25  MR. O'SHEA:  I think Agent Macfarlane will

1    be able to describe this better than this witness.  This

2    was a chart created by a program from a phone dump.

3                    THE COURT:  You want to wait until all of

4    the witnesses have testified before addressing this?

5                    MR. O'SHEA:  Yes.

6                    THE COURT:  Any problem with that?

7                    MR. BROWN:  We can do that, your Honor.

8                    THE COURT:  All right.  Same with 1852 or

9    I'm sorry, I should ask you, first, Mr. Brown what are

10   you offering in 1852?

11                   MR. BROWN:  Well, 1852 these are e-mails —

12                   THE COURT:  Are you offering the entire

13   exhibit?

14                   MR. BROWN:  Yes.

15                   THE COURT:  Any objection, Mr. Goldberg?

16                   MR. GOLDBERG:  Well, I don't think it has

17   been properly — I don't think a foundation has been laid

18   for this yet because this also came from a phone dump,

19   correct?

20                   THE COURT:  Do you want to wait?

21                   MR. GOLDBERG:  Mr. Danet said yes, these are

22   my e-mails, but we don't have the actual source of this

23   exhibit.

24                   THE COURT:  Do you want to wait, Government?

25                   MR. BROWN:  No, your Honor.  These were

1    provided in search warrants, which have been certified.

2                MR. GOLDBERG:  These were taken from the

3    search warrants, from the command control server?

4                MR. LEVINE:  Search warrants from Google.

5                MR. GOLDBERG:  And we stipulated to that.

6                MR. BROWN:  Yes.

7                THE COURT:  No objection?

8                MR. GOLDBERG:  I am better with it.  I

9    thought they were just coming in — I wouldn't object.

10               THE COURT:  Mr. O'Shea?

11               MR. O'SHEA:  You are offering the whole

12   exhibit, the whole document, guys?

13               MR. BROWN:  Yeah, yes.

14               MR. O'SHEA:  I have to look, Judge.  There

15   are references in here.  They are offering the document,

16   so this document is the report that you got from Google

17   when you issued a search warrant to gmail for gmail

18   transmissions?

19               MR. BROWN:  Yes, correct.

20               MR. O'SHEA:  And it just has the to and

21   from, the subject matter of the e-mail but obviously not

22   the content of the e-mail?

23               MR. LEVINE:  Content was all encrypted.

24               MR. O'SHEA:  And this saves Google coming in

25   having to — they would be able to authenticate it

1    anyway.  All right.  No objection.

2              THE COURT:  1851, are you offering?

3              MR. BROWN:  Yes, your Honor.

4              THE COURT:  Mr. Goldberg?

5              MR. GOLDBERG:  Same thing.  From a Google

6    search warrant?

7              MR. BROWN:  Yes.

8              MR. GOLDBERG:  No objection.

9              MR. O'SHEA:  What's the difference between

10   1851 and 1852?

11             MR. BROWN:  It came from different search

12   warrants.

13             MR. GOLDBERG:  1852, Master Fraud was the —

14             MR. BROWN:  No.

15             MR. O'SHEA:  1852 the from e-mail is from

16   amightysa, from Master Fraud.  There are a number of

17   different froms.

18             MR. BROWN:  And multiple search warrants.

19             MR. O'SHEA:  As long as it was obtained from

20   gmail, same way, different search warrants, guys?

21             MR. BROWN:  Yes.

22             MR. O'SHEA:  Then I can't object.

23             THE COURT:  All right.  2203?

24             MR. BROWN:  We are offering that, your

25   Honor.

1        MR. GOLDBERG:  What is it?

2        MR. BROWN:  The command and control

3   directory.

4        MR. GOLDBERG:  2203.

5        MR. O'SHEA:  That's that little Daisy chain

6   or whatever it is?

7        MR. BROWN:  This is from the search warrant.

8        MR. GOLDBERG:  No objection.

9        MR. O'SHEA:  2203 is — how did you guys get

10  this again because he couldn't tell you.

11        MR. BROWN:  They send us a CD of the server,

12  and we print it out, the directory, and it is a copy of

13  the directory.

14        MR. O'SHEA:  Was this directory in what they

15  sent or something you guys created?

16        MR. LEVINE:  This was within the site file.

17        MR. O'SHEA:  Tell me what you mean by that.

18  I mean because Brian can probably clear this up when he

19  testifies.

20        MR. BROWN:  And he will testify about

21  multiple directories.  It is 44 directories.  The whole

22  directory can be 28, 30 pages long.

23        MR. GOLDBERG:  This is a work space

24  directory.

25        THE COURT:  Let's go off the record

1    because —

2                    (Discussion held off the record.)

3                    THE COURT:  All right.  380?

4                    MR. BROWN:  Offering, your Honor.  Same as

5    367; same theory.

6                    MR. O'SHEA:  380 is what?

7                    MR. BROWN:  Is Jabber.

8                    THE COURT:  We are holding off on 367?

9                    MR. BROWN:  We can hold off on this one.

10                   THE COURT:  We can hold off as well.  On

11   behalf of the Government, did I miss any?

12                   MR. BROWN:  I don't think so, your Honor.

13                   THE COURT:  All right.  We are in

14   adjournment.  Thank you, sir.

15                   (Trial adjourned at 5:10 p.m.)

16                        - - - - -

17                 C E R T I F I C A T E

18                   I, George J. Staiduhar, Official Court

19   Reporter in and for the United States District Court,

20   for the Northern District of Ohio, Eastern Division,

21   do hereby certify that the foregoing is a true

22   and correct transcript of the proceedings herein.

23

24                   s/George J. Staiduhar
                     George J. Staiduhar,
25