1    UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF OHIO
2              EASTERN DIVISION

3             - - - - -

4

5    UNITED STATES OF AMERICA,          )
                                        )
6                Plaintiff,             )
                                        )
7          vs.                          )  Case No. 1:16CR224
                                        )
8    BOGDAN NICOLESCU,                  )
     RADU MICLAUS,                      )
9                                       )
                 Defendants.            )
10

11            - - - - -

12

13       CONTINUED TRANSCRIPT OF TRIAL PROCEEDINGS HAD

14    BEFORE HONORABLE JUDGE PATRICIA A. GAUGHAN, JUDGE

15    OF SAID COURT, ON WEDNESDAY, APRIL 3RD, 2019,

16         COMMENCING AT 10:00 O'CLOCK A.M.

17            - - - - -

18       Volume 8, Pages 1379 through 1583

19            - - - - -

20

21

22

23    Court Reporter:        GEORGE J. STAIDUHAR
                             801 W. SUPERIOR AVE.,
24                           SUITE 7-184
                             CLEVELAND, OHIO 44113
25                           (216) 357-7128

1    APPEARANCES:

2        On behalf of the Government:

3            OFFICE OF THE U.S. ATTORNEY
             BY:  DUNCAN T. BROWN, AUSA
4                 BRIAN M. McDONOUGH, AUSA
             801 West Superior Ave., Suite 400
5            Cleveland, OH 44113

6

7                         and

8            U.S. DEPARTMENT OF JUSTICE - CRIMINAL DIVISION
             BY:  BRIAN L. LEVINE, SENIOR COUNSEL
9            1301 New York Avenue, Suite 600
             Washington, DC 20530
10

11       On behalf of Defendant Bogdan Nicolescu:

12           LAW OFFICE OF MICHAEL J. GOLDBERG
             BY:  MICHAEL J. GOLDBERG, ESQ.
13           323 Lakeside Place, Suite 450
             Cleveland, OH 44113
14

15       On behalf of Defendant Radu Miclaus:

16           LIPSON O'SHEA
             BY:  MICHAEL J. O'SHEA, ESQ.
17           110 Hoyt Block Building
             700 West St. Clair Avenue
18           Cleveland, OH 44113

19

20                     - - - - -

21

22

23

24

25

1

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Tiberiu Danet | | | 1450 | |
|   By Mr. Goldberg | | 1384 | | 1452 |
|   By Mr. O'Shea | | 1434 | | 1455 |
| Bogdan D. Vaduva | 1457 | | | |
|   By Mr. Goldberg | | 1593 | | |
|   By Mr. O'Shea | | 1508 | | |
| Ryan Macfarlane | 1514 | | | |

1       P R O C E E D I N G S

2               THE COURT:  Please be seated.  Good morning,

3       ladies and gentlemen.

4               Ladies and gentlemen as you can see,

5       Juror No. 9, Ms. Diamond, is no longer here.  I apologize

6       for the delay this morning, but I, along with counsel,

7       had to make a very critical decision, and that is, do

8       we proceed, or do we simply recess until she can come

9       back?

10              We made the decision to proceed because we

11      still have an alternate that can now and is now Juror No.

12      9, but unfortunately, for the rest of you, that means

13      that if anyone else gets sick, we literally are going to

14      have to recess the trial until that person is well again

15      and can come back because, as you can see, we cannot

16      afford to lose another juror.

17              We also made the decision because we are

18      close to the end of the trial, and we though we would

19      take the risk that all twelve of you will stay healthy

20      enough to be able to make it in.

21              I am permitted to represent to you that we

22      anticipate all of the evidence will be concluded sometime

23      on Tuesday, and again, for those reasons, we made the

24      critical decision to not wait for Ms. Diamond to get

25      better because we don't want to impose any more time on

1    the rest of you.  We didn't think that would be fair.

2              But I have to reiterate, if one more person

3    becomes ill, I am going to have to impose upon the rest

4    of you, which means we will all have to literally sit and

5    wait until that juror gets better; recess the trial, be

6    it a day, two days, three days, et cetera, we have no

7    choice.

8              So I just need to give you the headsup.  If

9    it happens again, we are going to take a recess as long

10   as it takes to get that juror back.

11             I apologize for the delay, but we really had

12   to do some good, hard thinking on how to proceed here.  I

13   have never had a situation where we have lost four jurors

14   within a little over a week time.  So this is new for all

15   of us.

16             On behalf of the Government, are you

17   satisfied with this solution?

18             MR. BROWN:  Yes, your Honor.  Thank you very

19   much.

20             THE COURT:  On behalf of Mr. Nicolescu?

21             MR. GOLDBERG:  After consultation with my

22   client, yes, we are.

23             THE COURT:  On behalf of Mr. Miclaus?

24             MR. O'SHEA:  Yes, your Honor.

25             THE COURT:  Cross examination, Mr. Goldberg?

Mr. Tiberiu Danet - Cross

1      CROSS EXAMINATION

2   BY MR. GOLDBERG:

3   Q.   I am Mike Goldberg, and I have questions about your

4   testimony.  If you don't understand a question, it will

5   be my fault, and I will try to rephrase it.

6              You were arrested on September 28th, 2016,

7   correct?

8   A.   Yes.

9   Q.   And you have been in jail or prison or custody ever

10  since then, right?

11  A.   Yes.

12  Q.   And during that period — when was your first Court

13  appearance.  Do you remember?

14  A.   The arraignment was on December 14th or 15th of

15  2016.

16  Q.   Here?

17  A.   Yes.

18  Q.   In Ohio, but in Romania, did you go to Court in

19  Romania?

20  A.   Yes.  I think it was one day after getting arrested

21  or two days.

22  Q.   And you had a lawyer then?

23  A.   Yes.

24  Q.   And you had a lawyer since you got here in the

25  United States?

Mr. Tiberiu Danet - Cross

1    A.    Yes.

2    Q.    And you continue to have attorneys, correct?

3    A.    Yes.

4    Q.    Okay.  And you pled guilty last summer, or I'm

5    sorry, in the fall in this case, correct?

6    A.    Yes.

7    Q.    And you had a sentencing that had been scheduled,

8    but it has since been continued a couple times,

9    right?

10   A.    I think it was continued once.

11   Q.    Okay.  And that's to move it beyond the date of the

12   trial so that the Government can hear how you do in the

13   courtroom before they give you any credit for your

14   testimony, correct?

15   A.    No.  The decision was made by my attorney.

16   Q.    Oh, it was your attorney's decision?

17   A.    Yeah.

18   Q.    So what you say in the courtroom would have no

19   bearing on what kind of sentence would be recommended by

20   the Government?

21            MR. BROWN:  Objection.

22   BY MR. GOLDBERG:

23   Q.    Is that your understanding?

24   A.    Yes, it is my understanding.

25   Q.    That the Government doesn't have any —

Mr. Tiberiu Danet - Cross

1        THE COURT:  I'm sorry.  I just saw
2   objection, but I didn't hear it.
3        MR. BROWN:  And I noticed the microphone was
4   not on, but I objected, and I will object to this
5   question, your Honor.
6        THE COURT:  Overruled.
7   BY MR. GOLDBERG:
8   Q.   You don't think the Government has any say in your
9   sentencing?
10  A.   I know that the Government can make a position
11  within the range of the plea.
12  Q.   Right.  And if they are —
13  A.   Like my attorneys, too.
14  Q.   And if they are satisfied with what you say in
15  Court, they can recommend nine years, and if they are
16  unsatisfied, they can recommend the high end, which is
17  what, 12?
18  A.   They can recommend the high end anyway, too.
19  Q.   Okay.  So you testified yesterday that you met
20  Mr. Nicolescu again because you knew him through your
21  brother and didn't really have contact with him while you
22  were in school until around 2007 or '8, correct?
23  A.   Yes.  I think it was around 2007.
24  Q.   Okay.  And at that point, where were you
25  living?

Mr. Tiberiu Danet - Cross

1    A.    With my parents.

2    Q.    Okay.  And were they in an apartment or a

3    house?

4    A.    Yes, in an apartment.

5    Q.    The same apartment where you were living when you

6    were arrested?

7    A.    No.

8    Q.    You were living with your parents and who else?

9    A.    My brother.

10   Q.    Okay.  And at that time, was your brother engaged in

11   internet fraud?

12   A.    No.  He got engaged in internet fraud probably

13   around —

14   Q.    The question was:  Was he engaged in internet fraud

15   in 2008 when you met Mr. Nicolescu?

16   A.    It happened around the same time.

17   Q.    Okay.  So when you met Mr. Nicolescu in 2008 and

18   started talking to him, were you engaged in internet

19   fraud at that time?

20   A.    No.  But again, this was 2007, not '8.

21   Q.    2007.  Thank you for correcting me.

22              So you didn't commit any internet fraud

23   crimes, and your brother didn't commit any internet

24   crimes until you both met Mr. Nicolescu in 2007?

25   A.    Even though I was living —

Mr. Tiberiu Danet - Cross

1    A.    That's a yes or no.

2              MR. BROWN:  Objection, your Honor.

3              THE COURT:  Sustained.  Can I have one

4    moment?

5    A.    The question again?

6              THE COURT:  One moment.

7    BY MR. GOLDBERG:

8    Q.    When you met Mr. Nicolescu in 2007, you had not

9    committed any internet crime or any crimes up to that

10   point, correct?

11   A.    Yes, that's right.

12   Q.    And when your brother met Mr. Nicolescu in 2007, was

13   it at the same time?

14   A.    I don't know when my brother met Mr. Nicolescu.  As

15   far as I know, they had been classmates in high school.

16   I was not around my brother all the time.

17   Q.    But your brother engaged in internet crime as well

18   after meeting Mr. Nicolescu, correct?

19   A.    Yes.  But I can't say when that started.

20   Q.    Okay.  But not before that as far as you know,

21   right?

22   A.    As far as I know, yes.

23   Q.    And you were sharing a room at the time in your

24   apartment?

25   A.    No.

Mr. Tiberiu Danet - Cross

1    Q.    With your brother?

2    A.    No.  We had two rooms.

3    Q.    Okay.  So I want to ask you about some things right

4    at the end of your testimony yesterday.  You were asked

5    by Mr. Brown about the central control server.  Is that

6    the right term?

7    A.    Yes.

8    Q.    And you were asked who had log-ins for that,

9    right?

10   A.    Yes.

11   Q.    And you indicated three or four people, and I think

12   you eventually settled on four, right?

13   A.    Yes.

14   Q.    And we are talking about — do you know what company

15   hosted that server?

16   A.    That server changed location multiple times.

17   Q.    It was always one server, but it moved around?

18   A.    Yes.

19   Q.    You said that four people had log-in credentials,

20   and log-in credentials allows you to go on to that server

21   and work in a work space, correct?

22   A.    Allows you to log into the server and modify

23   whatever you want to.

24   Q.    Do whatever you want, right?

25   A.    Yes.

Mr. Tiberiu Danet - Cross

1    Q.   And then, you were shown an exhibit, Government's

2    Exhibit 2203.  Do you remember seeing that?

3                MR. GOLDBERG:  I am going to approach if I

4    may?

5                THE COURT:  Sure.

6    BY MR. GOLDBERG:

7    Q.   Do you remember seeing that?

8    A.   Yes.  It is on the screen.

9    Q.   So when you were asked without seeing the exhibit —

10   had you seen this exhibit before your testimony?

11   A.   I don't understand.  It was on the screen yesterday,

12   too.

13   Q.   Okay.  I am going to backup because I started one

14   question and finished with another.

15               Prior to your testimony yesterday, had you

16   seen Exhibit 2203?

17   A.   Yes.

18   Q.   And you had gone over it with the prosecutors prior

19   to your testimony?

20   A.   Gone over what exactly?

21   Q.   Exhibit 2203.

22   A.   I was shown the exhibit.

23   Q.   Okay.  Now, this exhibit shows the individuals that

24   have access and work space on the control server,

25   correct?

Mr. Tiberiu Danet – Cross

1  A.   No.   This shows the individuals that were using AOL

2  and Yahoo actually to create automatically for this

3  server.

4  Q.   Okay.   Now, doesn't it say "work spaces" at the

5  top?

6  A.   Yes.   It says work space.

7  Q.   That's the — that is a particular part of the

8  server, is the work space, correct?

9  A.   It is a folder —

10  Q.   Right.

11  A.   — in the server.

12  Q.   It is inside the server?

13  A.   Yes.

14  Q.   And in order to get into the work space, you need

15  log-in credentials, correct?

16  A.   No.   The log-in credential was only one, actually

17  two, two log-in credentials.   One was the root.   Whoever

18  had the root password had access to everything in the

19  server.

20  Q.   Okay.

21  A.   And pretty much the same where another account,

22  which is used — whoever had the work space in the

23  accounts are not related and the log-in.

24  Q.   Okay.   The log-ins and the work spaces are not

25  related is your testimony?

Mr. Tiberiu Danet - Cross

1    A.    Yes.

2    Q.    But we can agree that the name Natiune, Raul,

3    Sasha and TRX all had work spaces on the computer,

4    correct?

5    A.    Yes.  They are folders.

6    Q.    They could go on to the command or the central

7    command server, correct?

8    A.    These are names of folders, not names of

9    users.

10   Q.    Yeah, but they are on the — these are on the

11   server?

12   A.    Yes.  They are on the server.

13   Q.    So we can agree those individuals also had

14   credentials to access these files on the server?

15   A.    No.  You are mistaken.

16   Q.    So they can just go on the server and was open to

17   whose ever address and go into the —

18   A.    You didn't have to log in to the server to be able

19   to use something from a web page.  Whatever was available

20   on the server — you could go online to a specific

21   address and access something from over there.  You didn't

22   have to log in to the server to have access from a web

23   browser.

24   Q.    Okay.  So you are saying —

25   A.    And this is how these people were accessing the

Mr. Tiberiu Danet - Cross

1    respective folders from within the web browser.

2    Q.    Okay.  So they could just freely get on to a work

3    space on a server to a web browser?

4    A.    Yes.

5    Q.    They didn't need the credentials to change

6    files —

7    A.    Exactly.

8    Q.    — on the server itself.

9    A.    Yes.

10   Q.    And one of those persons was your brother under the

11   name of Raul, correct?

12   A.    Yes.

13   Q.    And his name is Valentin Danet, correct?

14   A.    Yes.

15   Q.    And it is your testimony that Mr. Danet was —

16   you don't know when he started engaging in fraud,

17   but eventually, he was engaging in internet fraud,

18   correct?

19   A.    Yes.

20   Q.    Now, you testified about ways that members of this

21   conspiracy communicated with each other, and you talked

22   about Jabber.  I don't believe I heard you talk about

23   WhatsApp.

24            Did you communicate with anyone else that

25   was engaged in the Bayrob Group over WhatsApp?

Mr. Tiberiu Danet - Cross

1    A.    No.

2    Q.    Never?

3    A.    I had — I didn't have WhatsApp installed on mine at

4    least in 2016.  I had it at one time.

5    Q.    But it was not something that was considered secure

6    enough to use, right?

7    A.    Yes.

8    Q.    What about Hangouts?  Hangouts, do you know what

9    that is?

10   A.    It is a service by Google.

11   Q.    Is it similar to WhatsApp?

12   A.    It looks like WhatsApp, but the underlying protocol

13   is actually Jabber, so it more depends on how you look at

14   it.

15   Q.    Okay.

16   A.    It looks like WhatsApp but works differently under

17   the hood.

18   Q.    It is similar to Jabber, but it looks the same?

19   A.    Yeah, Jabber but looks like WhatsApp.

20   Q.    Did you ever communicate with anybody in the Bayrob

21   Group using Hangouts?

22   A.    I might have did.  I was not using it regularly, but

23   I have been.

24   Q.    But it was not something that was regularly —

25   A.    No.

Mr. Tiberiu Danet - Cross

1   Q.   Okay.  So your degrees you mentioned, your degrees I

2   thought you said format, either format or formatting,

3   something to that effect?

4   A.   Computer science.

5   Q.   Computer science?

6   A.   Yeah.

7   Q.   Okay.  So that's what it is, you have a Master's in

8   computer science?

9   A.   Yes.

10  Q.   And your focus — or at least something that you

11  have an advanced degree — is in databases, correct?

12  A.   Yes.

13  Q.   And databases are essential to the whole Bayrob

14  function?

15  A.   Yes.

16  Q.   Your function within the Bayrob Group was to create

17  databases and ways of using database information,

18  correct?

19  A.   I did that, too, but it was not my responsibility.

20  I was not the only one doing that.

21  Q.   Okay.  You created the .PHP pages, right?

22  A.   Some of them.

23  Q.   HTML pages, right?

24  A.   Yes.

25  Q.   You created some false eBay listings, correct?

Mr. Tiberiu Danet - Cross

1   A.   Yes.

2   Q.   And did you mention how many of those you did where

3   you actually created the ad, the listing itself?

4   A.   How many listings I made?

5   Q.   Uh-huh.

6   A.   I can't remember.  No, I didn't mention that.

7   Q.   You talk about creating software or code that could

8   scrap credit card data, web history, users' names,

9   passwords, processing data, correct?

10  A.   Yeah.  I mentioned processing data such as web

11  history, but as far as the software goes, I wasn't the

12  only one.

13  Q.   Okay.  Well, I understand that.

14  A.   Yes.

15  Q.   But you created — you did these essential functions

16  for the Bayrob Group, correct?

17  A.   They are far from essential.

18  Q.   Pardon me?

19  A.   They are far from essential.

20  Q.   They are far from essential?

21  A.   Yes.

22  Q.   So if you didn't do the actions that you have

23  admitted to doing —

24  A.   No.  I meant what you mentioned right now.

25  Q.   Okay.  Those actions aren't essential?

Mr. Tiberiu Danet - Cross

1    A.    Like the web history and, yeah, that is, it didn't
2    help the network run.
3    Q.    Let's talk about things essential like the credit
4    cards, right?  That's essential?
5    A.    It is and isn't.  You could say the database is more
6    essential, but the credit cards at some point were bought
7    for $3, $5 apiece, and that was not essential.  If you
8    had that, you could buy that.
9    Q.    Okay.  So when you talked about classic Bayrob fraud
10   at the beginning of your testimony yesterday —
11   A.    Yes.
12   Q.    — and you talked about creating web pages, that
13   would allow the theft of monies from eBay customers
14   through a phony web page, correct?
15   A.    Yes.
16   Q.    And you created that.  You built that.
17   A.    I created the page itself, the way the page was
18   displayed to the users; which was the really hard part, I
19   didn't do that.
20   Q.    But without the web page, it doesn't happen,
21   right?
22   A.    Yeah.  You could —
23   Q.    You could say that.  You got to agree with me on
24   that?
25   A.    You could say that.  If you don't have the 1

Mr. Tiberiu Danet - Cross

1    percent, yes, it doesn't work.

2    Q.    You also instructed individuals in the Bayrob Group

3    on how to spam.  I think I saw an e-mail you sent with

4    that header, right?

5    A.    Yes.  It was in Europe.

6    Q.    Is that something you had any special understanding

7    of or training in or practice?

8    A.    No.  I had just created the interface that allowed

9    the web interface that helped run a whole engine behind

10   the scenes.

11   Q.    Uh-huh.

12   A.    That did the spamming.  I just created a web

13   interface and sent an e-mail on how to use the web

14   interface, which has nothing to do with how the spam

15   works in the background, which was done by somebody

16   else.

17   Q.    Okay.  But these are the things that you did and

18   contributed to the Bayrob Group, correct?

19   A.    Yes.

20   Q.    And you got money out of this scheme over the course

21   of nine years, eight years?

22   A.    Yes.  I tried to answer this question yesterday,

23   too, but when you say "nine years," you make it seem that

24   it has been going on for everyday for the nine years.

25   Q.    Let's say it this way —

1399

Mr. Tiberiu Danet - Cross

1    A.    There were breaks of years in this nine years.

2    Q.    — there were breaks of entire years?

3    A.    For me, yes.

4    Q.    Okay.  Which entire years?

5    A.    For example, again —

6    Q.    Tell me what years.  Just tell me what years you

7    didn't engage in this fraud.  I don't want examples.  I

8    want years, numbers.

9    A.    Yeah, I didn't say years like one continuous year.

10   I said out of the nine years, there were probably a total

11   of three or four like added months, maybe three —

12   Q.    Three or four years if you add up the months.  Is

13   that what you are saying?

14   A.    Yes.

15   Q.    So out of the nine years, if you added the months

16   you were involved, they would add up to four years?

17   A.    Less than four.

18   Q.    Less than four.  Okay.

19             So there should be big breaks —

20   A.    Yeah.

21   Q.    Well, let me finish my question.

22             There should be big breaks in the evidence

23   of when you were involved and when you weren't involved,

24   correct?

25             MR. BROWN:  Objection.

Mr. Tiberiu Danet - Cross

1        THE COURT:  Overruled.

2    A.   Yes.

3        THE COURT:  You can answer that, sir.

4    A.   There are — when you say "involved" —

5    Q.   When you were working?  You said you weren't

6    actually involved.

7    A.   When you say involved, it doesn't mean if I sent an

8    e-mail or logged in on the e-mail I was doing anything.

9    Q.   Okay.  So let me get this straight.

10            You may not have been involved in this

11   conspiracy for half the time, but there still may be some

12   e-mails to the members during the time you weren't

13   involved.  Is that what you are saying?

14   A.   First of all, I said —

15   Q.   Just answer what I am saying, or no it is not.

16   A.   You are twisting my words.  I said half the time, I

17   said three out of the nine.  That's one third of the

18   time.

19   Q.   Okay.  Well, you said four or more is what you just

20   said now.  So that's half of the time.  If you want

21   to say a third of the time, that's fine.  Answer my

22   question.

23            You still communicated with members of the

24   conspiracy, even though you weren't, quote, involved?

25   A.   Not all the time, no.

Mr. Tiberiu Danet - Cross

1  Q.   Okay.  So you made money out of the scheme?

2  A.   Yes.

3  Q.   And you were living with your parents most of the

4  time?

5  A.   In the beginning.

6  Q.   When did you move out from your parents' home?

7  A.   Probably around 2008 or '9.

8  Q.   So at the beginning, you were living with your

9  parents and then moved out.  Where did you move?

10 A.   To an apartment.

11 Q.   The apartment where you were arrested?

12 A.   No.

13 Q.   Where was this apartment?

14 A.   In Bucharest.

15 Q.   Okay.  And was it one you rented, or was it owned by

16 a member of your family?

17 A.   It was rented.

18 Q.   Okay.  And when you were arrested, you were living

19 in an apartment that was owned by a member of your

20 family?

21 A.   Yes.

22 Q.   Who was it owned by?

23 A.   My mother.  She had inherited from her mother.

24 Q.   And how long had you been living there?

25 A.   Probably something like five years.

Mr. Tiberiu Danet - Cross

1    Q.   Okay.  So we could say safely about 2011 you moved

2    in there?

3    A.   Probably.

4    Q.   Okay.  And you were paid — you made money in

5    bitcoin with your involvement —

6                 MR. BROWN:  Objection.

7                 THE COURT:  Let me hear the question.

8    BY MR. GOLDBERG:

9    Q.   You made money in the Bayrob scheme in bitcoin, paid

10   in bitcoin or paid in cash, correct?

11                THE COURT:  Overruled.

12   A.   Yes.

13   Q.   And it didn't matter which to you as long as you got

14   paid, right?

15   A.   For the longest time.

16   Q.   It didn't matter which way you got paid?

17   A.   Yeah, because in the beginning, there was no

18   bitcoin.

19   Q.   When it became bitcoin, then it didn't matter?

20   A.   No.  It became like four years after bitcoin was

21   created.

22   Q.   Okay.  So when you got paid, you didn't just keep

23   that money in your apartment.  You gave it to your

24   parents to put in their bank accounts, correct?

25   A.   No.

Mr. Tiberiu Danet - Cross

1   Q.   That would be ridiculous, right?  That would be

2   silly?

3   A.   I did not do that.

4   Q.   No.  Did you provide any information to the

5   Government about where the money went that you realized

6   from this criminal activity?

7   A.   Yes.

8   Q.   Okay.  And where did you tell them it went?

9   A.   Well, more than a hundred thousand Euros went to

10  Nicolescu's father

11  Q.   Okay.

12  A.   The rest of it I spent.  I even loaned to Nicolescu

13  when he was short on cash.

14  Q.   Okay.

15  A.   And of course, I bought a car.  I bought —

16  Q.   None of it got stashed away?

17  A.   Some of it was even seized during my arrest.

18  Q.   Some of it.  None of it got stashed away?  You had a

19  girlfriend when you got arrested?

20  A.   Yes.

21  Q.   She is your girlfriend?

22  A.   Yes.

23  Q.   She was living in your apartment?

24  A.   Yeah.

25  Q.   She is waiting for this to be over for you to get

Mr. Tiberiu Danet - Cross

1    out of jail and come back to her?

2    A.    Yes.

3    Q.    She didn't have any of your money?

4    A.    No.

5    Q.    So — and you agreed to forfeit any money that you

6    made as a result of this scheme as part of your plea

7    deal, right?

8    A.    Yes.

9    Q.    And other than the money that was seized at the time

10   of your arrest, what funds have you turned over to the

11   Government or identified that were part of your

12   forfeiture?

13   A.    I have tried to decrypt my containers that contained

14   funds without success.

15   Q.    You have tried?

16   A.    Yes.

17   Q.    Okay.  So in the course of your discussions with the

18   Government, you indicated that you had up to 200 bitcoin

19   somewhere encrypted in an encrypted partition in your

20   computer, right?

21   A.    I didn't have them.  That's not the correct

22   wording.

23   Q.    Word it for me, then.

24   A.    I had the access, which was — I had access to this

25   kind of bitcoin, but I was not the only one that had

Mr. Tiberiu Danet - Cross

1    access to it.

2    Q.    Bitcoin was your bitcoin, correct?

3    A.    No.

4    Q.    Well, you said in your plea that you had access

5    through your computer, through an encrypted partition of

6    100 the 200 bitcoins, correct?

7    A.    Yes.

8    Q.    Okay.  And this is — I mean, that's your nest egg,

9    right?  That's what you put together.  That's what you

10   have left over from this conspiracy?

11   A.    No.  That's not what I have left over.

12   Q.    You have more than that?

13   A.    A lot more people have access to that bitcoin.

14   Q.    Okay.

15   A.    Or at least one.

16   Q.    Okay.  Well, that would be your brother, right?

17   A.    No.  That would be Nicolescu.

18   Q.    Well, if Mr. Nicolescu had access to it, then that

19   would be the only other person, just you and

20   Mr. Nicolescu?

21   A.    As far as I know.  I have no way of knowing who he

22   gave access to.

23   Q.    Okay.  But you didn't give access to anybody?

24   A.    No.

25   Q.    And the Government gave you a computer and — out in

Mr. Tiberiu Danet - Cross

1    the prison where you were staying — and let you work on

2    it to try to access the bitcoin, correct, among other

3    things?

4    A.    Yeah, to try to access the container, not so much

5    the bitcoin.

6    Q.    Okay.  And this is a password that you had at one

7    point, right?

8    A.    It is actually a combination of six passwords.

9    Q.    All right.  Well, you had that at one time,

10   right?

11   A.    Yes.  I did have it at one time.

12   Q.    Okay.  But now that you have to turn it over to the

13   Government, you can't find it.  You can't figure out what

14   it is?

15               MR. BROWN:  Objection.

16               THE COURT:  Overruled.  Is that correct,

17   sir?

18               THE WITNESS:  I have to — so the six

19   passwords total up to a hundred characters.

20   BY MR. GOLDBERG:

21   Q.    Okay.

22   A.    It is not like "I love you mom" password, "Robert

23   12," you know.

24   Q.    Listen, criminals use long passwords?

25   A.    Exactly.

Mr. Tiberiu Danet — Cross

1  Q.   And you were a criminal for eight, nine years?

2  A.   Yes.

3  Q.   With a couple vacations in between?

4  A.   Yes.

5  Q.   And you use passwords everyday to get into whatever

6  computer you needed to get into, right?

7  A.   No.  The reason I remember my password —

8  Q.   Either you did or didn't.  The question is:  You

9  used computers, everyday password protected when you were

10 working as a criminal, right?

11 A.   Which computers do you mean?

12 Q.   You used a computer everyday to commit criminal

13 activity, right?

14 A.   Most of the passwords I used during —

15 Q.   Excuse me.  The answer to that is yes or

16 no.

17 A.   No.  Most of the passwords are stored in files.

18 They are not stored —

19 Q.   So you used a computer for criminal activity

20 most days when you were active in the conspiracy,

21 correct?

22 A.   Yes.

23 Q.   And every time you used the computer, you had to

24 access passwords, correct?

25 A.   Yes.

Mr. Tiberiu Danet – Cross

1    Q.   All right.  And those passwords are important

2    because if you don't have them, you can't do your

3    criminal activity, right?

4    A.   Yes.

5    Q.   And you had since — you had over a year and-a-half

6    at this point — well, you had about nine months

7    working with that computer to try to find the password,

8    correct?

9    A.   Um —

10   Q.   Let's back up.

11                You proffered, you gave a statement to the

12   United States in July of 2018, right?

13   A.   Yes.

14   Q.   Okay.  So — and did you have the computer before

15   you proffered to the Government?

16   A.   No.

17   Q.   And part of that proffer was to give that

18   information, right —

19   A.   Yes.

20   Q.   — to help them with their case?

21   A.   Yes.

22   Q.   And if it was truthful and if the Government found

23   that you were believable, you would get credit for it,

24   right?

25   A.   Yes.

Mr. Tiberiu Danet - Cross

1   Q.   And part of that agreement also required you to give

2   passwords, right?

3   A.   Yes.

4   Q.   So the Government —

5   A.   Which I did.

6   Q.   — so the Government at that point made sure that

7   you got a computer, so that you could find the passwords,

8   so they could get the bitcoin and any other —

9                MR. BROWN:  Objection.

10               THE COURT:  Sustained.

11  BY MR. GOLDBERG:

12  Q.   Did the Government give you a computer at that

13  point?

14  A.   No.  It was only after a couple of months when they

15  had tried what I had provided.

16  Q.   Okay.  So you gave them — verbally, you gave them

17  passwords, right?

18  A.   Yes.  The reason it took that long was —

19  Q.   Well, here.  Just answer my questions yes or no.

20  Verbally, you gave them passwords, right?

21  A.   Yes.

22  Q.   All right.  And Agent Macfarlane wrote them

23  down?

24  A.   Yes.  It was not just one password because I

25  couldn't remember certain characters or symbols or

Mr. Tiberiu Danet - Cross

1   combination of passwords.  You had to try multiple

2   combinations to be able to see which one worked, which

3   was a process that needed time.

4            MR. GOLDBERG:  May I approach, your Honor?

5            THE COURT:  You may.

6   BY MR. GOLDBERG:

7   Q.   Do you remember the exact passwords you gave to the

8   Government during the proffer?

9   A.   After another — I remember, yeah, part of them.

10  Q.   Okay.  Would it help you if I showed you the notes

11  from that proffer?

12  A.   Yeah.

13  Q.   Okay.  So I am showing you — I will have this

14  marked as Defendant's Exhibit M.

15            Do these look like passwords you turned over

16  to the Government?

17  A.   Yes.

18  Q.   And what day did that occur?

19  A.   That — July something, July in 2018.

20  Q.   Okay.  That was the first meeting?

21  A.   Yes.

22  Q.   Okay.  And down at the bottom, you see —

23            MR. BROWN:  Your Honor, could we see what

24  Exhibit M is?

25            THE COURT:  Certainly.

Mr. Tiberiu Danet - Cross

1              (Pause.)

2    BY MR. GOLDBERG:

3    Q.   Down at the bottom, there is a notation that says

4    "bitcoin" —

5              MR. BROWN:  Objection.

6    Q.   — correct?

7              MR. BROWN:  Objection.

8              THE COURT:  Sustained.

9    BY MR. GOLDBERG:

10   Q.   Did you give them a bitcoin password?

11   A.   Define "bitcoin password."

12   Q.   Did you give them a user name and password to get

13   them into the LUKS partition —

14             MR. BROWN:  Objection.

15   Q.   — to obtain the bitcoin?

16             MR. BROWN:  Objection.

17             THE COURT:  Sustained.

18   BY MR. GOLDBERG:

19   Q.   What did you say to them?  What did you give

20   them?

21   A.   Multiple passwords that helped get in all the

22   encrypted containers that I had, which were layered.  So

23   you needed several passwords to get in the first one and

24   so on.

25   Q.   And did the password as far as you know or the

Mr. Tiberiu Danet — Cross

1   partial password that you gave them for the bitcoin

2   container, did it open the container?

3   A.   No.  That was inside another container that couldn't

4   be opened.

5   Q.   Okay.  And there were other containers within your

6   laptop that also contained partitions that couldn't be

7   opened as well, correct?

8              MR. BROWN:  Objection.

9              THE COURT:  Overruled.  Do you know, sir?

10  A.   Can you —

11  Q.   Yeah.

12  A.   Repeat the question.

13  Q.   Once you gave all the passwords to the Government,

14  they used it on your devices, correct, as far as you

15  know?

16  A.   Yes.

17  Q.   And they were only able to access one container,

18  right?

19  A.   Yes.

20  Q.   And that container contained personal information,

21  personal pictures and videos?

22  A.   No.

23  Q.   It contained information regarding this —

24  A.   Yes.

25  Q.   — conspiracy?

Mr. Tiberiu Danet - Cross

1   A.   Yes.

2   Q.   Okay.  But they were not able to access any of the

3   other material on your computer, correct?

4            THE COURT:  I am going to sustain the

5   objection now.

6   BY MR. GOLDBERG:

7   Q.   Do you know what happened when they tried to use

8   your passwords?

9            MR. BROWN:  Objection.

10           THE COURT:  Sustained.

11  BY MR. GOLDBERG:

12  Q.   You — up until July of 2018, you had not sat down

13  with the Government to talk to them about this case,

14  correct?

15  A.   Yes.

16  Q.   And then when you did sit down with them, you were

17  in a room with your lawyer, with one or more of the

18  gentlemen sitting at this table, Mr. Macfarlane,

19  Agent Macfarlane, right?

20  A.   Yes.

21  Q.   Anyone else?

22  A.   Agent Stacy Lough, L-o-u-g-h.

23  Q.   And you said that that meeting occurred at the FBI

24  offices, correct?

25  A.   Yes.

Mr. Tiberiu Danet - Cross

1    Q.    And that lasted for how many hours?

2    A.    The first one lasted probably six hours.

3    Q.    Six hours.  And the agents were taking notes during

4    the proffer, correct?

5    A.    Yes.

6    Q.    And you met with them later as well in the same kind

7    of circumstances?

8    A.    Yes.

9    Q.    All right.  When was that?

10   A.    I met two times again, the same office, then another

11   time here in the courthouse.  I don't remember the dates,

12   but the ones in the FBI office were between July and

13   November of 2018.

14   Q.    So twice between July and November?

15   A.    No.  I think it was four times.

16   Q.    Four times?

17   A.    Yeah.

18   Q.    Okay.  And one of the things that they were

19   interested in during that first six-hour meeting and the

20   meetings thereafter were the different monikers, the

21   different names of individuals engaged in the conspiracy,

22   correct?

23   A.    Yes.

24   Q.    In fact, they brought up the monikers pretty early

25   in the proffer.  Would I be correct?

Mr. Tiberiu Danet - Cross

1           MR. BROWN:  Objection.

2           THE COURT:  Sustained.

3   BY MR. GOLDBERG:

4   Q.   But they wanted to know monikers, right?

5   A.   Yes.

6   Q.   Okay.  So you identified the moniker for Catalin

7   Dima, right?

8   A.   Yes.

9   Q.   You identified the moniker for Valentin Dima?

10  A.   Danet.

11  Q.   Okay.

12          MR. GOLDBERG:  May I approach, your Honor?

13          THE COURT:  Yes.

14  BY MR. GOLDBERG:

15  Q.   I will show you what I will have marked as Defense

16  Exhibit N.  Do you see the names?

17  A.   Yes.  I only mentioned —

18          THE COURT:  One moment.

19          MR. BROWN:  Objection.  First of all, could

20  we see —

21          THE COURT:  Show him the document.

22          MR. BROWN:  We are going to object to

23  marking this exhibit.

24          THE COURT:  Well, it can be marked.

25          MR. BROWN:  But the objection is to the use

Mr. Tiberiu Danet - Cross

1    of it.

2              THE COURT:  Side bar.

3                   (Side bar held on the record.)

4              THE COURT:  May I see it?

5              MR. O'SHEA:  Judge, I don't have an

6    argument, so I am going to sit down.  Okay?

7              THE COURT:  Sure.  Is this his proffer?

8              MR. BROWN:  That's the first proffer.

9              MR. GOLDBERG:  That's his proffer, his

10   statement.

11             THE COURT:  You need to be closer.

12             MR. GOLDBERG:  This is his first proffer

13   that occurred in July, I think, 2018.

14             THE COURT:  What are you doing with this?

15             MR. GOLDBERG:  I wish to point out with this

16   witness that he identified monikers and people during

17   that meeting.  He may have misled the Government

18   regarding the moniker involving his brother, and he did

19   not identify Master Fraud or by a moniker in that

20   meeting.

21             THE COURT:  You can use this for

22   impeachment, but you are not — you are not using it

23   appropriately at this point.

24             MR. GOLDBERG:  But for the next question, I

25   probably —

Mr. Tiberiu Danet - Cross

1    THE COURT:  But right now you haven't.

2    MR. GOLDBERG:  Okay.  All right.  Thank

3    you.

4    THE COURT:  I apologize.  Was that your

5    objection?

6    MR. BROWN:  Yes, your Honor.

7    (Side bar concluded.)

8    BY MR. GOLDBERG:

9    Q.   When you were asked about various monikers, you

10   identified Catalin Dima, correct?

11   A.   Yes.

12   Q.   And I asked you about Valentin Dima, and you said

13   that was Valentin Danet?

14   A.   I thought you were — I didn't know what you were

15   talking about.

16   Q.   Well, did you identify your brother Valentin Danet

17   during that proffer?

18   A.   Yes.

19   Q.   What about a moniker for Mr. Metei Marius,

20   M-a-r-i-u-s?

21   A.   I did not know that name.

22   Q.   You didn't?

23   A.   No.

24   Q.   What about the name Master Fraud, did you associate

25   the name Master Fraud or MF with Mr. Nicolescu during

Mr. Tiberiu Danet - Cross

1   that six-hour proffer?

2   A.   Yes.

3   Q.   And if you did that, then, it would be reasonable to

4   assume that Agent Macfarlane wrote that —

5                    MR. BROWN:  Objection.

6                    THE COURT:  Sustained.

7   BY MR. GOLDBERG:

8   Q.   Was Agent Macfarlane taking notes while you were

9   talking?

10  A.   Yes.

11  Q.   If I showed you —

12                   MR. BROWN:  Objection.

13  BY MR. GOLDBERG:

14  Q.   If I showed you the notes taken at that proffer

15  meeting, can you point out in the notes that you

16  identified Nicolescu as Master Fraud?

17                   THE COURT:  Sustained.

18  BY MR. GOLDBERG:

19  Q.   Have you had a chance to go through your statement

20  that was recorded by Agent Macfarlane in preparation for

21  Court?

22  A.   No.

23  Q.   So you haven't seen the notes at all?

24  A.   No.

25  Q.   But you are saying that you identified Nicolescu as

Mr. Tiberiu Danet - Cross

1    Master Fraud at that meeting for sure?

2    A.    Yes.

3    Q.    And there would be no reason that you could think of

4    why Agent Macfarlane wouldn't put that down?

5                   MR. BROWN:  Objection.

6                   THE COURT:  Sustained, sustained.  Folks,

7    disregard that last question.

8    BY MR. GOLDBERG:

9    Q.    Did you identify anybody else by moniker during the

10   meeting?

11   A.    Yes.

12   Q.    Who else?

13   A.    Ionut Flueras.

14   Q.    Did you give a moniker for him?

15   A.    Yes.  He had one ID on Yahoo and another one on one

16   of the criminal accounts, something starting with W.

17   Q.    Do you remember coming in here and pleading guilty,

18   right?

19   A.    Yes.

20   Q.    And you signed a long plea agreement that you said

21   you looked over very carefully?

22   A.    Yes.

23   Q.    And that plea agreement contained a number of

24   factual allegations that you had to sign off on?

25   A.    Yes.

Mr. Tiberiu Danet - Cross

1   Q.   You went over each of those paragraphs with your

2   attorney, correct?

3   A.   Yes.

4   Q.   Did you compare them with the indictment?  In other

5   words, did you look at the agreement you were asked to

6   sign and the indictment and see which paragraphs matched

7   which paragraphs?

8   A.   Not really.  I hadn't identified which paragraph

9   matched.

10  Q.   So if the factual basis that you signed off on

11  matched the language of the indictment, you — that would

12  be a surprise to you?

13              MR. BROWN:  Objection.

14              THE COURT:  Sustained.

15  BY MR. GOLDBERG:

16  Q.   Now, you talked about what you were getting out of

17  the plea agreement, and you were not so sure about what

18  you were actually facing —

19              MR. BROWN:  Objection.

20  Q.   — yesterday during your testimony, right?  Am I

21  remembering that correctly?

22              THE COURT:  Overruled.  Is that correct,

23  sir?

24              THE WITNESS:  Can you repeat that?

25              MR. GOLDBERG:  Yes.

Mr. Tiberiu Danet - Cross

1    BY MR. GOLDBERG:

2    Q.    So you had a year-and-a-half before you started

3    to cooperate, to talk about what kind of sentence

4    you could look at if you are convicted in this case,

5    right?

6    A.    Yes, but I was not really getting anywhere with my

7    attorney.

8    Q.    Wait.  You had two attorneys?

9    A.    That —

10   Q.    You had two attorneys, right?

11   A.    I had two attorneys prior to — yeah.  I hired a

12   second attorney.

13   Q.    And you were not getting anywhere with either one of

14   them?

15                 MR. BROWN:  Objection.

16                 THE COURT:  Sustained.

17   BY MR. GOLDBERG:

18   Q.    Well, listen, luckily it is right in your plea

19   agreement what you were looking at?

20                 MR. GOLDBERG:  And I have had this marked as

21   Defendant's Exhibit F, your Honor.

22                 THE COURT:  Did you say F?

23                 MR. GOLDBERG:  F, the plea agreement.

24   BY MR. GOLDBERG:

25   Q.    So do you recognize Defendant's Exhibit F?

Mr. Tiberiu Danet — Cross

1    A.    Yes.  It is my plea agreement.

2    Q.    Okay.  And those are your initials at the

3    bottom?

4    A.    Yes.

5    Q.    And did you initial each page?

6    A.    Yes.

7    Q.    And did you go over this with both your attorneys?

8    A.    Yes.

9    Q.    Okay.  And starting on page 9, there are sections

10   that talk about the Federal Sentencing Guidelines,

11   correct?

12   A.    Yes.

13   Q.    Okay.  And I know you didn't just sign this and not

14   ask what this all meant, right?

15   A.    Yes.

16   Q.    Okay.  And those guideline calculations go on to

17   page 10 as well, correct?

18   A.    Yes.

19   Q.    Okay.  And does it give a number that relates to

20   your total offense level before acceptance of

21   responsibility?

22   A.    Yes.

23   Q.    Okay.  What's that number?

24   A.    35.

25   Q.    Now, did you talk to your attorneys about what level

Mr. Tiberiu Danet — Cross

1  35 means?

2  A.    Yes, I did.

3  Q.    Okay.  And what was your understanding of the

4  sentencing range for a level 35?

5  A.    This being 11(c)(1)(C) —

6  Q.    No.

7  A.    — plea.

8  Q.    Without the (c)(1)(C.)?

9  A.    But it is 11(c)(1)(C) with that guideline

10 calculation.  That's what I understood.

11 Q.    Your 11(c)(1)(C) means you agreed to a range.

12 A.    Yes.

13 Q.    Without the range, what would your guideline level

14 be?

15 A.    But I did not sign a plea without the range.

16 Q.    You are right.  You signed a plea with a range, but

17 you also have an offense level, correct?

18 A.    Yes.

19 Q.    And do you think if you wouldn't have pled guilty

20 and signed this agreement and agreed to testify you would

21 be looking at a (c)(1)(C) sentence or something closer to

22 the guideline sentence?

23         MR. BROWN:  Objection, your Honor.

24         THE COURT:  Sustained.  Rephrase your

25 question.

Mr. Tiberiu Danet - Cross

1    BY MR. GOLDBERG:

2    Q.   You knew to get the (c)(1)(C) range, you had to

3    cooperate with the Government, right?

4    A.   I did not know that before cooperating.

5    Q.   Okay.  But you know it now, right?

6    A.   Yes.  Once I got the plea agreement, obviously, I

7    read it and know the terms of it.

8    Q.   Right.  And the 35 is the offense level you

9    discussed, or you knew — you knew what that 35 meant.  I

10   will back up and start over.

11                 You knew what offense level 35 meant,

12   correct?

13   A.   Yes, but I did not know I was at a 35 until

14   receiving the plea agreement.

15   Q.   Okay.  But then, you got the plea agreement, and you

16   saw that's where you would be, but you made a deal and

17   you got lower, right?

18   A.   No.  I received the plea agreement of a range of

19   9 to 12 with a level 35.  It is in the same plea

20   agreement.

21   Q.   So for the year-and-a-half you had one or two

22   lawyers, they never told you —

23                 MR. BROWN:  Objection, your Honor.

24                 THE COURT:  Sustained.

25

Mr. Tiberiu Danet - Cross

1    BY MR. GOLDBERG:

2    Q.    You had to have discussed what sentencing you were

3    facing.

4    A.    You mean before getting the plea agreement?

5    Q.    Of course.

6    A.    Yeah.  I know the statutory maximum, which is

7    the maximum, but when you say what you are facing, I

8    usually —

9    Q.    Well, what's the statutory maximum?

10   A.    I believe it is 27 years or something like that.

11   Q.    Okay.  And does the aggravated identity theft

12   counts, do they add anything to that?

13   A.    Yes.  If you are found guilty, yeah.

14   Q.    What do they add?

15   A.    Two years each.

16   Q.    And how many are there?

17   A.    Maximum of two years.  Yes, five.

18   Q.    So it is 37 years?

19   A.    Right.

20   Q.    So you knew it very well.  We didn't have to go

21   through all that.

22              You were looking at 37 years?

23              MR. BROWN:  Objection.

24              THE COURT:  Sustained.

25

Mr. Tiberiu Danet - Cross

1   BY MR. GOLDBERG:

2   Q.    You were looking up to 37 years?

3   A.    No.  The statutory maximum, that's the absolute

4   maximum somebody can get.

5   Q.    That's what I am saying.

6   A.    It is not one in the same thing looking at —

7   Q.    Before you signed the plea agreement, you had a

8   maximum sentence of 37 years, correct?

9   A.    Yeah.  But it could be as low as five years.  There

10  is other things involved than just the statutory maximum.

11  That doesn't decide your sentence.

12  Q.    Right.  The Guidelines do, and you went the over

13  those with your attorneys, too, right?

14  A.    Yes.

15  Q.    You saw this book, right?

16  A.    Yes.

17  Q.    Okay.  You saw this table, correct?

18  A.    Yes.

19  Q.    Okay.  What does it say for level 35?

20  A.    It says 168 to 210.  I don't understand the

21  relevance to my plea agreement, though.

22  Q.    It says 168 months to 210 months, correct?

23  A.    Yes.

24  Q.    And that's before you add in the aggravated identity

25  theft count?

Mr. Tiberiu Danet - Cross

1           MR. BROWN:  Objection.

2   Q.   Correct?

3           THE COURT:  Sustained.

4   BY MR. GOLDBERG:

5   Q.   You went over all that with your attorneys before

6   you signed the plea agreement, correct?

7   A.   You are forgetting to mention the 3 points for

8   acceptance of responsibility and other things, that

9   this came in the same plea agreement with the binding

10  range.

11  Q.   Okay.  I understand that you know all about the

12  Sentencing Guidelines, and I understand you know there is

13  a three-point reduction.

14          So you have to know that if you went to

15  trial, that you would face a sentence based close to the

16  range I just showed you, correct?

17          MR. BROWN:  Objection.

18          THE COURT:  Overruled.  Do you know, sir?

19          THE WITNESS:  I expected to get more than 12

20  years if I went to trial, yes.

21  BY MR. GOLDBERG:

22  Q.   Right.  You expected to get somewhere in the range

23  that I just showed you?

24  A.   Yes.

25  Q.   Okay.  You also signed a cooperation addendum to

Mr. Tiberiu Danet - Cross

1   your plea agreement, correct?

2   A.    Yes.

3   Q.    And that's been marked as Exhibit G?

4            MR. BROWN:  Yeah.

5            MR. GOLDBERG:  Okay.

6   BY MR. GOLDBERG:

7   Q.    What was your understanding of what the cooperation

8   addendum could do for you?

9   A.    Honestly, I was — I have seen addendums like this

10  and usually mention points and mine didn't, so I was

11  pretty upset about that.

12  Q.    Did it mention anything about other people in other

13  countries?  You are welcome to look at it.

14  A.    It did.  I was not the one.

15  Q.    Well, you signed it.  You signed that agreement,

16  correct?

17  A.    Yes, yes.

18  Q.    You read it before you signed it?

19  A.    Yes, I did.

20  Q.    You went over it with your lawyers?

21  A.    Yes.

22  Q.    You stood in this courtroom and acknowledged your

23  signature before this Court?

24  A.    Yes.

25  Q.    Okay.  What was your understanding of what you were

Mr. Tiberiu Danet - Cross

1  getting from the cooperation addendum?

2  A.    I was not promised anything, and I didn't have an

3  understanding that I would be getting anything.

4  Q.    Okay.  Well, what were you obligated to do regarding

5  your cooperation addendum?

6  A.    To cooperate fully with the Government.

7  Q.    And give the names of people in Romania and

8  passwords?

9  A.    Which I had already done, yes, in my proffer

10  meeting.

11  Q.    You were supposed to give passwords and anything

12  that the Government needed to decrypt your computers,

13  correct?

14  A.    Yes.

15  Q.    And they still haven't done that, have they?

16  A.    Not to my understanding.

17  Q.    Okay.  You were supposed to identify any unindicted

18  members of the Bayrob Group, and if they choose to

19  cooperate, they would get credit, right.

20  A.    Which I had already done in my first proffer

21  meeting.

22  Q.    Okay.  But would you get credit if the other members

23  of the Bayrob Group who were unindicted cooperated?  Was

24  that your understanding?

25  A.    No.  My understanding — because that addendum

Mr. Tiberiu Danet — Cross

1    doesn't mention any points for cooperation.  I don't have

2    any understanding that I would be getting anything more

3    than my nine to twelve-year plea.

4    Q.    Would you be closer to nine or twelve?

5                    MR. BROWN:  Objection.

6    Q.    If you sent people in from Romania to talk to the

7    Government?

8                    THE COURT:  Sustained.

9    BY MR. GOLDBERG:

10    Q.    You have indicated that you had a personal use

11    Jabber server at your home, correct?

12    A.    Excuse me.  Yes.

13    Q.    And was that contained — was that a separate

14    machine, or was it contained within a desktop or a laptop

15    that was in your apartment?

16    A.    It was — yeah.  It was contained in sort of a

17    desktop computer, a smaller one.

18    Q.    Okay.  Was there a brand name on it?

19    A.    It was an Intel computer.

20    Q.    It was an Intel computer?

21    A.    Yes.

22    Q.    Okay.  So have you seen that Intel computer that

23    contained the Jabber server since your arrest?

24    A.    No.

25    Q.    Was anything else on the Intel computer besides a

Mr. Tiberiu Danet — Cross

1    Jabber server?

2    A.    Yes.  There were a lot of things.

3    Q.    And the Jabber server, was it a software package?

4    Did you load it on to the computer?

5    A.    Yes.

6    Q.    And I assume since it was at your house, that you

7    were the system administrator for that Jabber server?

8    A.    Yes.

9    Q.    Which means that you could — you have full access

10   to the data stored in the conversations relating to any

11   Jabber chats, right?

12            MR. BROWN:  Objection.

13            THE COURT:  Sustained.

14   BY MR. GOLDBERG:

15   Q.    Well, you had — you were system administer, and you

16   could access the server, correct?

17   A.    Yes.

18   Q.    The Jabber server.

19            And you could access the sign-in

20   credentials of any person signing on to that Jabber

21   server, correct?

22   A.    Yes.

23   Q.    And that Jabber server could be accessed by any

24   device in the world as long as that person who was

25   accessing it had the sign-in credentials and the web

Mr. Tiberiu Danet - Cross

1    address, correct?

2              MR. BROWN:  Objection.

3              THE COURT:  One moment.  Overruled.  Can you

4    answer that, sir?

5              THE WITNESS:  Yes.

6    BY MR. GOLDBERG:

7    Q.   Could — if you had the Jabber — you used to make

8    mobile chats on a server, correct, from a SmartPhone?

9    A.   Yes.

10   Q.   And is that an application that you download and

11   put on your SmartPhone like I would download any

12   application?

13   A.   Yes.

14   Q.   And what kind of SmartPhone did you use?

15   A.   I once had a Samsung.  Then I changed it for another

16   one.

17   Q.   Okay.  And as long as you have got that application

18   and the application knows where the server is, you can

19   sign in to that Jabber server, correct?

20   A.   Yes.

21   Q.   And as long as you had the user ID and the password,

22   you could sign in as that person, correct?

23   A.   Yes.

24   Q.   And in fact, more than one person can sign on

25   under the same user ID and password at the same time,

Mr. Tiberiu Danet - Cross

1    correct?

2    A.    Not really.  That's why we had different accounts

3    for the mobile and the computer.

4    Q.    Okay.  So — but all right.

5                So different accounts for the mobile and the

6    computer, but the same individual could sign on from two

7    different devices at once?

8    A.    On to the different accounts.

9    Q.    Okay.  But you can't have two people on the same

10   account?

11   A.    It is either you can't have more or doesn't work

12   properly.  I don't know which one it isn't but —

13   Q.    So you are not sure?

14   A.    I am not sure, and it doesn't work properly or might

15   not even be possible.

16   Q.    So let's say you had a Jabber account on your server

17   in the name of Michael and another one in the name of

18   O'Shea, let's say, two different people, right?

19   A.    Yes.

20                MR. BROWN:  Objection.

21                THE COURT:  Let me hear the question.

22   BY MR. GOLDBERG:

23   Q.    Is there anything to prevent me from signing on

24   as Michael on one device and as O'Shea on another

25   device?

Mr. Tiberiu Danet - Cross Cont'd

1     THE COURT:  Overruled.

2 Q. At the same time?

3 A. No.

4     MR. GOLDBERG:  Thank you.  Nothing further.

5     THE COURT:  Cross examination, Mr. O'Shea?

6     MR. O'SHEA:  Thank you.

7     CROSS EXAMINATION CONTINUED

8 BY MR. O'SHEA:

9 Q. Good morning, sir.

10 A. Good morning.

11 Q. If I ask you a question and you are not — and you

12 give me a response and I start my next before you are

13 done with your response, will you tell me?

14 A. Okay.

15 Q. Okay.  I don't want to cut you off.  Okay?

16 A. All right.

17 Q. All right.  Now, let me take you back to September

18 28, 2016.  You remember that day, do you not, sir?

19 A. Yes.

20 Q. What happened on that day?

21 A. I was arrested.

22 Q. Okay.  Who was with you when you got arrested?

23 A. You mean at the moment?

24 Q. Yes, sir.

25 A. Nobody.

Mr. Tiberiu Danet - Cross Cont'd

1    Q.    You were all by yourself?

2    A.    Yes.

3    Q.    Where were you?

4    A.    In my apartment.

5    Q.    Okay.  And when did you become aware that other

6    people had been arrested?

7    A.    Only hours later when I got to the offices of — it

8    is called the Court.  It is kind of an FBI in Romania.

9    Q.    Romanian National Police?

10   A.    Yes, a special office.

11   Q.    And when you got there, did you see other people

12   that had also been arrested?

13   A.    There was a room full of people.  Nobody was

14   handcuffed, so I didn't know if they were arrested or

15   not.

16   Q.    Were you handcuffed?

17   A.    No.

18   Q.    Now, did you get a chance to talk to anybody else in

19   the room that day?

20   A.    No.

21   Q.    Did you recognize some of the people in the room

22   that day?

23   A.    No.

24   Q.    They were all strangers to you?

25   A.    When I had gotten there, there were only two people

Mr. Tiberiu Danet - Cross Cont'd

1    I had never seen, yes.

2    Q.    And since that day, have you seen any of the two

3    Defendants in this case?

4    A.    Yes.

5    Q.    Where did you see them?

6    A.    In jail and in Romania and here.

7    Q.    Did you see them in Romania?

8    A.    You mean after I got arrested or before?

9    Q.    After you got arrested.

10   A.    Yes.

11   Q.    Okay.  Now, from what I am hearing you tell us, you

12   knew a lot of the people that were allegedly involved

13   with this organization, right, you yourself?

14   A.    Actually, I knew very few of the people of all the

15   ones that I — that I knew existed, but I didn't know who

16   they were.

17   Q.    And how many people do you think existed?

18   A.    Maybe close to ten.

19   Q.    And you would agree with me that probably all ten of

20   them knew you had gotten arrested, correct?

21              MR. BROWN:  Objection.

22              THE COURT:  Sustained.

23   BY MR. O'SHEA:

24   Q.    Do you know if anybody else knew that you got

25   arrested other than yourself?

Mr. Tiberiu Danet — Cross Cont'd

1              MR. BROWN:  Objection.

2              THE COURT:  Sustained.

3    BY MR. O'SHEA:

4    Q.   Did you ever have a conversation with anybody about

5    other people that got arrested?

6              MR. BROWN:  Objection.

7              THE COURT:  Sustained.

8    BY MR. O'SHEA:

9    Q.   Do you have any specific formal computer skills,

10   training, sir?

11   A.   Yeah.  I did finish university.

12   Q.   What university?

13   A.   University of Bucharest.

14   Q.   Okay.  And what did you get your degree in?  Do you

15   know what I mean by that?

16   A.   It is — yeah.  It was the faculty — it is called

17   mathematics and informatics, and that means computer

18   science.

19   Q.   And did you get a degree in computer science?

20   A.   Yes.

21   Q.   All right.  And when did you get that degree, what

22   year?

23   A.   2007.

24   Q.   And did you ever have a legitimate job using those

25   skills?

Mr. Tiberiu Danet - Cross Cont'd

1    A.    Yes.

2    Q.    Which jobs?

3    A.    Software developer part-time; also did the

4    internship with Google.

5    Q.    Did you get paid?

6    A.    Yes.

7    Q.    Okay.  Did you do that here in the United States or

8    over here?

9    A.    The first time part-time over there and the other

10   one here in the United States.

11   Q.    After you learned those skills, did you ever donate

12   your time to the Red Cross or any charity or anything

13   like that?

14              MR. BROWN:  Objection.

15              THE COURT:  Sustained.

16   BY MR. O'SHEA:

17   Q.    Is it your testimony in front of this jury,

18   other than that short-lived job that you had, all you

19   utilized your skills for was to deceive and defraud

20   people?

21   A.    No.

22   Q.    My last question:  What volunteer work did you do to

23   assist your fellow Romanians with your skills?

24              MR. BROWN:  Objection.

25              THE COURT:  Sustained.

Mr. Tiberiu Danet - Cross Cont'd

1   BY MR. O'SHEA:

2   Q.   Now, just so I understand you, sir, other than those

3   two jobs that you talked about, all of your other

4   computer skills you dedicated to just things that

5   benefited you and/or your fraudulent activities.  Am I

6   right?

7                MR. BROWN:  Objection.

8   A.   No.  I had another job.

9   Q.   So we have a third job?

10  A.   Yes.

11  Q.   What was that?

12  A.   Software engineer again for a company.

13  Q.   How long was that?

14  A.   It was a couple of years, but I was working from

15  home.

16  Q.   Okay.  Let me rephrase my last questions:

17               Other than those three jobs, isn't it true

18  that all of your computer skills were utilized for your

19  personal needs or fraudulent activities?

20               MR. BROWN:  Objection.

21               THE COURT:  Overruled.

22  A.   No.  I had a lot of hobbies, too.  I had been using

23  those.  Not everything I do was related to this scheme.

24  I had other interests and hobbies relating to technical

25  stuff that had nothing to do with the criminal scheme.

Mr. Tiberiu Danet - Cross Cont'd

1    Q.   But the hobbies were for you, right?

2    A.   Yes.

3    Q.   Okay.  Now, let me ask you this, sir.

4              The money —

5    A.   I just thought of something.

6    Q.   Okay.  You had a fourth job?

7    A.   No.  It is — I worked with a professor from the

8    university.  I think you can find it online, wrote an

9    article and did some search about languages and the

10   similarities between languages by using computer science.

11             Then, when I was in college, it keeps coming

12   to me, when I was in college, I also volunteered to be

13   on the team of professors that are educating the high

14   school national team of Romania, and I did that several

15   times.

16   Q.   For what?

17   A.   For computer science, and I did that several times,

18   three years in a row if I am not mistaken.

19   Q.   Okay.  After you got your degree while you were in

20   college, like a lot of students, you are a part-time

21   teacher and helping.  Other than that, after you got your

22   degree in those three jobs, your answer that you gave me

23   before still stands, right?

24   A.   Yes.  The answer that I gave you before still

25   stands.

Mr. Tiberiu Danet - Cross Cont'd

1   Q.   Now, let's talk about the money that you made
2   defrauding people with your computer skills.
3               I think Mr. Goldberg asked you this, and I
4   just want to follow-up.  Where is it, the money?
5   A.   So a large chunk of it I gave to Nicolescu's
6   father.
7   Q.   Was he a charity?  Why did you give it to him?
8   A.   I didn't actually give it.  Nicolescu assured me it
9   was a good investment to give the money to his father,
10  and I personally know that he did the same.  He gave
11  a lot of money to his father that he has never seen
12  back.
13  Q.   And tell the ladies and gentlemen of the jury when
14  you called the Romanian authorities and told them about
15  the money you made so you could pay the income taxes.
16  When did you do that?
17  A.   I actually paid quite a bit of income tax.
18  Q.   I am talking about the money you made from your
19  illegal activities.
20              Are you telling us you called the Romanian
21  authorities, said "look, I am doing this illegal stuff.
22  I made money.  I want to pay taxes on it."
23              Did you do that?
24  A.   I was paying the tax on items I bought in
25  Romania.

1442

Mr. Tiberiu Danet - Cross Cont'd

1   Q.   That's sales tax.  I am talking about income

2   tax.

3   A.   I didn't pay income tax for this ones.

4   Q.   And all the money you made from all the frauds, that

5   you told the Romanian authorities that you are going to

6   go ahead now that you have been caught, you are going to

7   go ahead and pay your income taxes on it.

8           When have you done that?

9   A.   I haven't.

10  Q.   I thought you were cooperating.

11          MR. BROWN:  Objection.

12          THE COURT:  Sustained.

13          MR. O'SHEA:  Okay.

14  BY MR. O'SHEA:

15  Q.   Now, you spent a long time preparing for your

16  testimony with these gentlemen to my left.  Am I right,

17  sir?

18  A.   No.  I spent more time giving information about the

19  case than preparing for testimony.

20  Q.   Okay.  You are not going to tell the ladies and

21  gentlemen of the jury that the first time you saw those

22  exhibits that were up on your screen yesterday was in the

23  courtroom, right?

24          MR. BROWN:  Objection.

25          THE COURT:  Sustained.

Mr. Tiberiu Danet — Cross Cont'd

1   BY MR. O'SHEA:

2   Q.   Did you see those exhibits you saw on your computer

3   screen for the first time yesterday, on the computer

4   screen, or had you seen them before?

5   A.   I had seen them before shortly.

6   Q.   Okay.  And during that process when you saw

7   them before, things were pointed out for you, so you

8   would know what they looked like in the courtroom,

9   correct?

10  A.   No.

11              MR. BROWN:  Objection.

12              THE COURT:  Sustained.

13  BY MR. O'SHEA:

14  Q.   As part — did part of your criminal fraudulent

15  activity, sir, that you did on a regular basis with your

16  computer skills in Romania involve stealing user names

17  and passwords?

18  A.   Yes.

19  Q.   Why do you want to know what user name and passwords

20  are?  Why?

21  A.   For example, some of the accounts were sent, were

22  used to send e-mails.

23  Q.   You want user name and passwords so you can go into

24  someone's account like a Yahoo or Google and use that

25  account for your benefit, right?

Mr. Tiberiu Danet - Cross Cont'd

1          MR. BROWN:  Objection.

2          THE COURT:  Overruled.  You may answer that,

3   sir.

4   A.    No.  It was not like going personally into

5   somebody's account.  Those accounts were part of a

6   database.  They were just information, data.

7   Q.    What value do user names have for you, the user

8   names and passwords, if you are not using them to get

9   into accounts?

10  A.    You are using them to get into accounts in a

11  sense.

12  Q.    Does Pidgin even require a user name and password?

13  A.    Yes.

14  Q.    Does Yahoo require a user name and password?

15  A.    Yes.

16  Q.    Does Jabber require a user name and password?

17  A.    Yes.  Jabber is just a protocol.

18  Q.    Just so that I am clear, you never saw a specific

19  computer infected with anything from where you were,

20  right?

21          MR. BROWN:  Objection.

22          THE COURT:  Overruled.  Can you answer?

23  A.    I don't understand.

24  Q.    Did you ever see a specific computer like this or a

25  computer over here, did you ever see yourself a specific

Mr. Tiberiu Danet - Cross Cont'd

1    computer anywhere in the United States infected?

2    A.    Physically, no.

3    Q.    What's a web history or a cookie?  Tell the ladies

4    and gentlemen of the jury what those are.

5    A.    The web history is the history of web pages accessed

6    by somebody.

7    Q.    And how do cookies help that?

8    A.    It is a strange question.  They don't help.  It is

9    something else.

10   Q.    All right.  What do they do?  What do cookies

11   do?

12   A.    They store information, for example, when you are

13   logged into a website.  That way it knows when you are

14   coming back that you are the same person because that is

15   stored in a cookie.

16   Q.    And the cookies are on your computer, right, the guy

17   that is logged in?

18   A.    No.  The cookies are on the person's computer that

19   is using the computer.

20   Q.    So if I log into a Yahoo or Google account or any

21   website where I bought something, that website knows it

22   is the same computer because that website put cookies on

23   that computer, right?

24   A.    Yes.

25   Q.    And to the best of your understanding, it did it

Mr. Tiberiu Danet - Cross Cont'd

1    without permission, right?

2    A.    Actually, I don't know the law in the United States,

3    but in the European Union, all the websites display a

4    wording about that.

5    Q.    Okay.  Now, can you put up Exhibit 1852?  Do you

6    remember being shown this exhibit yesterday, sir?

7    A.    Yes.

8    Q.    Was this one of the exhibits they showed you before

9    you took the witness stand?

10   A.    There were many e-mail tables containing e-mails

11   such as this.

12                So I can't remember if this was one of them

13   or not.

14   Q.    Okay.  Mr. Danet, do you remember seeing this

15   exhibit yesterday, sir?

16   A.    Yes.

17   Q.    Do you remember seeing it before you sat down on the

18   witness stand yesterday?

19   A.    Not particularly.

20   Q.    So what you are telling these folks here, for the

21   first time in your life when you saw this exhibit was

22   yesterday when it was on the screen?

23   A.    No.  I said I did not remember if I saw it before or

24   not.  That was your question.

25   Q.    Okay.  All right.  Now, what do you think this

Mr. Tiberiu Danet – Cross Cont'd

1  exhibit is?

2  A.    It is a list of e-mails sent and probably received

3  by the account amightysa@gmail that I was using.

4  Q.    Do you know where they are from, how they came

5  onto this exhibit, this information?  Do you have any

6  idea?

7  A.    Not particularly, but I can only suppose.  I can

8  only —

9  Q.    Okay.  Now, the files that are referenced in some of

10  these communications, are they all encrypted?

11  A.    Most of them are, but I don't know if all are

12  encrypted.  I would have to check all the pages to see if

13  they are encrypted.  Usually when they are encrypted,

14  they have a certain extension.

15  Q.    Very well.  Can you pull up Exhibit 367?  Do you see

16  Exhibit 367?

17  A.    Yes.

18  Q.    Do you remember being shown this yesterday?

19  A.    Yes.

20  Q.    Same questions before you have sat down on that

21  witness stand yesterday, had you ever seen this document

22  before?

23  A.    You mean all 538 pages of it?  No.

24  Q.    The document itself?

25  A.    What — what do you mean by "seeing the document"?

Mr. Tiberiu Danet - Cross Cont'd

1    I have seen a lot of tables and documents.  I haven't

2    checked page by page each page.  There is a list of chat

3    messages, yes.

4    Q.   Do you even know what this is?

5    A.   It is a list of messages between me, I suppose, and

6    I would have to check the pages again and other people on

7    the Jabber account from my house.

8    Q.   Do you even know how it was put together?  Do you

9    have any idea?

10   A.   Yes.  I can see right at the top it is from the

11   server that was obtained from my house.

12   Q.   Okay.  How do you know that?  How do you know how it

13   was put together?

14   A.   Because it says in the beginning, asks you like file

15   name server .db, and that's a database.

16   Q.   So it is your testimony, sir, that the — I think

17   there is 13 columns — that that was put together by the

18   server?

19   A.   Yes.

20   Q.   Okay.  Showing you Exhibit 2203, prior to your

21   testimony yesterday, sir, before you sat down on

22   that witness stand, had you ever seen that document

23   before?

24   A.   Yes.  I believe this is part of the discovery.

25   Q.   Okay.  And this was a document that the Government

Mr. Tiberiu Danet - Cross Cont'd

1    showed you before you sat down, right?

2    A.   It was part of the discovery.  All the Defendants

3    seen it, yes.

4    Q.   Here is my question to you, Mr. Danet.  Let's not

5    get tricky.  All right?

6              MR. BROWN:  Objection.

7              THE COURT:  Sustained.

8    BY MR. O'SHEA:

9    Q.   Did you see this document marked as Exhibit 2203

10   when you met with the United States Attorneys prior to

11   your testimony yesterday, sir?  Yes or no.

12   A.   I have seen so many documents that it is hard for me

13   to say I seen this one.  You can say yes, I probably seen

14   it.

15   Q.   In your entire life, sir, have you ever had to give

16   an oath before for anything?

17   A.   I don't remember.  Probably not.

18   Q.   Okay.  Do you know that the oath that you took

19   here in this case requires you to be unconditionally

20   honest?

21   A.   Yes.

22   Q.   Do you even remember what the words of the oath

23   were, sir?

24             MR. BROWN:  Objection.

25             THE COURT:  Sustained.

1450

Mr. Tiberiu Danet — Redirect

1      MR. O'SHEA:  Nothing further, your Honor.

2      THE COURT:  Any redirect?

3      MR. BROWN:  Very briefly.  Thank you, your

4  Honor.

5                  REDIRECT EXAMINATION

6  BY MR. BROWN:

7  Q.   Do you recall testifying with Mr. Goldberg about a

8  root account, user name and password?

9  A.   Yes.

10 Q.   Do you know who had the root account, user name and

11 password?

12 A.   Like I said before yesterday, a couple of people

13 probably, four that I knew of.

14 Q.   And who were those four?

15 A.   I think I mentioned yesterday, Nicolescu, me,

16 Miclaus sometimes, and Linx.

17 Q.   And do you recall on Mr. O'Shea's cross examination

18 he asked you if you had ever physically seen an infected

19 computer in the U.S.?

20 A.   No.

21 Q.   How did you know there were computers infected with

22 Bayrob Trojan in the United States?

23                  MR. O'SHEA:  Objection.

24                  THE COURT:  Overruled.

25 A.   Excuse me.  Because it showed whenever there was an

Mr. Tiberiu Danet - Redirect

1    investigated computer, you could see its location based

2    on its IP.

3    Q.    And where would you see that?

4    A.    There were services online.  You put in an IP and

5    tells you where it is from.

6    Q.    But where would you see where the infected computer

7    was talking to?  Was that on the command and control?

8    A.    Yes.  It was in the list yesterday shown yesterday.

9    There was like — shown how every computer had a column

10   of state, city.

11   Q.    Would it show up in the data bases of the command

12   and control servers?

13   A.    Yes.  It was part of the Trojan.

14   Q.    Did it then become part of the Trojan, part of the

15   botnet?

16                MR. GOLDBERG:  Objection.

17                THE COURT:  Sustained.

18   BY MR. BROWN:

19   Q.    Did the infected computer become part of the Bayrob

20   botnet?

21   A.    Yes.  That's — the botnet compromises the infected

22   computers.

23                MR. BROWN:  Thank you.  Nothing further,

24   your Honor.

25                THE COURT:  Based on those questions,

Mr. Tiberiu Danet - Recross

1    Mr. Goldberg?

2                  MR. GOLDBERG:  Thank you.

3                  RECROSS EXAMINATION

4    BY MR. GOLDBERG:

5    Q.    The root account, you said four people had it.  You

6    said your brother didn't have the root account log-in

7    password?

8    A.    Like I said, I don't know if towards the end; I

9    know Miclaus didn't have it.  So it just depends on

10   time.

11   Q.    Okay.  So you don't know whether your brother had it

12   or not?

13   A.    Yes.  I don't know.

14   Q.    Okay.

15   A.    I don't know if a lot of people had it, too.

16   Q.    But your brother may have had it?

17   A.    Yes, may have had.

18   Q.    And you mentioned — there is a name on Exhibit

19   2203, which you were referring to with a root account, it

20   is L-i-n-x.  Is that short for something?

21   A.    No.  I don't know.

22   Q.    Do you know who that is?

23   A.    Yes.  It is Dima.

24   Q.    And have you ever met him?

25   A.    Once.

Mr. Tiberiu Danet - Recross

1   Q.   And you are saying that he had it, definitely had

2   the password and log-in?

3   A.   At a certain point, yes.

4   Q.   And that's in addition to the other three or four

5   people, or was he included?

6   A.   He is included in the three or four people.

7   Q.   But your brother is not?

8   A.   Yes.  I don't know if he is or isn't.

9   Q.   Well, you didn't mention your brother's name

10  yesterday as one of the people.

11  A.   No, I hadn't.

12  Q.   But today you are saying he may have had the

13  password?

14  A.   Yesterday I gave a list of the people that I knew

15  had the password.

16  Q.   Right.  And today you said your brother had it,

17  too?

18  A.   Yes, may have had.  Again, there are people that

19  have probably had it, and I don't even know their names

20  or nicknames or anything.

21  Q.   There could be an unlimited number of people that

22  had the passwords and log-ins, correct?

23  A.   I wouldn't say unlimited, but, yes.

24  Q.   Fifty, right?

25            MR. BROWN:  Object.

Mr. Tiberiu Danet - Recross

1    A.    50, no.

2    Q.    All right.  So how many?

3    A.    As many as Miclaus knew.

4    Q.    Or you, you had them, right?

5    A.    Yes.

6    Q.    And you could have given them to somebody,

7    right?

8    A.    I could have, yes.

9    Q.    And if your brother had them, he could have given

10   them to somebody.

11   A.    Yes.

12   Q.    And everybody else whose name is on here, not just

13   Mr. Nicolescu?

14   A.    Yes.

15   Q.    I know that's what you want to say because that's

16   what your job is here.

17             MR. BROWN:  Objection.

18             THE COURT:  Sustained.  Folks, disregard the

19   last statement.

20   BY MR. GOLDBERG:

21   Q.    But anybody could have given these passwords to

22   anybody if they wanted to, right?

23             MR. BROWN:  Objection.

24   A.    Yes, as long as they had somebody involved in the

25   scheme, as long as they wanted someone else to be

Mr. Tiberiu Danet - Recross Cont'd

1    involved in the scheme.

2              MR. GOLDBERG:  Okay.  Thank you.

3              THE COURT:  Recross, Mr. O'Shea?

4              RECROSS EXAMINATION CONTINUED

5    BY MR. O'SHEA:

6    Q.   As you sit here today, sir, at 11:37 in Cleveland,

7    Ohio, can you name a single computer in the United States

8    that was infected by this so-called virus, a single

9    computer by name, city, street, address, anything?

10   A.   What do you mean name of a computer?  Computer

11   doesn't have a name.  How am I going to name a

12   computer?

13   Q.   Name, address, a person who owned it.  As you sit

14   there right now without getting help from any

15   demonstrative exhibits or charts, as you sit there from

16   your own memory, can you name one?

17   A.   Obviously not.

18             MR. O'SHEA:  Thank you.  Nothing further.

19             MR. BROWN:  Nothing further.

20             THE COURT:  Any redirect?

21             MR. BROWN:  No.

22             THE COURT:  Folks, we are going to take our

23   luncheon recess, and I know it is a little bit early, but

24   please be downstairs at 12:45.  We will call for you at

25   that time.  Remember the admonitions, folks.  All rise

Mr. Tiberiu Danet – Recross Cont'd

1    for the jury.

2                     (Jury out.)

Mr. Vaduva — Direct

1      THE COURT:  We are in recess folks.

2      (Luncheon recess.)

3              – – – – –

4

5

6

7

8

9

10     AFTERNOON SESSION

11     THE COURT:  Please be seated.  Please call

12  your next witness.

13     MR. LEVINE:  The United States of America

14  calls Bogdan Vaduva.

15     THE COURT:  Please step up to the podium,

16  sir.  And please raise your right hand.

17             BOGDAN D. VADUVA

18  called as a witness by and on behalf of the Government,

19  being first duly sworn, was examined and testified

20  as follows:

21          DIRECT EXAMINATION

22  BY MR. LEVINE:

23  Q.  Good afternoon.

24  A.  Good afternoon.

25  Q.  Mr. Vaduva, could you please state and spell your

Mr. Vaduva — Direct

1    last name for the court reporter.

2    A.    Vaduva Bogdan Daniel and V-a-d-u-v-a, B-o-g-d-a-n,

3    and Daniel is like in the United States, D-a-n-i-e-l.

4    Q.    Okay.  So is Vaduva your family name?

5    A.    Yes.  Vaduva is my family name.

6    Q.    And your first name or given name?

7    A.    Would be Bogdan and Daniel my middle one.  In

8    Romania, we start with the family name.

9    Q.    Okay.  And Mr. Vaduva, were you employed by the

10   Romanian National Police or the RNP at the time the

11   Defendants were arrested?

12   A.    Yes.

13   Q.    And did you personally participate in the search of

14   some of the or two of the residents associated with

15   Radu Miclaus?

16   A.    Yes.

17   Q.    I want to talk to you today about your role in

18   those searches, but first, I want to go through your

19   background.

20            What is your highest level of education?

21   A.    Master's Degree.

22   Q.    Where did you get a Master's Degree?

23   A.    In the Romanian National Police Academy.

24   Q.    Okay.  So before going to the Romanian National

25   Police Academy, what did you do before that?  What

Mr. Vaduva — Direct

1    education wise, what did you do before that?

2    A.    Before the Academy, it is the high school.

3    Q.    And what did you study in high school?

4    A.    In high school:  Mathematics, informatics, and

5    intensive English language.

6    Q.    What is informatics?

7    A.    IT let's say, IT technology.

8    Q.    IT technology?

9    A.    Yes.

10   Q.    And you said you attended the police academy after

11   that?

12   A.    Yes.

13   Q.    How many years did you attend the police academy?

14   A.    Four.

15   Q.    And what year did you graduate from the police

16   academy?

17   A.    2010.

18   Q.    And after 2010, what did you do?

19   A.    I started working, it was the unit called the

20   Bucharest Brigade for Combating Organized Crime.

21   Q.    Okay.  And was that a unit within the Romanian

22   National Police?

23   A.    Yes, that is correct.

24   Q.    And within the Bucharest Brigade for Combating

25   Organized Crime, were you with a particular unit?

Mr. Vaduva — Direct

1    A.    Yes.  It was a smaller unit within — that was

2    combating cyber crime, in particular, car frauds and

3    skimmings.

4    Q.    And what is car fraud and skimming?

5    A.    Basically, we were investigating all the crimes

6    related to credit cards and fraudulent payment, stolen

7    items and credit cards, payment online, schemings, which

8    means cloning the credit card and obtaining the pin

9    number and withdraw the cash from ATMs.

10   Q.    Are there different ways of using a credit card that

11   doesn't belong to someone?

12   A.    Yes, that is correct.

13   Q.    And how many years did you work in the Bucharest

14   Brigade that you described here?

15   A.    Five years.

16   Q.    And what did you do after you worked with the cyber

17   crime unit in the Bucharest Brigade?

18   A.    I moved to the directory for combating organized

19   crime.  That was the unit covering the whole country.  It

20   was nationwide as area of competence.

21   Q.    Okay.  And within the directorate, were you in a

22   particular unit there?

23   A.    Also, in the cyber crime unit, but to the unit that

24   was in charge of investigating the, let's say, hackings

25   and computer intrusion type of crimes.

Mr. Vaduva - Direct

1   Q.   Okay.  And was this another unit within the Romanian
2   National Police?
3   A.   Yes, that is correct.
4   Q.   When did you start at the directorate or national
5   level?
6   A.   In 2015 and until December 2016 so about a
7   year-and-a-half.  It was the summer of 2015.
8   Q.   Okay.  And what type of crimes did you investigate
9   with the cyber crime unit in the directorate office
10  within the RNP?
11  A.   Type of crimes that would include computer attacks,
12  computer hackings, website attacks, botnets, all sorts
13  of crimes related to hacking, let's say, in a general
14  term.
15  Q.   And how long did you say you worked for the
16  directorate?
17  A.   One year-and-a-half.
18  Q.   Where did you go after working for the directorate?
19  A.   I applied for a position within the United States
20  Embassy in Romania for the Drug Enforcement
21  Administration.
22  Q.   Was that the DEA?
23  A.   The DEA.
24  Q.   And is that where you presently work?
25  A.   Yes, that is correct.  There is an office in

Mr. Vaduva — Direct

1    Romania.

2    Q.    So did you travel from Romania to travel testify —

3    to testify here today?

4    A.    Yes.

5    Q.    And how long have you been with the DEA with the

6    U.S. Embassy in Romania?

7    A.    Since December 2016.

8    Q.    Okay.  And what is your title with the DEA?

9    A.    Criminal investigator.

10   Q.    And can you give me an example of the type of

11   cases you work on now as a criminal investigator with the

12   DEA?

13   A.    The first case I worked within that office was,

14   let's say, a combination between cyber crime and drug

15   crimes?

16                 And we targeted twelve websites that were

17   selling online medication, the ones that are on schedule

18   tables in Romania and also in the United States to

19   include Xanax, Valium, Diazapam, codeine and most of them

20   being opioids that drug trafficking organizations in

21   Romania was diverting from Romanian pharmacies,

22   warehouses, and distributors and then selling them online

23   via postal services, let's say, and ending up more than

24   80 percent of them in the United States but also all over

25   the world?

Mr. Vaduva — Direct

1          But the majority of the crimes were in the

2   United States.  There were 75,000 packages between 2012

3   and 2017 that were sent in the United States.

4   Q.   Thank you.  Now, let's talk about searches of homes

5   and businesses and that kind of thing.

6          As part of your work, when you were with the

7   Romanian National Police, did you search homes and

8   apartments and businesses?

9   A.   Yes.

10  Q.   Roughly how many physical searches of residences or

11  businesses have you participated in?

12  A.   I would say hundreds.

13  Q.   Okay.  Now, in Romania to do a physical search of,

14  say, a residence do you need to get a court order before

15  conducting the search?

16  A.   Yes, that is correct.

17  Q.   And I would like to bring up just for us — and I

18  will bring the witness a physical copy of the

19  Government's Exhibit 1410, just the first page of

20  Government's Exhibit 1410 — what is Government's Exhibit

21  1410?

22  A.   This is a warrant that was approved, granted by a

23  Judge in the Court in Bucharest to conduct a search for

24  — at a certain location, assigned to a certain target,

25  let's say.

Mr. Vaduva - Direct

1    Q.   Okay.  And what location was this search warrant
2    for?
3    A.   This was in Bucharest.  In the sector 5, there is
4    six sectors in Bucharest on the street, Tiparnitei
5    number, 31st A being associated with Miclaus Radu Bogdan.
6    Q.   Can you spell the name of the address?
7    A.   T-i-p-a-r-n-i-t-e-i.
8    Q.   Do I have it correct, that that's T as in Tom?
9    A.   Yes.  In English, you don't have the small comma
10   let's say underneath.  It's a tsa not a ga, not a T.
11   Q.   Okay.
12   A.   It would be hard to explain it; don't have it.
13   Q.   All right.  If I could spell it and you could
14   confirm that I spelled it correctly for the court
15   reporter.  Is it T-i-p-a-r-n-i-t-e-i?
16   A.   Yes.  That is correct.
17   Q.   Okay.  And then there is a number 31 A.  Is that
18   correct?
19   A.   Yes.
20   Q.   And you said that that address is in what city?
21   A.   In Bucharest.
22   Q.   And Bucharest is the Capitol?
23   A.   Capitol of Romania.
24   Q.   Now, were you involved in obtaining that Court
25   order?

Mr. Vaduva – Direct

1    A.    Yes.

2    Q.    In order to obtain that Court order, did you have to

3    confirm the Romanian identification number and the birth

4    date for Radu Bogdan Miclaus?

5    A.    Yes.

6    Q.    And did you confirm Radu Bogdan Miclaus's birthday?

7    A.    Yes.

8    Q.    And what was it?

9              MR. O'SHEA:  Objection.

10             THE COURT:  Overruled.

11   A.    It was 5th of January, 1982.  We have the date of

12   births also, day, month, year, not month, day, year in

13   Romania.

14   Q.    Thank you, Mr. Vaduva.

15             Now, in order to obtain the Court order, the

16   search warrant, did you first physically visit that

17   address Tiparnitei, number 31 A?

18   A.    Yes.

19   Q.    All right.  I would like to bring up at this time

20   for the jury Government's Exhibit 1411.  And what is

21   Government's Exhibit 1411?

22   A.    House that we are talking about.

23   Q.    Okay.  Is this the house at Tiparnitei, number

24   31 A?

25   A.    Yes.

Mr. Vaduva - Direct

1    Q.    And it looks like there is a typo on the actual

2    exhibit.  Is the address spelled correctly at the

3    top?

4    A.    No.

5    Q.    Okay.  Is the correct address as you just provided

6    it to us?

7    A.    Should be an R and then N but instead it was

8    an M.

9    Q.    Okay.  Now, is this a fair and accurate photograph

10   of the way the house at Tiparnitei, number 31 A, appeared

11   to be when you visited it?

12   A.    Yes.  This is how I remember it.

13   Q.    Could we look at page 2 of this exhibit?  What does

14   page 2 of this exhibit show?

15   A.    It should be the 31st, which is to the left, and

16   then the number on the fence is not applied.  So it

17   should be 31st A, the one to the right, and it is between

18   the number 31st and the number 33.

19   Q.    But this is on the Tiparnitei street?

20   A.    Yes, the apartment on the street.

21   Q.    So this is the number right next to the house?

22   A.    Yes.

23   Q.    What does it mean when a street address has an

24   A after it?

25   A.    It can have letters from A to even more when

Mr. Vaduva - Direct

1    basically the lot numbers, the houses initially were,

2    let's say — so there is even numbers and uneven numbers.

3    The even numbers are on the right side as you enter the

4    street, and the uneven numbers are on the left side as

5    you — from — from the downtown all the way to the

6    peripheral area of the city.

7                So if initially there were houses at lot

8    numbers 29, 31 and 33 but then in between a portion of

9    that land was sold to somebody else and that somebody

10   else built a house, they would be assigned with the

11   31st A because it was in between, and initially, it was

12   not counted.

13   Q.   Got it.

14   A.   And you can get a lot of numbers when there is going

15   to be an entrance into that lot number and it is going to

16   be multiple houses.

17   Q.   Understood.  Thank you.

18                Can we look at the third page of this

19   exhibit, and if you could zoom in on the photograph, the

20   whole photograph.  Okay.  What is this?

21   A.   This is — looks like Tiparnitei Street, No. 3 as it

22   is written on the fence.

23   Q.   Okay.  And fourth photograph, please?

24                (Pause.)

25   Q.   (Continuing)  All right.  When you physically

Mr. Vaduva — Direct

1   visited Tiparnitei 31 A, prior to getting the search

2   warrant, what, if anything, did you see at that address?

3   A.   I saw — I remember I saw the motorcycle inside and

4   parked inside over the fence, let's say, in the

5   courtyard.

6   Q.   On the other side of the fence?

7   A.   A motorcycle.

8   Q.   Pardon?

9   A.   Motor bike.

10   Q.   Okay.  You said it was on the other side of the

11   fence?

12   A.   Yes.  Inside of the courtyard.

13   Q.   How were you able to see the motorcycle if it was on

14   the other side of the fence?

15   A.   Over the fence.

16   Q.   And could you describe this motorcycle?

17   A.   I remember it was a sports type of bike, not a

18   chopper but not a super sport, and I remember it being

19   dark colored.  I don't remember the make, but I remember

20   I searched the license plates to confirm the owner.

21   Q.   All right.  And who was the motorcycle registered

22   to?

23   A.   To Radu Miclaus.

24   Q.   That's Radu Bogdan Miclaus?

25   A.   Yes.

Mr. Vaduva — Direct

1   Q.   On September 18, 2016, were you part of the team

2   that conducted a search on Tiparnitei 31 A?

3   A.   Yes.

4   Q.   And was anyone from the residence present during

5   that search?

6   A.   Yes.  It was only the father of Radu Bogdan Miclaus.

7   Q.   Miclaus' father?

8   A.   Yes.

9   Q.   And was there anyone else present at the residence

10  when you got there?

11  A.   No, just the father.

12  Q.   Did you seize any items from Tiparnitei, number

13  31 A?

14  A.   Yes.  I remember I did.

15  Q.   And what did you do with the items that you seized

16  from Tiparnitei 31 A?

17  A.   The procedure all the time is you basically put them

18  in plastic bags, depending on the size of the items and

19  seal them, and after that, we took them to the

20  prosecutor's office that was in charge of the

21  operation.

22  Q.   Okay.  So you brought them to the prosecutor's

23  office?

24  A.   Yes, that is correct.

25  Q.   All right.  Now, I would like to show you what has

Mr. Vaduva — Direct

1    been marked as Government's Exhibit 1413, and I think we

2    can show this to the jury as well.

3              And what is Government's Exhibit 1413?

4    A.   This is one of the entrances to the apartment

5    building where Radu Bogdan Miclaus was also living.

6    Q.   And was this the next location you went to on

7    September 28, 2016?

8    A.   Yes, that is correct.

9    Q.   Okay.  And was the address here U-v-e-r-t-u-r-i-i?

10   A.   Yes.

11   Q.   How is that pronounced?

12   A.   Uverturii.

13   Q.   Uverturii?

14   A.   Uverturii.

15   Q.   And what was the full address?

16   A.   The full address was the Boulevard Uverturii No. 4,

17   apartment building C3, entrance No. 4, floor 4, which

18   would be your fifth floor because we don't count the

19   ground floor, apartment 70, sector 6.

20   Q.   Okay.  And is that also in Bucharest, Romania?

21   A.   Yes.

22   Q.   Can we look at the second page?

23              And what do we see here on the second page

24   of Government's Exhibit —

25   A.   This is a larger picture of the apartment building.

Mr. Vaduva – Direct

1    Q.    And can we look at the third page?

2    A.    This is still basically this entrance No. 4, was at

3    the end of the apartment building, but then, to the left,

4    there were three other entrances.  So it goes more to the

5    left of this apartment building.

6    Q.    And what does this photograph depict?

7    A.    I'm sorry.  I didn't —

8    Q.    What does this photograph depict?  What do we see in

9    this photograph?

10   A.    The floor No. 4, so the fifth floor, as you would

11   number it, the apartment was located.

12   Q.    Okay.  Is there another one on this one?

13   A.    So it was the last floor.

14   Q.    Okay.  And what does this last photograph

15   show?

16   A.    To the right, it shows the No. 4 assigned to the

17   street number, and to the left, there is a plaque with

18   the apartment building number, which is C3 and, again,

19   the street number and the Boulevard Uverturii 3, No. 4,

20   and in Romania, in general, you would see it doesn't —

21   you can't quite distinguish — but there is the No. 4

22   entrance, and they put in the apartment number.

23            So it would be, let's say, from apartment

24   No. 40 to apartment No. 60.  So you would know what

25   numbering of the apartments would be inside.

Mr. Vaduva – Direct

1    Q.    Okay.  And do all the photographs we have looked at

2    fairly and accurately depict the locations that you

3    searched in this case in 2016?

4    A.    Yes.

5    Q.    Okay.  When you arrived at the Uverturii building

6    entrance, was the search already in progress?

7    A.    No.

8    Q.    What was happening at the Uverturii building No. 4

9    entrance here when you arrived?

10   A.    Two other colleagues, two other police officers,

11   were waiting for Radu Miclaus Bogdan to be brought at the

12   location because he was stopped in traffic as I remember

13   in a county somewhere in the middle of Romania.

14              He was coming from the West, let's say, of

15   Romania, and normally, this would be the procedure.  If

16   you don't have the suspect or somebody from the family

17   inside the house and we know that, we won't break and use

18   force to put the door down and do it without their

19   presence.

20              So basically, we waited for him, those two

21   colleagues waited for him, and I joined them because at

22   that time both of them were not from any — from the

23   cyber unit, and they sent me to basically help and have

24   the knowledge to be present there as the cyber police

25   officer.

Mr. Vaduva — Direct

1    Q.    So that's standard procedure in Romania, to wait for

2    the person whose house you are searching or their family

3    before you do a search?

4    A.    It is standard, but it depends on the type of

5    crime that is committed, and any of the goods or

6    things that are inside may disappear, or somebody else

7    would come or something would danger collecting the

8    evidence, but in this case, it wasn't so.  So we were

9    okay to wait.

10   Q.    And roughly how long did you wait from for Miclaus

11   to arrive from the time you got there?

12   A.    I remember it was afternoon, I think, after 3:00

13   p.m.

14   Q.    Do you recall roughly, was it hours, half hour?

15   A.    Normally, in Romania, we enter at 6:00 a.m. for all

16   of the search warrants.  The Romanian penal codes state

17   you can enter for a search warrant between 6:00 a.m. and

18   8 p.m., and we go as early as possible?

19               So basically, if we have all of them in

20   house, not awake, so all of the search warrants in the

21   case started at 6:00.  So we waited quite a lot until

22   3:00 p.m. as you can imagine for him to come in from

23   Bucharest and participate in the search warrant.

24   Q.    Okay.  So you said you didn't start until around

25   3:00 p.m.?

Mr. Vaduva - Direct

1  A.    Yes.

2  Q.    But did Miclaus eventually arrive?

3  A.    Yes.

4  Q.    And when Miclaus arrived, was he given an

5  opportunity to contact a lawyer or a trusted

6  person?

7  A.    Yes.  That's also standard procedure according to

8  the Romanian penal code.

9  Q.    What is a trusted person?

10  A.    That's exactly how it is named, and basically, he

11  can call a friend; he can call a neighbor.  He can call

12  somebody he knows and would feel comfortable with

13  participating in case, let's say, he was never involved

14  in such a matters or if he is anxious, let's say, and

15  wants somebody to be present with him during the search

16  warrant.

17  Q.    So did you then after 3:00 p.m. wait for a lawyer or

18  trusted person to arrive?

19  A.    The penal code also says in case of a trusted

20  person, it doesn't say the amount of time you need to

21  wait before the person comes, but in the case of a

22  lawyer, you need to wait two hours.

23              So if the suspect wants to have a lawyer

24  present at the location, he will make the call or the

25  police officer would make the call.  You would note down

Mr. Vaduva - Direct

1    exactly the hour the call was made and wait two hours.

2    If those two hours come, you can start.

3    Q.    In this instance, did you wait for a lawyer or

4    trusted person to arrive?

5    A.    No.  It was not the case because Radu Miclaus Bogdan

6    waived this right and said he is comfortable to be just

7    himself during the search warrant.

8    Q.    Okay.  And how did you get in to the Uverturii

9    apartment?

10   A.    With his help, with the keys that he had.

11   Q.    So Radu Miclaus had the keys to the apartment?

12   A.    Yes.

13   Q.    And he opened the door?

14   A.    Yes.

15   Q.    Who was present in the Uverturii apartment when the

16   search began?

17   A.    Myself, the two other colleagues, and Radu Miclaus

18   Bogdan.

19   Q.    Okay.  And anybody else besides yourself, Miclaus,

20   and the two other colleagues?

21   A.    No.

22   Q.    What rooms were in the Uverturii apartment?

23   A.    It was an apartment composed of three rooms.  That's

24   how we count them, namely a living room and two bedrooms,

25   and of course, the hallway, bathroom, and kitchen.

Mr. Vaduva - Direct

1   Q.   And was Miclaus present in each room when that room

2   was searched?

3   A.   Yes.  That's also standard procedure.

4   Q.   Did you seize any digital devices like hard drives,

5   phones, routers from the Uverturii apartment?

6   A.   Yes.

7   Q.   Okay.  And last night did you meet with him with me

8   and did you have an opportunity to review the digital

9   devices that are on the table in front of you to confirm

10   that they were the devices you seized from the Uverturii

11   apartment?

12   A.   Yes.

13   Q.   And are these the devices that you seized from the

14   Uverturii apartment?

15   A.   Yes.

16   Q.   How were you able to tell that these were

17   the devices that you seized from the Uverturii

18   apartment?

19   A.   By remembering the looks of them, first of all, and

20   also by checking the serial numbers on the report or

21   inventory sheet that was written with that occasion, with

22   the actual serial numbers on the devices.

23   Q.   So last night you compared serial numbers in your

24   report to the serial numbers on the actual devices?

25   A.   Yes.

Mr. Vaduva — Direct

1   Q.    And did they match?

2   A.    Yes, all of them.

3   Q.    Okay.  Now, I want to go through some of these or

4   all of these with you.  And I would like to hand you what

5   has been previously marked as Government's Exhibit 2424,

6   Government's Exhibit 2341, and Government's Exhibit 2317.

7                What are these three exhibits in front of

8   you?

9   A.    The three hard drives that were extracted from the

10  PC desktop computer.

11  Q.    Okay.  Now, I am going to ask you about everything

12  you just said, but how large is each one of these hard

13  drives?

14  A.    Each of them has two terabyte for 2000 gigabytes, so

15  six terabytes or 6,000 gigabytes in total.

16  Q.    This is a total of six terabytes of hard drive

17  space?

18  A.    Yes.

19  Q.    And do you know how large a terabyte is?

20  A.    Yes.  It is quite large.

21  Q.    Quite large.  Can you be more specific?  In paper,

22  how many pages of paper would a terabyte be?

23  A.    Hundreds of thousands, but if we are talking movies,

24  it would be even more space than documents.  Documents

25  you could put quite a lot.

Mr. Vaduva – Direct

1    Q.    With documents like a Word document —

2    A.    Yes.  PDFs or —

3    Q.    How many documents could you get on a terabyte hard

4    drive?

5    A.    I don't know, maybe couple hundred thousand.

6    Q.    Did you find these hard drives out like they are now

7    or in a computer?

8    A.    No.  They were in the computer.

9    Q.    All right.  And can you describe the computer that

10   they were in?

11   A.    I remember that the central unit as we call it was a

12   black one, and it was sitting next to a desk, and it was

13   in the bedroom.

14   Q.    Okay.  You called it a central unit.  Was this a

15   laptop computer or a desktop?

16   A.    No, desktop, in the tower of the desktop.

17   Q.    These were in the tower of the desktop

18   computer?

19   A.    Yes.

20   Q.    And you said the computer, where was the computer

21   located?

22   A.    In one of the two bedrooms.

23   Q.    And was there a monitor attached to this

24   tower?

25   A.    Yes.

Mr. Vaduva — Direct

1    Q.    And was there a keyboard attached?

2    A.    Yes.

3    Q.    And was there a mouse attached?

4    A.    Yes.

5    Q.    And was the computer plugged in?

6    A.    No.

7    Q.    It was not plugged in at the time?

8    A.    No.

9    Q.    Did you seize the entire computer or just the hard

10   drive?

11   A.    Just the hard drives.

12   Q.    Why did you seize just the hard drives?

13   A.    First of all, because the computer was shut down, we

14   didn't — there is also a procedure that basically if a

15   computer is not shut down, we would call the colleagues

16   from the forensics unit and try to get the live RAM

17   acquisition, which would be the other memory of the

18   computer and try to get all the data from that RAM, but

19   that only is available if the computer is open.

20          If it is shut down, that erases every time

21   you read through the computer, so it wasn't essential.

22   The only storageable data that would have been usable to

23   the case as evidence would have been the hard drives

24   themselves.

25          And secondly, space wise, because it was

Mr. Vaduva − Direct

1    quite a large desktop computer, and as I previously said,

2    we needed to seal all of them in plastic bags, and we

3    also thought at that moment that being not a Romanian

4    case, being a case from the United States, it would have

5    had to be shipped as a response to the M−LAT request.

6    Q.   Okay.  So there was a tower.

7               All the data was — was all the data

8    available in that tower in these three hard drives?

9    A.   All the useable data.

10   Q.   What do you mean "all the usable."  Was there any

11   data not usable in the tower?

12   A.   Yes.  Some don't contain data at all.

13   Q.   So there was no other information in the tower

14   itself that you didn't seize?

15   A.   No.

16   Q.   Okay.  I want to show you what has previously been

17   marked as Government's Exhibit 255.  What is Government's

18   Exhibit 255?

19   A.   A Samsung mobile phone, a galaxy S3 model.

20   Q.   And where did you find Government's Exhibit 255?

21   A.   In the same room, in the same bedroom.  I think it

22   was in one of the drawers in the desk.

23   Q.   Okay.  And now, I would like to show you what

24   has previously been marked as Government's Exhibit

25   1415.

Mr. Vaduva – Direct

1          MR. LEVINE:  Let the record reflect we are

2    making our best efforts to protect the stand from

3    scratching.

4          THE COURT:  Very happy to hear that.

5    BY MR. LEVINE:

6    Q.    I am showing you what has previously been marked as

7    Government's Exhibit 1415.  What is Government's Exhibit

8    1415?

9    A.    This would be a wireless router that is supposed to

10   have three original antennas.  Right now the middle has

11   only the original, and to the right, there is an extra

12   one, and to the left of the cable, there is another

13   antenna that is basically amplifying the strength of the

14   router.

15   Q.    Can you explain to the jury where did you find this

16   exhibit?

17   A.    This was also in the same bedroom but it was pretty

18   strange because it was hanging at the window curtain with

19   the clothes hanging pins on the curtain so up next to the

20   window.

21   Q.    It was pressed up against the window?

22   A.    No.  Basically, it was the window, the curtain, and

23   it was tied to the curtain.

24   Q.    Tied to the inside of the curtain?

25   A.    Outside.  You would see it, but the curtain was

Mr. Vaduva — Direct

1   similar to what we have here, transparent ones.

2   Q.    So you would see it from the inside of the

3   apartment?

4   A.    Yes.

5   Q.    It was on the inside of the apartment, and then was

6   the curtain, and then was the glass?

7   A.    Yes.

8   Q.    Okay.  And you said what was it that was holding it

9   in place against the curtain?

10  A.    Pins that you use to hang the clothes to dry.

11  Q.    So clothes pins?

12  A.    Clothes pins, yeah.

13  Q.    And roughly how many searches did you say you

14  conducted in Romania?

15              MR. GOLDBERG:  Objection.

16              THE COURT:  Overruled.  You may answer.

17  A.    Hundreds.

18  Q.    And did you ever see an antenna like this during any

19  of the other searches you conducted?

20              MR. GOLDBERG:  Objection.

21              THE COURT:  Overruled.

22              THE WITNESS:  No.

23  BY MR. LEVINE:

24  Q.    I am going to take this.

25  A.    Okay.

Mr. Vaduva — Direct

1          MR. LEVINE:  Now, I will show the witness

2    previously marked Government's Exhibit 2047, 2048, 2049,

3    2050, 2051, and 2052.

4    BY MR. LEVINE:

5    Q.    What are these, Mr. Vaduva?

6    A.    These are also wireless routers but standard ones,

7    six of them.

8    Q.    Okay.  Where did you find these six routers?

9    A.    I remember there were five in the living room and

10   another one — I don't know exactly which of them — was

11   also in the bedroom.  It was on top of the dresser.

12   Q.    Okay.  In the hundreds of searches you conducted in

13   Romania, had you ever seen an apartment with six or seven

14   routers prior to this?

15   A.    No.  Usually, it is one or no more than two.  If it

16   is a house, you may find two.  If it is an apartment

17   building, usually you find one because it covers enough

18   area to cover a signal.

19   Q.    And was this an apartment or a house?

20   A.    An apartment.

21   Q.    Okay.  Thank you.  Okay.

22          MR. LEVINE:  I want to show this witness

23   what has previously been marked as Government's Exhibit

24   1414, and let's bring it up on the screen for the witness

25   right now.

Mr. Vaduva – Direct

1              THE COURT:  Just for the witness, did you

2      say?

3              MR. LEVINE:  Do you have an objection?

4      Let's bring it up to the witness first, your Honor.

5              MR. O'SHEA:  Objection.  May we approach?

6              THE COURT:  You may.

7              (Side bar held on the record.)

8              MR. O'SHEA:  All right.  Here is my

9      objection.  This translation of this report, which starts

10     on page 8, Judge, indicates that it has got information

11     about this being the residence of Radu Bogdan Miclaus.

12     That's hearsay pure and simple.

13             On page 9, it says the search property is

14     made up of three rooms, corners, annexes used by Radu

15     Bogdan Miclaus, Bogdan Nicolescu about who you declares

16     that he only came to the apartment once in a while.

17     Again, hearsay.

18             Then, I think on the inventory sheet here it

19     says, for instance, the phone is issued by Radu Bogdan

20     Miclaus.  So that's all hearsay without an exception

21     that I am aware of because I don't know who the declarant

22     is.

23             MR. LEVINE:  I will ask, so the declarant is

24     Miclaus, who is a party opponent, and I can ask the

25     witness who was there who provided that information.

Mr. Vaduva — Direct

1          THE COURT:  Because as of right now, the

2    objection is well taken, so —

3          MR. O'SHEA:  As long as the information came

4    from Radu Miclaus and only Radu Miclaus and not any other

5    agent or investigator, we have to be — I believe we

6    should be very careful about the foundation.

7          THE COURT:  And I am sustaining your

8    objection at this point, which is why I am not going to

9    allow the jurors to see it yet.

10          MR. LEVINE:  Okay.  That's fine, your

11    Honor.

12          (Side bar concluded.)

13    BY MR. LEVINE:

14    Q.   I am going to hand you a physical copy of the

15    Government's Exhibit 1414, so you have the whole thing.

16          THE COURT:  Folks, it is not on your screen,

17    correct?

18          (Jurors answered no).

19          THE COURT:  Okay.

20    BY MR. LEVINE:

21    Q.   And can I ask you, what is Government's Exhibit

22    1414?

23    A.   This is the standard report that we are drafting

24    while conducting a search warrant.

25    Q.   Okay.  And were you personally involved in preparing

Mr. Vaduva — Direct

1   this report?

2   A.    Yes.

3   Q.    What was your role in preparing this report?

4   A.    The handwriting, it is not mine.  I was the one that

5   actually wrote the one on Tiparnitei, but on this one was

6   the other colleague, Vilculescu Bogdan, the last of the

7   three that wrote it, and I was the one that was basically

8   was inventorying the goods and also checking the serial

9   numbers and spelling them out to him, while he was there

10  writing it.

11  Q.    So you would read aloud the serial numbers of each

12  of these devices?

13          MR. O'SHEA:  Objection to the form of the

14  question.

15          THE COURT:  I am going to allow that so I

16  can understand.  Is that what you said, sir?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Okay.  Thank you.

19  BY MR. LEVINE:

20  Q.    And your colleague would write them down on the form

21  as you read them aloud?

22          MR. O'SHEA:  Objection.

23          THE COURT:  Overruled.  I understand.

24  Mr. O'Shea, for this one I am going to allow it.

25          THE WITNESS:  Just as a further explanation,

Mr. Vaduva — Direct

1    normally this is what we do all the time because it would

2    be hard for only one police officer to look at the

3    physical evidence and also write it down, but then, at

4    the end, everybody reads it, and everybody double checks

5    it, the ones that sign it.

6    BY MR. LEVINE:

7    Q.    Did you read it, and did you double check it while

8    you were still at the Uverturii apartment?

9    A.    Yes, that is correct.

10   Q.    Okay.  And who signed Government's Exhibit 1414?

11   A.    The three of us as police officers and Bogdan Radu

12   Miclaus after he also read it.

13   Q.    All right.  And can you tell me who the three police

14   officers were who signed?

15   A.    It would be police subcommissioner Borld Ionun.

16   Q.    And could you spell that for the court reporter.

17   A.    B-o-r-l-d.

18   Q.    It is B-o-a-l —

19   A.    No, no.  Sorry.  B-o-r-l-d, I-o-n-u-n.

20   Q.    Okay.  And so that was one officer.  What was the

21   next officer?

22   A.    The next one was me, Police Inspector Vaduva Bogdan,

23   and the last one that actually wrote it is police

24   subinspector.  This is the sublieutenant of the ranking,

25   Vilculescu Bogdan, which would be V-i-l-c-u-l-e-s-c-u,

Mr. Vaduva — Direct

1    B-o-g-d-a-n.

2    Q.   Okay.  And did these people — strike that.

3              Including — and was one of the four people

4    who signed it Bogdan Miclaus?

5    A.   Yes.

6    Q.   Or Radu Bogdan Miclaus?

7    A.   Yes.

8    Q.   And did these four people sign every page of

9    Government's Exhibit 1414?

10   A.   Yes.  This is how we do it all the time, so

11   basically, we acknowledge with the person involved

12   everything that was written on every page.

13   Q.   Okay.  And was Miclaus in handcuffs at the time he

14   signed this form?

15   A.   No.  He was never in handcuffs.

16   Q.   Did you see or hear anyone threaten Miclaus?

17   A.   No.

18   Q.   Did you see or hear anyone yelling at Miclaus?

19   A.   No.

20   Q.   Did you see or hear anyone offer Miclaus something

21   of value to sign this form?

22   A.   No.

23   Q.   All right.  If you turn to page 3 of the form, there

24   is some information there about the ownership of the

25   apartment.

Mr. Vaduva – Direct

1          Who provided that information?

2    A.    I don't see information about ownership of the

3    apartment.  There is information about ownership of the

4    computer and of the routers.

5    Q.    Okay.  Who provided that information about ownership

6    of the computer and the routers?

7    A.    Bogdan Radu Miclaus himself confirmed that he was

8    the one using them.

9    Q.    And if we could turn to the English translation.

10   There is some information provided about a Linksys router

11   serial number CL7BIG C30244, do you see that?

12   A.    Yes.

13   Q.    Who provided that information?

14   A.    But he is mentioning about all of the above, the

15   five routers, not only the Linksys one.

16   Q.    Okay.

17   A.    So —

18   Q.    Okay.  But who provided the information?

19   A.    Himself.  He stated that in the —

20   Q.    Wait.  I am just asking you who provided the

21   information; not what is the information.

22   A.    Radu Bogdan Miclaus.

23   Q.    Okay.  And towards the top, did somebody indicate

24   that the computer, whose property the computer was, and

25   that he was the only one who uses it?

Mr. Vaduva — Direct

1   A.    Radu Miclaus Bogdan confirmed that.  Sorry, this is

2   also somehow standard procedure we tend to ask, so we

3   have it in writing who is the one using in case there is

4   multiple people in the house.

5                But in this case, it was only him, and

6   he confirmed those are goods were used by him and him

7   alone.

8   Q.    Okay.

9                MR. LEVINE:  Your Honor, at this point, can

10  I show the exhibit to the jury?

11               THE COURT:  Mr. Goldberg?

12               MR. GOLDBERG:  No objection.

13               THE COURT:  Mr. O'Shea?

14               MR. O'SHEA:  One moment, please.

15               (Pause.)

16               MR. O'SHEA:  Objection.

17               THE COURT:  For the same reasons you

18  articulated at the side bar?

19               MR. O'SHEA:  Yes, ma'am.

20               THE COURT:  Objection overruled.

21               I will allow it to be published, admitted

22  and published.

23               MR. LEVINE:  Can we show this to the jury,

24  your Honor?

25

Mr. Vaduva - Direct

1        MR. LEVINE:  Thank you so much.  Now what we
2   are looking at is page 4 of the translation?
3        THE COURT:  I apologize.  What number are we
4   on?
5        MR. LEVINE:  We are on Government's Exhibit
6   1414 and looking at page 8 of the exhibit, which is in
7   the English translation.
8        THE COURT:  Thank you.
9        MR. O'SHEA:  And your Honor, without — not
10  to interrupt, the exhibit itself is, I believe, 14 pages
11  long.  We are just talking about one page here as far as
12  publishing and admission.  I know that's two separate
13  things.  I don't know that the whole document comes in
14  yet because it refers to many other matters.
15        THE COURT:  Fair enough.
16        The pages that have already been testified
17  to will be admitted, and I will allow them to be
18  published.
19  BY MR. LEVINE:
20  Q.   While we are on this page, what did Radu Bogdan
21  Miclaus say with respect to his computer?
22  A.   He declared it is a computer owned by him and
23  private property, and he is the only one using it.
24  Q.   Okay.  If we could go to the first page of the
25  translation.

Mr. Vaduva – Direct

1          And does this first page of the translation

2    accurately state the address that you were searching at

3    Uverturii Boulevard?

4          MR. O'SHEA:  Objection, your Honor.

5          THE COURT:  Sustained.

6          MR. O'SHEA:  Could we not show this to the

7    jury?

8          THE COURT:  That's not why I sustained your

9    objection.

10          MR. O'SHEA:  Understood, Judge.

11          THE COURT:  Bring the entire exhibit up to

12    me and resolve the entire —

13          MR. O'SHEA:  Can it be taken down?

14          THE COURT:  Yes.

15          (Side bar held on the record.)

16          THE COURT:  This Court is satisfied that the

17    portions Mr. O'Shea discussed at the prior side bar are,

18    in fact, admissible.  They are non hearsay.

19          So do you have any other objection to the

20    exhibit, Mr. O'Shea?

21          MR. O'SHEA:  Yes.  He was just showing a

22    page — what page was that?  So on page 6 of 9, for the

23    record, it basically says — talks about an investigation

24    suspect Defendant person named Radu Miclaus.  That's

25    definitely information from somebody other than Radu

Mr. Vaduva - Direct

1    Miclaus.  No question in my mind.

2                    THE COURT:  May I see it?

3                    MR. LEVINE:  Yes.

4                    (Pause.)

5                    THE COURT:  Okay.  So your objection to page

6    6 of 9 of Exhibit 1414 is that it contains hearsay, and

7    the hearsay specifically is that the residence in

8    question is of Radu Bogdan Miclaus.

9                    MR. O'SHEA:  Here, we have a problem.  The

10   exhibit that I am looking at, Exhibit 1414, is not 9

11   pages long but, in fact, 12 pages long.

12                   MR. LEVINE:  As of last night, I removed the

13   order from the exhibit.

14                   MR. O'SHEA:  Okay.  It is repaginated.

15   Okay.  Okay.

16                   Just so we get clear, the exhibit that I am

17   holding, which was one of the original Exhibits 1414 as

18   marked, has on it on the first page that we are talking

19   about here — that would be on this one — let me just

20   point to the one in your hand.

21                   On page 6 of 9 that we were talking about,

22   it says "suspect" — this report was obviously generated

23   based on information that generated the search warrant

24   and not necessarily information that came from Radu

25   Miclaus himself.

Mr. Vaduva – Direct

1           MR. LEVINE:  With respect to this particular

2    page, your Honor, it just says suspect, defendant, or

3    person, so there is nothing —

4           THE COURT:  Let's start from the beginning.

5    This is — is this akin to a United States of America

6    police report?

7           MR. LEVINE:  I don't think so, your Honor.

8    I think this is an inventory form.

9           THE COURT:  I'm sorry, folks.

10          MR. LEVINE:  I don't think so.  This is

11   akin to an inventory form done at a jail or any other

12   location.

13          THE COURT:  Well, this page certainly

14   doesn't indicate that, and the fact that you said you

15   don't think so, it looks to me like it is a police

16   report, and police reports aren't coming in.  This does

17   not look like an inventory sheet that's attached to a

18   search warrant.

19          MR. LEVINE:  So your Honor, there is no

20   search warrant here.  The search warrant is a separate —

21   was Exhibit 1410.

22          We didn't admit it, and if I could go

23   through this briefly, it lists the item seized with a

24   serial number and indicates that the subject Miclaus,

25   there is a place for him to write an objection and shows

Mr. Vaduva — Direct

1    he did not write any objection.

2              A police report would be a report of an

3    incident what the police officer saw.  I think this is

4    very different —

5              THE COURT:  You are testifying now.  I

6    haven't heard that from this witness.

7              MR. LEVINE:  Okay.  I suggest we just made

8    3, 4, 7, and 8 which is his admission and signature.

9              THE COURT:  And again, I need to hear

10   that from the witness before I can say that this is

11   admitted.

12             MR. LEVINE:  Okay.  So let me —

13             THE COURT:  But the portion that Mr. O'Shea

14   has pointed out, unless you can explain it to me, it

15   certainly appears as if it is akin to a police report,

16   the officer's statements that go into a police report

17   about his or her investigation, and that's what my

18   problem is.

19             MR. LEVINE:  So I will stick to page 3, 4,

20   7, and 8 and ask the witness.

21             THE COURT:  Go off the record for George.

22             (Discussion held off the record.)

23             (Side bar concluded.)

24             THE COURT:  Without objection we are looking

25   at pages 7, 8.

Mr. Vaduva — Direct

1    MR. LEVINE:  3 and 4.

2    THE COURT:  3, 4, 7, and 8.

3    Mr. O'Shea, correct?

4    MR. O'SHEA:  Correct, your Honor.

5    THE COURT:  All right.

6  BY MR. LEVINE:

7  Q.   Okay.  So Mr. Vaduva, page 7 here is the English

8  translation of page 3 of your form.

9         Let me just clarify, can you read the

10  English translation?

11  A.   The whole page?

12  Q.   No.  Do you have the ability — I'm sorry.

13         You speak English very, very well, but I

14  just want to confirm, do you have the ability to read the

15  English translation?

16  A.   Sure.

17  Q.   Okay.  I am not asking you to read the whole

18  page.

19         Did Radu Miclaus say anything about whose

20  residence this was on this translated into English on

21  page 7 of this exhibit?

22  A.   At that time, he mentioned that he is coming from

23  time to time every once in a while because he was living

24  at that time with a girlfriend —

25  Q.   Okay.  So —

Mr. Vaduva — Direct

1  A.   — in the girlfriend's apartment.

2  Q.   So who was saying this to you?

3  A.   Radu Bogdan Miclaus.

4  Q.   And you used the word "he," and I want to be

5  specific.

6  A.   I'm sorry.

7  Q.   Who did he say came to the apartment from time to

8  time?

9  A.   Radu Bogdan Miclaus.

10  Q.   Did he say that anyone else came to the apartment

11  from time to time?

12  A.   No, not that I am aware of.

13  Q.   What did he say, if anything, about Bogdan Nicolescu

14  looking at the —

15            MR. GOLDBERG:  Objection.

16            THE COURT:  Sustained.

17  BY MR. LEVINE:

18  Q.   Did he indicate anything about anyone else coming to

19  the apartment?

20            MR. GOLDBERG:  Objection.

21            THE COURT:  Overruled.

22            THE WITNESS:  No, not that I remember.

23  BY MR. LEVINE:

24  Q.   If we could go to page 3 of the original Romanian —

25  looking at page 3, did Radu Bogdan Miclaus say anything

Mr. Vaduva − Direct

1    about who rented the apartment?

2                    MR. O'SHEA:  Objection.  Side bar.

3                    THE COURT:  On this?

4                    MR. O'SHEA:  I think so, Judge.

5                    THE COURT:  All right.

6                    (Side bar held on the record.)

7                    MR. O'SHEA:  If he is using this document to

8    refresh this witness' recollection, which appears he is

9    doing, the foundation has not been set.

10                   Would it assist you, a document to refresh

11   your recollection?  Answer:  Yes.  He can't just ask

12   right in there.

13                   MR. LEVINE:  I will ask a different question

14   on the record.

15                   (Side bar concluded.)

16   BY MR. LEVINE:

17   Q.    To whom did Miclaus tell what we see on page 3 in

18   Romanian and page 7 in English?

19   A.    Basically, we were all three officers standing with

20   him in the same room because, as I mentioned, nobody was

21   present anywhere else except where he was also present?

22                   And I can confirm it was I asking the

23   questions and sometimes also Borld Ionun because he was

24   also the higher ranking officer, and he was also involved

25   in the procedures, so both of us would ask.

Mr. Vaduva — Direct

1   Q.   And were you there to hear the answers?

2   A.   Of course.  As I said, all four were present all the

3   time in the same room.

4   Q.   Okay.  And do you recall Miclaus saying anything

5   about Bogdan Nicolescu?

6              MR. O'SHEA:  Objection.

7              THE COURT:  Sustained.

8   BY MR. LEVINE:

9   Q.   Did you recall Miclaus saying anything else about

10  who owned or rented the apartment?

11             MR. O'SHEA:  Objection.

12             MR. GOLDBERG:  Objection.

13             THE COURT:  Sustained.

14  BY MR. LEVINE:

15  Q.   What else, if anything, did Miclaus say?

16  A.   Right now, if I remember, only about the seized

17  goods from the apartment that he mentioned, and we asked

18  the questions, also.

19             And normally, everything that we asked and

20  connected with the case, it is going to be written down

21  in the report and note everything that he states will

22  also be written down in the report.

23  Q.   Okay.  If we could go to page 7 of this exhibit?

24             MR. O'SHEA:  Objection, your Honor.

25             THE COURT:  Sustained.  Sustained.  Please

Mr. Vaduva - Direct

1    don't show it.

2              MR. LEVINE:  Can we have a quick side bar?

3    Sorry.

4              (Side bar off on the record.)

5    BY MR. LEVINE:

6    Q.    All right.  Let me hand you what has been marked

7    Government's Exhibit 1414.  If you could turn to the last

8    page of the original Romanian, what is the blank space on

9    page 9 of Government's Exhibit 1414 or on the last page

10   of the Romanian?

11             MR. O'SHEA:  What page, Brian, again?

12             MR. LEVINE:  The last page of the form or

13   the last page of the translation.

14             THE WITNESS:  Are we talking about the

15   Z marking on the blank?

16   BY MR. LEVINE:

17   Q.    The blank space there, what he is that blank space

18   for?

19   A.    This phrase over here states that the person that

20   had participated and — and I am reminding everybody just

21   a standard form that we print and fill in, so the person

22   or persons in this case being Miclaus Radu Bogdan has

23   taken part in the search warrant?

24             And they don't have any objections or

25   perform any explanations in regards with the way the

1501

Mr. Vaduva — Direct

1    search warrant was conducted nor does he have any

2    objections or issues regarding the details that were

3    written down in the present report, and if they would

4    have something, they declare that.

5              And if he put that, the Z marking means that

6    he has nothing to say against what happened nor that he

7    has any arguments.

8    Q.   Okay.  Did Miclaus write —

9              THE COURT:  May I interrupt?  May I see

10   that, sir?

11             (Pause.)

12             MR. LEVINE:  Okay.  Your Honor, would it

13   help if I withdrew the question?

14             THE COURT:  No.  No, no, no.

15   BY MR. LEVINE:

16   Q.   Okay.  Did Miclaus write down any objection to the

17   search?

18   A.   No.

19   Q.   Did Miclaus write down anything about the search on

20   the form?

21   A.   No.

22   Q.   Was Miclaus given an opportunity to write down

23   anything on the form?

24   A.   Of course.

25   Q.   Now, were all the routers you testified to in

Mr. Vaduva — Direct

1    substantially the same condition as when you seized them

2    in Romania in 2016?

3    A.    Yes.

4              MR. LEVINE:  And I want to hand the witness

5    what has previously been marked as Government's Exhibit

6    2054.

7    BY MR. LEVINE:

8    Q.    What is Government's Exhibit 2054?

9    A.    This is the type of sealing matter that we use.  We

10   use clay and either like a — something to basically melt

11   it, and we are going to put it on this piece of

12   cardboard?

13              And so the whole process is putting these

14   goods in a bag, tying it up with rope, putting the rope

15   in between the cardboard, tying it.  Then also here,

16   putting the seal?

17              And basically, if you would like to open the

18   bag, you couldn't do it without breaking the seal.  So

19   that's our way to, one of — not the only way — to seal

20   and have the goods and the digital evidence kept in

21   exactly the same condition and shape as it was at the

22   moment of the search warrant.

23   Q.    Okay.  And once — and did you bag up and seal these

24   physical exhibits we looked at here on the table and used

25   the seal on them?

Mr. Vaduva — Cross

1   A.   Yes, that is correct.

2   Q.   And once you bagged up and sealed these items, where

3   did you bring them?

4   A.   To the prosecutor's office that was handling the

5   matter.

6         MR. LEVINE:  No further questions for this

7   witness.

8         THE COURT:  Mr. Goldberg?

9         MR. GOLDBERG:  Thank you.

10              CROSS EXAMINATION

11  BY MR. GOLDBERG:

12  Q.   You mentioned earlier in your testimony that you

13  were responding to an M-LAT request?

14  A.   Yes, that is correct.

15  Q.   An M-LAT request is a request that the United States

16  or another country in Romania had a treaty to make to

17  gather evidence?

18  A.   Yes.  That is correct, it is a legal agreement.

19  Q.   On behalf of the requesting country, correct?

20  A.   Yes, and that is correct.

21  Q.   And the requesting country can ask the target

22  country to search a place or a person?

23  A.   Yes, that is correct.

24  Q.   Intercept phone lines?

25  A.   Yes.  That is correct, and then I was mentioning,

Mr. Vaduva – Cross

1    this happens only if the crime that is mentioned in the

2    M-IAT has the equivalent in the country that it is

3    requested from.

4              So if the crime doesn't exist in Romania, we

5    cannot obtain judge warrants and the other authorizations

6    to conduct the wiretap, for example.

7    Q.    Fair enough.

8              And the type of fraud the United States was

9    investigating was is a crime in Romania?

10   A.    Yes.

11   Q.    So you had no problem filling the M-IAT request,

12   correct?

13   A.    Yes.

14   Q.    So the government that is requesting can ask you to

15   search a person or place, and you already answered that,

16   intercept telephone communications?

17   A.    Yes.

18   Q.    Intercept internet communications?

19   A.    Yes.

20   Q.    Enter and place a listening or video device within a

21   home?

22   A.    Yes.  That is also correct, but it depends on the

23   type of crime.  So it needs to be from the organized type

24   of crimes, crime or serious type of criminal activity.

25              If we are talking about regular theft, it

Mr. Vaduva – Cross

1    would not be authorized by the judge.  They specify the

2    exact crimes that are eligible to obtain such type of

3    measures, which are considered also very intrusive in the

4    personal life.

5    Q.    But a judge in Romania has to approve those requests

6    as well?

7    A.    All of them.

8    Q.    Now, the reports you were just going over, 1414 and

9    1410 with Mr. Levine, those were generated at the time of

10   the search or — they were generated at the time of the

11   search, correct?

12   A.    Yes, that is correct.

13   Q.    And was there another report generated at the same

14   time, a narrative telling a story of what happened and

15   how the police entered the residence and what happened

16   once they got in there, or are these exhibits the record

17   of the search?

18   A.    Yes.  This is the only record of the search.  The

19   only extra report that you would see is the inventory of

20   all of the assets that were seized during the whole

21   search operation from all of the targets.

22              But that would be just the inventory of the

23   goods to be passed to the United States authorized, so

24   that's it in regards to the search warrants.

25   Q.    So now, we are about two and-a-half years later,

Mr. Vaduva - Cross

1  right, roughly?

2  A.   Yes.

3  Q.   Okay.  So you remember some of the details of these

4  searches but not every detail.  You have to refresh your

5  memory by looking at the reports?

6  A.   That is correct.

7  Q.   So that is basically a report of the police

8  activity?

9  A.   That is correct.

10  Q.   And the only one that exists?

11  A.   Yes.

12  Q.   Okay.  With regard to the routers — and I am not

13  going to go through every number, there is a table here,

14  the number of devices — did you do anything forensically

15  to check these devices, or were they simply handed over

16  to the United States?

17  A.   No, because we are talking about the M-LAT request,

18  and the case was not conducted at all by Romanian

19  authorities, police or prosecutor's office.  We were just

20  fulfilling exactly what was requested in the M-LAT and

21  basically seized the goods and assets and turned them

22  over.

23         So we didn't conduct any type of — that

24  would mean for us to have our own case and to request

25  authorization for the additional forensics from the

Mr. Vaduva — Cross

1    judge, which was not the case.

2    Q.    Bagged it up, sent it over?

3    A.    Correct.  They were untouched from the time we were

4    sealing the apartment until they arrived in the

5    United States.

6    Q.    Can an M-LAT request also have you go out and talk

7    to witnesses?

8    A.    Yes, of course.

9    Q.    And that doesn't require any additional process from

10   a judge.  I mean a police officer in Romania can talk to

11   whoever they feel they need to?

12   A.    If it is a question that needs a little bit more

13   explaining.  So if it is organized crime area of the

14   crime, we only have the prosecutor's office, a special

15   prosecutor's office that only delegates the police

16   officers to do — conduct activities.

17              So us as police, we would not be able to

18   interview a witness, a suspect for anybody without the

19   prosecutor to basically point that out and have a

20   delegation order for us to do that.

21   Q.    Okay.

22   A.    Because the whole investigation is run by DIICOT.

23   Q.    DIICOT is the special prosecutor?

24   A.    Yes.  The directorate for investigating organized

25   crime and terrorism crimes.

Mr. Vaduva - Cross Cont'd

1   Q.   If they give you the order you can talk to whoever

2   is deemed?

3   A.   That was named in the delegation.

4   Q.   And you can gather up witnesses and have them

5   interviewed if that has been delegated?

6   A.   Yes, that is correct.

7   Q.   Is there a similar procedure for, say, a Defendant

8   being prosecuted in America who may have witnesses in

9   Romania to request that the Romanian police go find a

10  certain person or certain evidence and send it in a

11  bag?

12          MR. LEVINE:  Objection, your Honor.

13          THE COURT:  Sustained.

14  BY MR. GOLDBERG:

15  Q.   Is there a process where a Defendant, somebody

16  accused of a crime in America, can serve a subpoena that

17  would be processed in Romania?

18          MR. LEVINE:  Objection.

19          THE COURT:  Sustained.

20          MR. GOLDBERG:  I have nothing further.

21          THE COURT:  Mr. O'Shea?

22              CROSS EXAMINATION CONTINUED

23  BY MR. O'SHEA:

24  Q.   Good afternoon sir.

25  A.   Good afternoon.

Mr. Vaduva - Cross Cont'd

1    Q.    Do you fly back tonight?

2    A.    Yes, 7:45.

3    Q.    Very good.  If I understood you correctly, sir, you

4    said in connection with your good work at the Romanian

5    National Police starting around 2015, that just from that

6    period of time to when you left, you were involved with

7    hundreds of searches.

8              Did I hear you say that right?

9    A.    No.  I have said from 2010 since I was employed in

10   that period, I was only working at the directorate for

11   combating organized crime, and since that moment, I was

12   also involved in this case, in particular.

13   Q.    How many searches have you done when you were

14   assigned to that unit for, you know, cyber crime if we

15   can call it that?

16   A.    I would say less in the period that I was in the

17   directorate because the directorate was handling only the

18   large cases and fewer cases versus the Brigade where

19   actually we didn't conduct only cyber searches.

20              The Brigade was terrorist, combating

21   terrorist, trafficking, human trafficking, migrants and

22   cyber.  Because there were so many searches most of the

23   times and also financial investigation unit and because

24   we were a small unit, we were basically helping all of

25   the other colleagues to conduct the searches because we

Mr. Vaduva — Cross Cont'd

1    — there were 24 in our office, a lot more than in the

2    directorate but still not enough?

3                So I was participating in all type of

4    searches, not only cyber.  So that's why the number is so

5    high.  So there are two or three a week.

6    Q.    If we limit it to just cyber crimes during your

7    tenure from 2010 all the way up to the time you joined

8    the DEA, how many a month or year cyber crime searches

9    did you do?

10   A.    It would be pretty hard to name exactly, but let's

11   say —

12   Q.    More than a hundred; less than a hundred?

13   A.    Less than a hundred on cyber.

14   Q.    More than 50, less than a hundred?

15   A.    I think more than 50.

16   Q.    Somewhere between 50 and a hundred.

17   A.    Yes.

18   Q.    Okay.

19   A.    That would be my assumption.

20   Q.    All right.  Cyber crime is a busy part of your job

21   during that time, fair?

22   A.    Very.  Every weekend we would have skimming devices

23   in Bucharest, every weekend.

24   Q.    Okay.  Now, the house — can we see Exhibit 1411?

25   Do you see that picture, sir?

Mr. Vaduva — Cross Cont'd

1    A.    Yes.

2    Q.    All right.  Are you absolutely sure, sir, as you sit

3    here this afternoon that that is the house that you

4    searched that day?

5    A.    I believe so.

6    Q.    Okay.

7    A.    It has been two and-a-half years.

8    Q.    Do you know what color Mr. Radu Miclaus's parents'

9    house is?

10   A.    No.

11   Q.    Okay.  Do you know what color the roof is?

12   A.    No.  As I said, it has been two and-a-half years.  I

13   don't think anybody could remember exactly that.

14   Q.    Of these routers that we have set up in front of us

15   here, first of all, even in Romania, is possession of a

16   router illegal?

17   A.    No.

18   Q.    Is possession of a hundred routers illegal?

19   A.    No.

20   Q.    Okay.  Do you know what a log is when it comes to a

21   router?

22   A.    Yes.

23   Q.    As part of your investigation, did you obtain any

24   logs from these routers?

25   A.    Yes.  These particular ones?

Mr. Vaduva — Cross Cont'd

1    Q.   Yes, sir.

2    A.   Oh, no.  I thought in general.

3    Q.   Do you know what, if anything, these routers

4    were connected to when you went into and searched the

5    house?

6    A.   No.

7    Q.   Okay.  Now, do you remember — we had a couple of

8    side bars on this about this document that — this

9    Exhibit 1414 that was the search — we in America call it

10   a search warrant return report or something of that

11   nature.

12              The handwriting that we saw on the Romanian

13   version of that document, that's all your handwriting.

14   Am I right about that, sir?

15   A.   Yes.

16   Q.   Now, you don't want these folks on the jury to think

17   that is Radu Miclaus's handwriting, do you?

18              MR. LEVINE:  Objection.

19              THE COURT:  Sustained.

20   BY MR. O'SHEA:

21   Q.   Just so we are clear, that handwriting was not Radu

22   Miclaus's handwriting where blanks are being filled in.

23   That's your handwriting, right?

24   A.   Yes.  The only — the procedure point for them to

25   sign, they didn't write or make any comments themselves.

Mr. Vaduva - Cross Cont'd

1    Even if you had something to object, I would be the one

2    writing it, and the colleague wrote it for his apartment,

3    and I wrote it for the father's house.

4    Q.    And just so I understand your testimony correctly,

5    the only handwriting on that document that is purportedly

6    Mr. Miclaus' is where he signed at the bottom of a page,

7    right?

8    A.    Yes.

9    Q.    Everything else is either preprinted or your

10   handwriting.  Am I correct?

11   A.    Yes.  And in addition, he also gets a copy to keep

12   up for himself to remain in the house.

13   Q.    I thought you had a plane to catch, so let me ask

14   you this.

15              MR. LEVINE:  Objection, your Honor.

16              THE COURT:  Sustained.

17   BY MR. O'SHEA:

18   Q.    The question I asked you, was all the handwriting on

19   that form yours with the exception of Mr. Miclaus'

20   signing at the bottom, right?

21   A.    Yes.  This is the standard procedure and legal

22   procedure in Romania.

23   Q.    Okay.  Fifth time I heard you say that.  Thank

24   you, sir.

25              MR. O'SHEA:  Nothing further.

1        MR. LEVINE:  No redirect, your Honor.

2        THE COURT:  Sir, you may step down.

3        Ladies and gentlemen, I believe we will take

4    our afternoon recess now.  Please remember the

5    admonition.

6        All rise for the jury.

7        (Recess had.)

8        THE COURT:  Please be seated.  Call your

9    next witness.

10       MR. BROWN:  Thank you, your Honor.  The

11   United States calls the Special Agent Ryan Macfarlane.

12                   RYAN MACFARLANE

13   called as a witness by and on behalf of the Government,

14   being first duly sworn, was examined and testified

15   as follows:

16                 DIRECT EXAMINATION

17   BY MR. BROWN:

18   Q.   Would you please state your name for the

19   record?

20   A.   My name is George Ryan Macfarlane.

21   Q.   And what do you go by?

22   A.   Ryan.

23   Q.   And by whom are you employed?

24   A.   I am employed by the FBI.

25   Q.   And for how long have you been with the FBI?

1    A.    Just over 15 years.

2    Q.    And what is your current assignment with the

3    FBI?

4    A.    I am a supervisory special agent with the FBI.

5    Q.    And where are you assigned?

6    A.    I am based here in Cleveland.

7    Q.    And what squad do you supervise?

8    A.    I supervise a squad called CY 1, which is the

9    national security cyber squad.

10   Q.    And how long have you been the squad supervisor of

11   CY 1?

12   A.    For about two and-a-half years.

13   Q.    And how long total have you been in Cleveland?

14   A.    I have been in Cleveland for a total of ten years.

15   However, in the middle of that for about two years I was

16   back in D.C.

17   Q.    And before becoming an SSA — is that the correct

18   acronym?

19   A.    Yes.

20   Q.    Before becoming an SSA, what were you duties?

21   A.    My duties, I was a special agent investigating cyber

22   crime.

23   Q.    And during your two years in Washington, what did

24   you do?

25   A.    While I was in Washington, I was a supervisory

1  special agent, and I was working at the National Computer

2  Investigation Joint Task Force, which is a joint task

3  force that consists of about 15 Government agencies

4  working significant cyber crime and national security

5  matters.

6  Q.   And what were your duties there as a supervisory

7  special agent?

8  A.   I was managing a region of the country, so I was

9  responsible for approximately eight different offices.

10  And I was overseeing the cyber threats that those offices

11  worked.

12  Q.   Now, while you were in Cleveland as a special agent,

13  what were your duties as a special agent investigating

14  cyber crime?

15  A.   I was just investigating cases.

16  Q.   Okay.  And what sorts of cyber crimes did you

17  investigate?

18  A.   I investigated a large range of cyber crime,

19  everything from ransomware to internet fraud to computer

20  intrusions, to bank intrusions, and I also worked some

21  state-sponsored intrusions, which would be like China

22  compromises a U.S. company or Russia targets a clear

23  defense contractor.

24  Q.   And where were you assigned before coming to

25  Cleveland?

1  A.    I was in the Los Angeles field office.

2  Q.    And where were you before Los Angeles?

3  A.    I was in Atlanta.

4  Q.    And what did you do in Los Angeles?

5  A.    In Los Angeles, I was doing the same job.  I was a

6  special agent investigating cyber crime.

7  Q.    And how about Atlanta?

8  A.    Atlanta, I lived there before I was part of the

9  Bureau.

10  Q.    So your first assignment was in IA?

11  A.    It was, yes.

12  Q.    What did you do before joining the FBI?

13  A.    I did a number of different jobs, but the one I did

14  right before joining the Bureau was, I worked for a small

15  internet security company.

16  Q.    Okay.  And what did the — what did that company do,

17  what kind of work did it do?

18  A.    We helped our clients secure their networks, and I

19  was specifically responsible for managed services, which

20  was basically we watched our clients' networks for signs

21  of malicious activity, hacking.

22  Q.    And where did you go to college?

23  A.    I went to Georgia Tech.

24  Q.    What did you major in at Georgia Tech?

25  A.    Computer science.

1  Q.   And what sorts of classes did you take as a computer

2  science major?

3  A.   I took a wide variety of programming classes, math

4  classes, some engineering classes.

5  Q.   Okay.  Do you know any computer programming

6  languages?

7  A.   Yes.

8  Q.   Which languages do you know?

9  A.   I know Python.  I know C.  I know a wide variety of

10  web-based scripting languages and some older languages

11  that have no real relevance to this case.

12  Q.   And have you ever written computer programs?

13  A.   I have, yes.

14  Q.   Have you ever read code?

15  A.   Yes.

16  Q.   Have you written code?

17  A.   Yes.

18  Q.   Now, going back to the FBI, what are some of

19  your other duties as a squad supervisor of a cyber

20  squad?

21  A.   So as a supervisor of the cyber squad, I am

22  responsible for a team of special agents, analysts, and

23  computer scientists.  I — you know, my primary role

24  there is to help them navigate their cases and make sure

25  they have the resources that they need to get their job

1    done.

2              Additionally, I also, as part of my job,

3    have to — am responsible for public engagement.

4              So I spend a lot of my time reaching out to

5    local companies, community groups to explain the types of

6    threats we are seeing and how to best protect yourself

7    against those threats.

8    Q.   And why do you provide — is that commonly called in

9    the FBI outreach?

10   A.   Yes.

11   Q.   Why do you perform outreach in the cyber squad.

12   A.   I personally do it because I think it is the right

13   thing to do, but I think it is a needed function of the

14   FBI to make sure the public sees and understands the

15   threats that are out there.

16   Q.   And what sorts of outreach programs have you

17   presented?

18   A.   I have presented at a large range of the events.

19   I have presented everything from events at local

20   schools, high schools, senior groups.  I have talked

21   to local information technology groups, law firms, talked

22   to hospitals talked to retailers.  I have presented at

23   real estate conferences, really the entire gamut of

24   events.

25   Q.   Fair to say public and private sectors?

1    A.    Absolutely.

2    Q.    And do you receive any regular training on cyber

3    issues?

4    A.    I do.  I receive training — usually, I will attend

5    one or two training classes a year time permitting.

6    Q.    And in your 15 years of working cyber in the FBI,

7    have you seen any changes as to how the FBI investigates

8    cyber crime?

9    A.    Yes, many.

10   Q.    Could you explain some of them?

11   A.    So for the past 15 years, I would say that what the

12   FBI is seeing with cyber crime is, we are seeing more and

13   more complex cyber crime, and what that means is that we

14   have got groups that are becoming more sophisticated, and

15   there are certain technologies that have changed the

16   landscape of the cyber crime domain essentially?

17              So we have technologies such as dark

18   markets, which are essentially like the Amazon of

19   criminal activity, where criminals can go on those

20   markets, and they can buy and sell the fruits of their

21   labor.

22              One of the big issues cyber criminals had,

23   it was tough to find enough people to find the data that

24   they stole, and dark markets have solved that problem for

25   the cyber criminals.  We have seen the rise of

1    cryptocurrency, which is in itself not a criminal

2    technology, but one of the groups that has adopted

3    cryptocurrency is the cyber crime undergrounder because

4    it is a perfect mechanism for laundering money in a

5    semianonymous way?

6                    So we are dealing with those kinds of

7    problems, and usually those problems deal with a lot of

8    data.   So the FBI is consistently working on how to

9    address that data and how to analyze the data as fast as

10   possible.

11   Q.   Now, as a special agent in a cyber squad and now a

12   supervising special agent, what sorts of investigative

13   measures do you or your squad use to investigate cyber

14   crime?

15   A.   From an investigation standpoint, we will use all —

16   like a wide range of investigative measures.   We will use

17   legal processes, so we will issue subpoenas.   We will

18   issue search warrants.

19                   We will engage with the private and public

20   sector, both understanding what those groups are seeing

21   out there as well as providing alerts related to what we

22   are seeing.

23                   We will engage with other law enforcement

24   around the world because one of the biggest issues with

25   cyber crime is it is worldwide.

1    With cyber crime, you can have a group in

2  Spain or Romania targeting the entire world and using

3  infrastructure around the entire world.  So we have to

4  engage with partners globally to address those types of

5  issues, data intercepts.

6  Q.   And what do you mean by data intercepts?

7  A.   A data intercept is what is equivalent to a wiretap

8  on a phone but just for a server.  So instead of

9  listening to phone calls, you are actually seeing the

10  communications that are going inside and outside of the

11  server.

12  Q.   Do you use a technique called a pen register trap

13  and trace?

14  A.   Yes.

15  Q.   Is that sometimes shortened to a pen —

16  A.   P-R-T-T, and that's similar to a wiretap, except you

17  don't get to see any of the content.  It is just the

18  connection details.

19    So for example, if you did a PRTT or pen

20  trap and trace on an e-mail account, you would see the

21  "from" address and "to "address, the time, and some

22  additional data occasionally but no content.

23  Q.   And how do the pen or PRTT differ from a T-III or a

24  wire?

25  A.   When you have a wire, you would see all the traffic

1    or all the data that is flowing between that computer and

2    the rest of the world.

3    Q.    And in your 15 years with the FBI, approximately how

4    many PRTTs have you reviewed?

5    A.    I would estimate 50.

6    Q.    And how many searches, search warrants have you

7    executed as an agent or special agent?

8    A.    Hundreds.

9    Q.    And of those hundreds, how many were related to

10   cyber issues or cyber seizures?

11   A.    Nearly all of them.

12   Q.    And have you ever conducted a cyber wire?

13   A.    Yes.

14   Q.    Now, did there come a time in 2013 when you were

15   assigned a case involving the Bayrob Group?

16   A.    Yes.

17   Q.    And when you joined the investigation, what did you

18   understand that investigation to be about?

19   A.    So in 2013, I was coming back from Washington, D.C.

20   to Cleveland, and when I arrived here, there was a case

21   that needed some assistance, and it was the Bayrob

22   investigation.  I reviewed the data in the case file and

23   understood that back in 2007 —

24                 MR. GOLDBERG:  Objection.

25                 MR. O'SHEA:  Objection.

1    THE COURT:  Sustained.

2    THE WITNESS:  Viewing the case file

3    identified in 2007, there was a local victim in Cleveland

4    that had — was infected —

5    MR. O'SHEA:  Object.

6    THE COURT:  Sustained.

7    BY MR. BROWN:

8    Q.    Were you able to review prior investigative

9    techniques?

10    A.    I was, yes.

11    Q.    And from that review of the prior investigative

12    techniques, what, if anything, did you learn?

13    A.    The case was related to a computer virus or Trojan,

14    and that computer virus was responsible for —

15    MR. GOLDBERG:  Objection.

16    THE COURT:  Overruled at this point.

17    A.    The computer virus was responsible for supporting

18    eBay fraud.

19    Q.    Had you at this point in your career investigated

20    any cases involving eBay fraud?

21    A.    Yes.

22    Q.    Based on that experience, were you familiar with

23    common techniques used in eBay fraud?

24    A.    Yes, I was.

25    Q.    What did you understand eBay fraud in your

1    experience to be?

2    A.    The traditional form of eBay fraud would be where an

3    individual or group would post fake listings on eBay or

4    Craigslist and use the eBay brand to make the fraud look

5    legitimate.

6              Traditionally, though, those fraud cases,

7    internet fraud cases didn't involve any type of virus or

8    malware.

9    Q.    And based on your review of the case file and based

10   on your knowledge of traditional eBay fraud, based on

11   your experience, did this appear to be traditionally eBay

12   fraud?

13   A.    No.  This seemed to be a different type of eBay

14   fraud.

15   Q.    What made this different than what you encountered

16   in the past?

17   A.    It was more sophisticated.

18   Q.    How was it more sophisticated?

19   A.    It was the first internet fraud I had seen that

20   involved a Trojan or virus components to it.

21   Q.    And what do you understand a Trojan to be?

22   A.    A Trojan is a piece of malicious software that is

23   usually packaged with something that purports itself to

24   be legitimate.

25              So an example could be a calculator

1    application that you could download from the internet

2    that would actually be a calculator when you opened it up

3    and ran it on your background, but in the background, it

4    would be installing something malicious.

5    Q.    And based on your experience and also your review of

6    the investigation, when you joined the case, how did you

7    understand the Bayrob operation Trojan to operate?

8    A.    My understanding of the Bayrob Trojan was that it

9    was related to fraudulent listings posted on eBay, and

10   individuals interested in that vehicle would basically

11   express that interest by bidding or by e-mailing with the

12   person who posted that listing?

13                   And then, they would receive a second chance

14   offer that would typically include pictures of the

15   vehicle in the form of a picture viewer, a Kodak picture

16   review, and there was — there is another picture viewer

17   as well?

18                   And that picture viewer was a Trojan that

19   would infect the system at the same time, and once

20   infected, that computer would see different content when

21   visiting eBay and other sites on the internet.

22   Q.    And based on your understanding of that malicious

23   software, that Trojan, what was your approach to this

24   case when you joined the investigation?

25   A.    So my approach to this case was to look at it from

1    two different paths.  The first path was like the

2    traditional path of investigating things like

3    interviewing victims, following the money, doing database

4    searches, trying to find someone who had actually spoken

5    to one of the people responsible for this, and the other

6    path was to look at the actual technical component of

7    what the virus was doing, what it was communicating with,

8    and where it was getting his commands from.  So there was

9    the traditional path and the technical path, if you

10   would.

11   Q.    Is it fair to say the people path and data path?

12   A.    Yeah.  I would say people/money path and the

13   technical path.

14   Q.    And I am sorry, I didn't expect — could you speak a

15   little louder?  Did you say technical or tactical?

16   A.    Technical.

17   Q.    Okay.  Sorry.

18            Now, have you described the technical path?

19   What investigative steps did you identify at the

20   beginning of the investigation that were being taken at

21   that time?

22   A.    So at the time I joined the investigation, I

23   understood that a number of techniques had been tried to

24   follow the money.  There were a number of financial

25   payments that had been sent by victims of the Bayrob

1   Trojan —

2              MR. O'SHEA:  Object.

3              THE COURT:  Overruled.

4   A.    There were a number of financial transactions that

5   had been sent from victims of the Bayrob Trojan to

6   individuals in the U.S.  We had identified those victims

7   in the U.S., and we had attempted to follow where those

8   payments went.

9   Q.    And how did you trace that money?

10  A.    Using legal process, so we would issue legal process

11  to Western Union, for example.

12  Q.    And how did that process help the investigation?

13  A.    It really — it didn't provide us with any

14  information related to the identities of the people that

15  were responsible.

16  Q.    What, if anything, did you learn from this

17  process?

18  A.    We learned that the payments were going to Eastern

19  Europe in places like Romania and places surrounding

20  Romania.

21  Q.    And how did learning that not help identify

22  anybody?

23  A.    The payments were picked up by individuals using

24  fake IDs.

25              MR. O'SHEA:  Objection.

1    THE COURT:  Overruled.

2    BY MR. BROWN:

3    Q.   Now, what other process did you use other than

4    tracing the money?

5    A.   So we interviewed victims, but unfortunately, the

6    victims really didn't know who was victimizing them.  We

7    interviewed some of the intermediaries, the money mules

8    receiving money from the victims, and sending that money

9    on.

10           But they didn't really have a whole lot of

11   information on who they were speaking with and who they

12   were taking orders from.

13   Q.   What, if anything, were you able to learn from

14   interviewing victims?

15   A.   We learned there were a —

16              MR. O'SHEA:  Objection.

17              THE COURT:  Sustained.

18              THE WITNESS:  I learned that there were —

19              THE COURT:  One moment.

20   BY MR. BROWN:

21   Q.   What, if anything, did you learn from interviewing

22   victims?

23   A.   I learned that there were a number of —

24              MR. O'SHEA:  Objection.

25              THE COURT:  Sustained.

1    BY MR. BROWN:

2    Q.    What other processes did you use during part of the

3    investigation?

4    A.    So other than the people path, if you will, the

5    technical path, what we did was that early on in the

6    investigation we met with Symantec and AOL who had been

7    looking at this problem related to the Bayrob Trojan?

8                    And they provided the FBI with data that we

9    analyzed.

10   Q.    And at that time, were you using any of the other

11   legal techniques you had testified about earlier?

12   A.    At that time, yes.  We were issuing subpoenas, and

13   we were doing search warrants on some of the accounts

14   around that time period.

15   Q.    And what, if anything, were you learning from those

16   legal processes?

17   A.    We were learning that a lot of the accounts just

18   wouldn't have information that we could use to identify

19   who these individuals were.  All the technical details

20   were leading to dead ends.

21   Q.    What, if anything, did the meetings with — that you

22   had help the investigation?

23   A.    So when we met with both Symantec and AOL, they

24   provided us data based on investigations they were

25   conducting on this group.

1       They provided us with the raw data from

2   their investigations, and I took that data and analyzed

3   it myself.

4   Q.   And what did you learn from that analysis, if

5   anything?

6   A.   So from that analysis, I learned that the

7   Bayrob Trojan was a pretty interesting threat.  So it was

8   doing some interesting things to me at least.

9   Q.   Based on your training and experience, what did you

10  mean by "interesting things"?

11  A.   When I say "interesting," it was designed in a way

12  that I thought was pretty elegant for the period of time,

13  and it was allowing systems to be controlled by this

14  group in a number of different ways.

15  Q.   You just used the term "elegant."

16       Does that have a meaning based on your

17  training and experience?

18  A.   It was well designed for the time.

19  Q.   Now, based on your — on analyzing that information,

20  what steps did you take next?

21  A.   So based on that information, I was able

22  to review the data and identify a number of servers

23  that were responsible for controlling the infected

24  systems.

25  Q.   And how was that information helpful to your

1    investigation?

2    A.    So I took that — those servers, and I issued legal

3    process on those servers and was able to obtain search

4    warrants on those systems.

5    Q.    And what, if anything, did you learn from those

6    search warrants?

7    A.    So from the search warrants when I received the data

8    back from the providers, I identified that the servers

9    were, in fact, command and control servers for the Bayrob

10   botnet.

11                  MR. O'SHEA:  Objection.

12                  THE COURT:  Sustained.

13   BY MR. BROWN:

14   Q.    Did you receive information back from the search

15   warrants you issued?

16   A.    I did, yes.

17   Q.    And were you able to analyze that information?

18   A.    Yes, I was.

19   Q.    Were you able to analyze that information in regards

20   to investi — was it relevant to the investigation?

21   A.    Absolutely, yes.

22   Q.    How was it relevant to your investigation?

23   A.    The servers I received data on —

24                  MR. O'SHEA:  Objection.

25                  THE COURT:  Overruled.  I will allow

1    that.   Keep going.

2    A.    The results of the search warrant identified

3    thousands of files that were — that when analyzed, I

4    identified as being directly related to the Bayrob

5    virus.

6    Q.    How were you able to identify those files related to

7    the Bayrob virus?

8    A.    So I went through all the files and reviewed the

9    actual code that was contained within the file structure,

10   and I could see, based on the data I received from

11   Symantec and AOL and files and structure on the server,

12   matched essentially.  I was seeing two halves of a

13   whole.

14   Q.    Now, based on your investigation, approximately how

15   many command and control servers did you identify?

16   A.    Over the course of my investigation, I would

17   estimate that I identified approximately ten command

18   control servers that were operating in the U.S., and I

19   was aware that there were other ones that I could not

20   identify.

21   Q.    And based on your analysis, were you able to tell if

22   they were all operating at the same time?

23              MR. O'SHEA:  Objection.

24              THE COURT:  Overruled.  You may answer that.

25              THE WITNESS:  No.  The command and control

1  servers would be active at different periods of time, so

2  they would — from time to time, the command and

3  control server would move from one computer to another,

4  one server to another on the internet, and sometimes

5  they would move from one server provider to another

6  provider.

7  Q.    Now, did you serve any other legal process related

8  to the servers?

9  A.    Yes.  We served a good deal of legal process related

10  to the servers.  We would serve pen register trap and

11  traces.  We would serve search warrants.  We would serve

12  subpoenas, and we also did a data intercept on two to

13  three servers.

14  Q.    By "data intercept," you mean a wire?

15  A.    Yes.

16  Q.    Now, how would doing a wire on a command and control

17  server be helpful to your investigation?

18  A.    So doing a wire or data intercept was important for

19  this investigation because the way in which the Bayrob

20  Group had set up their infrastructure made it difficult

21  to investigate.

22          The Bayrob botnet used a tiered approach, so

23  there were infected computers at the bottom.  There were,

24  at least, one level of relays, and then there was the top

25  level command and control servers.

1  Q.    And how would doing a wire on a server help you see
2  that traffic?
3  A.    Because it was the only place that I could see all
4  the infected systems, because if I had a wiretap, for
5  example, on an infected system, it would let me see the
6  communication between that infected system and the relay
7  level?
8          But it would only be the traffic for that
9  one system, whereas if I went all the way up to the top,
10  I would see essentially everything that was connected to
11  the Bayrob botnet.
12  Q.    So do you recall the testimony of Liam O'Murchu
13  earlier in this trial?
14  A.    Yes.
15  Q.    And do you recall the investigation he conducted?
16  A.    I do, yes.
17  Q.    How is a wire different than the investigation that
18  Mr. O'Murchu testified about?
19  A.    So Mr. O'Murchu had data at the infected level.  So
20  he had systems that were infected, but they were not at
21  the top level.
22          So he was only seeing a very narrow portion
23  of what was going on, whereas when we got the data
24  intercept at the top level, we could see all the
25  communications between all the different systems.

1    Q.    Now, as a wire, I think you testified about what you

2    did to intercept with a wire?

3    A.    Yes.

4    Q.    What sorts of things did you intercept on a server

5    wire?

6    A.    So specifically on this server wire, what I was

7    seeing was I was seeing infected systems check in to the

8    controller, so they would reach out to the controller and

9    say "I am here, hello, do you have any commands for me?"

10            And then, I would see those commands be

11   passed back down, and I would see additional files go

12   down with, you know, with those commands.

13   Q.    Were you able to see the content of those files?

14   A.    I was, yes.

15   Q.    Were you able to see any identities during this part

16   of the investigation?

17   A.    During this part of the investigation, I was able to

18   see handles, but they were not accessing the command and

19   control server.

20   Q.    And what do you mean by handles?

21   A.    Handle would be something that they would use as

22   sort of a criminal alias or nickname.

23   Q.    And could you see how they were accessing the

24   command and control server?

25   A.    Yes.  They were accessing the command and control

1    server in two primary ways.

2              MR. O'SHEA:  Object.

3              THE COURT:  Overruled.  Go ahead.

4    A.    The first primary way was through what's called SSH

5    or secure shell, and the second way was through — they

6    were accessing specific files occasionally that were

7    hosted off of that command and control server.

8              One additional aspect was that they were

9    proxying — sometimes they were proxying traffic through

10   the command and control server as well.

11   Q.    Okay.  What do you mean "proxying traffic through

12   the command and control server"?

13   A.    Essentially just relaying traffic through the

14   command and control server.

15   Q.    And how can you tell if somebody was proxying

16   through the command and control server?

17   A.    For example, on one side, I would see a secure

18   connection come in on one side, and during the time frame

19   of that secure connection, I would see visits to websites

20   out the other end?

21              So I would say a connection come in, and I

22   would see the results of that connection go out.

23   Q.    Okay.  And how could you see this proxy trafficking

24   in and out using the wire technique?

25   A.    So the data interception or wire would show me all

1  the traffic coming across the command and control server,

2  everything, both the secure connections coming in and all

3  the requests to websites going out.

4  Q.  Were you able to see it on a computer in the

5  FBI?

6  A.  Yes.  We have an analysis system that helps to

7  analyze that data.

8  Q.  Okay.  And using that — is it a computer with a

9  type of software?

10  A.  Yes.

11  Q.  Okay.  So you connect a computer.  You are able to

12  see proxy traffic?

13  A.  Yes, I was.

14  Q.  Could I show you Exhibit 2255?  Do you recognize

15  this exhibit?

16  A.  Yes.

17  Q.  How do you recognize it?

18  A.  I made it.

19  Q.  When you say you made it, what do you mean?

20  A.  I was the one responsible for viewing this traffic

21  and categorizing as well as I was the one that actually

22  made the spreadsheet.

23  Q.  Did you create the data within the spreadsheet?

24  A.  No.  The data was from the data intercept.

25  Q.  And did you review all the data you put in the

1   spreadsheet?

2   A.   Yes.

3   Q.   And is the data a fair and accurate compilation of

4   the data that you observed?

5   A.   It is, yes.

6   Q.   Now, could we go down to row 275?  Do you see

7   725?

8   A.   Yes.

9   Q.   What is — what are we looking at in row 725?

10  A.   This is an event that occurred over the command and

11  control server.

12  Q.   What do you mean by an event over the command and

13  control server?

14  A.   It was something that I observed that happened

15  over the command and control server that I found

16  interesting.

17  Q.   Okay.  And can you tell on what date you observed

18  this?

19  A.   3-18-2013.

20  Q.   And can we scroll to the right to see rows E through

21  whatever else?  Okay.  And what is in column E?

22  A.   Column E is the date and time.

23  Q.   Okay.  What does column F tell you, if anything?

24  A.   It is a category of the traffic or data.

25  Q.   And what does column H tell you, if anything?

1    A.   H is empty.

2    Q.   Sorry.  I.

3    A.   I is the website that was visited.

4    Q.   And could you tell who visited that?

5    A.   Someone with access to the command and control

6    server, but I could not tell specifically who it was,

7    no.

8    Q.   How could you tell if it was someone that accessed

9    the command and control server?

10   A.   Because this command was sent through it.

11   Q.   As part of your investigation, are you familiar with

12   what Ypool.net is?

13   A.   Yes.

14   Q.   And based on your investigation what is Ypool.net?

15   A.   Ypool.net is a website related to cryptocurrency

16   money.

17   Q.   And can we keep scrolling to the my left — the

18   other way.  Okay.  What, if anything, does column M tell

19   you?

20   A.   That would be the browser identification of that

21   request.

22   Q.   So what does that tell you specifically about

23   the —

24   A.   Just the type of browser that was sent with the

25   request.

1    Q.    Now, based on your knowledge and investigation of

2    the case, why was a proxy visit to Y pool of

3    investigative importance?

4    A.    Because I had seen Ypool before on a Twitter page

5    associated with the handle Radu SPR, which was associated

6    with the criminal handle on Minolta 9797.

7    Q.    Now, what other traffic could you see using the

8    wire?

9    A.    I saw a lot of criminal activity, so I could see the

10    — I could see infected systems receive commands from the

11    controller that would instruct those infected systems to

12    collect credit card information.

13                    MR. O'SHEA:   Objection.

14                    THE COURT:   Overruled.

15    A.    And I would see the responses from those infected

16    systems containing credit card information.

17    Q.    How could you tell request and responses?

18    A.    The data — once analyzing the data, you could see,

19    based on the specific request and format of the data, if

20    it is a request or response?

21                    And based on my analysis, I reviewed all the

22    code and I understood exactly how the Trojan worked in

23    relation to the command and control server.

24    Q.    Okay.   Could you for the time being take 2255 down?

25                    Now, could we also take a look at lines 14

1    through 16 of 2255?  Was that additional traffic you

2    reviewed?

3    A.    Yes, it was.

4    Q.    Based on your review, was that traffic of

5    investigative relevance to you?

6    A.    Yes, it was.  As you can see right here, the command

7    and control server visited a domain at Yahoo related to

8    web posting, and investigation of that website led me to

9    understand that that was —

10              MR. O'SHEA:  Objection.

11              THE COURT:  Overruled.

12   A.    — someone on the command and control server

13   registering a domain at Yahoo.

14   Q.    And how was that information of importance to your

15   investigation?

16   A.    The Bayrob virus used domains to establish

17   communication between infected systems and the command

18   and control server, and a large number of those domains

19   were registered over small business .yahoo.com.

20   Q.    Looking at line 17, did you review that line?

21   A.    I did.

22   Q.    And was that of investigative relevance to you?

23   A.    It was.

24   Q.    And can you explain why that was relevant?

25   A.    So this specific file ping-view right here is a file

1    that was created by the Bayrob Group.

2                    MR. O'SHEA:  Objection.

3                    THE COURT:  Sustained.

4    BY MR. BROWN:

5    Q.    Based on your review of this wire data, were you

6    able to compare — were you able to compare this with

7    wire data to other facts you learned during your

8    investigation?

9    A.    Yes.

10   Q.    Were you able to see any of the data mentioned in

11   this line in other parts of your investigation?

12   A.    Yes, absolutely.

13                   MR. O'SHEA:  Objection.  Yes or no answer.

14   A.    Yes.

15   Q.    And how was that analysis able to help your

16   investigation?

17   A.    This file ping-view .PHP was a file that was on the

18   command and control server based on search warrant

19   results I received from the hosting provider.  I reviewed

20   this file and understood what it did and also saw it

21   being accessed over the data intercept.

22   Q.    Now, what did you understand, based on your

23   investigation, ping-view to do?

24                   MR. O'SHEA:  Objection.

25                   THE COURT:  Overruled.

1    A.    Ping-view provided a view of all the infected

2    systems and provided some additional capabilities to

3    control those systems.

4    Q.    How was an application like ping-view helpful to

5    understand in your investigation?

6    A.    Ping-view was a tool that the operators of this

7    server used to manage the infected systems.

8    Q.    And why is that an investigative important fact for

9    you?

10   A.    Because it is important to understand how these guys

11   operated.

12   Q.    Were you able, in analyzing this wire traffic, to

13   also see how many infected systems were being looked at

14   in ping-view?

15   A.    Yes.

16   Q.    Now, could you take a look at Exhibit 1137?  Do you

17   recognize this?

18   A.    Yes.

19   Q.    How do you recognize it?

20             MR. O'SHEA:  Objection.  It is being

21   published.

22             THE COURT:  Overruled.  Pardon me.

23             MR. O'SHEA:  Is it published to the jury

24   yet?

25             THE COURT:  It is.

1       MR. O'SHEA:  Objection.

2       MR. BROWN:  May I continue?

3       THE COURT:  You may.

4    BY MR. BROWN:

5    Q.   How do you recognize this?

6    A.   As part of my investigation, I took the data from a

7    command and control server that I did search warrants on,

8    and I recreated the command and control server.  I ran my

9    own that was not connected to the internet and was not

10   connected to infected systems.

11            So I took all the data from the search

12   warrant and essentially rebuilt the system so that I

13   could run what they were running.

14   Q.   And is this data — is it a fair and accurate

15   recreation of the data you got in search warrant

16   returns?

17   A.   Yes.

18   Q.   And what does it show to you?

19   A.   So this shows one of the interfaces that was built

20   by this group.

21   Q.   What does that mean?

22   A.   It is a web page used to control infected

23   systems.

24   Q.   And where did you find this web page?

25   A.   It was on the command and control server in a

1   specific directory with a large number of other files

2   that were related to the Bayrob structure.

3   Q.    And looking at Exhibit 1137, were you able to tell

4   how it worked?

5   A.    Yes.  And I could also see the underlying code

6   behind this.  So I could see the interface like the web

7   page it created, but I could also see the logic on the

8   back side of how it worked.

9              MR. BROWN:  Your Honor, may I publish this

10  for the jury?

11             THE COURT:  Mr. Goldberg, any objection?

12             MR. GOLDBERG:  No objection.

13             THE COURT:  Mr. O'Shea?

14             MR. O'SHEA:  Same objection, Judge.

15             THE COURT:  The same objection you said?

16             MR. O'SHEA:  Yes.

17             THE COURT:  Well, then, I think we need a

18  side bar.

19             (Side bar held on the record.)

20             MR. O'SHEA:  Not enough foundation,

21  publicizing.  I don't think there has been enough

22  foundation and explanation of what this is before

23  publication to the jury.

24             THE COURT:  Well, I am going to be real

25  blunt with you.  I am lost, and I don't know if it is

1    because I am not feeling well, but I am lost so I am

2    going to require more foundation so I can understand

3    it.

4              MR. BROWN:  All right.

5              (Side bar concluded.)

6    BY MR. BROWN:

7    Q.    Special Agent Macfarlane, looking at Exhibit 1137,

8    where did you find this data?

9    A.    So this data was on — from the results of the

10   search warrant on the command and control server.

11   Q.    Do you recall which command and control server?

12   A.    This data was on almost every command and control

13   server I did a search warrant for.

14   Q.    So this web page was something you saw in every

15   search warrant return?

16   A.    The file ping-view, yes, was nearly on every command

17   and control server I did a search warrant on.

18   Q.    And where on the command and control server would

19   you find this page?

20   A.    It would be in a subdirectory of the user directory

21   S3, which was the directory that contained a large number

22   of directories and subdirectories that all related to the

23   Bayrob structure.

24   Q.    Did you create the data in Exhibit 1137?

25   A.    No.

1    Q.    Did you populate any of the data in 1137?

2    A.    No.

3    Q.    Did you create any of the format in 1137?

4    A.    No.

5    Q.    Is 1137 a fair and accurate representation of

6    the data you found on the search warrant return of a

7    server?

8    A.    Yes.

9    Q.    And is it a fair and accurate representation of the

10   ping-view you found on every server you issued a search

11   warrant for?

12   A.    Yes.

13   Q.    Okay.

14               MR. BROWN:  Your Honor, may I publish?

15               MR. O'SHEA:  Fine, Judge.

16               MR. BROWN:  Thank you.

17   BY MR. BROWN:

18   Q.    Looking at 1137, what could you tell — based on

19   your investigation, what could you tell the left column

20   to be?

21   A.    So the left column here was an identifier for a

22   specific auto option fraud.

23   Q.    How could you tell that?

24   A.    Based on my review of the files, on the command and

25   control server, and the underlying data in a database

1  that populated this data.  It was the conclusion of my

2  analysis.

3  Q.   And where was that database located?

4  A.   On the command and control server.

5  Q.   And what does the next column tell you, if

6  anything?

7  A.   The next column would represent the e-mail address

8  of an infected system or associated with an infected

9  system.

10  Q.   Based on your investigation, how did you know that's

11  an e-mail address of an infected system?

12  A.   Based on my review of the underlying code and the

13  data contained within the database combined with my

14  understanding of how the scheme worked.

15  Q.   And based on your knowledge of the investigation, is

16  it, for example, BJ Ward 17@ATT.net, is that something

17  that would have been sent a second chance offer?

18          MR. GOLDBERG:  Objection.

19          THE COURT:  Sustained.

20  BY MR. BROWN:

21  Q.   Do you know how an e-mail address would appear in

22  that column?

23  A.   Data from that column would appear once a system

24  was infected, and I knew how the Bayrob Group was

25  infecting victims.  It was through the Trojan picture

1    viewer.

2    Q.    Now, there are a series of sort of empty boxes or

3    open boxes in four columns.  Do you know what those boxes

4    were based on your investigation?

5    A.    I do, yes.

6    Q.    And what did you know those boxes to be?

7    A.    So based on my review of the underlying code, I

8    could tell what those boxes did.

9          Checking one of those boxes would allow you

10   to issue a command to the associated infected victim.  So

11   for example, the column that has a number of checks right

12   here that has the camera would instruct the computer to

13   take screen shots.  So the infected computer would start

14   taking screen shots of that system, the desktop of that

15   system.

16   Q.    Based on your review of all this data, could you

17   tell how taking screen shots was important to the Bayrob

18   virus?

19         MR. GOLDBERG:  Objection.

20         THE COURT:  Sustained.

21   Q.    Could you tell in your review of the code, could you

22   tell where screen shots went once they were taken?

23   A.    Yeah.  Screen shots went back to the command and

24   control server.

25   Q.    So they remained on the command and control

1    server?

2    A.    Yes, they did.

3    Q.    Could you tell what the other boxes were for?

4    A.    The other boxes, if you checked the other boxes, it

5    would collect different types of data.

6              So for example, if you checked the credit

7    card, which is the column next to the camera, which would

8    be right there, it would start to collect credit card

9    information.

10   Q.    Could you tell what the other boxes did?

11   A.    They would collect other data like log-in data, and

12   I can't recall what this chat one is.  At one point in

13   time, I knew what it did, but at this point, I can't

14   recall what it is.

15   Q.    Based on your review of the underlying code, were

16   you able to tell if the data collected be, it a screen

17   shot or credit card data, was that collected

18   automatically then?

19              MR. GOLDBERG:  Objection.

20              THE COURT:  Overruled.

21   A.    Yes.  There were two ways in which to instruct the

22   botnet to collect data.  You could check one of these

23   boxes, or you could change the underlying database, the

24   data within the database to say, for example, I could

25   change an entire field to "on" effectively, and it would

1    make all the infected systems do something like collect

2    log-in data.

3    Q.    Based on your review of the code and your

4    understanding at this point of how the botnet worked, did

5    those two manners automate the collection system of the

6    botnet?

7                   MR. GOLDBERG:  Objection.

8                   THE COURT:  Overruled.

9    A.    My review of this page would basically show it

10   was a way to make it easy to interact with infected

11   victims.

12   Q.    Did you see any other web pages like 1137 in your

13   review of the search warrant data that helped interact,

14   helped the Bayrob interact with infected computers?

15   A.    Yes.  There were approximately somewhere in the

16   range of 10 to 30 different pages that provided some type

17   of service to the users of this server.

18   Q.    Could we take a look at Exhibit 1141 without

19   publishing to the jury right now?  And do you recognize

20   that?

21   A.    Yes, I do.

22   Q.    What do you recognize that to be?

23   A.    So this is another one of the files on the command

24   and control server.

25   Q.    And how do you recognize it to be a file from a

1    command and control server?

2    A.    Based on my analysis of the command and control

3    server and the files contained on it.  I found this

4    file in the command and control server, and I analyzed

5    it.

6    Q.    Did you create any of the data on this page?

7    A.    No, I did not.

8    Q.    Did you alter any of the data on this page?

9    A.    I did not.

10   Q.    Did you do anything to format the data on this

11   page?

12   A.    I did not.

13   Q.    Is the data on this page and its appearance a true

14   and accurate copy of how it appeared in the search

15   warrant returned data.

16   A.    Yes, it is.

17           MR. BROWN:  May I publish it to the jury,

18   your Honor?

19           THE COURT:  Any objection?

20           MR. GOLDBERG:  No objection, your Honor.

21           THE COURT:  Thank you.

22   BY MR. BROWN:

23   Q.    Special Agent Macfarlane, what did looking at

24   Exhibit 1141 help you in understanding the Bayrob Group

25   in your investigation?

1    A.    So this page, this web page is another Bayrob web

2    page used by the group to help them manage their fraud

3    scheme.

4    Q.    And how, based on your review of the data how, did

5    it help manage the fraud scheme?

6                    MR. O'SHEA:  Objection.

7                    THE COURT:  Overruled.

8    A.    So this web page was used by members of the Bayrob

9    Group to view communications with victims.

10   Q.    And how did it do that?

11   A.    This was essentially a criminal version of web mail.

12                   MR. O'SHEA:  Object.

13                   THE COURT:  Overruled.

14   BY MR. BROWN:

15   Q.    What do you mean by that?

16   A.    So I mean that this interface was specifically

17   designed to support the auto auction fraud that has been

18   previously described.

19   Q.    How did it support that?

20   A.    So for example:  It was an inbox like an e-mail

21   inbox that would track by fraudulent listing, put victims

22   or potential victims that were involved in that specific

23   auto auction.

24   Q.    Could you tell what LICI L-I-C-I meant in that

25   second column?

1    A.    Yes.   That's the identifier for a fraudulent

2    listing.

3    Q.    And could you tell the identity of the user of this

4    web application by looking at it?

5    A.    This is the view that you would see if you

6    were using this system, this web page as MF or Master

7    Fraud.

8    Q.    Okay.  And how could you tell or how could

9    you identify MF from Master Fraud looking at this page?

10   A.    Based on orel, which is up here where my arrow is.

11   You can see the user equals MF.

12   Q.    Were there other examples of the web supported

13   application you saw in the search warrant data?

14   A.    Yes.

15   Q.    And could we look at, without publishing Exhibit

16   1146, do you recognize this?

17   A.    I do.

18   Q.    How do you recognize it?

19   A.    I found this file on the command and control

20   server.

21   Q.    And what do you understand this to be?

22   A.    A list of templates used for the auto auction

23   fraud.

24   Q.    And where was this found?

25   A.    On the command and control server.

1   Q.   Did you create any of the data on this?

2   A.   I did not.

3   Q.   Did you modify any of the data on this?

4   A.   No.

5   Q.   Did you format any of the data on this?

6   A.   No.

7   Q.   Did you do anything to change or modify the

8   appearance of this?

9   A.   No.

10   Q.   Is this page a fair and accurate representation of

11   how the data that was formatted on the command and

12   control server?

13   A.   Yes.

14           MR. BROWN:  Permission to publish to the

15   jury, your Honor?

16           MR. GOLDBERG:  No objection.

17           MR. O'SHEA:  No objection.

18   BY MR. BROWN:

19   Q.   And Special Agent Macfarlane, what on this page was

20   relevant to your investigation?

21   A.   So this page is a list of different templates

22   used by the group to generate e-mails to potential

23   victims.

24   Q.   And why is finding this data relevant to your

25   investigation?

1    A.    Because this data links all the previous data that

2    we had seen from Symantec and AOL and victims.

3    Q.    How?

4    A.    Because the templates are the same.

5    Q.    What do you mean "the templates are the same"?

6    A.    So for example, you see this text up here, you can

7    see that we have seen this — this e-mail or this text

8    before, and down here, for example, on Dropbox, you know,

9    we have seen from previous testimony this specific

10   content.

11   Q.    So based on your investigation, what importance did

12   Dropbox mean?

13   A.    Dropbox was the service that they were using

14   to send links in the e-mail when they were infecting a

15   victim.

16   Q.    And if you look at the box labeled text-2 —

17   A.    Yes.

18   Q.    — could you explain in the subject why the text

19   looks like that, if you know?

20   A.    So when you see the brackets and the carats, this is

21   a way of randomizing the message before it would go out,

22   so that when the Bayrob Group was sending messages, each

23   message would look slightly different, so that it was

24   harder for security companies to generate signatures on

25   it.  So this was an evasion technique.

1   Q.    And based on your investigation and your experience,

2   why was it important to evade detection?

3   A.    This group needed to evade detection to be

4   successful with their fraud.

5   Q.    Now, do you see any other web-based templates that

6   are helpful in the fraud scheme?

7   A.    I did, yes.

8   Q.    Without publishing to the jury, could we take a look

9   at Exhibit 1138?  Do you recognize this?

10  A.    I do, yes.

11  Q.    What do you recognize it to be?

12  A.    So this is the view that a member of the Bayrob

13  Group would have when they were on the other end of a

14  live eBay chat with a victim.

15  Q.    And where did you find this?

16  A.    I found this on the command and control server.

17  Q.    Did you create any of the data in this exhibit?

18  A.    I did not.

19  Q.    Did you modify any of the information in this

20  exhibit?

21  A.    I did not.

22  Q.    Did you format any of the information in this

23  exhibit?

24  A.    I did not.

25  Q.    Is this exhibit a fair and accurate representation

1    of the data and the formatting as you saw it on the

2    command and control server?

3    A.    It is, yes.

4              MR. BROWN:  Your Honor, permission to

5    publish 1138?

6              MR. O'SHEA:  No objection.

7              MR. GOLDBERG:  No objection.

8              MR. BROWN:  Thank you.

9    BY MR. BROWN:

10   Q.    Could you explain what you see on this web

11   page?

12   A.    So what we are looking at here is a web page

13   that would be used by a member of the Bayrob Group

14   to communicate as an eBay agent over chat with a

15   victim.

16   Q.    Based on your investigation, did you see eBay chats

17   anywhere?

18   A.    Yes.

19   Q.    What was the importance of your investigation to

20   eBay chat?

21   A.    EBay chat was a feature of the Bayrob Trojan, so

22   when victims clicked on a Bayrob auto action and hit the

23   "support" or "help" link, they would be redirected to a

24   member of the Bayrob Group instead of being redirected to

25   eBay.

1560

1    Q.    And what was the importance based on your

2    investigation of having that functionality?

3    A.    This data represents communications between the

4    Bayrob Group and victims.

5    Q.    Now, looking at this, who is eBay?

6    A.    So in this web page, eBay would be the Bayrob

7    Group.

8    Q.    And who would UB be?

9    A.    That would be the victim.

10   Q.    And in this exhibit who is the UB?

11   A.    This would be the victim associated with B. J. Ward

12   17@ATT.net.

13   Q.    And how would a member of the Bayrob Group

14   communicate using this template?

15   A.    So they would see messages that they had sent and

16   the victim had sent, and then they would type into this

17   box down here their reply, and then they would click the

18   reply-to-asshole button.

19   Q.    What do you mean reply to asshole?

20   A.    That's just the name of the button.

21   Q.    During your investigation, did you ever talk to

22   people at eBay?

23   A.    Yes.

24   Q.    Did you ever learn if reply to asshole is a

25   functional button for employees of eBay?

1    MR. GOLDBERG: Objection.

2    THE COURT: Sustained.

3    BY MR. BROWN:

4    Q.   Was there anything else on this exhibit or this web

5    page that was relevant to your investigation into the

6    Bayrob Group?

7    A.   The URL for all of these exhibits is important

8    because I was able to use the URLs and the data structure

9    on the command and control server and match that up with

10   traffic from the data intercept as well as other

11   information in the course of my investigation.

12          All of these files helped me understand how

13   the Bayrob Group did what they did.

14   Q.   Special Agent, it is 4:00 p.m. I am going to ask a

15   stepback question.

16          What in the URL was relevant to your

17   investigation?

18   A.   The directory structure and the file.

19   Q.   Now, when you mean "directory structure," is that

20   basically just a listing of where the file lives on the

21   directory?

22   A.   Yes.  When you go to a website, the URL will

23   sometimes include where on the website you are going.  In

24   this case, there is a corresponding directory on the

25   command and control server in the /S my 4 directory, and

1  the my 4 directory contains a lot of files that help

2  support the auto auction fraud.

3  Q.    And you heard testimony about extensions during this

4  trial?

5  A.    Yes.

6  Q.    Is .PHP an extension?

7  A.    Yes.

8  Q.    What significance to this case did you place on this

9  .PHP?

10  A.    The .PHP in this case was significant because the

11  main files that were responsible for controlling the

12  malware were written in .PHP as well as a number of files

13  that were responsible for collecting a variety of

14  information from infected systems.

15  Q.    Now, did you continue your analysis of the wire?

16  A.    Yes.

17  Q.    Did you also continue your analysis of the search

18  warrant data?

19  A.    Yes.

20  Q.    What, if anything, did you see in the analysis of

21  those two sources of information?

22  A.    So between the data from the interception and the

23  data from the search warrants, I could take those two

24  pieces of data, and I could understand how infected

25  systems used the files on the command and control server,

1    and I found over I think 1400 directories that were

2    related to different aspects of the fraud.

3    Q.    I think you testified earlier about the screen

4    shots.  Do you recall that?

5    A.    I did, yes.

6    Q.    Did you find directories with screen shots on the

7    command and control server?

8    A.    I did.  I found directories containing screen

9    shots.

10   Q.    What, if anything, was the importance to your

11   investigation of screen shots?

12   A.    The importance of the screen shots based on, if you

13   remember ping-view, you could select the check box that

14   would take a screen shot, and that would tell the virus

15   to take screen shots of the infected system.

16            Those screen shots would then go back to the

17   command and control server and be effectively on the

18   command and control server.  It was a way of documenting

19   or seeing what their victims were seeing.

20   Q.    Okay.  And when you say "screen shots," what do you

21   mean?

22   A.    Just a picture of your desktop.

23   Q.    Okay.  Could we take a look at Exhibit 1170?  Let's

24   not publish it yet, make sure there are no objections.

25            Do you recognize that?

1  A.   I do.

2  Q.   What do you recognize that to be?

3  A.   A screen shot.

4  Q.   How do you recognize it to be a screen shot?

5  A.   Because I know it was found on the command and

6  control server.

7  Q.   And did you create any of the data on that screen

8  shot?

9  A.   I did not.

10  Q.   Did you alter any of the data on that screen

11  shot?

12  A.   I did not.

13  Q.   Did you modify or format any of the data on that

14  screen shot?

15  A.   I did not.

16  Q.   Is that screen shot a reliable, fair, and accurate

17  reliable image of the screen shot you saw on the command

18  and control server?

19  A.   It is, yes.

20          MR. BROWN:  Permission to publish to the

21  jury, your Honor?

22          MR. GOLDBERG:  No objection.

23          MR. O'SHEA:  No objection.

24  BY MR. BROWN:

25  Q.   Special Agent Macfarlane, can you tell us, what are

1    we looking at?

2    A.    So this is a picture found on the command and

3    control server.

4    Q.    And what is it a picture of if you could tell?

5    A.    It is the picture of a desktop of an infected

6    system.

7    Q.    How could you tell it is a picture of a

8    desktop?

9    A.    I know it is infected because it was found on the

10   command and control server.  I analyzed both the related

11   traffic from infected systems as well as the files that

12   were responsible for initiating these types of screen

13   shots on infected systems.

14   Q.    And looking at that screen shot, what, if

15   anything, could you tell of relevance to your

16   investigation?

17   A.    So based on my understanding of all of the data that

18   I obtained from the search warrants and the data

19   intercept, I understood that this screen shot was a

20   result of an infection?

21          So I knew this was an infected computer

22   because the only way in which this could come on to the

23   command and control server was if the system was

24   infected, because it had to get infected first before it

25   could actually take screen shots for the Bayrob Group.

1           Additionally, each one of these screen

2    shots would have a unique identifier associated

3    with the specific infected system that it came

4    from.

5    Q.    Did you find any programs or any code that showed

6    people sending screen shots from the desktop to the

7    command and control server?

8    A.    Yes, I did.

9    Q.    Of people?

10   A.    Of like individuals sending?

11   Q.    Yes.

12   A.    No, no.  This was just a function of the

13   malware.

14   Q.    Okay.  And looking at this page, what was of

15   investigative interest to you?

16   A.    A few things that were of interest to me were some

17   consistencies that I had seen in other places.  For

18   example, this was consistent with the templates that I

19   had seen from other sources of the investigation, such as

20   data provided by victims, data provided by AOL and

21   Symantec, as well as other screen shots that were on this

22   command and control server.

23   Q.    And Special Agent Macfarlane, what are you pointing

24   at?

25   A.    So this is the feedback rating, and if you remember

1567

1   from earlier testimony, this 106 stars is part of the

2   Bayrob template for their fake eBay page or their fake

3   eBay listing.

4   Q.   Did you see anything else about this page that had

5   the indicia of being part of the Bayrob Group?

6   A.   Yes.  And here is the eBay and protection, which was

7   invented by the Bayrob Group.

8   Q.   Did you see any other screen shots that were of

9   investigative interest to you?

10  A.   I did, yes.  There were thousands.

11  Q.   If you look at Exhibit 1177 without publishing to

12  the jury, please.

13              Do you recognize this?

14  A.   Yes.

15  Q.   What do you recognize it to be?

16  A.   Another screen shot of an infected system.

17  Q.   Where did you find this screen shot?

18  A.   I found this screen shot on the command and control

19  server.

20  Q.   Did you create this data?

21  A.   I did not.

22  Q.   Did you add or modify any data to this web page?

23  A.   I did not.

24  Q.   Did you do anything to change the formatting of this

25  screen shot?

1    A.    No.   This was just a picture I found on the command

2    and control server.

3    Q.    And is this screen shot a fair and accurate

4    representation of what you found on the command and

5    control server?

6    A.    Yes.

7                MR. BROWN:  Permission to publish to the

8    jury, your Honor?

9                MR. GOLDBERG:  No objection.

10               MR. O'SHEA:  No objection.

11   BY MR. BROWN:

12   Q.    And looking at Exhibit 1177, what, if anything, was

13   of investigative interest in this screen shot?

14   A.    So this screen shot showed the desktop of

15   another infected system.  I could see up here

16   that someone was logged into their Outlook account under

17   gradyread@hotmail.

18               I could see the current tab, which was a

19   Bayrob Group auction because it had the eBay agent

20   protection, and I could see other things on the desktop

21   such as what programs were on their desk bar down here

22   and the time, for example.

23   Q.    And were there screen shots involving other parts of

24   the eBay auction fraud scheme on the command and control

25   server?

1    A.    There were.  They would take screen shots of almost

2    every aspect of the fraud process.

3    Q.    Based on your investigation and review of the wire

4    traffic and the command and control server, were you able

5    to determine what the purpose of the self-documenting

6    through screen shots was?

7    A.    My analysis of the command and control server showed

8    that the Bayrob Group kept excellent records of

9    everything they did when it related to interactions with

10   victims.

11                They would track multiple different data

12   points for each investigated system to include screen

13   shots of the infected systems, account listings that were

14   stolen from that system, the way that system was used to

15   register domains or interact with other websites at the

16   direct command of the botnet as well as per victim a

17   large amount of data that was specific to their ability

18   to control all these different systems.

19   Q.    And based on that, did you see — could I show you

20   without publishing Exhibit 1180, and do you recognize

21   this?

22   A.    I do, yes.

23   Q.    What do you recognize it to be?

24   A.    Another screen shot of infected system.

25   Q.    And where did you find this?

1  A.  On the command and control server.

2  Q.  Did you create this data?

3  A.  Yes, sir.

4  Q.  Pardon me?

5  A.  No.  I'm sorry, no.

6  Q.  You did not create this data?

7  A.  No.

8  Q.  Is this a screen shot?

9  A.  It is, yes.

10  Q.  Did you alter any of this data?

11  A.  I did not.

12  Q.  Did you modify any of this data?

13  A.  I did not.

14  Q.  Is this a fair and accurate representation of what

15  you found on the command and control server?

16  A.  It is, yes.

17          MR. BROWN:  Permission to publish?

18          MR. GOLDBERG:  No objection.

19          MR. O'SHEA:  No objection, Judge.

20  BY MR. BROWN:

21  Q.  And what of investigative importance did you find

22  from this screen shot?

23  A.  So this screen shot is another screen shot of an

24  infected system, and I could see that when the screen

25  shot was taken the infected computer, the user of the

1    infected computer, had agreed to buy the vehicle, and an

2    invoice was generated.

3    Q.    How could you tell that?

4    A.    I could tell that because I found this specific

5    template on the command and control server, and this was

6    consistent with other data sources on specifically how

7    this scheme was run by this group.

8    Q.    And where on the command and control servers would

9    you find those templates?

10   A.    In various directories based on what the template

11   was related to.

12   Q.    Did you see on this screen shot any other data that

13   would have come from directories on the command and

14   control server?

15   A.    Yes.  This template was a Bayrob template that I

16   found on the command and control server, and it had other

17   specific data items that I had seen in other places such

18   as fax numbers and victim data as well as, you know, item

19   numbers.

20            All of these things were in the underlying

21   data found on the command and control server.

22   Q.    And based on your review of the code, were you able

23   to tell how that data that you pointed out, the victim

24   data, populated those directories?

25   A.    Yes.  A number of these data items came out of a

1    database that was created by the Bayrob Group.

2    Q.    Okay.  Now, were you also able to see these sorts of

3    templates in other parts of the fraud scheme?

4    A.    Yes.

5    Q.    Showing you Exhibit 2701 without publishing, do you

6    recognize this?

7    A.    I do.

8    Q.    How do you recognize it?

9    A.    This is a file that was found on the command and

10   control server.

11   Q.    And did you create any of the data?

12   A.    I did not.

13   Q.    Did you modify any of the data?

14   A.    I did not.

15   Q.    Did you change any of the formatting?

16   A.    I did not.

17   Q.    Is this, in fact, a screen shot?

18   A.    Yes.

19   Q.    Is this a fair and accurate representation of

20   a screen shot you saw on the command and control

21   server?

22   A.    No.  I took this screen shot after standing up

23   the — like the command and control server.

24   Q.    So this is a screen shot?

25   A.    It is, yes.

1    Q.    But you took the screen shot?

2    A.    I took the screen shot, yes.

3    Q.    Is this a screen shot a fair and accurate

4    representation of the web page or of the data you found

5    on the command and control server?

6    A.    It is, yes.

7                  MR. BROWN:  Permission to publish, your

8    Honor?

9                  THE COURT:  Mr. Goldberg?

10                  MR. GOLDBERG:  No objection.

11                  MR. O'SHEA:  No objection, Judge.

12   BY MR. BROWN:

13   Q.    And looking at Exhibit 2071, what, if anything, was

14   of investigative importance to you?

15   A.    So the company or the site name MTPL was of

16   importance because we had seen it in other places in our

17   investigation as a site that was used to recruit what

18   were called mules, which were individuals that received

19   money from victims and then sent them on to other places

20   in Europe.

21   Q.    Is it fair to say that this is a recruiting page for

22   money mules?

23   A.    It is, yes.

24                  MR. O'SHEA:  Objection.

25   Q.    Based on your investigation, did you recognize this

1    to be —

2              THE COURT:  Is there an objection?

3              MR. O'SHEA:  Yes.

4              MR. GOLDBERG:  Yes.

5              THE COURT:  Overruled.  I am going to allow

6    the answer to stand.

7    A.    Yes.  It was a recruiting page.

8    Q.    And did you see any other data relevant to your

9    investigation?

10   A.    Yes.  This page had other indicators that we had

11   seen in data from other aspects of the investigation, so

12   a number of these names, for example, were other

13   recruiting companies that we were aware of that were

14   recruiting mules for the Bayrob Group such as KST.

15              At one point in time, there was a U.S. wire

16   service, and the site name was MTPL, which was another

17   fake company doing recruiting for the Bayrob Group.

18   Q.    Okay.  Now, was a page like this also drawing

19   information from databases on the command and control

20   server?

21              MR. GOLDBERG:  Objection.

22              THE COURT:  Sustained.

23   BY MR. BROWN:

24   Q.    Okay.  Were you able to — seeing a page like that,

25   was there any investigative interest related to the

1    command and control server?

2    A.    So, yes.  Seeing files such as this one and other

3    files that were on the command and control server, it was

4    apparent to me that whoever was running this command and

5    control server was also running the recruitment

6    operations that we had seen in other aspects of the

7    investigation.

8    Q.    Were you able to see directories that supported

9    the recruitment operation on the command and control

10   server?

11                   MR. GOLDBERG:  Objection.

12   A.    Yes.

13                   THE COURT:  Overruled.

14   A.    Yes.  They were on the command and control

15   server.

16   Q.    And when you say they were directories, what did

17   they look like?

18   A.    So a directory is just a folder essentially, which

19   you put files into or other directories.

20                   So it would be a listing or a structure of

21   files that would be logically organized to categorize

22   data in a way that meant something to the users of the

23   system.

24   Q.    And what would the data within those files look

25   like?

1   A.   It would vary.  Some of the data would be templates

2   like this.  Some of the data would be files that

3   contained information, that would be imported into files

4   like this.

5            Some of the data would be like templates or

6   data collected from web pages like this, such as people

7   that signed up that would provide their information.

8   That data might end up on the command and control server

9   in a directory related to this page.

10  Q.   Without publishing to the jury, looking at Exhibit

11  2201, do you recognize this?

12  A.   Yes.

13  Q.   What do you recognize it to be?

14  A.   This is data that was contained within the

15  database.

16  Q.   Okay.  And how do you recognize it as data contained

17  within a database?

18  A.   Because I reviewed all the data in the data base,

19  and this is the data that I saw.

20  Q.   And where did you find this data?

21  A.   So on the command and control server, there was a

22  database that tracked a large amount of data related

23  to — related to all aspects of the criminal scheme, to

24  include the auction fraud, the recruiting, the money

25  mules, the infected systems, and a number of other

1    aspects.  There were over 50 tables related to different

2    information that was tracked and used by the Bayrob

3    Group.

4    Q.   And this was found on one of the command and control

5    servers?

6    A.   That is correct, yes.

7    Q.   Did you create this data?

8    A.   I did not, no.

9    Q.   Did you modify the data?

10   A.   I did not.

11   Q.   Did you format this data?

12   A.   I did not.

13   Q.   Is this a fair and accurate representation of the

14   data as it existed on one of the databases on the command

15   and control server?

16   A.   It is, yes.

17              MR. BROWN:  Permission to publish 2201?

18              MR. O'SHEA:  Can we have a side bar real

19   quick on that one, your Honor?

20              THE COURT:  You may.

21              (Side bar held off the record.)

22   BY MR. BROWN:

23   Q.   Special Agent Macfarlane, before we go on, did you

24   for a program format this data?

25   A.   Yes.  I pulled this data out of the database so that

1    we could see it and view it.

2    Q.    Did you put it in a format that is legible or

3    readable?

4    A.    I did, yes.

5    Q.    And in formatting this data, did you change any of

6    the data?

7    A.    No.

8    Q.    Did you change any of the meaning of the data?

9    A.    No.

10   Q.    Is this data the same data that existed on the

11   command and control server?

12   A.    It is.

13   Q.    But in a different format?

14   A.    Yes.  It is the way in which we can view the data

15   within the database.

16   Q.    Okay.  Is this an Excel spreadsheet?  Do you know

17   which program you used?

18   A.    So I used a tool called My Sequel Workbench, which

19   is a tool that allows you to access databases, and it

20   will take the data within a database and allow you just

21   to see it.  There is export function of that tool, which

22   allows you to export that data into a text format

23   file, and you can then use that file and view it

24   in a text viewer or Excel or a number of different

25   tools.

1    Q.    So you hit export, and it is readable?

2    A.    Yes.  And then you'd use another tool to read it.

3    In this case, I don't specifically remember what I used

4    to create this, you know, to export and view this data,

5    but it was likely Excel if I had to guess.

6    Q.    If you are using would Excel, Special Macfarlane,

7    would comma separating or tab separating the columns make

8    a difference in formatting?

9    A.    So that is a different format, yes, because the

10   fields are limited by two different characters, a comma

11   or a tab, but it wouldn't change the rest of the data.

12   You would still be able to import it into Excel and view

13   it or view it using a text viewer.

14              MR. BROWN:  Your Honor, I would move to

15   publish at this point that the data has not changed from

16   the database.

17              THE COURT:  Mr. Goldberg, any objection?

18              MR. GOLDBERG:  No objection.

19              MR. O'SHEA:  No objection, Judge.

20              MR. BROWN:  Thank you, your Honor.

21   BY MR. BROWN:

22   Q.    And could you explain what this table is?

23   A.    So this table is data related to recruitment

24   operations that were done by the Bayrob Group.  So this

25   first column was a list of infected systems that were

1    used with an associated e-mail account and a password for

2    that e-mail account.

3              So for example, we had seen the Bayrob Group

4    use the alias Martin Steinberg to recruit mules as part

5    of the criminal scheme.  This column contains a large

6    number of e-mail accounts that were used or consistent

7    with that alias.

8    Q.    And in fact, did you see those e-mail addresses in

9    recruitment pages?

10   A.    We did, yes.

11   Q.    And what is the SOCKS column, what does SOCKS mean?

12   A.    So these columns are named by the Bayrob Group, and

13   this was the name of the column related to infected

14   systems, the port which it connected to and data that you

15   would need to proxy through that system.

16   Q.    And were you able to determine in your investigation

17   what the status column meant?

18   A.    The status column was information as to the current,

19   whether this e-mail account was still active, good, or

20   working.

21   Q.    Okay.

22              THE COURT:  Folks, we are going to adjourn

23   for the evening.  Do not form any opinion, and do not

24   talk about the case.  Please be downstairs tomorrow

25   morning at 9:00 a.m.  We will call for you at that time.

1              Have a good evening everybody.  All rise for

2  the jury.

3              (Jury out.)

4              THE COURT:  Okay.  Let's go through the

5  exhibits for the day.  Are you offering 1410?

6              MR. LEVINE:  No.

7              THE COURT:  1411?

8              MR. LEVINE:  Yes.

9              THE COURT:  I am just going to start reading

10  now:  1413, 2424.

11              MR. BROWN:  Is that a physical?

12              MS. CHANDLER:  Yes.

13              MR. BROWN:  Okay.

14              THE COURT:  2341.

15              MR. LEVINE:  Physical.

16              THE COURT:  2317.

17              MR. LEVINE:  Physical.

18              THE COURT:  255.

19              MR. LEVINE:  Physical.

20              THE COURT:  1415.

21              MR. LEVINE:  Physical.

22              THE COURT:  2047.

23              MR. LEVINE:  Physical.

24              THE COURT:  2048.

25              MR. LEVINE:  Physical.

1    THE COURT:  2049.

2    MR. LEVINE:  Physical.

3    THE COURT:  2050.

4    MR. LEVINE:  Physical.

5    THE COURT:  2051.

6    MR. LEVINE:  Physical.

7    THE COURT:  2052.

8    MR. LEVINE:  Physical.

9    THE COURT:  May I assume that you are

10   offering only pages 3, 4, 7, and 8 of 1414?

11   MR. LEVINE:  Correct, your Honor.

12   THE COURT:  2054.

13   MR. LEVINE:  Physical.

14   THE COURT:  2255.

15   MR. O'SHEA:  What was the last one?  I

16   apologize.

17   THE COURT:  That's all right.  2054.

18   MR. O'SHEA:  Okay.

19   THE COURT:  2255, 1137, 1141.

20   MR. O'SHEA:  What's 1137?  Oh, that.  Okay.

21   THE COURT:  I will repeat, 1141, 1146, 1138,

22   1170, 1177, 1180, 2071, 2201.  On behalf of the

23   Government, did I miss anything?

24   MR. BROWN:  I do not believe so, your Honor.

25   I will double check with the expert.

1583

1          Exhibits offered pursuant to a stipulation

2     by Paul Mueller, and we can talk tonight and sort those

3     out.

4          MR. GOLDBERG:  Your Honor, I don't think you

5     missed anything.

6          THE COURT:  Okay.  We will see you in the

7     morning.

8          (Trial adjourned at 4:33 p.m.)

9               - - - -

10              C E R T I F I C A T E

11         I, George J. Staiduhar, Official Court

12    Reporter in and for the United States District Court,

13    for the Northern District of Ohio, Eastern Division,

14    do hereby certify that the foregoing is a true

15    and correct transcript of the proceedings herein.

16

17              s/George J. Staiduhar
                George J. Staiduhar,
18              Official Court Reporter

19              U.S. District Court
                801 W. Superior Ave., Suite 7-184
20              Cleveland, Ohio 44113
                (216) 357-7128
21

22

23

24

25