1          UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF OHIO
2              EASTERN DIVISION

3              - - - - -

4

5   UNITED STATES OF AMERICA,      )
                                    )
6              Plaintiff,           )
                                    )
7          vs.                      ) Case No. 1:16CR224
                                    )
8   BOGDAN NICOLESCU,               )
    RADU MICLAUS,                   )
9                                   )
               Defendants.          )
10

11             - - - - -

12

13      CONTINUED TRANSCRIPT OF TRIAL PROCEEDINGS HAD

14   BEFORE HONORABLE JUDGE PATRICIA A. GAUGHAN, JUDGE

15    OF SAID COURT, ON MONDAY, APRIL 8TH, 2019,

16        COMMENCING AT 9:00 O'CLOCK A.M.

17             - - - - -

18      Volume 11, Pages 2000 through 2248

19             - - - - -

20

21

22

23   Court Reporter:          GEORGE J. STAIDUHAR
                              801 W. SUPERIOR AVE.,
24                            SUITE 7-184
                              CLEVELAND, OHIO 44113
25                            (216) 357-7128

1    APPEARANCES:

2        On behalf of the Government:

3            OFFICE OF THE U.S. ATTORNEY
             BY:  BRIAN M. McDONOUGH, AUSA
4            801 West Superior Ave., Suite 400
             Cleveland, OH 44113
5

6                        and

7            U.S. DEPARTMENT OF JUSTICE - CRIMINAL DIVISION
             BY:  BRIAN L. LEVINE, SENIOR COUNSEL
8            1301 New York Avenue, Suite 600
             Washington, DC 20530
9

10       On behalf of Defendant Bogdan Nicolescu:

11           LAW OFFICE OF MICHAEL J. GOLDBERG
             BY:  MICHAEL J. GOLDBERG, ESQ.
12           323 Lakeside Place, Suite 450
             Cleveland, OH 44113
13

14       On behalf of Defendant Radu Miclaus:

15           LIPSON O'SHEA
             BY:  MICHAEL J. O'SHEA, ESQ.
16           110 Hoyt Block Building
             700 West St. Clair Avenue
17           Cleveland, OH 44113

18       Also present:

19           Doina Francu, Interpreter

20

21                        - - - - -

22

23

24

25

```
1                        I N D E X

2    WITNESSES:              DIRECT  CROSS  REDIRECT  RECROSS

3    Valentin Danet

4       Direct Continued      2003

5       By Mr. Goldberg               2010

6       By Mr. O'Shea                 2031

7    Marius Matei             2034           2084

8       By Mr. Goldberg               2060

9       By Mr. O'Shea                 2077

10   Catalin Dima             2086           2155

11      By Mr. Goldberg               2128

12      By Mr. O'Shea                 2143                2156

13   Donald Wertz             2157

14      By Mr. O'Shea                 2163

15   Ashley Parton            2164

16      By Mr. O'Shea                 2175

17   Clint Bertke             2176

18      By Mr. O'Shea                 2188

19

20

21

22

23

24

25
```

Mr. Valentin Dima – Direct Cont'd

P R O C E E D I N G S

1

2          THE COURT:  Please be seated, and good

3   morning, ladies and gentlemen.

4          Ladies and gentlemen, Mr. Duncan Brown is

5   not present here this morning.  He has another very

6   important matter, and I have given him permission to

7   attend.

8          So please understand that I have encouraged

9   him to do this other matter, and he has my complete

10  permission to do so.

11         Mr. McDonough?

12         MR. McDONOUGH:  Thank you, your Honor.

13                   VALENTIN DIMA

14  resumed the witness stand on behalf of the Government,

15  being previously sworn, was examined and testified

16  further as follows:

17             DIRECT EXAMINATION CONTINUED

18  BY MR. McDONOUGH:

19  Q.   Good morning, Mr. Dima.

20  A.   Good morning.

21  Q.   When we left off on Friday, I believe we were

22  talking about e-mails.  What was your e-mail address?

23  A.   Keke.zete.

24         THE TRANSLATOR:  Keke.zete @ GMX.com.

25  Q.   Who did you receive e-mails from?

Mr. Valentin Dima - Direct Cont'd

1           MR. GOLDBERG:  Objection.

2   Q.   Did you send e-mails to anyone?

3   A.   Yes.

4           MR. GOLDBERG:  Objection.

5           THE COURT:  Overruled.

6   Q.   Who?

7           THE TRANSLATOR:  At least to five other

8   members.

9   Q.   Members of what?

10          THE TRANSLATOR:  Among those were supporting

11  this fraud.

12          MR. O'SHEA:  Objection.

13          THE COURT:  Overruled.

14  BY MR. McDONOUGH:

15  Q.   For what purpose were you sending e-mails to the

16  group?

17          THE TRANSLATOR:  Information necessary for

18  us.

19  Q.   Like what?

20  A.   Credit cards, domains, posting information.

21  Q.   Okay.  Did you receive any instructions?

22  A.   Yes.

23  Q.   From whom?

24  A.   From obe.

25  Q.   What instructions?

Mr. Valentin Dima - Direct Cont'd

1    A.   Like buying, hosting domains like I said.

2    Q.   Who is your brother?

3    A.   Catalin Dima.

4    Q.   Does Catalin Dima have a nickname?

5    A.   Yes.

6    Q.   What was his nickname?

7    A.   Linxstal.

8    Q.   What was Catalin's e-mail?

9    A.   Linxstal @ GMX.com.

10   Q.   How long did you remain in this group?

11   A.   About three years, around three years.

12   Q.   Why did you leave?  I'm sorry.  Withdraw that.  How

13   did you get your brother into the group?

14             MR. GOLDBERG:  Objection.

15             THE COURT:  I'm sorry.

16             MR. GOLDBERG:  Objection, your Honor.

17             THE COURT:  Overruled.

18   BY MR. McDONOUGH:

19   Q.   Keep your voice up.

20             How did you get your brother involved into

21   this group?

22             THE TRANSLATOR:  I put him in touch with

23   obe.

24   Q.   Okay.  When did you he have leave the group?

25   A.   At the beginning of 2013?

Mr. Valentin Dima — Direct Cont'd

1   Q.   Why?

2   A.   Because I want a normal life and also —

3   Q.   If you could keep your voice up.

4   A.   Because I want a normal life, and I knew bad for

5   us.

6   Q.   What do you mean you wanted a normal life?

7              THE TRANSLATOR:  I wanted to have a

8   normal life like any other person, not to be stressed

9   out.

10  Q.   Why were you stressed out?

11             THE TRANSLATOR:  Because I was doing bad

12  things.

13  Q.   How much money were you making doing bad things?

14             MR. GOLDBERG:  Objection.

15             THE COURT:  Sustained.

16  Q.   What did you do after you left?

17             THE TRANSLATOR:  I opened an online store.

18  Q.   What did the online store do?

19             THE TRANSLATOR:  I was selling different

20  items for the bedroom like pillows and bed covers and

21  things like that.

22  Q.   Do you still do that?

23             THE TRANSLATOR:  No.  I don't use that

24  store, but I opened another store online.  I also try for

25  uber, and I am also helping out my brother.

Mr. Valentin Dima - Direct Cont'd

1    Q.   Do you have family?

2    A.   Yes, I have wife.

3    Q.   Do you have any children?

4    A.   Not yet.

5    Q.   What does your wife do?

6    A.   Like an accountant but not exactly.

7    Q.   Where does she work?

8              THE TRANSLATOR:  At a company that deals

9    with paintings and decorations.  It is called Benjamin

10   Moore.

11   Q.   Benjamin Moore.  Okay.  All right.

12             What did you do with your laptop computer

13   that you used for crime?

14             THE TRANSLATOR:  I throw away the hard

15   drive, and then I sold the laptop.

16   Q.   When did you throw away the hard drive?

17   A.   In 2013.

18   Q.   How did you find out about the arrest of Bogdan

19   Nicolescu?

20             THE TRANSLATOR:  Through a friend of

21   mine.

22   Q.   How did you find out about the arrest of

23   Radu Miclaus?

24             THE TRANSLATOR:  The same way through the

25   same means.

Mr. Valentin Dima — Direct Cont'd

1    Q.    What's the last time you had contact with Bogdan

2    Nicolescu?

3                  THE TRANSLATOR:  In 2013.

4    Q.    When is the last time you had contact with Radu

5    Miclaus?

6                  THE TRANSLATOR:  I didn't have too much of a

7    direct contact, probably at the same time I saw him the

8    last time.

9    Q.    In February 2019, did you receive a summons from the

10   Romania National Police to appear before DIICOT,

11   D-I-I-C-O-T?

12   A.    Yes.

13   Q.    What did you do in response to that summons?

14                 THE TRANSLATOR:  I answered some questions.

15   Q.    Before you answered questions, did you have to take

16   an oath?

17   A.    Yes.

18   Q.    Do you remember what questions you were asked?

19                 THE TRANSLATOR:  Overall, yes.

20   Q.    Did you tell the truth?

21   A.    No.

22   Q.    Why did you lie?

23                 THE TRANSLATOR:  That was my first instinct.

24   Q.    First instinct for what?

25                 THE TRANSLATOR:  I was afraid of

Mr. Valentin Dima — Direct Cont'd

1   repercussions and consequences.

2   Q.   Afraid of repercussions or consequences like what?

3   A.   Like going to prison.

4   Q.   Like going to prison where?

5          THE TRANSLATOR:  Either here or in Romania.

6   Q.   Here or —

7          THE TRANSLATOR:  Or in Romania.

8   Q.   Was the FBI there?

9   A.   Yes.

10  Q.   After that, did you have a chance to meet with the

11  FBI?

12  A.   Yes.

13  Q.   Have we met before?

14  A.   Yes.

15  Q.   Where did we met?

16  A.   In Bucharest.

17  Q.   With the FBI?

18  A.   Yes.

19  Q.   Did you enter into a proffer letter with the

20  Government?

21  A.   Yes.

22  Q.   Did you have an attorney in Romania?

23  A.   Yes, I had.

24  Q.   Did the FBI ask you questions in Romanian in a

25  meeting when we met?

Mr. Valentin Dima – Cross

1  A.  Yes.

2  Q.  Did the Government give you a non prosecution

3  letter?

4  A.  Yes.

5  Q.  What did the Government promise you that we would

6  not do, or I'm sorry.  Withdraw that.

7           What did the Government promise you?

8           THE TRANSLATOR:  That I would not be

9  accused if I come here and say — tell the truth as a

10  witness.

11           MR. McDONOUGH:  No further questions, your

12  Honor.

13           THE COURT:  Mr. Goldberg, cross examination.

14              CROSS EXAMINATION

15  BY MR. GOLDBERG:

16  Q.  Good morning, sir.

17           THE TRANSLATOR:  Good morning.

18  Q.  When you met with the Romanian police on February

19  19th, had you heard from any law enforcement prior to

20  that date about Bayrob?

21  A.  Can you repeat the question, please?

22  Q.  Prior to February 19, 2019, had any police tried to

23  speak with you regarding Bayrob?

24  A.  No.

25  Q.  And at the end of that meeting, did they ask you

**2011**

Mr. Valentin Dima - Cross

1  would you come to the United States and testify, the

2  first meeting?

3  A.   Yes.

4          THE TRANSLATOR:  Yes.  They asked me if I

5  was willing to do it.

6  Q.   And during that first meeting, you understood that

7  they, the police and the FBI, were interested in

8  information about Mr. Miclaus and Mr. Nicolescu and

9  Mr. Danet, correct?

10  A.   Yes.

11  Q.   And you understood that they were being prosecuted

12  in the United States, correct?

13  A.   Yes.

14  Q.   And you wanted the meeting with an agreement to come

15  to the United States to testify about your first

16  statement?

17  A.   I didn't understand exactly.

18  Q.   At the end of that — you said you lied to the FBI,

19  right?

20  A.   Yes.

21  Q.   And to the Romanian National Police under oath,

22  right?

23  A.   Yes.

24  Q.   But at the end of that meeting, you agreed

25  that you would come to the United States to testify,

2012

Mr. Valentin Dima — Cross

1  right?

2  A.  Yes.

3  Q.  No one accused you of being a liar during that

4  meeting, did they?

5  A.  Yes.

6  Q.  During that first meeting, no one accused you of

7  being a liar?

8  A.  Yes, they did not.

9  Q.  Did not.  All right.

10  Now, you have testified completely

11  differently here in Court than you did under oath with

12  the Romanian police, correct?

13  A.  No.

14  MR. McDONOUGH:  Objection.

15  THE COURT:  Overruled.  Is that true, sir?

16  THE TRANSLATOR:  Yes.  As I said before

17  here —

18  BY MR. GOLDBERG:

19  Q.  I am going to stop you because my answer was yes or

20  no, and the answer is yes, completely different.

21  A.  Yes.

22  Q.  Okay.  Now, prior to being involved with the scheme

23  that you testified here today, you were previously

24  involved with your brother in internet fraud in the early

25  2000s, correct?

2013

Mr. Valentin Dima - Cross

1   A.   Yes.

2   Q.   And that had nothing to do with these guys.  That

3   was with your brother and some other guys, right?

4   A.   No.  I just put my brother in —

5              THE TRANSLATOR:  I just put my brother in

6   touch with obe.

7   Q.   No.  I am talking about before that.

8              In 2003, 2002, you were involved in internet

9   fraud with your brother?

10             MR. McDONOUGH:  Objection.

11  A.   No.

12             THE COURT:  Overruled.  Is that true, sir?

13  Yes or no.

14             THE WITNESS:  No.

15  BY MR. GOLDBERG:

16  Q.   And you don't recall your brother or having his

17  laboratory or computers seized by the Romanian National

18  Police in 2003?

19             MR. McDONOUGH:  Objection.

20             THE COURT:  Sustained.

21  BY MR. GOLDBERG:

22  Q.   Do you know whether your brother was involved in

23  internet fraud prior to 2003?

24  A.   Yes.

25  Q.   He was.  But you had nothing to do with

2014

Mr. Valentin Dima - Cross

1    that?

2    A.    No.

3    Q.    And the Romanian police seized his computers in

4    2003?

5    A.    Yes.

6    Q.    And he was involved with internet fraud in that he

7    was selling fake items on the internet in the

8    United States, correct?

9              MR. McDONOUGH:  Objection.

10             THE COURT:  Sustained.

11   BY MR. GOLDBERG:

12   Q.    What was your — what kind of fraud — well, do you

13   know what your brother was doing that got him in trouble

14   in 2003?

15   A.    No.

16   Q.    Okay.  Fair enough.

17             So what town did you grow up in?

18   A.    In Bucharest.

19   Q.    Near Bucharest.  And you grew up with your brother

20   in the same house?

21   A.    Yes.

22   Q.    And you also had a friend by the name of Vaca,

23   correct?

24   A.    Yes.

25   Q.    And did you all live in the same neighborhood?

Mr. Valentin Dima - Cross

1    A.    Yes.

2    Q.    What about the Danet brothers, did you know them

3    growing up?

4    A.    No.

5    Q.    Okay.  But you and Vaca — what is Vaca's real

6    name?

7    A.    Victor.

8    Q.    What's his last name?

9    A.    Constantinescu.

10                 THE TRANSLATOR:  That's

11   C-o-n-s-t-a-n-t-i-n-e-s-c-u.

12   Q.    Thank you.  Okay.

13                 You've testified that in 2013 — let me ask

14   you this:  You indicated that you had — you indicated

15   that your brother's name was Linxstal?

16   A.    Yes.

17   Q.    Okay.  And did you — and you indicated what your

18   name was — your GMX e-mail account was?

19   A.    Yes.

20   Q.    What was it?

21   A.    Keke.zete.

22   Q.    And did you provide anything to the FBI, the

23   Romanian National Police or anyone else to prove that

24   that was your e-mail?

25   A.    No.

2016

Mr. Valentin Dima - Cross

1    Q.    You don't have any copies of your e-mails on

2    computers, right?

3    A.    No.

4    Q.    Did you give them the password to the e-mail

5    account?

6    A.    No.

7    Q.    What's the password to the e-mail account?

8    A.    I don't remember.

9    Q.    Okay.  So there is many, many e-mails where we see

10   the name keke from — before 2013 that have come into

11   evidence in this trial, but you don't remember the

12   password of that account, correct?

13   A.    We used long passwords.

14   Q.    Okay.  Well, did you try to find that password and

15   give it to the Government?

16   A.    No.  I don't remember the passwords so.

17   Q.    Okay.  So we are supposed to just believe you when

18   you say "I am keke, and I was involved in the Bayrob

19   Group" because you have no other proof, right?

20   A.    Yes.

21   Q.    So in 2013, you stopped being involved, you got —

22   you destroyed or threw away your hard drive?

23   A.    Yes.

24   Q.    Did you break it into pieces or just —

25   A.    I just throw it.

Mr. Valentin Dima — Cross

1   Q.   And you got rid of any other possible connection
2   between you and Bayrob, right?
3              THE TRANSLATOR:  There was nothing else,
4   just the laptop.
5   Q.   Okay.  Did you go to the police at any time prior to
6   February of 2019, two months ago, to say, "hey, I know
7   something about this fraud"?
8   A.   No.
9   Q.   Something about this crime?
10  A.   No.
11  Q.   Okay.  You knew a lot of people separate from
12  Bayrob that are involved in internet crime in Romania,
13  correct?
14             MR. McDONOUGH:  Objection.
15             THE COURT:  Sustained.
16  BY MR. GOLDBERG:
17  Q.   Do you know anybody besides the guys you identified
18  in here that were in internet fraud in Romania?
19             MR. McDONOUGH:  Objection.
20             THE COURT:  Sustained.
21  BY MR. GOLDBERG:
22  Q.   Okay.  Now, you indicated in your testimony that you
23  spent time at Nicolescu's house, correct?
24  A.   Yes.
25  Q.   Didn't Vaca have a house near Nicolescu's?

Mr. Valentin Dima - Cross

1           THE TRANSLATOR:  Yes.  He had rented a house
2    together with other friends.
3    Q.   And that was what, couple minutes away?
4    A.   One-hour.
5    Q.   One-hour away but closer than Bucharest?
6    A.   No.  It was closer to obe's house.
7           THE COURT:  Would you repeat that?
8           THE WITNESS:  It was closer to obe's house
9    near Brasov.
10   Q.   So that was a place where you stayed as well,
11   correct?
12   A.   Yes.
13   Q.   Who else lived at obe's house when you were
14   there?
15   A.   My brother, Bogdan Nicolescu, and two other
16   people.
17   Q.   So there were other people at the house when you
18   were there?
19   A.   Yes.
20   Q.   Now, you indicated that you started a couple of
21   internet businesses after you got out of being involved
22   with Bayrob?
23   A.   Yes.
24   Q.   Okay.  And those businesses sold items on the
25   internet?

**2019**

Mr. Valentin Dima - Cross

1  A.  Yes.

2  Q.  Now, I know that your first instinct, as you

3  testified, is to lie, but those businesses, you are

4  telling this Court that you didn't take credit cards

5  and commit frauds and steal money from 2013 through

6  today?

7              THE TRANSLATOR:  I didn't do anything else

8  illegal.

9  Q.  Okay.  Now, over the weekend — part of your deal

10  with the United States was to come here with your

11  brother, right?

12  A.  Yes.

13  Q.  Okay.  As long as you were allowed to travel

14  together, stay together, be together, that was part of

15  your deal?

16  A.  Yes.

17  Q.  And if you weren't allowed to do that, you wouldn't

18  be here, right?

19              THE TRANSLATOR:  I would have come anyway.

20  Q.  Okay.  But your attorney, talking to the U.S.

21  Attorney's Office, made sure that was part of the deal,

22  right?

23              THE TRANSLATOR:  Yes.

24  Q.  And you and your brother are staying at the same

25  hotel?

**2020**

Mr. Valentin Dima - Cross

1   A.    Yes.

2   Q.    And are you sharing a room?

3   A.    No.

4   Q.    But did you spend this past weekend together?

5   A.    Yes.

6   Q.    And was anybody else from this case at the hotel

7   with you?

8   A.    No.

9   Q.    And you and your brother — did you leave the

10  hotel?

11  A.    Yes.

12  Q.    And you and your brother discussed this case over

13  the weekend?

14              THE TRANSLATOR:  Not about what was

15  discussed here because I was not allowed.

16  Q.    But you talked about the case, right?

17  A.    Of course.

18  Q.    Of course.  And you didn't talk about what you said

19  in Court, but you talked about what could come up in

20  Court?

21              THE TRANSLATOR:  We talked just in general.

22  I can't say in particular what about.

23  Q.    It is only natural to talk about what may happen in

24  the courtroom, right?

25  A.    Yes.

2021

Mr. Valentin Dima — Cross

1  Q.  And you've known about the arrests since the day
2  they happened, right, September 2016?
3  A.  Yes.
4  Q.  And you have talked to your brother, to Vaca, about
5  this case during that time?
6  A.  Yes.
7  Q.  And you have discussed in detail about what would
8  happen if you got brought into it, correct?
9          THE TRANSLATOR:  I don't remember exactly
10  details what we discussed, but we did discuss about the
11  case.
12  Q.  Okay.  Besides Vaca and your brother, who else did
13  you discuss this case with prior to coming to Court
14  today?
15  A.  I talked with a friend of mine.
16  Q.  Who was that?
17  A.  You want the name?
18  Q.  Yes.
19  A.  Radu Munteanu.
20  Q.  Okay.  What was his e-mail?
21          THE TRANSLATOR:  Radu Munteanu,
22  M-u-n-t-e-a-n-u.
23  Q.  I am going to ask you some e-mail addresses, and you
24  tell me if they are familiar.
25  A.  Okay.

Mr. Valentin Dima - Cross

1  Q.   Primo 2 Mario 39 @ Yahoo?

2  A.   No.  I don't know this name.

3            MR. GOLDBERG:  May I approach the witness,

4  your Honor?

5            THE COURT:  Sure.

6  BY MR. GOLDBERG:

7  Q.   I am going to show you a list of e-mails.  I will

8  have this marked.  Okay.

9            Do you recognize that one?

10  A.   No, no.

11  Q.   Is that a Romanian word?

12  A.   Yes.

13  Q.   What does it say?

14  A.   In English?

15  Q.   Yes.

16  A.   Dick.

17  Q.   Okay.  And you don't recognize that e-mail?

18  A.   No.

19  Q.   Okay.  What about this, next one, say it.  What is

20  it?

21  A.   No.  No I don't know.

22  Q.   K-i-c-k-v-l @ Yahoo, don't know that one?

23  A.   No.

24  Q.   What about the next one?

25  A.   No.

Mr. Valentin Dima — Cross

1    Q.   What does that say?

2    A.   It is a name.

3    Q.   It is a name?

4    A.   Yeah.

5    Q.   What's the name?

6    A.   Liviul.

7    Q.   And you are not familiar with liviul.

8    A.   No.

9    Q.   What's the last name?

10   A.   Popoviciul.

11   Q.   Okay.  What about dzeu?

12   A.   No.

13   Q.   Don't know that one?

14   A.   No.

15   Q.   Okay.  What about — let's go down to — natiune you

16   said you know, right?

17   A.   Yes.

18   Q.   Okay.  Linxstal you said you know.

19   A.   I know.

20   Q.   What about checozaur?

21   A.   No.

22   Q.   What about rubyconstruct?

23   A.   No.

24   Q.   Ajutoare, do you know that one?

25   A.   No.

Mr. Valentin Dima – Cross

1   Q.   Gheatadelux.

2   A.   No.

3   Q.   W-x-y-z-k-l, do you that one?

4   A.   Yeah, this is Vaca.

5   Q.   Did you give that e-mail to the U.S. Attorney's

6   Office?

7   A.   I don't remember.

8   Q.   Okay.  What about W-x-y-z-2-k-l @ AOL.com?

9   A.   This is Vaca, too.

10  Q.   What about amightysa @ AOL.com?

11  A.   I know who it is, but I never talk to him.

12  Q.   Well, who is it?

13  A.   We name it Amy.  But I think this is —

14  Q.   What about mrxtornado @ gmail?

15  A.   No, I don't know.

16  Q.   What about r-e-d-i-c-e-x-s @ GMX.com, that's

17  you?

18  A.   Yes.

19  Q.   What about scama @ GMX?

20  A.   I don't know.

21  Q.   What about ra 101 Putin @ GMX.com?

22  A.   This one I know, but I don't know who is it.

23  Q.   What about w t w x @ GMX?

24  A.   No.

25  Q.   What about qweaxy, q w e a x y @ GMX.com?

Mr. Valentin Dima — Cross

1   A.   Sounds familiar, but I don't know.

2   Q.   What about Minolta 9797?

3   A.   This is Radu.

4   Q.   What about the w t w 554 @ GMX.com?

5   A.   I don't know.

6   Q.   Okay.  Just very briefly, let's talk about your

7   statement to the police in Romania on the — on the 19th

8   of February.

9   A.   Yes.

10   Q.   Okay.  Now, this was about a month and-a-half

11   ago?

12   A.   Yes.

13   Q.   And up to this point, you hadn't heard from anybody

14   about Bayrob?

15   A.   No.

16   Q.   Just other people that you talked to privately but

17   no police?

18   A.   Exactly.

19   Q.   Okay.  So you are brought in.  Did you bring an

20   attorney with you?

21   A.   No.

22   Q.   And do you recognize what I am showing you as

23   Defendant's Exhibit S?

24   A.   Yes.

25   Q.   Okay.  Is that your name at the top?

Mr. Valentin Dima - Cross

1   A.   Yes.

2   Q.   Is that your signature at the bottom?

3   A.   Yes.

4   Q.   It is your signature that, in fact, appears on each

5   page, correct?

6   A.   Yes.  That's mine.  Yes, yes.

7   Q.   Okay.  Now, you do have an attorney in Romania,

8   correct?

9   A.   Yes.

10  Q.   What's his name?

11  A.   Dragos Pagaru.

12  Q.   He wasn't with you when went on the 19th?

13  A.   No.

14  Q.   But he was with you when you went on the 22nd?

15  A.   Yeah.

16  Q.   Back to your statement, just to go over a couple

17  things on your statement, I am going to play — who

18  asked you questions, the FBI or the Romanian National

19  Police?

20  A.   The Romanian.

21  Q.   I am going to pretend to be the Romanian National

22  Police, and you are going to be you, and you are going

23  to answer the questions the way you answered them that

24  day.

25              THE TRANSLATOR:  I don't know how to answer

2027

Mr. Valentin Dima - Cross

1    the way I answered then because at that time I was
2    lying.
3    Q.   Well, that's fine.  We know your first instinct is
4    to lie.  We are just going to go through your statement.
5    Okay?
6                THE TRANSLATOR:  Yes.  So what answers do
7    you want me to give you?
8    Q.   Right from your statement.  You signed every page
9    of this statement.  You said everything in here,
10   correct?
11   A.   Yes.
12   Q.   Do you want to take a moment and go through and read
13   it?
14   A.   Yeah.
15   Q.   Go ahead.  Tell me when you are ready.
16                (Pause.)
17   A.   I am ready.
18   Q.   Is there anything in that document that you did not
19   say that day?
20   A.   No.
21   Q.   Okay.  Did you take an oath to tell the truth?
22   A.   Yes.
23   Q.   Okay.  The same exact oath that you took here on
24   Friday to tell the truth, right?
25                THE TRANSLATOR:  According to the procedures

Mr. Valentin Dima - Cross

1    that they were in Romania.

2    Q.    "So help me God" is what you said?

3    A.    Yes.

4    Q.    And you signed right under the "God."  Is your

5    signature not right under the word "God"?  What's that

6    word mean right there?

7    A.    God.

8    Q.    Okay.  What does that say?

9    A.    It is not my signature, but that's my signature

10   there.

11   Q.    Your signature is at the bottom though?

12   A.    Yes.

13   Q.    All right.  So regarding the testimony, "I attest

14   law enforcement says what do you know about Bogdan

15   Nicolescu?"

16              What did you say?

17   A.    "I don't know."

18   Q.    Did you say "it doesn't ring a bell"?

19              THE TRANSLATOR:  "The name doesn't tell me

20   anything."

21   Q.    Okay.  So would that be an accurate translation?

22              THE TRANSLATOR:  Not quite.

23   Q.    "What do you know about Radu Miclaus?"

24              What was your answer?

25              THE TRANSLATOR:  "The name doesn't tell me

Mr. Valentin Dima - Cross

1    anything."

2    Q.    What do you know about Tiberiu Danet, Danet

3    Tiberiu?

4                    THE TRANSLATOR:  The name doesn't tell me

5    anything.

6    Q.    What do you know about Valentin Danet?

7                    THE TRANSLATOR:  Name doesn't tell me

8    anything.

9    Q.    You told the police that you know — after you were

10   shown pictures — I am going to strike the question.

11                   You were shown pictures, correct?

12   A.    Yes.

13   Q.    And after you were shown pictures, you said, "ah, I

14   know Nicolescu from a house my friends rented in Bosnov,"

15   correct?

16   A.    Yes.

17   Q.    "And Vaca asked me to buy the oil for a Mazda that

18   belonged to Nicolescu.  That's where I remember him

19   from," correct?

20   A.    Yes, that's true.

21   Q.    So you signed the end of the agreement or the end of

22   the statement?

23   A.    Yes.

24   Q.    Right.  And that's your signature that appears on

25   it?

Mr. Valentin Dima - Cross

1   A.   Yes.

2   Q.   And I haven't done anything to take that copy.

3   That's what you signed, right?

4   A.   Yes.

5   Q.   Okay.  Except for the exhibit sticker up there, S.

6   Okay.  And then, we can agree you met these guys from the

7   U.S. Attorney's Office, Mr. McDonough and another

8   U.S. Attorney?

9   A.   Yes.

10  Q.   And they were able to promise you something, right?

11  You changed your story from that to what you said here in

12  Court?

13  A.   Exactly.

14  Q.   With no proof other than your word that you had any

15  particular e-mail address, or you had any particular

16  involvement with Bayrob?

17              MR. McDONOUGH:  Objection.

18              THE COURT:  Sustained.

19  BY MR. GOLDBERG:

20  Q.   You just agreed to change what you said, what

21  you swore under oath from one thing to something

22  else?

23              MR. McDONOUGH:  Objection.

24              THE COURT:  Overruled.

25              THE TRANSLATOR:  No.  I didn't change.  I

Mr. Valentin Dima - Cross Cont'd

1    just chose to tell the truth.

2    BY MR. GOLDBERG:

3    Q.   Okay.  Well, you changed.  You said one thing on the

4    19th, and you said something completely opposite on the

5    22nd?

6              THE TRANSLATOR:  Yes.  I said the first time

7    I lied, and now I came to tell the truth.

8    Q.   Okay.  Well, once you got something in return, you

9    told a different story.  Can we agree with that?

10   A.   Yes.

11   Q.   Okay.  Thank you.

12   A.   You are welcome.

13             MR. GOLDBERG:  I don't have any other

14   questions, your Honor.

15             THE COURT:  Mr. O'Shea.

16             CROSS EXAMINATION CONTINUED

17   BY MR. O'SHEA:

18   Q.   Good morning.  Do you speak English?

19   A.   Not so good.

20   Q.   Okay.  Have you ever met Radu Miclaus in your

21   life?

22   A.   Yes.

23   Q.   When?

24             THE TRANSLATOR:  I believe it was in 2012.

25   Q.   Where?

Mr. Valentin Dima — Cross Cont'd

1          THE TRANSLATOR:  A location near the City of

2    Pitesti, P-i-t-e-s-t-i.

3          MR. O'SHEA:  Can you put up Exhibit 1854.

4    BY MR. O'SHEA:

5    Q.   Do you see Exhibit 1854, sir?

6    A.   Yes.

7    Q.   Okay.  Do you remember being asked questions about

8    this exhibit on Friday?

9    A.   Yes.

10   Q.   Isn't it true that you never saw this exhibit before

11   you came here to the United States?

12   A.   Yes.

13   Q.   Okay.  And as you sit here right now without looking

14   at the exhibit —

15          MR. O'SHEA:  Can you take it down for a

16   second?

17   Q.   — you don't remember any of the exact e-mails

18   without looking at this exhibit, right?

19          THE TRANSLATOR:  Some of them I remember.

20   Q.   But there are a lot of e-mails in there, and they

21   had to show you those e-mails when you came here, right,

22   these guys?

23          THE TRANSLATOR:  I don't understand the

24   question.

25   Q.   When you got here to America, they had to show you

Mr. Valentin Dima – Cross Cont'd

1    this exhibit and point to this e-mails, these lawyers,

2    right?

3                    THE TRANSLATOR:  Yes.

4    Q.   How did you find out about the arrests?

5                    THE TRANSLATOR:  A friend informed me about

6    it.

7    Q.   Okay.  Is it a fair statement that a lot of people

8    knew about the arrests?

9                    MR. McDONOUGH:  Objection.

10                   THE COURT:  Sustained.

11   BY MR. O'SHEA:

12   Q.   Did your friend tell you how he found out about the

13   arrests?

14                   THE TRANSLATOR:  Yes.  I remember that he

15   said that he found out through the interpreter or from a

16   friend who is here in America.

17   Q.   Was it about the — was it around the same time that

18   they got arrested?

19   A.   Probably maximum one month after that.

20   Q.   Okay.  Prior to making your deal with the American

21   Government, were you afraid of going to prison?

22   A.   Yes.

23   Q.   Do you have a family?

24   A.   Yes, I have.

25   Q.   Did you get the impression that if you did not

Mr. Matei - Direct

1   cooperate you might go to prison?

2               MR. McDONOUGH:  Objection.

3               THE COURT:  Sustained.

4   BY MR. O'SHEA:

5   Q.   Do you know what an oath is?

6   A.   Yes.

7               MR. O'SHEA:  Nothing further, your Honor.

8               THE COURT:  Any redirect?

9               MR. McDONOUGH:  No, your Honor.

10              THE COURT:  You may step down, sir.

11              THE WITNESS:  Thank you.  Thank you, Ma'am.

12              THE COURT:  Please call your next witness.

13              MR. McDONOUGH:  Your Honor, the

14   United States of America calls Marius Matei.

15              Mr. Matei?

16                   MARIUS MATEI

17   called as a witness by and on behalf of the Government,

18   being first duly sworn, was examined and testified

19   as follows:

20                 DIRECT EXAMINATION

21   BY MR. McDONOUGH:

22   Q.   Good morning.  Could you please state your first

23   name or your given name, and spell it for the benefit of

24   our court reporter?

25   A.   Marius, M-a-r-i-u-s.

Mr. Matei - Direct

1    Q.    Could you please state your last name or family

2    name, and spell it for the benefit of our court

3    reporter?

4    A.    Matei, M-a-t-e-i.

5    Q.    Did you commit any computer crime with anyone in

6    this courtroom?

7    A.    Yes, I did.

8    Q.    Who?

9    A.    Bogdan.

10   Q.    Would you please point out Bogdan?

11   A.    He is the person at the middle of the

12   table.

13   Q.    Could you please describe what he is

14   wearing?

15   A.    Glasses and a blue shirt.

16   Q.    Is he wearing a tie?

17   A.    No.

18   Q.    Is he at the front table or back table?

19   A.    At the front table.

20         MR. McDONOUGH:  Your Honor, may the

21   record reflect this witness has identified the Defendant

22   Bogdan.

23         THE COURT:  Nicolescu.

24         MR. McDONOUGH:  Bogdan Nicolescu.

25         THE COURT:  Record may so reflect.

2036

Mr. Matei – Direct

1  BY MR. McDONOUGH:

2  Q.   How long have you known Bogdan Nicolescu?

3  A.   Before 2007.

4  Q.   Did he have any nicknames?

5  A.   In real life, we would call him obe.

6  Q.   And outside of real life, did he have any

7  nicknames?

8  A.   Master Fraud.

9  Q.   Did you commit computer crimes with anyone else

10  besides obe or Master Fraud in this courtroom?

11  A.   Yeah, the person in the back, Radu.

12  Q.   Could you please point out Radu?

13  A.   He is at the second table on the left side.

14  Q.   Could you please describe what he is wearing?

15  A.   Also blue shirt.

16  Q.   Is he wearing glasses?

17  A.   No.

18  Q.   Is he wearing a tie?

19  A.   No.

20        MR. McDONOUGH:  Your Honor, may the record

21  reflect this witness has identified the Defendant Radu

22  Miclaus?

23        THE COURT:  Record may so reflect.

24  BY MR. McDONOUGH:

25  Q.   How long have you known Radu Miclaus?

Mr. Matei – Direct

1    A.    Almost the same period.

2    Q.    Do you recall who you met first?

3    A.    Bogdan.

4    Q.    Where did you grow up in Romania?

5    A.    Mostly in Bucharest.

6    Q.    Where did you go to school?

7    A.    In Bucharest.

8    Q.    How far did you go in school?

9    A.    It was a neighborhood high school.

10   Q.    Okay.  Did you have parents?

11   A.    Yes.

12   Q.    What happened in high school with your parents?

13            MR. GOLDBERG:  Objection.

14            THE COURT:  Overruled.

15   A.    My mom died.

16   Q.    When did your mom die?

17   A.    In the last grade of high school.

18   Q.    What happened after your mom died your last year of

19   high school?

20   A.    Sorry?

21   Q.    May I approach the witness, your Honor?

22            THE COURT:  Yes.

23   A.    My father —

24            THE COURT:  Would you like me to take a

25   brief recess?

Mr. Matei - Direct

1      MR. McDONOUGH:  Yes, your Honor.

2          THE COURT:  Folks, we will take a brief

3  recess.  Remember the admonitions.

4          All rise for the jury.

5          (Recess had.)

6          THE COURT:  Please be seated.  You may

7  continue, Mr. McDonough

8  BY MR. McDONOUGH:

9  Q.   What did your father do after your mother

10 died?

11 A.   He tried seeking another woman.

12 Q.   Okay.  Did you have any other family?

13 A.   There was an aunt.

14 Q.   Near your house?

15 A.   In the house, no.  I was left with my brother.

16 Q.   Okay.  How old is your brother compared to

17 you?

18 A.   He is three years older.

19 Q.   Okay.  After high school, did you go to the

20 university?

21 A.   Yes.  I went to university, but I quit after one

22 year.

23 Q.   What did you study at the university?

24 A.   Something with welding metals at some point.

25 Q.   I couldn't understand what you said.

Mr. Matei - Direct

1    A.    Something with welding metals at some point.

2    Q.    Welding metals?

3    A.    Yes.

4    Q.    Where did you live after you dropped out of the

5    university?

6    A.    In my parents' flat, apartment.

7    Q.    Who was living there with you?

8    A.    My brother.

9    Q.    Where did your father go?

10   A.    I don't know.

11   Q.    Okay.  How did you feel at that time?

12   A.    Drugs.

13   Q.    Did you end up using drugs?

14   A.    Yes.

15   Q.    What drugs did you use?

16   A.    Weed, ketamine, and ecstasy.

17   Q.    What is weed?

18   A.    Marijuana.

19   Q.    And what is ecstasy?

20   A.    Some pills.

21   Q.    And what is ketamine, k-e-t-a-m-i-n-e?

22   A.    Horse drug tranquilizer.  I don't know exactly,

23   something for animals.

24   Q.    An animal?

25   A.    Yes.

Mr. Matei - Direct

1    Q.   A tranquilizer?

2    A.   Yes.

3    Q.   How long did you use that?

4    A.   One year or three years.

5    Q.   How long did you use ecstasy?

6    A.   Not many.

7    Q.   How long did you use weed?

8    A.   For a long time.

9    Q.   Where did you meet Bogdan Nicolescu a/k/a Master

10   Fraud a/k/a obe?

11               MR. GOLDBERG:  Objection.

12               THE COURT:  Overruled.

13               THE WITNESS:  First time I met him, Bogdan,

14   through a friend of mine.

15   BY MR. McDONOUGH:

16   Q.   Who is the friend?

17   A.   He is called Vaca.

18   Q.   Vaca?

19   A.   Yes.

20   Q.   Did you say what city?

21   A.   No, in Brasov we met.

22   Q.   Brasov?

23   A.   Yes.

24   Q.   What were you doing in Brasov?

25   A.   When I first met him?

Mr. Matei - Direct

1   Q.   Yes.

2   A.   It was a ski trip.

3   Q.   Okay.  How did you start committing crime with

4   Vaca?

5   A.   After sometime my friend Vaca, also, he propose that

6   I meet him, Bogdan, for this purpose.

7   Q.   Where did you go?

8   A.   Also in Brasov.

9   Q.   Whose house?

10  A.   Yes, to his house.

11  Q.   Whose house?

12  A.   Bogdan's house.

13  Q.   What did you take to Bogdan's house in

14  Brasov?

15  A.   I was with my computer so he can set it up.

16  Q.   What computer did you have, what type?

17  A.   A laptop, I don't remember now.

18  Q.   Okay.  How did Bogdan set up your computer?

19  A.   He installed the Linux base system operating.

20  Q.   L-i-n-u-x?

21  A.   Yes.

22  Q.   How did Bogdan install it?

23  A.   He used his computer first to get it out and then

24  put it on my computer.

25  Q.   Besides that Linux, how else did Bogdan set up your

Mr. Matei - Direct

1    computer?

2    A.    He installed windows, and there was VM ware

3    software.

4    Q.    What does that do?

5    A.    That is emulating more PCs and one PC.

6    Q.    Doing what with the PCs?

7    A.    Emulates more PCs.

8    Q.    Okay.

9    A.    And one PC, virtual PCs.

10   Q.    Virtual PCs?

11   A.    Yes.

12   Q.    Virtual machines?

13   A.    Yes.

14   Q.    What else?

15   A.    And he gave me instructions how to use it.

16   Q.    What instructions did Bogdan give you to use

17   the Linux, the virtual machines on your laptop or

18   computer?

19   A.    He gave me precise instructions.  At some point, I

20   have to write it down in a text file, how to start it.

21   He insist on having a long password and everything, each

22   step.

23   Q.    Who insisted on you having a long password?

24   A.    Bogdan did.

25   Q.    Over time how did you communicate with Bogdan?

Mr. Matei - Direct

1   A.   Through e-mail and chat mostly.

2   Q.   What was your nickname for chatting?

3   A.   Where we chat in the workplace, it was Natiuning.

4   Q.   Natiuning?

5   A.   Natiuning.

6   Q.   That was you?

7   A.   Yes.

8   Q.   What was Bogdan's nickname when you were chatting

9   with him?

10  A.   In the workplace, it was Master Fraud.

11  Q.   How do you know that was Master Fraud?

12  A.   At some point, I stood next to him and saw him type

13  it from the computer.

14  Q.   Where were you when you saw Bogdan typing on the

15  computer?

16  A.   At his place.

17  Q.   Whose place?

18  A.   Bogdan's place.

19  Q.   Do you know what type of computer Bogdan had?

20  A.   Desktop PC.

21  Q.   Do you know the brand or the case?

22  A.   Yes, I know the case it was a Fractal especially

23  designed.

24  Q.   F-r-a-c-t-e-l?

25  A.   Yes.

Mr. Matei - Direct

1    Q.    Fractal design case?

2    A.    Yes, which is especially made for noise reduction.

3    Q.    Noise reduction?

4    A.    Yes.

5    Q.    You have seen this before?

6    A.    Yes.

7    Q.    What color was it?

8    A.    Black.

9    Q.    Was the word "Fractal" anywhere on the case?

10   A.    I don't remember.

11              MR. McDONOUGH:  Your Honor, the Government

12   would ask permission for this witness to stand off the

13   witness stand with the Court's permission.

14              THE COURT:  He may.

15   BY MR. McDONOUGH:

16   Q.    Showing you what has been marked for identification

17   as Government's Exhibit 2038, do you recognize what this

18   is?

19   A.    This is the case.

20   Q.    What case?

21   A.    The case of Bogdan's computer.

22   Q.    How do you recognize it?

23   A.    At his recommendation, I also bought one, so I

24   know.

25   Q.    Okay.  Is the name "Fractal" on this case?

Mr. Matei - Direct

1    A.    Do you want me to look?  Yes.

2    Q.    Where is "Fractal" on this case?

3    A.    On the back of the case.

4    Q.    You may take the stand.

5              You bought a computer, a Fractal computer as

6    well?

7    A.    The case.

8    Q.    What was your role in committing these computer

9    crimes with Bogdan Nicolescu?

10   A.    I received some duties, something to do for the

11   whole group, and in exchange, I was allowed to use the

12   tools.

13   Q.    What tools did you use?

14   A.    Mainly the SOCKS page.

15   Q.    I'm sorry.  What page?

16   A.    Proxy page.

17   Q.    Do you know what SOCKS is?

18   A.    It is a proxy.

19   Q.    How did you use that page?

20   A.    Every time I would do something, I would use one of

21   the proxies.

22   Q.    And what were you doing?

23   A.    First step was to create eBay accounts.  Then I

24   bought hostings.  I was helping to create e-mail

25   accounts.  Also, he would tell me what to do.

Mr. Matei - Direct

1   Q.   How often were you at Bogdan's house in
2   Brasov?
3   A.   I was quite a few times.
4   Q.   How long would you stay there for the longest
5   time?
6   A.   One week.
7   Q.   Okay.  How many hours a day would you work for that
8   week?
9   A.   16 hours.
10  Q.   16 hours —
11  A.   A day.
12  Q.   A day?
13  A.   Yes.
14  Q.   Did Bogdan have a gmail account?
15  A.   Yes.  He had one with w b w.bogdan.
16           MR. McDONOUGH:  Ms. Chandler, would you
17  please bring up Government's Exhibit 29?
18  BY MR. McDONOUGH:
19  Q.   Do you recognize this?
20  A.   Yes.  This is in trying to create a secure
21  connection for chat.
22  Q.   Do you know what was the platform, how you
23  communicated with Bogdan Nicolescu?
24  A.   We used the Pidgin a—m.
25  Q.   What was the e-mail address for Bogdan?

Mr. Matei - Direct

1    A.    Bogdan.w b w @ gmail.com.

2    Q.    How did you keep track of credit cards that were

3    used by the group?

4    A.    We had a tool where all the credit cards appeared,

5    and then we had a place where we would connect what we do

6    with each credit card.

7    Q.    Did you comment on that page?

8    A.    Yes, I did.

9              MR. McDONOUGH:   Can you please pull up

10   Government's Exhibit 1204?  Can you zoom in on the top

11   third of that document?

12   BY MR. McDONOUGH:

13   Q.    Do you recognize this?

14   A.    Yes.

15   Q.    What is it?

16   A.    This is the table with credit cards.

17   Q.    Do you see your nickname on here?

18   A.    Yes.

19   Q.    Where?

20   A.    On row 6, 7, 9.

21   Q.    Would you please highlight row 6, 7, 9.  Anywhere

22   else?

23   A.    Yes, 12, 13, 17, 18, 19.

24   Q.    How would you get to this page from your

25   computer?

Mr. Matei — Direct

1    A.    With an address that I received from Bogdan.

2    Q.    All right.  What are the notes that you are writing

3    in column 3, notes?

4    A.    We have noted what we did with the credit cards.

5    Q.    Row 6, what did you do with that credit card?

6    A.    Three shopping but —

7    Q.    Okay.  Shopping?

8    A.    Maybe web posting.  I don't know the exact

9    name.

10   Q.    Okay.  How about line 7, what's that note?

11   A.    That I used the credit card.

12   Q.    Okay.  Line 9?

13   A.    I used that domain name.

14   Q.    Domain name, that's a website?

15   A.    Enoin.com, I used it there.

16   Q.    Lines 12 and 13?

17   A.    Bought posting.

18   Q.    How about line 17 through 19?

19   A.    Bought posting.

20   Q.    Do you see some other nicknames in that notes

21   column?

22   A.    Yes.

23   Q.    Do you know who those people are?

24   A.    Yes.

25   Q.    Who is Minolta?

Mr. Matei - Direct

1    A.    Minolta is Radu.

2    Q.    Who is Linx, L-i-n-x.

3    A.    Linx, it is a friend, Catalin Dima.

4    Q.    Catalin Dima?

5    A.    Yes.

6    Q.    Okay.  If we could go line 4 and 5, what is that

7    note proasta, p-r-o-a-s-t-a?

8    A.    That's the credit card is not good.

9    Q.    How about looking down to line 26, what does the

10   word mort mean, m-o-r-t?

11   A.    Also not good.

12   Q.    All right.  What would I use these credit cards to

13   purchase?

14   A.    Whatever we needed:  Phone numbers, domains,

15   postings.

16   Q.    Okay.  Could you use these credit cards to do

17   shopping yourself?

18   A.    But we never did.

19   Q.    Why not?

20   A.    Shopping in a store?

21   Q.    Right, shopping in a store, buying shoes, buying

22   clothes, buying items.

23   A.    I don't know why.  We were worried we would expose

24   ourselves.

25   Q.    You would expose yourselves.  How did you stay

Mr. Matei — Direct

1   unexposed?

2   A.   Using Bogdan's tools.

3   Q.   All right.  How did you get on to the internet from

4   your computer?

5   A.   Also using Bogdan's tools.

6   Q.   Can you describe a tool?

7   A.   Yes.  We connect through a wireless network

8   connection.

9   Q.   How did you connect to a wireless network?

10  A.   Using an antenna to the neighborhood.

11  Q.   Where did you receive the antenna?

12  A.   Where do I see it?

13  Q.   Where was it placed?

14  A.   Inside my house.

15          MR. McDONOUGH:  May I approach the witness,

16  your Honor?

17          THE COURT:  Of course.

18  BY MR. McDONOUGH:

19  Q.   You have zone something like this before,

20  Government's Exhibits 1415?

21  A.   Yes.  That is an the antenna example.

22  Q.   Okay.  Where would you get the antenna?

23  A.   From Bogdan.

24  Q.   All right.  Was the antenna, was it configured in

25  any way?

Mr. Matei - Direct

1    A.    Physically?

2    Q.    Yes, physically.

3    A.    I know that bracket was specially put there by

4    Bogdan to mount it on a photo tripod.

5    Q.    Which bracket was specially put?

6    A.    This one.  (Indicating.)

7    Q.    Who specially put a bracket on there?

8    A.    Bogdan did.

9    Q.    And what purpose did this bracket that Bogdan put on

10   here serve?

11   A.    To mount it on a photo tripod, so he can aim it to

12   the —

13   Q.    What's a photo tripod?

14   A.    Tripod where you put the photo camera to take

15   pictures.

16   Q.    How many legs did the tripod have?

17   A.    Three.

18   Q.    Where did this bracket go?

19   A.    On top of it instead of the camera like this, and

20   you point.

21          MR. McDONOUGH:  Let the record reflect the

22   witness is moving his right hand in a left and right

23   motion?

24   BY MR. McDONOUGH:

25   Q.    Did you have one of those?

2052

Mr. Matei — Direct

1    A.    Yes.

2    Q.    Where did you have it in your house?

3    A.    In the living room, in the bedroom, on the other

4    side of the apartment, on a balcony.

5    Q.    Did you see an antenna like that at anyone else's

6    house?

7    A.    No.  I don't remember seeing one.

8    Q.    Okay.  How long were you committing crimes as part

9    of this group?

10   A.    Before 2010, somewhere between 2007 and 2010.

11   Q.    All right.  Did you know if Bogdan Nicolescu had a

12   girl friend?

13   A.    Yes.

14   Q.    Do you recall her name?

15   A.    Simona.

16   Q.    Where did you see Simona?

17   A.    At his place, and one time I drove her from

18   Bucharest to his place.

19              MR. McDONOUGH:  May we have Government's

20   Exhibit 20, Ms. Chandler?

21   BY MR. McDONOUGH:

22   Q.    Do you recognize this photograph?

23   A.    I recognize Simona.

24   Q.    You mentioned you were at Bogdan Nicolescu's house

25   in Brasov?

Mr. Matei — Direct

1    A.    Yes.

2    Q.    And there is a city, is it outside of Brasov —

3    A.    It is outside.

4    Q.    What's the name of that place outside Brasov?

5    A.    Rasnov.

6    Q.    And did he have any other houses you were at?

7    A.    I was at Brasov, and then he moved to Harman.

8    Q.    H-a-r-m-a-n?

9    A.    Yeah.

10   Q.    All right.  You were at the house in Harman?

11   A.    Yes.

12   Q.    Could you describe that house?

13   A.    It has a space living downstairs and bedroom with

14   the kitchen upstairs.

15   Q.    If you were on the street looking at the house,

16   describe it.

17   A.    It was a long driveway with a brick wall on the

18   left, and he had a pole right in the street.

19           MR. McDONOUGH:  Government's Exhibit 1419,

20   page 5, Ms. Chandler, and if we could zoom in on the

21   photograph, please?

22   BY MR. McDONOUGH:

23   Q.    Do you recognize this photograph?

24   A.    Yes.  This is the entrance to the house.

25   Q.    What does this photograph depict?

Mr. Matei - Direct

1    A.    I'm sorry?

2    Q.    What does1 this photograph depict or show?

3    A.    It showed the entrance to the house, the gate, the

4    yard, and that's the wall I was mentioning.

5    Q.    There is a red arrow you can touch?

6    A.    This is the driveway going to the house.

7    Q.    Can you point the arrow to Bogdan's house?

8    A.    This one.

9    Q.    So is this picture from —

10   A.    I think it is inside the house.

11              MR. McDONOUGH:  You can take it down,

12   please.

13   BY MR. McDONOUGH:

14   Q.    Did you ever engage in any team building

15   activities?

16              MR. GOLDBERG:  Objection.

17              THE COURT:  Overruled.  Do you understand

18   the question, sir?

19              THE WITNESS:  Yes.

20   BY MR. McDONOUGH:

21   Q.    What was the team building activity?

22   A.    Bogdan had the idea at some point to celebrate

23   Thanksgiving Day.

24   Q.    Where did you celebrate Thanksgiving Day?

25   A.    At his father's hotel.

Mr. Matei – Direct

1    Q.    Where was his father's hotel?

2    A.    It is near Pitesti.

3    Q.    Where is Pistesti, P-i-s-t-e-s-t-i?

4    A.    Somewhere on the left of Brasov.

5    Q.    You can move the arrow there.  Did you go to Pitesti

6    for the Thanksgiving Day?

7    A.    Yes, I did.

8              MR. GOLDBERG:  Objection.

9    Q.    Is Thanksgiving Day a holiday in Romania?

10   A.    No.

11             THE COURT:  Overruled.

12   BY MR. McDONOUGH:

13   Q.    Who was at the Thanksgiving Day party at Bogdan

14   Nicolescu's father's hotel?

15   A.    It was me, Bogdan, my friend Vaca, also Catalin

16   Dima.

17   Q.    Okay.

18   A.    And others.

19   Q.    What did you do at the Thanksgiving Day party?

20   A.    We had stuffed turkey and alcohol and also play

21   poker.

22   Q.    Okay.  When did you leave the group?

23   A.    In 2014.

24   Q.    Why?

25   A.    I quit drugs, and I got a job.

Mr. Matei - Direct

1    Q.   No more weed?

2    A.   No.

3    Q.   No more ecstasy?

4    A.   No.

5    Q.   No more ketamine?

6    A.   No.

7    Q.   How did you support yourself?

8    A.   I have a job, a steady job.

9    Q.   What is your steady job?

10   A.   I am doing GDPR at the hotel.

11   Q.   What is GDPR?

12   A.   GDPR is general data protection regulation.

13   Q.   What is a general data protection regulation?

14   A.   I make sure that people's personal information is

15   safe, and they can interact and verify the validity.

16   Q.   Is that a law in the European Union?

17   A.   Yes, from 2015.

18   Q.   Okay.  Where do you work?

19   A.   At a hotel in a resort near Brasov.

20   Q.   At a hotel in a resort near Brasov?

21   A.   Yes.

22   Q.   And that deals with privacy?

23   A.   Mostly.

24   Q.   Anyone else at the hotel work besides you in this

25   GDPR privacy?

Mr. Matei — Direct

1    A.   No.

2    Q.   What did you do with your laptop after you left the

3    group?

4    A.   I took out the hardware, the hard disk, and

5    destroyed the computer.

6    Q.   I'm sorry.  You did what?

7    A.   Throw the computer away.

8    Q.   How did you destroy the computer?

9    A.   The hard drive, the computer I just gave it to a

10   neighbor, the computer without the hard drive.

11   Q.   Computer you gave away?

12   A.   Yes, yes.

13   Q.   What did you do with the hard drive?

14   A.   The hard drive, I destroyed it with a hammer.

15   Q.   Destroyed it with a hammer?

16   A.   Yes.

17   Q.   What did you do with the pieces?

18   A.   I throw them out from a mountain.

19   Q.   You threw them out?

20   A.   Yes, from a mountain.

21   Q.   On a mountain?

22   A.   From a mountain.

23   Q.   In February 2019, did you receive a summons?

24   A.   Yes.

25   Q.   Did you appear before the DICOTT with the RNP and

Mr. Matei - Direct

1    FBI in Bucharest?

2    A.    Yes.

3    Q.    Were you under oath?

4    A.    Yes.

5    Q.    Were you asked questions?

6    A.    Yes.

7    Q.    Did you tell the truth?

8    A.    No.

9    Q.    Why not?

10   A.    To get a chance and stay with my family.

11   Q.    To get a chance to stay with your family.  Who is

12   your family?

13   A.    My wife and my child.

14   Q.    How long you been married, how many years?

15   A.    For two years.

16   Q.    How old is your daughter?

17   A.    Almost two years.

18   Q.    Almost two years.  Okay.  After that, did you have a

19   chance to meet with the FBI, myself, and another

20   U.S. Attorney in Bucharest in Romania?

21   A.    Yes.

22   Q.    Did the FBI ask you questions?

23   A.    Yes.

24   Q.    Did you enter into a proffer agreement with the

25   United States Government?

Mr. Matei - Direct

1    A.    Yes.

2    Q.    Did you have an attorney in Romania?

3    A.    Yes.

4    Q.    Did the Government make any promises to you?

5    A.    My government?

6    Q.    Did the United States Government make any promises

7    to you?

8    A.    Yes.

9    Q.    What was the promise?

10   A.    That I come to testify in Court.

11   Q.    Yeah.  We promised you we would not prosecute you in

12   a prosecution letter.

13   A.    Yes.

14   Q.    If you came and told the truth?

15   A.    Yes.

16   Q.    And did the Government fly you here?

17   A.    Yes.

18   Q.    Put you up in a hotel?

19   A.    Yes.

20   Q.    Paid your per diem for meals and such?

21   A.    Yes.

22              MR. McDONOUGH:  No further questions.

23              THE COURT:  Mr. Goldberg, cross?

24              MR. GOLDBERG:  Thank you.

25                   - - - - -

Mr. Matei − Cross

1              CROSS EXAMINATION

2    BY MR. GOLDBERG:

3    Q.   Mr. Matei, you indicated that you were on a number

4    of drugs?

5    A.   I was, yes.

6    Q.   All right.  During the time that you were

7    involved with the crimes that you have admitted to

8    here today?

9    A.   Yes.

10   Q.   Okay.  And when you met with the FBI in February —

11   on February 22nd of this year, were you still using

12   ketamine?

13   A.   No.

14   Q.   Were you still using ecstasy?

15   A.   No.

16   Q.   Marijuana, any of those drugs?

17   A.   I quit in 2014.

18   Q.   Okay.  So if the testimony you gave today about

19   actually watching Mr. Nicolescu on his computer typing

20   Master Fraud wasn't in your statement that you gave to

21   the FBI, it wouldn't be a result of you being on drugs;

22   it would be a result of them not taking good notes?

23            MR. McDONOUGH:  Objection.

24            THE COURT:  Sustained.

25

Mr. Matei — Cross

1    BY MR. GOLDBERG:

2    Q.   You didn't tell the FBI when you met with them on

3    February 22nd that you saw Mr. Nicolescu using the name

4    Master Fraud, did you?

5    A.   I don't think so.

6    Q.   You don't think you did, right?  But you are saying

7    it here today.

8    A.   Yes.

9    Q.   Because you know what the Government wants for you

10   to say that he is Master Fraud, right?

11              MR. McDONOUGH:  Objection.

12              THE COURT:  Sustained.

13   BY MR. GOLDBERG:

14   Q.   You know what this case is about, right?

15              MR. McDONOUGH:  Objection.

16   Q.   You know what this case is about.  Mr. Nicolescu is

17   on trial, correct?

18   A.   Yes.

19   Q.   And the Government wants to establish that he is

20   Master Fraud in all these e-mails.  You know that,

21   right?

22   A.   Yes.

23   Q.   Okay.  So you don't tell the Government on the 22nd

24   of February that "I saw him using the name Master Fraud,"

25   right?

Mr. Matei — Cross

1   A.   I was under shock, I didn't tell them.

2   Q.   You didn't say that, did you?

3   A.   No.

4   Q.   But then, you come into Court in front of the jury,

5   and then you say, oh, I saw him using the name Master

6   Fraud, right?

7   A.   Yes.

8   Q.   Because now you are telling the truth?

9   A.   Yes.

10  Q.   And you know what an oath means, and you are going

11  to follow an oath, right?

12  A.   Yes.

13  Q.   And we can agree that you took an oath on the 19th

14  of February, three days before you talked to the FBI and

15  Mr. McDonough and promised to tell the truth right hand

16  to God, right?

17  A.   Yes.

18  Q.   And you lied right in their face, right?

19  A.   Yes.

20  Q.   Just like your lying in the faces of this jury

21  today?

22  A.   No.

23              MR. McDONOUGH:  Objection.

24              THE COURT:  Answer may stand.

25

Mr. Matei — Cross

1    BY MR. GOLDBERG:

2    Q.    Okay.  You identified Exhibit 1415 as a directional

3    antenna, correct?

4    A.    Yes.

5    Q.    And this was part of the equipment that was

6    necessary to conduct your part or any part of the Bayrob

7    fraud, correct?

8    A.    You have to have that.

9    Q.    You have to have one of these.  If you don't have

10   one of these, you couldn't connect to the internet

11   through someone else's Wi-Fi, correct?

12   A.    You could connect to one of the members of the

13   group.

14   Q.    You could connect to one of the members of the

15   group's Wi-Fi?

16   A.    If I don't have an antenna, someone else with the

17   group would have one.

18   Q.    So you would have to go through the internet to

19   connect to someone else's antenna?

20   A.    Yes.

21   Q.    But the people involved in this everybody had one of

22   these, correct?

23   A.    Not at the time.  Bogdan help us.

24   Q.    I'm sorry?

25   A.    Bogdan insisted to help so everybody should have

Mr. Matei - Cross

1    one.

2    Q.    Right, including Bogdan?

3    A.    (No response.)

4    Q.    Now, you've got a nickname outside of this, and your

5    nickname is hack, right?

6    A.    Yes.

7    Q.    And that's not because you — it is because you are

8    good with computers, right?

9    A.    I think so, yes.

10   Q.    And that nickname wasn't because of anything you did

11   with Bayrob; it was a nickname you had before you met

12   Mr. Nicolescu?

13   A.    Yes.

14   Q.    And these are self-taught skills, right?

15   A.    Yes.

16   Q.    Okay.  And you earned the nickname hack not because

17   you were able to do legitimate things on the internet but

18   because you were able to hack into systems and equipment

19   that you are not supposed to be on?

20            MR. McDONOUGH:  Objection.

21   A.    No.

22            THE COURT:  Overruled.

23   BY MR. GOLDBERG:

24   Q.    I mean, that's what you did before you got involved

25   with Bayrob?

Mr. Matei — Cross

1    A.    Hacking is different.

2    Q.    I'm sorry.

3    A.    Hacking is a different thing.

4    Q.    Hacking is a different meaning in Romania than it

5    does in America?

6    A.    Maybe say hacking that is related to internet

7    crime.

8    Q.    When they call somebody that had just general

9    mediocre — well, how did you get the name hack.  Because

10   you had good computer skills, right?

11              You have known your way around programming

12   languages and equipment?

13   A.    At that point, no.

14   Q.    You just got the name hack because it fits

15   you?

16   A.    No.  It was some dial-up accounts were involved.

17   Q.    I'm sorry?

18   A.    Dial-up accounts when you use the modem with the

19   phone to connect to the internet.

20   Q.    Dial-up accounts?

21   A.    Yes.

22              THE COURT:  Oh, dial-up account?

23              THE WITNESS:  Yes.

24   Q.    That's how you got the name hack?

25   A.    Yes.

Mr. Matei — Cross

1   Q.   Because you were able to use the dial up connection

2   to get into systems you weren't supposed to be in?

3   A.   To connect to an internet because it was a big thing

4   to connect to the internet.

5              THE COURT:  Sir, I'm going to ask you to

6   keep your voice up, please.

7              THE WITNESS:  Okay.  So it was a big thing

8   to connect to internet in that period with these dial-up

9   accounts.

10  BY MR. GOLDBERG:

11  Q.   So dial-up, there was nothing illegal about dialing

12  up?

13  A.   Yes, but getting those accounts was illegal.

14  Q.   Getting which accounts?

15  A.   To connect to the internet.

16  Q.   Okay.  Now, listen to this very carefully.

17              This had nothing to do with Bayrob,

18  right?  Dialing up had nothing to do with Bayrob.

19  Dialing is from 20 years ago.

20  A.   Yeah.  But the nickname was from there.

21  Q.   Okay.  So the nickname hack was being able to

22  dial-up and get into systems you were not supposed to be

23  in, right?

24  A.   Just connecting to the internet and getting to

25  accounts.

Mr. Matei - Cross

1    Q.    Getting accounts that you weren't supposed to

2    get?

3    A.    Yes.

4    Q.    Okay.  Thank you very much.

5              You have got a relationship with Vaca?

6    A.    Yes.

7    Q.    What's his real name?

8    A.    Victor Constantinescu.

9    Q.    You talk to him about this case?

10   A.    Yes.

11   Q.    You talk to him about what happened in this case?

12   A.    About the case, yes.

13   Q.    You talk to him about testifying here?

14   A.    Yes.

15   Q.    Okay.  And you talk to him about — did you talk to

16   him about what happened to Mr. Nicolescu and Mr. Danet

17   and Mr. Miclaus when they were arrested?  Did you call

18   him up —

19   A.    No.  He was the one who told me.

20   Q.    He told you, and this you talked about it?

21   A.    Just that they were arrested.

22   Q.    And that's all you talked about, just the fact they

23   were arrested?

24   A.    Mainly.

25   Q.    All right.  So when you met with the U.S. Attorney's

Mr. Matei — Cross

1    Office and you claimed that you were natiuning on all

2    these e-mails, did you provide them any proof like in the

3    form of your e-mails that came or registration of your

4    name or anything like that?

5    A.    No.

6    Q.    They showed you e-mails with the name Natiuning,

7    right?

8    A.    Yes.

9    Q.    And they showed you exhibits with the name

10   Natiuning, right?

11   A.    Yes.

12   Q.    And that's when you said, "oh, that's me.  I am

13   natiuning," right?

14   A.    Yes.

15   Q.    Because when you went to the police department on

16   the 19th, they asked you who is natiuning, and what did

17   you say?

18   A.    I don't know.

19   Q.    And they asked you who is Master Fraud, what did you

20   say?

21   A.    No.

22   Q.    No.  When you went to the police department —

23   A.    I don't know.

24   Q.    I don't know.  What about Catalin Dima and Valentin

25   Dima.  You know them, too?

Mr. Matei - Cross

1    A.    Yes.

2    Q.    And Catalin Dima is even more of a computer expert

3    than you?

4    A.    Yes.

5    Q.    They don't call him hack though?

6    A.    No.

7    Q.    So before you went into the police department on the

8    19th, the first time, did you talk to Catalin Dima before

9    going in?

10   A.    No.

11   Q.    Did you talk to any of these guys before you went

12   in?

13   A.    To his brother.

14   Q.    You have talked about what you are going to say,

15   no?

16   A.    No.  About what's going on.

17   Q.    About what?

18   A.    About what's going on.

19   Q.    Right, right.  And you talked about what kind of

20   questions they may ask you, right?

21   A.    No.

22   Q.    Well, this was — February of 2019 was six years

23   after you say you left this group, right?

24   A.    What?

25   Q.    You left the group what year?

Mr. Matei — Cross

1    A.    '14.

2    Q.    2013.  So five years later, right?

3    A.    Yes.

4    Q.    And you talked to Valentin Dima prior to going and

5    talking to the police, right?

6    A.    Yes.

7    Q.    And you knew when they called you in that

8    Mr. Nicolescu was on trial, that he was going to trial

9    for committing these acts?

10   A.    We talked.  We didn't know for sure.

11   Q.    Are you familiar with — do you know the name

12   Danet?

13   A.    No.

14   Q.    Never heard —

15   A.    I heard the name, but I don't know the person.

16   Q.    So you don't know Tiberiu Danet or Valentin

17   Danet?

18   A.    No.

19   Q.    Who else did you talk to between the time you got

20   your subpoena or your summons to go into the police

21   station on the 19th and then going in?

22   A.    Just Valentin and after the subpoena with his

23   brother after we went to the Court.

24   Q.    Then you all talked together?

25   A.    Yeah.

Mr. Matei - Cross

1   Q.   And did you have a lawyer when you went into the

2   police station?

3   A.   No.

4   Q.   But you got a lawyer afterwards, right?

5   A.   Yes.

6   Q.   Same lawyer as those guys?

7   A.   No.

8   Q.   You got your own lawyer, right?

9   A.   Yes.

10  Q.   Okay.  And we can agree that the story that you told

11  the police and the FBI on the 19th is completely opposite

12  of what you are saying here today?

13  A.   Yes.

14  Q.   And when you were in the police station on the 19th,

15  after you gave them all the information that you said you

16  knew, which was nothing, they said, hey, will you come to

17  the trial and testify?

18  A.   Yes.

19  Q.   Yeah.  And you were willing — well, actually you

20  weren't willing to do it because you were afraid to

21  fly?

22  A.   Yes.

23  Q.   And you also said because you took all kinds of

24  drugs, and you still have side effects?

25  A.   Yes.

Mr. Matei - Cross

1    Q.   Okay.  And that's true?

2    A.   Yes.

3    Q.   Okay.  So you lied about other stuff on the 19th,

4    but you didn't lie about being afraid to fly and having

5    side effects of drugs?

6    A.   Yes, I didn't lie.

7    Q.   Side effects like what, paranoia, fear, panic

8    attacks?

9    A.   Fear, yes, panic attacks, yes.

10   Q.   Is anything more serious than having the U.S.

11   Attorney's Office threaten to prosecute you?

12                MR. McDONOUGH:  Objection.

13                THE COURT:  Sustained.

14   BY MR. GOLDBERG:

15   Q.   Were you afraid of being prosecuted.

16   A.   Yes.

17   Q.   Did that make you even more panicky?

18   A.   Yes.

19   Q.   So you were willing to play ball with them and say

20   what they needed you to say, right?

21                MR. McDONOUGH:  The objection.

22                THE COURT:  Overruled.

23                THE WITNESS:  I mean, what I can to stay

24   with my family.

25

Mr. Matei - Cross

1   BY MR. GOLDBERG:

2   Q.   Right.  As a lot of people would, right?

3   A.   I guess so.

4   Q.   But the fact is you are a liar, right?

5   A.   Now?

6   Q.   Well, you are a liar in your life, right?  You have

7   been a liar?

8   A.   No.

9   Q.   You never lied?

10  A.   I lied, but I considered myself from 2014 till

11  now.

12  Q.   Okay.  I am going to hand you what has previously

13  been marked as Defendant's Exhibit T.  Do you recognize

14  that?

15  A.   Yes.

16  Q.   Take a look at all the pages, and make sure they are

17  correct.  And I will ask you a couple of questions.

18           Is that the statement you gave under oath to

19  the Romanian police and the February — on February 19,

20  2019?

21  A.   Yes.

22  Q.   Six weeks ago or so, yes?

23  A.   I don't know —

24  Q.   Just last February, February 19th?

25  A.   Yes.

Mr. Matei — Cross

1    Q.    And were you promised anything in return for signing
2    — saying answering those questions and signing that
3    statement?
4    A.    No.
5    Q.    Now, does your signature appear on that document?
6    A.    Yes.
7    Q.    On every page?
8    A.    Yes.
9    Q.    Does it appear —
10   A.    Yes.
11   Q.    Right here.  Okay.  And what's the word right above
12   it?
13   A.    God.
14   Q.    God?
15   A.    Yes.
16   Q.    That's your oath to God that you are telling the
17   truth?
18   A.    Yes.
19   Q.    Like the one you took this morning?
20   A.    Yes.
21   Q.    Same exact one basically, right?
22   A.    Different comment.
23   Q.    Yeah, but swear to tell the truth, very simple,
24   right?  You can explain if it is not?
25   A.    No, same thing.

Mr. Matei — Cross

1   Q.   Okay.  All right.  I am going to ask you a couple
2   specific questions about this.
3                 They ask for — I am looking down here —
4   they asked what address, nicknames, telephone numbers
5   do you use.  You said your nickname and address was
6   what?
7   A.   I give my actual e-mail account I remember and my
8   phone name.
9   Q.   Your name at gmail and your phone?
10  A.   Yeah.
11  Q.   And they asked you what was Bogdan N?  You said you
12  don't remember what Bogdan N used; only that it had the
13  name Bogdan in it?
14  A.   Yes.
15  Q.   Then they asked you, do you recognize Natinuing GMX,
16  Natinuing aim, Linxstal GMX, Keke GMX, amightysa at
17  gmail, what did you say in answer to that?
18  A.   I said I don't know.
19  Q.   You never heard?
20  A.   This is what I said.
21  Q.   And they asked, do you have a GMX account, and you
22  said no?
23  A.   Yes.
24  Q.   All lies according to you?
25  A.   Yes.

Mr. Matei – Cross

1   Q.    Because after they showed you the Natinuing e-mails

2   then you said oh, yeah, that's me?

3   A.    Yes.

4   Q.    Because you don't want to go away from your wife and

5   your family, correct?

6   A.    Because this is the truth.

7   Q.    Well, you are saying that, but the reason you are

8   here is that you were given a promise that you don't have

9   to go away?

10  A.    Yes.

11  Q.    And you weren't given that promise when you talked

12  to the police the first time, but the second time when

13  the U.S. Attorney's Office showed up they told you you

14  were in trouble, right?

15  A.    Yes.

16  Q.    They told you you could be sitting with these guys

17  in Court, right?

18  A.    Yes.

19  Q.    But if you tell us that you are Natinuing and if you

20  tell us about Bogdan, everything is cool, no problem?

21          MR. McDONOUGH:  Objection.

22  Q.    You won't be prosecuted?

23          THE COURT:  Sustained.

24  BY MR. GOLDBERG:

25  Q.    Everything is fine, you won't be prosecuted,

Mr. Matei - Cross Cont'd

1    right?

2    A.    Yes.

3    Q.    Because that's exactly what happened, right?

4    A.    Yes.

5              MR. GOLDBERG:  Thank you, your Honor.

6    Nothing further.

7              THE COURT:  Mr. O'Shea cross?

8              CROSS EXAMINATION CONTINUED

9    BY MR. O'SHEA:

10   Q.    Good morning.

11   A.    Good morning.

12   Q.    Sir, if you can, can you tell us, the ladies and

13   gentlemen of the jury and the rest of us in the

14   courtroom, a little more about the job that you

15   currently have, that you talked about a little bit?  What

16   is it?

17   A.    It is about informing the guests in the hotel why do

18   they use personnel data, how do we keep it, under what

19   rules.  This is one part.

20             The other part is where I make sure that if

21   someone asks what do we have about him, I can collect it

22   from every department what they have and why they used it

23   and where it is and how it is stored and everything like

24   this.

25   Q.    How long have you had this nice job?

Mr. Matei - Cross Cont'd

1   A.    The GDPR job for about a year, maybe less than a
2   year.
3   Q.    And how long you have been married, two years?
4   A.    Yes.
5   Q.    And you have a three-year old daughter?
6   A.    No, almost two years old.
7   Q.    A two-year old daughter?
8   A.    Yes.
9   Q.    And do you use this job to support your family?
10  A.    Yes.
11  Q.    Does your wife work?
12  A.    She is ending in May the prenatal program.
13  Q.    Does she have a job then?
14  A.    She had one.  Now, it is paid by the government, and
15  in May, she get another one.
16  Q.    You don't want to lose this job, right?
17  A.    No.
18  Q.    And if you got arrested and prosecuted by your
19  government, you would definitely lose your job?
20  A.    If I cannot attend to it, yes.
21  Q.    And if your employer where you work with these
22  computer skills found out that you got arrested and
23  prosecuted, they would fire you, right?
24  A.    If I cannot attend to work, yes, but just knowing
25  about, I am not sure.

Mr. Matei - Cross Cont'd

1    Q.    You don't want to lose this job.

2    A.    No, I don't.

3    Q.    Okay.  When you were doing the illegal stuff up

4    until 2014 with your hack computer skills, did you

5    pay Romanian income taxes on the money you were

6    stealing?

7    A.    No.

8    Q.    Did you do anything whatsoever after you got

9    religion in 2014 to give back to the people you stole it

10   from?

11   A.    No.  Just little things in my computer.

12   Q.    Why not if you are a new man?

13   A.    I don't have any money to do that.

14   Q.    Did you even try?

15   A.    No.

16   Q.    Now, the drugs that I think I heard you testify,

17   ecstasy, marijuana, and did I here you right, horse

18   tranquilizers?

19   A.    Yes.

20   Q.    These tranquilizer drugs are the drugs they use to

21   put horses to sleep?

22   A.    They tranquilize horses.

23   Q.    Do you know what "tranquilize" means?

24   A.    They don't feel anything.

25   Q.    Okay.  During this time that you were involved with

Mr. Matei - Cross Cont'd

1    whatever this group was, you were taking horse
2    tranquilizers?
3    A.    No.   I don't think so.
4    Q.    When were you taking the horse tranquilizers?
5    A.    Before meeting them.
6    Q.    What did the horse tranquilizer do to your
7    brain?
8    A.    You imagine things at times.
9    Q.    And was it the marijuana, the ecstasy, or the horse
10   tranquilizer that did the permanent injury on you?
11                  MR. McDONOUGH:  Objection.
12                  THE COURT:  Sustained.
13   BY MR. O'SHEA:
14   Q.    Did the horse tranquilizers do permanent injuries on
15   you?
16                  MR. McDONOUGH:  Objection.
17                  THE COURT:  Sustained.
18   BY MR. O'SHEA:
19   Q.    Did I hear you testify that you still suffer from
20   side effects from the drugs?
21   A.    I think so.   I don't know it is exactly from
22   that.
23   Q.    What drugs gave you the side effects do you
24   think?
25                  MR. McDONOUGH:  Objection.

Mr. Matei — Cross Cont'd

1          THE COURT:  Sustained.

2     BY MR. O'SHEA:

3     Q.   The stuff that you are talking about, the last time

4     you were involved with any of this illegal stuff was five

5     years ago?

6     A.   Yes.

7     Q.   Do you think you could remember if you tell

8     this jury exactly what happened five years ago or did

9     the Government have to show you things to help you

10    remember?

11    A.   How I got out of the group?

12    Q.   Just all the stuff you testified about.

13    A.   I remember.

14    Q.   You remember all the e-mail addresses permanently on

15    your brain, or did you have to have help?

16    A.   No.  I remember now except one, I think.

17          MR. O'SHEA:  Can you bring up Exhibit

18    1204?

19    Q.   Do you remember testifying about this under oath

20    here this morning, sir?

21    A.   Yes.

22    Q.   Just so that we are clear, before you sat down where

23    you are sitting now, somebody showed you this exhibit,

24    right?

25    A.   Yes.

Mr. Matei - Cross Cont'd

1    Q.    And they told you they were going to show it to you

2    in this courtroom, right?

3    A.    Yes.

4    Q.    How long did that conversation occur?

5    A.    How long it took?

6    Q.    Yeah.  How long did that conversation where they

7    showed you this exhibit, how long was the meeting?

8    A.    The whole meeting one hour, I think.  I don't

9    know.

10   Q.    I am going to show you, sir —

11            MR. O'SHEA:  May I approach the witness?

12            THE COURT:  Of course.

13   BY MR. O'SHEA:

14   Q.    Exhibit 1415, I believe, do you remember talking

15   about this earlier?

16   A.    Yes, yes.

17   Q.    Do you have any idea where this specific antenna or

18   modem came from, any idea at all where this one came

19   from?

20   A.    No.

21            MR. O'SHEA:  Could you put up Exhibit 1419?

22   This was a picture of a house.

23   BY MR. O'SHEA:

24   Q.    Do you remember testifying about that picture,

25   sir?

Mr. Matei - Cross Cont'd

1    A.    I did earlier, yes.

2    Q.    Yeah.  Do you know who took this picture?  Do you

3    have any idea?

4    A.    No.

5    Q.    Do you know even when it was taken, sir?

6    A.    No.

7    Q.    I think you agreed with Mr. Goldberg when he asked

8    you questions here that when you were put under oath

9    before you lied?

10   A.    Yes.

11   Q.    And your nickname is hack, h—a—c—k, hack?

12   A.    I don't know exactly how they write it down; how

13   they say it I know.

14   Q.    Do you know how the word "hack" is used in the

15   United States?

16   A.    I guess I do, h—a—c—k.

17   Q.    Do you know what it means in the United States?

18   A.    Yes, hacking computers.

19   Q.    And that was your nickname, right?

20   A.    Yes.

21   Q.    Okay.  I think you indicated that you learned of the

22   arrests that happened in September of 2016, right?

23   A.    Yes.

24   Q.    How soon after they happened did you learn of

25   them?

Mr. Matei — Redirect

1   A.   I don't remember.  I know it was winter.

2   Q.   Okay.  Not a year later, just a couple of months or

3   couple of weeks later?

4   A.   I cannot say for sure.

5   Q.   Okay.  Do you remember who told you?

6   A.   Yes.  Stranger came to the hotel I work and asked

7   for me and told me.

8   Q.   A stranger?

9   A.   Yes.

10  Q.   Do you find that peculiar some stranger comes in and

11  says "hey" —

12  A.   In that case, it was sent by somebody.

13              THE COURT:  I'm sorry.  It was what?

14              THE WITNESS:  Sent by somebody.

15  BY MR. O'SHEA:

16  Q.   Last question, sir:  Are oaths important to

17  you?

18              MR. McDONOUGH:  Objection.

19              THE COURT:  Overruled.

20  A.   Yes.

21              MR. O'SHEA:  Nothing further.

22              THE COURT:  Redirect?

23                 REDIRECT EXAMINATION

24  BY MR. McDONOUGH:

25  Q.   Was Bogdan Nicolescu your friend?

Mr. Matei — Redirect

1    A.    I considered him my friend.

2    Q.    Was Radu Miclaus your friend?

3    A.    I also considered him my friend.

4              MR. McDONOUGH:  Nothing further.

5              MR. GOLDBERG:  Nothing.

6              MR. O'SHEA:  Nothing further.

7              THE COURT:  You may step down.

8              Folks, do you want to call a witness for 15

9    minutes, or would you prefer not to?

10             MR. BROWN:  We can go ahead and call a

11   witness for 15.

12             THE COURT:  You are all set, sir.  We will

13   do about ten minutes of the next witness.

14             MR. McDONOUGH:  The United States of America

15   would call Catalin Dima.

16             THE COURT:  Please step up to the podium,

17   sir, and raise your right hand.

18                      CATALIN DIMA

19   called as a witness by and on behalf of the Government,

20   being first duly sworn, was examined and testified

21   as follows:

22             THE COURT:  Please take a seat right over

23   there, sir.

24                      - - - -

25

Mr. Catalin Dima - Direct

1                DIRECT EXAMINATION

2    BY MR. McDONOUGH:

3    Q.   All right.  Good morning.

4              Could you please state your first name, and

5    spell it for the benefit of the court reporter?

6    A.   It is Catalin, C-a-t-a-l-i-n.

7    Q.   And what is your last name or family name, and spell

8    it for the benefit of the court reporter?

9    A.   It is Dima, D-i-m-a.

10   Q.   Did you commit computer crimes with anyone in this

11   courtroom?

12   A.   Yes.

13   Q.   Who?

14   A.   Bogdan Nicolescu.

15   Q.   Could you please identify Bogdan Nicolescu?

16   A.   He is over there.

17   Q.   Could you describe what he is wearing?

18   A.   He is wearing a gray suit and blue shirt and

19   glasses.

20   Q.   Is he wearing a tie?

21   A.   No.

22   Q.   Is he at the front table or back table?

23   A.   Front table.

24              MR. McDONOUGH:  May the record reflect the

25   witness identified the Defendant Bogdan Nicolescu?

Mr. Catalin Dima - Direct

1           THE COURT:  May so reflect.

2    BY MR. McDONOUGH:

3    Q.    How long have you known him?

4    A.    2011.

5    Q.    And what were his nicknames?

6    A.    Obe, Master Fraud, and MF.

7    Q.    Where did you go to school?

8    A.    I went to a public high school in Bucharest.

9    Q.    What did you study?

10   A.    I took computer science and technology courses.

11   Q.    Did you go to the university?

12   A.    Yes.

13   Q.    What university did you go to?

14   A.    I study economics for four years in Bucharest, but I

15   didn't get it.

16   Q.    What did you do after you did not graduate from the

17   university?

18   A.    I started working as a developer building

19   websites.

20   Q.    How did you learn how to be a web developer?

21   A.    I am into computers since the eighth grade.  I am a

22   self-taught programmer, also from high school where I

23   studied computer programming.

24   Q.    Okay.  What kind of computer programs did you teach

25   yourself or did you learn in high school?

Mr. Catalin Dima - Direct

1   A.   In high school.  Okay.  It was like Turbo Pascal NC

2   and afterwards.

3   Q.   I'm sorry.  The computer programs you learned

4   growing up, one was Pascal.

5   A.   Yes.

6   Q.   P-a-s-c-a-l?

7   A.   Exactly.

8   Q.   What were other computer programs that you used to

9   develop and design websites?

10  A.   PHP, HTML —

11  Q.   PHP?

12  A.   Yes, PHP.

13  Q.   And what's the last one?

14  A.   HTML.

15  Q.   HTML?

16  A.   And JavaScript.

17  Q.   And JavaScript?

18  A.   JavaScript, yes.

19  Q.   J-a-v-a-S-c-r-i-p-t?

20  A.   Yes.

21  Q.   And you learned those yourself or those were taught

22  to you?

23  A.   I learned those by myself.

24  Q.   When you were developing websites, for whom were you

25  working?

Mr. Catalin Dima - Direct

1    A.   Small companies in Bucharest.

2    Q.   How much money did you make?

3    A.   Right now or at that time?

4    Q.   At that time.

5    A.   Right.  1,500 to 2,000 Euro a month.

6    Q.   How did you meet Bogdan Nicolescu?

7    A.   I met him in Brasov at his place.

8    Q.   How long were you at his place — is it Rosnov?

9    A.   Rosnov.

10   Q.   And how did you get to his place in Rosnov?

11   A.   I don't know how to answer the question exactly.

12   Q.   Okay.  Well, let me ask you this:

13        Did you know him in high school?

14   A.   Pardon?

15   Q.   Did you know Bogdan Nicolescu in high school?

16   A.   No.

17   Q.   Did you know him in college?

18   A.   No.

19   Q.   Were you introduced to him?

20   A.   Yes.

21   Q.   Who introduced you?

22   A.   My brother and Victor.

23   Q.   What's your brother's name?

24   A.   Valentin Dima.

25   Q.   Does your brother have a nickname?

Mr. Catalin Dima - Direct

1   A.   Inside the group.

2   Q.   Yes.

3   A.   It was something like keseti.

4   Q.   That was your brother's nickname?

5   A.   Yes.

6   Q.   And what was your nickname in the group

7   A.   Linxstal.

8   Q.   Linx?

9   A.   Linxstal.

10  Q.   That was your nickname?

11  A.   Yes.

12  Q.   How did you start committing computer crimes with

13  Bogdan Nicolescu?

14  A.   After I went to his place, he taught me how to

15  encrypt my computer, and he showed me the whole scheme,

16  the virus, and everything.

17  Q.   What was the whole scheme, the virus, everything?

18  A.   Okay.  It was composed of — from the virus, which

19  we used to infect victim's computers to inject fake eBay

20  pages with our ads.  We also did some cars on eBay.

21          So yeah, we infected victims' computers, and

22  then, we tried to sell them fake cars, cars that didn't

23  exist.

24  Q.   How did you use your programming skills as part of

25  this scheme?

Mr. Catalin Dima - Direct

1    A.    I wrote some helper tools like on a spammer, which

2    we used to send e-mails.

3    Q.    What is a spammer?

4    A.    It is a software that can send many e-mails in a

5    very short period of time automatically.

6    Q.    What would sending e-mails automatically in a short

7    period of time do?

8    A.    Infect computers to send out the virus.

9    Q.    Infect the computers with what virus?

10   A.    The virus that Bogdan wrote.

11   Q.    How do you know Bogdan wrote a virus?

12   A.    Because he told me, and also, he show meed me.

13   Q.    Where did he show you?

14   A.    First in Rasnov.

15   Q.    First in Rasnov?

16   A.    Rasnov, yes.

17   Q.    Where in Rasnov, whose house?

18   A.    At his place, I think he rented it.

19   Q.    Where else?

20   A.    At his place in a village near Pitesti, but I don't

21   remember the name.

22   Q.    Who lives in Pitesti?

23   A.    He has a house there but not in Pitesti.  It is near

24   Pitesti.  It is a village.

25   Q.    What's the name of it?  Do you know?

Mr. Catalin Dima - Direct

1    A.   I don't remember.

2    Q.   How long would you visit Bogdan Nicolescu's house?

3    A.   One week or ten days at the time.

4    Q.   What would you do when you visited with him for one

5    day or ten days at a time?

6    A.   Work on tools.  He was working on the virus.  I was

7    working on my — like the spammer, e-mail creator of its

8    own.

9    Q.   Did you keep track of listings on eBay?

10   A.   Yes.

11   Q.   Okay.  Did you list cars on eBay?

12   A.   Yes.

13            MR. McDONOUGH:  May we have Government's

14   Exhibit 1144, please?

15   BY MR. McDONOUGH:

16   Q.   Showing you what has been marked for identification

17   purposes as Government's Exhibit 1144, have you seen this

18   before?

19   A.   Yes.

20   Q.   What is it?

21   A.   This was user interface for one of our tool.

22   Q.   This is a user interface for one of your tools?

23   A.   Yeah, which we used to automatically list the cars

24   on it.

25   Q.   So automatically lists cars?

2093

Mr. Catalin Dima - Direct

1          MR. McDONOUGH:  All right.  Can we zoom in

2    on the upper left quadrant of this exhibit?  All right.

3    BY MR. McDONOUGH:

4    Q.   Who is Linx?

5    A.   That's me.

6    Q.   Who is MF?

7    A.   Master Fraud Bogdan.

8    Q.   Who is min?

9    A.   Min is Minolta.

10   Q.   Who is Raul?

11   A.   I am not sure.

12   Q.   Okay.  All right.

13   A.   I can guess.

14   Q.   No.  I don't want you to guess.

15   A.   Okay.

16   Q.   On this sheet, on Government's Exhibit, how many

17   cars did you list?

18   A.   32.

19   Q.   How many did Master Fraud list?

20          MR. GOLDBERG:  Objection.

21          THE COURT:  Sustained.

22   BY MR. McDONOUGH:

23   Q.   Do you know what this —

24          MR. GOLDBERG:  Your Honor, I object to the

25   use of this exhibit with this witness.  I should have

Mr. Catalin Dima - Direct

1    objected sooner.

2            THE COURT:  I have sustained the last

3    objection.

4    BY MR. McDONOUGH:

5    Q.   You kept track of the auto listings, the group

6    did?

7    A.   Yes.

8            MR. O'SHEA:  Objection.

9            THE COURT:  Sustained as to the form.

10   BY MR. McDONOUGH:

11   Q.   Where did you keep track of the auto listings?

12   A.   We have a database.

13   Q.   Where was the database kept?

14   A.   On a VPS, virtual private server.

15   Q.   What is a virtual private server?

16   A.   It is a server that you can rent online.

17   Q.   What was your role involving the virtual private

18   server?

19   A.   I was doing maintenance work, transferring the files

20   between servers.

21   Q.   Okay.  How did you transfer files between servers?

22   A.   Using a tool called Rsync.

23   Q.   Rsync, R-s-y-n-c?

24   A.   Yes.

25   Q.   What did that tool allow you to do?

Mr. Catalin Dima - Direct

1    A.    To take everything from one server and put it on

2    another server.

3    Q.    Why would you have to move one virtual private

4    server to another virtual private server?

5    A.    Because we needed redundancy, because the servers we

6    bought and using stolen credit cards.

7    Q.    I am going to stop you.  You said redundancy?

8    A.    Yes.

9    Q.    What do you mean by redundancy?

10   A.    If one server goes down, we need more servers to be

11   online, so the whole thing is — will keep working.

12   Q.    What was the second reason that you said you had to

13   move, the reason to have multiple virtual private

14   servers?

15   A.    Because we used stolen credit cards to rent servers,

16   so yeah, they sometimes — the owner of the credit card

17   will figure out that his card is used for this purpose,

18   and the server will be closed.

19   Q.    Okay.

20              THE COURT:  Mr. McDonough?

21              MR. McDONOUGH:  This is a good time to

22   break, your Honor.

23              THE COURT:  Remember the admonition, folks.

24   Do not form any opinion.  Do not talk about the case.

25   Please be downstairs at 1:30.  We will call for you at

Mr. Catalin Dima - Direct

1    that time.  Have a good lunch, everyone.  Get outside and

2    enjoy that weather.

3                    (Jury out.)

4                    THE COURT:  Sir, do not talk about the case

5    with anyone.

6                    THE WITNESS:  Okay.

7                    MR. O'SHEA:  Thank you, Judge.

8                    (Luncheon recess taken.)

9                         - - - - -

10

11

12

13

14                     AFTERNOON SESSION

15                    THE COURT:  Whenever you are ready,

16   Mr. McDonough.

17                    MR. McDONOUGH:  Thank you your Honor.

18   BY MR. McDONOUGH:

19   Q.   All right.  Mr. Dima, when we left off from this

20   morning, we were talking about some eBay listings.  How

21   did you list a vehicle on eBay?

22   A.   Using the free access service, so we get a real car

23   also from eBay, save it, and later we will — we would

24   pose it on eBay.

25   Q.   I didn't hear that last.

Mr. Catalin Dima - Direct

1    A.   And later we would pose it on eBay ads.

2    Q.   You would get the car from a what ad?

3    A.   EBay ad.

4    Q.   From an eBay ad?

5    A.   Yeah.

6    Q.   And showing you what has been marked for

7    identification as Government's Exhibit 1432, which is in

8    evidence.

9              MR. McDONOUGH:  Ms. Chandler may we have

10   Government's Exhibit 1432?

11   BY MR. McDONOUGH:

12   Q.   Do you recognize this?

13   A.   Yes.

14   Q.   What's that?

15   A.   It is a car.

16   Q.   What kind of car?

17   A.   It is a 1970 Chevrolet Chevelle.

18   Q.   Okay.  When you posted a car on eBay, who was

19   responsible for interacting with the buyer?

20   A.   Me.

21   Q.   All right.  If the buyer had a question, how did you

22   know about it?

23   A.   He would send an e-mail to me.

24   Q.   Okay.  How would you know that the buyer had a

25   question?

Mr. Catalin Dima - Direct

1    A.   I would check my e-mail often.

2    Q.   Okay.  In fact, it is approximately 1:45 p.m. in

3    Cleveland, Ohio.  What time is it in Romania right

4    now?

5    A.   It is minus seven hours, so it is like — no, we are

6    minus seven so it is like 9:00 p.m.

7    Q.   Right now in Romania?

8    A.   Yeah.

9    Q.   All right.  What if you were sleeping when that

10   e-mail came?

11   A.   That's it, I don't know.

12   Q.   Okay.

13   A.   We — I would answer after I wake up.

14   Q.   Okay.  Did you have any communications with the

15   buyer other than e-mail?

16   A.   Yes.  We used to have a live chat on eBay, fake live

17   chat.

18   Q.   Okay.  What if you were unavailable for live chat,

19   who would do that?

20   A.   Maybe somebody else would take the chat for us.

21   Q.   How would — I'm sorry.  Continue.

22   A.   Yeah.  Somebody else would take the chat for us.

23   Q.   How would anybody else know that there was a live

24   chat from the buyer?

25   A.   I remember that we used to have a tool that would

Mr. Catalin Dima - Direct

1   ring.

2   Q.   The tool would do what?

3   A.   Would ring, you know.  It will hear a sound.

4   Q.   Okay.  The tool would read what?

5   A.   Ring.

6   Q.   The tool would ring?

7   A.   Yeah.

8   Q.   Who would the tool ring?

9   A.   All of us.

10  Q.   Okay.  All right.

11  A.   Or maybe only two.  I think it was configurable, so

12  they can put their name, the tool.

13  Q.   You could adjust the tool?

14  A.   Yeah.

15  Q.   To who it would notify?

16  A.   Exactly.

17  Q.   Who posted ads on eBay for cars besides you?

18  A.   All of us.

19  Q.   Okay.  I am going to show you Government's Exhibit

20  1144, and if we could please zoom in to the upper left

21  corner to show the address bar, just that first little

22  corner there.  Down a little bit.  Do you see the address

23  of where that is from?

24  A.   Yeah.  It is localhost.

25  Q.   What is S/my 4 auto/listings.PHP?

Mr. Catalin Dima — Direct

1   A.   It is like a web tool.

2   Q.   Who were you on this web tool.

3   A.   Linx, the first one.

4   Q.   And what is 32 count, what does that represent?

5   A.   It means I have 32 cars that are live.

6   Q.   What does "live" mean?

7   A.   Active, still active.

8   Q.   The ad is still active?

9   A.   Yes.

10  Q.   Who is MF?

11  A.   It is Master Fraud.

12  Q.   How many cars did he have live?

13  A.   38.

14  Q.   And who is m i n?

15  A.   Minolta.

16  Q.   And how many cars did he have?

17  A.   947 cars.

18  Q.   900 —

19  A.   —47.

20  Q.   Did you list each ad one at a time?

21  A.   No.  We used automatic tool.

22  Q.   An automatic tool?

23  A.   Yes.

24  Q.   What did the automatic tool do?

25  A.   Automatically list tools on eBay.

Mr. Catalin Dima - Direct

1    Q.    If we could zoom out.

2                Do you see the last line of Government's

3    Exhibit 1144?

4    A.    Yes.

5                MR. McDONOUGH:  Ms. Chandler, would you

6    please highlight that last line?

7    BY MR. McDONOUGH:

8    Q.    What vehicle did you list on that last time?

9    A.    Chevrolet Chevelle Super Sport.

10   Q.    Did you use the same ad more than once?

11   A.    Maybe sometimes.

12   Q.    Okay.  All right.  Now, did you use e-mail

13   communication with the group?

14   A.    Yes.

15   Q.    How did you use e-mail communication?

16   A.    We had addresses at GMX.com.

17   Q.    I am going to show you Government's Exhibit 1854,

18   page 69?

19                MR. McDONOUGH:  And if we could zoom in just

20   on the table itself, Ms. Chandler.

21   BY MR. McDONOUGH:

22   Q.    Do you see the first column?

23   A.    Yes.

24   Q.    Date, second column is.

25   A.    Time.

Mr. Catalin Dima - Direct

1    Q.   And the third column is?

2    A.   From.

3    Q.   Who sent the e-mail?

4    A.   Exactly.

5    Q.   And fourth column?

6    A.   It is to.

7    Q.   Do you see some of those e-mail addresses in that

8    fourth column, that box?

9    A.   Yes.

10   Q.   Do you recognize any of them?

11   A.   Yeah, some of them.

12   Q.   Who do you recognize?

13   A.   The second one, amightysa.

14   Q.   Do you know who amightysa is?

15   A.   Tiberiu.

16   Q.   Tiberiu who?  Do you know his last name or no?

17   A.   No.

18   Q.   Okay.  What else do you recognize?

19   A.   Keke.zete, the third one.

20   Q.   Keke.zete.

21   A.   Keke.zete, my brother.

22   Q.   Your brother's name?

23   A.   Valentin Dima.

24   Q.   Okay.  And who is the next one?

25   A.   Me, Linxstal.

Mr. Catalin Dima - Direct

1    Q.   That's you?

2    A.   Yeah.

3    Q.   All right.  And the next one?

4    A.   Minolta.

5    Q.   Who is that?

6    A.   Radu.

7    Q.   Next one?

8    A.   Natiuning.

9    Q.   Who is Natiuning?

10   A.   Marius Matei.

11   Q.   Marius Matei.  Okay.  Next one?

12   A.   W x y z.  This was Victor.

13   Q.   Victor who?

14   A.   Victor Kasianchuk.

15   Q.   And what's his nickname?

16   A.   Vaca.

17   Q.   And the last one?

18   A.   I don't know about this one.

19   Q.   Okay.  So that was January 22nd, 2012.  Who sent you

20   the e-mail?

21   A.   Bogdan, Master Fraud.

22   Q.   And what was the e-mail about?

23   A.   About some credit cards.

24   Q.   And what did you use the credit cards for?

25   A.   Myself not much.

Mr. Catalin Dima - Direct

1    Q.   When you say not much, what do you mean by
2    that?
3    A.   He don't remember.  It was like to purchase phone
4    numbers sometimes.
5    Q.   Let me ask you this.  You mentioned earlier about
6    virtual private servers going from one to another?
7    A.   Yes.
8    Q.   Did you need credit cards for that?
9    A.   Yes, of course.
10   Q.   Did you make purchases on the credit cards?
11   A.   We the group but not me.  We the group.
12   Q.   The group?
13   A.   Yeah.
14   Q.   You didn't use a credit card?
15   A.   I did.
16   Q.   You did do what?
17   A.   Like I said, to purchase some phone numbers and —
18   Q.   You said to purchase phone numbers?
19   A.   Yes, phone numbers, so it could use tools, for ads
20   on eBay.
21   Q.   Oh, you needed a phone number?
22   A.   Yes, a real phone number, so they can send an
23   investigation card.
24   Q.   So that eBay can send a notification?
25   A.   Yes.

Mr. Catalin Dima - Direct

1    Q.    Okay.  Did you use credit cards for those virtual
2    private servers?
3    A.    Myself, no, I don't remember.
4    Q.    Okay.
5    A.    I don't remember what the other guys did.
6    Q.    All right.  Now, that was January 22nd, 2012.  Did
7    you get other e-mails from Master Fraud?
8    A.    In this list or generally?
9    Q.    Yes, in this list.
10   A.    Yes.
11   Q.    When?
12   A.    On November 2nd.
13   Q.    When else?
14   A.    November 5th, November 6th, everyday pretty much.
15   Q.    Now, in that fourth column, there is a line
16   e libera Angela dot.  What's that?
17   A.    It means Angela was free.  Angela was a mule.
18   Q.    Did you have contact with Angela?
19   A.    I don't remember.
20   Q.    And if we could zoom out or scroll down, if
21   possible.  All right.
22              November 7, 2012, did you get an e-mail from
23   kekezete?
24   A.    Yes.
25   Q.    That's your brother?

Mr. Catalin Dima – Direct

1    A.    Yes.

2    Q.    What is he e-mailing you about?

3    A.    About updated credit card list.

4    Q.    Who did your brother e-mail?

5    A.    To Master Fraud, to me, Minolta, Munteanu.

6    Q.    And if we can continue to scroll down, November 8th,

7    2012, what is print screen viewer?

8    A.    This was a tool, so you can see the infected

9    computer's desktop screen in real-time, take

10   snapshots, and you could see basically the desktop

11   of the victims.

12   Q.    Do you know who created that tool to take a picture

13   of the infected computer's desktop?

14   A.    Yes, Bogdan.

15   Q.    And if we can go to page 70, please?  November 9th,

16   did you get an e-mail from Master Fraud?

17   A.    Yes.

18   Q.    What is SMS?

19   A.    We used SMS to communicate with the mules.

20   Q.    Okay.  We can continue to scroll down.  Okay.  And

21   if — do you know what the December 10th, 2012, do you

22   know what vumper is?

23   A.    Yes.  It is a service where you can purchase virtual

24   phone numbers.

25   Q.    What was that for?

Mr. Catalin Dima – Direct

1    A.    Police ads on eBay.

2    Q.    And if we can go to the next page, please, 71.

3    February 10th, 2013, did you get an e-mail from Master

4    Fraud?

5    A.    Yes.

6    Q.    What does the proxy mean?

7    A.    One second.  Means fuels.  But I don't remember

8    about fuels.

9    Q.    That's okay.  February 11, 2013, did you get an

10   e-mail from Master Fraud?

11   A.    Yes.

12   Q.    What is that e-mail about?

13   A.    It is about drones, he used to call them drones.

14   It's about some —

15   Q.    Wait.  That one is Natiuning, right, the drone?

16   A.    Yes.

17   Q.    What's the one below it.  The CC log-in gmail?

18   A.    CC means credit cards.

19   Q.    Okay.

20   A.    I don't know what you mean by logging in.

21   Q.    Did others have gmail accounts in the group?

22            MR. GOLDBERG:  Objection.

23   Q.    If you know.

24            THE COURT:  Sustained.

25

Mr. Catalin Dima – Direct

1    BY MR. McDONOUGH:

2    Q.    You mentioned drone, what is a drone?

3    A.    Some kind of relay proxy, so the infected computers

4    would first connect to the drone, then would connect to

5    the VPS computer.

6    Q.    So between the computers and the virtual private

7    users —

8    A.    Yes.

9    Q.    The relay?

10   A.    Yes.

11   Q.    It is called a drone?

12   A.    Yes.

13   Q.    Was there more than one drone?

14   A.    Yes.

15   Q.    Maybe we can scroll down, please.  February 13th,

16   2013, did you get an e-mail from Master Fraud regarding

17   SOCKS, S o x u r i?

18   A.    SOCKS, okay.

19   Q.    What is SOCKS?

20   A.    SOCKS like the infected computer acting as a proxy,

21   so you could go to them to have an IP.

22   Q.    Did you get an e-mail later, 2031, from Master

23   Fraud?

24   A.    Yes.

25   Q.    What is false alarm?

Mr. Catalin Dima - Direct

1   A.   I don't remember.

2   Q.   How about the one after?

3   A.   This is a curse.

4   Q.   Curse word.  Who sent the curse word?

5   A.   Bogdan.

6   Q.   Do you recall what that was about?

7   A.   Not really.

8   Q.   If you could scroll down, please.  February 13th,

9   top line, what is that e-mail about?

10  A.   I don't remember, the eBay?

11  Q.   Yes.  Do you know what that eBay is?

12              MR. GOLDBERG:  Objection.

13  A.   I don't remember.

14              THE COURT:  Overruled.  The answer I don't

15  remember will stand.

16  BY MR. McDONOUGH:

17  Q.   February 18, 2013, what is the e-mail from Master

18  Fraud new web user/pass?

19  A.   This one was about the credentials to access the web

20  page where you could see everything in the interface like

21  infected computers and everything.

22  Q.   And the web page and interface and the infected

23  computers, where would you see that?  Where was that

24  located?

25  A.   On the VPS.

Mr. Catalin Dima - Direct

1    Q.    All right.  Who sent you the credentials to get to

2    the VPS?

3    A.    Bogdan and —

4             MR. O'SHEA:  Objection.

5    A.    And maybe the other guys —

6             MR. O'SHEA:  Object.

7             THE COURT:  Sustained.

8    BY MR. McDONOUGH:

9    Q.    Do you know who sent you that?

10   A.    Which one exactly?

11   Q.    Well, new web user/pass, is there another e-mail

12   below that?

13   A.    Yes.

14   Q.    What's Parola S 3?

15   A.    These are the credentials for the VPS, so I could

16   log in and set it up.

17   Q.    And who sent you the credentials?

18   A.    Bogdan, Master Fraud.

19   Q.    And what is SSH port?

20   A.    SSH port is a number, is a port.  Is it required for

21   you to log into a server.  If you don't know it, you

22   can't log into a server.

23   Q.    Do you know the number 18615?

24   A.    Yes, I remember.

25   Q.    How do you know or remember that port number?

Mr. Catalin Dima - Direct

1   A.   It is not unusual for a number to remember it.  I

2   don't know the answer.  I also used to set it up

3   sometimes.

4   Q.   You would set that up?

5   A.   Yes.

6   Q.   Did you need to have — the port — is the port

7   number involved in moving a VPS from one server to

8   another server?

9   A.   Yes.

10              MR. GOLDBERG:  Objection.

11              THE COURT:  Sustained.

12  BY MR. McDONOUGH:

13  Q.   How did you use the port number to move from one VPS

14  to another VPS?

15  A.   I would use a tool called rsync, r-s-y-n-c.  Yes, I

16  could transfer the files from one server to another.

17  Q.   How did you use port 18615?

18  A.   I don't know the question exactly.

19  Q.   What was port 18615?

20  A.   It was an extra port we used to access the VPS

21  servers.

22  Q.   And who is we?

23  A.   The group.

24  Q.   The whole group?

25  A.   Yes.

Mr. Catalin Dima - Direct

1   Q.   All right.  February 18th, 2013, did you get e-mails

2   from Master Fraud?

3   A.   Yes.

4   Q.   What are all those e-mails about?

5   A.   About this, credit cards.

6   Q.   Okay.  And were the e-mails, were there attachments

7   to the e-mails?

8   A.   Sometimes, yes.

9   Q.   Okay.  The one on February 18th, did you have

10  attachments?

11  A.   I don't remember.

12  Q.   All right.

13  A.   Oh, okay.

14  Q.   In the column here?

15  A.   It was an Excel sheet with credit cards.

16  Q.   Okay.  Did you have text files?

17  A.   Yes.

18  Q.   All right.  February 18, 2013, what did you send

19  regarding SSH port and new passwords?

20  A.   Yeah.  Like I said, sometimes I would set the VPS

21  up, so I changed a port and the standard passwords.

22  Q.   How would you notify everyone else in the group

23  about a new VPS and a new port and new password?

24  A.   By e-mail.

25  Q.   February 19th, 2013, did you get an e-mail from

Mr. Catalin Dima - Direct

1   Master Fraud?

2   A.   Yes.

3   Q.   What's he sending you?

4   A.   A new password, SSH password.

5   Q.   And what's the file he attached to this?

6   A.   It's Pack 3, but I don't remember about this

7   one.

8   Q.   Well, what is it, what is a text file?

9   A.   What is a text file?

10  Q.   Right.  Is that a text file?

11  A.   It is an encrypted text file.  It is like a file, a

12  document which contains text.

13  Q.   Okay.  If we can go to page 73, please.  March 3rd,

14  2013, what is Parola S 3?  Did you send an e-mail?

15  A.   Yes.  It is the same thing to Marius Matei.

16  Q.   And if you can scroll down.  You sent some

17  additional e-mails March 4th, 2013?

18  A.   Yes.

19  Q.   What did you send?

20  A.   VPN, random, VPN IP.

21  Q.   What's that?

22  A.   I don't remember about this.

23  Q.   Last e-mail, March 13, 2013, what did you

24  send?

25  A.   Job sites.

Mr. Catalin Dima – Direct

1   Q.   What are you referring to at job sites?

2   A.   The job sites we were using for recruiting mules.

3   Q.   Did you have any contact with mules?

4   A.   Yes.

5   Q.   What kind of contact?

6   A.   SMS.

7   Q.   What's that again?

8   A.   Text messages.

9   Q.   What were you text messaging mules?

10  A.   About transfers.

11  Q.   What transfers?

12  A.   From the victims, from eBay.

13  Q.   What were you sending to mules?

14  A.   That they should go to Western Union and pickup the

15  money.  Oh, I think to the bank and pick up the money and

16  transfer the money to us by Western Union.

17  Q.   How did you know the names of where the mules should

18  transfer the money?

19  A.   We had like text files somewhere on Yahoo.

20  Q.   Text file on Yahoo?

21  A.   Yeah, we have notes.

22  Q.   For that Yahoo notes, who had access to the text

23  file on Yahoo notes?

24  A.   Everybody, all of us.

25  Q.   Everybody in the group?

2115

Mr. Catalin Dima - Direct

1   A.   Yes.

2   Q.   Same user name, same password?

3   A.   Yes.

4   Q.   What was on that Yahoo notes text list?

5   A.   I don't remember right now from the memory.

6   Q.   Did you use that information that was in the Yahoo

7   text?

8   A.   Yes.

9   Q.   And what information did you use?

10  A.   I put some information there about transfers.

11  Q.   Okay.  How did you know if a mule was free or

12  available?

13  A.   We used to talk about it.

14  Q.   And how would you talk about it?

15  A.   We would ask Jabber once if a mule is free or they

16  are using it.

17  Q.   And how long did you continue to engage in e-mails

18  with Master Fraud and the rest of the group?

19  A.   Are you asking me about my period inside the

20  group?

21  Q.   Yes.

22  A.   From 2011 to 2013.

23  Q.   If we can go to page 77, Ms. Chandler, scroll down,

24  please.

25              I want to ask you a question about an e-mail

Mr. Catalin Dima - Direct

1   at the end of November, November 21st.  If we could

2   scroll down a little bit.  Do you see an e-mail from

3   Master Fraud November 21, 2013?

4   A.   Yes.

5   Q.   What was the subject of that e-mail?

6   A.   Actually, I can't see — I can see two mails.

7   Q.   What was the first e-mail?

8   A.   Okay.  To me.  It is the only one.  Spam.

9   Q.   Spam, what is spam?

10  A.   Generally speaking or just —

11  Q.   Generally, what is spam.

12  A.   Yeah, it is where you can send unwanted e-mails to

13  people, mass sending of unwanted e-mails to people.

14  Q.   Did you do anything with spam?

15  A.   Yes.

16  Q.   What did you do?

17  A.   We sent a lot of e-mail to the victims.

18  Q.   For what purpose?

19  A.   To infect them and inject the fake eBay pages with

20  the ads.

21  Q.   Did there come a time when you left the group in

22  2013?

23  A.   Pardon?

24  Q.   Did there come a time when you left the group?

25  A.   I don't understand the expression.  Sorry.

Mr. Catalin Dima – Direct

1    Q.    I'm sorry.  When did you stop?

2    A.    In 2013 at the end if I remember well.

3    Q.    Why did you stop?

4    A.    Because I wanted a normal life again.  I got tired

5    of hiding from my friends.

6    Q.    How much money were you making?

7    A.    Wasn't like — how do you say — same income every

8    month but —

9    Q.    From when you started to when you ended, how did it

10   change?

11   A.    $50,000, maybe $60,000 maybe $70,000.

12   Q.    Over how many years?

13   A.    Three years.

14   Q.    How long did you work everyday?

15   A.    It depends, from a few hours to maybe 16 hours.

16   Q.    Where did you work?

17   A.    Where?

18   Q.    Yes.

19   A.    At my place, at Bogdan's place.

20   Q.    Okay.  What did you do after you stopped?

21   A.    I got a real job.  I started working.

22   Q.    Doing what?

23   A.    Web development.

24   Q.    Web development?

25   A.    Yes.

2118

Mr. Catalin Dima - Direct

1    Q.    Who did you do web development for?

2    A.    The first company or —

3    Q.    Sure.

4    A.    It is called Every Mattress, a UK based company.

5    Q.    What did you do for this UK based company?

6    A.    Web development.

7    Q.    How long were you there?

8    A.    One year.

9    Q.    Where did you go after that?

10   A.    Then I got hired by an American company called

11   CellTrust.

12   Q.    CellTrust?

13   A.    Yes.

14   Q.    What is CellTrust.

15   A.    It is an American company building software products

16   with like a mobile fleet management software and

17   encryption voiceover IP, encrypted voiceover IP.

18   Q.    Okay.  Where do you work there?

19   A.    I have a small office for my place.  I also went to

20   the United States for a few months.

21   Q.    Okay.  Do you have any family?

22   A.    Yes.

23   Q.    What family do you have?

24   A.    I have a wife and a son.

25   Q.    How long have you been married?

Mr. Catalin Dima - Direct

1    A.    Since 2006.

2    Q.    How old is your son?

3    A.    Eleven years old.

4    Q.    After you left the group to go to the UK company and

5    then to the American company, when was the next time you

6    had communication with Bogdan Nicolescu?

7    A.    In 2016.

8    Q.    How did he contact you?

9    A.    He call me.

10   Q.    What did he talk to you about?

11   A.    He told me that he got involved in cryptocurrency,

12   and he was mining.

13   Q.    What is mining for cryptocurrency?

14   A.    It is — you use computer power to generate virtual

15   money we call currencies.

16   Q.    Did he explain to you how he was able to use

17   computer power?

18   A.    Yeah.  He told me that he is using the infected

19   computers to mine cryptocurrencies.

20   Q.    Okay.

21   A.    The whole network.

22   Q.    The whole network?

23   A.    Yeah.

24   Q.    Did you know how many infected computers were on the

25   whole network?

Mr. Catalin Dima - Direct

1    A.    In 2016 or —

2    Q.    At any time?

3    A.    At any time, thousands.

4    Q.    Did your group keep track of the infected

5    computers?

6    A.    Yes.

7    Q.    Where did your group keep track of the infected

8    computers?

9    A.    We had a web interface on the VPS.

10   Q.    Was there a list of folders and files on the

11   VPS?

12   A.    Yes.

13              MR. McDONOUGH:  Ms. Chandler, may we pull up

14   Government's Exhibit 1126, and if we could zoom in on the

15   text.

16   BY MR. McDONOUGH:

17   Q.    Do you see Government's Exhibit 1126?

18   A.    Yes.

19   Q.    Do you recognize what this list is?

20   A.    Those are some folders on the VPS.

21   Q.    How would you access that list of folders on the

22   VPS?

23   A.    You would log in as I said before using a name and a

24   password and special SSH port.

25   Q.    Can we go to page 14, please?  Do you see a folder

Mr. Catalin Dima - Direct

1    — folders on that page?

2    A.   I see many folders.

3    Q.   Any of them relate to you?

4    A.   Yeah.

5    Q.   Which ones?

6    A.   Linx, this one.

7    Q.   Can we please zoom in on Linx, the bottom half of

8    the page?

9              What is in the Linx folder?

10   A.   Some safe cars.

11   Q.   I'm sorry.  What kind of cars?

12   A.   Safe access.

13   Q.   When you say safe?

14   A.   Some safe ads like pictures for the cars and

15   descriptions.

16   Q.   Okay.  How would you get pictures of all these

17   cars?

18   A.   From the eBay with the automatic tool.

19   Q.   So these are cars you got using a tool?

20   A.   Yes.

21   Q.   Are these ones you used?

22   A.   Yes.

23   Q.   And if we could zoom out, please.

24              Government's Exhibit 1126, those files and

25   folders were located where?

Mr. Catalin Dima - Direct

1    A.    On the VPS server.

2    Q.    Okay.  All right.  What did Bogdan Nicolescu ask you

3    — withdraw.

4              What did Bogdan Nicolescu ask you regarding

5    cryptomining or cryptocurrency in 2016?

6              MR. GOLDBERG:  Objection.

7              THE COURT:  Sustained.

8    BY MR. McDONOUGH:

9    Q.    You mentioned earlier you had a conversation with

10   Bogdan Nicolescu?

11   A.    Yes.

12   Q.    Did he ask you anything?

13   A.    He asked me that if we could build a crypto

14   exchange.

15   Q.    For the other people to be able to sell or buy

16   crypto currencies because he is getting good at crypto

17   currencies?

18             MR. GOLDBERG:  Objection.

19             THE COURT:  Overruled.

20   BY MR. McDONOUGH:

21   Q.    What was your response to Bogdan's request?

22   A.    I didn't want to.  I didn't want to be involved with

23   him any more.

24   Q.    Why?

25   A.    Because I had — I had been involved with normal

Mr. Catalin Dima - Direct

1    job, which I enjoyed, so I didn't want to go back to

2    criminal activities at all or.

3    Q.    Had you ever had any interaction with computers

4    and criminal activities prior to meeting Bogdan

5    Nicolescu?

6    A.    I was under investigation in like 19 years ago.

7    Q.    How old are you now?

8    A.    37.

9    Q.    So 19 years ago you were how old?

10   A.    Like maximum, like 20 years I was.

11   Q.    And what school were you in at that time?

12   A.    High school, or I just started university.

13   Q.    Okay.  What did — what was the investigation when

14   you were in high school or at the university involving

15   computers 19 years ago?

16   A.    The details about it?

17   Q.    Yeah.

18   A.    At about generating credit cards we were using to

19   buy stuff from the internet.

20   Q.    Where did you get the credit card numbers?

21   A.    I don't remember, maybe from the internet.  We used

22   to chat on the IRC, a lot of channels there.

23   Q.    And what would you buy with your stolen credit

24   cards?

25   A.    Small things like clothing or small electronics.

Mr. Catalin Dima - Direct

1    Q.    All right.  Where would the small clothing or

2    electronics get shipped?

3    A.    To Romania.

4    Q.    I'm sorry.  To where?

5    A.    To Romania.

6    Q.    To Romania.  To what address?

7    A.    To me.

8    Q.    To your house?

9    A.    Yes.

10   Q.    Did the police show up one day?

11   A.    Yes.

12   Q.    What did they do?

13   A.    They seized my computer.

14   Q.    Were you ever arrested for that?

15   A.    No.

16   Q.    Were you ever charged with that?

17   A.    No.  They dismissed the case and gave me back the

18   computer.

19   Q.    Did you ever have to go to court for that?

20   A.    No.

21   Q.    When did they give you the computer back?

22   A.    A few years ago maybe, five six years ago.

23   Q.    What did you do with the computer that you used to

24   commit computer crimes in this case?

25   A.    I wiped the hard drive and sold it.

Mr. Catalin Dima - Direct

1    Q.    When you say wiped the hard drive, what do you mean

2    by that?

3    A.    It is like erasing traces, fill it up with random

4    stuff.

5    Q.    You erased it?

6    A.    Yes.  I erased it.

7    Q.    Did your hard drive have a password?

8    A.    At that time, yes.  It was encrypted.

9    Q.    Why did you encrypt your hard drive?

10   A.    To keep my criminal information private.

11   Q.    How long was your password?

12              MR. GOLDBERG:  Objection.

13   A.    Long.

14              THE COURT:  Sustained.

15   BY MR. McDONOUGH:

16   Q.    In February 2019, did you receive a summons to

17   appear before DIICOT, the Romanian National Police?

18   A.    Yes.

19   Q.    Did you appear at DIICOT?

20   A.    Yes.

21   Q.    Were you questioned by prosecutors?

22   A.    Yes.

23   Q.    The FBI?

24   A.    Yes.

25   Q.    Were you placed under oath?

Mr. Catalin Dima - Direct

1  A.   Yes.

2  Q.   Were you asked questions?

3  A.   Yes.

4  Q.   What were you asked?

5  A.   About my connections with Bogdan and the Bayrob

6  Group.

7  Q.   Did you tell the truth?

8  A.   No.

9  Q.   Why did you lie?

10  A.   Because I was afraid of being prosecuted.

11  Q.   Prosecuted where?

12  A.   In Romania or maybe in the United States.

13  Q.   Did you get an attorney?

14  A.   Yes.

15  Q.   Did you meet with the FBI?

16  A.   Yes.

17  Q.   Did you meet with the FBI and U.S. Attorneys and

18  myself?

19  A.   Yes.

20  Q.   Where?

21  A.   At a hotel in Bucharest.

22  Q.   Did you contact anyone after you got that summons to

23  appear?

24  A.   Anyone?

25  Q.   Yes, in the group?

Mr. Catalin Dima - Direct

1    A.   In the group?

2    Q.   Yeah.

3    A.   No.  Only with my brother I talked about.

4    Q.   Did the Government enter into a proffer with you?

5    A.   Yes.

6    Q.   The Government, the FBI asked you questions?

7    A.   Yes.

8    Q.   Did the Government enter into a non prosecution

9    letter with you?

10   A.   Yes.

11   Q.   The Government flew you over for this case to

12   testify?

13   A.   Yes.

14   Q.   Put you in a hotel, paid your per diem, meals,

15   correct?

16   A.   Yes.

17   Q.   Did the group ever get together?

18   A.   Sometimes, yes.

19   Q.   Do you know if Bogdan Nicolescu's father owns

20   anything?

21              MR. GOLDBERG:  Objection.

22              THE COURT:  Sustained.

23   BY MR. McDONOUGH:

24   Q.   Do they celebrate Thanksgiving in Romania?

25              MR. GOLDBERG:  Objection.

Mr. Catalin Dima - Cross

1        THE COURT:  Sustained.

2    BY MR. McDONOUGH:

3    Q.   Were you ever at a gathering?

4    A.   Yes.

5    Q.   Where?

6    A.   At that village close to Pitesti.

7    Q.   For what purpose?

8    A.   Like a Thanksgiving meal, something like that.

9    Q.   And who hosted?

10   A.   Bogdan.

11   Q.   What was provided?

12   A.   Rooms and food.

13   Q.   Who was there?

14   A.   At that meeting?

15   Q.   Yes.

16   A.   Me, my brother, Bogdan, Victor, Marius, Radu.

17        MR. McDONOUGH:  No further questions.

18        THE COURT:  Cross, Mr. Goldberg?

19        MR. GOLDBERG:  Thank you.

20              CROSS EXAMINATION

21   BY MR. GOLDBERG:

22   Q.   I am Mike Goldberg.  I have a couple questions.

23        MR. GOLDBERG:  May I approach?

24        THE COURT:  Of course.

25

Mr. Catalin Dima — Cross

1   BY MR. GOLDBERG:

2   Q.   Let me show you a list of e-mail addresses.  Let me

3   ask you real quick, do you know c-a-p-c-o-z-a-u-r @

4   GMX.com?

5   A.   No.

6   Q.   Do you know r-e-z-i-c-e-x-s @ GMX.com?

7   A.   No.

8   Q.   Do you know s-c-a-m-a @ GMX.com?

9   A.   No.

10  Q.   Do you know w-t-w-x @  GMX.com?

11  A.   No.

12  Q.   Do you know q-w-t-a-x-y @ GMX. com?

13  A.   No.

14  Q.   Therefore, you don't know if any of those

15  individuals have log-in credentials for the Master Fraud

16  account, correct?

17  A.   Correct.

18  Q.   Now, it sounds to me like you were in charge of a

19  lot of things here.

20           Correct me if I am wrong, you posted ads.

21  You said you posted about 35 of them, correct?

22  A.   Yes.

23  Q.   And you said that there are 35 ads that you posted

24  up at one time?

25  A.   Yes.

Mr. Catalin Dima - Cross

1   Q.   Okay.  And then, you said — you showed — the list

2   was shown to you where there was over a thousand ads all

3   posted at the same time, right?

4   A.   Right.

5   Q.   And you were responsible for talking to customers

6   that were responding to your ads?

7   A.   Yes.

8   Q.   And you managed — you had root access credentials

9   for the servers, correct?

10  A.   Correct.

11  Q.   Which means — root access means you could do

12  anything on the servers that you needed to do?

13  A.   Yes, correct.

14  Q.   You could move the servers between machines?

15  A.   Yes.

16  Q.   You could change any of the parameters of any of the

17  — anything that the servers were doing?

18  A.   Not really.  I think only the parameters that I knew

19  of.

20  Q.   Okay.  The ones you knew of you could manipulate?

21  A.   Yes, of course.

22  Q.   And isn't it a fact that you wrote some of the

23  automated tools that were used to post the ads for the

24  whole Bayrob Group?

25  A.   Yes, that's correct.

Mr. Catalin Dima — Cross

1   Q.    Okay.  You have experience in Linux code?

2   A.    Not really Linux but Linx administration.

3   Q.    Okay.  Which is all the stuff we are seeing on the

4   server, right?

5   A.    Yes.

6   Q.    And what about C computer language?

7   A.    I don't know C computer language.

8   Q.    What about JavaScript?

9   A.    Yes.  I know JavaScript.

10  Q.    Which was very important for the work you were doing

11  in the Bayrob Group, right?

12  A.    Not really but —

13  Q.    No.  Okay.  What about gmail PHP?

14  A.    PHP was important.

15  Q.    PHP?

16  A.    Yes, PHP.

17  Q.    Python?

18  A.    Python, yes.

19  Q.    These were all things you were proficient in at the

20  time, correct?

21  A.    Yes.

22  Q.    Now, you mentioned that with regard to the Yahoo

23  notes everyone shared credentials?

24  A.    That's like — that's what I remember, yes.

25  Q.    Which means everyone had a name and had a user ID

1    and a password.  Everyone had a user ID and a password

2    for the same account, correct.

3    A.    Correct.

4    Q.    So if I am on the outside looking in, looks like

5    that's one person, but to the group, it is many people

6    using the same account, correct?

7    A.    Correct.

8    Q.    And — and that's one of the ways that the

9    Bayrob Group communicated certain information to each

10   other?

11   A.    Yes.

12   Q.    You talked about being summoned to the police

13   station in February of 2019 a couple minutes ago?

14   A.    Yes.

15   Q.    Okay.  Up to that point, you had not been talked to

16   by law enforcement regarding Bayrob?

17   A.    No.

18   Q.    Okay.  So you went in to the police station — to

19   the police station, to DICOTT.  Did you bring a lawyer

20   with you?

21   A.    No.

22   Q.    And you indicated that you no longer had the laptop

23   at least the hard drive, that you used, correct?

24   A.    That came from —

25   Q.    No.  When you went to the police station, February

Mr. Catalin Dima — Cross

1    19, 2019.

2    A.    They didn't ask about any of that.

3    Q.    Right.  They didn't ask because you denied knowing

4    anything about anything.

5    A.    Of course.

6    Q.    And eventually, you did talk to the police and

7    told them everything you said here today in Court,

8    right?

9    A.    Yes.  Not the Romanian police but to the FBI and the

10   American authorities.

11   Q.    It is okay to lie to the Romanian police but better

12   not to lie to the FBI?

13            MR. McDONOUGH:  Objection.

14            THE COURT:  Sustained.

15   BY MR. GOLDBERG:

16   Q.    Is that like okay in Romania, to lie to the Romanian

17   police?

18   A.    It is not okay to lie, generally speaking.

19   Q.    All right.  So eventually, you talked to the FBI and

20   Romanian police, and this time you were really going to

21   tell the truth, right?

22   A.    Yes.

23   Q.    So did you give the Romanian police and the FBI the

24   second time you talked to them anything showing that you

25   were actually Linxstal on these e-mail addresses?

Mr. Catalin Dima - Cross

1           MR. McDONOUGH:  Objection.  Clarify.

2    BY MR. GOLDBERG:

3    Q.   Did you give them a password to the account?

4    A.   No.

5    Q.   Did you give them any copies of e-mails, copies of

6    spreadsheets, anything from the Bayrob Group?

7    A.   No.

8    Q.   You knew when you went back the second time exactly

9    what they wanted to know, right?

10   A.   Yes.

11   Q.   And you knew from your first conversation with

12   them that they were interested in Bogdan Nicolescu,

13   correct?

14   A.   Correct.

15   Q.   And they are interested in tying the name Bogdan

16   Nicolescu to Master Fraud?

17           MR. McDONOUGH:  Objection.

18           THE COURT:  Sustained.

19   BY MR. GOLDBERG:

20   Q.   Did you understand what they were interested

21   in?

22   A.   Yes.

23   Q.   What were they interested in?

24   A.   Convicting Bogdan.

25   Q.   Right.

Mr. Catalin Dima — Cross

1    A.    Finding evidence and witnesses.

2    Q.    And your understanding was, if you gave them the

3    information they were asking for, they wouldn't convict

4    you?

5                    MR. McDONOUGH:  Objection.

6                    THE COURT:  Overruled.

7    Q.    Right?

8    A.    Right.  The truth.  No —

9    Q.    Well, let me ask the next question:

10                    You get to stay home with your wife, your

11   child, your nice job with the United States company, you

12   don't get prosecuted at all as long as you tell them

13   about Bogdan, right?

14                    MR. McDONOUGH:  Objection.

15   A.    As long as I tell them the truth.

16                    THE COURT:  Overruled.

17   BY MR. GOLDBERG:

18   Q.    As long as you swear to tell the truth,

19   right?

20   A.    Tell the real truth.

21   Q.    Because you know you swore to tell the truth

22   when you talked to the Romanian police on February

23   19th?

24   A.    Yes.  But I —

25   Q.    Just answer yes.  We don't need to answer.  You can

Mr. Catalin Dima - Cross

1    explain.

2                    MR. McDONOUGH:  Objection.

3                    THE COURT:  Overruled.  Answer yes or no

4    questions, and the Government can ask further questions

5    on redirect.

6    A.    Okay.  So it is yes.

7    Q.    You can't show me one thing that establishes your

8    identity as Linxstal on those e-mails, can you?

9                    MR. McDONOUGH:  Objection.

10   Q.    You can't show me one piece of paper, any proof?

11                   THE COURT:  Overruled.

12   A.    No.

13   Q.    And we are supposed to take your word and this jury

14   for what your role was in this conspiracy?

15                   MR. McDONOUGH:  Objection.

16                   THE COURT:  Sustained.

17   BY MR. GOLDBERG:

18   Q.    I am going to hand you what I previously marked as

19   Defendant's Exhibit U.  Take a look at that, and tell me

20   what it is.

21   A.    This is my witness, how to say this, my statement.

22   Q.    This is a copy of a statement you gave to the

23   Romanian police on the 19th of February?

24   A.    Yes.

25   Q.    2019?

Mr. Catalin Dima - Cross

1   A.    Yes.

2   Q.    Is your signature on it?

3   A.    Yes.

4   Q.    Did you look at all the pages.  Your signature is

5   everywhere?

6   A.    Yes.

7   Q.    Is that your signature under the oath to tell the

8   truth so help you God?

9   A.    Yes.

10   Q.    And do you think there is anything missing from the

11   statement that should be on there or anything taken out

12   that was there before?

13   A.    I think this is my first statement.

14   Q.    Okay.  And you were specifically asked about Bogdan

15   Nicolescu, correct?

16   A.    Correct.

17   Q.    And you said you didn't know anything about him and

18   any kind of crime, correct?

19   A.    Correct.

20   Q.    And you didn't know any e-mails associated with

21   him?

22   A.    Correct.

23   Q.    And you said you didn't know who Linxstal was,

24   correct?

25   A.    Correct.

Mr. Catalin Dima — Cross

1   Q.   And you would agree that your testimony here today
2   is exactly the opposite, right?
3   A.   It is not the opposite; the truth like I said.
4   Q.   Well, okay.  It is the opposite.  The jury decides
5   what —
6   A.   Yeah.
7   Q.   You are saying the opposite thing today than you
8   told the police three days before then, right?
9   A.   Yes, yes.
10  Q.   You said you were previously involved in a fraud 19
11  years ago or something to that effect?
12  A.   Yes.
13  Q.   And you actually said you did that.
14           You said that you used stolen credit cards
15  to buy stuff?
16  A.   Generated credit cards, yes.
17  Q.   Generated credit cards?
18  A.   Yes.
19  Q.   Like you made a credit card?
20  A.   Not me.  If I remember well, it was a tool so you
21  can use to generate credit cards.
22  Q.   Okay.  So you generated credit cards, but you knew
23  that was wrong?
24  A.   Yes.
25  Q.   Did you talk to the police in that case?

Mr. Catalin Dima — Cross

1   A.   Yes.

2   Q.   Did you confess, or did you lie then, too?

3   A.   I didn't lie.

4          MR. McDONOUGH:  Objection.

5   Q.   I'm sorry.

6          THE COURT:  Go ahead, sir.

7   Q.   Did you lie or —

8   A.   No.

9   Q.   You told the truth?

10  A.   Yes.

11  Q.   And they just dismissed the case?

12  A.   Yes.

13  Q.   All right.  And that was 19, 18 years ago?

14  A.   Something like that, yes.

15  Q.   And you are saying they sent those computers back

16  five or six years ago?

17  A.   Yes.

18  Q.   So 10 or 11 years later you get your laptop

19  back?

20  A.   My desktop computer, yes.

21  Q.   Okay.  So the laptop that you used for this fraud

22  that you are talking about here today, you said you

23  completely wiped the hard drive?

24  A.   Yes.

25  Q.   And then you sold it?

Mr. Catalin Dima — Cross

1    A.    Yes.

2    Q.    All right.  How did you sell it?

3    A.    On the local ad website.

4    Q.    Okay.  What other evidence did you destroy besides

5    your computer?

6    A.    Only my computer.

7    Q.    I got a question:

8             When did you find out when

9    Bogdan Nicolescu, Tiberiu Danet, and Radu Miclaus

10   were in jail?

11   A.    So in 2016.

12   Q.    Okay.  And after — but you had stopped using the

13   GMX e-mail at that point, right?

14   A.    Yes.  I haven't been using GMX account for like four

15   years, since 2013 when I stopped.

16   Q.    So at that point, it had been sometime?

17   A.    Yes.

18   Q.    Okay.  And same thing goes for the — for

19   the servers.  You hadn't had any access to the

20   servers?

21   A.    No.

22             MR. GOLDBERG:  Can I have one moment, your

23   Honor?

24             THE COURT:  You may.

25

Mr. Catalin Dima - Cross

1   BY MR. GOLDBERG:

2   Q.   So you said that — your brother testified here

3   earlier today, Valentin?

4   A.   Okay.

5   Q.   And you grew up together, and you are in contact —

6   you always remained in contact with your brother,

7   correct?

8   A.   Yes, of course.

9   Q.   You stayed together this past weekend?

10  A.   Yes.

11  Q.   Okay.  And I would imagine you discussed with him

12  what's going to happen here in Court today?

13  A.   Yes.  We tried to imagine.

14  Q.   Yeah.  You discussed what he told the Court on

15  Friday and what he —

16  A.   No, of course.

17  Q.   You didn't talk about that at all?

18  A.   No.

19  Q.   But you talked about what would happen here in

20  Court?  You talked about —

21  A.   On Friday?

22  Q.   Just over the weekend.

23  A.   Oh, over the weekend, no.  He describe a little bit

24  like how is it, how this place —

25  Q.   Did he ask you — did he tell you about the

Mr. Catalin Dima — Cross

1   questions that were going to be asked?

2   A.   No, of course.

3   Q.   After you went to the police station on the 19th and

4   gave what you said was your false statement —

5   A.   Okay.

6   Q.   — but before you went for the second statement, you

7   talked to your brother?

8   A.   Yes.

9   Q.   Okay.  And you talked about what you were going to

10  tell the FBI and the police the second time you went in,

11  right?

12  A.   We are talking about during the whole suit, that's

13  it.

14  Q.   And Mr. Matei, too, correct?

15  A.   Correct.

16  Q.   You guys all communicated?

17  A.   Yes.

18  Q.   And the first time you went in, you didn't get

19  anything in return for going in?

20  A.   Correct.

21  Q.   But the second time, after you gave a statement

22  giving the Government what they were looking for about

23  Mr. Nicolescu, you got something very valuable in return,

24  correct?

25  A.   Correct.

Mr. Catalin Dima — Cross Cont'd

1  Q.   And that was a complete dismissal just like in 2003,
2  correct?
3            MR. McDONOUGH:  Objection.
4            THE COURT:  Sustained.
5  BY MR. GOLDBERG:
6  Q.   It was a complete pass on prosecuting you for all of
7  your crimes?
8  A.   Yes.
9            MR. GOLDBERG:  Thank you, your Honor.  I
10 have nothing further.
11           THE COURT:  Cross.
12           Mr. O'Shea?
13           CROSS EXAMINATION CONTINUED
14 BY MR. O'SHEA:
15 Q.   Good afternoon, sir.
16 A.   Hello.
17 Q.   Can you hear me?
18 A.   Yes.
19 Q.   Okay.  Did I hear you testify that you had taken
20 computer classes in the past?
21 A.   Yes.
22 Q.   When did you take those computer classes?
23 A.   In high school.
24 Q.   Did you take any classes at the university —
25 A.   No.

Mr. Catalin Dima - Cross Cont'd

1    Q.    — in computers.

2    A.    No.

3    Q.    All you know about your computer fraud activities

4    you know from high school and from self-taught?

5    A.    Computer activity or computers?

6    Q.    Computer fraud activities, self-taught?

7    A.    I don't understand the questions.

8    Q.    Did they teach computer fraud in the high

9    school?

10   A.    No.

11   Q.    No?

12   A.    No.

13   Q.    You didn't go to any classes on it, right?

14   A.    No.

15   Q.    You taught yourself, right?

16               MR. McDONOUGH:  Objection.

17               THE COURT:  Overruled.

18   A.    I taught myself computer programming like I

19   said.

20   Q.    What about the fraud part?  You taught yourself

21   that?

22   A.    No, of course —

23   Q.    Did you go to a class on that?

24   A.    No.

25   Q.    How did you find out about the arrest of Bogdan

Mr. Catalin Dima - Cross Cont'd

1   Nicolescu?

2   A.   My brother told me.

3   Q.   Did he call you?

4   A.   Yes, he called me and told me.

5   Q.   Call you on your cellphone?

6   A.   Yes.

7   Q.   Do you remember when he called you?  Was there snow

8   on the ground?  Was it before Christmas, before

9   Thanksgiving, do you remember?

10  A.   I remember it was like autumn, I think.  I don't

11  remember the exact time.  Maybe November 2016.

12  Q.   Do you remember being asked questions about all

13  those eBay cars for sale by the prosecutor a little while

14  ago?

15               Do you remember being asked that before

16  lunch?

17  A.   I don't understand the question.

18  Q.   Do you remember answering questions under oath about

19  eBay cars and —

20  A.   Yes.

21  Q.   — and listings and stuff?

22  A.   Yes.

23  Q.   As you sit here this afternoon in a U.S. federal

24  courthouse in Cleveland, Ohio, isn't it true that you

25  can't tell these ladies and gentlemen of the jury about a

Mr. Catalin Dima - Cross Cont'd

1   single transaction that you remember on eBay fraud, not

2   one?

3   A.    The exact details, no.

4   Q.    In order for you to have any ability to

5   testify about anything, you have to look at documents,

6   right?

7   A.    Right.

8   Q.    And those documents were given to you by the

9   Government, right?

10  A.    Right.

11  Q.    I think I heard you testify on direct examination

12  under oath that there was some sort of program that

13  Bogdan developed that automatically listed cars for eBay

14  sales, right?

15  A.    No, that's me.

16  Q.    That was you?

17  A.    He wrote the virus.

18  Q.    And this program would automatically take the

19  pictures and put them up without anybody doing anything

20  just after you wrote the program?

21  A.    No, no.  You had to control it.  It was not fully

22  automatic.

23  Q.    Okay.  Well, how automatic was it?

24  A.    You needed to give commands to it so the program

25  could list the cars online.

Mr. Catalin Dima — Cross Cont'd

1   Q.    Did you have to do each car manually, or did it do

2   it automatically after you programmed it?

3   A.    You have to choose a car or many cars, then the tool

4   would list the cars online.

5   Q.    And that's the part of the fraudulent stuff that you

6   did?

7   A.    Yes.

8   Q.    Can you pull up Exhibit 1854, please?  Do you see

9   Exhibit 1854, sir?

10  A.    Yes.

11  Q.    Do you remember testifying about certain portions of

12  this exhibit?

13  A.    Yes, I do.

14  Q.    Okay.  Do you see how I can control the arrow now?

15  Do you see the bottom here?

16  A.    Yes.

17  Q.    How many pages long is it?

18  A.    114 pages.

19  Q.    And do you remember being directed to certain

20  portions of those pages?

21  A.    Yes.

22  Q.    As you sit here without looking, did you —

23          MR. O'SHEA:  Could you take it down?

24  Q.    (Continuing)  Without looking at that exhibit that

25  they supplied to you, as you sit here today in a

2148

Mr. Catalin Dima - Cross Cont'd

1    federal courthouse in Cleveland, Ohio, you couldn't

2    remember any of those specific dates and e-mails.  Isn't

3    that right?

4    A.   Yes.

5    Q.   Do you remember testifying on direct examination

6    when asked about some of these e-mails is that you used

7    the term "maybe, I don't remember."  Do you remember

8    saying all that?

9                   MR. McDONOUGH:  Objection.

10                   THE COURT:  Sustained.

11   BY MR. O'SHEA:

12   Q.   Do you remember using the term "maybe" when the

13   prosecutor asked you about certain e-mails?  Do you

14   remember using that term out of your mouth, the word

15   "maybe"?

16   A.   Yes.

17   Q.   Do you remember saying the term "I don't remember"

18   when being asked about certain e-mails?

19   A.   Yes.

20   Q.   Even after they were shown to you on that chart,

21   right?

22   A.   Yes.

23   Q.   And you will agree with all of us that you met

24   with the prosecutors before you testified here,

25   right?

Mr. Catalin Dima — Cross Cont'd

1  A.   Yes.

2  Q.   So that you could go over these exhibits and be

3  prepared for today, right?

4  A.   Yes.

5  Q.   Now, have you ever — strike that.

6           I think you already indicated that you've

7  written computer code before, right?

8  A.   Yes.

9  Q.   And if you don't write computer code correctly, the

10  program won't work, right?

11  A.   Right.

12  Q.   Now, do you remember just telling me that you used

13  the term "maybe, I am not sure," and "I don't remember."

14           Do you remember that just a few seconds

15  ago?

16  A.   Yes.

17  Q.   Would that work in a computer code if you forgot

18  certain letters and commands?

19  A.   No.

20  Q.   Now, the $70,000 that you made from people

21  through your fraudulent activities, sir, tell the

22  ladies and gentlemen of the jury when you gave that money

23  back.

24  A.   Gave or —

25  Q.   Gave it back to the people you stole it from?

2150

Mr. Catalin Dima — Cross Cont'd

1    A.   I don't have that kind of money at the moment.

2    Q.   So you never gave it back, right?

3    A.   Right.

4    Q.   Tell the ladies and gentlemen what activities

5    you have engaged in to give back a single penny

6    of that money, a single cent of that that money to

7    anybody?

8                MR. McDONOUGH:  Object.

9                THE COURT:  Overruled.

10   A.   None.

11   Q.   Tell the ladies and gentlemen of the jury when you

12   notified the Romanian authorities of the money you took

13   so you could pay income taxes on it.

14   A.   I didn't.

15   Q.   This current job that you have, where is it, what

16   part of the world?

17   A.   In Bucharest at the moment.

18   Q.   Is it an American company?

19   A.   Now, I am working for a UK Romanian based company.

20   It is a mixed company.

21   Q.   When you were applying for that job, did you tell

22   those people that you were applying with about all your

23   fraudulent activities, sir?

24   A.   No.

25   Q.   Why not?

Mr. Catalin Dima - Cross Cont'd

1    A.   It is obvious; couldn't tell them.

2    Q.   They wouldn't hire you, right?

3    A.   Right.

4    Q.   Why wouldn't they hire you about this fraudulent

5    activity that you are no longer part of?

6                 MR. McDONOUGH:  Objection.

7                 THE COURT:  Sustained.

8    BY MR. O'SHEA:

9    Q.   Would it be they couldn't trust you?

10                MR. McDONOUGH:  Objection.

11                THE COURT:  Sustained.

12   BY MR. O'SHEA:

13   Q.   Now, you have an 11 year-old son and a wife.  Am I

14   right?

15   A.   Right.

16   Q.   And you have this job, and you use this job to

17   support them.  Am I right?

18   A.   Right.

19   Q.   And you don't want to lose this job, right?

20   A.   The current job?

21   Q.   Yes, sir.

22   A.   Yes, of course.

23   Q.   What job did you have in February of 2019, sir, the

24   same current job you have now?

25   A.   September —

Mr. Catalin Dima - Cross Cont'd

1    Q.    February, just a couple months ago when you

2    talked to the authorities, what job did you have, same

3    one?

4    A.    Yes, the current one.

5    Q.    Were you saying to yourself when they called you

6    "boy, I don't want to lose my job"?

7    A.    Of course.  I value my job by all means.

8    Q.    Now, after you were interviewed by the Romanian

9    authorities and FBI at one point, did you go into your

10   employer and tell him what you had done?

11   A.    I didn't tell him.

12   Q.    To this very day, your employer has no idea,

13   right?

14   A.    Right.

15             MR. O'SHEA:  Can we bring up Exhibit 1126?

16   BY MR. O'SHEA:

17   Q.    Do you remember being asked questions about this

18   document, sir, on direct examination, Exhibit 1126?

19   A.    Yes.

20   Q.    Does it look like it is about 28 pages long?

21   A.    Yes.

22   Q.    You were asked about page 14.  Am I right?

23   A.    Yes.

24   Q.    Prior to testifying here in this federal courtroom

25   in Cleveland, Ohio, were you told and shown this document

Mr. Catalin Dima — Cross Cont'd

1   before you sat down sir?

2   A.   Yes.

3   Q.   During all of your years when you were involved with

4   the computer fraud, did you ever work with anyone to

5   steal user names and passwords?

6   A.   Who use mine?

7   Q.   When you were doing any computer fraud?

8   A.   Yes.

9   Q.   Why would you steal user names and passwords?  What

10  value would they have to you as a computer thief?

11  A.   Myself, I didn't steal any user names and

12  passwords.

13  Q.   Were you ever part of a group that did it?

14  A.   Of course, yes.

15  Q.   What value — tell the ladies and gentlemen

16  of the jury what value does a user name and password

17  have?

18  A.   You can use that account to do all kinds of things

19  like, for example, if you have Facebook account, you can

20  use it to post things on it.

21  Q.   Do you know what a Google account is?

22  A.   Of course.

23  Q.   Do you know what a gmail account is?

24  A.   Yes.

25  Q.   Do you know in order to log on to gmail you need a

Mr. Catalin Dima — Cross Cont'd

1   user name and password?

2   A.   Yes.

3   Q.   Do you know anything else.

4   A.   No.

5   Q.   Last question, last couple of questions, maybe just

6   one, sir:

7                Mr. Goldberg just asked you if — where you

8   spent this weekend, and you spent it with your brother,

9   right?

10  A.   Right.

11  Q.   Did you and your brother share the same hotel?

12  A.   Yes.

13  Q.   Did you have meals together?

14  A.   Yes.

15  Q.   Did you go for walks together and see Cleveland?

16  A.   Yes, of course.

17  Q.   Did you have the same hotel or separate rooms?

18  A.   Separate rooms.

19  Q.   And it is your testimony with all the credibility

20  you have that you and your brother, during this weekend,

21  never had a single conversation about this case ever.

22               Is that what you want us all to believe?

23               MR. McDONOUGH:  Objection.

24               THE COURT:  Sustained.

25               MR. O'SHEA:  Nothing further.

Mr. Catalin Dima - Redirect

1    THE COURT:  Any redirect?

2         - - - - -

3         REDIRECT EXAMINATION

4    BY MR. McDONOUGH:

5    Q.    On cross examination, you were asked about defense

6    Exhibit U.  Do you remember that.

7    A.    U?

8    Q.    Yes, regarding your interview, the questions asked

9    by the Romanian National Police?

10   A.    Yes, of course.

11   Q.    Do you see on the last page of Defendant's Exhibit

12   U, page 4, these three pictures?

13   A.    Yes.

14   Q.    Do you recognize any of these pictures?

15   A.    The two of them.

16   Q.    What two do you recognize?

17   A.    First is Radu, and the third is Bogdan.

18   Q.    Were you friends with them?

19   A.    Not really friends.

20   Q.    How so?

21   A.    We were working together but not — we didn't

22   share —

23   Q.    I'm sorry?

24   A.    We were working together but didn't share the

25   same sort of friends like in the normal life with my

Mr. Catalin Dima - Recross

1   family.

2   Q.   Different circles?

3   A.   Yes.

4              MR. McDONOUGH:  No further questions.

5              THE COURT:  Recross, Mr. Goldberg?

6              MR. GOLDBERG:  Nothing based on that.

7                RECROSS EXAMINATION

8              MR. O'SHEA:  I do.

9   BY MR. O'SHEA:

10  Q.   Did I just hear you say, sir, that you guys had the

11  same, at least in part, circle of friends.  Did you use

12  that term?

13  A.   No, no, no.  We had different friends for everyday

14  activities for like social things, going out and

15  whatever.

16             MR. O'SHEA:  Nothing further.

17             THE COURT:  You may step down, sir.

18             Ladies and gentlemen, we are going to take

19  our afternoon recess.  Remember the admonition.

20             All rise for the jury.

21             (Recess had.)

22             THE COURT:  Please be seated.  Government,

23  call your next witness.

24             (Mr. Brown returned, and the following

25  discussion was held:)

Mr. Wertz – Direct

1    MR. BROWN:  Thank you, your Honor.

2    Government calls Donald Wertz.

3    DONALD WERTZ

4    called as a witness by and on behalf of the Government,

5    being first duly sworn, was examined and testified

6    as follows:

7    MR. BROWN:  May I inquire, your Honor?

8    THE COURT:  You may.

9    DIRECT EXAMINATION

10   BY MR. BROWN:

11   Q.   Mr. Wertz, would you please state and spell your

12   name for the record?

13   A.   Donald, D-o-n-a-l-d, middle name is James, last name

14   W-e-r-t-z.

15   Q.   And just to state, where do you live?

16   A.   I live in Wadsworth, Ohio.

17   Q.   And how long have you lived in Wadsworth?

18   A.   Approximately three years.

19   Q.   Prior to living in Wadsworth, where did you life?

20   A.   Seville, Ohio.

21   Q.   And how long did you live in Seville?

22   A.   Approximately 7, 8 years.

23   Q.   And were you living there between 2011 and 2018?

24   A.   Yes.

25   Q.   And who do you work for?

Mr. Wertz - Direct

1    A.    Allegheny.

2    Q.    And what do you do?

3    A.    I am a driver.

4    Q.    In fact, did you just come straight from

5    work?

6    A.    That is correct.

7    Q.    Thank you very much.

8              Are you familiar with the website Facebook?

9    A.    Yes, that is correct.

10   Q.    How are you familiar with Facebook?

11   A.    Pretty familiar.

12   Q.    Do you have an account?

13   A.    That is correct.

14   Q.    And how long have you had an account?

15   A.    About eight to nine years.

16   Q.    Okay.  And what do you use Facebook for?

17   A.    A lot of friends I work with, lot of family members

18   out of town, lot of people that I know, they use it to

19   talk to family members and people out of town.

20   Q.    Okay.  And do you have an account at Facebook?

21   A.    Yes, that is correct.

22   Q.    How did you set up your account with Facebook?

23   A.    I just logged on to the website about eight years

24   ago when I opened it up.  Asked me like my first, middle

25   name, last name.  They asked me an address at the time;

Mr. Wertz — Direct

1   wanted me to set up, enter like a Yahoo mail or gmail to
2   send notifications to?
3              And it also required me to set up a
4   password, so I could access the account when I wanted to
5   go on and off of it.
6   Q.    Okay.  And is that when you were living in Seville?
7   A.    Yes, that's correct.
8   Q.    And after signing up, were you ever asked to provide
9   credentials for your security?
10  A.    I think it was like a security question, that
11  nature, just if you had ever forgot your password, things
12  like that.
13  Q.    Did you ever see a page offering or asking you to
14  confirm your identity or —
15  A.    I had a page that I came home one day and asked me
16  for a credit card that was required; asked me to enter my
17  credit card information.
18             The Facebook page it said right on there
19  your account will not be charged.  We just need to have
20  some type of number on there to keep your account going.
21  Q.    And in addition to credit card information, what
22  information, if any, was asked on that page?
23  A.    It asked me the expiration date and the number to
24  the cards I was going to put on there.
25  Q.    Did it ask you for your name?

Mr. Wertz - Direct

1    A.   Yes, that is correct.

2    Q.   Did it ask you for your address?

3    A.   I do believe so.

4    Q.   Do you recall if it asked for any other personal

5    information?

6    A.   I do not believe so.

7    Q.   Okay.  Before publishing to the jury, could you pull

8    up Exhibit 1427 just to publish to the witness?  May we

9    have the Government's back on?  Okay.

10                 And could you take a look at Exhibit 1427?

11   Do you recognize that?

12   A.   Yes, that is correct.  This is the screen that

13   appeared that day, which I thought was kind of strange,

14   but like I said, my friends and family used this website

15   to send pictures and communicate back and forth to the

16   family.

17                 Yes, that is a screen that appears to be the

18   same as what it was that day.

19                 MR. BROWN:  Permission to publish to the

20   jury, your Honor?

21                 MR. GOLDBERG:  No objection.

22                 MR. O'SHEA:  No objection.

23   BY MR. BROWN:

24   Q.   And what about this page made you think it was from

25   Facebook?

Mr. Wertz — Direct

1    A.    I just looked on top.  I am not too familiar —

2                    THE COURT:  I am going to ask you to hold on

3    one second, sir.

4                    Can you see, folks?

5    BY MR. BROWN:

6    Q.    What about this page made you think it was

7    Facebook?

8    A.    Just looked at the top upper heading, and it said

9    Facebook.  I am not too familiar with computers, but I

10   did see the logo that said Facebook and nothing really

11   looked out of the ordinary.

12                   I had thought, hey, as you can see on the

13   screen, it says in the information will only be used to

14   verify your identity.  I really didn't think any of it

15   that didn't pop out or anything would be in danger, and I

16   thought it would be okay being that it was Facebook and

17   proceeded to put in my information.

18   Q.    Looking at Exhibit 1204, which has been admitted,

19   page 6 line 367, can you pull that up and looking at

20   the — the highlighted line here, do you recognize that

21   name?

22   A.    That's my name that appears on the yellow

23   highlighted line.

24   Q.    And do you recognize that address next to your

25   name?

Mr. Wertz - Direct

1   A.   Yes, that is correct.  That is my previous address

2   of Wooster Pike in Seville, Ohio.

3   Q.   Okay.  And that Seville in Ohio, is that the Zip

4   Code for Seville?

5   A.   Yes, 44273.

6   Q.   Do you recognize the number next to the Zip

7   Code?

8   A.   Yes, that is correct.  That's my previous number.

9   Q.   Okay.  Your cellphone number?

10  A.   The 330-201-2294.

11  Q.   And do you recognize the number next to the

12  telephone number?

13  A.   I do recognize the number.  That's a previous bank

14  account, and that would be the last four on the card

15  -9950.

16  Q.   Okay.  So that was the credit card?

17  A.   Yes, that is correct.

18  Q.   Okay.  And do you recognize if that's the expiration

19  date?

20  A.   6 of 2015, yes, that's correct.

21  Q.   Now, have you ever given your credit card

22  information out to people to use?

23  A.   I have not.

24  Q.   Have you ever allowed your credit card to be used

25  outside of your immediate observation?

Mr. Wertz - Cross

1    A.    I have not.

2              MR. BROWN:  Those are all the questions I

3    have.

4              I'm sorry.

5    Q.    Do you recall approximately when this was?

6              Well, at this time, was your credit card

7    still active in 2015.

8    A.    That is correct.  In 2015, yes, it was still

9    active.

10   Q.    And were you still living in Seville before

11   2015?

12   A.    Yes, that is correct.

13             MR. BROWN:  No further questions for this

14   witness.

15             THE COURT:  Cross?

16             MR. GOLDBERG:  No, thank you.

17             THE COURT:  Mr. O'Shea.

18                  CROSS EXAMINATION

19   BY MR. O'SHEA:

20   Q.    Sir, in order to gain access to your Facebook page

21   when you log-in, do you just use a user name and

22   password, and am I correct about that?

23   A.    That is correct.

24             MR. BROWN:  No redirect, your Honor.

25             THE COURT:  You may step down.

1      THE WITNESS:  Thank you.

2      THE COURT:  Call your next witness.

3      MR. BROWN:  Your Honor, the Government calls

4  Ashley Parton.

5      THE COURT:  Please step up to the podium,

6  Ma'am.  And raise your right hand.

7                    ASHLEY PARTON

8  called as a witness by and on behalf of the Government,

9  being first duly sworn, was examined and testified

10  as follows:

11                  DIRECT EXAMINATION

12  BY MR. BROWN:

13  Q.    Could you please state your name, and spell it for

14  the record?

15  A.    Ashley Parton, A-s-h-l-e-y, P-a-r-t-o-n.

16  Q.    Thank you.  And Ms. Parton, just city and state,

17  where do you live?

18  A.    Kansas City, Missouri.

19  Q.    Okay.  Could you pull the microphone closer or just

20  speak a little bit louder?

21              And how long have you lived in Kansas City?

22  A.    I have lived in Kansas City since 2012.

23  Q.    And where did you live before Kansas City?

24  A.    I lived in Gladstone, Missouri.

25  Q.    And how far away from Kansas City is Gladstone?

Mr. Parton - Direct

1    A.    Ten minutes.

2    Q.    Is it a suburb?

3    A.    It is a suburb, yes.

4    Q.    And how long did you live in Kansas City?

5    A.    From 2008 to 2011.

6    Q.    And while you were living in Gladstone, did you

7    work?

8    A.    I was — I worked for CitiBank for a little while,

9    and then I worked for a place called uniforms PRN, and

10   then I was a stay-at-home mother, and I took care of my

11   grandmother who was ill.

12   Q.    And approximately what years were you staying home

13   and taking care of your grandmother?

14   A.    Between 2009 and 2011.

15   Q.    Now, while you were staying home taking care of your

16   family and grandmother, were you looking for work as

17   well?

18   A.    Yes.

19   Q.    And what sort of work were you looking for?

20   A.    I was looking for anything that I could work from

21   home and take care of my daughter and my grandmother.

22   That's what I did.

23   Q.    Stay-at-home work or stay-at-home job?

24   A.    Yes.

25   Q.    And how were you looking for stay-at-home?

Mr. Parton — Direct

1   A.   I was looking on online like careerbuilder or

2   monster.com.

3   Q.   And using the websites how did you look for work?

4   What did the job search look like?

5   A.   Anything that was stay-at-home I would search

6   for.

7   Q.   And how would you communicate with potential

8   employers?

9   A.   Via e-mail usually.

10  Q.   And how would they communicate with you?

11  A.   E-mail.

12  Q.   And what e-mail were you using at that time?

13  A.   I do not remember the e-mail, but I know it was with

14  Yahoo.

15  Q.   Okay.  And why don't you remember the Yahoo?

16  A.   I have — I have been using an e-mail address since

17  then for a very long time, and I don't remember what

18  e-mail I had created to find jobs at that time.

19  Q.   Did you have an e-mail that was just for your job

20  search?

21  A.   Yes.

22  Q.   Do you use that e-mail any more?

23  A.   No.

24  Q.   Have you used that e-mail — when was the last time

25  you used that e-mail?

Mr. Parton — Direct

1   A.   2011.

2   Q.   Now, in 2011, did you get any job offers?

3   A.   I did.

4   Q.   From what companies did you get a job offer?

5   A.   KPL.

6   Q.   And what kind of offer did they give you?

7   A.   It was to be a transaction agent.

8   Q.   So when KPL said "come be a transaction agent," what

9   did that mean to you?

10  A.   That meant that I was going to be able to work from

11  home.  I would have the flexibility that I needed to work

12  and take care of my grandmother and my daughter.

13  Q.   Did KPL tell you what was involved in being a

14  transfer agent?

15  A.   They told me that I would be, I would have —

16              MR. O'SHEA:  Objection.

17              THE COURT:  One moment.  Sustained.

18  BY MR. BROWN:

19  Q.   What did you understand your job duties to be at

20  KPL?

21              MR. O'SHEA:  Objection.

22              THE COURT:  Overruled.

23  A.   I was going to have to — money would be transferred

24  into my account, and I would just withdraw it and send it

25  via Western Union.

Mr. Parton — Direct

1   Q.   Based on your understanding of that job description,

2   did you pursue a job with KPL?

3   A.   I did.

4   Q.   What I would like to show you right now is

5   Government's Exhibit 1408.  If you could just show it to

6   the witness at this time.

7               Now, take a look at this exhibit.  Do you

8   recognize it?

9   A.   I do.

10  Q.   And what do you recognize this to be?

11  A.   I recognize the KPL partnership, Martin and then the

12  Yahoo.

13  Q.   Is this an e-mail you had with KPL?

14  A.   It is not, no.

15  Q.   Could we turn to page 2?  Do you recognize the name

16  in this e-mail?

17  A.   Which name?

18  Q.   About a third of the way down.  Do you see who it is

19  addressed to?

20  A.   To me?

21  Q.   Yes.

22  A.   Yes.

23  Q.   Okay.  And why do you not recognize this

24  e-mail?

25  A.   I didn't create that particular e-mail.  I wouldn't

1    have use the 4 2.  I don't recall using that ever.

2    Q.    Okay.  But do you recall receiving —

3              MR. BROWN:  Could we take that down?

4    BY MR. BROWN:

5    Q.    Do you recall receiving an e-mail from KPL offering

6    you a job?

7    A.    Yes.

8    Q.    And do you recall who it was from?

9    A.    It was from a Martin.

10   Q.    And once you accepted that job, what happened?

11   A.    I received my first deposit into my account, and

12   then I went and withdrew it and sent it via Western

13   Union.

14   Q.    Now, how would you know when you got a deposit into

15   an account?

16   A.    They would either text me or e-mail me.

17   Q.    And who would text or e-mail you?

18   A.    I believe it was Martin.

19   Q.    And what e-mail would he use?

20   A.    I don't remember.  I know it was a Yahoo.

21   Q.    And what text would you use?

22   A.    I'm sorry?  What was that?

23   Q.    How would he text you?  What number did he use?

24   A.    I don't remember.

25   Q.    What number did you give him to text?

Mr. Parton — Direct

1   A.   My cellphone number.

2   Q.   And is that a cellphone you still have?

3   A.   No.

4   Q.   What bank account did you use for KPL?

5   A.   It was a Bank of America account.

6   Q.   Was that your personal account?

7   A.   No.

8   Q.   Why did you use that Bank of America account?

9   A.   Because I didn't want my personal account associated

10  with work.

11  Q.   Why not?

12  A.   For privacy reasons.

13  Q.   So you opened up an account at Bank of America?

14  A.   Yes.

15  Q.   And you said Martin would text or e-mail you when

16  money was coming in?

17  A.   Yes.

18  Q.   And what would you do once you received a text or

19  e-mail like that?

20  A.   I would go and withdraw the money and then go to

21  Western Union.

22  Q.   And what would you do once you got to Western

23  Union?

24  A.   I would fill out the form to send money via Western

25  Union and complete the transaction.

2171

Mr. Parton - Direct

1  Q.    And where would you get the information to fill out

2  that form?

3  A.    From the e-mail or the text.

4  Q.    And who would send you that e-mail?

5  A.    Martin.

6  Q.    Do you recall the address where you would send the

7  e-mail or send the money?

8  A.    I remember Bulgaria.

9  Q.    What about Bulgaria stood out to you?

10  A.    That it was another country.

11  Q.    Okay.  Were you ever told to send money to the

12  United States?

13  A.    No.

14  Q.    Now, after you sent the money to Western Union, what

15  did you do?

16  A.    Then, there was a percentage of money that I was

17  allowed to keep, so I would take that out of it, and that

18  was then — that was it.

19  Q.    And would you receive any other form of payment

20  other than a percentage?

21  A.    No.

22  Q.    Now, showing you Exhibit 1456, which has previously

23  been admitted, on page 10, do you recognize that bank of

24  America?

25  A.    I recognize the Bank of America and the address for

Mr. Parton — Direct

1   the bank.

2   Q.   And how do you recognize that Bank of America

3   address?

4   A.   That was the Bank of America that I went to.

5   Q.   Okay.  And do you recall — do you see the amount

6   that is being transferred into that bank account?

7   A.   Yes.

8   Q.   Does that amount mean anything to you based on your

9   job as a transfer agent?

10  A.   That was around the amount that most of the

11  transactions were.

12  Q.   Okay.  Would they ever vary up?  Like were they

13  larger than that?

14  A.   I know they were under $10,000.

15  Q.   And about how many transfers did you conduct while

16  working for KPL?

17  A.   Approximately five to eight.

18  Q.   And how often would you make transfers?

19  A.   Maybe once or twice a week.

20  Q.   And did there come a time when you stopped working

21  for KPL?

22  A.   Yes.

23  Q.   Why?

24  A.   They were asking me to make new bank accounts and do

25  more transactions per day, and I didn't feel comfortable.

Mr. Parton - Direct

1    I didn't have the time to do that.

2    Q.    Okay.  And were there any other reasons why you

3    stopped working for KPL?

4    A.    I was also contacted by Bank of America.  They said

5    there was an investigation —

6                   MR. O'SHEA:  Objection.

7                   THE COURT:  Sustained.

8    BY MR. BROWN:

9    Q.    Based on the Bank of America contact, what did you

10   do, if anything?

11   A.    I gathered up all the of the records that I had

12   kept and took them, made copies, and took them to Bank

13   of America, so they had all of the information that I

14   had.

15   Q.    Why did you give Bank of America all of your

16   transaction records?

17   A.    They said there was an investigation.

18                  MR. O'SHEA:  Objection.

19                  THE COURT:  Sustained.

20   BY MR. BROWN:

21   Q.    Was there anything else that happened that led you

22   to stop working for KPL?

23   A.    I was also visited by the Kansas City police

24   department.

25   Q.    And what, if anything, happened when you were

Mr. Parton - Direct

1   visited by the Kansas City police department?

2   A.   They put me in handcuffs and took me to jail for

3   questioning.  They put me in a paper suit.  After the —

4   they took me in for questioning for a while.  After that,

5   about an hour later, they let me go.  They did not give

6   me a phone call or anything.  I wandered around Kansas

7   City for quite a while trying to find a phone to make a

8   phone call to get home.

9   Q.   What do you mean by "paper suit?"  I'm sorry.

10  A.   They took all of my clothing from me and had me wear

11  very thin clothes made out of a paper-type material.

12  Q.   Did anything else happen as a result of that police

13  visit?

14  A.   Yes.  After that, they came and broke into my

15  window.  They were searching my house.  They overturned

16  furniture throughout my house searching for stuff.  They

17  took my cellphone.  I had all of my children's, my

18  daughter's baby photos on there, and then they took my

19  computer as well.

20  Q.   Did you ever get your phone back?

21  A.   No, I have not.

22  Q.   How has that affected your life since then?

23              MR. O'SHEA:  Objection.

24              MR. GOLDBERG:  Objection.

25              THE COURT:  Sustained.

Mr. Parton — Cross

1    MR. BROWN:  No further questions.

2    THE COURT:  Cross, Mr. Goldberg.

3    MR. GOLDBERG:  Thank you for your time,

4  Ms. Parton.  No questions.

5    THE COURT:  Mr. O'Shea.

6    CROSS EXAMINATION

7  BY MR. O'SHEA:

8  Q.   I only have a few questions for you, Ms. Parton.

9    MR. O'SHEA:  Can we show her 1408 again?

10  BY MR. O'SHEA:

11  Q.   Now, Ma'am, do you see that exhibit in front of

12  you?

13  A.   Yes.

14  Q.   Now, prior to you coming into this courtroom, had

15  you ever seen that document before?

16  A.   Yes.

17  Q.   When?

18  A.   Just a little bit ago.

19  Q.   And that was the first time you had seen this

20  document?

21  A.   Yes.

22  Q.   And who showed it to you?

23  A.   The prosecuting attorneys.

24  Q.   Okay.  And had you seen this document laying around

25  on the ground?  Did you even know what it was until

Mr. Bertke – Direct

1    someone told you what it was?

2    A.    No.

3    Q.    Okay.  Now, let me ask you, can we put up Exhibit

4    1456?  Do you remember talking about this document just a

5    moment ago, Ma'am.  Let's go to page 10.

6    A.    Yes.

7    Q.    Now, Ma'am, prior to coming and testifying this

8    afternoon, had you ever seen that document before?

9    A.    No.

10   Q.    Same questions before; same answers I assume.  You

11   hadn't seen it until some prosecutor showed it to you?

12   A.    Yes.

13   Q.    And if it was laying on the ground, you wouldn't

14   even know what it was?

15   A.    Yes.

16                THE COURT:  Any redirect?

17                MR. BROWN:  No redirect.

18                THE COURT:  You may step down, Ma'am.  Call

19   your next witness.

20                MR. LEVINE:  United States of America calls

21   Clint Bertke.

22                        CLINT BERTKE

23   called as a witness by and on behalf of the Government,

24   being first duly sworn, was examined and testified

25   as follows:

Mr. Bertke - Direct

1                    DIRECT EXAMINATION

2    BY MR. LEVINE:

3    Q.   Good afternoon.

4    A.   Good afternoon.

5    Q.   Will you please — move the mike in front of you —

6    and if you could please state and spell your last name

7    for the court reporter?

8    A.   Clint Bertke, B-e-r-t-k-e.

9    Q.   And Mr. Bertke, where do you live?

10   A.   I live in Fort Recovery, Ohio.

11   Q.   And how long have you lived in Fort Recovery?

12   A.   Forty one years.

13   Q.   And who lives with you in Fort Recovery, Ohio?

14   A.   My wife and five kids.

15   Q.   Five kids.  How old are your kids?

16   A.   The oldest is 13, youngest is 6.

17   Q.   And what do you do for work, Mr. Bertke?

18   A.   I build custom cabinetry and trim.

19   Q.   And do you work for a particular company?

20   A.   It is called Voldy Custom Cabinets.

21   Q.   And is that someone else's company, or is that that

22   your company?

23   A.   That is my company.

24   Q.   And what kind of cabinets do you make?

25   A.   Any kind of cabinets that you want.

Mr. Bertke - Direct

1   Q.   Do you have any employees that work for your
2   cabinet-making business?
3   A.   I do not at this time.
4   Q.   Okay.  Mr. Bertke, are you familiar with the website
5   eBay.com?
6   A.   Yes, I am.
7   Q.   How are you familiar with eBay?
8   A.   I frequent it.  I buy things off it.
9   Q.   What type of things have you purchased on eBay?
10  A.   Little things like office supplies as big as a
11  car.
12  Q.   You purchased a car on eBay?
13  A.   Yes, I did.
14  Q.   When was that?
15  A.   About six years ago.
16  Q.   Was that — do you remember the particular year?
17  A.   It would have been like 2013.
18  Q.   What kind of car was it that you purchased?
19  A.   A 1972 Cutlass.
20  Q.   And is that — did you actually receive that
21  car?
22  A.   Yes.
23  Q.   How many times would you say you made purchases on
24  eBay?
25  A.   I would say at least twice a week.

Mr. Bertke - Direct

1    Q.   Twice a week from what period to what period.  Was
2    it for years?
3    A.   Yeah, probably a decade or more.
4    Q.   All right.  And did you ever look into purchasing a
5    pickup truck on eBay?
6    A.   Yes, I did.
7    Q.   And what kind of pickup truck was it?
8    A.   It was a Ford F 150.
9    Q.   Can we bring up just for us Government's Exhibit
10   1333.  All right.
11           Are you familiar with the e-mail address
12   Clint Bertke @ hotmail.com?
13   A.   Yes, I am.  That is my address.
14   Q.   And is that your current e-mail address?
15   A.   Yes, it is.
16   Q.   Are you familiar with the phone number
17   419-852-2130?
18   A.   Yes, I am.
19   Q.   And how are you familiar with that number?
20   A.   That is my current cellphone number.
21           MR. LEVINE:  Can we publish this to the
22   jury, your Honor?
23           THE COURT:  Any objection?
24           MR. GOLDBERG:  No objection.
25           MR. O'SHEA:  No objection.

Mr. Bertke - Direct

1          THE COURT:  All right.

2          MR. LEVINE:  Thank you, your Honor.

3    BY MR. LEVINE:

4    Q.   Looking at the e-mail dated July 26, 2010, is that

5    your e-mail address in the "to" field?

6    A.   Yes, it is.

7    Q.   And what is the e-mail address in the "from" field?

8    A.   It is P-r-o-n-t-o 251 @ Yahoo.com.

9    Q.   And prior to this e-mail interaction, were you

10   familiar with the e-mail address P-r-o-n-t-o 251 @

11   Yahoo.com?

12   A.   No.

13   Q.   What is the subject line of this July 26th, 2010,

14   e-mail?

15   A.   "Clint Bertke, my F 150 for sale."

16   Q.   All right.  And is that your name in the subject

17   line of the e-mail?

18   A.   Yes, it is.

19   Q.   Okay.  Could you please read that e-mail for us, the

20   July 26 e-mail?

21   A.   "Hi there.  I am e-mailing to let you know that my

22   '04 Ford F 150 is still available.  I had a buyer, but I

23   could not get the deal done because I didn't get his loan

24   approved.  I am still interested to sell, and I am

25   willing to let it go for less as long as you get this

Mr. Bertke — Direct

1    done fast.  I have also attached a few pictures of the

2    truck.  Let me know if you are interested.  Thank you."

3    Q.    Thank you very much.

4                  Before receiving this e-mail, had you been

5    interested in purchasing a Ford F 150?

6    A.    Yes.

7    Q.    And was it for your personal use or cabinet-making

8    business?

9    A.    Permanent use.

10   Q.    And before receiving this e-mail, had you

11   communicated with the purported seller of the

12   Ford F 150?

13   A.    Yes.

14   Q.    And this e-mail says "I have attached a few pictures

15   of the truck."  Did you click any attachments to this

16   e-mail?

17   A.    Yes, I did.

18   Q.    Scroll down a little bit, and is that your response

19   we see on July 27, 2010?

20   A.    Yes, it is.

21   Q.    Could you read your response?

22   A.    "Hi.  My name is Clint.  And yes, I am still

23   interested in the '04 F 150.  If you could call me at

24   419-852-2130, and we will set up a time to see and test

25   drive the truck.  Also, I have cash in hand, so there

Mr. Bertke - Direct

1    will be no wait for the loan.  Again" or "thanks again,

2    Clint, Clint Bertke."

3    Q.    Do you recognize the phone number in that

4    e-mail?

5    A.    That is my phone number.

6    Q.    And if we could now scroll up to the next e-mail.

7    Okay.

8                And was this the response you received from

9    the seller?

10   A.    Yes, it is.

11   Q.    Could you please read the response from the

12   seller?

13   A.    "Clint, I have reenlisted the truck on eBay.  As I

14   said before, right now I am on a business trip and,

15   unfortunately, forgot my cellphone or cell, so it is best

16   if you just e-mail me.  The truck is in OR.  However,

17   shipping is already paid because my buyer changed his

18   mind after I had made arrangements to ship the truck.  It

19   is ready to ship at any time."

20   Q.    And then, does the e-mail continue with item?

21   A.    "There is item number 170515682914.  You could

22   search it on eBay.  Buy it now price, $9,300, shipping

23   included, clear — title is clear.  No problem with the

24   vehicle whatsoever.  If you are interested, please use

25   the eBay or use the buy-it-now option on eBay.

Mr. Bertke - Direct

1                  "You can even choose to have eBay hold the

2      money until you get the truck and inspect it at your own

3      place, so you would be totally protected."

4      Q.   And if you could please read the line after the —

5      the words after "ex-mailer"?

6      A.   Okay.  "It is courier 3.50 period 00 period 09

7      period 1098.

8      Q.   And then is there a website after that?

9      A.   Yes, HTTP w w w.R-o-s-e-c-i-t — mine just went

10     blank — there it is.  It is www.rosecitysoftware.com.

11     Q.   Now, after receiving this e-mail, did you attempt to

12     purchase the Ford F 150?

13     A.   No.

14     Q.   At some point after July 26, 2010, did you realize

15     your computer was infected with a virus?

16     A.   Yes.

17                  MR. GOLDBERG:  Objection.

18                  THE COURT:  Sustained.

19     BY MR. LEVINE:

20     Q.   What happened after July 26th, 2010?

21     A.   I noticed my computer wasn't running right.  There

22     was something wrong with it.

23     Q.   And do you remember approximately when that was?

24     A.   I am not real sure.

25     Q.   Okay.  And what did you do when you realized

Mr. Bertke - Direct

1    something was wrong with your computer?

2    A.    My wife's cousin is a computer guru, so I got ahold

3    of him.  He came over and fixed it.

4    Q.    Okay.  When you say he is a computer guru, what does

5    he do?

6    A.    He is like an IT specialist for brightnet.com.

7    Q.    And what is brightnet.com?

8    A.    It is a local server.

9    Q.    And your wife's cousin was able to solve the

10   problem?

11   A.    Yes, my wife's cousin.

12   Q.    And if you can bring up Government's Exhibit 1204

13   and go to page 2 of 1204 and zoom in around line 96

14   and then line 96, looking at the fourth column of

15   line 96 of Government's Exhibit 1204, do you see your

16   name there?

17   A.    Yes, I do.

18   Q.    And looking at the columns to the right of your

19   name, do you recognize the address 299 Lowry Road, Fort

20   Recovery, Ohio 45846?

21   A.    Yes.  That is my current address.

22   Q.    Was it also your address in 2010?

23   A.    Yes, it was.

24   Q.    And looking at the next column to the right, do you

25   recognize the phone number 419-852-2130?

Mr. Bertke - Direct

1    A.    Yes.

2    Q.    What is that number?

3    A.    That is my current cellphone number.

4    Q.    And was it also your cellphone number in 2010?

5    A.    Yes, it was.

6    Q.    And looking at the next column to the right, do you

7    recognize that number?

8    A.    Yes, I do.

9    Q.    And what is that number?

10   A.    That is my credit card number.

11   Q.    And how do you remember — first of all, is it your

12   current credit card number?

13   A.    No, it is not.

14   Q.    Was it your credit card in the 2010 time frame?

15   A.    Yes, it was.

16   Q.    How do you remember that that was your credit card

17   number?

18   A.    I pretty much memorized it.  I had that card since I

19   was 18.

20   Q.    And did you use that card frequently?

21   A.    Yes.

22   Q.    And was there a time you noticed charges on your

23   credit card statement that weren't your charges?

24   A.    Yes.

25   Q.    Were these unauthorized charges?

Mr. Bertke — Direct

1    A.    Yes, they were.

2    Q.    Were they small or large charges?

3    A.    They were small.

4    Q.    Looking at the third column over from the left, are

5    you familiar with a company called Craigslist?

6    A.    Yes.

7    Q.    Have you ever made any credit card charges to

8    Craigslist?

9    A.    No, I have not.

10   Q.    Are you familiar with a company called Yahoo

11   hosting?

12   A.    No.

13   Q.    Have you ever made any credit card charges with

14   Yahoo hosting?

15   A.    No.

16   Q.    Are you familiar with a company called Indeed?

17   A.    No.

18   Q.    Have you ever made any credit card charges to

19   Indeed?

20   A.    No, I have not.

21   Q.    Once you found charges on your credit card

22   statements that you hadn't put on there, what did you

23   do?

24   A.    I called Discovercard up.

25   Q.    And what did you do when you called the company?

Mr. Bertke - Direct

1    A.    They had immediately canceled the card.

2    Q.    And did you have to pay for the unauthorized charges

3    on your credit card?

4    A.    I did not.

5    Q.    Did the incident have any other impact on you or

6    your business?

7              MR. GOLDBERG:  Objection.

8              THE COURT:  Overruled.  You may answer, sir.

9    A.    Yes, it did.

10   Q.    What impact did it have?

11   A.    I have suppliers that keep that credit card number

12   on hand, so I had to contact all my suppliers to tell

13   them what was happening, and I would get them a new

14   credit card number as soon as possible.

15   Q.    Okay.  What county is Fort Recovery in?

16   A.    It is in Mercer.

17   Q.    Where is Mercer?

18   A.    It is between Darke and Van Wert counties.

19   Q.    What city is Fort Recovery closest to?

20   A.    The biggest city would be Celina.

21   Q.    How far from here, how long did it —

22   A.    Around four hours.

23             MR. LEVINE:  No further questions.

24             THE COURT:  Cross?

25             MR. GOLDBERG:  Thank you, no questions.

Mr. Bertke - Cross

1              - - - - -

2

3                 CROSS EXAMINATION

4    BY MR. O'SHEA:

5    Q.    Did I hear you are a cabinet maker?

6    A.    Yes.

7    Q.    And you install cabinets as well as making

8    them?

9    A.    Yes, I do.

10   Q.    And they have to line up, and you do correct

11   measurements before you bring them into a kitchen to

12   install?

13   A.    Yes.

14   Q.    And if they are off, the whole thing could be

15   off?

16   A.    Yes.

17   Q.    Now, can we pull up Exhibit 1333 again?

18             Now, prior to today, prior to sitting down

19   in this courtroom where you are sitting right now, had

20   you ever seen this document before, sir?

21   A.    Yes, I have.

22   Q.    Where did you see it?

23   A.    Here.

24   Q.    In this very courthouse?

25   A.    Yes.

Mr. Bertke - Cross

1   Q.   And how long ago was that, sir?

2   A.   That was on Sunday afternoon-evening.

3   Q.   And who showed it to you?

4   A.   That man right there.

5   Q.   Okay.  One of those good looking fellows right

6   there?  (Indicating.)

7   A.   Yeah.

8   Q.   Okay.  And if you had seen it laying on the

9   ground, had they not shown it to you, would you know what

10  it is?

11  A.   No, I wouldn't.

12  Q.   And let me have you see Exhibit 1204 as well.

13               Same question, sir, had you seen this

14  document before you sat down here this afternoon?

15  A.   Yes.

16  Q.   And where had you seen it, same time as the other

17  one?

18  A.   Yes.

19  Q.   Now, had you — had it been laying on the ground,

20  would you even know what it was had someone not pointed

21  out exactly what it is?

22  A.   No.

23               MR. O'SHEA:  Nothing further, Judge.

24               THE COURT:  Any redirect.

25               MR. LEVINE:  No redirect, your Honor.

1              THE COURT:  You may step down, sir.

2              Call your next witness.

3              MR. BROWN:  Subject to the admission of

4     exhibits into evidence, the Government would rest at this

5     time.

6              THE COURT:  Ladies and gentlemen, we have

7     issues that we need to address outside of your hearing,

8     so we will adjourn for the evening.

9                   This case is not over.  Do not form any

10    opinion regarding this matter.  Do not talk about it

11    amongst yourselves or with anyone else.  Please be

12    downstairs at 9:00 a.m.  We will call for you at that

13    time.

14             All rise for the jury.  Have a good evening,

15    folks.  See you in the morning.

16                  (Jury out.)

17             THE COURT:  Please be seated.  Let's begin

18    by going over the exhibits from today.

19             MR. O'SHEA:  A moment please, Judge?

20             THE COURT:  Certainly.

21             MR. O'SHEA:  All set?

22             THE COURT:  Ready?

23             MR. O'SHEA:  Yes, Judge.

24             THE COURT:  All right.  29, 20, 1419, 1144.

25             MR. McDONOUGH:  Your Honor, for 1419, we

1    would be offering page 5, the picture of the house in

2    Harman.

3                    THE COURT:  That's page 5 only?

4                    MR. McDONOUGH:  Correct.

5                    MR. O'SHEA:  Objection, Judge, as to

6    that Exhibit 1419, page 5, just the photograph itself.

7    I don't know about the process and all the verbal —

8    not that I expect any of our jurors to understand

9    Romanian.

10                    THE COURT:  So you want all of the verbiage

11   to be redacted?

12                    MR. O'SHEA:  All of it, just the photograph.

13                    MR. McDONOUGH:  Correct.  We would redact

14   it, so it would show just the black and white photograph.

15                    MR. O'SHEA:  Okay.

16                    THE COURT:  1144, 1126.  Are you offering

17   1408?

18                    MR. LEVINE:  I don't think so, your Honor.

19   No, we are not.

20                    MR. O'SHEA:  You are not offering 1408?

21                    MR. BROWN:  No.

22                    THE COURT:  1333, on behalf of the

23   Government for today only, did I miss anything?

24                    MR. BROWN:  No.  Your Honor, that looks like

25   the complete list.

1          THE COURT:  Okay.  Now, I want to go back to

2    the exhibits that we had discussed early in the trial and

3    that you indicated you wanted to hold off until the

4    conclusion of your case.

5          1320 are you offering?

6          MR. LEVINE:  Is that a physical exhibit?

7          THE COURT:  No.  That's not physical.  You

8    are not offering?

9          MR. LEVINE:  No.

10          THE COURT:  1324, are you offering?

11          MR. LEVINE:  Yes, we are.

12          MR. O'SHEA:  All five pages?

13          MR. LEVINE:  We made redactions consistent

14    with the Court's ruling at the time.  That's why we

15    didn't offer it at the time, but yes, pages subject to

16    the redactions that are already on the exhibit.

17          THE COURT:  Any objection with redactions,

18    Mr. Goldberg?

19          MR. GOLDBERG:  No, your Honor.

20          THE COURT:  And Mr. O'Shea.

21          MR. O'SHEA:  No, your Honor.

22          THE COURT:  1325, are you offering.

23          MR. LEVINE:  Yes, we are, your Honor.  As

24    with the last one redacted as per the Court's order at

25    the time.

1          THE COURT:  Any objection to the redaction?

2          MR. GOLDBERG:  Who did this come in through?

3          MR. LEVINE:  This came in through Special

4   Agent Stacy Lough with further authentication from Chris

5   Drake.

6          MR. GOLDBERG:  No objection.

7          MR. O'SHEA:  Same, Judge.

8          THE COURT:  1893, are you offering?

9          MR. BROWN:  Your Honor, I believe that was

10  subject to redaction, so we would be offering.

11          MR. GOLDBERG:  Can you scan it real quick?

12          THE COURT:  With redaction, Mr. Goldberg,

13  any objection?

14          MR. GOLDBERG:  Who did it come in through?

15          MR. BROWN:  Special Agent Diaz.

16          MR. GOLDBERG:  No objection.

17          MR. O'SHEA:  No objection, Judge.

18          THE COURT:  1322?

19          MR. LEVINE:  I think we may have discussed

20  this one.  Yes, I think this one —

21          THE COURT:  You are offering?

22          MR. LEVINE:  Yes.  I think we may have went

23  around circle on this one, and I think there was no

24  objection to it.

25          THE COURT:  I'm sorry.  I don't think we had

1    formally had it offered and admitted.  So you are

2    offering 1322?

3                    MR. LEVINE:  Yes, your Honor.

4                    THE COURT:  And any objection.

5                    MR. GOLDBERG:  No objection, your Honor.

6                    MR. O'SHEA:  No objection, Judge.

7                    THE COURT:  Admitted.  1869.  I'm sorry.

8    I'm sorry.  Yes, yes, 1869.

9                    MR. O'SHEA:  I have an objection.

10                   THE COURT:  Hang on.  So you are offering

11   1869, Mr. Levine?

12                   MR. BROWN:  We are not offering it.

13                   MR. LEVINE:  Not offering, your Honor.

14                   MR. O'SHEA:  Never mind.

15                   THE COURT:  1896.

16                   MR. BROWN:  Not offering.

17                   THE COURT:  402, are you offering.

18                   MR. O'SHEA:  How many pages is that, guys,

19   half and half.  There is some translations after the

20   Romanian version.

21                   I object.

22                   THE COURT:  Hang on.  I don't know if they

23   are offering.

24                   MR. O'SHEA:  I'm sorry.  Right, right.

25                   MR. BROWN:  Not offering, your Honor.

1               THE COURT:  Okay.  4?

2               MR. LEVINE:  We are not offering that one,

3     your Honor.

4               THE COURT:  1321, are you offering?

5               MR. LEVINE:  We are conferring, your Honor.

6               THE COURT:  Oh, sure.

7               (Pause.)

8               MR. BROWN:  We will offer it, your Honor.

9               MR. O'SHEA:  Can I see all three pages?  Try

10    to go to the first page.  Object.

11              THE COURT:  Hang on.

12              MR. GOLDBERG:  I would object to this

13    exhibit as well, your Honor.

14              THE COURT:  And Mr. O'Shea, you are as well?

15              MR. GOLDBERG:  Yes.  I can state my reasons

16    if you need.

17              THE COURT:  You go right ahead.

18              MR. O'SHEA:  If you go down three quarters

19    of the way down to the bottom of page 1, it says "the

20    following example, almost all these accounts are, quote,

21    obvious fraud," stuff like that.

22              MR. LEVINE:  So your Honor, I am just

23    looking in here, this is basically, if you recall the

24    testimony of Chris Drake, he identified 19,000 e-mails

25    from Defendants, and this is just a summary of what

1    criteria he used to identify those 19,000 e-mails, but

2    the specific e-mails, the specific e-mails that we are

3    admitting are the ones discussed through witnesses and

4    already admitted, and this just helps how he identified

5    the 19,000 e-mails.

6                    THE COURT:  Isn't that what his testimony is

7    for?

8                    MR. LEVINE:  This is a summary of his

9    testimony.

10                    THE COURT:  That's the problem, a summary of

11    his testimony.

12                    MR. LEVINE:  It is a summary of the 19,000

13    e-mails and the criteria which was used.  That's why I

14    feel it is a fair Rule 1006 summary.  The obvious words

15    like "obvious fraud" we can redact out.  He used first,

16    the ex-mailer header; secondly, the e-mail subjects he

17    used; third, flagging customers —

18                    THE COURT:  But the bottom line is, you are

19    offering it as substantive evidence, and you are

20    referring to 1006 as summary?

21                    MR. LEVINE:  As Rule 1006 summary.

22                    THE COURT:  Right.  That's your basis,

23    Mr. Goldberg?

24                    MR. GOLDBERG:  I disagree.  I agree with

25    Mr. O'Shea.  This is basically the witness' testimony put

1    into an e-mail that he sent to the — sent for

2    investigatory purposes.

3            THE COURT:  I agree.  I don't think it is —

4    it comes under summary evidence.  I am not going to

5    permit it.

6            MR. BROWN:  Thank you, your Honor.

7            THE COURT:  1204 are you offering?

8            MR. LEVINE:  I believe 1204 has already been

9    admitted, your Honor.

10           THE COURT:  Oh, I apologize.  It has been.

11    It has been.

12           5 are you offering?

13           MR. LEVINE:  Moving to the English

14    translation, no, we are not, your Honor.

15           THE COURT:  2045 are you offering?

16           MR. LEVINE:  So this is a certification from

17    Master Fraud.  The Court already ruled on this

18    certificate, first authentication motion, and Defendant

19    stipulated to it.

20           So I guess we would be willing —

21           THE COURT:  I am going to ask you to keep

22    your voices up for the court reporter.

23           MR. BROWN:  Offering the stipulation, your

24    Honor.

25           THE COURT:  Any objection?

1          MR. GOLDBERG:  No objection.

2          MR. O'SHEA:  As to authenticity, no

3    objection.  Can I see the second?  This is all stuff that

4    was found at Nicolescu's house?

5          MR. LEVINE:  The ones that say Nicolescu's

6    house.

7          MR. O'SHEA:  Pop up again, if you go to —

8    about there.

9          (Pause.)

10         MR. O'SHEA:  One more up.

11         (Pause.)

12         MR. O'SHEA:  No objection, Judge.

13         THE COURT:  I believe 367 has been admitted,

14   yes?

15         MR. O'SHEA:  It has certain pages of 367

16   have been admitted.  We would like to make sure that page

17   688 is one of them.

18         If you can pull up that page.

19         THE COURT:  So you are adding 688 to what we

20   have already admitted.  Am I right?

21         MR. LEVINE:  If it has not already been

22   admitted.

23         THE COURT:  It has not been.  Any objection,

24   Mr. Goldberg?

25         MR. GOLDBERG:  No, your Honor.

1           MR. LEVINE:  This isn't the right page, your

2     Honor.

3           THE COURT:  Page 688?

4           MR. LEVINE:  Yes.  We are determining the

5     correct page, your Honor.  I'm sorry.  This is my fault.

6     668, I'm sorry, your Honor.

7           THE COURT:  668.  All right.  No problem.

8           MR. O'SHEA:  Judge, I'm sorry.

9           THE COURT:  Hang on.

10          Mr. Goldberg?

11          MR. GOLDBERG:  No objection.

12          THE COURT:  Mr. O'Shea?

13          MR. O'SHEA:  Objection, Judge, for the same

14    reasons we talked about when portions of 367 were

15    previously admitted, incorporate by reference.

16          MR. LEVINE:  So your Honor, we would redact

17    out the two nicks at top the nicu and dan.  But the

18    reason we didn't cover it initially, we hadn't yet

19    established that ferdy was associated with the files.

20          We now have had six Romanians come in and

21    say that ferdy was Miclaus, and Romeo was Danet.  So we

22    would redact out the other names, and the rest would be

23    what we would like to admit on this page.

24          THE COURT:  I will allow —

25          MR. GOLDBERG:  I was going to object to the

1   redaction.  I am not objecting to the exhibit.  I object

2   to them redacting names off the page.

3               MR. LEVINE:  We are okay with not redacting.

4               THE COURT:  Fair enough.  So 668 is added

5   without redaction, and that's 367.  All right.

6               MR. LEVINE:  Thank you, your Honor.

7               THE COURT:  380 are you offering?

8               MR. LEVINE:  Yes, we are, your Honor.

9               THE COURT:  Any objection?

10               MR. LEVINE:  If we could look at the English

11   version.

12               So we asked the witness about — I think it

13   is the next page.  So we are specifically interested in

14   admitting page 7 of Government's Exhibit 380, which is

15   all between Danet and Nicolescu as the testimony.

16               THE COURT:  So you are only offering page 7

17   of 380?

18               MR. LEVINE:  Correct, your Honor.

19               THE COURT:  Any objection?

20               MR. GOLDBERG:  Well, I do object.  There is

21   no date, timestamp on these messages.  I know that

22   Danet authenticated it during his testimony, I believe he

23   did.  Page 7 also does contain a lot of extraneous,

24   potentially prejudicial material that doesn't have

25   anything to do with the case.  I am looking at the first

1    large message.

2                    MR. LEVINE:  So, your Honor —

3                    THE COURT:  Let him finish.

4                    MR. LEVINE:  Oh, I'm sorry.

5                    MR. GOLDBERG:  Half of that first message

6    seems to be extraneous.  There is also message one, two,

7    three, fourth message below that.  There is stuff about

8    Gypsies hotels, how is the hotel — seems extraneous to

9    me not relating to anything relevant here.

10                   If the Court will admit it, I would ask that

11   those irrelevant statements be redacted, but I object to

12   the exhibit itself because it is not timestamped.  I

13   don't believe there was any testimony as to when these

14   conversations took place, and if there was, I know my

15   colleagues will correct me.

16                   THE COURT:  Mr. O'Shea?

17                   MR. O'SHEA:  It doesn't even mention my

18   client, so I am not worried about it.

19                   THE COURT:  So you are not objecting?

20                   MR. O'SHEA:  No.

21                   THE COURT:  Mr. Levine.

22                   MR. LEVINE:  Yes, your Honor.  So Danet —

23   this was taken from Danet's phone when he arrived in

24   Miami and phone searched.

25                   Danet testified as to the conversation in

1    the first — not the first line — but the second, third,

2    fourth, fifth, and sixth line there, and what his

3    testimony was that conversation between him and Nicolescu

4    was about sending a spam room of 20,000 e-mails and only

5    getting one credit card as a result, and that he put it

6    on a file that was on the command and control server that

7    was called the Vanghelie file, which they named after a

8    mayor in Bucharest who was known to be not that smart.

9              So it was fully authenticated by Danet

10   without the time date.  The reason there is no time date

11   is on Danet's phone there were two files forensically

12   found associated with the Jabber application.

13             One file contained a log of his current

14   conversations, and another contained a log of his deleted

15   conversations.  This is from the deleted conversations,

16   and apparently, Jabber only stores the conversation

17   itself and not the time, date once you delete it, and

18   that's why that is not here.

19             THE COURT:  What about the argument of

20   extraneous matter?

21             MR. LEVINE:  We are really only interested

22   in those five lines, and we don't oppose redacting the

23   rest of the exhibit.

24             THE COURT:  I am going to allow it with the

25   redaction.

1              So, I'm sorry, technically, Mr. Goldberg,

2      I need to know, with redaction, are you still

3      objecting?

4              MR. GOLDBERG:  I am objecting based on the

5      lack of —

6              THE COURT:  That's fine.

7              MR. GOLDBERG:  — specific time and date.

8              THE COURT:  I am going to allow it over

9      objection.

10             I believe that's everything, but let me turn

11     to the Government and ask you:

12             Did I miss any exhibit, or are there

13     any other exhibits you are offering into evidence.

14             MR. LEVINE:  We have a few that we have

15     listed here that we would want confirmed are in evidence.

16             First one is Government's Exhibit 2203.

17             MR. BROWN:  These are confirming your

18     records.

19             MR. O'SHEA:  I think we went through this

20     yesterday.

21             THE COURT:  That has already been admitted.

22             MR. LEVINE:  It may well have been.

23             MR. O'SHEA:  These must have come in Friday.

24             THE COURT:  2203 has already been admitted.

25             MR. LEVINE:  Okay.  Thank you, your Honor.

1           THE COURT:  No problem.  Any others you want

2   clarification on?

3           MR. LEVINE:  So there were four exhibits

4   that are stipulations.

5           THE COURT:  Okay.  But Mr. Levine, I will

6   ask you to hang on one second.

7           First of all, any other exhibits, do you

8   have any question about anything we have done from March

9   25th until today?

10          MR. LEVINE:  No, other than these —

11          MR. BROWN:  No.

12          THE COURT:  Okay.  So secondly, now, we are

13  turning to exhibits that have not been discussed yet, are

14  there any other exhibits?

15          MR. BROWN:  Yes.  We have four that

16  would come in pursuant to the stipulation with

17  Paul Mueller.

18          THE COURT:  Paul Mueller?

19          MR. BROWN:  Yes, and that would be 1104,

20  1462, 1689, and 1836.

21          THE COURT:  Okay.  Let's start with 1104.

22          MR. GOLDBERG:  Yes, no objection.

23          MR. O'SHEA:  Can I see page 2, page 3, page

24  4, no objections.

25          THE COURT:  1462.

```
1              MR. O'SHEA:  These are all through what
2    stipulation?
3              MR. BROWN:  Paul Mueller.
4              MR. O'SHEA:  Thank you.
5              MR. GOLDBERG:  No objection.
6              MR. O'SHEA:  One moment, Judge.
7              THE COURT:  Sure.
8              MR. O'SHEA:  Page 1, if I could; page 2
9    again, no objection, Judge.
10             THE COURT:  1689?
11             MR. GOLDBERG:  No objection.
12             MR. O'SHEA:  And we are just looking for the
13   document itself to be admitted?
14             MR. BROWN:  This was pursuant to
15   stipulation.
16             MR. O'SHEA:  Yeah, all right.  You are just
17   looking for this certain authenticity.  Yeah, no
18   objection.
19             THE COURT:  1836?
20             MR. GOLDBERG:  No objection.
21             MR. O'SHEA:  Can I go to the first page one
22   more time?
23              (Pause.)
24             MR. O'SHEA:  No objection.
25             THE COURT:  Mr. Levine, any other —
```

1    Mr. McDonough?

2                    MR. McDONOUGH:  Yes, your Honor.

3                    I wanted just to confirm three exhibits for

4    a previous witness Donna Wolfe.

5                    The Government was offering Government's

6    Exhibit 1733 —

7                    THE COURT:  Okay.  Hang on.  You are just

8    confirming?

9                    MR. McDONOUGH:  Yes, your Honor.

10                   THE COURT:  Hang on.  You just want to know

11   if we've addressed it already?

12                   MR. McDONOUGH:  Correct.  And if not, I

13   would move to have them admitted.

14                   THE COURT:  1733 has been admitted.

15                   MR. McDONOUGH:  Page 12 only, the mule

16   contract and Government's Exhibit 2253, these are the

17   Keleman-Donna text messages to Donna's cellphone.

18                   THE COURT:  They have been admitted.

19                   MR. McDONOUGH:  I was offering — the

20   Government was offering three groups of pages.

21                   THE COURT:  Folks, those were admitted.

22                   MR. McDONOUGH:  I believe we only showed

23   some of those — some of those pages, your Honor.

24                   We would offer pages 1 to 40, 42 to 47 and

25   50 to 95 and Government's Exhibit 1735.

1          THE COURT:  I have down here 2253 has been

2     admitted, but now you are saying you are only offering

3     pages 1 to 40, 42 to 47 —

4          MR. McDONOUGH:  And 50 to 95.

5          THE COURT:  50 to 95.  Okay.  Next

6     exhibit?

7          MR. McDONOUGH:  Next exhibit is —

8          MR. O'SHEA:  One moment, Judge, if I may.

9          THE COURT:  Those have already been

10    admitted.  That's why I am a little confused.

11         MR. O'SHEA:  I was getting confused by your

12    confusion.  I apologize, Judge.  The entire exhibit is

13    admitted, not just specific pages.

14         THE COURT:  That was my understanding, but

15    now I am hearing they do not want to offer the entire

16    exhibit.

17         MR. McDONOUGH:  Correct.  I was just

18    offering those pages.  I will deal with — they are all

19    dealing with Donna Wolfe pages.

20         Any additional pages involving additional

21    people I am not offering.

22         MR. O'SHEA:  2253 is 95 pages?  Can I look

23    at it tonight to make sure?

24         MR. GOLDBERG:  The problem that I have with

25    admitting the whole thing now, drawing it back because I

1    used it to cross examine Valentin Danet, and I for one

2    object to withdrawing the whole exhibit, your Honor —

3              MR. McDONOUGH:  If there is an objection, I

4    will offer the whole exhibit, your Honor.

5              MR. GOLDBERG:  — if it has already been

6    admitted.  I feel like that looks — that gives the wrong

7    impression.

8              THE COURT:  Well, I absolutely would then

9    allow you to offer the remaining pages, but if we are

10   going to make it nice and easy and just offer the whole

11   thing, that's fine.

12             But I would always then give you the

13   opportunity to offer what they don't.

14             MR. GOLDBERG:  Thank you.

15             THE COURT:  But go ahead, Mr. McDonough,

16   what's your pleasure?

17             MR. McDONOUGH:  And then, on that one, as I

18   say, we would be happy to offer the whole thing.  If

19   there is an objection, we — on that one.

20             And last one, Government's Exhibit

21   1735, these are all of Donna Wolfe's Western Union

22   receipts.

23             THE COURT:  1735 has been admitted.

24             MR. O'SHEA:  No problem.

25             THE COURT:  It has been admitted.

1           MR. O'SHEA:  Yeah.  213 pages.

2           THE COURT:  Okay.  Any other exhibits you

3    need clarification on?

4           MR. McDONOUGH:  No, your Honor.

5           MR. BROWN:  No, your Honor.

6           THE COURT:  Any other exhibits you are

7    offering into evidence?

8           MR. LEVINE:  I don't think so, your

9    Honor.

10          THE COURT:  Do you have a need to go back

11   through all of the exhibits, or is everyone — in other

12   words to have a listing?

13              Is everyone comfortable that their records

14   are straight?

15          MR. GOLDBERG:  The Government provided us

16   with an updated admitted list, and if they could provide

17   us with another one, I think we are like 90 percent of

18   the way there.

19          THE COURT:  Do you have any problem doing

20   that?

21          MR. LEVINE:  No, your Honor.

22          THE COURT:  That would be nice.  All right.

23          MR. GOLDBERG:  And we appreciate it.

24          THE COURT:  All right.  That's very generous

25   of you.  All right.

1              Mr. Levine, looks like you want to speak.

2              MR. LEVINE:  Thank you, your Honor.

3              THE COURT:  I can tell.

4              MR. LEVINE:  You were talking about jury

5    instructions at the end of last week.

6              THE COURT:  Right.  But I think we have

7    other matters to address before we get to jury

8    instructions.

9              Formally, Mr. Levine, is the Government now

10   resting?

11             MR. BROWN:  Yes, your Honor.  Now that the

12   exhibits have been admitted, the Government rests.

13             THE COURT:  All right.

14             Mr. Goldberg?

15             MR. GOLDBERG:  Your Honor, we will make a

16   motion pursuant to Rule 29(a).

17             MR. O'SHEA:  Before we do that, I don't mean

18   to interrupt, I don't know — I am ready to give a Rule

19   29 argument at this very second.  Maybe Mr. Goldberg is,

20   but —

21             MR. GOLDBERG:  I assumed that's where we

22   are.

23             MR. O'SHEA:  I am not sure that's where we

24   were.  Don't you have exhibits first?

25             THE COURT:  You still have to do 29 first.

1          MR. GOLDBERG:  Yeah.

2          THE COURT:  Then, I am going to call on you.

3          MR. GOLDBERG:  If you are not ready —

4          MR. O'SHEA:  If you are ready, go ahead.

5    Does the Government — let me ask you this:  Does the

6    Government — are they looking to dismiss out any of the

7    counts, or are you going forward with everything?

8          MR. BROWN:  Going forward with everything.

9          MR. O'SHEA:  Okay.  All right.

10          MR. GOLDBERG:  Your Honor, do you want to

11   hear Rule 29 now, or would you prefer that we do it first

12   thing in the morning?

13          THE COURT:  Well, the jurors are coming in

14   9:00.  I think now is the time to do it.

15          MR. GOLDBERG:  Thank you.

16          THE COURT:  And folks, if you need a short

17   recess, I am happy to give it to you.

18          MR. O'SHEA:  I am fine with a short recess.

19   I am not ready to jump into that pool yet, Judge, doing

20   some clerical things first.

21          THE COURT:  And gentlemen, would you like

22   your clients to be present?

23          MR. O'SHEA:  For the Rule 29 stuff, I don't

24   think they need to be present.

25          MR. GOLDBERG:  Your Honor, I have discussed

1    it with my client, and he understands his right to be

2    present, and he is going to waive that right in order to

3    facilitate his way back.

4                    THE COURT:  Mr. Nicolescu, you understand

5    what we are doing at this portion of the trial,

6    correct?

7                    DEFENDANT NICOLESCU:  Yes.

8                    THE COURT:  And is it your desire to waive

9    your presence and be transported back —

10                   DEFENDANT NICOLESCU:  Yes.

11                   THE COURT:  — to wherever you are being

12   held?

13                   DEFENDANT NICOLESCU:  Yes, that is my

14   desire.

15                   THE COURT:  All right.  Thank you, sir.

16                   Mr. Miclaus, the same question, sir:  You

17   understand what we are doing?

18                   MR. MICLAUS:  Yes.

19                   THE COURT:  Your lawyer is going to be

20   arguing dismissal of some or all counts, and are you

21   waiving your presence?

22                   MR. MICLAUS:  Yes.

23                   THE COURT:  All right.  Both gentlemen can

24   be excused, and folks, let's take a quick restroom break,

25   so not a long one.

1           (Recess had.)

2           THE COURT:  Mr. Goldberg?

3           MR. GOLDBERG:  Thank you, your Honor.

4           Defendant Nicolescu move, pursuant to Rule

5    29(a) of the Federal Rules of Criminal Procedure, for a

6    judgment of acquittal with regard to all the counts in

7    the indictment.

8           We submit to the Court that the evidence

9    adduced so far in the trial up and through the resting of

10   the Government has not been sufficient beyond a

11   reasonable doubt, even taking it in a light most

12   favorable to the Government to sustain any of the

13   counts.

14          I am going to talk about two counts in

15   particular or several counts in particular where I am

16   making a blanket motion for Rule 29 judgment of

17   acquittal.

18          But I would ask the Court to look at the

19   specific wire fraud separate counts, Counts 2 through 13,

20   and we only heard from one victim, Mr. Patterson from

21   Webster, New York with regard to these counts.

22          We heard from other victims, but with regard

23   to these specific counts, we only heard from

24   Mr. Patterson.  I believe the Government will argue that

25   Donna Wolfe being the common money mule for all these

1  transactions supplied the requisite evidence in terms of

2  the wire fraud counts.

3  However, in looking over the jury

4  instructions, one of the elements is reliance, someone

5  relied on a false statement in paying money, and we can

6  infer the reliance by the evidence we have here to a

7  degree.

8  But to have victims stated, specific amounts

9  stated and not hear the victims in Court indicating that

10  they in fact relied on the representations I think is a

11  failure of the evidence.

12  More specifically, also, your Honor, and

13  moving on to the false domain name enhancement, we had

14  two witnesses, Special Agent — supervisor Special Agent

15  Macfarlane and Liam O'Murchu.  We may have heard from the

16  AOL representative as well indicating that they saw false

17  domain names being registered.

18  We didn't see any evidence of either wire

19  shark or documentary evidence that they saw the specific

20  domain names listed in the indictment actually being

21  registered.

22  We have Agent Macfarlane and I think

23  Mr. O'Murchu saying that as they were observing evidence

24  during either as data interception Title III, one of the

25  servers, or during Mr. O'Murchu's undercover work with

1   his infected machine, he saw this activity when the

2   Government tried to use the indictment to guide the

3   witness to say which domain names were registered.

4           The Court prevented the Government from

5   doing that, and I would suggest that the Government

6   needed to establish which domain names specifically were

7   registered pursuant to the scheme and to fulfill the

8   elements of registering a false domain name, Count 23,

9   beyond a reasonable doubt.

10          I don't believe there is sufficient evidence

11  in the record to sustain beyond a reasonable doubt that

12  the elements of that count, both for the domain names

13  listed in paragraph 168 of the indictment or the domain

14  names for the money laundering counts in Count 21.

15          So that being the case, I would ask

16  specifically that counts — well, that all the counts be

17  dismissed, but I specifically would like the Court to

18  look at the proof that we have heard regarding Counts 2

19  through 13 and counts — and Count 23 and grant judgment

20  of acquittal accordingly.

21          Thank you.

22          THE COURT:  I'm sorry.  You said Count 23?

23          MR. GOLDBERG:  That's correct, your Honor.

24  Maybe I said the wrong number.

25          THE COURT:  Count 21 is the —

1          MR. GOLDBERG:  I'm sorry.

2          THE COURT:  — appears to be money

3     laundering, and then we have the enhancement.

4          MR. GOLDBERG:  I had the numbers along the

5     side here.  I'm sorry, your Honor.  That's not a separate

6     count.  It is the domain name enhancement.

7          THE COURT:  Right.  I just wanted the record

8     to be clear that your Rule 29 motion goes to all of the

9     counts, but specifically, you argued Counts 2 through 13

10    and the enhancement.

11          MR. GOLDBERG:  Correct.  And I'm sorry.  I

12    argued it as a separate count.

13          It is the enhancement that applies to Counts

14    1 through 20.

15          THE COURT:  Right.  Thank you.

16          MR. LEVINE:  It was actually 1 through 21.

17    We corrected that.

18          MR. GOLDBERG:  Thank you.  1 through 21.

19          THE COURT:  Who do I call on for the

20    Government?

21          MR. BROWN:  Your Honor, it is the

22    Government's position that the testimony taken at trial,

23    the evidence offered and admitted into evidence right now

24    has satisfied the Government's burden at this stage of

25    the proceedings for all counts to proceed to the jury.

1           We believe that viewing the evidence and

2    testimony in a light most favorable to the Government

3    does allow the submission of all counts.

4           Looking specifically at Counts 1 through 13

5    and specifically 2 through 13, which Count 1 is the

6    conspiracy to commit wire fraud, and 2 through 13 are the

7    substantive wire counts, first of all, Count 1, the

8    Government would argue because it is a conspiracy based

9    on the testimony of the Romanian test of witnesses as

10   well as the witnesses Liam O'Murchu, Special Agent Ryan

11   Macfarlane, Special Agent Diaz and Owen Miller of AOL.

12          We've established there was a wire fraud,

13   specifically that there was a scheme to defraud to obtain

14   money via the wires and via posting fraudulent eBay pages

15   that were transmitted in interstate commerce.

16          And there were material representations and

17   concealments of material facts.  We believe that the

18   Defendant or the witnesses who testified prove that the

19   Defendants on trial did have an intent to defraud, and

20   that as a group and as a conspiracy, they acted together

21   and in concert to obtain goods through wire fraud.

22          As to the material or the substantive Counts

23   2 through 13, the Government asserts that the testimony

24   of Donna Wolfe and Valentin Danet both establish a fraud

25   scheme.

1           Donna Wolfe testified to each of Counts 2,

2    3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 in her role in the

3    fraud scheme, her role in receiving money, sending money

4    via mails and text directions overseas as part of that

5    fraud scheme.

6           Valentin Danet also testified specifically

7    to those schemes as well.  We also believe that the

8    testimony of Special Agent Ryan Macfarlane in viewing the

9    account spreadsheet, which I believe is Exhibit 1741,

10   further when viewed in a light most favorable to the

11   Government supports the submission of Counts 2 through 13

12   to the jury.

13          I will also direct the Court's attention to

14   Exhibits 1735 and 2253, which were all testified to and

15   discussed by Donna Wolfe about those exhibits, relevance

16   and role in the wire fraud conspiracies.

17          As to the false domain enhancement, your

18   Honor —

19          THE COURT:  Well, Mr. Goldberg specifically

20   argued lack of reliance.

21          MR. BROWN:  Well, your Honor.

22          MR. GOLDBERG:  Right.

23          MR. BROWN:  And to that Valentin Danet

24   testified that he did each of the frauds on the amounts

25   on the spreadsheets, so we would rely on the testimony of

1    Valentin Danet to rebut those arguments, that he

2    specifically sent e-mails to the victims contained in

3    those counts to further the wire fraud scheme and to

4    create that reliance.

5              Then, turning to Count 21, to the

6    enhancement, which 3553 — 3559(g), excuse me — the

7    Government contends that testimony from both

8    Liam O'Murchu and Special Agent Ryan Macfarlane support

9    that they did review command and control servers, they

10   reviewed files within the command and control server, and

11   saw those domain names.

12             Special Agent Macfarlane, based on his

13   review of the testimony, he created that table, and he

14   collected that data for that table, so we believe that

15   the testimony of Ryan Macfarlane would support the

16   enhancement.

17             I am sorry, the testimony is based on his

18   review of the command and control server.  That review is

19   what he based his table on, and we believe, based on that

20   testimony of that review, it would withstand a Rule 29

21   review.

22             MR. LEVINE:  I just want to add one point

23   and the testimony of Liam O'Murchu that he saw, in fact,

24   a computer being instructed to reach out to communicate

25   with each one of the infected domains listed in paragraph

1       168 of the indictment.

2               And just to clarify with Mr. Goldberg, while

3       the Court found it was unnecessary to admit that exhibit,

4       because it was already part of the indictment, the Court

5       found that the most efficient way to proceed was to allow

6       it to be shown to the jury and to allow Mr. O'Murchu to

7       testify about it rather than me having to ask about each

8       domain individually.

9               THE COURT:  This Court is well aware that I

10      must view the evidence in the light most favorable to the

11      Government, and I am not permitted to judge credibility

12      of any witnesses.

13              This Court is absolutely satisfied that the

14      Government has produced sufficient evidence on each and

15      every one of the 21 counts and the enhancement.

16              Going specifically to Mr. Goldberg's

17      objection regarding Counts 2 through 13, I absolutely

18      agree with the Government that based upon Donna Wolfe's

19      testimony and Valentin Danet's testimony alone, that is

20      sufficient evidence to let Counts 2 through 13 go to the

21      jury.

22              And regarding the enhancement, Mr. Levine, I

23      am in complete agreement with you.  I did not admit it

24      but I certainly allowed testimony regarding the

25      indictment chart; regardless, the testimony of Macfarlane

1    and O'Murchu, their testimony supports the enhancement.

2                    The Rule 29 motion is denied as to Defendant

3    Bogdan Nicolescu.

4                    MR. GOLDBERG:  Thank you, your Honor.

5                    THE COURT:  Mr. O'Shea?

6                    MR. O'SHEA:  Thank you, Judge.  All right.

7                    Judge, part of the argument I will make by

8    way of introduction, I know this involves computer

9    crimes, but the same rules apply that involve computer

10   crime, and my concern only, Judge, and I am just making

11   the argument, is that we don't relax our otherwise

12   overview for Rule 29 purposes just because computer crime

13   cases are harder to prove in a certain way because of the

14   complexity and the technological issues involved.  That's

15   all I want to say.

16                   I want to make that clear, that I don't

17   think — I think the same rules of engagement for Rule 29

18   purposes apply as they would in a murder case, in a drug

19   trafficking case, or anything else of that nature.

20                   So I review from my own perspective the Rule

21   29 argument applying that macro rule of the road, if you

22   would, Judge.  Not that you are not, Judge, but I am just

23   making the argument for the record.

24                   Now, let me talk about the eBay scam, Judge,

25   Counts 2 through 13 to ratify a little bit about what

1    Mr. Goldberg said.

2              As the Court knows, the indictment in this

3    case is 53 pages long.  Counts 3 through 13, we heard no

4    victim — I think we had on Count 2 DP come in, but that

5    was it.  Page 20 of the jury instructions, Judge, as I

6    understand them — and these are parts that we agreed on,

7    let me see if I can pull mine up real quit, Judge —

8    item B on page 20 of the jury instructions, that requires

9    the Government to prove evidence as it relates to

10   Radu Miclaus, that the scheme involved a material

11   representation or concealment of material fact.

12             Again, I incorporate by reference

13   Mr. Goldberg's comments that we don't have the

14   individuals that are listed by initial only on Counts 3

15   through 12 and from different cities throughout —

16             THE COURT:  And you are saying they had to

17   bring in each and every victim in order to prove those

18   counts?  That's your position?

19             MR. O'SHEA:  Or some evidence about those

20   particular victims who are human, presumably, relied on

21   some material representation or concealment of material

22   fact.  They did not do so.  That is clear.

23             So I believe, Judge, that again the rules

24   of engagement don't change because it is a computer

25   crime.

1            THE COURT:  And I would never suggest that

2    the rules aren't the same.

3            MR. O'SHEA:  I am not, Judge.  I am just

4    making the argument because maybe it makes me feel

5    better, Judge.

6            But if we go to page 21 as well, Judge, we

7    talked, you know, item B, you see there the term false or

8    fraudulent pretenses, representations or promises

9    actually have to cite academic argument, they have to be

10   made to a human being.

11           They can't be made to a computer.  A

12   computer obviously can't be defrauded.  It has to be a

13   human being.  Again, I believe in order for this case to

14   go to the jury as relates to Counts 2 through 13, again,

15   you need those human beings.

16           I concede that the logistics of getting

17   those folks in here could be complicated, but again,

18   I emphasize that doesn't change the rules of engagement

19   just because it is complicated to get them here.

20           THE COURT:  And are you arguing that

21   there was no evidence whatsoever that was presented

22   during this trial regarding the victims in Counts 3

23   through 13?

24           MR. O'SHEA:  Yes.

25           THE COURT:  That's your argument?

1              MR. O'SHEA:  That's my argument, Judge, and

2    again relying on the jury instructions that we have all

3    pretty much agreed on in order to facilitate that

4    argument, even further than Mr. Goldberg already

5    adequately did.

6              In addition to that, Count 14 has to do with

7    the computer fraud count, and Count 14 involves two — it

8    is like a two horned, you know, wild animal.  They talk

9    about access to computers and damage to a computer.

10             I saw evidence, I will concede that there

11   was access to a computer, but I did not hear any

12   individual who owned a computer say that their computer

13   was damaged in some way.  I didn't hear it, Judge.  Maybe

14   I missed it.

15             There was a lot of volume here, but we can't

16   infer just because a person's computer may have slowed

17   down during some cryptomining, that it was damaged in

18   some way, and by damage, I take the normal definition of

19   something that needed repair that was destroyed or

20   something like that.  I just haven't seen it, Judge.

21             I know that they were — they had 27, again,

22   victims named in Count 14 and another — and who they

23   claimed were infected with the Bayrob Trojan, another 48

24   people, human beings, again, Judge, that were punitive

25   victims of cryptomining.

1              But we didn't hear from those folks, Judge.
2    We don't know if their computer was damaged in any way.
3    We can't infer that.
4              So again, just because it is a computer
5    crime doesn't make it — I would say that certainly they
6    have produced no proof to get by for Rule 29 purposes on
7    this access element.
8              In addition to that, Judge, I think Count 14
9    is the one count from a conspiracy count standpoint where
10   you do need overt acts, and I don't see that they
11   produced any proof that Radu Miclaus individually, I
12   argue on his behalf, engaged in any of those overt acts
13   as set forth in the indictment itself, your Honor.
14             Lastly, as it relates to Count 14, there is
15   a breakdown between ten or more computers and the like.
16   Again, in order to differentiate — we just went through
17   this with the jury instructions between felony and
18   misdemeanor — certainly, the felony part doesn't get
19   through a Rule 29 part because, again, by my count, they
20   didn't call in 10 people that had been damaged or access
21   to their computers at all.  We don't know.  We can't
22   speculate.
23             It is like saying there were 10 or 15
24   victims of a store robbery, and they all got stuff
25   stolen, but we assume that they did because they were

1    standing around.

2              We only called one or two of them in, and we

3    will just assume that the other ones must have had stuff

4    stolen, too.  I don't think because it is a computer

5    crime that we can change optics on this or the metrics in

6    any way.

7              So I didn't hear about 10 or more human

8    beings that came in here and said there were computers

9    either damaged or accessed.  I think I only heard one or

10   two, Judge, and so that's my argument that relates to

11   Count 14.

12             Again, Counts 16 through 20 are the identity

13   theft counts, your Honor.  Page 46 of the jury

14   instructions talks specifically about that each

15   Defendant, and I think the jury instructions use each

16   Defendant knowingly used somebody's ID.

17             Not a single human being came in here,

18   pointed to my client and said "that human being over

19   there, Radu Miclaus, knowingly used my ID without my

20   consent," not a single human being came in here and did

21   that; agent or layman; doesn't matter.  Nobody did,

22   Judge.  They probably could have done it, but they

23   didn't.

24             Again, just because it is computer crimes,

25   you can't say, just say, well, it is through online and

1    the internet and stuff like that you don't need to do

2    that.  It is different than somebody swapping or stealing

3    a purse off the street with somebody and stealing their

4    property that way.

5              I guess if they are arguing that somebody's

6    identity was stolen, identity theft, but how can the

7    argue that if they don't have the person here?  So again,

8    same argument.

9              Count 21, your Honor, as relates to that,

10   that's the money-laundering count, your Honor, that

11   specifies — I think in the indictment a time period,

12   Judge.  I think, okay, and that time period is March

13   31st, 2013, to August 1st, 2013, and I will let the

14   Government respond to this with particularity if they

15   can.

16             As I see in the indictment, there were 12

17   e-mail acts that were supposedly done between 3-31 of '13

18   and 8-1 of '13.  I don't see any of those, any proof that

19   those were done by anybody in the conspiracy or, more

20   particular, Radu Miclaus in any way.  I just don't, and

21   maybe the Government can correct me if I am wrong here,

22   but I saw in Counts 21 a time period.

23             General time period, introductory

24   paragraph Y saying that, you know, 1-1-2007 to 7-6 of

25   2016, but when you get down to the red meat of Count 21,

1    they specify a specific date range.  There is 12 e-mail

2    acts.

3              I think the date range, if I am not

4    mistaken, I don't know if they are all automatically

5    chronological.  I think you kind of have to reach up to

6    them to get there, but I think the date range is 3-31-13

7    to 8-1 of '13.  So I don't see any proof that my client

8    was involved in any of that, your Honor.

9              And again, I incorporate as it relates to

10   the false domain enhancement Mr. Goldberg's argument,

11   your Honor and, again, only the testimony of

12   Agent Macfarlane where he just said there is the chart

13   from the indictment, that those are the false domains.

14   If that's sufficient, I can't see it, Judge.

15             Last but not least, Count 15 is the

16   trademark count, your Honor.  I have not seen any proof

17   at all that there were any trademarks used with

18   Radu Miclaus' knowledge, none.

19             Now, I know what they are going to argue,

20   they are going to argue this is a conspirator, right?  So

21   that gets them by any direct proof, and anybody pointing

22   at Radu Miclaus is saying, "oh, you know, he was part —

23   we produced enough evidence that he was part of the

24   conspiracy.  So therefore, anything that the conspiracy

25   did on any of the counts, that's sufficient to get by

1    Rule 29 purposes."

2                    But there is a part of the jury

3    instructions, your Honor, that talks about conspiracy.

4    If you give me a second, Judge, again, Mr. Goldberg went

5    much faster than I thought he would, that talks about

6    what you have got to prove for conspiracy.

7                    And I don't think the Government has it as

8    easy as they think they do when it comes to that, Judge,

9    again based on the jury instructions.

10                   A moment please, Judge.

11                   THE COURT:  Sure.

12                   MR. O'SHEA:  For instance, on page 24 of the

13   jury instructions when it is talking about the agreement,

14   paragraph 2 says you don't have to have any formal

15   agreements, written or spoken, nor does it require proof

16   that everyone involved agreed on all the details, but

17   proof that people simply met together from time to

18   time to talk about common interests or engaged in

19   similar conduct is not enough to establish a criminal

20   agreement.

21                   So I just don't see how, when it comes to

22   Mr. Radu Miclaus as it relates to Count 15, Judge, how

23   they proved that he engaged in any agreement on these

24   trademarks, nothing.

25                   I think a lot of what you heard was

1    Mr. Nicolescu and how he is the creator of the code and

2    any viruses that were transmitted, that he was able to

3    mark up these documents and purportedly create a Wal-Mart

4    or an eBay or a Facebook or a Yahoo or a Google trademark

5    but nothing about Mr. Miclaus, nothing at all, and not

6    that he was at any meeting at any time in the past,

7    present where that was even discussed, you know,

8    nothing.

9                As far as — again, I limit my arguments,

10   Judge, for purposes of Rule 29, solely to what took place

11   in this courtroom.  I know that my client proffered and

12   stuff like that, but as it relates to the evidence that

13   came from that witness stand, I listened carefully.

14               And I didn't hear anybody testify, including

15   Mr. Danet or any of those unindicted, uncharged

16   co-conspirators, that my client had anything to do with

17   any meeting involving trademarks, nothing.

18               And so I just don't know how that — you

19   could pin the tail on that donkey.  I don't.  I mean, I

20   know that conspiracy count or the conspiracy law draws a

21   broad light.

22               If we also look on page 28 of the jury

23   instructions — one moment — if you look at the bottom

24   of page 28 and top of 29, it starts out "this does not

25   require that the Defendant specifically agreed or knew

1    that the crime would be committed, but the Government

2    must prove that the crime was within the reasonable

3    contemplation of the persons who participated in the

4    conspiracy.  No Defendant is responsible for the acts of

5    others that go beyond the fair scope of the agreement as

6    the Defendant understood it."

7              Now where, Judge, where-oh-where in this two

8    and-a-half-week long trial is there a single piece of

9    evidence that my client, Radu Miclaus, knew anything

10   about trademarks at all?  I think, at best, they said his

11   job was by use of this e-mail stuff, was that he assisted

12   in money mules.

13             That's it, Judge.  That's basically what

14   they claim, the theory of their case is, that was his

15   role responsibility, but as far as drafting up pages,

16   code, or anything else of that nature, nothing.

17             Now, I also know, Judge, that a couple of

18   their unindicted co-conspirators, one of which who

19   obviously had a much more significant involvement if you

20   believe him in this organization than Radu Miclaus did,

21   would simply say something — and Mr. McDonough would ask

22   the question — who else helped you commit computer

23   fraud?

24             That guy, Radu Miclaus.

25             That was it.  There was zero specifics from

1       any of those unindicted co-conspirators, zero as to any

2       specific thing that Radu Miclaus did, zero.  They just

3       simply said he was in, and that was it, flatline after

4       that.

5                    They went into specifics as it related to

6       Mr. Nicolescu quite extensively, but as it related to the

7       actions of Radu Miclaus, nothing.  They just said yep, he

8       was involved in a very vague, undated, non specific way,

9       period.

10                   Now, I know we are going from our own

11      personal recollection of what witnesses heard for

12      purposes of Rule 29, Judge, but that can't be enough for

13      this conspiracy generally as it relates to Count 1.

14                   As it relates to Count 14 and 15, again, it

15      is a conspiracy.  They just said he was involved.

16                   Now, I can tell you that I am not making

17      this argument with respect to the allegation that he may

18      have been involved with this money-laundering activity.

19                   I did make an argument as it relates to the

20      time scope 3-31 to 8-1-13, but probably for the sake of

21      integrity to the argument that I am making is that I can

22      see that as relates to the money laundering and muling

23      business, that they were able to identify Mr. Miclaus as

24      having done some of that.

25                   But as it relates to anything involving

1    coding, anything involving cryptomining, anything

2    involving placing a virus on someone's computer,

3    communicating with a specific person, including the

4    scandalous nasty things that were said to Mr. O'Murchu in

5    code, that, you know, they didn't really send e-mails.

6              They were planning those cute little

7    statements in code, there was nothing at all specifying

8    that my client had any involvement with that at all,

9    Judge, none.

10             And we also know that Mr. Danet couldn't

11   specify what specifically he did either.  They just

12   couldn't be specific.

13             And I think the way I read those portions of

14   the jury instructions that I just cited to requires more

15   than just saying "yeah, he knew these guys, and he was

16   around and communicated with Nicolescu on a few occasions

17   and Danet on a few occasions."

18             But for witnesses to come in and say "yeah,

19   he was involved," the ones we heard in the last couple of

20   days, yeah, he was involved; no specifics, no dates, no

21   specific tractions, nothing.

22             And as a matter of fact, I know I got a

23   little ad nauseam about it, but the witnesses that they

24   did call in, that they were saying there is an e-mail

25   that I sent or I received or something like that, I asked

1    the witness:  Do you even know what this document means?

2    If you saw it laying on the ground, would you know what

3    it means?

4              No.

5              That person clearly stated under oath I

6    would have to have someone point to stuff that happened

7    three, four, five years in order for me to even say that

8    that was me.

9              And I know that on a couple of those there

10   was this e-mail address only with no content that had a

11   Minolta 9797 on it, but this person had no idea what

12   e-mail content was, and they couldn't say specifically

13   that that was my client standing right there that did it,

14   nothing.

15             So the attachment from a conspiracy

16   standpoint, again, going by the jury instructions, is so

17   thin as to not be able to make it beyond a reasonable

18   Rule 29 argument.

19             Thank you, Judge.

20             MR. BROWN:  Your Honor, which portion of

21   that would you like the Government to renew its arguments

22   for 1 through 13?

23             THE COURT:  I think the Government should

24   address all of it.

25             MR. BROWN:  Okay.  Very good.

1                    First of all, as soon as possible, with

2      respect to Count 21, Count 21 charges from — let me get

3      the exact date range here — from on or about January

4      1st, 2007, to the date of the indictment, and then it

5      lays forth the counts or with the specific charging

6      language and myriad dates in the conspiracy.

7                    So the Government would argue that the

8      indictment is clear in the dates it is charging, which is

9      from January 1, 2007, to the date of the indictment.

10                    THE COURT:  Well, he was specifically

11     referencing — and I know Mr. O'Shea will correct me if I

12     am wrong — the e-mails from March 31 to August 1st,

13     2013.  That's what Mr. O'Shea was specifically

14     referencing in Count 21.

15                    Am I correct, Mr. O'Shea?

16                    MR. O'SHEA:  Yes, ma'am.  They are listed in

17     the indictment.

18                    MR. BROWN:  And 1956(h), your Honor,

19     specifically does not have a requirement for overt acts.

20     So the way this is charged is proper under the charging

21     requirements of 1956(h).

22                    Now, turning to — let's go to the wire

23     fraud and the wire fraud conspiracy and the substantive

24     wire fraud, again, the Government would adopt the

25     arguments it made in the Rule 29 challenge raised by

1      Defendant Bogdan Nicolescu specifically, which is, again,

2      we don't have to have victims present to testify.

3                    The testimony of Donna Wolfe, the testimony

4      of Valentin Danet did establish both the substantive

5      counts and also the conspiracy as did the testimony of

6      Special Agents Diaz and Macfarlane about the conspiracies

7      to commit wire fraud.

8                    I am trying to organize all these pages

9      here, I'm sorry.

10                   The analysis of subsection D, the term of

11     false or fraudulent pretenses, representations, or

12     promises, there were no cars delivered.  So the

13     Government would argue that those were known to be untrue

14     and made with reckless indifference to their truth.

15                   I think every Romanian witness who testified

16     said that there were no cars that they ever — they

17     actually owned and were able to sell.

18                   And those material facts, especially when

19     you look at Catalin Dima's testimony saying I believe

20     Valentin Danet's yesterday was that they would get the

21     picture and put them in eBay web pages to entice people

22     to buy them.

23                   So we believe that those are intentional and

24     knowingly untrue statements that were used as fraudulent

25     or false pretenses and represent to be material facts.

1          So I think the argument under that

2     subsection B is addressed with, at least, those two

3     witnesses if not also Valentin Dima and Donna Wolfe.

4          The trademark arguments —

5          THE COURT:  Okay.  So wait.

6          So you have addressed Counts 2 through 13?

7          MR. BROWN:  Yes.

8          THE COURT:  How about going on to Count 14

9     then?

10         MR. BROWN:  I was just about to go to the

11    computer charge.

12         THE COURT:  Okay.

13         MR. BROWN:  First of all, your Honor, this

14    conspiracy language — well, strike that.

15         The damage is as defined, impairment to

16    operation — where is the — I had it on one of these

17    sheets.

18         But we had Liam O'Murchu testify that his

19    machine was slowed down significantly.  We had Donald

20    Patterson testify that he had to have a computer virus

21    removed.

22         We had Mr. Bertke talk about his cousin in

23    law, the computer guru who we did not call as a witness,

24    your Honor, or as an expert, testify as to removing

25    viruses.

1           We also heard from, I believe, Special Agent

2    Macfarlane talk about the effect of cryptomining in

3    general on computers, and I believe that was consistent

4    with the testimony of Liam O'Murchu who talked about the

5    slowness.

6           So we believe that the definition as

7    required in 1030 has been addressed, and again, that

8    damage is to intentionally impair without authorization,

9    integrity, availability of data, program systems, or

10   information as a result of transmission.

11          So again, they intentionally impaired

12   because the computer slowed down.  I think we have

13   testimony showing damage, which would be an impairment,

14   and I am just trying to think of the witness, the 1028(a)

15   witness.  It was maybe Allynn Stallings.  And I am not

16   entirely sure they did get a computer glitch.  She kept

17   getting a black screen.  I believe that was her

18   testimony, your Honor.  And it is also a multi-object

19   conspiracy.

20          So with the ten or more computers, I believe

21   we have ample testimony from Special Agent Macfarlane

22   about the number of computers he saw at any one time that

23   were being infected, and he did put time frames on all of

24   those.

25          So that was well in excess of ten in any

1    year.  And I was just handed a note that it was Larry

2    Kuehl and Stallings who testified that they had to have

3    their computers cleaned.

4              Am I hitting all of the 1030s on conspiracy,

5    Count 14, or do we have trademark — can we move on to

6    15?

7              THE COURT:  Count 14 specifically,

8    Mr. O'Shea argued no overt acts by MacFarlane.

9              MR. BROWN:  Well, your Honor, it is a

10   conspiracy.  It is a — we have a definition for

11   Pinkerton conspiracy as well.

12             Mr. Miclaus, I think we have testimony about

13   his involvement at virtually every stage of this.  He was

14   always aware.  We have the spreadsheet, which is 1741,

15   his getting material benefit from these things and his

16   ongoing and active participation, both in the auto

17   auction, and we have in 1854 and 1856 Minolta 9797

18   e-mails in many, if not the majority, of those e-mails

19   where they are talking about things such as Y pool,

20   .exe.dep, and other Bayrob functionalities.

21             So we believe that he was a knowing and very

22   active participant in every stage of the scheme.  In

23   fact, I think we have testimony that the auto auction,

24   the way it worked was once the screenshot or once the

25   attachment was opened up, the virus was on, and he was

1    certainly involved in the auction stage.

2              So he was certainly doing a material act to

3    help spread the virus, therefore, to using the most

4    accepted for law school 101 definition of conspiracy.  He

5    was involved in that conspiracy.

6              Going on to trademark, I think going back to

7    his use of auto auction and posting pages, which we see

8    again in 1741, where he listed over 900 on those pages

9    were eBay logos, eBay trademarks, which were — we had

10   testimony from Ms. Leavitt that eBay was a trademark

11   violation.

12             In a conspiracy count, those are more than

13   enough.  We don't have to show that he was actively and

14   necessarily using Wal-Mart or other trademarks, but he

15   was using the eBay trademark without authorization, and

16   that definitely satisfies the Rule 29 analysis.

17             Aggravated identity theft, there are

18   challenges there.  Each of those Defendants, quite

19   simply, testified that they were real people; that they

20   were harmed; that their information was found on a device

21   they had not given permission for; that personal

22   identifying information in addition to credit card

23   information that would be necessary to use that

24   information such as name, address, or in some

25   circumstances telephone number were found.

1          Some had notes about their actual use.  Some

2     had notes about their potential use, but the statutory

3     language of 1028(a) possession, not necessarily limited

4     to use, and based on the spreadsheets — and I am going

5     to blank on the —

6               MR. McDONOUGH:  1204.

7               MR. BROWN:  Thank you.  — we have the type

8     of data that is necessary to establish a 1028 capitalized

9     possession, which is again credit card information, name,

10    address, and other indentifying information

11          And then, as I said, there were some notes

12    of interest, specifically Minolta being associated with

13    some of those checking out, and I believe we have

14    Larry Kuehl whose testimony was Media Temple, was

15    actually charged on his account, and I believe if I

16    am not wrong, that was also associated with Minolta in

17    1204.

18          I feel like we are on the home stretch, your

19    Honor, but my notes are at times incomplete.  We have the

20    address of the conspiracy to commit money laundering.

21          Again, with the conspiracy to commit money

22    laundering as well your Honor, in 1741, we have

23    Minolta min getting a cut, 10 percent cut, I believe, of

24    money that was being transferred through money mules in

25    the spreadsheet attached to that e-mail.

1        And the Government would assert that we have

2  established the identity of Minolta, the nickname Minolta

3  min to apply to Radu Miclaus; that it was in a chart

4  breaking down percentages of how to split money, mule

5  money, that satisfies his role in the money-laundering

6  conspiracy, which was testified to by Bogdan Antonovich

7  and many others in the sort of category of Romanian

8  witnesses.

9        Finally, with the 3559(g) argument, I

10 believe, again, as argued earlier, the testimony of

11 Ryan Macfarlane and his review of this command and

12 control server that creates a table, that satisfies any

13 challenge under Rule 29 in that regard.

14        Thank you.

15        THE COURT:  I am going to reiterate for

16 purposes of this Defendant that the Court must view the

17 evidence in a light most favorable to the Government,

18 and I am not permitted to judge credibility of the

19 witnesses.

20        Frankly, Mr. Brown has set forth the

21 evidence accurately, and I agree with everything he has

22 just stated in terms of the evidence that the Government

23 has produced on each and every Count.

24        But I am going to address three major points

25 that Mr. O'Shea has brought up, and the first is, this

1    proposition that the victims had to be here in Court

2    personally to testify.

3              The Court simply doesn't agree.  I believe

4    that the Government can produce sufficient evidence

5    through documents and other witnesses' testimony to

6    support the counts that deal with individual victims.

7              So I simply don't agree with this

8    proposition that a victim has to be present in Court and

9    testify in order for the Government to survive a 29

10   motion on any given Count.

11             I must state regarding this proposition that

12   there wasn't sufficient evidence as to Defendant Radu

13   Miclaus.  The Court absolutely disagrees with that, and I

14   simply cite to generally the documentary evidence, and I

15   am well aware that this case is no different than a

16   murder case or a theft case in looking at a Rule 29

17   motion.

18             I have listened very carefully over the past

19   two weeks, and I could, in fact, go through all of the

20   documents that the Government has produced to support

21   each and every one of these counts, but I am not going to

22   do it.

23             I do believe that Mr. Brown has sufficiently

24   set forth the Government's position, and I agree with it.

25   But to say that there is no evidence of Mr. Miclaus being

1    part of each and every one of these conspiracies,

2    frankly, it is just wrong; again, looking at all of

3    the documents that have been admitted into evidence

4    here.

5              And finally, the statement that witnesses

6    came in and simply said Defendant Nicolescu was part of

7    the scheme and nothing more was said, well, the fact of

8    the matter is, on a Rule 29 motion, that is sufficient to

9    get the case to a jury.

10             And multiple witnesses came into this

11   courtroom and testified that they were a member of the

12   conspiracy to commit — and we will call it the general

13   fraudulent scheme — and that Mr. Miclaus was a member as

14   well.  That, therefore, means this case goes to the jury.

15   The Rule 29 motion is denied.

16             Mr. Goldberg, are you presenting any

17   witnesses?

18             MR. GOLDBERG:  No, your Honor.  I think we

19   are going to offer the statements —

20             THE COURT:  Let's go through each one if you

21   don't mind.

22             Are you offering Defendant's Exhibit M, and

23   this is a Defendant Nicolescu exhibit?

24             MR. GOLDBERG:  I am not sure which one

25   it is.  Excuse me.  Do you have that?  Let me make it

1    easy.

2                    THE COURT:  Sure.

3                    MR. GOLDBERG:  The only exhibits that we are

4    going to offer are Defendant's Exhibits Q —

5                    THE COURT:  Did you say Q?

6                    MR. GOLDBERG:  Q, S, T, and U.

7                    THE COURT:  All right.

8                    MR. GOLDBERG:  Along with their stipulated

9    translations.

10                    THE COURT:  All right.  Q, any objection?

11                    MR. McDONOUGH:  Yes, your Honor.

12                    THE COURT:  Which one is Q?

13                    MR. GOLDBERG:  That's Valentin Danet.

14                    MR. McDONOUGH:  Your Honor, I believe that

15    he is referring to the Romanian DICOT prosecutor's

16    questions and answers of the four Romanian witnesses and

17    trying to introduce those, which I believe is the subject

18    of his motion to admit examples of extrinsic evidence of

19    a witness' prior inconsistent statement.

20                    THE COURT:  So that is the February 19 —

21                    MR. McDONOUGH:  19th.

22                    THE COURT:  — 2019 interview?

23                    MR. McDONOUGH:  Correct, your Honor.

24                    THE COURT:  And you are correct, this Court

25    does have before it an anticipatory motion for official

1    translation and admission of prior inconsistent

2    statements, and of course, that was filed this morning

3    before any of the testimony we heard today.

4              That motion is denied and will not be

5    allowed.  I did, in fact, allow questioning regarding the

6    February 19, 2019, interviews.  The case that Defendant

7    relies upon, United States v Harris, simply does not

8    stand for the proposition that extrinsic evidence, the

9    actual statement itself, comes into evidence.

10             In that case, it appears as if the witness

11   was not permitted to be examined regarding the prior

12   statement.  I have allowed that, but it will not come in

13   as substantive evidence.

14             Again, any objection?

15             MR. McDONOUGH:  Yes, your Honor.  The

16   Government understands that like Exhibit Q, that this

17   is, again for another Romanian witness, this is the

18   February 19th interview in Romania for the same reasons

19   as Exhibit Q.

20             THE COURT:  I will not allow it for the same

21   reasons.

22             MR. McDONOUGH:  The Government would object

23   this is like another Q and S.

24             THE COURT:  I will not allow in.

25             And U?

1          MR. McDONOUGH:  The Government would object.

2     Again, this is another Romanian February 19th —

3          THE COURT:  The Court will not allow.

4          Anything further, Mr. Goldberg?

5          MR. GOLDBERG:  No, your Honor.

6          THE COURT:  You do rest?

7          MR. GOLDBERG:  We rest.

8          THE COURT:  Mr. O'Shea?

9          MR. O'SHEA:  We rest, no exhibits.

10          THE COURT:  I have the jury instructions

11     ready.  What I am going to do is give each one of you a

12     copy.  I would like to meet with you tomorrow morning to

13     make sure there aren't any mistakes, any changes, and if

14     while you review them this evening, if you do find that

15     something is not right, please communicate with one

16     another so I know if there is any objection or if you

17     have an agreement, and then I can make the changes

18     accordingly.

19          So for today only, on behalf of the

20     Government, is there anything further?

21          MR. BROWN:  And this is really minor, could

22     we make sure the VGA cable is here tomorrow morning?

23          MR. LEVINE:  For opening, we had a VGA cable

24     that went from over there to here, and we had a little

25     closing.  I did not realize we were going to use it in

1    closing.

2                    THE COURT:  You know what —

3                    MR. LEVINE:  Can we have the cable?

4                    THE COURT:  We will discuss this off the

5    record.

6                    Anything for the record?

7                    MR. BROWN:  For the record, no.

8                    MR. GOLDBERG:  No, your Honor.

9                    MR. O'SHEA:  Oh, nothing further, Judge.

10                    (Trial adjourned at 5:55 p.m.)

11                        - - - - -

12                    C E R T I F I C A T E

13          I, George J. Staiduhar, Official Court

14    Reporter in and for the United States District Court,

15    for the Northern District of Ohio, Eastern Division,

16    do hereby certify that the foregoing is a true

17    and correct transcript of the proceedings herein.

18                        s/George J. Staiduhar
                           George J. Staiduhar,
19                         Official Court Reporter

20                         U.S. District Court
                           801 W. Superior Ave., Suite 7-184
21                         Cleveland, Ohio 44113
                           (216) 357-7128
22

23

24

25