Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 1 of 163. PageID #: 6339
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/20 1 of 163. PageID #: 3187

1

1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                        EASTERN DIVISION

3    ------------------------------X
     UNITED STATES OF AMERICA,      :  Case No. 1:16-cr-00224
4                                   :  Cleveland, Ohio
                Plaintiff,          :
5                                   :
          v.                        :  Friday, December 6, 2019
6                                   :
     BOGDAN NICOLESCU               :
7    RADU MICLAUS,                  :
                                    :
8             Defendants.           :
     ------------------------------X
9

10

11          TRANSCRIPT OF SENTENCING PROCEEDINGS

12       BEFORE THE HONORABLE PATRICIA A. GAUGHAN

13          UNITED STATES CHIEF DISTRICT JUDGE

14
     Court Reporter:            Donnalee Cotone, RMR, CRR, CRC
15                              Realtime Systems Administrator
                                United States District Court
16                              801 West Superior Avenue
                                Court Reporters 7-189
17                              Cleveland, Ohio 44113
                                216-357-7078
18                              donnalee_cotone@ohnd.uscourts.gov

19

20

21

22

23

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer-aided transcription.

GOVERNMENT
EXHIBIT

A

2

```
1    APPEARANCES:

2

3    For the Government:     DUNCAN T. BROWN

4                           BRIAN M. McDONOUGH

5                           Assistant United States Attorneys

6                           801 West Superior Avenue

7                           Suite 400

8                           Cleveland, Ohio 44113

9                           216-622-3600

10                          duncan.brown@usdoj.gov

11                          Brian.McDonough@usdoj.gov

12

13   For the Defendant      MICHAEL J. GOLDBERG, ESQ.

14   Bogdan Nicolescu:      Law Office of Michael J. Goldberg

15                          323 W. Lakeside Avenue

16                          Suite 450

17                          Cleveland, Ohio 44113

18                          216-696-4514

19                          goldberg@goldberg-lawfirm.com

20

21

22

23

24

25
```

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 3 of 163. PageID #: 6341
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/20 3 of 163. PageID #: 3189

3

```
 1    APPEARANCES (Continued):

 2

 3    For the Defendant          MICHAEL J. O'SHEA, ESQ.

 4    Radu Miclaus:             Lipson O'Shea Legal Group

 5                              110 Hoyt Block Building

 6                              700 West St. Clair Avenue

 7                              Cleveland, Ohio 44113

 8                              216-241-0011

 9                              michael@lipsonoshea.com

10

11    For Probation:            NAOMI MORGAN

12

13    Special Agent:            G. RYAN MACFARLANE

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                                   **I N D E X**

2                                                                      **PAGE**

3     APPEARANCES.......................................   2

4     DIRECT EXAMINATION OF G. RYAN MACFARLANE...........  14
      BY MR. BROWN
5
      CROSS-EXAMINATION OF G. RYAN MACFARLANE............  36
6     BY MR. GOLDBERG

7     CROSS-EXAMINATION OF G. RYAN MACFARLANE............  51
      BY MR. O'SHEA
8
      REPORTER CERTIFICATE.............................. 163
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 5 of 163. PageID #: 6343
Case: 1:16-cr-00224-PAG Doc #: 230-1 Filed: 02/03/20 5 of 163. PageID #: 3194

5

```
           1                    MORNING SESSION, FRIDAY, DECEMBER 6, 2019

           2                    (Proceedings commenced at 9:40 a.m.)

           3                                 - - -

           4                    DEPUTY CLERK:  All rise.

09:40:28   5                    THE COURT:  Please be seated.

           6            We are here in the matter of United States of America

           7    v. Bogdan Nicolescu and Radu Miclaus, Case Number 16-cr-224.

           8            Present in court is Mr. Nicolescu; is that correct,

           9    sir?

09:41:19  10                    DEFENDANT NICOLESCU:  Yes.

          11                    THE COURT:  Represented by his attorney,

          12    Mr. Michael Goldberg.

          13            Also present is --

          14                    MR. GOLDBERG:  Good morning, Your Honor.

09:41:23  15                    THE COURT:  Good morning.

          16            Also present is Mr. Miclaus, correct, sir?

          17                    DEFENDANT MICLAUS:  Yes.

          18                    THE COURT:  Represented by his attorney,

          19    Mr. Michael O'Shea.

09:41:35  20                    MR. O'SHEA:  Good morning, Your Honor.

          21                    THE COURT:  Good morning.

          22            On behalf of the Government is Mr. Duncan Brown.

          23                    MR. BROWN:  Good morning, Your Honor.

          24                    THE COURT:  Good morning.

09:41:39  25            And Mr. Brian McDonough.
```

Case 1:16-cr-00224-PAG Doc #: 230-1 Filed: 02/03/20 6 of 163. PageID #: 3192

6

MR. McDONOUGH:  Good morning, Your Honor.

THE COURT:  Good morning.

And seated between them is Special Agent

Ryan Macfarlane.

AGENT MACFARLANE:  Good morning, Your Honor.

THE COURT:  Good morning.

On behalf of probation, Ms. Naomi Morgan.

We're here today for purposes of sentencing.  On

April 11th, a jury returned a verdict on all counts as to

both defendants, specifically Counts 1, 2 through 13, 14,

15, 16 through 20, and 21.  But not guilty of the

enhancement as to both defendants.

At that time I referred both matters to the probation

department for a presentence investigation report.

I do, in fact, have the reports as to both defendants.

The Court notes that as to both defendants, the

calculations are the same.  It is my intention to now go

over those calculations.  And, again, it relates to both.

According to the reports, the base offense level is 7.

20 levels are added due to the amount of loss being between

9.5 million and 25 million.

Two more levels are added because the offense involved

ten or more victims.

Two more levels are added in that the defendants

received and sold stolen credit card accounts and personal

Case 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 7 of 163. PageID #: 6345
Case 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/20 7 of 163. PageID #: 3193

7

1    account information.

2         Two more levels are added for sophisticated means.

3         Two more levels are added in that the defendants

4    fraudulently obtained credit card information.

09:43:29  5         Four more levels are added because there was a

6    conviction under 1030a5A, for a base offense level of 39.

7         Two levels added in that there was a conviction under

8    18 U.S.C. 1956.

9         Two more levels are added for sophisticated

09:43:49  10    laundering.

11         There are no victim-related adjustments.

12         Four levels are added for role in the offense.

13         No obstruction of justice, for an adjusted offense

14    level subtotal of 47.

09:44:04  15         No Chapter 4 enhancements.

16         No adjustment for acceptance of responsibility, for a

17    total offense level of 47, which becomes a 43 pursuant to

18    the instructions in the guidelines.

19         As to Count 16 through 20, aggravated identity theft,

09:44:27  20    the guideline sentence is the term of imprisonment required

21    by statute, which is two years consecutive to any other term

22    of imprisonment.

23         The Court is in receipt of several sentencing

24    memorandums.  I have, in fact, reviewed them all.

09:44:47  25         Subsequent to receiving the briefing, the Court has

Case 1:16-cr-00224-PAG Doc #: 289-1 Filed: 02/03/23 8 of 163. PageID #: 6346
Case 1:16-cr-00224-PAG Doc #: 230-1 Filed: 02/03/23 8 of 163. PageID #: 3194

8

1   been made aware that the Government's lawyers and the

2   defense lawyers have, in fact, had further discussions and

3   have agreed on some of the calculations that I just went

4   over for the record.

09:45:10  5      So I'm now going to go over the calculations again and

6   state where there's agreement and where there is

7   disagreement.

8        All parties agree that the base offense level is a 7.

9        And regarding how much should be added to that for

09:45:35 10  amount of loss, it is the Government's position that it is

11  not a 20, but that it should be an 18, for a loss of between

12  3.5 and $9.5 million.

13       The defendants do not believe it should be a 20.  They

14  believe that it should be increased by 16, which is a loss

09:46:03 15  of between 1.5 and $3.5 million.

16       Everyone agrees that two levels should be added in

17  that the offense involved ten or more victims.

18       The Government believes that two levels should be

19  added because of the receipt and selling of stolen property.

09:46:34 20       The defendants do not believe the two levels should be

21  afforded.

22       All parties agree that the two levels for

23  sophisticated means should be given.

24       The Government believes two levels should be added for

09:46:58 25  fraudulently obtaining credit card information.

Case 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 9 of 163. PageID #: 6347
Case 1:16-cr-00224-PAG Doc #: 230-1 Filed: 02/03/20 9 of 163. PageID #: 3195

9

         1          The defendants do not believe those two levels should

         2    be added.

         3          The Government believes that the four levels should be

         4    added for the conviction under 1030.  The defendants do not

09:47:16 5    believe that should be added.

         6          The Government believes that under specific offense

         7    characteristics, two levels should be added because of the

         8    conviction under 1956.

         9          Defendants do not believe it should be afforded.

09:47:36 10         Now, as to sophisticated laundering, the Court is a

        11    bit confused as to the Government's position.

        12          Am I correct that because sophisticated -- it's been

        13    agreed upon that the two levels should be added in

        14    paragraph 49 for sophisticated means, that you are agreeing

09:48:04 15   to not advocate for the two levels for sophisticated

        16    laundering, or am I simply incorrect on that?

        17               MR. BROWN:  Your Honor, the Government's

        18    position would be that the special -- the argument has

        19    always been the special skills would apply across the board

09:48:21 20   to all of the conduct, including nonmoney laundering

        21    techniques, but very sophisticated money laundering as

        22    argued in our brief, that the setting up of the money in the

        23    company --

        24               THE COURT:  Okay.  I don't want to hear

09:48:37 25   argument.  This is my question.

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 10 of 163. PageID #: 3648
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 10 of 163. PageID #: 3196

10

```
 1              MR. BROWN:  We would argue --
 2              THE COURT:  Is it the Government's position
 3   that the two levels should be added in paragraph 49 for
 4   sophisticated means, and that the two levels should be added
 5   for sophisticated laundering?
 6              MR. BROWN:  Yes, and I --
 7        Right.  Right.  And, yes.  With the recognition that
 8   the special skills in Chapter 3 may apply to -- to one of
 9   those sophisticated -- but, yes.  We'd be arguing -- yeah.
10        I mean -- because with the interplay with Chapter 3 it
11   gets a little confusing so we don't want to say we're
12   jettisoning an argument for sophisticated laundering.
13              THE COURT:  Look it, folks.  I just need to
14   know what's been agreed upon.  And -- and it was my
15   understanding that you were only going to advocate for a
16   two-level increase versus the four here, two in
17   paragraph 49, two in paragraph 51.
18        And I just need to know what the agreement was, and if
19   you want to speak privately, I would recommend you do that.
20              MR. BROWN:  We'll advocate for two,
21   Your Honor.  Yeah.  Just for 49.  We'll just advocate
22   for 49.
23              THE COURT:  Okay.  So paragraph 51, you are in
24   agreement with the defendants, that that would be changed to
25   a zero?
```

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 11 of 163. PageID #: 3349
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 11 of 163. PageID #: 1917

11

```
              1              MR. BROWN:  Yes.  Your Honor, may I ask one
              2     question, though?
              3              THE COURT:  Sure.
              4              MR. BROWN:  Can you include 2B(10) [sic],
09:50:23      5     which is relocation of criminal activity overseas to avoid
              6     detection?
              7         I didn't hear that in the calculation so far.  I'm
              8     sorry.
              9              THE COURT:  That's all right.
09:50:37     10              MR. BROWN:  I'm standing up, Your Honor.
             11              THE COURT:  That's all right.
             12         I am on paragraph 49.
             13              MR. BROWN:  Okay.
             14              THE COURT:  And I am using the language --
09:50:46     15              MR. BROWN:  Okay.
             16              THE COURT:  -- in paragraph 49.
             17         Now, you, I believe, have used different terminology.
             18              MR. BROWN:  Okay.  Very good.  Thank you, Your
             19     Honor.
09:50:59     20              THE COURT:  In the e-mail that was sent to me
             21     that was -- that defense counsel were copied on, so it was
             22     not an ex parte communication, of course, but I believe you
             23     used different language or terminology than that used in the
             24     presentence report.
09:51:16     25         So I am going based on the presentence report.
```

Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 12 of 163. PageID #: 3950
Case: 1:16-cr-00324-PAG Doc #: 230 Filed: 02/03/23 12 of 163. PageID #: 3199

12

```
            1              MR. BROWN:  Sentencing guidelines is my second
            2     language, Your Honor, so I apologize.  Thank you.
            3              THE COURT:  Overseas criminal conduct which is
            4     what you reference in the e-mail, is really the
09:51:37    5     sophisticated means, which is in --
            6              MR. BROWN:  I understand, Your Honor.  Yes.  I
            7     see.  Right.
            8              THE COURT:  So we're on the same page, right?
            9              MR. BROWN:  Yes.
09:51:48   10              THE COURT:  Okay.  And, again, folks, I'm just
           11     trying to figure out what's in dispute and what isn't in
           12     dispute.
           13         And I believe lastly, role in the offense is being
           14     disputed.  It's the Government's position that the four
09:52:10   15     levels should be added.  It is the defendant's position that
           16     it not be afforded.
           17         So, Mr. Brown, let me turn to you, sir.
           18         Have I stated accurately what's in dispute and what's
           19     not in dispute?
09:52:28   20              MR. BROWN:  Yes, Your Honor.
           21              THE COURT:  Mr. Goldberg.
           22              MR. GOLDBERG:  You have, Your Honor.  Just to
           23     reiterate -- and I'm sure you covered this -- with regard to
           24     the enhancement, under 2B (11), we have -- our original
09:52:50   25     brief didn't object to that enhancement, but we are
```

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 02/30/23 13 of 163. PageID #: 6351
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 13 of 163. PageID #: 3199

13

 1    objecting to it now.

 2         But other than that, yes, you have correctly stated

 3    our position, what is agreed to and what is not.

 4              THE COURT:  I did state that.

09:53:01  5              MR. GOLDBERG:  Thank you.

 6              THE COURT:  Mr. O'Shea.

 7              MR. O'SHEA:  Yes.

 8              THE COURT:  All right.  Now, it's my

 9    understanding that the Government wants to present testimony

09:53:15 10    here today as to some or all of the objections.

11         And it's also my understanding that the testimony

12    does, in fact, relate to both defendants.

13         So at this time I think it's wise that we hear

14    testimony.  Following the testimony, we will then go over

09:53:37 15    every objection, and if there's further argument, I will

16    listen.

17         But I want to remind everyone that I have read

18    everything.  But I will entertain further argument.

19         I will then make a ruling and then we'll proceed to

09:54:01 20    the actual appropriate sentence.

21         And when I go over the objections, I will begin with

22    Mr. Nicolescu, and when I've concluded with those

23    objections, I will then go to Mr. Miclaus's.

24              So on behalf of the Government.

09:54:20 25              MR. BROWN:  Thank you, Your Honor.  On behalf

Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 14 of 163. PageID #: 3252
Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 14 of 163. PageID #: 3200
**Macfarlane (Direct by Brown)**
14

| | |
|---|---|
| | 1 | of the Government we would call Special Agent |
| | 2 | Ryan Macfarlane. |
| | 3 | THE COURT:  Please step up here, sir. |
| | 4 | Please raise your right hand. |
| 09:54:24 | 5 | G. RYAN MACFARLANE, |
| | 6 | of lawful age, a witness called by the Government, |
| | 7 | being first duly sworn, was examined |
| | 8 | and testified as follows: |
| | 9 | THE COURT:  Please take a seat, sir. |
| 09:55:34 | 10 | MR. BROWN:  Thank you, Your Honor. |
| | 11 | THE COURT:  Thank you. |
| | 12 | DIRECT EXAMINATION OF G. RYAN MACFARLANE |
| | 13 | BY MR. BROWN: |
| | 14 | Q.    Special Agent Macfarlane, what I'd like to do is |
| 09:55:40 | 15 | basically focus the majority of my questions on evidence |
| | 16 | that was used to create loss amount figures.  Just to give |
| | 17 | you sort of a roadmap. |
| | 18 | Have you read the Government's sentencing memorandum? |
| | 19 | A.    I have, yes. |
| 09:55:54 | 20 | Q.    So you're familiar with the -- sort of the pool of |
| | 21 | numbers that we were looking to to factor loss amount? |
| | 22 | A.    Yes, I am. |
| | 23 | Q.    Okay.  So let me walk you through each of those -- |
| | 24 | each of those groups of numbers. |
| 09:56:08 | 25 | The Government said that the eBay fraud was |

1    approximately 3.5 to $4.5 million.  Do you remember

2    reviewing that number?

3    A.    Yes.

4    Q.    And based on that investigation, how did -- in fact,

09:56:19 5   were you part of the team that came up with that number?

6    A.    I was, yes.

7    Q.    And how -- what -- what evidence that you discovered

8    during your investigation is that 3.5 to $4.5 million based

9    upon?

09:56:33 10  A.    That information was based on information that we

11   found within the Bayrob databases that were contained within

12   search warrants.

13         It was then -- the data that was found on the search

14   warrants was then compared to a number of IC3 reports, which

09:56:52 15  is the Internet Crime Complaint Center.

16         And we took specific indicators that were associated

17   with the Bayrob Group, such as known e-mail accounts, known

18   money mules, known fax numbers and other technical

19   indicators that allowed us to identify complaints that were

09:57:13 20  related to the Bayrob Group, and we aggregated those

21   numbers.

22   Q.    Okay.  So is it fair to say that the 3.5 to 4.5 is a

23   reflection of actual observed transactions?

24   A.    Yes.

09:57:28 25  Q.    Does that include any sort of calculation that was

1    extrapolated from IC3 complaints?

2    A.    The calculation was based -- well, there was no

3    additional calculation.  It was based on the IC -- IC3

4    complaints that we were able to identify.

09:57:44  5    Q.    Okay.  And were those IC3 complaints relating to

6    completed eBay fraud?

7    A.    Yes.

8    Q.    So it wasn't just, My computer's running slow, I think

9    there's a problem with it, it's --

09:57:55 10    A.    No.  No.  There were a number of IC3 complaints where

11    the -- you know, the loss numbers were not associated.  They

12    just weren't realistic with -- with eBay -- or with the

13    activity that we had seen, and we discounted those

14    specific -- if we couldn't confirm that information, we

09:58:12 15    would discount it.

16    Q.    And what sort of commonalities were you looking at

17    through the IC3 complaints?

18    A.    As I previously mentioned, we were looking at e-mail

19    accounts that we had associated to the Bayrob Group, other

09:58:28 20    technical indicators such as fax numbers that were used by

21    the Bayrob Group.

22          I'm trying to think if there's additional -- and

23    primarily the money mules.  Where the money was sent,

24    whether that was an identified Bayrob money mule or not.

09:58:49 25    Q.    So -- so again, just looping back around, you

Case: 1:16-cr-00244-PAG Doc #: 289-1 Filed: 01/30/23 17 of 163. PageID #: 3655
Case: 1:16-cr-00244-PAG Doc #: 289 Filed: 01/30/23 17 of 163. PageID #: 3205

Macfarlane (Direct by Brown)

17

1    were -- and these money mules and these fax account numbers,

2    these were the mules and the faxes associated with money

3    mule accounts testified to in Court?

4    A.    Correct.  And then we would also make sure that the

09:59:05  5    actual complaint itself was consistent with the behavior of

6    the Bayrob eBay fraud operation.

7         So whether, you know, whether it was -- whether it was

8    the fact pattern matched what we had observed in the -- in

9    the fraud.

09:59:20 10   Q.    Okay.  So would -- would your testimony, based on your

11   research, based on your investigation that the 3.5 to 4.5,

12   is that a conservative estimate, is that exactly spot on, is

13   that, you know --

14             MR. GOLDBERG:  Objection.

09:59:39 15   BY MR. BROWN:

16   Q.    -- wildly -- well, based on how you tied it to your

17   investigation --

18             THE COURT:  Overruled.

19             THE WITNESS:  So I would believe that would be

09:59:45 20   a very conservative number and the reason I believe it's

21   conservative is because in a number of instances, I took the

22   data from the Bayrob Group in the databases that detailed

23   the victims that they had targeted.

24        And then I ran the full victim list that I found in

10:00:03 25   the Bayrob data against IC3 data to see what percentage of

1    victims that were in the database had actually reported the

2    fraud.

3         I also did this with the amount spreadsheet that was

4    sent between the two Bayrob members which detailed the

10:00:24  5  specific victims, where they were in the fraud stage, what

6    they had sent for the vehicles, and whether the money was

7    recovered by the Bayrob Group or not.

8         So it was a qualified list of Bayrob victims being

9    sent between two Bayrob Group members, and I found that on

10:00:42 10  both -- both accounts, approximately 30 to 35 percent of

11   the -- of the victims that were documented by the Bayrob

12   Group during their process was actually found within IC3.

13        So I believe that there is a -- it's very likely that

14   60 percent of the Bayrob victims did not report to IC3.

10:01:09 15  So I had both of those datasets, and I compared the

16   victim list compiled and tracked by the Bayrob Group with

17   the actual Internet Crime Complaint Center reporting.  And

18   the report rate was -- was in the 30 to 35 percent range.

19   BY MR. BROWN:

10:01:24 20  Q.    And based on your investigation, if it was

21   100 percent, approximately what would the loss amount value

22   be there?

23                  MR. GOLDBERG:  Objection.

24                  THE COURT:  Overruled.

10:01:33 25                 THE WITNESS:  So the loss -- the loss amount

 1    from the eBay portion alone would be in the range of 10

 2    to -- as high as 30 million.

 3         It was tough for me to estimate that accurately

 4    because of a number of different factors.

 5         One of the factors was that the Bayrob Group

 6    occasionally would -- would victimize the same victim twice.

 7    So that number was not consistent.  It was not always 7,000

 8    to 10,000 or $11,000.

 9         Sometimes they would victimize a victim twice and by

10    saying that there was a problem with the initial transaction

11    and they would take a $9,000 loss and turn it into a $17,000

12    loss.

13    BY MR. BROWN:

14    Q.   And, in fact, do you recall testimony from Mr. Savadra

15    about that?

16    A.   Yes.  And that that had occurred, and I believe we did

17    have people testify to that specifically.

18    Q.   Now, do you recall also, going back to the sentencing

19    memorandum, a section about stolen credit cards found in the

20    database and other files within the community control

21    infrastructure?

22    A.   Yes.

23    Q.   Okay.  Were you in fact the agent who identified

24    credit cards found in the databases and command and control

25    server?

Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 20 of 163. PageID #: 3058

1    A.    I was, yeah.

2    Q.    Generally, what does that mean when you say you found

3    them on the databases on the C&C?

4    A.    So during my analysis I would find credit cards in

10:03:12  5    multiple different locations within the command and control

6    servers, as well as within Title 3 data.

7          For example, on the command -- the first command and

8    control server that I did a search warrant on had data that

9    was -- what I assessed to be data that was either acquired

10:03:32  10   or purchased or stolen from another source.

11         There was a file called 10,000 cards, which was a

12   compressed archive of credit card information.

13         I don't know the original source of this information,

14   but I did look through the file and found that it was -- you

10:03:50  15   know, it was credit card information consistent with most

16   other cases that we work in cybercrime that have, you know,

17   stolen credit card information.

18   Q.    We'll talk about how they might have gotten them in

19   detail in a few minutes, but based on your investigation, is

10:04:06  20   it fair to say that they're in the business of buying and

21   selling credit cards?

22   A.    Yes.

23                MR. GOLDBERG:  Objection.

24                THE COURT:  Overruled.

10:04:14  25                THE WITNESS:  Yes, it was.

Case 1:16-cr-00324-PAG Doc #: 289-1 Filed: 02/03/23 21 of 163. PageID #: 3207

1    BY MR. BROWN:

2    Q.    Now, did you also learn about stolen credit cards from

3    speaking with codefendant Danet?

4    A.    I did.

10:04:26   5    Q.    Do you recall what he told you about credit cards?

6    A.    So Tiberiu Danet stated that they used credit cards to

7    procure their infrastructure, and I found on the command and

8    control server a table specifically for storing credit cards

9    that had been used by the group for obtaining and paying for

10:04:47   10    various services that were involved in their fraud.

11    Q.    Do you recall if Mr. Danet told you a specific number

12    of credit cards he recognized as being stolen and used?

13    A.    I think he mentioned in his proffer over 500.

14    Q.    Now, about those tables, was there anything unique

10:05:05   15    about those tables that you saw in your investigation that

16    would delineate good credit cards, bad credit cards, active

17    credit cards, inactive?

18    A.    So the table that contained the credit cards that were

19    being used for the Bayrob's infrastructure and other

10:05:20   20    services such as fax numbers and voiceover IP would have a

21    notes category and they would leave notes as to who was

22    using that credit card, what it was used for, and whether

23    that credit card was active or not.

24         And there was a -- if a card was dead or had been

10:05:38   25    cancelled there would be a term "mort" would be put next to

1    it.

2    Q.    And did you learn through your investigation what mort

3    meant?

4    A.    It means that the credit card was no longer active.  I

10:05:54  5    believe it's like a shortened Romanian for dead.

6    Q.    And in fact, in your experience and training and your

7    investigation, is it common to find a table like that in a

8    scheme like this?

9    A.    I have seen tables like this in other cases where we

10:06:13 10    have sophisticated cyber criminals that are tracking a

11    number of elements related to their -- their criminal

12    operations.

13          So it is not necessarily unusual for them to track

14    their credit cards that they have, what they're being used

10:06:28 15    for, who within the group is using it, but usually we only

16    find that within groups that are well organized and pretty

17    sophisticated.

18    Q.    Could you tell if the program that was tracking it was

19    a commercially available program?

10:06:44 20    A.    It was a -- it was a standard database system that was

21    -- was used to track both the credit card information as

22    well as all the other different elements of the Bayrob

23    Group's operations.

24    Q.    Could you tell if it was created within the Bayrob

10:06:55 25    Group or was --

Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 23 of 163. PageID #: 3361
Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 23 of 163. PageID #: 3209
Macfarlane (Direct by Brown)
23

1    A.    No.   The software itself would have been downloaded

2    but it would have been highly customized by the Bayrob Group

3    for this specific purpose.

4         So the entire structure of the tables and all the

10:07:10   5    fields within them would have been designed and, you know,

6    populated by the Bayrob Group and were integral to the rest

7    of the programming and code that the Bayrob Group used to

8    operate.

9    Q.    Now, turning to another section.

10:07:33   10        You provided evidence and investigative, I guess,

11   results about stolen credentials to help formulate a loss

12   value.

13        What -- what did you find in terms of stolen

14   credentials on the databases and in the command and control

10:07:50   15   server?

16   A.    So the databases on the command and control server had

17   a large number of stolen credentials and this was a main --

18   one of the main components of the Bayrob Trojan was to

19   collect account credentials for multiple different accounts,

10:08:10   20   such as e-mail -- e-mail accounts like Gmail, Hotmail,

21   Yahoo, Paypal accounts, Dropbox accounts, and -- and other

22   accounts that were -- were valuable to them.

23   Q.    Now, when you're talking about credentials, you're

24   talking -- that's not the same as a credit card number,

10:08:32   25   right?

1    A.    Correct.  That would be a user name and a password to
2    access a system like eBay.  And eBay was another account
3    that they would -- they would sometimes --
4    Q.    Based on your investigation, how would they monetize
5    the credentials?
6    A.    So the Bayrob Group was a vendor on AlphaBay, which is
7    a dark market that caters to other cyber criminals.
8          So they were -- they had a store on AlphaBay where
9    they advertised goods such as sniffed credit cards that were
10   100 percent working, is -- is what their advisement was.
11         And they would have -- they would sell those for
12   different values based on the type of card or the time
13   period they were selling them.  Anywhere from, I believe,
14   5.99 to 35 or $36 per card.
15         And those cards would -- were available for other
16   cyber criminals to purchase so that they could do criminal
17   activity using somebody else's credit card information.
18         And it was, as I said, being done on AlphaBay, which
19   was -- at the time, was one of the biggest criminal dark
20   markets on the Internet before the FBI took that -- took
21   that down with the assistance of another -- a number of
22   other agencies.
23   Q.    Were they selling any other services based on their
24   criminal activity on AlphaBay?
25   A.    They were also selling the infected systems themselves

```
 1   as proxies to other cyber criminals so that they could hide
 2   their location.
 3   Q.    And could you tell if they had any buyers, if there
 4   were any actual transactions?
 5   A.    Yes.  On AlphaBay itself it will tell you how many
 6   transactions that that vendor has done and specifically what
 7   their -- their customer service rating is, you know.
 8         So you can -- you can give, you know, a vendor a
 9   five-star rating based on the quality of their product and
10   their customer service.
11         So the AlphaBay profile for the Bayrob Group's store
12   had, I believe, over 500 transactions, and had a very good
13   rating.
14   Q.    Okay.  Now, is this part and parcel of the buying and
15   selling of credit cards you talked about earlier in one of
16   the loss calculations of 10,000 cards?
17   A.    It is.  It is, yes.  So the 10,000 cards was -- was
18   cards they had when my role in the investigation began.
19         When I came upon that command and control server,
20   those 10,000 cards were already there.
21         I believe those cards were -- were purchased from some
22   other location, just based on the way they were packaged on
23   the server.  But I don't know.  I don't know the exact
24   source of those cards.
25         What I do know is I do know that they were using a --
```

          1    like over 800 cards that were well documented within the

          2    Bayrob database for services to further their criminal

          3    activity at places like Yahoo small businesses to purchase

          4    domains, DreamHost and Bluehost to purchase server

10:11:54  5    infrastructure, places like RapidFAX to -- to acquire a fax

          6    number so victims could send in confirmations of their

          7    eBay -- eBay wire payments for their vehicles that they

          8    never received.

          9         Those were -- those were well documented and there

10:12:12 10    were over 800 of those in the database that I observed.

         11         And then there were a larger -- a much larger number

         12    of credit cards that were collected from victims during this

         13    process as well.

         14         At the very end of the -- before they were arrested,

10:12:33 15    they were actually replacing the web browser on a portion of

         16    the infected systems, and everything that that web browser

         17    would send to sites on the Internet would be collected and

         18    within that, that was how they were mining credit card

         19    information as well as account information to be sold on --

10:12:58 20    on AlphaBay.

         21    Q.   Let's back up here just a minute, because

         22    that's -- it's barely 10:00 and that -- that had a lot of

         23    information there.

         24         You said they were replacing web browsers.  What --

10:13:13 25    what does that mean?

Case: 1:16-cr-00244-PAG Doc #: 289-1 Filed: 01/30/23 27 of 163. PageID #: 3365

1    A.    So on infected systems they had complete control over

2    that system.  They could install software that they wanted

3    to install.  They would install multiple different plug-ins,

4    depending on what they wanted that system to do.

10:13:27    5        What they could also do is they could also replace the

6    underlying software that was the web browser on that system,

7    and everything that that -- everything that was done over

8    that web browser would then get sent to at least one system

9    in North Carolina.

10:13:46   10       And that system in North Carolina had effectively a

11   large -- a large amount of storage, and that storage would

12   hold all of this web traffic from all these infected

13   victims.  And then the -- from a criminal standpoint, the

14   beauty of that was that it was all the data.

10:14:09   15       And I could pull -- I could go back and re-mine that

16   over and over again.

17       So I could pull credit card information out of it but

18   I could also pull banking credentials out of it.

19   Q.   Okay.  So is it fair to say based on that that the

10:14:22   20  infected web browser would collect every web page an

21   infected user went to?

22       So if I went -- if I was infected and I went to

23   espn.com, I went to my bank, I went to, you know, a place

24   I -- car payment, I go to cleveland.com, whatever, all of

10:14:41   25  that traffic is stored?

1    A.    All of the traffic that you were providing to those

2    sites was stored.

3    Q.    So I go to my cleveland.com, if I click on an article

4    it would show the traffic of me clicking on the article,

10:14:54  5    correct?

6    A.    It would show the -- so if you -- if you

7    were -- unfortunately, this is -- this is where things get a

8    little technical.

9    Q.    Okay.  Let me make it easy.  If I type in my password

10:15:05  10    to my bank account, would it collect that?

11    A.    Yes.

12    Q.    If I typed in my account to Facebook, would it collect

13    that?

14    A.    Yes.  Any data that you were providing up to a site,

10:15:16  15    that would -- that was the focus of what was being

16    collected.

17    Q.    And is that the type of data that they were monetizing

18    in your -- that you saw on AlphaBay?

19    A.    Yes.

10:15:23  20    Q.    For sale?

21    A.    Yes.

22    Q.    And when you say "re-mining old data," is that -- is

23    that in laymen's terms being able to go back into collected

24    information and pull out information of value that could be

10:15:39  25    monetized?

Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 29 of 163. PageID #: 3667
Case: 1:16-cr-00324-PAG Doc #: 230 Filed: 01/30/23 29 of 163. PageID #: 3215
Macfarlane (Direct by Brown)
29

1    A.    Yes.

2        So in reviewing the code that was responsible for

3    mining the data, I could see what they were mining within

4    that code.

10:15:52 5        So they were pulling out account credentials for a

6    number of different services primarily related to e-mail,

7    some file sharing was the bulk of their initial collection.

8        However, in reviewing and analyzing the data, you

9    could see the process was evolving.  I could see that they

10:16:15 10    were -- they were adding in -- within some of their code

11    they actually had something called a study URL, which was

12    used to pull data for the next -- the next type of data item

13    that they were interested in pulling out.

14        When we arrested them, the study URL actually was for

10:16:33 15    Bank of America.  So they were pulling out Bank of America

16    accounts.  They had already pulled out Wells Fargo accounts.

17        So they were -- they were evolving from doing, you

18    know, traditional e-mail accounts and Paypal accounts and

19    eBay accounts to moving into bank accounts at the time they

10:16:53 20    were being arrested.

21    Q.    And if that had gone on, would that increase the loss

22    amount realized by the Bayrob Group or would it keep it

23    about the same?

24                MR. GOLDBERG:  Objection.

10:17:06 25                THE COURT:  Overruled.

1          THE WITNESS:  I believe it would have provided

2     them another revenue stream from the data they were already

3     collecting.

4          So I don't know whether the Bayrob Group was planning

10:17:16  5     on using those accounts themselves or selling those accounts

6     to other cyber criminals.  Either of those is concerning.

7          However, they would have the option to do either of

8     them.  They could -- it's very common on the dark markets to

9     sell bank account login credentials because of their value.

10:17:34 10     BY MR. BROWN:

11     Q.   Now, when you sell something on AlphaBay like that,

12     login credentials, can you sell them to multiple people?

13     A.   You can.  As a criminal, you can sell them to multiple

14     people, but it will -- it's not wise to, because the

10:17:53 15     criminal marketplaces are based on rating.

16          And what will happen if you sell the same accounts to

17     multiple people and the first person is able to use that

18     account and it gets suspended and then you sell it to a

19     second person, they go and they use it and the account --

10:18:09 20     the account doesn't work, it's been suspended, then your

21     rating will suffer from that.

22          And cyber criminals on this dark markets, really their

23     rating itself is what is -- is one of the most valuable

24     aspects.  Because nobody is going to buy from you if you're

10:18:24 25     a three-star vendor on AlphaBay, right?  If you've got a

1    five-star rating on AlphaBay, you're going to have a lot of

2    business.

3        So it's -- it's very customer service centric, and

4    it's important that you deliver on the products that you're

10:18:40  5    providing.

6    Q.    So is it fair to say that the market drives vendors to

7    continually add new valid credentials?

8    A.    Yes.  I mean, that's the very -- the basic business

9    nature of the dark markets is that credentials have a shelf

10:18:56 10    life and you can use them for whatever criminal purpose you

11    want to use them for, but eventually they're going to

12    expire.

13        And the same is true of credit card information as

14    well.  Sooner or later those credit cards will be discovered

10:19:09 15    as being used for fraud.

16    Q.    Based on your investigation of what you described as

17    the Bayrob evolution from going through just spam to mining

18    collected data, based on your investigation did it appear

19    that the Bayrob Group was developing tools and databases to

10:19:24 20    meet that growing demand?

21    A.    Yes.

22    Q.    And was it creating -- were the tools able to provide

23    increased -- increased credentials, credit card numbers,

24    from -- from single victims and multiple victims?

10:19:45 25    A.    Yes.  There were a number of victims that I -- both

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 33 of 163. PageID #: 3670

1    their process supported growing their available dataset that

2    could be mined for credentials as well as the way in which

3    they targeted effectively landed them on systems that would

4    have access to more and more credit card information.

10:20:06  5         For example, I remember one specific infected system,

6    which based on my analysis was a hotel in Europe, and that

7    system was responsible for processing credit card payments.

8         So that specific system, for example, was providing

9    multiple different credit card numbers on a pretty

10:20:28 10   consistent basis, right?  It wasn't -- it wasn't, you know,

11   my computer, your computer.  It was a business computer that

12   was processing credit card information.

13        So not only did it get the -- you know, it -- it was

14   victimizing multiple people.  As they visited the hotel,

10:20:47 15   their credit card information would have been stolen and

16   then it could be sold or used.

17   Q.    Okay.  So when you say -- or you provided a lot of the

18   credential information, credit card information for our --

19   for our memorandum; is that correct?

10:21:01 20   A.    I did, yes.

21   Q.    So when you provided a number of credit cards of

22   25,000 stolen credit cards on the database, was that a

23   conservative estimate?

24   A.    That 25,000 credit cards was a -- was the combination

10:21:16 25   of the credit cards that I observed on the command and

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 33 of 163. PageID #: 3631
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/20 33 of 163. PageID #: 3219
Macfarlane (Direct by Brown)
33

1    control server, the credit cards that I knew the Bayrob

2    Group had used that were documented by the Bayrob Group for

3    the various services that they had procured, or the cards

4    that were in the database that tracked what was sold on

10:21:35  5    AlphaBay.

6        So it was a combination of all three of those

7    different categories.

8        And if we were to break those down, it would be 10,000

9    from the initial review of the search warrant, just under a

10:21:50  10    thousand for the cards that were used by the Bayrob Group

11    itself, and then the remainder of that would have been cards

12    that were either in the database that tracked what had been

13    sold on AlphaBay or cards that had been collected already by

14    the various means that the Bayrob Group used, such as the

10:22:11  15    browser replacement technique.

16    Q.    And is it your -- your belief based on your

17    investigation that at time of arrest, the Bayrob Group was

18    continuing to evolve?

19    A.    Yes, it is.

10:22:23  20    Q.    They weren't winding down?

21    A.    No.

22    Q.    They weren't comfortable in their niche?

23    A.    No.  They seemed to be -- to be moving into what I

24    would call sort of a criminal big data phase.

10:22:37  25    Q.    Now, during your investigation, did you ever find any

1    evidence that specifically defendant Miclaus was involved in

2    the theft of cryptocurrencies?  Let's back up.

3         Was he involved in the mining of cryptocurrencies?

4    A.   So I believe he was aware of what was going on with

10:23:01 5    the Bayrob botnet and its mining of cryptocurrencies.

6         Open-source research identified that he was -- he had

7    made two different polls -- posts on social media account

8    that was inquiring to the status of ypool.net, which is a

9    cryptocurrency mining pool, effectively a way for lots of

10:23:30 10    different people to be involved in cryptocurrency and all

11    kind of share the benefit of their -- their work.

12         But the reason that was important was because the

13    Bayrob botnet itself was instructing infected systems to

14    download a cryptocurrency miner and to join that specific Y

10:23:52 15    pool, mining pool.

16    Q.   So he was involved in the use of cryptomining on

17    infected systems?

18    A.   Yes.  He was aware of it.  Whether he was writing the

19    code or not -- I don't think he was writing the code.

10:24:05 20         I think he was both aware of the fact that this was

21    what the Bayrob -- one of the revenue channels for the

22    Bayrob Group and was responsible for, you know, potentially

23    checking the status of how things were going as well as the

24    recovery of the money on the other end.

10:24:22 25    Q.   So he was receiving a benefit from the cryptocurrency

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 35 of 163. PageID #: 3673
Case: 1:16-cr-00224-PAG Doc #: 280 Filed: 03/03/20 35 of 163. PageID #: 3221
Macfarlane (Direct by Brown)
35

|  | 1 | mining on infected systems? |
|---|---|---|
|  | 2 | A.   Yes. |
|  | 3 |          MR. GOLDBERG:  Objection. |
|  | 4 |          THE COURT:  Overruled. |
| 10:24:33 | 5 | BY MR. BROWN: |
|  | 6 | Q.   Is that consistent with his behavior on the -- with |
|  | 7 | the eBay fraud? |
|  | 8 | A.   His role within the eBay fraud was that he was -- he |
|  | 9 | was one of the prolific posters of auto auctions within |
| 10:24:45 | 10 | the -- within the eBay fraud period of the Bayrob Group. |
|  | 11 |      So he was -- I think he had posted 947 different eBay |
|  | 12 | auctions that were documented within the Bayrob Group |
|  | 13 | database, and was responsible for the fraud workflow related |
|  | 14 | to those. |
| 10:25:02 | 15 | Q.   And was there ever a time that you observed during |
|  | 16 | your investigation that he withdrew from the conspiracy or |
|  | 17 | was not an active participant in the conspiracy? |
|  | 18 | A.   No. |
|  | 19 | Q.   Was he an active participant the entire time of your |
| 10:25:20 | 20 | investigation? |
|  | 21 | A.   Yes. |
|  | 22 |          MR. BROWN:  Your Honor, I think those are all |
|  | 23 | the questions I have at this time.  Thank you. |
|  | 24 |          THE COURT:  Mr. Goldberg. |
| 10:25:21 | 25 |          MR. GOLDBERG:  Thank you, Your Honor. |

Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 36 of 163. PageID #: 3274
Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 36 of 163. PageID #: 3274
Macfarlane (Cross by Goldberg)
36

                    CROSS-EXAMINATION OF G. RYAN MACFARLANE

1

2    BY MR. GOLDBERG:

3    Q.    Good morning, Agent Macfarlane.

4    A.    Good morning.

10:25:31  5    Q.    Special Agent Macfarlane.  I have a few questions.

6    Start with the AlphaBay information that you provided us

7    this morning.

8          AlphaBay, you indicated that FBI shut AlphaBay down at

9    some point, correct?

10:25:42 10    A.    Yes.  It was -- FBI was involved with a larger

11    coalition of law enforcement to shut down AlphaBay.

12    Q.    And where was AlphaBay located?  Where were the

13    criminals operating AlphaBay located?

14    A.    So a number of the criminals that were running

10:25:58 15    AlphaBay are still unknown.  So the one that was arrested

16    was located in Thailand.

17                    THE COURT:  I'm sorry?

18                    THE WITNESS:  Thailand.

19    BY MR. GOLDBERG:

10:26:07 20    Q.    So AlphaBay was a worldwide structure for buying and

21    selling credentials?

22    A.    So AlphaBay was a dark marketplace, a criminal

23    marketplace where you could buy and sell credit card

24    information, account credentials, drugs, guns, fake

10:26:26 25    passports, criminal services, tutorials, hack -- like

1    hacking for hire.  It had a large product set.

2    Q.    And would you agree with me that the credit cards and

3    account credentials that you were able to actually observe

4    the Bayrob Group market through AlphaBay, you aren't able to

10:26:57 5    determine the source of those credentials other than the

6    credentials themselves?

7         In other words, whether they're U.S.-based or

8    European-based, South American-based?

9    A.    No.  We did a number of online buys from the Bayrob

10:27:14 10   Group's AlphaBay vendor store and we were able to, using our

11   online covert employees, buy a number of credit cards.

12        We would then take those credit cards and I would run

13   those back through the databases that I had from the search

14   warrants and I could see that those cards were in there and

10:27:33 15   then I could run that back to the specific infected system

16   that those cards were stolen from.

17        So we did run a number of purchases through there and

18   then we also did buy a number of computer systems as proxies

19   as well and I could confirm that those systems were also in

10:27:52 20   the Bayrob Group database.

21   Q.    But in terms of where the victims of those thefts were

22   located, could you determine whether they were U.S.-based or

23   in some other country or some other continent?

24   A.    We specifically bought some Ohio-based victims so that

10:28:12 25   we would have the ability to talk to those victims and also

1    know that they were here in the Northern District of Ohio.

2    Q.    Okay.  So aside from what you purchased, you indicated

3    you can determine a number of the AlphaBay transactions

4    based on the ratings that were available for the Bayrob

10:28:37  5    Group as a seller, and you said numbers of transactions.

6         You don't have -- you don't have a dollar amount to go

7    with those transactions, correct?

8    A.    That would be within the database.

9    Q.    And -- but you can't state it here today?

10:28:51 10    A.    Yeah.  I don't have that number.

11    Q.    You can't state the number of account credentials that

12    were actually marketed on AlphaBay that you observed here

13    today?

14    A.    So -- well, for the account credentials specifically,

10:29:05 15    the account credentials were not on AlphaBay.

16         The credit cards and the systems to be used as proxies

17    were on AlphaBay.

18    Q.    Okay.  So when I say "account credentials," I'm

19    lumping everything together.

10:29:16 20         But, okay.  Specific to credit cards numbers, can you

21    give a number associated with AlphaBay transactions that you

22    personally observed in the materials?

23    A.    So I don't have the exact number for you.  I knew that

24    that number was somewhere within the -- like 1500 to 2,000

10:29:43 25    specific credit cards that were sold based on my review of

Case: 1:16-cr-00824-PAC Doc #: 289-1 Filed: 01/30/23 39 of 163. PageID #: 3257
Case: 1:16-cr-00824-PAC Doc #: 230-1 Filed: 02/03/20 39 of 163. PageID #: 3257
Macfarlane (Cross by Goldberg)
39

1    the databases.

2    Q.    Okay.  But so you're making a gesture.  You're

3    estimating?

4    A.    I am, yes.

10:29:55  5    Q.    You are estimating based on seeing specific

6    transactions that occurred, or looking in the database and

7    seeing specific data that was exchanged for money?

8    A.    So within -- so when we did the search warrants on the

9    last few Bayrob command and control servers, they actually

10:30:15 10    had a separate series of tables that were related to their

11    vendor account on AlphaBay.

12         So they're -- on one of the servers itself, I found

13    the specific store related to their AlphaBay vendor.  So

14    like it was CVV2 land was their vendor account on AlphaBay.

10:30:41 15    I actually found like a CVV2 land dataset on one of the

16    command and control servers.

17         And what they were doing is they were actually

18    tracking what they had sold over that store.

19    Q.    Sold in terms of actual account numbers or what they

10:31:03 20    had sold in terms of actual revenue?

21    A.    The credit cards that they had sold over that store.

22    And I believe they were actually tracking when specifically

23    it had sold and then what it had sold for.

24    Q.    Okay.  So you can give us a number then as to the

10:31:23 25    revenue that was generated from selling these credentials,

Case: 1:16-cr-00824-PAG Doc #: 289-1 Filed: 01/30/23 40 of 163. PageID #: 3678
Case: 1:16-cr-00824-PAG Doc #: 289-1 Filed: 02/03/20 40 of 163. PageID #: 3226
**Macfarlane (Cross by Goldberg)**
40

```
          1    account numbers on AlphaBay?

          2    A.   I could do that.  I could aggregate that data.  Yes.

          3    Q.   So what do you -- what is that number?

          4    A.   I haven't done that.

10:31:37  5    Q.   Okay.  So but you said there were about 20-, 2,500?

          6    A.   It was -- it was somewhere within the 15 to 2,000

          7    range, if I remember correctly.

          8    Q.   Okay.  1,500 to 2,000, and you indicated at 5.99 to

          9    $36 apiece?

10:31:52 10    A.   Yes.

         11    Q.   I can't do the math of that.  But that would have been

         12    the money that was derived by the defendants in this case or

         13    by the criminal conspiracy related to the AlphaBay sales?

         14    A.   That's correct.

10:32:07 15    Q.   Okay.

         16    A.   Well, let me -- let me qualify that.

         17         So that would be the -- it would depend a little bit

         18    on how they were doing business.

         19         So that was what they were tracking and I'm not

10:32:23 20    sure -- so there's a couple of different things that we see

         21    happen over AlphaBay, which is usually cyber criminals will

         22    do business over AlphaBay with individuals, other cyber

         23    criminals for a while, and then once they are -- once they

         24    are comfortable with that individual, they will sometimes

10:32:42 25    move off of AlphaBay for transactions.
```

1        So --

2   Q.   But now you're speculating.

3   A.   Well, this is based on other cases that I've seen.

4   It's very consistent, because then you don't have to pay

10:32:55   5   AlphaBay a percentage of your sales.  It's more cost

6   effective.

7        So a number of -- it's pretty common practice within

8   dark market vendors to go off, you know, like off of

9   AlphaBay for transactions.

10:33:09  10  Q.   Again, you're speculating as regards to the Bayrob

11  Group, though?

12  A.   Yes, and I don't know whether they did that here or

13  not --

14  Q.   Okay.

10:33:17  15  A.   -- but --

16  Q.   So I wasn't texting when I was using my phone just

17  now.  I just did a quick math.  5.99 times 1,500 is 8,985.

18       Any reason to disagree with that?

19  A.   I believe your math.

10:33:28  20  Q.   Okay.  And if we took the 2,000 times 36, which is

21  your high-end number, I get 72,000 total.

22  A.   Okay.

23  Q.   Somewhere between 9,000 and 72,000 for AlphaBay

24  activity.  And you would agree with me that you just

10:33:50  25  testified -- obviously, you just testified that eBay fraud

1    was -- could have been somewhere up to $30 million?

2    A.    That's correct.

3    Q.    Okay.  All right.

4         The AlphaBay fraud time frame, were you able to

10:34:05  5    determine what that was in examining these databases and

6    servers?

7    A.    I could tell you.  And I apologize.  I don't remember

8    exactly when -- because the AlphaBay vendor profile will

9    actually, like, have when that vendor started on AlphaBay.

10:34:25 10    I want to say they opened up that account in 2016.

11    Q.    Okay.  And by that time, the eBay portion of -- of the

12    Bayrob Group activity was winded down?

13    A.    It was -- it had stopped.

14    Q.    It had stopped?

10:34:41 15    A.    It had stopped, yes.

16    Q.    Okay.  And you also mentioned you're relying somewhat

17    on the reviews by other people on -- that used them as a

18    vendor, used the Bayrob Group as a vendor on AlphaBay?

19    A.    You can see the reviews of every transaction that

10:35:00 20    they've done where somebody has left like a -- has rated

21    them and left a review.  So --

22    Q.    Is there -- is there any difference on how you leave a

23    review on AlphaBay as opposed to eBay?

24    A.    Other than the content of the review?

10:35:18 25    Q.    Right.

```
          1    A.     No.  It's a very -- very similar process.

          2    Q.     Okay.  So you would agree with me that part of the

          3    eBay scheme that we've heard was the creation of false

          4    reviews by eBay, by the Bayrob Group in order to lull

10:35:33  5    various victims and other people that were observing these

          6    buyers and sellers, correct?

          7    A.     Yes.

          8    Q.     So based on this same group doing that activity,

          9    which, I think, was proven at trial, you could assume or at

10:35:51 10    least would it be reasonable for me to say that some of

         11    these or all of these reviews could have been fabricated by

         12    the Bayrob Group to make them look more attractive as a

         13    vendor on AlphaBay?

         14    A.     No.  Because there's a significant technical

10:36:04 15    difference that I think --

         16    Q.     Well, that's what I was asking before.

         17    A.     So -- yeah.  So the -- if you were to look at the

         18    reviews that were related to the eBay accounts that were

         19    operated by the Bayrob Group, that was -- those reviews were

10:36:22 20    actually -- they were populated because the Bayrob Group

         21    could have control over that system and could control how

         22    that system viewed the eBay website.  So they were injecting

         23    those reviews --

         24    Q.     Understood.

10:36:39 25    A.     -- into that eBay session.
```

Case 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 44 of 163. PageID #: 3302
Case: 1:16-cr-00324-PAG Doc #: 230-1 Filed: 02/03/20 44 of 163. PageID #: 3302
**Macfarlane (Cross by Goldberg)**
44

1      When I view the AlphaBay reviews and the page related

2    to that vendor, what I'm viewing is I'm viewing those

3    reviews that were left on the AlphaBay site itself.

4    Q.    Okay.  Fair enough.

10:36:56  5      So the long and short of it is, the injection of a

6    review is different from -- you know that you're not viewing

7    an injected review on AlphaBay?

8    A.    I would assume my system was not compromised in

9    showing me, you know, fabricated AlphaBay reviews for this

10:37:16 10    vendor.

11    Q.    Just one more question on this.

12      Do you know that the Bayrob Group used fabricated

13    reviews in other parts of their activity, correct?

14    A.    Correct.

10:37:27 15    Q.    And you don't know whether or not any or all of the

16    AlphaBay reviews for the Bayrob vendor were

17    legitimate -- were genuine or not, do you?

18    A.    I would assess that those reviews were legitimate

19    based on my understanding of AlphaBay, based on we -- our

10:37:51 20    seizing of that server.

21      So although this is a different case, we have some of

22    the back end database information for the AlphaBay servers,

23    so we can see the activity behind that.

24      And I was able to confirm with the case agents that

10:38:10 25    had the AlphaBay case, that, you know, CVV2 land was on that

1    and that their -- the data was in the AlphaBay server and it

2    was consistent with the other data that was there.

3          I have no indication that those were injected or -- or

4    created falsely in any way, nor has that arisen in the

10:38:33  5    AlphaBay case, to my knowledge.

6    Q.    Okay.  I'm going to move off of that and go to

7    something else.

8          Toward the beginning of your testimony in estimating

9    the loss from eBay, a portion of this fraud, you said that

10:38:49 10    you compared IC3 reports and extrapolated out a number from

11    those, correct?

12    A.    So I compared -- what we did is we identified IC3

13    complaints that were tied to the Bayrob Group's activity and

14    then we aggregated that loss amount.

10:39:10 15    Q.    Okay.  But those are reports -- those victims in those

16    reports, they weren't each interviewed, the circumstances

17    weren't verified.  These are just reports that were filed

18    online, correct?

19    A.    Some of the reports were just filed online.  Some of

10:39:26 20    those reports, we actually did reach out and interview those

21    individuals and some of those -- some of those individuals

22    testified at trial.

23    Q.    Correct.  And have you seen all the victim impact

24    statements that were provided to the probation department

10:39:38 25    and to the defense as part of the -- as part of the

1    sentencing portion of this case?

2    A.    I believe I've reviewed a large portion of them, yes.

3    Q.    Okay.  And you would agree with me that the -- at

4    least the victim impact statements total amount of loss --

10:39:53  5    my math could be off on this too -- is about $550,000,

6    correct?

7    A.    Yeah.  I don't -- I don't have that number in front of

8    me, but I believe you, yes.

9    Q.    So now turning your attention to Bogdan Antonovich,

10:40:11 10    who was the European money mule master who was a cooperating

11    witness in this case, correct?

12    A.    Correct.

13    Q.    And he had proffered and given information to the

14    Government about his activities in Europe in getting the

10:40:23 15    funds that were wired by the transfer agents in the

16    United States to Europe in order to be provided back to the

17    defendants, correct?

18    A.    Correct.

19    Q.    And the amount of funds that were transferred in that

10:40:34 20    manner was totalled out to be somewhere in the area of

21    $1.1 million over the course of the eBay portion of this

22    scheme, correct?

23    A.    I believe that was what he testified to, yes.

24    Q.    The $1.1 million is what we know was sent overseas,

10:40:53 25    correct?

A.   Correct.

Q.   And --

A.   Well, no.  Let me.

$1.1 million is not what I knew was sent over overseas.  That was what he was responsible for, based on his testimony.

Q.   Well, do you have any evidence that there was any other European money mule that would have obtained funds on behalf of eBay on the Bayrob Group?

A.   Antonovich was not their only money mule.

Q.   Well, who else did this activity?

A.   There were other individuals that were related to money muling.

Q.   And do you have numbers related to their -- dollar numbers related to their activity?

A.   I don't, because they were not forthcoming with that information.

Q.   Okay.  So if we had a number -- the only evidence that we have of money actually wired overseas came from Antonovich, and that was 1.1 million, in terms of a total amount?

A.   For Antonovich's part --

Q.   Correct.

A.   -- we identified through Western Union as well --

Q.   Right.

1    A.    -- additional wire transfers and through IC3

2    complaints, additional wire transfers, but we believe that

3    his role in the money muling was over a million dollars.

4    Q.    I mean, going back to his role, you did go back and

10:42:14 5    look at the Western Union activity that he pointed out that

6    he was involved in, right?

7    A.    We had the Western Union records for -- yeah, for

8    everything that we could identify related to a wire for

9    Bayrob.

10:42:27 10    Q.    So you had no reason to believe after that part of the

11    investigation that the 1.1 million number is far off?

12    A.    For Antonovich?

13    Q.    Correct.

14    A.    I think that would be -- essentially, yes, I believe

10:42:41 15    that may be an accurate number for what he was responsible

16    for.

17    Q.    And with regard to use of credit cards, you said there

18    were about 800 that you found on the servers that were

19    actually used for infrastructure purposes?

10:42:58 20    A.    Correct.

21    Q.    And you said that Danet told you there were 500 but

22    you found that there were about 800?

23    A.    That's correct.

24    Q.    He underestimated or lied, one of the two?

10:43:08 25    A.    What he recalled was there were 500.

1    Q.    My recollection of the testimony in trial was that

2    there was about 100 -- in the neighborhood of $100,000 total

3    used for infrastructure purposes from stolen credit card

4    numbers.

10:43:26    5        Would that be your understanding?

6    A.    I don't believe that we did that calculation.

7    Q.    Okay.  So you don't have a number of -- from those 800

8    credit cards that were located by you as stolen, you don't

9    have a number of how much was actually spent?

10:43:45  10    A.    No.  We did not -- we did not calculate how much was

11    spent on those cards.

12    Q.    Okay.  With regard to the Cc 10000 database, you

13    indicate you were able to open and observe that database?

14    A.    I was, yes.

10:44:05  15    Q.    And it was -- was it a -- did it have addresses

16    associated with credit card numbers and personal -- other

17    personal information?

18    A.    Yes.  It had a very full dataset for each credit card

19    number.

10:44:20  20    Q.    And those -- do we have a time frame as to when those

21    were -- let me ask you this.

22        Do we know when they were harvested?  What country

23    they were harvested from?  Who harvested them, and how they

24    got onto the server?

10:44:37  25    A.    For the time frame question, if I am recalling

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 50 of 163. PageID #: 3688

1    correctly, I believe those cards were in the 2012 to 2014

2    range, when observing the expiration dates of those cards,

3    that's on recollection, and I apologize for not being able

4    to say for sure that's the case, but that's what I recall.

10:45:11  5         As far as the location of those cards, I remember

6    seeing locations across the world to include the U.S.,

7    within that dataset. My assessment of how that data was

8    arrived on to that server was that it was transferred onto

9    that server, and that's based on the fact it was an archive

10:45:43  10  as opposed to within the database or within another location

11   that was actually being actively processed by the Bayrob

12   Group.

13   Q.   Let me follow up on that. So, in other words, you

14   don't have evidence that Bayrob's group's activity actually

10:46:00  15  harvested those numbers but rather they were stored in a

16   file on one of the command control servers?

17   A.   I don't think that the Bayrob Group harvested those

18   credit card numbers. I think they were in possession of

19   them and based on the format, I believe it was moved from

10:46:18  20  another location.

21   Q.   Okay. And when did you -- do you have an idea -- what

22   year did you actually locate that database?

23   A.   So that would have been in the 2013, 2014 time frame.

24   Q.   Okay. And were you able to ascertain whether or not

10:46:43  25  any of those credit cards were ever used by Bayrob Group in

1        any part of their criminal scheme?

2        A.     I was not, no.

3        Q.     And would you agree that -- I think your testimony was

4        that by 2014 they were all expired?

10:46:56  5      A.     As I said, I think it was a historic dataset of credit

6        card information acquired from another location.

7        Q.     Okay.

8                      MR. GOLDBERG:  I have nothing further.  Thank

9        you.

10:47:29 10                     THE COURT:  Mr. O'Shea.

11                      MR. O'SHEA:  Thank you.

12                      CROSS-EXAMINATION OF G. RYAN MACFARLANE

13       BY MR. O'SHEA:

14       Q.     Good morning, Agent Macfarlane.

10:47:44 15      A.     Good morning.

16       Q.     Now, as a preliminary matter, you're aware from your

17       knowledge of how the sentencing guidelines work, sir, that a

18       good portion of the sentence that these gentlemen, including

19       but not limited to my client, will depend on what the Court

10:48:01 20      comes up with as far as a loss, right?

21       A.     That's correct.

22                      MR. BROWN:  Objection.

23                      THE COURT:  Overruled.

24              Again, folks, I'm going to remind everybody, it's not

10:48:12 25      trial.

1          MR. O'SHEA:  Understood.

2     BY MR. O'SHEA:

3     Q.    So you're here today to assist the Court, your

4     understanding, in trying to figure out what the loss amount

10:48:22 5    is, right?

6     A.    I am, yes.

7     Q.    Okay.  And you agree with me that the loss amount that

8     you assert on behalf of the federal government has to be, to

9     some degree, reasonably accurate.

10:48:33 10        Am I right about that, sir?

11    A.    Yes.

12    Q.    Okay.  Now, I read a presentence investigation report

13    back in July where the Government asserted a loss amount

14    according to, at least to the probation department, of 3.5

10:48:48 15   to $4.5 million.

16        Are you aware of that?

17    A.    I am.

18    Q.    And then we have another one that comes out in

19    September, and that loss jumps somewhat exponentially to 9.5

10:49:02 20   to 25 million bucks, right?

21    A.    I believe that was what it was in the last sentencing.

22    Q.    Do you have any idea about why in July it was 3.5 and

23    now it's -- to 4.5 and how it jumped up in September to 9.5

24    to 25 million bucks?

10:49:22 25        Do you have any idea how that happened?

1    A.    Well, I believe the initial sentencing document was

2    based off the indictment, and the numbers that we used for

3    the indictment were very conservative because we wanted to

4    be responsible, and it was what we could -- we could

10:49:35  5    effectively prove in court.

6        And the initial numbers came primarily from the eBay

7    portion of the Bayrob Group's activity alone.  And the

8    additional losses are based on a more total look at what

9    they were doing is my understanding based on the

10:49:58 10    conversations and the data that I provided back to the U.S.

11    Attorney's Office.

12    Q.    Because a big jump is in large part based upon this

13    credit card business.

14        Am I right about that?

10:50:08 15    A.    Correct.

16    Q.    Okay.  That leads me -- and I think you indicated on

17    direct examination that what you're giving us here today is

18    just sort of an -- to use your words -- an estimate.

19        Am I right about that?

10:50:21 20    A.    It is.

21    Q.    All right.  And that includes whether or not this

22    database is accurate or not.

23        Am I right about that?

24    A.    The database is one of the core data sources, yes.

10:50:31 25    Q.    Okay.  But you're just assuming that the database is

1    accurate, right?

2         Is that fair?

3    A.    Based on my review of the database, I am assuming that

4    the data within it is the data within it, yes.

10:50:43   5    Q.    Okay.  All right.  Now, I think Mr. Goldberg went into

6    this a little bit, too.

7         There wasn't much follow-up that the federal

8    government did as it relates to this database and this

9    credit card business, notwithstanding the fact that this was

10:50:56  10    a ten-year investigation by my estimate, to find out whether

11    or not any loss whatsoever had been incurred by anyone or

12    any credit card number in that database, right?

13    A.    I would disagree with that.

14    Q.    Okay.  Let me ask you this:  In your years as an FBI

10:51:17  15    agent with this credit card fraud and financial fraud stuff,

16    you're aware of the Truth in Lending Act and how it protects

17    consumers from losses and the Federal Fair Credit Billing

18    Act?

19         You're aware of how that works, right?

10:51:32  20    A.    I would say I am.

21                   MR. BROWN:  Objection, Your Honor.

22                   THE COURT:  Overruled.

23         I'm not sure where you're going with this, but for

24    now, I'll overrule it.

10:51:43  25                   MR. O'SHEA:  All right.

Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 02/30/23 55 of 163. PageID #: 3493

1        THE WITNESS:  Generally --

2        THE COURT:  It's not relevant.

3        THE WITNESS:  Generally, yes.

4   BY MR. O'SHEA:

10:51:48  5   Q.   All right.  Now, you're aware, for instance, if

6   somebody suffers -- you've seen this.  If somebody suffers a

7   credit card loss, they notify the credit card company within

8   a certain period of time, and they have to reverse the

9   charges so that the consumer has no loss.

10:51:58 10       Am I right about that?

11  A.   Depending on how you -- yeah.  From a financial

12  standpoint, if you catch those transactions, yes, and you go

13  to your credit card company, they will --

14  Q.   They have to reverse it, right?

10:52:12 15  A.   If you say so, they do.  I'm not sure that they have

16  to.  But, yes, they traditionally do.

17        MR. BROWN:  I'm going to object to this.  This

18  is also getting into --

19  BY MR. O'SHEA:

10:52:22 20  Q.   All right.  Let me follow up with another question.

21       Did you, during the course of preparing for today or

22  during this investigation, ever identify any of these people

23  in this database, these credit card numbers, whether anybody

24  had ever suffered an actual loss or had attempted to get any

10:52:44 25  type of restitution through these processes to have any loss

1    at all, sir?

2                 MR. BROWN:  Objection, Your Honor.  That's

3    irrelevant to the calculation of loss amount.

4                 MR. O'SHEA:  Well, I don't know about that,

10:52:55  5    Judge.  I --

6                 THE COURT:  Well, I do and I agree.

7                 MR. O'SHEA:  Okay.  All right.

8    BY MR. O'SHEA:

9    Q.    Well, let me ask you this:  You don't know whether or

10:53:05 10   not any of those persons who are listed to those credit card

11   numbers, with some exceptions, I guess, ever suffered a loss

12   at all.

13        Am I right?

14                MR. BROWN:  Objection again, Your Honor.

10:53:18 15               THE COURT:  I'm not sure this is relevant, but

16   because it's the nature of this hearing; it's not trial,

17   it's sentencing.

18        Can you answer that, sir?

19                THE WITNESS:  Sure.

10:53:29 20       We did talk to victims that we identified through

21   credit card -- so, for example, I'll give you a very

22   concrete example.

23        One of the guys that was used to pay for the -- one of

24   the command and control servers at DreamHost, I reached out

10:53:45 25   to that individual and I talked to him, and he was not aware

Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 57 of 163. PageID #: 3295

1    that his card was being used for DreamHost.

2         So, you know, depending on how closely you follow your

3    credit card bill, you can miss a 39 or $49 charge.  And he

4    had been paying his credit card bill.

10:54:03  5         I'm assuming that he went back to his bank and said,

6    Hey, listen.  My credit card has been compromised.  But if I

7    hadn't reached out to him and said, Hey, listen, you know,

8    are you currently running a server at DreamHost, and he

9    said, No, I'm not, and I said, You need to check your credit

10:54:21 10   card bill because you're getting charged for it, he would

11   have continued to pay his credit card bill.

12   BY MR. O'SHEA:

13   Q.    Follow up.  Two questions:  One, that's one person you

14   identified, and two, you used the word "if," if, but you're

10:54:34 15   not sure, absent your intervention, whether he would have

16   suffered any loss at all, right?

17   A.    I think he would have continued to pay his credit card

18   bill and suffered loss.  I'm not sure if he would have

19   caught it or not.  I don't know.  And so there's a lot of

10:54:51 20   ifs there.

21   Q.    You're not willing to concede this morning that part

22   of your loss that you're trying to assert here involves

23   speculation?

24                MR. BROWN:  Your Honor, objection to the --

10:55:02 25                THE COURT:  Sustained.

Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 58 of 163. PageID #: 3296

1          MR. O'SHEA:  Let me move on.

2    BY MR. O'SHEA:

3    Q.    Now, I think one of the questions that Mr. Brown asked

4    you at the conclusion of the direct examination was, was

10:55:15  5    Mr. Miclaus aware of what was going on.

6          Do you remember that question?

7    A.    Yes.

8    Q.    Okay.  Now, there were a bunch of people that

9    testified in this case, I'll call them collectively these

10:55:25 10    Romanian witnesses that you flew over here during trial, and

11    Mr. Danet.

12          They were more than just aware of what was going on,

13    right?

14    A.    Yes, they were involved.

10:55:36 15    Q.    Okay.  And you're not aware, yourself, sir, of whether

16    or not Mr. Miclaus was writing any code.

17          I think that was one of the questions that Mr. Brown

18    brought up, right?

19    A.    I don't -- I don't have any code that I can

10:55:55 20    specifically attribute to Miclaus, no.

21    Q.    Okay.  And the nickname that Mr. Nicolescu gave

22    himself was what?

23    A.    MasterFraud.

24          MR. O'SHEA:  Okay.  Nothing further, Judge.

10:56:21 25          THE COURT:  Mr. Brown.

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 59 of 163. PageID #: 3397
Case: 1:16-cr-00224-PAG Doc #: 230-1 Filed: 02/03/20 59 of 163. PageID #: 3495

59

                              1          MR. BROWN:  Yes, Your Honor, I don't have any

                              2   further questions.  I think everything has been asked and

                              3   answered that we need for close.

                              4          THE COURT:  You may step down, sir.

         10:56:56    5      On behalf of the Government are there any other

                              6   witnesses?

                              7          MR. BROWN:  No, Your Honor.

                              8          THE COURT:  I'm assuming no witnesses,

                              9   Mr. Goldberg?

         10:57:01   10          MR. GOLDBERG:  That is correct, Your Honor.

                             11          THE COURT:  And Mr. O'Shea.

                             12          MR. O'SHEA:  Correct, Your Honor.

                             13          THE COURT:  Why don't we take a very short

                             14   recess then.

         10:57:07   15                         - - -

                             16      (Proceedings in recess at 10:57 a.m. )

                             17          THE COURT:  Please be seated.

                             18      In that the loss issue is common to both defendants, I

                             19   will hear from everyone on this issue.

         11:17:00   20      Following the loss issue, I will simply go over the

                             21   objections by Mr. Nicolescu, and after we have resolved

                             22   those, I will then go over the objections of Mr. Miclaus,

                             23   certainly understanding that there might be some

                             24   overlapping.

         11:17:17   25      But let's address the loss issue as to both defendants

Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 60 of 163. PageID #: 6308
Case: 1:16-cr-00324-PAG Doc #: 230-1 Filed: 02/03/23 60 of 163. PageID #: 3248

60

1    at the outset.

2        Any objection to that?

3            MR. GOLDBERG:  No, Your Honor.

4            MR. BROWN:  No, Your Honor.

11:17:29  5            MR. O'SHEA:  No, Your Honor.

6            THE COURT:  All right.  Because the Government

7    is objecting to the additional 20 levels, as well as the

8    defendants, I'm going to call on you first, Mr. Brown --

9            MR. BROWN:  Okay.

11:17:45 10            THE COURT:  -- to address the loss issue.

11            MR. BROWN:  Thank you.  And this is just loss?

12            THE COURT:  Just loss.

13            MR. BROWN:  The other 18 pages will come

14    later.

11:17:54 15        Your Honor, thank you very much.

16        The constant theme -- and although we're just talking

17    about loss right now, but the constant theme here is really

18    not just the sentencing guidelines in a vacuum, but the

19    sentencing guidelines sort of hand in hand with the 3553

11:18:13 20    considerations.

21        Because unlike many sentencings, the 3553(a) can be

22    imposed very needfully on the sentencing guidelines as we go

23    through step by step, rather than just at the end as a

24    whole.

11:18:29 25        Because with the length and complexity and

Case: 1:16-cr-00224-PAG Doc #: 239-1 Filed: 01/30/23 61 of 163. PageID #: 3299
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 61 of 163. PageID #: 3249

61

1    sophistication and the evolution of this scheme, those

2    considerations should be compared with the guidelines at

3    every step.

4         This isn't just a code.  This isn't just 7 plus 20

11:18:49  5    plus whatever, whatever, and you get a number and then you

6    move on to the -- there is sort of a conversation between

7    the needs of justice and the guidelines as they're set out.

8         And, you know, that is what is the idea of the system

9    of justice.  It's not just mathematics, it's a system.

11:19:06 10        And it's especially important because --

11             THE COURT:  But we get to that after we come

12    up with --

13             MR. BROWN:  Absolutely.  Right.

14             THE COURT:  It's my obligation to make a

11:19:16 15    determination of what the appropriate numbers are.

16             MR. BROWN:  Right.  And --

17             THE COURT:  And then only after that do I take

18    a look at the full picture to determine in the interest of

19    justice what the appropriate sentence is.

11:19:27 20        So, unfortunately, I need to go through this exercise.

21             MR. BROWN:  No, and I'm not asking you to not

22    do that.

23         I'm saying that as the Government went through this,

24    and all of our arguments are, we're looking at based on the

11:19:41 25    behavior, the defendants, based on what they did and what

Case: 11-16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 62 of 163. PageID #: 3640
Case: 1:16-cr-00324-PAG Doc #: 230 Filed: 02/03/23 62 of 163. PageID #: 3240

62

1    they were planning to do and able to do, they're facing very

2    severe justice, and deservedly so.

3         But -- so we'll go right into the loss amount, which

4    is what Special Agent Macfarlane -- yeah.

11:20:00   5              THE COURT:  Please confine your comments for

6    now to whether I should add 16 to the 7 or 18 to the 7.

7              MR. BROWN:  Yes.  And, Your Honor, the

8    Government would argue it's 18.  And 18, if anything, it is

9    the definite number, loss amount number that the Government

11:20:21  10   could prove.

11        You know, the 3.5 to 4.5 million in eBay loss the

12   Government contends is well supported, if not, again,

13   under-representative of the actual loss of 100 percent of

14   the victims.

11:20:33  15        But of the one third who could be tied to database

16   numbers and IC3 complaints, as Special Agent Macfarlane just

17   testified to, that 3.5 to 4.5 million number is very

18   demonstrable, it's very concrete, it's very provable.

19        The Government's -- since Mr. O'Shea brought it up,

11:20:52  20   the Government's additional numbers were based on, quite

21   appropriately so, intended loss and also other investigative

22   techniques.

23        The Government would point out that that 10,000 card

24   table, setting aside the 500 to 800 cards that were actually

11:21:06  25   seen in the database, and the Government would conclude that

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 63 of 163. PageID #: 3640
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 63 of 163. PageID #: 3240

63

1    the database is not floating in the ether or somewhere on

2    the Internet.

3        The database was taken from the command and control

4    server.  The command and control server was the domain of

11:21:20  5    the defendants.  The numbers that were created and existed

6    on that database were created and maintained by the

7    defendants.

8        If -- it was not a database created by Special Agent

9    Macfarlane.  It was not a database created by the users of

11:21:37  10   Facebook who were looking at the evidence.

11       Those were the defendants's numbers.  They possessed

12   those credit card numbers, they possessed the information on

13   that database.  That's accurate.

14       That's why Special Agent Macfarlane could say these

11:21:49  15   10,000 cards were in the possession of the defendant.

16       And to argue about the speculative value of those

17   numbers, the guidelines has a solution for that, which is if

18   you cannot find the value of a credit card, you say it's

19   worth $500.

11:22:05  20       So if you look at just that 10,000 -- set aside eBay.

21   If you look at that 10,000, putting aside the thousand that

22   Danet or Special Agent Macfarlane observed -- and that's,

23   again, being conservative and generous, a thousand -- that

24   9,000 times 500 is 4.5 million.

11:22:22  25       So you have 3.5 plus potentially 5.5, we're well

                1   within that 18 range.

                2        The reason eBay was discussed, too, Your Honor, and

                3   why we felt comfortable in our brief writing 20 but were

                4   also willing to argue 18 -- and this is going back to my

11:22:40        5   preamble -- is AlphaBay is the crowning achievement of what

                6   we knew about the Bayrob Group at time of arrest.

                7        This is what they were evolving into, which was big

                8   data mining to exploit over time and over victim multiple

                9   credentials, credit card information, and other data that

11:22:59       10   they could go back to a victim multiple times and get

               11   credentials to sell, which enriches them.

               12        But then also to use maybe for their support system or

               13   when we're assigning loss -- and this is where it is

               14   speculative, but not impermissibly so -- if you sell a

11:23:18       15   credit card for $50 on AlphaBay, that's a loss of $50.

               16        However, that credit card still is being exploited.

               17   That could be another $500.  That could be another loss

               18   amount.

               19        And instead of -- you know, quite frankly, the loss

11:23:34       20   amount calculations could get grotesque.  It's a very crude

               21   method of really framing the harm of the loss.

               22        Because dollar loss is a loss but there's also a great

               23   harm with what they evolved into.

               24        So 18 is the Government's argument.  Very fair and

11:23:53       25   indicative of provable numbers but also, when you take a

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 65 of 163. PageID #: 3603
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 65 of 163. PageID #: 3293

65

```
  1    step back and look at that 18, it shows a continuing and

  2    evolving harm that will be addressed further in the

  3    guidelines and also in our argument.

  4        Thank you.

  5        THE COURT:  Mr. Goldberg.

  6        MR. GOLDBERG:  Thank you, Your Honor.

  7        Very briefly, because I did address this in my

  8    sentencing memoranda --

  9        THE COURT:  And I want to assure everyone I

 10    have read everything submitted in great detail multiple

 11    times.

 12        So go ahead.

 13        MR. GOLDBERG:  But I will point to the

 14    testimony we heard this morning from Special Agent

 15    Macfarlane.  We have a documented actual transfer of funds,

 16    which I believe is the most accurate loss, one of the most

 17    accurate loss indicators and something that should be given

 18    great weight, of 1.1 million being transferred to the

 19    defendants in Europe from the eBay scam portion of this

 20    scheme.

 21        You know, to say there were other money mules, we

 22    don't have numbers for them and we don't know what it is.

 23    Instead of speculating and saying, well, you know, we saw

 24    all of these different transactions online and extrapolating

 25    information from the referral forms to the FBI, let's look
```

11:24:07 (line 5)
11:24:17 (line 10)
11:24:27 (line 15)
11:24:52 (line 20)
11:25:11 (line 25)

Case: 1:16-cr-00824-PAG Doc #: 289-1 Filed: 02/30/23 66 of 163. PageID #: 3604
Case: 1:16-cr-00824-PAG Doc #: 230 Filed: 02/03/23 66 of 163. PageID #: 3254

66

1    at what we really have.

2         We have Sergeant Macfarlane -- Agent Macfarlane saying

3    1.1 million was the number.  We have the victim impact

4    statements that come up with about 550,000 of that

11:25:33  5    1.1 million.

6         So there will be a difference between the victims that

7    come forward and the actual amount of money.  So that's 1.1

8    million.

9         We add to that about $100,000 -- and I believe that

11:25:46 10    this was testified to at trial -- in the use of those 800

11    credit cards to fund infrastructure.  That would be an

12    amount that would be added to the 1.1 million and that would

13    be 1.2 million.

14         And then as we heard Special Agent Macfarlane also

11:26:05 15    testify, the AlphaBay loss, that is, the money realized from

16    that activity, was somewhere in the amount of 72,000 at

17    most, and that comes into place in a different part of my

18    argument.

19         But if you used -- if you add that, that's

11:26:30 20    1.27 million.

21         And then if you add in -- even if you replace that

22    number with $500 per card for the 800 or so credit cards

23    actually used in the scheme, we had 400,000.

24         So that comes out to a total of well under $2 million,

11:26:50 25    Your Honor, which is why we are arguing that the loss amount

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 67 of 163. PageID #: 6405
Case: 1:16-cr-00224-PAG Doc #: 230-1 Filed: 02/03/23 67 of 163. PageID #: 3253

67

1    should be placed in the 16 point range under subsection --

2    well, 2B1.1(b)(1)(i).  More than 1.5 million, but under

3    3.5 million.

4         I would just point out, as I have in the brief, that

11:27:11  5    there is a lot of speculation about the nature of the credit

6    card numbers that were on the Cc 10000 database, where they

7    came from.  They were never -- there's never any indication

8    that any of them were ever used.

9         They certainly weren't, according to Agent Macfarlane,

11:27:35 10   they weren't -- harvesting of that information wasn't the

11   result of any activity by the Bayrob Group.  And to just

12   throw those 10,000 card numbers in at $500 apiece, I think,

13   is speculative.

14        So while the Government gets up and says that, you

11:27:57 15   know, we're going to follow the guidelines, they're making

16   an argument about 3553 factors they start off with, which is

17   what they've done all along.

18        Bogdan Nicolescu is a bad guy, therefore, every

19   inference you could possibly make against them should be

11:28:18 20   made.  That's what the Government just did until the Court

21   stopped it.

22        And that's what I'm asking the Court not to do in

23   determining loss.  The loss that I've suggested accounts for

24   Mr. Nicolescu for the conspiracies activity in whole and I'd

11:28:34 25   ask you to adopt that number, Your Honor.

Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 02/30/23 68 of 163. PageID #: 36406
Case: 1:16-cr-00324-PAG Doc #: 236-1 Filed: 02/03/23 68 of 163. PageID #: 32546

68

1           Thank you.

2                    THE COURT:  Mr. O'Shea.

3                    MR. O'SHEA:  Thank you, Your Honor.  I think

4      I'll be a lot briefer.

11:28:41  5           The loss here, and just limiting our arguments, as I

6      think you want us to, just to the loss amount is so

7      speculative in -- just in the context of sentencing.  I'm

8      hearing words like, I'm speculating, I'm assuming, I'm

9      estimating.  That's coming from the Government, Your Honor.

11:29:03 10           And let me lay out this analogy for whatever value it

11     has.  If the Government came to a bank and said, we want

12     $2.5 million and we want you to loan us that money based

13     upon this estimation, this type of speculation, they

14     couldn't get a car loan based on this information, Judge,

11:29:22 15     they couldn't get a mortgage and they couldn't even get, to

16     use a word that we used a lot this morning, a credit card

17     account based upon this type of speculation.

18           And this type of speculation is what they want you to

19     use in determining loss as it relates to them.  The burden

11:29:37 20     is on them.  It's not up to Mr. Goldberg, myself, or any of

21     these two gentlemen to tell you what the loss is, Judge.

22     It's up to them.

23           And I'll leave you with this.  I don't think they

24     could get a credit card loan, bank loan, car loan, any loan

11:29:51 25     based upon this level of speculation that they want you to

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 69 of 163. PageID #: 3607
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/20 69 of 163. PageID #: 3259

69

```
11:30:05
11:30:21
11:30:40
11:30:55
11:31:09
```

1    engage in in order to determine loss here.

2                    THE COURT:  Mr. Brown.

3                    MR. BROWN:  Good alphabet, Your Honor.

4                    THE COURT:  I'm sorry?

5                    MR. BROWN:  No, nothing, Your Honor.

6           Your Honor, the loss is not speculative, and we're not

7    just throwing up, casting aspersions because we don't like

8    the defendants.

9           The defendants were found guilty based on evidence

10   presented to the jury of 21 counts of money laundering, wire

11   fraud, aggravated identity theft, wire fraud, counterfeit

12   fraud, and computer fraud.

13          These defendants engaged in a series of behaviors that

14   resulted in both demonstrable and intended losses, and

15   that's what the Government is producing, they're basing

16   their numbers on.

17          The eBay fraud was not just pulled out of the air and

18   the reason that the Government used 3.5 to 4.5 as a base

19   from the very beginning was because at time of indictment,

20   that is what, based on our investigation, the most

21   conservative appropriate -- conservatively appropriate

22   number was.

23          We were not going to issue press releases.  We were

24   not going to prosecute the case initially based on rampant

25   speculation.

Case: 1:16-cr-00824-PAG Doc #: 289-1 Filed: 01/30/23 70 of 163. PageID #: 6408
Case: 1:16-cr-00824-PAG Doc #: 230 Filed: 02/03/23 70 of 163. PageID #: 3250

70

1                 Because of the amount of data we had already found

2          that the defendants had created, and the amount of data that

3          we had received pursuant to court process and also search

4          warrants, at time of arrest, the Government's position was

11:31:24    5      to responsibly and deliberately investigate everything.

6                 So all of those numbers were defensible.  The 3.5 to

7          4.5 is very defensible, as Special Agent Macfarlane spent

8          probably a good five to ten minutes talking about IC3, all

9          of those things, which would be paperwork that any bank in

11:31:44   10      the world would love to see if we're applying for a loan.

11                The increase in numbers with the large number of

12          credit card tables, with the AlphaBay activity, came because

13          when we -- when the Government continued their investigation

14          after time of indictment, that loss -- those numbers

11:32:02   15      supporting that loss amount was discovered within the

16          databases and within the behavior and the ongoing criminal

17          conduct of the defendants.

18                And it is entirely reasonable for the

19          Government -- for the Court to look at intended loss and the

11:32:16   20      type of evidence-based estimation that Special Agent

21          Macfarlane gave today, that it's not just, Well, if they

22          stole 3.5, they're going to steal 10 because 10 is a

23          round -- that wasn't it.

24                It was not only I looked at the IC3s, but then I also

11:32:38   25      went back and I looked at losses within the database.  And

```
 1          it looked to be our known amount was a third of what was in

 2          the databases, which were the defendants' databases.

 3               So it is a reasonable extrapolation.  Say, one third

 4          here, one -- you know, one third to fill out the unknown

 5          there.

 6               But that's why, again, we always start with our base

 7          known number of 3.5 to 4.5 million, and then again we're not

 8          engaging in wild speculation.  I don't think in any of our

 9          briefs we said credentials sold on AlphaBay were sold for X

10          and add on $500 per credential or per credit card bill.

11          That would be speculative.

12               I think the Government could have been done that, but

13          we didn't because we would rather just show that that is

14          really understating the danger to that loss value.

15               Thank you, Your Honor.

16                    THE COURT:  I agree with the Government.

17          Agent Macfarlane's testimony alone satisfies the

18          Government's burden.  The agent testified that looking at

19          eBay loss alone, the conservative number is 3.5 to 4.5.

20               The Court reminds everyone that an 18-level

21          adjustment, which is urged by the Government, the starting

22          point is 3.5 million.

23               So with the eBay loss alone, we are in the 18-level

24          adjustment.

25               Agent Macfarlane testified that the evidence
```

Case: 1:16-cr-00234-PAG Doc #: 289-1 Filed: 02/03/23 72 of 163. PageID #: 3450
Case: 1:16-cr-00234-PAG Doc #: 230 Filed: 02/03/23 72 of 163. PageID #: 3258

72

1    supporting his statement that the conservative eBay loss was

2    between 3.5 and 4.5 is based upon the spreadsheet which

3    Valentine Danet accidentally sent to his brother, Tiberiu.

4         Now, I know that was not specifically in the testimony

11:34:41  5    today, but the Court certainly recalls that that is evidence

6    and I do believe it was in the Government's sentencing

7    memorandum.

8         It's also based upon the IC3 complaints, and Agent

9    Macfarlane testified that those complaints represent about

11:34:58 10    one third of the victims.  And it also comes from the

11    victims' statements.

12        So frankly, the Court doesn't even have to go further

13    beyond the eBay loss.

14        But, of course, we do have the second component, and

11:35:13 15    that being the credit card component, we'll call it.  And

16    Mr. Brown is exactly correct that you take any number of the

17    credit cards and you multiply it by 500.

18        So most certainly we are above that 3.5 threshold.

19    And I feel compelled to comment on what I'm going to call

11:35:43 20    usability.

21        To the extent that either defendant is challenging the

22    fact that there is no evidence that the stolen credit cards

23    resulted in any actual loss to any victim, I reject that

24    argument.

11:35:57 25        The Sixth Circuit has consistently held that there is

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 73 of 163. PageID #: 3641
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/20 73 of 163. PageID #: 3259

73

1    no usability requirement for assessing loss under guideline

2    2B1.1.

3         Therefore, because there's been an agreement not to

4    use the 20-level increase, but to use either the 18 or

11:36:19  5    16-level increase, the Court is, in fact, giving the

6    18-level increase because the Government has met its burden

7    of proof on this issue.

8         The defendants -- both defendants' objection as to the

9    loss is not well taken.

11:36:39 10        So now, Mr. Goldberg, I am going to address your

11    objections that are primarily in your sentencing memorandum

12    and certainly, when I conclude, if there are any other

13    objections that I have missed, I'm sure you will let me

14    know, but I'm taking your most recent ones in your

11:37:07 15    memorandum.

16              MR. GOLDBERG:  Thank you, Your Honor.

17              THE COURT:  Your next objection is in regards

18    to paragraph 49, the two-level increase for business of

19    receiving and selling stolen property.

11:37:37 20        So if you're following along with me, that's on

21    page 13 of the presentence report, and it starts at the top

22    of the page, the first full sentence.

23         Mr. Goldberg, do you wish to be further heard on this

24    issue?

11:37:58 25              MR. GOLDBERG:  Your Honor, I would just ask

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 74 of 163. PageID #: 3462
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 74 of 163. PageID #: 3260

74

1       that the Court consider the fact that the Government has

2       argued for the massive amount of loss attributable to eBay

3       fraud, and then we heard the testimony of Special Agent

4       Macfarlane, who indicated that at most, based on his

11:38:22  5    calculations, the -- well, I'll back up.

6            That at most, the credit card numbers that were

7       contained in the credit card or Cc 10000 database could have

8       been sold for was anywhere between 9,000 and $72,000.

9            So -- and that was the only evidence of funds that

11:38:52 10   were derived from this group from buying and selling stolen

11      credit cards or account information.

12           I think that that guideline enhancement does not say

13      if you just bought and sold.  It's not addressing that.

14      It's if you're in the business of doing it.

11:39:12 15        And I do not believe that we can legitimately and

16      nonspeculatively say that the Bayrob Group was engaged in

17      the business of doing this.  This was something that was an

18      aside when the group transitioned away from one thing they

19      were doing into another sphere.

11:39:34 20        So they weren't in the business of doing this, and I

21      don't think it's properly assessed here.  It wasn't asked

22      for, I don't believe, in the original PSI.  It was added

23      later.  And I don't believe it applies here.

24           And I think it's a little bit akin to criminal

11:39:50 25   livelihood, the kind of inquiry the Court would have to make

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 75 of 163. PageID #: 3613
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 75 of 163. PageID #: 3261

75

           1    in terms of this being the business of -- I see that in drug

           2    cases.  The defendant had no other means of income other

           3    than the criminal livelihood.

           4         In this case, the buying and selling of stolen

11:40:07   5    credentials was clearly not the business that these people

           6    were in.  And for that reason this two-point enhancement

           7    under 2B1.1(b)(2)(A)(i) should not be counted, Your Honor.

           8              THE COURT:  I believe you mean --

           9              MR. GOLDBERG:  I cited the wrong --

11:40:33  10              THE COURT:  2B1.1(b)(4).

          11              MR. GOLDBERG:  Correct, Your Honor.

          12              THE COURT:  All right.  Mr. Brown.

          13              MR. BROWN:  Thank you, Your Honor.

          14         Bogdan Nicolescu dropped out of college.  He didn't

11:40:46  15    have another job.  This -- he was selling things on

          16    AlphaBay, not Etsy.  This is not a hobby or a craft

          17    interest.

          18         He was using the money to buy servers and other

          19    infrastructure devices that supported the Bayrob Group.

11:41:02  20         There is every indication that Nicolescu, Danet, and

          21    Miclaus were in the business of buying and selling stolen

          22    property.

          23         The testimony specifically of Special Agent

          24    Macfarlane -- and I was listening, because I found this

11:41:15  25    interesting, the Government found this interesting.

1          He said that those cards on the table, that 10000 Cc

2      table, were possessed.  He didn't say harvested.

3          And he was asked specifically about harvested

4      from -- he said possessed.  They had to come from somewhere.

11:41:32   5          And then in 2016 they start as -- and again, the

6      testimony, and because words matter -- the vendor on

7      AlphaBay was the Bayrob Group.  They were vendors.  They

8      were selling.  They were -- they were possessing and

9      selling.  They were in the business of selling stolen

11:41:47  10   property.

11          And this, you know, when you think of the RSP, you

12      think of chop shops and engine blocks and VIN numbers.

13          But this is stolen property.  They were going into

14      people's computers, especially now with the web browser that

11:42:05  15   they were starting to install, and stealing property,

16      credentials, things of value, anything of value, which in a

17      cyber world, we have to assign credentials and credit card

18      information and not just tangible things you hold in your

19      hand.

11:42:19  20          It's property that they stole, and then by going onto

21      AlphaBay they were selling those.

22          And more disturbingly, they were also selling proxy

23      service and space on those infected computers.

24          So they weren't just selling the credentials.  They

11:42:34  25   were selling the laptop.  They were selling the hard drive.

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 02/03/23 77 of 163. PageID #: 3615
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 77 of 163. PageID #: 3263

77

1    They were selling the botnets to be used for who knows what

2    type of criminal activity.

3         And because it was AlphaBay, we know it was criminal

4    activity.

11:42:45  5         Thank you, Your Honor.

6              THE COURT:  In determining whether a defendant

7    is in the business of receiving and selling stolen property,

8    I have to look at a non-exhaustive list of factors:

9    Regularity and sophistication of the defendant's activities,

11:43:01 10   the value and size of the inventory of stolen property

11   maintained by the defendant, the extent to which the

12   defendant's activities encouraged or facilitated other

13   crimes, and the defendant's past activities involving stolen

14   property.

11:43:15 15        Here, the defendant -- defendants, but for right now

16   we're speaking of defendant Nicolescu -- operated a

17   long-standing and highly sophisticated scheme.

18        And as a result of the scheme, the Bayrob Group

19   obtained vast amounts of credit card data, which it did, in

11:43:35 20   fact, sell.

21        The participants in this scheme, which has been

22   pointed out by the Government, were unemployed or

23   underemployed.

24        I do, in fact, find that the defendant was in the

11:43:48 25   business of receiving and selling stolen property and the

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 78 of 163. PageID #: 6416
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/20 78 of 163. PageID #: 3264

78

1    adjustment will be applied.

2         And this is so even if the defendant was not initially

3    in the business of buying and selling property.

4         By the end of this scheme, defendant had, in fact,

11:44:06  5    sold credit cards on AlphaBay.  And frankly, Agent

6    Macfarlane's testimony bolsters this Court's position that

7    the adjustment is warranted.

8         So the objection is not well taken.

9         The next objection by defendant Nicolescu is the

11:44:28  10   two-level increase for the -- an offense involving

11   trafficking of unauthorized access devices.

12        Do you wish to be -- you are still maintaining this

13   objection and do you wish to be further heard if the answer

14   is yes?

11:44:44  15           MR. GOLDBERG:  Yes, Your Honor.  And I'll

16   clear up any confusion that I caused, because my original

17   sentencing memorandum, I don't believe, maintained that

18   objection.

19        It said it was objected to at one place and then I

11:44:59  20   listed the objections and that was not one of them.

21        And then I did go back in further review and I

22   specifically, in the memorandum I submitted yesterday to

23   supplement, submitted the language of the guideline relating

24   to the application of the 1029A [sic] identity theft.

11:45:25  25           MR. BROWN:  28.

Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 79 of 163. PageID #: 3457
Case: 1:16-cr-00324-PAG Doc #: 230 Filed: 02/03/20 79 of 163. PageID #: 3265

79

1       MR. GOLDBERG:  -28A, identity theft.  When

2  that is applied, Your Honor, when there's a conviction and

3  there's going to be a sentence, under that provision,

4  Application Note 2 of that guideline provision indicates

11:45:42  5  that the enhancement under 2B1.1(11) [sic] should not be

6  applied.  It's pretty clear on the face of the language.

7       So I do maintain that objection.

8       And I apologize for the -- not noting it in my

9  original memorandum.

11:46:04 10       MR. BROWN:  Thank you, Your Honor.

11       The trafficking and use of authentication features

12  should be applied for a number of reasons.

13       First of all, addressing the 1028A, I think it's

14  2.2.1, those were five aggravated identities.  There were

11:46:21 15  hundreds of other identities used to support the criminal

16  structure.

17       And the application note in the language of that -- or

18  of the guideline chapter says if the 1028A had

19  authentication features for the underlying crimes herein,

11:46:40 20  the indictment would be wire fraud or -- yeah, wire fraud or

21  computer fraud.

22       Those five are a small snapshot of the entire criminal

23  activity.  They should be applied because, again, it

24  demonstrates the harm caused by the theft of authentication

11:47:01 25  features.

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 02/30/23 80 of 163. PageID #: 3658
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 80 of 163. PageID #: 3266

80

1    The use of stolen authentication features and

2    trafficking in those was not limited to the five aggravated

3    identity thefts.

4    And, in fact, those five aggravated identity thefts

11:47:10  5    came at a point in time when additional identities and

6    credentials were being used, which we cited in our brief

7    that it was both credentials and authentication features on

8    eBay and in various -- in other various uses to support the

9    structure and promote the structure of the crime.

11:47:30 10    So we think that the -- the enhancement can coexist

11    with the 1028A convictions, because they're separate and

12    they're of different natures.

13    The 1028As were definite certain people and

14    these -- the offensive behavior contemplated in this

11:47:50 15    enhancement includes all of the other stolen credentials,

16    whether they were active or not active, whether they were

17    proven "good" like on these databases or not, or whether

18    they were just sold to other users.

19    So we think that reading the guideline section for the

11:48:07 20    1028A is -- that narrowly is limiting both the intention or

21    how the 1028A was written.

22    It limits the use and the reason for that enhancement,

23    which is to encompass the larger criminal behavior, and it

24    also severely under-reflects and underreports what that

11:48:30 25    enhancement is reflecting in this case, which is hundreds

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 81 of 163. PageID #: 3619
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 81 of 163. PageID #: 3617

81

           1    and hundreds of authentication features being harvested and

           2    used to support the criminal infrastructure, not just those

           3    five aggravated identity theft convictions.

           4         You've got questions, Your Honor.

11:48:47   5              THE COURT:  Well, Mr. Brown, I'm not certain I

           6    quite follow your rationale.

           7              MR. BROWN:  If -- yes.

           8              THE COURT:  I agree that I can't apply the

           9    specific offense characteristic for transfer, possession, or

11:49:08  10    use of a means of identification.  That's what the section

          11    says.

          12         But our two-level increase here is for production or

          13    trafficking --

          14              MR. BROWN:  Well --

11:49:22  15              THE COURT:  -- of an unauthorized access

          16    device.  Am I not correct?

          17              MR. BROWN:  And authentication feature.  And

          18    they certainly traffic.  And then that's why I'm saying that

          19    you can't read as narrowly the 1028A.

11:49:35  20              THE COURT:  Okay.  Maybe we're saying the same

          21    thing, just in a little bit different way.

          22              MR. BROWN:  And you're saying it better,

          23    Your Honor.

          24              THE COURT:  No, I'm sure I'm not.

11:49:43  25         But, Mr. Goldberg, as far as I am concerned, I

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 82 of 163. PageID #: 3620
Case: 1:16-cr-00224-PAG Doc #: 230-1 Filed: 02/03/20 82 of 163. PageID #: 3268

82

 1    acknowledge that I cannot give it for transfer, possession,

 2    or use of a means of identification, but I can for

 3    production or trafficking of an authorized access device.

 4        Nothing in application note 2 that you refer to

11:50:01  5    prohibits an increase when the defendant is convicted for

 6    the production or trafficking of an unauthorized access

 7    device.

 8        And again, as opposed to transfer, possession, or use

 9    of a means of authentication.  And because access device

11:50:22 10    includes credit card numbers and because the scheme involved

11    the sale of credit card numbers, I do, in fact, believe that

12    the two-level increase is appropriate and the objection is

13    overruled.

14        Your next objection is to the four-level increase

11:50:39 15    because of the conviction under 1030, and this is your *ex*

16    *post facto* argument.

17            MR. GOLDBERG:  And the only thing I would add

18    to it, Your Honor, is I would refer the Court to guideline

19    section -- I believe it's 1B -- 1B1.11.

11:50:56 20            THE COURT:  1B.11?

21            MR. GOLDBERG:  1B1.11(b)(1) indicates that if

22    the Court determines the use of the guidelines manual in

23    effect on the date --

24            THE COURT:  Okay.

11:51:12 25            MR. GOLDBERG:  -- that the defendant is

Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 83 of 163. PageID #: 3621
Case: 1:16-cr-00324-PAG Doc #: 230 Filed: 02/03/20 83 of 163. PageID #: 3269

83

1    sentenced would violate *ex post facto*, the Court shall use

2    the guideline manual in effect on the date that the offense

3    and conviction was committed.

4        The argument I made in brief, I'll stand on that, and

5    here's authority for it in the guideline itself.  And I

6    believe that the guideline manual from 2015 would come out

7    to the same level with the exception of this extra four

8    points under paragraph 49 of the PSI.

9            MR. BROWN:  Your Honor, I'm a little confused

10   as to what the problem is.  I admit, I had computer problems

11   last night.  I couldn't log on to anything so I had to go

12   back to my books.

13       And going to the guideline manual in 2016 -- I also

14   pulled 2009, 2008 -- there is a four-level enhancement under

15   2B1.1. -- or 1B.11.

16       Here, let me pull out 2008, which is when our

17   investigation began.

18       I'm sorry.  For 10.

19       Wait.  Where is that?

20            MR. GOLDBERG:  B19.

21            MR. BROWN:  Sorry.  Yeah.  14B.  They still

22   have that -- here it is.

23       In 2008, it was under B1.1(15)(a)(2).  Plus four for

24   conviction under 18 U.S.C. 1030(a)(5)(A), sub(1).

25       So Your Honor, there is no *ex post facto*.  It might

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 84 of 163. PageID #: 3670
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/20 84 of 163. PageID #: 3472

84

| | |
|---|---|
| 1 | have been changed paragraph numbers, but since 2008 through |
| 2 | the present, there's always been a four-level enhancement |
| 3 | consistent with the 2019 enhancement of four levels. |
| 4 | THE COURT: Ms. Morgan. |
| 11:53:03  5 | PRETRIAL PROBATION OFFICER: Your Honor, I |
| 6 | would just argue -- |
| 7 | THE COURT: Mr. Brown is saying you don't even |
| 8 | have to get into the -- we'll call it the *ex post facto* |
| 9 | argument -- because it's the same in both manuals; am I |
| 11:53:16 10 | correct? |
| 11 | MR. BROWN: Maybe a different paragraph |
| 12 | number, but that -- |
| 13 | PRETRIAL PROBATION OFFICER: That would be |
| 14 | correct, Your Honor. |
| 11:53:23 15 | THE COURT: That was not the response, but you |
| 16 | have since looked at it. |
| 17 | PRETRIAL PROBATION OFFICER: I would agree |
| 18 | with the Government, Your Honor. My initial response was to |
| 19 | the one book rule used at the time of sentencing, you only |
| 11:53:37 20 | use one book to determine the guideline range. |
| 21 | And that there is authority for that one in the |
| 22 | sentencing guidelines. |
| 23 | But I would agree we don't need to get to that |
| 24 | argument when the adjustment has been there the entire time. |
| 11:53:51 25 | THE COURT: Mr. Goldberg, I'll give you a |

Case: 1:16-cr-00324-PAG Doc #: 239-1 Filed: 01/30/23 85 of 163. PageID #: 3643
Case: 1:16-cr-00324-PAG Doc #: 230 Filed: 02/03/23 85 of 163. PageID #: 3271

85

1    moment to look at it.

2              MR. GOLDBERG:  Your Honor, I would concede

3    that if the language is exactly the same and it's the

4    paragraph number is the only change, then I'm wrong.

11:54:04  5              THE COURT:  All right.

6         Just for the heck of it, I am going to say that even

7    if the language hadn't been the same, I don't see *ex post*

8    *facto* applicability here because 1B1.11(b)(3) makes it clear

9    if a defendant is convicted of two offenses, one committed

11:54:32  10   before and one after, a revised edition of the guideline

11   manual becomes effective, the revised edition is to be

12   applied to both offenses.

13        And in our case, because the defendant's criminal

14   conduct continued after 2015, *ex post facto* clause is simply

11:54:54  15   not violated by using the 2015 edition of the manual.

16        And because, Mr. Brown, I state that because I assumed

17   that both parties were in agreement that the language had

18   changed.

19        So in an abundance of caution, I am going to overrule

11:55:17  20   the objection based upon your statement that the language is

21   the same.  But even if for some reason you're misreading it,

22   I do find the *ex post facto* clause is not violated.

23        All right.  So we are now at a base offense level of

24   37 instead of 39, and that is because where the probation

11:56:00  25   officer added 20 levels, this Court has added 18 levels to

Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 86 of 163. PageID #: 6424
Case: 1:16-cr-00324-PAG Doc #: 230 Filed: 02/03/20 86 of 163. PageID #: 3272

86

1    the amount of loss, which takes us from the stated 39 in

2    paragraph 49 to a 37.

3        The next objection is the next paragraph, and that's

4    paragraph 50.

11:56:31  5        The defendant was convicted under 18 U.S.C. 1956,

6    which is why there is an increase of two levels.

7        Mr. Goldberg, you're maintaining the objection,

8    correct?

9            MR. GOLDBERG:  I am maintaining the objection,

11:56:45 10    but I'm offering no further argument.

11            THE COURT:  All right.  Mr. Brown.

12            MR. BROWN:  Your Honor, the Government's

13    position is it's pretty straightforward.

14        They were -- sorry.

11:56:54 15        They were convicted of the 1956 conviction, 2S1.1 or

16    so, whatever that is, directs you to -- yeah, 2S1.1(b)(2)(B)

17    directs you to add two and since it was a 1956(h), it's a

18    1956 conviction.

19            THE COURT:  I agree.  The jury convicted the

11:57:15 20    defendant of conspiracy to commit money laundering in

21    violation of 18 U.S.C. 1956(h).  The object of the

22    conspiracy was not solely to violate 1957, but rather 1956.

23        Therefore, the defendant's argument is rejected and

24    the two-level adjustment is proper.

11:57:39 25        I believe we all agree -- so the plus two in

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 87 of 163. PageID #: 3425
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 87 of 163. PageID #: 3273

87

```
              1    paragraph 50 remains.

              2         Paragraph 51, we all agree should change from a plus

              3    two to a zero.

              4         Mr. Brown.

11:57:53      5              MR. BROWN:  That is correct, Your Honor.

              6              THE COURT:  All right.

              7         The next objection relates to paragraph 53, and that

              8    is aggravating role.

              9         Mr. Goldberg, you're maintaining your objection; am I

11:58:11     10    correct?

             11              MR. GOLDBERG:  I am maintaining my objection

             12    that Mr. Nicolescu does not merit the four-point enhancement

             13    but should be considered for the three or two-point

             14    enhancement.

11:58:21     15         If you look at his overall conduct, especially with

             16    regard to the money laundering count, which is the count of

             17    conviction, he was not the leader, organizer.

             18         I also would submit that he did not supervise more

             19    than five or more people during the course of this -- these

11:58:40     20    criminal activities and that his role in this matter was

             21    almost exactly the same as Mr. Danet, who testified in Court

             22    on behalf of the Government.

             23         With that, I'll defer to my memo.

             24              MR. BROWN:  Thank you, Your Honor.

11:58:55     25         He's the master of frauds.  MasterFraud.  He -- to
```

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 02/30/23 88 of 163. PageID #: 6426
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 88 of 163. PageID #: 3274

88

1    look at it just as money laundering as the aggravating role

2    is to put the horse -- or the cart about 10 Romanian blocks

3    in front of the horse.

4        Without my eBay, which is what he called the

11:59:17  5    fraud -- or the virus -- without the virus, the Trojan,

6    there would be no money laundering in this conspiracy,

7    right?  So he created the opportunity for money laundering,

8    and then he created the virus that infected everybody.

9        He oversaw more than five people.  He moved -- when

11:59:39  10   Danet left, he moved more people in.  He recruited

11   Valentine Danet.  He recruited people to come into the

12   conspiracy.

13       To get into the command and control server, you had to

14   take multiple sophisticated complicated steps to thwart

11:59:58  15   security and to create greater protections of your

16   anonymity.

17       Who set up the wireless routers, the -- if you

18   remember the exhibit, the orange antenna, who set that up,

19   who installed all of the software onto people's computers?

12:00:13  20   It was Nicolescu.

21       He designed the software, he designed the security, he

22   designed the protection for everything.

23       To say that he was not the leader is to ignore all of

24   the evidence that the jury accepted, all of the evidence

12:00:28  25   that the jury agreed showed that he was, in fact, deserving

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 89 of 163. PageID #: 3457
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/20 89 of 163. PageID #: 3257

89

     1   of the moniker he gave himself, which was MasterFraud.

     2            THE COURT:  Mr. Brown, do you agree that this

     3   adjustment is for leadership role in the money laundering

     4   conspiracy?

12:00:51  5            MR. BROWN:  Your Honor --

     6            THE COURT:  Technically.

     7            MR. BROWN:  But I don't think you can -- I

     8   don't think you can separate the money laundering conspiracy

     9   from the rest of the organization.

12:01:00 10           THE COURT:  I understand that, but you do

   11   acknowledge that this adjustment is for the money laundering

   12   conspiracy technically?

   13           MR. BROWN:  Yes.

   14           THE COURT:  Okay.

12:01:11 15           MR. BROWN:  But the money laundering is also

   16   to promote the criminal activity, and that was one of the

   17   theories of the age conspiracy.  And the promotion was

   18   controlled, maintained, and more specifically, evolved by

   19   and at the direction of Nicolescu.

12:01:27 20     The move to cryptocurrencies, the move to AlphaBay,

   21   the move to, you know, or away from the eBay.  This was all

   22   driven by Nicolescu.

   23           THE COURT:  I agree with you.

   24           MR. BROWN:  Thank you.

12:01:40 25           THE COURT:  Witnesses testified that this

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 90 of 163. PageID #: 3428
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/20 90 of 163. PageID #: 3276

90

1    defendant was the mastermind behind the entire operation,

2    and the entire operation includes the money laundering

3    scheme.

4         Nicolescu controlled the money mule network in the

12:01:54  5    United States which was necessary to the success of the

6    money laundering scheme.  He provided directives to other

7    members in the conspiracy.

8         And although other minor members of the conspiracy

9    came and went, certainly this defendant, as well as another,

12:02:11  10    were -- was a constant member of the scheme.  He maintained

11    control of the money laundering scheme by limiting and

12    controlling the interactions between other members.

13         Thus, I do, in fact, find that he was an organizer or

14    leader of the money laundering scheme and the four-level

12:02:33  15    adjustment is appropriate.  The defendant's objection is not

16    well taken.

17         Paragraph 55 now becomes a 43.  Again, two levels came

18    off of paragraph 49, and two levels came off of

19    paragraph 51.

12:03:03  20         So the adjusted offense level is a 43.

21         Since there were no Chapter 4 enhancements, no

22    acceptance of responsibility, the total offense level is a

23    43.

24         Mr. Goldberg, are there any objections I missed?

12:03:26  25              MR. GOLDBERG:  I don't believe so, Your Honor.

Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 91 of 163. PageID #: 3679
Case: 1:16-cr-00324-PAG Doc #: 230 Filed: 02/03/23 91 of 163. PageID #: 3427

91

1    Thank you.

2                      THE COURT:  All right.  And on behalf of the

3    Government.

4                      MR. BROWN:  No objections, Your Honor, thank

12:03:33  5    you.

6                      THE COURT:  I do, in fact, find total offense

7    level is a 43, and that is as to Count Group 1.

8         The Court is well aware of Count 16 through 20, that

9    the guideline sentence is the term of imprisonment required

12:03:52  10    by statute.  And a 43 and a criminal history category of 1,

11    and the defendant doesn't have any criminal history points,

12    results in a guideline imprisonment range of life.

13        Because the statute does not provide for life, it is

14    incumbent upon this Court to then reduce it to a 42, which

12:04:24  15    is 360 months to life.

16        Ms. Morgan, did I state that accurately, ma'am?

17                      PRETRIAL PROBATION OFFICER:  I believe so,

18    Your Honor.

19                      THE COURT:  Mr. Brown?

12:04:36  20                      MR. BROWN:  I believe so, yes, Your Honor.

21                      THE COURT:  Mr. Goldberg?

22                      MR. GOLDBERG:  I think the Court has to take

23    into consideration the aggregate statutory maximums.

24                      THE COURT:  Which is less than life.

12:04:48  25                      MR. GOLDBERG:  Which is 20.  Which is a total

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 92 of 163. PageID #: 3640
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 92 of 163. PageID #: 3278

92

1    of 20.

2                        MR. BROWN:  For wire fraud?  Right?

3                        MR. GOLDBERG:  Correct.

4                        MR. BROWN:  I'm just checking to make sure.

12:05:10   5             THE COURT:  Conspiracy to commit mail and wire

6    fraud is imprisonment of not more than 20 years.

7                        MR. GOLDBERG:  So our --

8                        MR. BROWN:  Right.  It would only be 30 if it

9    affected a financial institution.

12:05:23  10            MR. GOLDBERG:  Yes.  So our position on this

11   is that the statutory maximum, the aggregated offenses, not

12   including the 1028 counts, is 20 years.

13        And the guideline should reflect of maximum of 240

14   months, not 360.  That was an objection we maintained, I

12:05:39  15   believe, with the PSI.

16                       MR. BROWN:  That is correct.  So the

17   guideline -- and I believe it would be -- right.

18        So it would have to be reduced to the highest

19   guideline that includes the stat max, I believe, which would

12:06:00  20   be a 38, which is 235 to 293.

21        So the guideline range would be 235 to 240 if I --

22   going back to my narcotics here.

23                       THE COURT:  So, Ms. Morgan, you were

24   accounting for consecutive time?

12:06:21  25                       PRETRIAL PROBATION OFFICER:  Correct,

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 93 of 163. PageID #: 3641
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 93 of 163. PageID #: 3273

93

           1    Your Honor.

           2              THE COURT:  And, Mr. Brown, you are agreeing

           3    with Mr. Goldberg?

           4              MR. BROWN:  Just on the guideline calculation,

12:06:27   5    setting aside Counts 16 through 20.

           6              THE COURT:  We're not talking about 16 through

           7    20.  Correct me if I'm wrong.

           8       What Ms. Morgan did was take each one of the counts,

           9    took the statutory maximum, and ran them consecutive.

12:06:48  10              MR. BROWN:  Okay.  I understand.

          11              THE COURT:  And it is your position, as is

          12    Mr. Goldberg's, that you don't -- in order to find that

          13    first guideline level, you don't go consecutive.

          14              MR. BROWN:  I was under the impression that

12:07:03  15    because the offense conduct was part of a continuing course

          16    of conduct, there was merger under the 2S1.1 and the wire

          17    fraud.

          18              THE COURT:  Because I have agreement of

          19    counsel, I will, in fact, drop it then from a 43 to a 38.

12:07:24  20              MR. BROWN:  Okay.

          21              THE COURT:  Gentlemen, let me ask you, do you

          22    prefer that we finish with Mr. Nicolescu or go to the

          23    objections of Mr. Miclaus?

          24       Do you have a preference, Mr. Goldberg?

12:07:47  25              MR. GOLDBERG:  I really don't, Your Honor.  I

Case: 1:16-cr-00324-PAG Doc #: 289-1 Filed: 07/30/23 94 of 163. PageID #: 3642
Case: 1:16-cr-00324-PAG Doc #: 230 Filed: 02/03/23 94 of 163. PageID #: 3282

94

```
  1    think that Mr. O'Shea is ready to go on the role issue.

  2                THE COURT:  Mr. O'Shea.

  3                MR. O'SHEA:  Let me think about that for a

  4    second.

  5                THE COURT:  Well, you know, Mr. O'Shea,

  6    because I think many of your arguments are the same, it

  7    might be helpful if we did proceed right to your objections.

  8         As long as Mr. Goldberg doesn't have any major

  9    objection, he has to sit here longer.

 10                MR. GOLDBERG:  I have no major objections to

 11    anything Mr. O'Shea wants to do.

 12                THE COURT:  All right.

 13                MR. O'SHEA:  All right.  Thank you, Your

 14    Honor.  -- yes, ma'am.

 15                THE COURT:  Well, go ahead.  Let me see what

 16    you're going to say.

 17                MR. O'SHEA:  I thought we had determined that

 18    I would just argue role at this point because you dispensed

 19    with all the other ones.

 20                THE COURT:  Okay.  If you would just give me

 21    one moment.

 22                MR. O'SHEA:  Yes, ma'am.

 23                THE COURT:  Mr. O'Shea, I found that your

 24    objections in your sentencing memoranda really repeated the

 25    objections in the presentence report.
```

12:08:00 5
12:08:16 10
12:08:26 15
12:08:37 20
12:09:09 25

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 95 of 163. PageID #: 6433
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 95 of 163. PageID #: 3283

95

|    |    |
|----|----|
| 1 | So let's quickly go over them to make certain that I |
| 2 | get all of your objections, and you can tell me if you're |
| 3 | maintaining it or not. |
| 4 | MR. O'SHEA:  Very well, Judge. |
| 12:09:22  5 | THE COURT:  Objection to paragraph 4, it |
| 6 | really doesn't go to guideline calculation.  Are you |
| 7 | maintaining it? |
| 8 | MR. O'SHEA:  Let me catch up to you, Judge. |
| 9 | THE COURT:  Sure.  I'm on page 26. |
| 12:09:38 10 | Oh, I'm sorry.  Before I begin, Ms. Morgan, you did |
| 11 | communicate with the Court sometime ago and indicate that |
| 12 | there was an error on page 32, and that you wanted to |
| 13 | correct it orally, here in court. |
| 14 | Correct me if I'm wrong. |
| 12:10:01 15 | Mr. O'Shea, it's page 32 -- I'm sorry -- and |
| 16 | Mr. Brown, Mr. McDonough.  Page 32. |
| 17 | It's -- you see the paragraph that starts "The |
| 18 | probation officer agrees," if you go up from that three |
| 19 | sentences, the sentence starts, "Further, the defendant was |
| 12:10:32 20 | not a mope in the money laundering scheme.  He was in charge |
| 21 | of the" -- and it has there, U.S. portion. |
| 22 | Ms. Morgan, you indicated that that was a typo, and |
| 23 | you meant it to read European? |
| 24 | PRETRIAL PROBATION OFFICER:  That's correct, |
| 12:10:49 25 | Your Honor. |

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 96 of 163. PageID #: 3434
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/20 96 of 163. PageID #: 2824

96

                        1          THE COURT:  Mr. Brown, Mr. McDonough, do you

                        2     see where I'm at?

                        3          MR. BROWN:  Yes.  And we would agree with the

                        4     oral correction, that he was both not a mope and in charge

     12:11:00    5     of European operations.

                        6          THE COURT:  Well, okay.  I'm not getting

                        7     there.  I'm not there yet.

                        8       Mr. O'Shea, do you see the correction?

                        9          MR. O'SHEA:  I note the correction,

     12:11:08   10     Your Honor.

                       11          THE COURT:  Okay.  So now, let's go back to

                       12     page 26.  Your objection to paragraph 4.  Are you

                       13     maintaining it?

                       14          MR. O'SHEA:  One moment, please, Judge.  I'm

     12:11:19   15     looking at my sentencing memorandum.

                       16       Maintaining that objection, Judge.

                       17          THE COURT:  All right.  The objection is

                       18     overruled.

                       19       The report basically recites what is in the

     12:11:42   20     indictment, and I believe the probation officer was in her

                       21     right to do so, and I note, again, that this does not go to

                       22     the guideline calculations.

                       23       The next objection is paragraph 8.

                       24       Are you maintaining it?

     12:12:00   25          MR. O'SHEA:  I am, Your Honor.

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 02/30/23 97 of 163. PageID #: 3435
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 97 of 163. PageID #: 3283

97

           1          THE COURT:  Again, this does not go to
           2     guideline calculation.  It's overruled.
           3          Paragraph 13, does, in fact, state that the defendant
           4     was acquitted of the enhancement.  So I see nothing wrong
12:12:12   5     with the report.
           6          Paragraph 15, are you maintaining that?
           7          MR. O'SHEA:  We'd already done this this
           8     morning, so, yeah.  We maintain the objection for the
           9     record, Your Honor.
12:12:30  10          THE COURT:  Okay.  Defendant is objecting that
          11     the presentence report relies on the theories of loss
          12     provided by the Government and does not provide an
          13     independent accounting.
          14          I'm overruling that objection.  The probation officer
12:12:47  15     notes in her response that she simply provided a summary of
          16     information.  She did receive the information from the
          17     Government.  She never received any information from the
          18     defendant regarding loss amounts, except to note that the
          19     loss amounts would be contested.
12:13:06  20          And, again, I have thoroughly addressed the loss
          21     amount, so that objection is not well taken.
          22          Are you maintaining your objection to paragraphs 16
          23     and 17?
          24          MR. O'SHEA:  Yes, Your Honor.
12:13:20  25          THE COURT:  Again, this does not go to the

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 98 of 163. PageID #: 3646
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 98 of 163. PageID #: 3284

98

|  |  |
|---|---|
| 1 | guideline calculation, but if the Government would like to |
| 2 | discuss this issue, I simply don't have enough information |
| 3 | to know if that should be included in the report or not |
| 4 | included in the report. |
| 12:13:40 5 | MR. BROWN:  And, Your Honor, I think this is |
| 6 | relevant to what's been called the mope factor.  The |
| 7 | defendant was actively engaged in hundreds and hundreds of |
| 8 | eBay postings.  He was -- to use such a broad term as not -- |
| 9 | not -- |
| 12:14:01 10 | THE COURT:  Well, Mr. Brown -- |
| 11 | MR. BROWN:  -- involved with 500 victims.  He |
| 12 | was involved with in excess of 500 victims through the eBay |
| 13 | fraud alone. |
| 14 | He was involved -- however you want to describe it -- |
| 12:14:12 15 | with over 60,000 computers. |
| 16 | THE COURT:  And I guess that's -- the 60,000 |
| 17 | computers is, I'm just -- I don't know. |
| 18 | MR. BROWN:  Well, the -- |
| 19 | THE COURT:  Where did we get that from? |
| 12:14:21 20 | MR. BROWN:  Well, the size of the botnet grew |
| 21 | consistently throughout the course of the conspiracy.  And |
| 22 | the benefit and the fruits of having such a large computer |
| 23 | network, if for no other reason than for cryptomining, |
| 24 | was -- without putting Special Agent Macfarlane back up, but |
| 12:14:42 25 | I can proffer -- it was consistently, towards the end, well |

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 99 of 163. PageID #: 3487
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/20 99 of 163. PageID #: 3288

99

```
           1   over 600,000 [sic], if not well over 100,000 computers

           2   within the botnet, as high as 400- or perhaps even 600,000

           3   computers.

           4                    THE COURT:  Again, this doesn't even go to a

12:14:59   5   guideline calculation, so I'm going to overrule the

           6   objection for what it's worth.

           7        Objection to 18, 19, 20, and 21.  Are you even

           8   maintaining that, given --

           9                    MR. O'SHEA:  I have to, Your Honor, yes.

12:15:32  10        But for the record, I do, but, you know, I get what

          11   I'm hearing from what the Government said this morning is

          12   that, you know, he assisted in some stuff.  But the computer

          13   skills factor just wasn't presented at trial.

          14                    THE COURT:  Okay.  I get --

12:15:45  15                    MR. BROWN:  Your Honor, he actually -- it was

          16   presented at trial.  He advertised his computer skills on

          17   that freelancer.com, and he had a whole paragraph of skills

          18   that he was offering for sale that were directly related to

          19   what the eBay group -- or the Bayrob Group was doing, as

12:16:03  20   well as all sorts of other stuff.  So --

          21                    THE COURT:  I completely agree with you.

          22   Frankly, I find that the evidence was overwhelming in that

          23   regard.  So the objection is overruled.

          24        Objections to paragraphs 25 to 42.  This is objecting

12:16:16  25   to the four-scheme structure set forth in the indictment and
```

Case: 1:16-cr-00224-PAG Doc #: 239-1 Filed: 02/03/23 1 of 163. PageID #: 3438
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 01/30/23 100 of 163. PageID #: 3286

100

              1    the "duplicative stacking of multiple counts in the

              2    indictment."

              3         I'm going to overrule it.  There's nothing improper

              4    about the indictment.

12:16:32      5         Paragraph 43, defendant notes he was acquitted of the

              6    false domain registration enhancement.  It's overruled.  He

              7    absolutely was.  The probation officer notes it, but the

              8    probation officer also has a duty to note that he was

              9    charged with it and then found not guilty.

12:16:51     10         Paragraph 44, are you even maintaining that regarding

             11    victim impact statements?

             12         And I think this is the appropriate time, Mr. O'Shea,

             13    to say, I don't think anybody is asking for restitution

             14    here.

12:17:07     15                   MR. BROWN:  No, Your Honor.

             16                   THE COURT:  So I don't --

             17                   MR. O'SHEA:  In light of that, it's become

             18    moot, Your Honor.

             19                   THE COURT:  All right.  Paragraphs 46 and 47

12:17:19     20    go to acceptance of responsibility.

             21         Are you maintaining that objection?

             22                   MR. O'SHEA:  I am, but I don't know if we do

             23    it right now, Your Honor.  Might do it on the variance and

             24    departure stuff, but . . .

12:17:31     25                   THE COURT:  It's up to you.

Case 1:16-cr-00224-PAC   Doc #: 229-1   Filed: 02/03/23   101 of 163.   PageID #: 6439
Case 1:16-cr-00224-PAC   Doc #: 229-1   Filed: 02/03/23   101 of 163.   PageID #: 3287

101

1          MR. O'SHEA:  We maintain the objection for

2     purposes of what we're doing now.

3          THE COURT:  Okay.  So meaning the probation

4     officer was incorrect in assigning zero.  That's the stage

12:17:43  5     we're at right now.

6          MR. O'SHEA:  Yes.

7          MR. BROWN:  Your Honor, there are no grounds

8     at all that the Government would offer any departure for

9     acceptance of responsibility.  He went to trial.

12:17:56  10     The Government is at a loss how to respond to the

11     rejection multiple times of offers as relevant to sentencing

12     today.

13     The jury heard and convicted on all of the evidence.

14     The Court heard and is going to be sentencing on all

12:18:13  15     of the evidence.

16          THE COURT:  I will say, there are rare

17     circumstances where a defendant can receive acceptance of

18     responsibility even though he chooses to proceed to trial.

19     I do not find that the defendant's proffer -- and

12:18:29  20     that's really what the argument here is -- is because of the

21     proffer, he should get acceptance.  I don't find that the

22     proffer is one of those rare situations.  He is not entitled

23     to acceptance of responsibility.

24          Objection to paragraph 47.  And this is, again, the

12:18:50  25     1030 conviction, and we now hear that the language is the

Case: 1:16-cr-00224-PAG Doc #: 239-1 Filed: 01/30/23 102 of 163. PageID #: 6440
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 102 of 163. PageID #: 3285

102

```
         1    same.  So I'm going to overrule the objection.

         2         And even if for some reason Mr. Duncan has stated it

         3    inaccurately, I do not find the *ex post facto* clause to have

         4    been violated.

12:19:06 5         Paragraph 49, this goes to loss.  The argument is, is

         6    the Government has functionally forever locked itself into

         7    the loss amount from the initial presentence report.  And I

         8    do not agree that they have locked themselves in at all.

         9         Paragraph 49, I don't believe is -- no, I apologize.

12:19:43 10        49 you are specifically objecting to sophisticated

        11    means.

        12         Am I correct that you agreed prior to today that you

        13    are not maintaining that objection?

        14              MR. O'SHEA:  Yeah.  Based on the agreement we

12:19:58 15   made with the Government, yes, Your Honor.

        16              THE COURT:  All right.

        17        Paragraph 50, this is the two-level adjustment under

        18    2S1.1.

        19        Are you maintaining that objection?

12:20:20 20             MR. O'SHEA:  Just for the record, Your Honor,

        21    I think you've already addresses it.

        22              THE COURT:  I have.

        23        It's overruled for the same reasons I stated in

        24    regards to Mr. Nicolescu.

12:20:30 25        Paragraph 51.  This is sophisticated laundering, but
```

1    the -- we have already afforded that zero point, so that is

2    no longer relevant.

3                    MR. O'SHEA:  Agreed.

4                    THE COURT:  All right.  Paragraph 53, you

12:20:52  5    objected.  However, the probation officer agreed and amended

6    the report, so that is no longer relevant.

7                    MR. O'SHEA:  Right.

8        And, Judge, part of my sentencing memorandum is off, I

9    think, by some paragraph references.  I think -- because the

12:21:11 10   amended PSI came out with different paragraph numbers

11   than --

12                    THE COURT:  Oh, okay.

13                    MR. O'SHEA:  So I just want to make sure that

14   I got it right.  You make reference to paragraph 53.

12:21:24 15                    THE COURT:  You're right.

16                    MR. O'SHEA:  That really should be

17   paragraph -- let me see here.

18                    THE COURT:  51.  You're right.

19                    MR. O'SHEA:  Okay.

12:21:31 20                    THE COURT:  And that's not relevant anymore

21   because the Government has agreed.

22                    MR. O'SHEA:  Understood, Judge.

23                    THE COURT:  All right.  So now we are at

24   the -- I believe, and correct me if I'm wrong, the only

12:21:43 25   objection remaining, which is role in the offense.

Case: 1:16-cr-00224-PAG Doc #: 229-1 Filed: 01/30/23 104 of 163. PageID #: 3442
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 104 of 163. PageID #: 3290

104

1    So let me first establish that.  Is that the only

2    remaining objection?

3             MR. O'SHEA:  Yeah, Judge.  Just for the

4    record, in my sentencing memorandum I refer to it as

12:22:00  5    paragraph 54.  It should be paragraph 53.

6             THE COURT:  Right.  Is that the only other

7    objection?

8             MR. O'SHEA:  Yes.

9             THE COURT:  You now may be heard.

12:22:08 10             MR. O'SHEA:  Thank you, Your Honor.

11    I know, I expect that the Government will disagree

12    with me here, but I can't imagine how they could make

13    Mr. Miclaus into a manager of this operation, given the

14    evidence that I heard at trial.

12:22:22 15    I think he was utilized, and I call him a mope because

16    that's what I think my history of the criminal justice

17    system portrays him to be, that he was just used just sort

18    of like a bagman to assist the operation.

19    Assuming that we agree with everything the jury found

12:22:43 20    here in the Government's theory, it is impossible for me to,

21    even marginally, equalize his conduct in this operation, in

22    this Bayrob Group, with that of the gentleman to my left,

23    Mr. Nicolescu.  It's impossible for me to do that.

24    And it's -- I think it strains a fair amount of

12:23:04 25    credibility for the Government to argue that he had some

Case 1:16-cr-00224-PAC Doc #: 289-1 Filed: 01/30/23 105 of 163. PageID #: 3443
Case 1:16-cr-00224-PAC Doc #: 296 Filed: 02/03/23 105 of 163. PageID #: 3291

105

1    sort of equal managerial role here.

2         You know, to use a McDonald's -- I mean, type of

3    analogy, he's the -- my client is the fry boy, and the guy

4    to my left here, Mr. Nicolescu, is the manager of this

12:23:21  5    restaurant.

6         And for the Government to argue that he had some sort

7    of manager or supervisory role defies the evidence that I

8    heard at trial.

9         And I just -- I can't -- I can't even understand how

12:23:36  10    the Government would argue that just because he was a bagman

11    and assisted at maybe transporting money, and because he put

12    up a single ad that he had computer skills, which the

13    Government never produced any evidence at trial that he

14    wrote any code.

12:23:57  15         I think we addressed this a little bit this

16    morning -- that he designed the operation, that he had

17    anything to do with the actual computer botnet itself, that

18    he was managing that, coming up with a scheme or anything

19    like that on his own defies the evidence that was produced

12:24:14  20    at trial.  Even at sentencing today, I think the Government

21    was tacitly conceding that.

22         So and, you know, for whatever value it has, you know,

23    going back to trial again, we have to look, you know -- and

24    I point this out, I think in the sentencing memorandum --

12:24:37  25    you have to do a compare and contrast analysis of the

1     operators in this group.

2          And when we look at guys like Mr. Danet and these

3     Romanian witnesses that came in -- do you remember those

4     guys, the ones that weren't even charged with a crime -- and

12:24:52  5     then you look at my client and you compare them, it's just

6     not fair to say he had some sort of supervisory or

7     managerial role.

8          When compared -- and we point this out in our

9     sentencing memorandum.  You can compare even unindicted,

12:25:09 10    uncharged people in determining that type of role.  You're

11    allowed to do that.  That's legal to do.

12         So merely because he's one of the two at the table

13    does not automatically make him into a manager or

14    supervisor.

12:25:24 15         We have to look at the other people that cut a deal,

16    including Mr. Danet.  We have to look at the other operators

17    that came in here that were flown over here by the

18    Government at the 11th hour to testify in the trial in

19    analyzing whether my client really ranked anywhere near

12:25:43 20    above what I call a fry boy role, Your Honor.

21              MR. BROWN:  Your Honor, yeah.  I think it

22    strains the evidence, and, frankly, insults the jury to call

23    Mr. Miclaus just a fry boy or a mope.

24         Mr. Miclaus was one of two members of the Bayrob Group

12:26:09 25    who was present at the inception of the Bayrob Group and was

Case: 11-6c-00324-PAG Doc #: 229-1 Filed: 02/03/23 107 of 163. PageID #: 6445
Case: 1:16-cr-00324-PAG Doc #: 236 Filed: 02/03/23 107 of 163. PageID #: 3295

107

1   present at the time of the arrest of the Bayrob Group.

2   Danet came and went.  Miclaus stayed.  He was always there,

3   he was always a member.

4       To say that posting hundreds, if not thousands of

12:26:28  5   auctions on eBay is relegated to fry boy is to insult the

6   victims who were victimized by those ads and those auctions,

7   and it also misrepresents the enthusiasm and the consistency

8   that he acted in.

9       He posted auctions.  He met with Antonovich and other

12:26:49 10   mules.  I mean, you heard from Antonovich that they would

11   pull up -- it was like out of a movie -- that they would

12   pull up, roll down windows or open doors and pass bags of

13   cash to each other.

14       It wasn't -- Antonovich was passing it to the

12:27:03 15   controlling member of the money laundering part of the

16   Bayrob Group.

17       There -- he and Nicolescu were the only two people who

18   got money from Antonovich, and I believe the testimony was

19   Nicolescu did it once.

12:27:17 20       Every other transaction with cash was done by Miclaus.

21   He was the head of the money laundering operation and he was

22   the one who carried the money home, literally and

23   figuratively.

24               THE COURT:  Miclaus was the head of the money

12:27:30 25   laundering.

Case 1:16-cr-00224-PAC Doc #: 289-1 Filed: 01/30/23 108 of 163. PageID #: 6446
Case 1:16-cr-00224-PAC Doc #: 236-1 Filed: 02/03/23 109 of 163. PageID #: 3294

108

1                    MR. BROWN:  Well, he was the one who took the

2         money.  He was the one who received the money from

3         Nicolescu, who -- or from Antonovich, who aggregated it from

4         the money mules picking it up at Western Union.

12:27:43 5         He was the guy -- he was the one who within the Bayrob

6         Group was touching the money last.  That's what the

7         Government's position, that testimony from Antonovich would

8         lead one to believe about Miclaus's role.

9              He also was, when they switched over to eBay, he was

12:27:58 10        the one posting on his Twitter account about Y pool and was

11        making the shift to cryptocurrency mining back in 2013,

12        2014, when the Government would argue most of the world

13        still didn't know, let alone understand, what cryptomining

14        was.  He was there.

12:28:15 15        He had the skills to do as much as he was doing, if

16        not more.  The fact that he didn't do more, I think, nobody

17        can safely say.

18             He -- but what we do know is he was there all the

19        time.  He was actively involved and he was actively evolving

12:28:34 20        along with the eBay group -- or the Bayrob Group.

21             The Government also will say, you know, this role and

22        this, you know, the argument about proffering -- and it's

23        something we'll hear again I'm sure later in the

24        afternoon -- can't be used as a shield and a sword.

12:28:53 25        You can't say, well, my guy proffered and he should be

Case 1:16-cr-00244-PAG Doc #: 229-1 Filed: 02/03/23 109 of 163. PageID #: 3447
Case 1:16-cr-00244-PAG Doc #: 230 Filed: 02/03/23 109 of 163. PageID #: 3295
109

1    given a lot of credit for that because he came in and

2    proffered and told all about everything he knew, and then

3    say, well, wait a second, he's working the shake machine on

4    the drive-through.  He doesn't -- you know, he can barely

12:29:08  5    put on his paper hat at the McDonald's.

6         If that's the case, then yeah, the proffer is worth

7    zero, the proffer is worth no consideration.  If you want to

8    say the proffer is worth a lot, then you do have to concede

9    that the proffer is worth a lot because he was a higher up.

12:29:21  10        Again, Your Honor, the Government would concede that

11    the proffer is not worth anything, but he is a higher up.

12    The proffer is not worth anything because he rejected it.

13    He determined the value of the proffer by rejecting it.

14        However, his role is very much appropriate and

12:29:36  15    deserving of an aggravated role.  This was a 400- to 600,000

16    computer botnet.  It operated over ten years.  It stole

17    millions and millions of dollars.

18        You don't -- in an operation like that -- and it was

19    an operation where they bragged that there were five people

12:29:54  20    involved in this.  He was one of the five.

21        Investigation showed there were really three core

22    members.  He was one of the three.

23        You don't ride for free in an operation like that.  He

24    had skills.  He applied his skills, and he received great

12:30:08  25    benefit.

Case 1:16-cr-00224-PAG Doc #: 229-1 Filed: 01/30/23 110 of 163. PageID #: 3448
Case 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 110 of 163. PageID #: 3296

110

1    He was an underemployed skydiving teacher in

2    Bucharest, Romania, but he had BMWs, he had the ability to

3    travel the world, he had the ability to skydive, and he

4    definitely reaped the benefits of a person deserving all

12:30:25    5    four levels of aggravating role.

6        Thank you.

7            THE COURT:  I agree with the Government.

8        Let me begin by saying there can be more than one

9    leader or organizer of a criminal conspiracy.

12:30:38    10        I am instructed to look at certain factors such as

11    exercise of decision-making authority, nature of

12    participation in the commission of the offense, the

13    recruitment of accomplices, the claimed right to a larger

14    share of the fruits of the illegal activity, the degree of

12:30:57    15    participation and planning or organizing the offense, the

16    nature and scope of the illegal activity, and the degree of

17    control and authority exercised over others.

18        When I look at all of the evidence that was presented

19    at trial, I do, in fact, agree that Mr. Miclaus was, in

12:31:18    20    fact, a leader or organizer, not the sole, but a leader or

21    organizer.  The objection is not well taken.

22            MR. O'SHEA:  Judge, one last thing.  I'm

23    sorry.

24            THE COURT:  Sure.

12:31:31    25            MR. O'SHEA:  I see in the report not plus 4

1    but plus 3.  Did we address that, Judge?  Because the PSI

2    said plus 3 and I just heard the Government say plus 4.

3                   THE COURT:  I have 4 here.  Paragraph 53?  I'm

4    on the report that was revised September 16th, 2019.

12:32:18  5                   MR. O'SHEA:  On paragraph 53 mine says plus 3,

6    Judge.

7                   THE COURT:  Mine says plus 4.

8         Ms. Morgan, Document Number 188?

9         Do I have an agreement, Mr. Brown?

12:32:36  10                   MR. BROWN:  I would say plus 4.  Our document

11    is 184.  But we argued plus 4 in our brief.

12                   THE COURT:  I'm going off the latest, which is

13    188.

14                   MR. O'SHEA:  I have 184, Judge.  That's what I

12:32:49  15    was referring to.  I apologize.

16                   THE COURT:  Well, that's not the latest one.

17    The latest one is date report revised September 16th, 2019,

18    and then there's in bold, "Second Revised Final,

19    October 15th, 2019," Document 188.

12:33:08  20                   PRETRIAL PROBATION OFFICER:  That's correct,

21    Your Honor.

22                   THE COURT:  So, Ms. Morgan, did you afford

23    three or four levels?

24                   PRETRIAL PROBATION OFFICER:  Four levels.

12:33:15  25                   THE COURT:  Yeah.  That's what the latest

Case 1:16-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 112 of 163. PageID #: 6450
Case 1:16-cr-00324-PAG Doc #: 290 Filed: 02/03/23 112 of 163. PageID #: 3298

112

1    report has.

2              MR. O'SHEA:  Can I ask just a fundamental

3    question.  How did it go from 3 to 4?

4              THE COURT:  I only look at the last report.

12:33:25  5              PRETRIAL PROBATION OFFICER:  It was a typo on

6    my part.  It was intended as four levels, and I believe that

7    in the -- I would have to check, but I thought that in

8    my -- it does say four initially and then over by the side

9    it says three.  But it does reference four initially.

12:33:45  10              MR. O'SHEA:  Sorry for the confusion.

11             THE COURT:  That's all right.  That's all

12   right.

13        So we are at a total offense Level 43, but we are all

14   in agreement because of the statutory maximum, we start at a

12:33:58  15   total offense level of 38, which is 235 to 293.

16        So Mr. Goldberg, let me start with you.

17        On the issue of sentencing, do you want me to turn to

18   you or to your client first?

19             MR. GOLDBERG:  I think I'll go first,

12:34:26  20   Your Honor.

21             THE COURT:  You go right ahead.

22             MR. GOLDBERG:  Thank you, Your Honor.

23        May it please the Court.

24        As the Court knows, I was a latecomer to the case, and

12:34:33  25   before I start, I would compliment the Government -- without

Case: 1:16-cr-00224-PAG Doc #: 290-1 Filed: 01/30/23 113 of 163. PageID #: 6451
Case: 1:16-cr-00224-PAG Doc #: 236 Filed: 02/03/23 113 of 163. PageID #: 3299

113

         1    prejudice to my client's postconviction relief if he seeks

         2    that, or appeal -- I would say that the Government acted in

         3    a highly professional way with me, providing me the

         4    information after hours when needed.

12:34:49 5         And I commend the U.S. Attorney's Office for the

         6    Northern District of Ohio on the gentlemen who are seated at

         7    counsel table today, and the FBI on -- the agent.

         8         That being said, I do think that this case stemmed a

         9    little bit, and the treatment of my client stemmed a little

12:35:08 10   bit from what -- I'll use an O'Shea-ism and say a "white

        11    whale syndrome," which was how the Department of Justice

        12    can -- looked at the Bayrob Group, looked at Mr. Nicolescu,

        13    and made this effort to track him down and to bring him to

        14    justice here.

12:35:29 15        And once he was here, there was no compromise, there

        16    was no serious plea negotiations.  A proffer letter that

        17    I -- I did not receive this proffer letter, but -- as part

        18    of my representation, but it was provided to former counsel.

        19        And that proffer letter is like nothing I've ever seen

12:35:47 20   before.  It says that you can make a statement but if we

        21    find something on your computers, we're using it against

        22    you.

        23        In other words, it's not really an opportunity to

        24    proffer because anything that you give over in terms of

12:35:58 25   allowing the Government into your devices, they're going to

Case: 1:16-cr-00224-PAG Doc #: 229-1 Filed: 01/30/23 114 of 163. PageID #: 3452
Case: 1:16-cr-00224-PAG Doc #: 236 Filed: 02/03/23 114 of 163. PageID #: 3605

114

1       use against you.

2              Who would accept that?

3              And nonetheless, up until the Romanian witnesses, the

4       latecomers were rounded up by the Government and interviewed

12:36:18  5   and changed all their statements from we know nothing to we

6       know everything, at that point the Government pulled all

7       plea negotiations when my client was discussing pleading to

8       exactly what he was convicted of, the offenses minus the

9       specs.  We would have been having the same conversation

12:36:40 10   right now about --

11             THE COURT:  When you say "specs," you mean the

12      enhancement?

13             MR. GOLDBERG:  The enhancement.  The

14      specifications.  That's a state term.

12:36:48 15        The enhancements that raised the offense -- the

16      statutory max to 37 -- I'm sorry -- to 27 years from 20 if

17      convicted of use of domain names.

18             We were going to open plea to that but once the

19      Romanians were rounded up, that was pulled.  There was no

12:37:04 20   plea.  So we had no choice but to go to trial in this case,

21      Your Honor.

22             And I think -- and I'm not speaking for Mr. O'Shea,

23      but Mr. Miclaus had the same situation.

24             Now, I've made the argument in brief.  I think there's

12:37:17 25   a couple of things that the Court should consider when

Case: 1:16-cr-00224-PAG Doc #: 229-1 Filed: 02/03/23 115 of 163. PageID #: 3453
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 115 of 163. PageID #: 3651

115

          1    evaluating the 3553 factors that I think are paramount.

          2         I don't have a lot of personal information about

          3    Mr. Nicolescu that would be helpful.  You see it in the PSI

          4    about his background, how he grew up, where he grew up, and

12:37:39  5    how he eventually got into this activity.

          6         And I expect Mr. Nicolescu to be treated like any

          7    other defendant standing before this Court under these

          8    circumstances and not any better or any worse because of his

          9    background.

12:37:56 10         But I think the Court has to look at disparity.  And

         11    in asking for a downward variance from the guidelines in my

         12    brief, I attached some information on disparity, both in the

         13    form of a law journal article talking about the issue with

         14    the guidelines, and when it comes to computer crime,

12:38:19 15    white-collar crime in general, that goes more to a policy

         16    disagreement argument that I'll make in a moment.

         17         But I also attached a number of cases that are

         18    similar, and it's -- goes to my argument about the white

         19    whale syndrome when you look at the number one case that the

12:38:37 20    Government cites in their brief is a case that involved a

         21    life sentence for somebody that had a worldwide fentanyl

         22    conspiracy with people -- with dead people and with factors

         23    that had nothing to do with this case, and that -- using

         24    that to support a 360-month sentence that they're

12:39:01 25    requesting.

Case: 11-6c-cr-00244-PAG Doc #: 229-1 Filed: 01/30/23 116 of 163. PageID #: 3454
Case: 1:16-cr-00244-PAG Doc #: 236-1 Filed: 02/03/23 116 of 163. PageID #: 3802

116

1          My cases that I both cite in the brief and then I also

2     just put them at the end in Exhibit C, just because I didn't

3     want to make the brief too long, are other cases from around

4     the country where similar conduct, even more loss conduct,

12:39:21  5     more serious sophistication has been punished less.

6          And there's a couple of cases that I cited.  And I

7     know the Court has looked at my materials.  I'm not going to

8     go through them again.  I would just particularly point out

9     a couple of cases I think are far more relevant to

12:39:40  10    determining a variance in a proper sentence in this case

11    than the cases pointed out by the Government.

12         One is *Trifu*, T-R-I-F-U, where the Romanian defendant

13    received a sentence of 96 months, which was a substantial

14    downward variance.  And *Borlea*, which was a -- similar as

12:40:02  15    well, where a 42-month sentence was imposed.

16         There was another case where the defendant went to

17    trial, which case was that -- and both of those defendants

18    went to trial in their case.

19         Other cases that I've cited were cases where there was

12:40:20  20    a negotiated settlement or at least a plea bargain, but the

21    sentences generally have not been guideline sentences.  And

22    I think that's consistent with the practice of the district

23    courts throughout the country and in the Northern District

24    of Ohio.

12:40:38  25         And I did attach some Sentencing Commission data

Case 1:16-cr-00244-PAC Doc #: 289-1 Filed: 01/30/23 117 of 163. PageID #: 3455
Case 1:16-cr-00244-PAC Doc #: 230 Filed: 02/03/23 117 of 163. PageID #: 3363

117

1    regarding downward variances granted in money laundering and

2    fraud cases, and there seems -- it seems to be the highest

3    category of case when it comes to granting downward

4    variances.

12:40:56   5    In my sentencing memorandum, Your Honor, I ask the

6    Court to consider an aggregate sentence of 168 months, I

7    believe.  It's 14 years.  I don't believe that a

8    sentence -- that would be including one or more of the

9    counts of 1028A, aggravated identity theft tacked on.

12:41:24   10    I don't believe a sentence greater than that is

11    necessary to achieve the ends that 3553(a) supports.

12    I believe that there is no chance that a sentence in

13    that range, or even a sentence that's less than that would

14    send a message to anyone in Europe planning on trying to

12:41:46   15    conduct a similar scheme that America goes easy on these

16    kind of crimes.  Other countries do, but America doesn't.

17    And 14 years in prison for a scheme, although it was

18    large and I acknowledge it, and it was long running, netted

19    my client no more than $500,000 over the course of those

12:42:07   20    years.

21    And I understand that I'm standing here today

22    representing a client who exercised his right to trial, and,

23    again, I don't think he had a choice.  I don't think the

24    Government wanted him to plead.  I think they wanted to put

12:42:20   25    the case on, and that's their right as well.

1       So when you look at just the disparities of these

2   other cases that would be created by a guideline sentence

3   here without a substantial variance, I think that the

4   sentence based on the percentage of the guidelines that I'm

12:42:47   5   recommending that -- as a defense attorney for

6   Mr. Nicolescu, I think that that addresses the disparity

7   concern in 3553.

8       With regard to policy disagreements, Your Honor, my

9   argument on policy disagreements is pretty much encapsulated

12:43:05  10   in -- I believe it's Exhibit A.  It's the law journal

11   article -- where -- and I could have found probably a lot

12   more scholarly research on the subject -- but where the

13   professors who prepared that article talk about how

14   they -- the guidelines are evolving, and unfortunately, for

12:43:32  15   someone like Mr. Nicolescu, maybe are not fine tuned to his

16   type of situation, where we see overlapping factors, and

17   that there is some -- there is some support and authority

18   for addressing those overlapping factors and the

19   inordinately high guideline numbers that are resulting from

12:44:00  20   this type of crime.

21       Because unlike the Government, I don't think this

22   compares to a robbery with a gun.  I don't think that this

23   type of activity compares to putting people in physical

24   danger.  It is certainly punishable and it should be

12:44:15  25   punished and there should be a serious sentence netted out.

Case: 1:16-cr-00224-PAG Doc #: 229-1 Filed: 01/30/23 119 of 163. PageID #: 3457
Case: 1:16-cr-00224-PAG Doc #: 236 Filed: 02/03/23 119 of 163. PageID #: 3905
119

                1          But I don't believe that there should be a sentence

                2    that is similar to drug kingpins or terrorists or other

                3    people that present a health threat to the community.

                4          I admit what Mr. Nicolescu has been convicted of is

12:44:34        5    very serious and it should be discouraged.  And a sentence

                6    of 168 months in this case would have that effect.  It would

                7    punish him.

                8          It would use the sanction that is no greater than

                9    necessary to affect the deterrence of other people, to

12:44:50       10    prevent Mr. Nicolescu from preventing further crime -- from

               11    committing further crime, and would provide him the

               12    necessary resources to enter the community, whether it's

               13    here or overseas, hopefully of a different mindset.

               14          Hopefully there will be training.  As a nonviolent

12:45:11       15    offender, hopefully he can put his considerable intelligence

               16    and skill set to work when he is eventually released from

               17    incarceration.

               18          And the Government will probably argue that there's no

               19    way that Mr. Nicolescu could ever be rehabilitated.  He's

12:45:28       20    beyond rehabilitation.

               21          Well, I don't think that's true.  I think

               22    Mr. Nicolescu went down a path that he knew was illegal and

               23    knew was criminal.  Didn't think he was going to get caught,

               24    yes, but that was the path that was open to him given his

12:45:43       25    upbringing in eastern Europe, his skill set.

Case: 1:16-cr-00224-PAG Doc #: 229-1 Filed: 01/30/23 120 of 163. PageID #: 3458
Case: 1:16-cr-00224-PAG Doc #: 236 Filed: 02/03/23 120 of 163. PageID #: 3663

120

1    There was -- and his inability to leave.  He couldn't

2    leave.  He was stuck in Romania with his family and this was

3    the path he went.

4        Given the opportunities that he would have had

12:45:58  5    elsewhere, he wouldn't have taken this path.

6        I truly believe that and I don't think that because he

7    continued this activity for over a long period of time or

8    was particularly cruel or adept at it, I don't think that

9    that means that he's beyond rehabilitation.  14 years is a

12:46:18  10    long time, Your Honor.

11        I'd also just wrap up by saying Mr. Nicolescu was --

12    has been in prison at this point for -- been incarcerated

13    for 3.5 years, I believe.  He was arrested in July of 2016.

14        He's been incarcerated in various holding facilities,

12:46:36  15    extradited from Romania.  He stands a substantial period of

16    time in prison after today and I think that the way he was

17    arrested and ripped out of his home country, brought back to

18    the United States, I think that adds to the deterrent effect

19    in Europe and to other people that may undertake this

12:46:59  20    activity.

21        All that being said, Your Honor, I would ask the Court

22    to consider the sentence -- to consider in the sentence a

23    downward variance from the guideline that we've determined

24    here this morning and this afternoon and sentence

12:47:14  25    Mr. Nicolescu substantially below that.

Case 1:16-cr-00244-PAG Doc #: 289-1 Filed: 01/30/23 121 of 163. PageID #: 6459
Case 1:16-cr-00244-PAG Doc #: 230 Filed: 02/03/23 121 of 163. PageID #: 3307

121

                    I've recommended 14 years, but I'll leave it to the

 2    Court's discretion in terms of whether to grant or -- and

 3    how large that variance could be.  Thank you.

 4                    THE COURT:  Mr. Nicolescu, do you have

 5    anything to say, sir?

 6                    THE DEFENDANT:  Yeah.

 7          During trial I've been moved by the human pain.

 8                    THE COURT:  Could you -- thank you.

 9                    THE DEFENDANT:  I'm sorry.  During trial I've

10    been moved by the human pain that was expressed by the

11    victims that testified, and seeing or hearing those stories

12    have -- has opened my eyes to the reality of the situation,

13    and I have developed a better appreciation for the extent to

14    which real lives were affected.

15          I can only hope that my incarceration helps those

16    victims.  My -- my deepest hope is that upon my release, the

17    probation department could allow me to have a job in the

18    computer programming field.

19          And I wish to say I will never do anything to harm

20    anybody or anything that would otherwise -- could bring me

21    back to a courtroom.  And I only wish to use my -- to use

22    my -- to do something positive using my skill, and not to

23    waste my life completely.

24          Thank you.

25                    THE COURT:  Thank you.

Case: 1:16-cr-00224-PAG Doc #: 229-1 Filed: 01/30/23 122 of 163. PageID #: 3460
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 122 of 163. PageID #: 3908

122

1                MR. BROWN:  First of all, Your Honor, the

2       Government would ask, regardless of the sentence that you

3       hand down today, a condition of his incarceration and

4       supervised release is he has no contact with computers or

12:49:13 5      the Internet, and he certainly not be allowed to volunteer

6       any work for the Bureau of Prisons.

7            I think that it is the Government's position that it

8       is patently offensive and arrogant that he stand before the

9       Court, considering the course of this case, and say that he

12:49:29 10     wants to use his prison skills in prison for the good of

11      people.

12           During the objections, and now, it's said that the

13      Government sees this case as a white whale or that we're

14      casting aspersions.  The Government will firmly contend and

12:49:50 15     firmly state on the record that Mr. Nicolescu is a bad man.

16           That this was not a chase of a white whale across the

17      seas, but, in fact, nine years of pursuing an extremely

18      sophisticated, extremely dangerous individual who took steps

19      beyond normal behavior to hide his identity, to hide his

12:50:10 20     tracks, and to hide his future moves.

21           The Government should not be criticized for spending

22      nine years tracking this defendant down and working with

23      Romania to extradite him.  And the Government will point out

24      that the extradition took three months, which is extremely

12:50:29 25     fast and extremely efficient for any country because of the

Case 1:16-cr-00244-PAG Doc #: 229-1 Filed: 01/30/23 123 of 163. PageID #: 3461
Case 1:16-cr-00244-PAG Doc #: 230 Filed: 02/03/23 123 of 163. PageID #: 3860

123

1    level of cooperation that the two countries had recognizing

2    the dangerousness of this defendant.

3         The Government would also point out that its

4    recommendations -- when it gets to its recommendations,

12:50:44  5    they're not based on law review articles, but we do look to

6    the assessment of academics and experts, one of whom took

7    the time out of his day -- actually took the time out of his

8    career to travel here in the courtroom.

9         The Government does want to recognize that Mr. Liam

12:51:06 10    O'Murchu is here.  He's not here to collect a trophy or to

11    revel in the sentence.

12         He's here as a professional who is involved in this

13    case who has a vested interest in keeping the Internet safe

14    and secure and who works for a company who has a vested

12:51:22 15    interest in providing Internet safety for all consumers.

16         And the Government would like to point out that this

17    is not an academic exercise.  This is, in fact, the

18    culmination of a lot of very sophisticated, dedicated work

19    of both the public and private sector.

12:51:36 20         And that dedicated work is not because we had to get a

21    scalp to hang on the wall, which is offensive to think, it's

22    because the Bayrob Group posed a significant and very

23    rarified danger to consumers worldwide on the Internet.

24         They started out as a very aggressive eBay fraud

12:51:57 25    system and piece of malware that infected computers and not

Case: 1:16-cr-00224-PAG Doc #: 229-1 Filed: 01/30/23 124 of 163. PageID #: 3462
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 124 of 163. PageID #: 3910

124

 1   just infected them but then put Web pages that looked like

 2   real eBay.  They had eBay chats in very good English.

 3        They had a level of sophistication with the eBay

 4   escrow agents to lull consumers into thinking that they were

 5   buying cars.  And when they collected that information,

 6   instead of just perpetuating this scheme, they evolved.

 7        And I'd like to take a step back and point out that

 8   some of the cases we cite here today -- and the Government

 9   would say largely all the cases the defense provides -- are

10   flawed in that the nature of Internet crime and the nature

11   of cybercrime is changing, specifically because of

12   defendants like Mr. Nicolescu -- and I'll include

13   Mr. Miclaus in that and I'll include Mr. Danet in that -- is

14   that these are not people stealing a credit card and busting

15   it out, to use the vernacular, "running up a large bill."

16   They are patient.  They are deliberate.  They are selling

17   them on places like eBay -- or AlphaBay or Silk Road to give

18   the opportunity for others to exploit those cards also.

19   This is not -- every comparison falls short.

20        This is not the difference between a person robbing a

21   bank with a gun and a person hacking into a bank and

22   stealing a million dollars, which is what most of those

23   comparison are.

24        This would be one person stealing from 50 million

25   banks or one person hacking into 50 million banks.  The

Case: 1:16-cr-00224-PAG Doc #: 239-1 Filed: 01/30/23 125 of 163. PageID #: 6463
Case: 1:16-cr-00224-PAG Doc #: 236 Filed: 02/03/23 125 of 163. PageID #: 3911

125

```
 1    scale and the scope of the criminal enterprise is

 2    fundamentally different than most cases out there.

 3        The closest thing really in recent press that this

 4    could compare to is two days ago or maybe yesterday, two

 5    Russian hackers were arrested -- or indictments were issued

 6    from the Northern District of California, and I want to say

 7    Missouri; is that correct?

 8              MR. MACFARLANE:  Pittsburgh and Omaha.

 9              MR. BROWN:  Pittsburgh and Omaha.

10        My geography is atrocious outside of the northern

11    district of Ohio.

12        It was almost as sophisticated -- possibly as

13    sophisticated of a scheme, but they're in Russia and they're

14    not coming back.

15        And we have these defendants.  We worked very hard to

16    make sure we got these defendants who were in 2016 and, you

17    know, still going forward, some of most sophisticated

18    examples of criminal activity in the world in this field.

19        You know, for Mr. Goldberg to say that the defendant

20    should be granted some consideration because he couldn't

21    leave Romania, well, Mr. Danet had interned at Google.  He

22    finished school.  He didn't drop out.  He got a Master's.

23    He interned at Google.  He had the opportunity to go back to

24    Google.  Google wanted to hire him.

25        Mr. Nicolescu had that opportunity as well.  He
```

Case 1:16-cr-00244-PAG Doc #: 239-1 Filed: 01/30/23 126 of 163. PageID #: 3464
Case 1:16-cr-00244-PAG Doc #: 230 Filed: 02/03/23 126 of 163. PageID #: 3412

126

1    dropped out of college because he saw there was more value

2    in being a criminal than being legitimate.  That's not

3    something to feel sorry about.  That was a deliberate choice

4    by somebody who has skills and abilities that most people

12:55:09  5    would never even dream of.

6         And he squandered it for criminal enterprise.

7         And the Government's position is we can't feel sorry

8    for somebody who makes that choice and then throws himself

9    on the mercy of the Court for saying, look, I didn't have

12:55:21 10    any opportunities.  He took those opportunities away from

11    himself when he made the choice to become a cyber criminal.

12         Likewise, he says he claims he only netted 500,000.

13    The Government contends that that's a mere shell of what he

14    actually earned.  And in part we may never know how much he

12:55:39 15    earned, because like everything else in this criminal

16    conspiracy, he hid behind multiple layers of encryption and

17    multiple layers of obfuscation.

18         The LUKS partitions and all of the different layers of

19    encryption that we may or may not ever be able to break into

12:55:57 20    is where he was hiding, the Government contends, his money.

21         So, again, the posture that he's coming asking for the

22    mercy of the Court is, I think, a disingenuous and

23    unbelievable posture based on his activity.

24         And again, the Government would point out that we

12:56:14 25    spent a lot of time on loss amount and I started off talking

1      about how loss amount is sort of a crude calculation for

2      this kind of crime.

3           On the servers, we saw the beginnings of what the

4      eBay -- or the Bayrob Group was becoming in the download of

12:56:32  5   the browsers.

6           We saw people's web history and credentials for sites,

7      not illegal sites, but embarrassing sites, pornographic

8      sites that people would not want to know -- other people to

9      know that they were visiting.

12:56:47  10       We saw plenty of bank information, the Wells Fargo,

11      the Bank of America.

12           We did see -- and we attached it as an exhibit, I

13      believe -- of a working schematic and an interactive

14      schematic from a power plant in Lorain, Ohio where if it was

12:57:03  15   sold on AlphaBay, you could -- Special Agent Macfarlane

16      talked to the managers of the power plant.  You could have

17      turned on and turned off parts of the power plant.  You

18      could have disrupted the power grid.

19           This is the type of data -- and when we're talking in

12:57:15  20   the abstract world, this is the type of data we're talking

21      about that they are collecting.  It was indiscriminate, but

22      in their mind it was going to become exploitable.

23           And they had the knowledge and the skill, all of them,

24      Nicolescu, Danet, and Miclaus, had the knowledge and skill

12:57:31  25   to exploit that.

Case: 1:16-cr-00224-PAG Doc #: 289-1 Filed: 01/30/23 128 of 163. PageID #: 6466
Case: 1:16-cr-00224-PAG Doc #: 236 Filed: 02/03/23 128 of 163. PageID #: 3914

128

                    They could mine -- they could write code.  One of them

         could write code, one of them could work databases, one of

         them could post things.  They had the ability to find

         information, exploit information, and profit from that

12:57:47  information.

                    And, you know, I guess if we've got to go back to the

         whaling analogy, we caught a big whale, but if he had been

         allowed to continue to swim, it would have been even bigger

         when we caught him.

12:57:59        These defendants are, the Government contends, unique

         because they're not rehabilitatable.  They have skills and

         they have personalities where they really don't care who

         they exploit, because it's money.

                    And Nicolescu said this in one of his Jabber chats.

12:58:16  First we had the money, then we had the power, soon we'll

         have both.

                    And that was in 1516 as the botnet was growing and

         changing from eBay to pure data mining exploitation.

                    Your Honor, the Government in this case would suggest

12:58:29  and would recommend that the full 240 months, the statutory

         maximum, be imposed in this defendant.

                    And Your Honor, we would also like to be heard

         specifically on the aggravated identity theft.  We're

         recommending that all five be run consecutive to each other

12:58:46  and to the 240 months.

Case: 1:16-cr-00224-PAG Doc #: 239-1 Filed: 02/03/23 129 of 163. PageID #: 3467
Case: 1:16-cr-00224-PAG Doc #: 239-1 Filed: 02/03/23 129 of 163. PageID #: 3467

129

1    These defendants didn't just exploit dead credit

2    cards.  They didn't steal envelopes out of the mailboxes

3    like credit card thefts used to be.  They didn't just buy

4    things from AlphaBay.

12:58:59 5    You heard from five residents in the Northern District

6    of Ohio whose lives were affected by this, and more if you

7    count Ms. Liddy and others from outside the district.

8    You heard of -- from a cabinetmaker who is still --

9    you know, he had -- for years had to change his credit

12:59:17 10    accounts because checks kept coming back and accounts kept

11    coming back because the credit card was stolen.  He had to

12    cancel it.

13    You know, was it a significant loss, no, it wasn't

14    millions of dollars, but it was ongoing and it was a hassle,

12:59:32 15    and it was an invasion of these people's privacies and sense

16    of security.  And these were people in the Northern District

17    of Ohio.  That's why we brought them in.

18    And we think that each of those five victims should be

19    given full due credit and full recognition of not only what

12:59:45 20    they had to go through, but also as the representation of

21    the hundreds of victims who responded to our Internet

22    surveys that made up the victim lists that were submitted to

23    Court.

24    So for those reasons, Your Honor, the Government is

12:59:59 25    asking for 360 months for defendant Nicolescu.  Thank you.

1                    THE COURT:  Mr. Goldberg, anything else?

2                    MR. GOLDBERG:  The only thing I would respond

3        to say is the analogy, although a little bit flippant about

4        a white whale syndrome, was to reference the lack of

13:00:24   5        negotiation or ability to resolve the case, not -- not

6        criticizing the Government in any other way.  They went

7        after somebody that had, in their view, committed serious

8        crimes.  It was basically the inability to really work

9        something out once I got involved in the case.

13:00:45  10                    MR. BROWN:  Your Honor, we had a Frye hearing

11        before trial where the discussion of negotiations and pleas

12        were discussed and the defendant on the record rejected the

13        final offers.

14                    THE COURT:  Ms. Morgan, anything before I

13:00:55  15        pronounce sentence?

16                    PRETRIAL PROBATION OFFICER:  No, Your Honor.

17                    THE COURT:  Mr. Nicolescu, it is the judgment

18        of this Court that you be committed to the custody of the

19        Bureau of Prisons to be in prison for a term of 216 months

13:01:06  20        on Counts 1 through 13 and Count 21; 60 months on Count 14;

21        120 months on Count 15, all to be served concurrently with

22        each other.

23            In addition, I am sentencing you to 24 months on each

24        of Counts 16 to 20 to be served concurrently with each

13:01:38  25        other, but consecutively with all other counts for a total

Case 1:16-cr-00224-PAC Doc #: 229-1 Filed: 01/30/23 131 of 163. PageID #: 3469
Case 1:16-cr-00224-PAC Doc #: 236-1 Filed: 02/03/23 131 of 163. PageID #: 3617

131

1    term of imprisonment of 240 months.

2           Upon release from imprisonment, you will be placed on

3    supervised release for a term of three years.  That's three

4    years on Counts 1 to 15 and 21 and one year on Counts 16 to

13:01:57  5    20, all to be served concurrently.

6           Within 72 hours of release from the custody of the

7    Bureau of Prisons you must report in person to the probation

8    office in the district to which you are released.

9           There is a special assessment of $2,100 due and

13:02:14 10    payable today.

11           While on supervision, you must comply with all of the

12    mandatory and standard conditions adopted by this Court.

13    They are set forth in Part D of your report.

14           In addition, you must surrender to the Bureau of

13:02:31 15    Immigration and Customs Enforcement U.S. Department of

16    Homeland Security for deportation as provided by law.

17           If you are ordered deported from the United States,

18    you must remain outside the United States unless legally

19    authorized to reenter.

13:02:45 20           If you do reenter, you must report to the nearest

21    probation office within 72 hours after you return.

22           You must submit to a warrantless search based only

23    upon reasonable suspicion of contraband or evidence of a

24    violation of a condition of release.

13:03:01 25           You must not engage in an occupation, business

Case 1:16-cr-00224-PAC Doc #: 239-1 Filed: 02/03/23 132 of 163. PageID #: 3470
Case 1:16-cr-00224-PAC Doc #: 230 Filed: 02/03/23 132 of 163. PageID #: 3416

132

1 profession, or volunteer activity involving information

2 technology without the prior approval of your probation

3 officer.

4  So it's going to be a determination by your officer.

13:03:18 5 You must allow the probation officer to install computer

6 monitoring software on any computer that you use.

7  I am going to add the computer search for monitoring

8 software condition.  I'm also adding the computer search

9 warning to others condition.

13:03:39 10  You must provide your officer with access to any

11 requested financial information and authorize the release of

12 any financial information.  You may not incur any new credit

13 charges or open additional lines of credit without the

14 approval of your officer.

13:03:56 15  You must apply all monies received from income tax

16 refunds, lottery winnings, judgments, et cetera, to your

17 financial obligation.  You may not access the Internet

18 without approval of your officer.

19  Let me inform you that you do have the right to appeal

13:04:10 20 your conviction and sentence to the extent -- strike that.

21  You have the right to appeal.  If you cannot afford to

22 appeal, the cost will be borne by the Government.

23  I do, in fact, find the sentence to be sufficient, but

24 not greater than necessary to satisfy the purposes of

13:04:28 25 sentencing.

1     Let me start with the Government's request of a

2    30-year sentence. I have to ask whether a sentence that is

3    equivalent to one imposed for murder, rape, or terrorism is

4    appropriate, and I find that the answer is no.

13:04:45  5     I find that the scheme caused tremendous damage to a

6    large number of individuals, but I also acknowledge it

7    didn't leave any individual destitute.

8     I also do acknowledge that the defendant was acquitted

9    of the enhancement, and that is different than what occurred

13:05:12  10    at the plea negotiation stage, as was pointed out by

11    Mr. Goldberg, and I do note that the enhancement did, in

12    fact, carry an additional seven-year prison term, and he was

13    acquitted of that.

14     That all being said, this Court cannot justify a

13:05:31  15    sentence as low as what Mr. Goldberg has advocated for.

16     I do consider this to be a very serious scheme that

17    warrants a very serious sentence. The defendant victimized

18    a large number of people from another continent. The

19    complexity of the scheme allowed the defendant's criminal

13:05:57  20    behavior to continue unabated for nearly a decade.

21     I find that tremendous resources had to be used from a

22    number of governments, as well as private sector forensic

23    computer experts. They were all expended in an effort to

24    capture this defendant and stop him from victimizing even

13:06:25  25    more people.

Case 1:16-cr-00224-PAG Doc #: 290-1 Filed: 01/30/23 134 of 163. PageID #: 3472
Case 1:16-cr-00224-PAG Doc #: 230-1 Filed: 02/03/23 134 of 163. PageID #: 3320

134

1    And, frankly, I see many defendants come before me who

2    simply have little or no chance of achieving in life due to

3    their circumstances.

4    But, sir, you are very different. You were given the

13:06:43 5    gifts of tremendous intelligence and skill and instead of

6    using those gifts for good, you chose a path of crime. And

7    you did it because of greed.

8    You didn't want to work hard enough to earn money

9    honestly. But you certainly had the ability to do so.

13:07:03 10    I also find that a lengthy sentence is appropriate in

11    order to protect the public from further crimes, and to

12    deter similar conduct. Such a sentence is necessary to send

13    a message to others like the defendant who operate well

14    planned and what I call heartless computer crimes.

13:07:24 15    I want to send the message that if you engage in this

16    conduct, you are going to be caught and justice will be

17    served. And when you are caught, consequences are very,

18    very serious.

19    It is for those reasons that this Court finds the

13:07:42 20    sentence to be sufficient, but not greater than necessary to

21    satisfy the purposes of sentencing.

22    Let me go further. I have attempted to identify

23    mitigating factors, and the only two mitigating factors I

24    can identify is the fact that the defendant has no criminal

13:07:59 25    record and that this was not a crime of violence.

Case 1:16-cr-00224-PAG Doc #: 229-1 Filed: 02/30/23 135 of 163. PageID #: 3473
Case 1:16-cr-00224-PAG Doc #: 296 Filed: 02/03/23 135 of 163. PageID #: 3271

135

          1           But, again, a very serious crime.

          2           Mr. Goldberg, you are, for the record, maintaining all

          3     of your objections?

          4                MR. GOLDBERG:  That's correct, Your Honor.

13:08:17  5                THE COURT:  And I'm preserving those for you.

          6           Any other objections?

          7                MR. GOLDBERG:  I would ask the Court to note

          8     an objection to the sentence to the extent it exceeds the

          9     recommendation made in the sentencing memorandum filed by

13:08:29 10     the defendant.  Other than that, no objections.

         11                THE COURT:  Fair enough.

         12                MR. GOLDBERG:  Thank you.

         13                THE COURT:  And anything further?

         14                MR. GOLDBERG:  No, Your Honor.  Thank you.

13:08:36 15                THE COURT:  Okay.  Mr. Brown.

         16           First of all, sir --

         17                MR. BROWN:  Yes, Your Honor.

         18                THE COURT:  -- any objections?

         19                MR. BROWN:  None at all, Your Honor.

13:08:41 20                THE COURT:  And secondly, anything further?

         21                MR. BROWN:  No, Your Honor.  Thank you very

         22     much.

         23                THE COURT:  Ms. Morgan, as to this defendant,

         24     anything else?

13:08:48 25                PRETRIAL PROBATION OFFICER:  No, Your Honor.

Case 1:16-cr-00224-PAG Doc #: 229-1 Filed: 01/30/23 136 of 163. PageID #: 3474
Case 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 136 of 163. PageID #: 3522

136

```
 1                   MR. GOLDBERG:  Your Honor, I'm sorry.  I have

 2        one additional thing.

 3                   THE COURT:  Oh, sure.

 4                   MR. GOLDBERG:  I would ask the Court to

 5        consider -- and I understand the nature of Mr. Nicolescu may

 6        require the Court to defer to the BOP completely, but to the

 7        extent that you could make a recommendation to Allenwood,

 8        Pennsylvania Federal Correctional Facility, we would ask the

 9        Court to do that.

10            I'm sorry.  He does have family in the United States,

11        not necessarily in that area, but that would be convenient

12        for them.

13                   MR. BROWN:  Your Honor, our only

14        recommendation is that he be somewhere that can handle

15        sufficiently the restrictions placed on him for

16        communication.

17                   THE COURT:  Yeah, that's a given.

18                   MR. BROWN:  Right.

19                   THE COURT:  So you're not objecting to the

20        recommendation?

21                   MR. BROWN:  We have no ability to --

22                   THE COURT:  No reason one way or the other.

23                   MR. BROWN:  We have no authority in that.

24                   MR. O'SHEA:  Nothing further, Your Honor.

25                   THE COURT:  So no recommendation on that.
```

Case: 1:16-cr-00224-PAG Doc #: 229-1 Filed: 02/03/23 137 of 163. PageID #: 3425
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 137 of 163. PageID #: 3325

137

 1              MR. O'SHEA:  No.

 2              THE COURT:  Well, I will recommend it, but as

 3    you say, Mr. Goldberg, it's purely a recommendation.  The

 4    Bureau of Prisons will make that determination.

13:09:53  5              MR. GOLDBERG:  Thank you, Your Honor.

 6              THE COURT:  All right.  You're all set,

 7    Mr. Nicolescu.

 8         Mr. O'Shea, should I turn to you first?

 9              MR. O'SHEA:  Yes, Your Honor.

13:10:03 10              THE COURT:  Or your client.

11              MR. O'SHEA:  Me first, if I can, Your Honor.

12              THE COURT:  You go right ahead.

13              MR. O'SHEA:  All right.

14         First and foremost, Judge, for purposes of what I'm

13:10:19 15    doing here at this podium in your courtroom, I would ask

16    that you consider that I'm going to make some comments to

17    you based upon the law and equity as I see it.

18         To the extent that the Government disagrees with me or

19    the Court might -- and I know this to be true, but just let

13:10:36 20    me say it.  Please hold it against me and not my client.

21         My client has a long statement that he would like to

22    make to you today.  I don't know whether we want to take a

23    break or not, but it's a long one, Your Honor, about how he

24    feels about what he has done and his contrition, all right.

13:10:54 25              THE COURT:  Is it the same one that was

Case 1:16-cr-00224-PAG Doc #: 289-1 Filed: 02/03/23 138 of 163. PageID #: 3476
Case 1:16-cr-00224-PAG Doc #: 290 Filed: 02/03/23 138 of 163. PageID #: 3924

138

1    already provided to me?

2              MR. O'SHEA:  I think so, yes, Your Honor.

3              THE COURT:  I received it yesterday evening.

4              MR. O'SHEA:  All right.  Very well, Judge.

13:11:05  5              THE COURT:  And I did, in fact, read it in its

6    entirety this morning, even making it a point to get here

7    extra early so that I could have the time to read it.

8              MR. O'SHEA:  Thank you, Your Honor.

9    That's -- then we don't need to necessarily --

13:11:20 10              THE COURT:  Sir, I'm directing this to you.

11        I did, in fact, read it in its entirety.

12              DEFENDANT MICLAUS:  Thank you.

13              MR. O'SHEA:  Thank you, Your Honor.

14        Moving on, then.  In my sentencing memorandum, I make

13:11:37 15    reference to page 44 of the departure in variance primer

16    where it says the issues that are subject -- that may not,

17    rather, be subject to a departure, but may nevertheless be

18    the basis of a variance, and I don't think the Government

19    disagrees with me on that.

13:11:49 20        Attached to our -- well, my client's sentencing

21    memorandum were these exhibits that kind of give the Court

22    some background as it relates to, as we have on Exhibit A,

23    quick facts, again, set forth by the Sentencing Commission

24    relative to theft, property destruction, and fraud offenses.

13:12:11 25        And Exhibit B, quick facts and circumstances involving

Case: 11-6cr-00824-PAG Doc #: 229-1 Filed: 01/30/23 139 of 163. PageID #: 3457
Case: 1:16-cr-00824-PAG Doc #: 236-1 Filed: 02/03/23 139 of 163. PageID #: 3525

139

1    money laundering offenses, and then of course, Exhibit C,

2    copyright and trademark offenses.

3        Kind of giving the Court an idea of context, you know,

4    nationwide and what the averages are and the like.

13:12:26  5        So -- and I'm sure the Government won't agree that

6    what are in those sentencing factors or quick facts are

7    relevant here, but nevertheless, that document, those three

8    documents were prepared by the federal government.

9        And the federal government take -- I assume the

13:12:42  10    Sentencing Commission took great pains to go make sure that

11    the facts that they were going to utilize in setting forth

12    those memorandums were accurate.

13        So I assume they're accurate and therefore, we pointed

14    out in our sentencing memorandum, you know, average

13:12:58  15    sentences, number of cases where we have had variances.  So

16    I assume that's accurate.

17        So I think any Court could be comfortable in relying

18    on those when it comes to trying to formulate a sentence in

19    a case like this.

13:13:14  20        Now, I get and anticipate the fact that the Government

21    will argue that this is a really unique type of case, not

22    one of the average ones.  But I don't see anything in those

23    memos that say that cases like this weren't taken into

24    consideration with coming up with those averages and those

13:13:33  25    facts.

Case: 11-66-cr-00324-PAG Doc #: 289-1 Filed: 01/30/23 140 of 163. PageID #: 6478
Case: 1:16-cr-00324-PAG Doc #: 236-1 Filed: 02/03/23 140 of 163. PageID #: 3326

140

1          So I emphasize those and we attached them as exhibits

2     to our sentencing memorandum for that very purpose.

3          One thing I'd also like to point out, Your Honor, in

4     this presentence investigation -- I should have brought this

13:13:45  5     up as an objection, but I don't know if it is.

6          It says that his arrest date is 12-16-16.  My

7     understanding is he was arrested in September of 2016, about

8     three months earlier.  So he obviously should get some sort

9     of credit on that.  I don't think the Government would

13:14:01 10    disagree with me on that, either.

11          I don't think also the Government would disagree with

12     me on the fact that my client is not MasterFraud, and I'm

13     asking this Court to consider the fact that the guy named

14     MasterFraud was either by himself or by the Government given

13:14:17 15    that name for a reason.  My client had no such nickname.  No

16     powerful title like MasterFraud.

17          So we've argued very, I think, fairly, and I hope the

18     Government believes that at least the argument is fair, that

19     my client, when compared to others in this organization,

13:14:36 20    this Bayrob Group, had a participation level, an

21     organizational level, a mastermind, master fraud level, you

22     know, way, way less when compared to people that got plea

23     deals and people that are going to receive zero time in

24     jail.  Zero.

13:14:57 25          So when talking about the variances in this case, I,

Case: 1:16-cr-00224-PAG Doc #: 229-1 Filed: 02/03/23 141 of 163. PageID #: 3279

1    again, because like I said, on page 44, the primer, we get

2    to emphasize his role, and I know that the Court for

3    purposes of a departure and in calculating the sentencing

4    guideline range disagreed with me about the role.

13:15:19  5    But the fact -- you know, and I think it was somewhat

6    of a -- if you excuse the argument, Your Honor -- a

7    technical argument, because we're arguing guidelines and

8    departures here.

9    But here when it comes to variances, we get to argue a

13:15:34 10    little bit more of, you know, really planet earth type of

11    stuff.  What goes on in his life and comparing him to the

12    others in this case.

13    So I'm asking this Court in determining whatever

14    sentence the Court chooses to impose on my client, that the

13:15:51 15    Court consider that.

16    Now, as we pointed out -- and by the way, Your Honor,

17    again there was a typo, I just noticed it this morning on

18    page 26 of our sentencing memorandum.  I have where it says

19    the sentence, I have 94 to 11 months.  It should be 111

13:16:05 20    months.  I'm sure you caught that anyway, Judge.

21                   THE COURT:  I knew that.

22                   MR. O'SHEA:  All right.  But, you know, we

23    pointed out, Judge, the only thing that changed with my

24    client was -- and I think Mr. Goldberg emphasized this -- is

13:16:24 25    that he went to trial.  Okay.

Case 1:16-cr-00324-PAC Doc #: 229-1 Filed: 01/30/23 142 of 163. PageID #: 3480
Case 1:16-cr-00324-PAC Doc #: 236-1 Filed: 02/03/23 142 of 163. PageID #: 3828

142

1        I don't think -- and I think that the Government is

2   going to agree with me -- that my client did anything to

3   obstruct justice other than if you want to say just sitting

4   in the chair and listening while the case was presented.

13:16:37  5        As we all know at this point, you know, and for a

6   while we tried to not broadcast something like this, but my

7   client proffered.  And from what I remember from my

8   conversations with the Government -- and I trust them when I

9   tell me this stuff -- proffered well.

13:16:53 10        And I think if we -- if we ask ourselves the question,

11  be it the Court, be it the Government, including myself,

12  that we have almost rarely, if ever, seen a situation where

13  an individual in a situation, any type of conspiracy,

14  proffers, proffers well, but then goes to trial.

13:17:12 15        So we are in unique and virgin territory here about

16  how do we -- how do we deal with a situation where somebody

17  proffers well, assists the Government, but nevertheless goes

18  to trial, and the only reason they go to trial is because

19  what the Government wants them to do, that 94 to 111 months,

13:17:33 20  is not what they want to do as far as the sentence.

21        That was the only disagreement that the defendant had,

22  Your Honor.  That's it.  There is no other disagreement.  He

23  didn't obstruct.  He didn't do anything other than

24  cooperate.

13:17:47 25        And I'll bet you if you ask anybody in the U.S.

Case: 1:16-cr-00224-PAG Doc #: 229-1 Filed: 01/30/23 143 of 163. PageID #: 3481
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 143 of 163. PageID #: 3929

143

1    Marshal's office, or anybody at the Euclid jail where he

2    spent time, or at the Cuyahoga County jail, that he was

3    nothing other than a polite, cooperative, pleasant person to

4    deal with on a daily basis.

13:18:01  5        And, you know, for whatever value it does have,

6    Your Honor, as I think has been pointed out to you in some

7    of the writings the defendant has supplied to you, my

8    client, to a certain degree, for whatever value it has, was

9    a victim of the craziness at the Cuyahoga County jail.

13:18:16 10        Because by merely attempting to exercise his right to

11   have access to a computer so he could, you know, examine

12   evidence in this case, Your Honor, that both I, and I think

13   the Court took great pains to do and issue orders so that

14   that could happen, that that was thwarted, not through

13:18:33 15   anybody's in this courtroom's fault at all.  But

16   nevertheless, it had an impact on the guy.

17        And, you know, the fact that he was at the

18   Cuyahoga County jail is kind of my fault because I thought

19   that would be a better place.  I didn't want him anywhere

13:18:48 20   near this guy over here, MasterFraud at CCA, and obviously,

21   I was right about that.

22        But the fact that he ended up in Cuyahoga County jail

23   and he was sent into the hole as long as he was for merely

24   asking to look at his evidence is something I ask the Court

13:19:03 25   to take into consideration in the totality of what the Court

Case: 11-6c-r00824-PAG Doc #: 229-1 Filed: 01/30/23 144 of 163. PageID #: 3482
Case: 1:16-cr-00824-PAG Doc #: 236-1 Filed: 02/03/23 144 of 163. PageID #: 3530

144

 1     is about to do.

 2          Now, I call in my sentencing memorandum this thing

 3     called a proffer factor, okay, because it is a factor I'm

 4     asking this Court to take into consideration when, A,

13:19:21  5     sentencing him, and B, analyzing him and comparing him to

 6     the other persons that were part of this Bayrob Group, both

 7     indicted and non-indicted, both charged and uncharged,

 8     because the law allows you to do it.

 9          And then, you know, I know that the Government

13:19:46 10     disagrees with this, but I call this the mope factor.  I've

11     been doing this long enough to know that the guy who is

12     the -- for instance, to use the analogy of a guy who

13     transports the drugs from Chicago to Cleveland -- and I

14     think this is what the Government is going to try to

13:20:04 15     argue -- is somehow an organizer or a leader because he or

16     she knows what's going on as part of the organization.

17          And I think that Agent Macfarlane said it best this

18     morning when he said, at best -- and the question was

19     brought out of him by the Government -- that Mr. Miclaus was

13:20:26 20     aware of what's going on.

21          I don't think, to be honest -- and again, I'm talking

22     about this thing I call the mope factor.  The mere fact that

23     he's aware of what MasterFraud is doing doesn't make him a

24     manager, organizer, or a leader.

13:20:43 25          And the Government made that argument here this

Case 1:16-cr-00244-PAC Doc #: 289-1 Filed: 02/30/23 145 of 163. PageID #: 3493
Case 1:16-cr-00244-PAC Doc #: 290 Filed: 02/03/23 145 of 163. PageID #: 3591

145

1    morning and this afternoon, that because he's aware of what

2    this MasterFraud guy was doing, that somehow he's a leader

3    or an organizer.

4         And I go back to my McDonald's analogy again, and

13:21:04  5    maybe it's not the best analogy.  Again, if it's not,

6    Your Honor, hold it against me and not against Mr. Miclaus.

7         That it is clearly unfair and inequitable to argue

8    that Mr. Miclaus holds the same rank and role in this

9    organization as that of MasterFraud.  It is against the

13:21:21 10    facts and it is against equity and fairness.  It is.

11         So I ask the Court to consider how he was involved.

12         Now, I didn't hear that Mr. MasterFraud was -- had any

13    other job other than being MasterFraud.  Again, blame that

14    on my recollection of what we heard at trial.

13:21:43 15         But I did hear that this man was working, my client,

16    Mr. Miclaus, that -- and I think the Government won't

17    disagree with this -- based on their investigation, this guy

18    did not just -- he wasn't just a skydiver, part time, that's

19    not true.  He did thousands of skydives.  He was an

13:21:59 20    instructor, a worker.  He had jobs.

21         And this stuff that he was doing -- if we look at the

22    real facts -- was something that he was kind of doing on the

23    side.  But it wasn't his, you know, sole profession like it

24    was for Mr. MasterFraud.  So I don't expect the Government

13:22:17 25    is going to argue that.  I hope they don't.

1       So, again, I'm asking -- I'm pointing this out,

2  Your Honor, because I'm asking you to compare my client to

3  Mr. Danet, who's got himself a deal, obviously, and to the

4  unindicted, uncharged folks that they flew over here free of

13:22:39 5  charge.

6       So please compare him with the facts that you know

7  that he was involved with from the trial rather than just

8  simply argument.

9       Now, one of the things that we also make reference to

13:22:51 10  on page 22 of our sentencing memorandum -- and I don't know

11  if I'm making the best argument about this -- is dependence

12  upon criminal activity for livelihood.

13       Now, I remember one of the more remarkable things at

14  trial is when one of these witnesses that they brought over

13:23:07 15  here, that they flew over here, on cross-examination or

16  direct examination -- I can't remember which -- was asked

17  about his high school class in Romania.

18       And the question was asked, Well, how many students,

19  fellow students in that high school class in the computer

13:23:24 20  class was engaging in computer fraud?

21       And the witness quite frankly said, I think almost

22  everybody.  It's almost like a way of life over there.

23       Now, I'm not saying to you that that's an excuse for

24  engaging in criminal conduct, but it does provide some

13:23:41 25  context about where my client lives and what my client

1    experienced growing up.

2         So that's the reason we point it out.  That was a

3    Government witness who said that, and I assume under oath,

4    that told the truth.

13:23:55 5         Now, we also know that as you've already pointed out,

6    Your Honor, my client, for purposes of the variance that I'm

7    asking for here today, is zero criminal history points.

8         And I don't know that the Government is going to argue

9    this like they did with MasterFraud here, but there's zero

13:24:14 10   chance that my client is going to re-offend.

11        They can make this argument, but my client has skills

12   way behind beyond that of being involved in the Bayrob

13   Group, and I think that was presented at trial.

14        Now, we also know that my client will be deported back

13:24:31 15   to Romania when he gets out of the institution that he gets

16   assigned to.  We know that.

17        We also know that he was apprehended in his home

18   country, brought over here, that he has a certain amount of

19   depression that he suffered because while here, of course as

13:24:45 20   the Government is aware, his mother passed away.  He wasn't

21   there for that.

22        I can't imagine what kind of impact that has on you,

23   what type of guilt you have to live with and resentment of

24   yourself, not the Government, because of that event.  I

13:25:02 25   can't imagine that happening to anybody.

Case: 11-6cr-00324-PAG Doc #: 229-1 Filed: 01/30/23 148 of 163. PageID #: 3496
Case: 1:16-cr-00324-PAG Doc #: 236 Filed: 02/03/23 148 of 163. PageID #: 3534

148

1          And if that's not -- not enough punishment, but a

2     punishment that we might consider in determining his

3     sentence.

4          We also point out, again, Your Honor, that the

13:25:14  5     comparison to people charged and uncharged in this case --

6     and I know that the Government, I get it, has to make tough

7     decisions when they're going to go to trial.  I get that.

8          But the fact that people got to sit right up there who

9     had actively, in my opinion, Judge -- again, hold this

13:25:36 10     against me if I'm wrong -- actively more involvement in the

11     Bayrob Group, active, conscious greed that exceeded that of

12     my client, who will never see a day behind bars and who only

13     get out the "get out of jail" card solely because they

14     agreed to get on a plane and fly over here free of charge.

13:25:58 15          So I'm not quite sure how the Government could say

16     that that's okay, but my client has got to get all the years

17     that they're going to argue for.  I'm not even sure what

18     they're going to argue for in light of what's developed this

19     morning.

13:26:14 20          So I think I have been doing this long enough to know

21     that I rarely have a client who is cooperative and polite in

22     getting things done, who treats his captors and his

23     prosecutors with as much dignity and fairness as this guy

24     has.

13:26:33 25          I will tell you this, Judge.  That as you can see from

Case: 1:16-cr-00224-PAG Doc #: 239-1 Filed: 01/30/23 149 of 163. PageID #: 6487
Case: 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 149 of 163. PageID #: 3935

149

1    that 34-page letter that he wrote you, this is a unique

2    individual when compared to other people that have probably

3    appeared in your courtroom.

4         I'm not saying he's a better human, but how often is

13:26:54 5    it that a guy takes the time to pen a 34-page life story to

6    you trying to tell you how you got here.  And I'm going to

7    ask you to consider that very strongly because it's not

8    every day.

9         As a matter of fact, I've never seen it, so I can't

13:27:09 10   imagine a guy who has not -- who's not demonstrated more

11   polite cooperation, respect.

12        I get it that he was doing stuff before he was

13   apprehended, I get that, but after that, after he got here,

14   working with the Government, being polite to them,

13:27:25 15   cooperative with them, making an incredibly potentially bad

16   decision to take the case to trial after doing what he did,

17   I'm asking you to consider that, Judge, because it's not an

18   everyday event, and I just -- I haven't seen it.

19        So, please, I plead to you, take that into

13:27:43 20   consideration when determining what happens for Mr. Miclaus

21   the rest of his life, Judge.

22             THE COURT:  And, sir, do you have anything to

23   say other than what you've already put into your

24   correspondence?

13:27:57 25            DEFENDANT MICLAUS:  No, thank you.  No, Your

Case: 1:16-cr-00224-PAG Doc #: 229-1 Filed: 01/30/23 150 of 163. PageID #: 6488
Case: 1:16-cr-00224-PAG Doc #: 236 Filed: 02/03/23 150 of 163. PageID #: 3936

150

1    Honor.

2                    THE COURT:  And please accept my sympathy on

3    the loss of your mother.  I did, in fact, read that in your

4    letter to me.

13:28:07  5                    DEFENDANT MICLAUS:  Thank you.

6                    THE COURT:  Mr. Brown.

7                    MR. BROWN:  Your Honor, like with

8    Mr. Nicolescu, we held a Frye hearing on the record in open

9    court where all offers of settlement were rejected by the

13:28:20 10    defendant, knowingly, voluntarily, and of his own free will.

11        The Government will also say that although the

12    defendant did proffer, when it became clear he was not

13    pleading, we did not affirmatively use any information that

14    he provided as per the terms of the letter.

13:28:37 15        We did not violate any sort of ethical duties by

16    taking a proffer and using it improperly.

17        So we want the record to reflect that.  That, again,

18    the suggestion that the Government assisted or was assisted

19    by the proffer is not true.  We -- if anything, we -- we had

13:29:01 20    to recalibrate after thinking that he was going to honor the

21    plea deal.  He didn't.

22        The Government would also like to point out -- and

23    this is very interesting because of the names MasterFraud

24    and Amightysa, which are very -- you know, lots of bravado

13:29:18 25    and gusto there.

Case 1:16-cr-00224-PAG Doc #: 229-1 Filed: 01/30/23 151 of 163. PageID #: 6489
Case 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 151 of 163. PageID #: 6557

151

1     You know, Miclaus's nickname was -- both of them were

2    for stuff he bought.  The Minolta 9797 was because he liked

3    Minolta digital cameras, which are not cheap, and RaduSPR01

4    is the license plate of his BMW.

13:29:37  5     So this defendant is not lacking in, you know,

6    self-aggrandizer sense of self-worth here.  He's naming

7    himself after all the cash he's spending.  And he did

8    travel, too.

9     And, look, he was a part-time skydiving instructor,

13:29:57 10   and he was able to travel throughout Europe.  He was able to

11    stay -- yeah, he went to Spain, he went to other places on

12    vacations.  He was benefiting financially from the criminal

13    enterprise that he was engaged in.

14     And, likewise, the people who came over and testified

13:30:12 15   were participants in the scheme at various points in time.

16    They all left the scheme.  They all stopped the scheme.

17     The two constant members of the Bayrob Group were

18    Nicolescu and Miclaus.  Miclaus was always there from the

19    beginning and he was there at the end.  Was he -- did he

13:30:28 20   write the code?  No.

21     Did he have the ability to write code?  He absolutely

22    did.

23     I cannot stand here and I would not stand here today

24    and say he definitely did or did not.  I don't think anybody

13:30:40 25   could, other than Nicolescu, Danet, and Miclaus, point to

Case 1:16-cr-00224-PAC Doc # 239-1 Filed 01/30/23 152 of 163 PageID #: 6490
Case 1:16-cr-00224-PAC Doc # 239-1 Filed 02/03/23 152 of 163 PageID #: 3938

152

1   specific things that they did or not do.

2       Obviously, we're not asking Mr. Miclaus to do that

3   today.

4       But he did financially benefit repeatedly from his

13:30:54  5   activity, his constant ongoing activity in the Bayrob

6   scheme.  He was not some babe in the woods who was just

7   carried along or some naif who was thrown money every once

8   in a while just to keep quiet because they liked him.

9       He was an active participant.  He knew what was going

13:31:11  10  on.  He participated in what was going on.  He had all of

11  the same computer systems and all of the same technology

12  that allowed him to go through the -- you know, the multiple

13  steps that were described, from the wireless router to the

14  SSH shells, tunneling through people's accounts to the VPNs

13:31:29  15  to the Tor router, to everything to get to the command and

16  control server, and he did.  He did.

17      He was -- he is, not was.  He's intelligent.  He was

18  capable, and, again, he squandered those talents to live a

19  life of crime.

13:31:49  20      He could have, in high school -- he could have after

21  high school made other decisions and he didn't.  He chose to

22  hitch his wagon to Nicolescu and to Danet.  He did that

23  because he was making lots of money.  And it was easy to

24  make money.

13:32:03  25      And, you know, I don't know how to explain it, but,

Case 1:16-cr-00224-PAC Doc #: 289-1 Filed: 01/30/23 153 of 163. PageID #: 3491
Case 1:16-cr-00224-PAC Doc #: 290-1 Filed: 02/03/23 153 of 163. PageID #: 3591

153

13:32:23

13:32:42

13:32:57

13:33:12

13:33:25

1    you know, in Danet's proffer he said, Look, every American

2    can stand to lose 10,000 bucks.

3         If we really want to look at the psyche of, and assess

4    a common psyche to an entire country, maybe that's the one.

5    It's the picture that all Americans are wealthy and stupid

6    and are deserving to be milked.  And that's what drove

7    Miclaus, and he was a willing participant in all of this.

8         The Government would contend, absolutely it's not an

9    average case and we would urge, like we did with Nicolescu,

10   you throw those things out the window where they're looking

11   at a single bank robbery or a single credit card fraud.

12   This is not that.

13        It is a fraud on a massive, sophisticated evolving

14   scope, and at every point of its growth and every point of

15   its evolution, Mr. Miclaus was there, actively

16   participating.

17        He had the Jabber accounts between Nicolescu and

18   himself and Danet.  He was talking to them through the

19   secured Jabber.  He was keeping up to date on all of the

20   cryptomining.

21        He was not saying, hey, when are we going back to eBay

22   fraud, or, Hey, I got a new picture of a Camero.  That

23   wasn't him.  He went lockstep along as this scheme developed

24   because he was continuing to make money and continuing to

25   expand his role and his duties within the group.

Case 1:16-cr-00224-PAG Doc #: 2390-1 Filed: 01/30/23 154 of 163. PageID #: 3492
Case 1:16-cr-00224-PAG Doc #: 2390-1 Filed: 02/03/23 154 of 163. PageID #: 3540

154

1    Again, this was a group that prided itself in five

2    people, maybe three most of the time.  He was one of the two

3    constants of that two, three, five-member group.  Always

4    there.

13:33:40  5    And for him to suggest, Well, somebody else who had a

6    part-time role should be held accountable instead of me,

7    well, he was there and he stayed and he chose to stay.

8    And within that role, again, he wasn't -- he wasn't

9    the -- he wasn't the fry boy.  He was the one posting the

13:34:01  10   ads.  He was the one collecting money when it came -- you

11   know, when it was aggregated for Europe.  He knew.

12   And who do you trust with the money other than one of

13   the guys in charge?  You don't give it to the mope because

14   the mope is going to lose it or gamble it away or do

13:34:20  15   whatever.  You give it to a trusted member and he was that

16   trusted member who got the money when it made that final

17   step back in the Bayrob Group.  He was that trusted member.

18   And there is nothing inconsistent with his role with

19   that four-level that he got today and with anything that the

13:34:36  20   Government argued in its briefs.

21   And because of that, Your Honor, because he had the

22   opportunity at every step to be treated differently, to let

23   himself be treated differently or actively treat himself

24   differently to set himself apart, and at every step he

13:34:55  25   refused to do that.

1    He didn't have to get involved when they were doing

2    eBay fraud.  He didn't have to post hundreds and hundreds

3    and hundreds of accounts.  But he did.  He didn't have to go

4    into the transition with the eBay -- or with the Y pool and

5    the cryptocurrency.  But he did.  He could have taken the

6    deal.

7        And at some point he has to be held accountable for

8    his actions, his ten years worth of actions that harmed

9    hundreds and thousands of people here, overseas, in the

10   Northern District -- as I already said, and I won't go back

11   through those victims, but he has to be held accountable.

12       And because of that, we're treating him equally as to

13   the other core members of the Bayrob Group, which is asking

14   for the maximum which is 240 months and the five

15   years -- the five aggravated identity thefts to be run

16   consecutively.

17       Thank you very much, Your Honor.

18             THE COURT:  Ms. Morgan, anything, ma'am?

19             PRETRIAL PROBATION OFFICER:  No, Your Honor.

20             THE COURT:  It's the judgment --

21             MR. O'SHEA:  May I just respond, Judge.

22       I never said my client was a babe in the woods.  Never

23   said that, number one.

24       Number two, I never argued that the Government

25   violated any ethical duty.

Case: 1:16-cr-00224-PAG Doc #: 229-1 Filed: 02/30/23 156 of 163. PageID #: 3494
Case: 1:16-cr-00224-PAG Doc #: 230-1 Filed: 02/03/23 156 of 163. PageID #: 3542

156

1          THE COURT:  No, I know.

2          MR. GOLDBERG:  Never said that.  Never would.

3      In addition to that, Judge, to argue that the proffer

4  wasn't useful is completely contrary to this fact that they

13:36:08  5  offered him 94 to 111 months and they're arguing something

6  different today based only on the fact that he went to

7  trial.

8      So for them to say the proffer was no good is the

9  antithesis of the offer that they gave him.

13:36:19 10      Thanks, Judge.

11          THE COURT:  It's the judgment of this Court,

12  sir, that you be committed to the custody of the Bureau of

13  Prisons to be in prison for a term of 192 months on Counts 1

14  through 13 and 21, to be served concurrently to each other.

13:36:35 15      60 months on Count 14 to be served concurrently.

16      120 months on Count 15 to be served concurrently.

17      24 months on each of Counts 16 to 20 to be served

18  concurrently with each other, but the two years will be

19  served consecutively with the all -- with all other counts.

13:37:04 20      Mr. Goldberg, I certainly hope I made that clear as to

21  your client as well.

22          MR. GOLDBERG:  My understanding was, one

23  24-month sentence --

24          THE COURT:  Correct.

13:37:13 25          MR. GOLDBERG:  -- they will all be served

Case: 1:16-cr-00244-PAG Doc #: 229-1 Filed: 01/30/23 157 of 163. PageID #: 3495
Case: 1:16-cr-00244-PAG Doc #: 230 Filed: 02/03/23 157 of 163. PageID #: 3943

157

1      together.

2                  THE COURT:  But consecutive.

3                  MR. GOLDBERG:  Consecutive to the underlying

4      events, yes.

13:37:21  5                  THE COURT:  That's for a total of 194 months.

6          Upon release from imprisonment, you will be placed on

7      supervised release for a term of three years.

8          On Counts 1 to 15 and 21, one year.

9          On Counts 16 to 20, all to run concurrently.

13:37:38  10          Within 72 hours of release from the custody of the

11      Bureau of Prisons you must report in person to the probation

12      office in the district to which you are released.

13          There is a $2,100 special assessment due and payable

14      today.

13:37:50  15          While on supervision, you must comply with all of the

16      mandatory and standard conditions adopted by this Court.

17      They are set forth in Part D of the report.

18          In addition, you must surrender to the Bureau of

19      Immigration and Customs Enforcement U.S. Department of

13:38:06  20      Homeland Security for deportation as provided by law.

21          If you are ordered deported from the United States,

22      you must remain outside the United States unless legally

23      authorized to reenter.

24          If you reenter the United States, you must report to

13:38:20  25      the nearest probation office within 72 hours after your

1   return.

2       You must submit to a warrantless search based only

3   upon reasonable suspicion of contraband or evidence of a

4   violation of a condition of release.

13:38:32  5   You may not engage in an occupation, business,

6   profession, or volunteer activity involving information

7   technology without the prior approval of your officer.

8       You must allow your officer to install computer

9   monitoring software on any computer you use.

13:38:48  10   I'm also going to impose the computer search for

11  monitoring software and computer search warning to others

12  conditions.

13      You must provide your officer with access to any

14  requested financial information.

13:39:02  15   You may not incur any new credit charges or open

16  additional lines of credit without the approval of your

17  officer.

18      You must apply all monies received from income tax

19  refunds, lottery winnings, et cetera, to your financial

13:39:17  20  obligation.

21      Let me inform you, sir, that you do have the right to

22  appeal your conviction and sentence.  If you cannot afford

23  to appeal, the cost will be borne by the Government.

24      I do, in fact, find the sentence to be sufficient, but

13:39:29  25  not greater than necessary to satisfy the purposes of

1    sentencing.

2         I incorporate all of the statements I made regarding

3    codefendant Nicolescu's sentencing, my rationale for his

4    sentence.

13:39:45  5         However, I'm going to add two points which accounts

6    for the lower sentence than Mr. Nicolescu.

7         I absolutely unequivocally stand by my ruling and my

8    statement that Mr. Miclaus was an organizer and leader, but

9    I also acknowledge the arguments somewhat of Mr. O'Shea,

13:40:16 10   that in the hierarchy, Nicolescu is at the top.

11        And I am, in fact, looking and comparing the

12   individuals, as urged by Mr. O'Shea.

13        My second reason for giving a lesser sentence is

14   because of the proffer.  I totally understand the

13:40:44 15   Government's argument as to the proffer, but the fact of the

16   matter is at some point in time, this defendant admitted his

17   conduct.  At no point did defendant Nicolescu do so.

18        Unfortunately for Mr. Miclaus, he did not follow

19   through on that proffer, and that decision has cost him

13:41:09 20   significant prison time and, in fact, basically doubled his

21   sentence.

22        I am allowed to consider the pretrial actions in

23   fashioning an appropriate sentence and I do, in fact,

24   believe that I can take into account the fact, again, that

13:41:30 25   at some point in time he admitted to his wrongdoing.

Case: 11-16-cr-00244-PAG Doc #: 239-1 Filed: 02/03/23 160 of 163. PageID #: 3498
Case: 1:16-cr-00244-PAG Doc #: 239 Filed: 02/03/23 160 of 163. PageID #: 3498

160

| | |
|---|---|
| 1 | Mr. O'Shea, first of all, sir, other than all of your |
| 2 | objections, which are preserved and protected for the |
| 3 | record, any other objections? |
| 4 | MR. O'SHEA:  Just basically mirror what |
| 13:41:45 5 | Mr. Goldberg said.  We'd ask for the sentence in the |
| 6 | sentencing memorandum.  Other than that, Your Honor, no. |
| 7 | THE COURT:  And anything further? |
| 8 | MR. O'SHEA:  Other than, Judge, I think I |
| 9 | pointed out that in the PSI, in case it goes down with him |
| 13:41:59 10 | to the Bureau of Prisons, his arrest date as I understand it |
| 11 | was September 29th, 2016, and not December 16th. |
| 12 | THE COURT:  But I will tell you the Bureau of |
| 13 | Prisons, they have the accurate date and there will be |
| 14 | credit for time served.  They compute that.  They don't go |
| 13:42:15 15 | off the presentence report. |
| 16 | MR. O'SHEA:  Fine and dandy, as long as |
| 17 | they're going to use the day he was arrested in Romania |
| 18 | rather than when he set foot here in the United States. |
| 19 | And I don't think the Government will argue about it. |
| 13:42:29 20 | THE COURT:  Mr. Brown, Mr. McDonough? |
| 21 | MR. BROWN:  I'm sorry.  Goldberg was talking |
| 22 | to me. |
| 23 | THE COURT:  He wants the date of arrest |
| 24 | changed in the presentence report.  And frankly, I don't |
| 13:42:42 25 | have the date. |

Case 1:16-cr-00224-PAC Doc #: 229-1 Filed: 01/30/23 161 of 163. PageID #: 3499
Case 1:16-cr-00224-PAC Doc #: 229-1 Filed: 02/03/23 161 of 163. PageID #: 3499

161

                              1          MR. BROWN:  It's the September date,

                              2    Your Honor, is the date of arrest.  However, I'm not sure

                              3    how BOP credits the --

                              4          THE COURT:  Yeah, I don't get into that.

13:42:53           5    That's their business.

                              6      But you're not objecting to changing the date of

                              7    arrest to -- Mr. O'Shea?

                              8          MR. O'SHEA:  September 29th, 2016.

                              9          THE COURT:  September 29th, 2016.

13:43:04        10          MR. BROWN:  As long as it also says the date

                             11    of arrival in the U.S. is December whatever.  But, yeah.

                             12          MR. O'SHEA:  I don't think they factually

                             13    dispute that he was arrested on September 29th, 2016, in

                             14    Romania, and never left the custody of any agency after

13:43:18        15    that.

                             16          THE COURT:  That will be corrected.  Anything

                             17    further?  Anything else, Mr. O'Shea?

                             18          MR. O'SHEA:  Nothing further, Your Honor.

                             19          THE COURT:  First of all, Mr. Brown?

13:43:25        20          MR. BROWN:  No objections and nothing further,

                             21    Your Honor.

                             22          AGENT MACFARLANE:  Wait.  Wait.  Wait.  Wait.

                             23          MR. BROWN:  I spoke too early.

                             24      It's 192 plus 24, correct?  So a total of 216?

13:43:53        25          THE COURT:  I apologize.  I apologize.

Case 1:16-cr-00224-PAG Doc #: 229-1 Filed: 02/03/23 162 of 163. PageID #: 3500
Case 1:16-cr-00224-PAG Doc #: 230 Filed: 02/03/23 162 of 163. PageID #: 3540

162

<pre>
             1          I did my math incorrectly.  It is this Court's intent
             2     to sentence defendant Miclaus to a total of 18 years.
             3          Mr. Nicolescu received a total of 20 years.
             4          I apologize.  I think my math was off.
13:44:15     5                    MR. BROWN:  Now I've got to do math,
             6     Your Honor.
             7                    THE COURT:  I'm sorry?
             8                    MR. BROWN:  Now I've got to do math,
             9     Your Honor, real quick.  Yeah.  So it's a total of 18?
13:44:23    10                    AGENT MACFARLANE:  Yeah.
            11                    THE COURT:  A total of 18 years.
            12                    MR. BROWN:  Okay.  Thank you, Your Honor.
            13                    (Discussion off the record.)
            14                    THE COURT:  Mr. McDonough?
13:44:30    15                    MR. BROWN:  Right.  So it would be 192 --
            16                    MR. McDONOUGH:  Correct, Your Honor.
            17          You said on Counts 1 through 13 and 21, 192 months.
            18          Count 14 is 60 months.
            19          Count 15 is 120 months.  Those all run concurrent.
13:44:44    20          Count 16 to 20 are 24 months.
            21          They're all concurrent to each other, but consecutive.
            22          So the total sentence is 192 plus 24 for a total of
            23     216 months, which is 18 years.
            24                    THE COURT:  I think where I made an error is
13:45:00    25     when I did the total.
</pre>

Case: 11-cr-00324-PAG Doc #: 229-1 Filed: 01/30/23 163 of 163. PageID #: 6501
Case: 1:16-cr-00324-PAG Doc #: 2901 Filed: 02/03/23 163 of 163. PageID #: 3340

163

|   |   |
|---|---|
| 1 | You are absolutely correct.  The total is 216. |
| 2 | MR. BROWN:  Thank you, Your Honor. |
| 3 | MR. McDONOUGH:  Thank you, Your Honor. |
| 4 | THE COURT:  All right.  Ms. Morgan, anything |
| 13:45:06  5 | else? |
| 6 | PRETRIAL PROBATION OFFICER:  No, Your Honor. |
| 7 | THE COURT:  All right.  We are in adjournment. |
| 8 | - - - |
| 9 | (Proceedings adjourned at 1:45 p.m.) |
| 10 | |
| 11 | |
| 12 | **C E R T I F I C A T E** |
| 13 | |
| 14 | I certify that the foregoing is a correct transcript |
| 15 | from the record of proceedings in the above-entitled matter. |
| 16 | |
| 17 | */s/ Donnalee Cotone        3rd of February, 2020* |
| | DONNALEE COTONE, RMR, CRR                    DATE |
| 18 | Realtime Systems Administrator |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |