EXHIBIT B



# The First Step Act of 2018: An Overview

March 4, 2019

**Congressional Research Service**

https://crsreports.congress.gov

R45558



Congressional Research Service
*Informing the legislative debate since 1914*

**SUMMARY**

R45558

March 4, 2019

**Nathan James**
Analyst in Crime Policy

# The First Step Act of 2018: An Overview

On December 21, 2018, President Trump signed into law the First Step Act of 2018 (P.L. 115-391). The act was the culmination of several years of congressional debate about what Congress might do to reduce the size of the federal prison population while also creating mechanisms to maintain public safety. This report provides an overview of the provisions of the act.

The act has three major components: (1) correctional reform via the establishment of a risk and needs assessment system at the Bureau of Prisons (BOP), (2) sentencing reform via changes to penalties for some federal offenses, and (3) the reauthorization of the Second Chance Act of 2007 (P.L. 110-199). The act also contains a series of other criminal justice-related provisions.

The First Step Act requires the Department of Justice (DOJ) to develop a risk and needs assessment system to be used by BOP to assess the recidivism risk of all federal prisoners and to place prisoners in programs and productive activities to reduce this risk. Prisoners who successfully complete recidivism reduction programming and productive activities can earn additional time credits that will allow them to be placed in prerelease custody (i.e., home confinement or a Residential Reentry Center) earlier than they were previously allowed. The act prohibits prisoners convicted of any one of dozens of offenses from earning additional time credits, though these prisoners can earn other benefits, such as additional visitation time, for successfully completing recidivism reduction programming. Offenses that make prisoners ineligible to earn additional time credits can generally be categorized as violent, terrorism, espionage, human trafficking, sex and sexual exploitation, repeat felon in possession of firearm, certain fraud, or high-level drug offenses.

The act makes changes to the penalties for some federal offenses. The act modified mandatory minimum prison sentences for some drug traffickers with prior drug convictions by increasing the threshold for prior convictions that count toward triggering higher mandatory minimums for repeat offenders, reducing the 20-year mandatory minimum (applicable where the offender has one prior qualifying conviction) to a 15-year mandatory minimum, and reducing a life-in-prison mandatory minimum (applicable where the offender has two or more prior qualifying convictions) to a 25-year mandatory minimum. The act made the provisions of the Fair Sentencing Act of 2010 (P.L. 111-220) retroactive so that currently incarcerated offenders who received longer sentences for possession of crack cocaine than they would have received if sentenced for possession of the same amount of powder cocaine before the enactment of the Fair Sentencing Act can submit a petition in federal court to have their sentences reduced. The act also expands the safety valve provision, which allows courts to sentence low-level, nonviolent drug offenders with minor criminal histories to less than the required mandatory minimum for an offense. Finally, the act eliminated the stacking provision, which allowed prosecutors to charge offenders with a second and subsequent use of a firearm in furtherance of a drug trafficking or violent offense in the same criminal incident, which, if the offender is convicted, carries a 25-year mandatory minimum. Now, the mandatory minimum will only apply when the offender has a prior conviction for use of a firearm in furtherance of a drug trafficking or violent crime from a previous criminal prosecution.

The First Step Act contains the Second Chance Reauthorization Act of 2018. This act reauthorizes appropriations for and expands the scope of some grant programs that were initially authorized under the Second Chance Act of 2007 (P.L. 110-199). The reauthorized programs include the Adult and Juvenile State and Local Offender Demonstration Program, Grants for Family-Based Substance Abuse Treatment, Careers Training Demonstration Grants, the Offender Reentry Substance Abuse and Criminal Justice Collaboration Program, and the Community-Based Mentoring and Transitional Service Grants to Nonprofit Organizations Program. The act also reauthorized and modified a pilot program that allows BOP to place certain elderly and terminally ill prisoners on home confinement to serve the remainder of their sentences.

Finally, the First Step Act includes a series of other criminal justice-related provisions. These provisions include a prohibition on the use of restraints on pregnant inmates in the custody of BOP and the U.S. Marshals Service; a change to the way good time credit is calculated so prisoners can earn 54 days of good time credits for each year of imposed sentence rather than for each year of time served; a requirement for BOP to provide a way for employees to safely store firearms on BOP grounds; a requirement for BOP to try to place prisoners within 500 driving miles of their primary residences; authority for the Federal Prison Industries to sell products to public entities for use in correctional facilities, disaster relief, or emergency response, to the District of Columbia government, and to nonprofit organizations; a prohibition against the use of solitary confinement for juvenile delinquents in federal custody; and a requirement that BOP aid prisoners with obtaining identification before they are released.

# Contents

Correctional Reforms ............................................................................................................. 1
   Development of the Risk and Needs Assessment System ................................................. 1
   Implementation of the Risk and Needs Assessment System ............................................ 4
   Incentives and Rewards for Program Participation ......................................................... 4
   Earned Time Credits for Program Participation .............................................................. 5
   Prerelease Custody ....................................................................................................... 5
   Reporting Requirements ................................................................................................ 7
      Department of Justice Report to Congress ................................................................ 7
      Report from the Independent Review Committee ..................................................... 7
      Government Accountability Office Audit ................................................................. 8
   Authorization of Appropriations ................................................................................... 8

Sentencing Reforms ............................................................................................................. 8
   Changes to Mandatory Minimums for Certain Drug Offenders ...................................... 8
   Expanding the Safety Valve .......................................................................................... 9
   Eliminating the Stacking Provision ............................................................................... 9
   Retroactivity of the Fair Sentencing Act ....................................................................... 9

Reauthorization of the Second Chance Act .......................................................................... 10
   Reauthorization of the Adult and Juvenile State and Local Offender Demonstration
     Program ................................................................................................................ 10
   Reauthorization of Grants for Family-Based Substance Abuse Treatment ...................... 12
   Reauthorization of the Grant Program to Evaluate and Improve Educational Methods
     at Prisons, Jails, and Juvenile Facilities .................................................................. 12
   Reauthorization of the Careers Training Demonstration Grants ..................................... 13
   Reauthorization of the Offender Reentry Substance Abuse and Criminal Justice
     Collaboration Program ........................................................................................... 13
   Reauthorization of the Community-Based Mentoring and Transitional Service Grants
     to Nonprofit Organizations Program ....................................................................... 13
   Reauthorization and Expansion of the BOP Early Release Pilot Program ....................... 14
   Reauthorization of Reentry Research ............................................................................ 14
   Evaluation of the Second Chance Act ........................................................................... 15
   Recidivism Reduction Partnerships .............................................................................. 16
   Repealed Programs ...................................................................................................... 16

Other Provisions ................................................................................................................. 16
   Modification of Good Time Credits ............................................................................... 16
   Bureau of Prisons Secure Firearm Storage .................................................................... 16
   Prohibition on the Use of Restraints on Pregnant Prisoners ........................................... 17
   Placement of Prisoners Closer to Families ..................................................................... 17
   Home Confinement for Low-Risk Prisoners .................................................................. 18
   Increasing the Use and Transparency of Compassionate Release .................................... 18
   Identification for Returning Citizens ............................................................................. 18
   Expanding Prisoner Employment Through the Federal Prison Industries ........................ 19
   De-escalation Training ................................................................................................. 19
   Evidence-Based Treatment for Opioid and Heroin Abuse .............................................. 19
   BOP Pilot Programs for Mentoring and Rescue Animals ............................................... 20
   National Prisoner Statistics Program ............................................................................. 20
   Healthcare Products .................................................................................................... 20

Federal Interagency Reentry Coordination ........................................................................... 20
Juvenile Solitary Confinement ........................................................................................... 21

# Contacts

Author Information ............................................................................................................ 21

On December 21, 2018, President Trump signed into law the First Step Act of 2018 (P.L. 115-391). The act was the culmination of several years of congressional debate about what Congress might do to reduce the size of the federal prison population while also creating mechanisms to maintain public safety.

Correctional and sentencing reform was an issue that drew interest from many Members of Congress. Some Members took it up for fiscal reasons; they were concerned that the increase in the Bureau of Prisons' (BOP) budget would take resources away from the Department of Justice's (DOJ) other priorities. Other Members were interested in correctional reform due to concerns about the social consequences (e.g., the effects incarceration has on employment opportunities and the families of the incarcerated, or the normalizing of incarceration) of what some deem *mass incarceration*, or they wanted to roll back some of the *tough on crime* policy changes that Congress put in place during the 1980s and early 1990s.

This report provides an overview of the provisions of the First Step Act. The act has three major components: (1) correctional reform via the establishment of a risk and needs assessment system at BOP, (2) sentencing reform that involved changes to penalties for some offenses, and (3) the reauthorization of the Second Chance Act of 2007 (P.L. 110-199). The act also contains a series of other criminal justice-related provisions that include, for example, changes to the way good time credits are calculated for federal prisoners, prohibiting the use of restraints on pregnant inmates, expanding the market for products made by the Federal Prison Industries, and requiring BOP to aid prisoners with obtaining identification before they are released.

# Correctional Reforms

The correctional reform component of the First Step Act involves the development and implementation of a risk and needs assessment system (system) at BOP.[1]

## Development of the Risk and Needs Assessment System

The act requires DOJ to develop the system to be used by BOP to assess the risk of recidivism of federal prisoners and assign prisoners to evidence-based recidivism reduction programs[2] and productive activities[3] to reduce this risk. DOJ is required to develop and release the system within 210 days of enactment of the First Step Act. The system is to be used to

- determine the risk of recidivism of each prisoner during the intake process and classify each prisoner as having a minimum, low, medium, or high risk;

---

[1] For more information on the use of risk and needs assessment in prisons, see CRS Report R44087, *Risk and Needs Assessment in the Federal Prison System*.

[2] The act defines *evidence-based recidivism reduction program* as a group or individual activity that (1) has been shown through empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism; (2) is designed to help prisoners succeed in their communities upon release from prison; and (3) may include social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills; family relationship building, structured parent-child interaction, and parenting skills; classes on morals or ethics; academic classes; cognitive behavioral treatment; mentoring; substance abuse treatment; vocational training; faith-based classes or services; civic engagement and reintegrative community services; a prison job, including through a prison work program; victim impact classes or other restorative justice programs; and trauma counseling and trauma-informed support programs.

[3] The act defines *productive activities* as a group or individual activity that is designed to allow prisoners determined as having a minimum or low risk of recidivating to remain productive and thereby maintain a minimum or low risk of recidivating.

- assess and determine, to the extent practicable, the risk of violent or serious prison misconduct of each prisoner;
- determine the type and amount of recidivism reduction programming that is appropriate for each prisoner and assign each prisoner to programming based on the prisoner's specific *criminogenic needs*;[4]
- periodically reassess the recidivism risk of each prisoner;[5]
- reassign prisoners to appropriate recidivism reduction programs or productive activities based on their reassessed risk of recidivism to ensure that all prisoners have an opportunity to reduce their risk classification, that the programs address prisoners' criminogenic needs, and that all prisoners are able to successfully participate in such programs;
- determine when to provide incentives and rewards for successful participation in recidivism reduction programs or productive activities;
- determine when a prisoner is ready to transfer into prerelease custody or supervised release; and
- determine the appropriate use of audio technology for program course materials to accommodate prisoners with dyslexia.

DOJ is authorized to use existing risk and needs assessment instruments, validated annually, to meet the requirements of the act.

When developing the system, the Attorney General is required to consult with

- the Director of BOP;
- the Director of the Administrative Office of the United States Courts;
- the Director of the Office of Probation and Pretrial Services;
- the Director of the National Institute of Justice;
- the Director of the National Institute of Corrections; and
- the Independent Review Committee, which is established by the First Step Act.[6]

When developing the system, the Attorney General, with the assistance of the Independent Review Committee, is required to

---

[4] *Criminogenic needs* are risk factors for recidivism that can change and/or be addressed through an intervention.

[5] The act requires BOP to reassess prisoners not less than annually, and prisoners who are at high or medium risk for recidivism and within five years of being released are to receive more frequent reassessments.

[6] Under the act, the National Institute of Justice (NIJ) is required to select a nonpartisan and nonprofit organization with expertise in the study and development of risk and needs assessment tools to host the Independent Review Committee (committee). The organization selected by NIJ is required to select no fewer than six members for the committee who have expertise in risk and needs assessment systems. The committee is required to

- conduct a review of the existing prisoner risk and needs assessment systems;
- develop recommendations regarding rehabilitative programs and productive activities;
- conduct research and data analysis on rehabilitative programs related to the use of prisoner risk and needs assessment tools, the most effective and efficient uses of such programs, which rehabilitative programs are the most effective at reducing recidivism, and the type, amount, and intensity of programming that most effectively reduces the risk of recidivism; and
- review and validate the system.

The committee is to terminate two years after DOJ releases the system.

- conduct a review of the existing risk and needs assessment systems;
- develop recommendations regarding recidivism reduction programs and productive activities;
- conduct ongoing research and data analysis on (1) evidence-based recidivism reduction programs related to the use of risk and needs assessment, (2) the most effective and efficient uses of such programs, (3) which programs are the most effective at reducing recidivism, and the type, amount, and intensity of programming that most effectively reduces the risk of recidivism, and (4) products purchased by federal agencies that are manufactured overseas and could be manufactured by prisoners participating in a prison work program without reducing job opportunities for other workers in the United States;[7]
- annually review and validate the risk and needs assessment system, including an evaluation to ensure that assessments are based on *dynamic risk factors* (i.e., risk factors that can change); validate any tools that the system uses; and evaluate the recidivism rates among similarly classified prisoners to identify any unwarranted disparities, including disparities in such rates among similarly classified prisoners of different demographic groups, and make any changes to the system necessary to address any that are identified; and
- submit an annual report to Congress each year for five years starting in 2020 (see below).

Also, prior to releasing the system, DOJ is required to consult with the Independent Review Committee to

- review the effectiveness of recidivism reduction programs in prisons operated by BOP;
- review available information regarding the effectiveness of recidivism reduction programs and productive activities provided in state prisons;
- review the policies for entering into recidivism reduction partnerships authorized by the act; and
- direct BOP regarding (1) evidence-based recidivism reduction programs, (2) the ability for faith-based organizations to provide educational programs outside of religious courses, and (3) the addition of any new effective recidivism reduction programs that DOJ finds.

Under the act, the system is required to provide guidance on the type, amount, and intensity of recidivism reduction programming and productive activities to which each prisoner is assigned, including information on which programs prisoners should participate in based on their criminogenic needs and the ways that BOP can tailor programs to the specific criminogenic needs of each prisoner to reduce their risk of recidivism. The system is also required to provide guidance on how to group, to the extent practicable, prisoners with similar risk levels together in recidivism reduction programming and housing assignments.

The act requires BOP, when developing the system, to take steps to screen prisoners for dyslexia and to provide programs to treat prisoners who have it.

---

[7] In 2011, Congress gave the Federal Prison Industries (FPI) *repatriation authority*. As a part of the Commerce, Justice, Science, and Related Agencies Appropriations Act, 2011 (P.L. 112-55), Congress authorized FPI to manufacture goods for the commercial market if they are currently or would have otherwise been manufactured outside the United States.

## Implementation of the Risk and Needs Assessment System

Within 180 days of DOJ releasing the system, BOP is required to

- complete the initial risk and needs assessment for each prisoner (including for prisoners who were incarcerated before the enactment of the First Step Act);
- begin to assign prisoners to appropriate recidivism reduction programs based on the initial assessment;
- begin to expand the recidivism reduction programs and productive activities available at BOP facilities and add any new recidivism reduction programs and productive activities necessary to effectively implement the system; and
- begin to implement any other risk and needs assessment tools necessary to effectively implement the system over time.

BOP is required to expand recidivism reduction programming and productive activities capacity so that all prisoners have an opportunity to participate in risk reduction programs within two years of BOP completing initial risk and needs assessments for all prisoners. During the two-year period when BOP is expanding recidivism reduction programs and productive activities, prisoners who are nearing their release date are given priority for placement in such programs.

BOP is required to provide all prisoners with the opportunity to participate in recidivism reduction programs that address their criminogenic needs or productive activities throughout their term of incarceration. High- and medium-risk prisoners are to have priority for placement in recidivism reduction programs, while the program focus for low-risk prisoners is on participation in productive activities.

Prisoners who successfully participate in recidivism reduction programming or productive activities are required to be reassessed not less than annually, and high- and medium-risk prisoners who have less than five years remaining until their projected release date are required to have more frequent reassessments. If the reassessment shows that a prisoner's risk of recidivating or specific needs have changed, BOP is required to reassign the prisoner to recidivism reduction programs or productive activities consistent with those changes.

DOJ is required to develop and administer a training program for BOP employees on how to use the system. This training program must include

- initial training to educate employees on how to use the system in an appropriate and consistent manner,
- continuing education,
- periodic training updates, and
- a requirement that employees biannually demonstrate competence in administering the system.

To ensure that BOP is using the system in an appropriated and consistent manner, DOJ is required to monitor and assess how the system is used at BOP, including an annual audit of the system's use.

## Incentives and Rewards for Program Participation

The First Step Act requires the use of incentives and rewards for prisoners to participate in recidivism reduction programs, including the following:

- additional phone privileges, and if available, video conferencing privileges, of up to 30 minutes a day, and up to 510 minutes a month;
- additional time for visitation at the prison, as determined by the warden of the prison;
- transfer to a facility closer to the prisoner's release residence, subject to the availability of bedspace, the prisoner's security designation, and the recommendation from the warden of the prison at which the prisoner is incarcerated at the time of making the request; and
- additional incentives and rewards as determined by BOP, to include not less than two of the following: (1) increased commissary spending limits and product offerings, (2) greater email access, (3) consideration for transfer to preferred housing units; and (4) other incentives solicited from prisoners and determined appropriate by BOP.

Rewards or incentives prisoners earn are in addition to any other rewards or incentives for which they may be eligible (e.g., good time credit under 18 U.S.C. Section 3624(b)).

## Earned Time Credits for Program Participation

Under the act, prisoners who successfully complete recidivism reduction programming are eligible to earn up to 10 days of time credits for every 30 days of program participation. Minimum and low-risk prisoners who successfully completed recidivism reduction or productive activities and whose assessed risk of recidivism has not increased over two consecutive assessments are eligible to earn up to an additional five days of time credits for every 30 days of successful participation. However, prisoners serving a sentence for a conviction of any one of multiple enumerated offenses are ineligible to earn additional time credits regardless of risk level, though these prisoners are eligible to earn the other incentives and rewards for program participation outlined above. Offenses that make prisoners ineligible to earn additional time credits can generally be categorized as violent, terrorism, espionage, human trafficking, sex and sexual exploitation, repeat felon in possession of firearm, certain fraud, or high-level drug offenses. Prisoners who are subject to a final order of removal under immigration law are ineligible for additional earned time credits provided by the First Step Act.

Prisoners cannot retroactively earn time credits for programs they completed prior to the enactment of the First Step Act, and they cannot earn time credits for programs completed while detained pending adjudication of their cases.

The act requires BOP to develop guidelines for reducing time credits prisoners earned under the system for violating institutional rules or the rules of recidivism reduction programs and productive activities. The guidelines must also include a description of a process for prisoners to earn back any time credits they lost due to misconduct.

## Prerelease Custody

A prisoner is not eligible to be placed in prerelease custody until

- the amount of time credits the prisoner has earned is equal to the remainder of his/her imposed term of imprisonment;
- the prisoner has shown a reduced risk of recidivism or has maintained a minimum or low recidivism risk during his/her term of imprisonment;

- the remainder of his/her imposed term of imprisonment has been computed under applicable law (e.g., any good time credits the prisoner has earned have been credited to his/her sentence); and

- the prisoner has been determined to be a minimum or low risk to recidivate based on his/her last two assessments, or has had a petition to be transferred to prerelease custody approved by the warden, after the warden's determination that the prisoner (1) would not be a danger to society if transferred to prerelease custody, (2) has made a good faith effort to lower his/her recidivism risk through participation in recidivism reduction programs or productive activities, and (3) is unlikely to recidivate.

A prisoner who is required to serve a period of supervised release after his/her term of incarceration and has earned time credits equivalent to the time remaining on his/her prison sentence can be transferred directly to supervised release if the prisoner's latest reassessment shows that he/she is a minimum or low risk to recidivate.[8] However, BOP cannot allow a prisoner to start serving a period of supervised release more than 12 months before he/she would otherwise be eligible to do so. If a prisoner has earned more than 12 months of additional time credits, the amount in excess of 12 months would be served in prerelease custody.

Prisoners who are placed on prerelease custody on home confinement are subject to a series of conditions. Per the act, prisoners on home confinement are required to have 24-hour electronic monitoring that enables the identification of their location and the time, and must remain in their residences, except to

- go to work or participate in job-seeking activities,

- participate in recidivism reduction programs or similar activities,

- perform community service,

- participate in crime victim restoration activities,

- receive medical treatment,

- attend religious activities, or

- participate in family-related activities that facilitate a prisoner's successful reentry.

When monitoring adherence to the conditions of prerelease custody, BOP is required, to the extent practicable, to reduce the restrictiveness of those conditions for prisoners who demonstrate continued compliance with their conditions.

If a prisoner violates the conditions of prerelease custody, BOP is authorized to place more conditions on the prisoner, or revoke prerelease custody and require the prisoner to serve the remainder of the sentence in prison. If the violation is nontechnical[9] in nature (e.g., committing a new crime), BOP is required to revoke the prisoner's prerelease custody.

BOP is required to expand its capacity, if necessary, so that all eligible prisoners can be placed in prerelease custody.

---

[8] Supervised release is a period of supervision that a prisoner serves after completing a term of incarceration. Courts decide whether to impose a term of supervised release, if it is not required by statute, and the court sets the terms and conditions of the period of supervised release. For more information, see CRS Report RL31653, *Supervised Release (Parole): An Overview of Federal Law*.

[9] Technical violations of prerelease custody are behaviors that are violations of the conditions of prerelease custody but are not criminal offenses (e.g., leaving home confinement for unauthorized activities).

# Reporting Requirements

The act requires the submission of several reports to help Congress oversee the implementation and assess the effects of the system.

## Department of Justice Report to Congress

Two years after the enactment of the First Step Act, and each year thereafter for the next five years, DOJ is required to submit a report to the House and Senate Judiciary Committees and the House and Senate Subcommittees on Commerce, Justice, Science, and Related Agencies (CJS) Appropriations that includes information on

- the types and effectiveness of recidivism reduction programs and productive activities provided by BOP, including the capacity of each program and activity at each prison and any gaps or shortages in capacity of such programs and activities;

- the recidivism rates of prisoners released from federal prison, based on the following criteria: (1) the primary offense of conviction; (2) the length of the sentence imposed and served; (3) the facility or facilities in which the prisoner's sentence was served; (4) the type of recidivism reduction programming; (5) prisoners' assessed and reassessed risk of recidivism; and (6) the type of productive activities;

- the status of prison work programs offered by BOP, including a strategy to expanding prison work opportunities for prisoners without reducing job opportunities for nonincarcerated U.S. workers; and

- any budgetary savings that have resulted from the implementation of the act, and a strategy for investing those savings in other federal, state, and local law enforcement activities and expanding recidivism reduction programs and productive activities at BOP facilities.

## Report from the Independent Review Committee

Within two years of the enactment of the First Step Act, the Independent Review Committee is required to submit a report to the House and Senate Judiciary Committees and the House and Senate CJS Appropriations Subcommittees that includes

- a list of all offenses that make prisoners ineligible for earned time credits under the system, and the number of prisoners excluded for each offense by age, race, and sex;

- the criminal history categories of prisoners ineligible to receive earned time credits under the system, and the number of prisoners excluded for each category by age, race, and sex;

- the number of prisoners ineligible for earned time credits under the system who did not participate in recidivism reduction programming or productive activities by age, race, and sex; and

- any recommendations for modifications to the list of offenses that make prisoners ineligible to earn time credits and any other recommendations regarding recidivism reduction.

**Government Accountability Office Audit**

Within two years of BOP implementing the system, and every two years thereafter, the Government Accountability Office is required to audit how the system is being used at BOP facilities. The audit must include an analysis of the following:

- whether prisoners are being assessed under the system with the required frequency;
- whether BOP is able to offer recidivism reduction programs and productive activities as defined in 18 U.S.C. Section 3632(f);
- whether BOP is offering the type, amount, and intensity of recidivism reduction programs and productive activities that allow prisoners to earn the maximum amount of additional time credits for which they are eligible;
- whether DOJ is carrying out the duties required by the First Step Act;
- whether employees of the BOP are receiving the training required by the act;
- whether BOP offers work assignments to all prisoners who might benefit from them;
- whether BOP transfers prisoners to prerelease custody or supervised release as soon as they are eligible; and
- the rates of recidivism among similarly classified prisoners to identify any unwarranted disparities, including disparities among similarly classified prisoners of different demographic groups.

## Authorization of Appropriations

The First Step Act authorizes $75 million per fiscal year from FY2019 to FY2023 for DOJ to establish and implement the system; 80% of this funding is to be directed to BOP for implementation.

# Sentencing Reforms[10]

The First Step Act makes several changes to federal sentencing law. The act reduced the mandatory minimum sentences for certain drug offenses, expanded the scope of the safety valve, eliminated the stacking provision, and made the provisions of the Fair Sentencing Act of 2010 (P.L. 111-220) retroactive.

## Changes to Mandatory Minimums for Certain Drug Offenders

The act adjusts the mandatory minimum sentences for certain drug traffickers with prior drug convictions. The act reduces the 20-year mandatory minimum (applicable where the offender has one prior qualifying conviction) to a 15-year mandatory minimum and reduces the life sentence mandatory minimum (applicable where the offender has two or more prior qualifying convictions) to a 25-year mandatory minimum.[11] The act also changes the prior conviction criteria

---

[10] Portions of this section were excerpted from CRS In Focus IF10573, *Federal Correctional Reform and the First Step Act of 2018*.

[11] For more information on mandatory minimum sentences for drug offenses, see CRS Report R45074, *Mandatory Minimum Sentencing of Federal Drug Offenses*.

under which these mandatory minimum penalties apply. In order for these mandatory minimums to apply, the offender's prior convictions must meet the new criteria of a *serious drug felony[12]* or a *serious violent felony*[13] rather than any *felony drug offense*.

## Expanding the Safety Valve

The act makes drug offenders with minor criminal records eligible for the safety valve provision, which previously applied only to offenders with virtually spotless criminal records.[14] The safety valve allows judges to sentence low-level, nonviolent drug offenders to a term of imprisonment that is less than the applicable mandatory minimum.

## Eliminating the Stacking Provision

The act eliminates *stacking* by providing that the 25-year mandatory minimum for a "second or subsequent" conviction for use of a firearm in furtherance of a drug trafficking crime or a violent crime applies only where the offender has a prior conviction for use of a firearm that is already final.[15] Under prior law, two violations that were charged concurrently triggered the enhanced mandatory minimum.

## Retroactivity of the Fair Sentencing Act

The First Step Act authorizes courts to apply retroactively the Fair Sentencing Act of 2010, which increased the threshold quantities of crack cocaine sufficient to trigger mandatory minimum sentences, by resentencing qualified prisoners as if the Fair Sentencing Act had been in effect at the time of their offenses.[16] The retroactive application of the Fair Sentencing Act is not automatic. A prisoner must petition the court in order to have his/her sentence reduced.

---

[12] A *serious drug felony* is defined as an offense described in 18 U.S.C. Section 924(e)(2)—which encompasses only drug felonies that carry a maximum prison term of 10 years or more—for which the offender served a term of imprisonment of more than 12 months and the offender's release from any term of imprisonment was within 15 years of the commencement of the instant offense. Before the First Step Act, any prior conviction for a *felony drug offense* (meaning a drug offense with a maximum term of imprisonment of more than one year) counted for purposes of the repeat offender mandatory minimums.

[13] A serious violent felony is defined as an offense described in 18 U.S.C. Section 3559(c)(2) for which the offender served a term of imprisonment of more than 12 months and any offense that would be a felony violation of 18 U.S.C. Section 113 if the offense were committed in the special maritime and territorial jurisdiction of the United States, for which the offender served a term of imprisonment of more than 12 months. Before the First Step Act, only drug felony convictions counted for purposes of the repeat offender mandatory minimums.

[14] For background and further information on the safety valve and how it is applied, see CRS Report R41326, *Federal Mandatory Minimum Sentences: The Safety Valve and Substantial Assistance Exceptions*.

[15] For more information on penalties for the use of a firearm in furtherance of a drug trafficking or violent crime see CRS Report R41412, *Federal Mandatory Minimum Sentencing: The 18 U.S.C. 924(c) Tack-On in Cases Involving Drugs or Violence*.

[16] Prior to the enactment of the Fair Sentencing Act, 5,000 grams of powder cocaine or 50 grams of crack cocaine triggered the Controlled Substances Act's 10-year mandatory minimum and 500 grams of powder or 5 grams of crack triggered its 5-year mandatory minimum. The Fair Sentencing Act established a 5,000 grams to 280 grams ratio for the 10-year mandatory minimum and a 500 grams to 28 grams ratio for the 5-year mandatory minimum.

# Reauthorization of the Second Chance Act

The Second Chance Reauthorization Act of 2018 (Title V of the First Step Act) reauthorizes many of the grant programs that were initially authorized by the Second Chance Act of 2007 (P.L. 110-199). The Second Chance Reauthorization Act also reauthorized a BOP pilot program to provide early release to elderly prisoners.

## Reauthorization of the Adult and Juvenile State and Local Offender Demonstration Program

The Second Chance Reauthorization Act amends the authorization for the Adult and Juvenile State and Local Offender Demonstration Program so grants can be awarded to states, local governments, territories, or Indian tribes, or any combination thereof, in partnership with interested persons (including federal correctional officials), service providers, and nonprofit organizations, for the strategic planning and implementation of reentry programs. The Second Chance Reauthorization Act amended the authorization for this program to allow grants to be used for reentry courts and promoting employment opportunities consistent with a transitional jobs strategy in addition to the purposes for which grants could already be awarded.[17]

The act also amended the Second Chance Act authorizing legislation for the program to allow DOJ to award both planning and implementation grants. DOJ is required to develop a procedure to allow applicants to submit a single grant application when applying for both planning and implementation grants.

Under the amended program, DOJ is authorized to award up to $75,000 for planning grants and is prohibited from awarding more than $1 million in planning and implementation grants to any single entity. The program period for planning grants is limited to one year and implementation grants are limited to two years. DOJ is also required to make every effort to ensure the equitable geographic distribution of grants, taking into account the needs of underserved populations, including tribal and rural communities.

Under the amended program, applicants for implementation grants are subject to several requirements, including

- demonstrating that the application has the explicit support of the chief executive, or the designee, of the state, unit of government, territory, or Indian tribe applying for the grant;

---

[17] The act defines *transitional jobs strategy* as an employment strategy for youth and adults who are chronically unemployed or those that have barriers to employment that (1) is conducted by state, tribal, and local governments, state, tribal, and local workforce boards, and nonprofit organizations; (2) provides time-limited employment using individual placements, team placements, and social enterprise placements, without displacing existing employees; (3) pays wages in accordance with applicable law, but in no event less than the higher of the rate specified in Section 6(a)(1) of the Fair Labor Standards Act of 1938 or the applicable state or local minimum wage law, which are subsidized, in whole or in part, by public funds; (4) combines time-limited employment with activities that promote skill development, remove barriers to employment, and lead to unsubsidized employment such as a thorough orientation and individual assessment, job readiness and life skills training, case management and supportive services, adult education and training, child support-related services, job retention support and incentives, and other similar activities; (5) places participants into unsubsidized employment; and (6) provides job retention, re-employment services, and continuing and vocational education to ensure continuing participation in unsubsidized employment and identification of opportunities for advancement.

- discussing the role of federal and state corrections, community corrections, juvenile justice systems, and tribal and local jail systems in ensuring the successful reentry of ex-offenders into the applicants' communities;

- providing evidence of collaboration with state, local, and tribal agencies overseeing health, housing, child welfare, education, substance abuse, victim services, employment agencies, and local law enforcement agencies;

- providing a plan for analyzing the barriers (e.g., statutory, regulatory, rules-based, or practice-based) to reentry for ex-offenders in the applicants' communities;

- demonstrating that a state, local, territorial, or tribal reentry task force will be used to carry out the activities funded under the grant;

- providing a plan for continued collaboration with a local evaluator; and

- demonstrating that the applicant participated in the planning grant process, or engaged in a comparable reentry planning process.

DOJ is also required to give priority consideration to applications for implementation grants that focus on areas with a disproportionate population of returning prisoners, received input from stakeholders and coordinated with prisoners families, demonstrate effective case assessment and management, review the process by which violation of community supervision are adjudicated, provide for an independent evaluation of reentry programs, target moderate and high-risk returning prisoners, and target returning prisoners with histories of homelessness, substance abuse, or mental illness.

Under the amended program, applicants for implementation grants would be required to develop a strategic reentry plan that contains measurable three-year performance outcomes. Applicants would be required to develop a feasible goal for reducing recidivism using baseline data collected through the partnership with the local evaluator. Applicants are required to use, to the extent practicable, random assignment and controlled studies, or rigorous quasi-experimental studies with matched comparison groups, to determine the effectiveness of the program.

As authorized by the Second Chance Act, grantees under the Adult and Juvenile State and Local Offender Demonstration program are required to submit annual reports to DOJ that identify the specific progress made toward achieving their strategic performance outcomes, which they are required to submit as a part of their reentry strategic plans. Data on performance measures only need to be submitted by grantees that receive an implementation grant. The act repeals some performance outcomes (i.e., increased housing opportunities, reduction in substance abuse, and increased participation in substance abuse and mental health services) and adds the following outcomes:

- increased number of staff trained to administer reentry services;

- increased proportion of eligible individuals served by the program;

- increased number of individuals receiving risk screening needs assessment and case planning services;

- increased enrollment in and completion of treatment services, including substance abuse and mental health services for offenders who need them;

- increased enrollment in and degrees earned from educational programs;

- increased number of individuals obtaining and maintaining employment;

- increased number of individuals obtaining and maintaining housing;

- increased self-reports of successful community living, including stability of living situation and positive family relationships;
- reduction in drug and alcohol use; and
- reduction in recidivism rates for individuals receiving reentry services after release, as compared to either baseline recidivism rates in the jurisdiction of the grantee or recidivism rates of the comparison or control group.

The act allows applicants for implementation grants to include a cost-benefit analysis as a performance measure under their required reentry strategic plan.

The act reauthorizes appropriations for the program at $35 million for each fiscal year from FY2019 to FY2023.

## Reauthorization of Grants for Family-Based Substance Abuse Treatment

The Second Chance Act authorized DOJ to make grants to states, local governments, and Indian tribes to develop, implement, and expand the use of family-based substance abuse treatment programs as an alternative to incarceration for parents who were convicted of nonviolent drug offenses and to provide prison-based family treatment programs for incarcerated parents of minor children.

The Second Chance Reauthorization Act amends the authorization for the program to allow grants to be awarded to nonprofit organizations and requires DOJ to give priority consideration to nonprofit organizations that demonstrate a relationship with state and local criminal justice agencies, including the judiciary and prosecutorial agencies or local correctional agencies.

The act reauthorizes appropriations for the program at $10 million for each fiscal year from FY2019 to FY2023.

## Reauthorization of the Grant Program to Evaluate and Improve Educational Methods at Prisons, Jails, and Juvenile Facilities

The Second Chance Act authorized a grant program to evaluate and improve academic and vocational education in prisons, jails, and juvenile facilities. This program authorizes DOJ to make grants to states, units of local government, territories, Indian tribes, and other public and private entities to identify and implement best practices related to the provision of academic and vocational education in prisons, jails, and juvenile facilities. Grantees are required to submit reports within 90 days of the end of the final fiscal year of a grant detailing the progress they have made, and to allow DOJ to evaluate improved academic and vocational education methods carried out with grants provided under this program.

The Second Chance Reauthorization Act amends the authorizing legislation for this program to require DOJ to identify and publish best practices relating to academic and vocational education for offenders in prisons, jails, and juvenile facilities. In identifying best practices, the evaluations conducted under this program must be considered.

The act reauthorizes appropriations for this program at $5 million for each fiscal year from FY2019 to FY2023.

## Reauthorization of the Careers Training Demonstration Grants

The Second Chance Act authorized DOJ to make grants to states, units of local government, territories, and Indian tribes to provide technology career training for prisoners. Grants could be awarded for programs that establish technology careers training programs for inmates in a prison, jail, or juvenile detention facility.

The Second Chance Reauthorization Act expanded the scope of the program to allow grant funds to be used to provide *any* career training to those who are soon to be released and during transition and reentry into the community. The act makes nonprofit organizations an eligible applicant under the program. Under the legislation, grants funds could be used to provide subsidized employment if it is a part of a career training program. The act also requires DOJ to give priority consideration to any application for a grant that

- provides an assessment of local demand for employees in the geographic area to which offenders are likely to return,
- conducts individualized reentry career planning upon admission to a correctional facility or post-release employment planning for each offender served under the grant,
- demonstrates connections to local employers, and
- evaluates employment outcomes.

The act reauthorizes appropriations for this program at $10 million for each fiscal year from FY2019 to FY2023.

## Reauthorization of the Offender Reentry Substance Abuse and Criminal Justice Collaboration Program

The Second Chance Act authorized DOJ to make grants to states, units of local governments, territories, and Indian tribes in order to improve drug treatment programs in prisons and reduce the post-prison use of alcohol and other drugs by long-term users under correctional supervision. Grants may be used to continue or improve existing drug treatment programs, develop and implement programs for long-term users, provide addiction recovery support services, or establish medication assisted treatment (MAT) services as part of any drug treatment program offered to prisoners.

The Second Chance Reauthorization Act reauthorizes appropriations for this program at $15 million for each fiscal year from FY2019 to FY2023.

## Reauthorization of the Community-Based Mentoring and Transitional Service Grants to Nonprofit Organizations Program

The Second Chance Act authorized DOJ to make grants to nonprofit organizations and Indian tribes to provide mentoring and other transitional services for offenders being released into the community. Funds could be used for mentoring programs in prisons or jails and during reentry, programs providing transition services during reentry, and programs providing training for mentors on the criminal justice system and victims issues.

The Second Chance Reauthorization Act amends the authorization for the program to pivot the focus toward providing community-based transitional services to former inmates returning to the community. Reflecting the change in focus, the reauthorization changed the name of the program

to "Community-based Mentoring and Transitional Services Grants to Nonprofit Organizations." The act specifies the transitional services that can be provided to returning inmates under the program, including educational, literacy, vocational, and the transitional jobs strategy; substance abuse treatment and services; coordinated supervision and services for offenders, including physical health care and comprehensive housing and mental health care; family services; and validated assessment tools to assess the risk factors of returning prisoners.

The act reauthorizes appropriations for this program at $15 million for each fiscal year from FY2019 to FY2023.

## Reauthorization and Expansion of the BOP Early Release Pilot Program

The Second Chance Reauthorization Act reauthorized and expanded the scope of a pilot program initially authorized under the Second Chance Act that allowed BOP to place certain elderly nonviolent offenders on home confinement to serve the remainder of their sentences. BOP was authorized to conduct this pilot program at one facility for FY2009 and FY2010. An offender eligible to be released through the program had to meet the following requirements:

- at least 65 years old;
- never have been convicted of a violent, sex-related, espionage, or terrorism offense;
- sentenced to less than life;
- served the greater of 10 years or 75% of his/her sentence;
- not received a determination by BOP to have a history of violence, or of engaging in conduct constituting a sex, espionage, or terrorism offense;
- not escaped or attempted to escape;
- received a determination that release to home detention would result in a substantial reduction in cost to the federal government; and
- received a determination that he/she is not a substantial risk of engaging in criminal conduct or of endangering any person or the public if released to home detention.

The Second Chance Reauthorization Act reestablishes the pilot program and allows BOP to operate it at multiple facilities from FY2019 to FY2023. The act also modifies the eligibility criteria for elderly offenders so that any offenders who are at least 60 year old and have served two-thirds of their sentences can be placed on home confinement.

The act also expands the program so that terminally ill offenders can be placed on home confinement. Eligibility criteria for home confinement for terminally ill offenders under the pilot program is the same as that for elderly offenders, except that terminally ill offenders of any age and who have served any portion of their sentences, even life sentences, are eligible for home confinement. Terminally ill prisoners are those who are deemed by a BOP medical doctor to need care at a nursing home, intermediate care facility, or assisted living facility, or those who have been diagnosed with a terminal illness.

## Reauthorization of Reentry Research

The Second Chance Act authorized appropriations for a series of reentry-related research projects, including the following:

- a study by the National Institute of Justice (NIJ) identifying the number and characteristics of children with incarcerated parents and their likelihood of engaging in criminal activity;

- a study by NIJ identifying mechanisms to compare recidivism rates between states;

- a study by NIJ on the characteristics of individuals released from prison who do not recidivate;

- a study by the Bureau of Justice Statistics (BJS) analyzing the populations that present unique reentry challenges;

- studies by BJS to determine the characteristics of individuals who return to prison, jail, or a juvenile facility (including which individuals pose the highest risk to the community);

- annual reports by BJS on the profile of the population leaving prisons, jails, or juvenile facilities and entering the community;

- a national recidivism study by BJS every three years;

- a study by BJS of violations and revocation of community-based supervision (e.g., probation, parole, or other forms of post-incarceration supervision) violations;

- providing grants to states to fund studies aimed at improving data collection on former prisoners who have their post-incarceration supervision revoked in order to identify which such individuals pose the greatest risk to the community; and

- collecting data and developing best practices concerning the communication and coordination between state corrections and child welfare agencies, to ensure the safety and support of children of incarcerated parents.

The Second Chance Reauthorization Act reauthorizes appropriations for these research projects at $5 million for each fiscal year from FY2019 to FY2023.

## Evaluation of the Second Chance Act

Within five years of the enactment of the Second Chance Reauthorization Act, NIJ is required to evaluate grants used by DOJ to support reentry and recidivism reduction programs at the state, local, tribal, and federal levels. Specifically, NIJ is required to evaluate the following:

- whether the programs are cost-effective, including the extent to which the programs improved reentry outcomes;

- whether the programs effectively delivered services;

- the effects programs had on the communities and participants involved;

- the effects programs had on related programs and activities;

- the extent to which programs met the needs of various demographic groups;

- the quality and effectiveness of technical assistance provided by DOJ to grantees for implementing such programs; and

- other factors as may be appropriate.

NIJ is required to identify outcome measures, including employment, housing, education, and public safety, that are the goals of programs authorized by the Second Chance Act and metrics for measuring whether those programs achieved the intended results. As a condition of receiving

funding under programs authorized by the Second Chance Act, grantees are required to collect and report data to DOJ related to those metrics.

NIJ is required to make data collected during evaluations of Second Chance Act programs publicly available in a manner that protects the confidentiality of program participants and is consistent with applicable law. NIJ is also required to make the final evaluation reports publicly available.

## Recidivism Reduction Partnerships

The Second Chance Reauthorization Act requires BOP to develop policies for wardens of prisons and community-based facilities to enter into recidivism-reducing partnerships with nonprofit and other private organizations, including faith-based and community-based organizations to deliver recidivism reduction programming.

## Repealed Programs

The Second Chance Reauthorization Act repealed the authorization for the State, Tribal, and Local Reentry Courts program (Section 111 of the Second Chance Act), the Responsible Reintegration of Offenders program (Section 212), and the Study on the Effectiveness of Depot Naltrexone for Heroin Addiction program (Section 244).

# Other Provisions

In addition to correctional and sentencing reform and reauthorizing the Second Chance Act, the First Step Act contained a series of other criminal justice-related provisions.

## Modification of Good Time Credits

The act amended 18 U.S.C. Section 3624(b) so that federal prisoners can earn up to 54 days of good time credit for every year of their *imposed* sentence rather than for every year of their sentenced *served*. Prior to the amendment, BOP interpreted the good time credit provision in Section 3624(b) to mean that prisoners are eligible to earn 54 days of good time credit for every year they serve. For example, this means that an offender who was sentenced to 10 years in prison and earned the maximum good time credits each year could be released after serving eight years and 260 days, having earned 54 days of good time credit for each year of the sentence served, but in effect, only 47 days of good time credit for every year of the imposed sentence.[18]

## Bureau of Prisons Secure Firearm Storage

The act requires BOP to provide a secure storage area outside of the secure perimeter of a correctional institution for qualified law enforcement officers employed by BOP to store firearms or allow this class of employees to store firearms in their personal vehicles in lockboxes approved by BOP. The act also requires BOP, notwithstanding any other provision of law, to allow these same employees to carry concealed firearms on prison grounds but outside of the secure perimeter of the correctional institution.

---

[18] U.S. Government Accountability Office, *Bureau of Prisons: Eligibility and Capacity Impact Use of Flexibilities to Reduce Inmates' Time in Prison*, GAO-12-320, February 2012, pp. 23-25.

## Prohibition on the Use of Restraints on Pregnant Prisoners

The act prohibits BOP or the U.S. Marshals Service (USMS) from using restraints on pregnant inmates in their custody. The prohibition on the use of restraints begins on the date that pregnancy is confirmed by a healthcare professional. The restriction ends when the inmate completes postpartum recovery.

The prohibition on the use of restraints does not apply if the inmate is determined to be an immediate and credible flight risk or poses an immediate and serious threat of harm to herself or others that cannot be reasonably prevented by other means, or a healthcare professional determines that the use of restraints is appropriate for the medical safety of the inmate. Only the least restrictive restraints necessary to prevent escape or harm can be used. The exception to the use of restraints does not permit BOP or USMS to use them around the ankles, legs, or waist of an inmate; restrain an inmate's hands behind her back; use four-point restraints; or attach an inmate to another inmate. Upon the request of a healthcare professional, correctional officials or deputy marshals shall refrain from using restraints on an inmate or shall remove restraints used on an inmate.

If restraints are used on a pregnant inmate, the correctional official or deputy marshal who used the restraints is required to submit a report within 30 days to BOP or USMS, and the healthcare provider responsible for the inmate's health and safety, that describes the facts and circumstances surrounding the use of the restraints, including the reason(s) for using them; the details of their use, including the type of restraint and length of time they were used; and any observable physical effects on the prisoner.

BOP and USMS are required to develop training guidelines regarding the use of restraints on inmates during pregnancy, labor, and postpartum recovery. The guidelines are required to include the following:

- how to identify certain symptoms of pregnancy that require immediate referral to a healthcare professional;
- circumstances under which exceptions to the prohibition on the use of restraints would apply;
- in cases where an exception applies, how to use restraints in a way that does not harm the inmate, the fetus, or the newborn;
- the information required to be reported when restraints are used; and
- the right of a healthcare professional to request that restraints not be used and the requirement to comply with such a request.

## Placement of Prisoners Closer to Families

The act amends 18 U.S.C. Section 3621(b) to require BOP to house prisoners in facilities as close to their primary residence as possible, and to the extent practicable, within 500 driving miles, subject to a series of considerations. When making decisions about where to house a prisoner, BOP must consider bedspace availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns. BOP is also required, subject to these considerations and a prisoner's preference for staying at his/her current facility or being transferred, to transfer a prisoner to a facility closer to his/her primary residence even if the prisoner is currently housed at a facility within 500 driving miles.

## Home Confinement for Low-Risk Prisoners

The act amends 18 U.S.C. Section 3624(c)(2) to require BOP, to the extent practicable, to place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph. Under Section 3624(c)(2), BOP is authorized to place prisoners in prerelease custody on home confinement for 10% of the term of imprisonment or six months, whichever is shorter.

## Increasing the Use and Transparency of Compassionate Release

The act amends 18 U.S.C. Section 3582(c) regarding when a court can modify a term of imprisonment once it is imposed. Under Section 3582(c)(1)(A), a court, upon a petition from BOP, can reduce a prisoner's sentence and impose a term of probation or supervised release, with or without conditions, equal to the amount of time remaining on the prisoner's sentence if the court finds that "extraordinary and compelling reasons warrant such a reduction," or the prisoner is at least 70 years of age, the prisoner has served at least 30 years of his/her sentence, and a determination has been made by BOP that the prisoner is not a danger to the safety of any other person or the community. This is sometimes referred to as *compassionate release*. The amendments made by the act allow the court to reduce a prisoner's sentence under Section 3582(c)(1)(A) upon a petition from BOP or the prisoner if the prisoner has fully exhausted all administrative rights to appeal a failure by BOP to bring a motion on the prisoner's behalf or upon a lapse of 30 days from the receipt of such a request by the warden of the prisoner's facility, whichever is earlier.

The act also requires BOP within 72 hours of a prisoner being diagnosed with a terminal illness to notify the prisoner's attorney, partner, and family about the diagnosis and inform them of their option to submit a petition for compassionate release on the prisoner's behalf. Within seven days, BOP is required to provide the prisoner's partner and family with an opportunity to visit. BOP is also required to provide assistance to the prisoner with drafting and submitting a petition for compassionate release if such assistance is requested by the prisoner or the prisoner's attorney, partner, or family. BOP is required to process requests for compassionate release within 14 days.

If a prisoner is mentally or physically unable to submit a petition for compassionate release, BOP is required to notify the prisoner's attorney, partner, or family that they can submit a petition on the prisoner's behalf. BOP is required to accept and process requests for compassionate release that are drafted by the prisoner's attorney, partner, or family. BOP is also required to assist prisoners who are mentally or physically unable to prepare their own request if such assistance is requested by the prisoner's attorney, partner, or family.

BOP is required to make available to prisoners information regarding their ability to request compassionate release, the timeline for submitting a request, and their right to appeal to a court the denial of a request after exhausting all administrative appeals BOP makes available to prisoners. This information is to appear in written materials for prisoners and staff, and be visibly posted

The act also requires BOP to submit annual reports to the House and Senate Judiciary Committees that provides data on how BOP is processing applications for compassionate release.

## Identification for Returning Citizens

The act amends the authorization for the federal prisoner reentry initiative (34 U.S.C. Section 60541(b)) to require BOP to assist prisoners and offenders who were sentenced to a period of

community confinement[19] with obtaining a social security card, driver's license or other official photo identification, and birth certificate prior to being released from custody.

The act also amends 18 U.S.C. Section 4042(a) to require BOP to establish prerelease planning procedures to help prisoners apply for federal and state benefits and obtain identification, including a social security card, driver's license or other official photo identification, and birth certificate. BOP is required to help prisoners secure these benefits, subject to any limitations in law, prior to being released. The act also amends Section 4042(a) to require prerelease planning to include any individuals who only served a sentence of community confinement.

## Expanding Prisoner Employment Through the Federal Prison Industries

The act authorizes the Federal Prison Industries (FPI, also known by its trade name, UNICOR) to sell products to public entities for use in correctional facilities, disaster relief, or emergency response; to the District of Columbia government; and to nonprofit organizations.[20] However, FPI is not allowed to sell office furniture to nonprofit organizations.

The act also requires BOP to set aside 15% of the wages paid to prisoners with FPI work assignments in a fund that will be payable to the prisoner upon release to aid with the cost of transitioning back into the community.

## De-escalation Training

The act requires BOP to provide training to correctional officers and other BOP employees (including correctional officers and employees of facilities that contract with BOP to house prisoners) on how to de-escalate encounters between a law enforcement officer or an officer or employee of BOP and a civilian or a prisoner, and how to identify and appropriately respond to incidents that involve people with mental illness or other cognitive deficits.

## Evidence-Based Treatment for Opioid and Heroin Abuse

Within 90 days of enactment of the act, BOP is required to submit a report to the House and Senate Judiciary and Appropriations Committees that assesses the availability of, and the capacity of BOP to provide, evidence-based treatment to prisoners with opioid and heroin abuse problems, including MAT, where appropriate. As a part of the report, BOP is required to provide a plan to expand access to evidence-based treatment for prisoners with heroin and opioid abuse problems, including MAT, where appropriate. After submitting the report, BOP is required to execute the plan it outlines in the report.

The act places a similar requirement on the Administrative Office of the United States Courts (AOUSC) regarding evidence-based treatment for opioid and heroin abuse for prisoners serving a term of supervised release. AOUSC has 120 days after enactment to submit its report to the House and Senate Judiciary and Appropriations Committees.

---

[19] *Community confinement* is defined as "residence in a community treatment center, halfway house, restitution center, mental health facility, alcohol or drug rehabilitation center, or other community facility."

[20] For background information on FPI, see CRS Report RL32380, *Federal Prison Industries: Background, Debate, Legislative History, and Policy Options*.

## BOP Pilot Programs for Mentoring and Rescue Animals

The act requires BOP to establish two pilot programs that are to run for five years in at least 20 facilities. The first is a mentoring program that is to pair youth with volunteer mentors from faith-based or community organizations.[21] The other program is to use prisoners to provide training and therapy to animals seized by federal law enforcement officers and to abandoned or rescued animals in the care of organizations that provide shelter and similar services.

## National Prisoner Statistics Program

The act requires BJS to expand data collected under its National Prisoner Statistics program to include 26 new data elements related to federal prisoners. Some of the data the act requires BJS to collect include the following:

- the number of prisoners who are veterans;
- the number of prisoners who have been placed in solitary confinement in the past year;
- the number of female prisoners who are known to be pregnant and the result of those pregnancies;
- the number of prisoners who received MAT to treat a substance abuse problem;
- the number of prisoners who are the parent or guardian of a minor child;
- the number of assaults on BOP staff by prisoners and the number of criminal prosecutions that resulted from those assaults;
- the capacity of recidivism reduction programs and productive activities to accommodate eligible prisoners at each BOP facility; and
- the number of prisoners enrolled in recidivism reduction programs and productive activities at each BOP facility, broken down by risk level and by program, and the number of those enrolled prisoners who successfully completed each program.

Starting one year after the enactment of the act, BJS is required to submit an annual report to the House and Senate Judiciary Committees for a period of seven years that contains the data specified in the act.

## Healthcare Products

The act requires BOP to provide tampons and sanitary napkins that meet industry standards to prisoners for free and in a quantity that meets the healthcare needs of each prisoner.

## Federal Interagency Reentry Coordination

The act requires the Attorney General to coordinate with the Secretary of Housing and Urban Development, the Secretaries of Labor, Education, Health and Human Services, Veterans Affairs, and Agriculture, and the heads of other relevant federal agencies, as well as interested persons, service providers, nonprofit organizations, and state, tribal, and local governments, on federal

---

[21] *Youth* is defined as a "prisoner who was 21 years of age or younger at the time of the commission or alleged commission of the criminal offense for which the individual is being prosecuted or serving a term of imprisonment, as the case may be."

reentry policies, programs, and activities, with an emphasis on evidence-based practices and the elimination of duplication of services.

The Attorney General, in consultation with the secretaries specified in the act, is required to submit a report to Congress within two years of the enactment of the act that summarizes the achievements of the coordination, and includes recommendations for Congress on how to further reduce barriers to successful reentry.

## Juvenile Solitary Confinement

The act prohibits juvenile facilities from using room confinement for discipline, punishment, retaliation, or any reason other than as a temporary response to a covered juvenile's behavior that poses a serious and immediate risk of physical harm to any individual.[22] The provisions of the act only apply to juveniles who have been charged with an alleged act of juvenile delinquency; have been adjudicated as delinquent under Chapter 403, Title 18 of the U.S. Code; or are facing charges as an adult in a federal district court for an alleged criminal offense.

Juvenile facilities are required to try to use less restrictive techniques, such as talking with the juvenile in an attempt to de-escalate the situation or allowing a mental health professional to talk to the juvenile, before placing the juvenile in room confinement. If the less restrictive techniques do not work and the juvenile is placed in room confinement, the staff of the juvenile facility is required to tell the juvenile why he/she is being placed in room confinement. Staff are also required to inform the juvenile that he/she will be released from room confinement as soon as he/she regains self-control and no longer poses a threat of physical harm to himself/herself or others. If a juvenile who poses a threat of harm to others does not sufficiently regain self-control, staff must inform the juvenile that he/she will be released within three hours of being placed in room confinement, or in the case of a juvenile who poses a threat of harm to himself/herself, that he/she will be released within 30 minutes of being placed in room confinement. If after the maximum period of confinement allowed the juvenile continues to pose a threat of physical harm to himself/herself or others, the juvenile is to be transferred to another juvenile facility or another location in the current facility where services can be provided to him/her. If a qualified mental health professional believes that the level of crisis services available to the juvenile are not adequate, the staff at the juvenile facility is to transfer the juvenile to a facility that can provide adequate services. The act prohibits juvenile facilities from using consecutive periods of room confinement on juveniles.

## Author Information

Nathan James
Analyst in Crime Policy

---

[22] *Room confinement* means the involuntary placement of a juvenile alone in a cell, room, or other area for any reason.

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.